1

1                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF KENTUCKY
2               SOUTHERN DIVISION at LONDON
                        - - -
3

UNITED STATES OF AMERICA,    : Docket No. 21-CR-019
4                       :
             Plaintiff,   : London, Kentucky
5                       : Thursday, August 23, 2022
                       :
6  versus               : 8:15 a.m.
                       :
7  JOHN L. STANTON,          :  Jury Trial.  Day 1 of 7
                       :
8             Defendant.  :

9                      - - -
              TRANSCRIPT OF JURY TRIAL
10            BEFORE ROBERT E. WIER
          UNITED STATES DISTRICT COURT JUDGE
11                     - - -

12  APPEARANCES:

13  For the United States:      ANDREW E. SMITH, AUSA
                        U.S. Attorney's Office
14                     260 West Vine Street
                     Suite 300
15                     Lexington, Kentucky 40507

16  For the Defendant:          PETER J. STRIANSE, ESQ
                        Tune, Entrekin & White
17                     5000 11th Avenue N.
                     Suite 600
18                     Nashville, Tennessee 37203

19

20  Court Reporter:            KIMBERLEY KEENE, RMR
                        Official Court Reporter
21                     Room 317
                     310 South Main Street
22                     London, Kentucky  47041
                     (606) 877-7968
23

24     Proceedings recorded by mechanical stenography,
  transcript produced by computer.
25

2

1      (Proceedings commenced at 8:15 a.m.)

2      (Final pretrial conference was held.)

3      (Voir dire was conducted and a jury was impanelled and

4  sworn.)

5      (Jury entered the courtroom at 1:40 p.m.)

6          THE COURT:  All right.  Ladies and gentlemen of the

7  jury, thank you for your attention today, for the effort that

8  you made, your cooperation.  And thank you in advance for the

9  serious way I know that you'll take the important job of jury

10  service in this case.

11      I'm going to begin by having the clerk place you under

12  oath.  So if the clerk would apply the trial oath to the jury,

13  please.

14      (Oath administered to proper jury panel.)

15          THE COURT:  Be seated, please.

16      I'm going to cover some housekeeping and preliminary

17  instructions with you.  I'll give you instructions at

18  different points throughout the trial.  Let me give you some

19  now.  I typically will give episodic instructions when

20  something happens or I need to give you some guidance on a

21  particular issue as the case is unfolding.  And then, at the

22  end, I'll give you a lengthy set of substantive and procedural

23  instructions.

24      All of the instructions matter, so listen to all of them,

25  pay attention to all of them, follow all of them.  I'll give

3

1    you now some preliminary instructions.

2         And so housekeeping matters pertaining to the trial.

3         Now, schedule-wise.  We will start every morning at 8:30

4    with proof.  That means you need to be here, checked in at

5    8:15 ready to go.  I'm confident that you will be on time.

6    That's critical that that happen so that we can stay on track.

7    We can't start without you.

8         So if you are on the way in the morning and something

9    happens or you get delayed or something is going to interfere

10   with you being here on time, do contact the clerk immediately.

11   Make sure that the clerk has your cell phone information so

12   that if we need to reach you or we haven't heard from you, or

13   there is a need for communication, we can get to you the

14   quickest way possible.  Both directions.  So be sure we have

15   got your contact information.

16        Do be here on time and ready to go, checked in by 8:15.

17        Normally, I'll go for about an hour and a half between

18   breaks.  Sometimes a little bit shorter, almost never longer

19   than that.  So it is always an hour and 15 minutes, and

20   sometimes hour and a half.  I'll try to keep it to really a

21   predictable schedule.  We'll start in the morning, go for

22   about an hour and a half, take a morning break; go for an hour

23   and a half, take a lunch, come back; afternoon, same kind of

24   thing.  Go for a hour and a half, take a break, go again, take

25   a break, and then have a shorter end-of-day session.  It is

4

1    typically what I do.

2         Now, I've raised four sons.  I've been on many long road

3    trips.  I've been accused many times of being a tyrant when it

4    comes to breaks.

5         So this is what I'll say:  I'm trying to make progress in

6    the case.  We can only do that by being in here working.  But

7    I recognize there may be times when my schedule aims,

8    notwithstanding, we need to take a break.  If you need it,

9    that's fine.  I'm going to let you take one.

10        So if we're not close to a break and you need to take a

11   break to be comfortable, just raise your hand say, Judge, can

12   we take a break?  I'll give you a break early.  Just remember

13   I'm trying to keep us on track to get the case resolved in a

14   timely way.  So I don't want it to be a grueling event for

15   you.  I don't want it to be distracting or uncomfortable.  So,

16   of course, if are you not feeling well or need to take a

17   break, raise your hand, I'll accommodate that.  But that's my

18   typical approach.  So do keep that in mind.

19        There will be times when I'm conferring with the lawyers

20   about something.  We might have some legal issues to take up.

21   Something might come up that we need to talk about separately.

22   I'll try to keep that to a minimum.  I'm going to do our work

23   when you are on a break or early in the morning or late in the

24   evening so that we don't keep you idle while you're here ready

25   to work.

1    There will be a little bit of that.  I'll try to keep

2    that to a minimum.  You have my word, if you're waiting, we're

3    working.  I promise.  I'm not taking your time in any way for

4    granted.

5    Feel free to bring into the courtroom any drinks.  You're

6    welcome to bring in drinks.  That's totally fine.  Bearing in

7    mind the break schedule that I talked about.  You know your

8    own body.  So you are welcome to bring in coffee, water.

9    Anything you want is fine.

10   I recommend wearing layers because the courtroom can --

11   the temperature can fluctuate quite a bit.  So sometimes it is

12   kind of chilly, sometimes it is hot.  And the building doesn't

13   turn with my agility.  We'll try to keep it comfortable.

14   I'm wearing a wool blanket the whole time, so I'm not a

15   good gauge for the temperature.  If you wear layers, you can

16   add or subtract.  And my case manager has an enormous blanket

17   and sometimes you'll see her just wrapped up to under her

18   chin, covered up all the way.  So anyway, wear what you need

19   to, to be comfortable as we go through the trial.

20   I'll typically go until about 5:30 in the evening.

21   Sometimes we'll break a little bit earlier, if it is a logical

22   stopping point.  I rarely would go past 5:30.  If I've got a

23   witness on the stand and it is 5:28 and the lawyers say five

24   more minutes and we can be finished with this witness, maybe

25   then.  But very rarely go past 5:30.  If we have a reason to

6

1    stop at 5:15 that makes sense, I'll break a little early.  I

2    typically go 8:30 to 5:30 as I've described it.

3        Now, when the case is at its end and the arguments have

4    been made, I've given you the instructions, then the schedule

5    is going to mostly be up to you.  Once it is submitted to you,

6    I want you to take all of the time that you need to take to

7    fully, completely, and fairly decide the case.  There is no

8    clock on it.  There is no time pressure.  No outside limit.

9        So once it is given to you, you can work late.  You can

10   work past dinner, we'll feed you.  You can work into evening

11   as late as the group wants to work.

12       If you get to the end of the deliberations day and you

13   think we want to go home and come back the next day, that will

14   be fine.  We'll accommodate that, too.  I want you to do what

15   works for you as a group.

16       Confer on that when the time comes.  That will be after

17   the case.  So we'll cross that bridge when we come to it.  I

18   don't want you to feel there is any time pressure at the end.

19   There is not.  Take the time you need to fairly decide the

20   case.

21       More on that later.

22       Do pay attention to where you're seated.  That will be

23   your seat all the way through.  Remember to return to that

24   point.

25       If at any point you cannot hear or a witness, the

1    witnesses will all be in the witness chair.  If you can't hear

2    a witness, raise your hand.  I'll correct that to make sure

3    that you can hear.

4        We will display exhibits to you.  A lot of them will be

5    electronic.  They will ultimately be on the screen in front of

6    you.  What will happen is, normally, the witness will see that

7    exhibit first, and so you won't see it until I've admitted

8    that into evidence.

9        So the witness might be looking at it.  I might be

10   looking, the lawyers, and it might not be on your screen yet

11   because it is not admitted.  Once it is admitted, then it

12   ought to be on your screen.  If it's not working, just raise

13   your hand and we'll fix that to be sure you can see it.

14       Above all else, you need to see what the evidence is.

15       Now, your duty as jurors is to find from the evidence

16   what the facts are in the case.  And you alone are the judges

17   of the facts.  Every time that you the leave courtroom,

18   everybody is going to stand up to give you respect as the

19   triers of the fact.  That's your role in the case.

20       You will apply those facts to the law I give you and

21   reach a decision in the case in accordance with your oaths.

22   And we went over the oath earlier.  As I said, you are bound

23   to follow the law I give you.  I know you'll all do that

24   consistent with that oath.

25       Only you can decide the facts.  Nobody else.  It is not

8

1    up to me.  Not up to the lawyers.  The factual decisions will

2    be the jury's to make in this case.

3         Now, your conduct.  I've already touched on this a little

4    bit.

5         During the case, during the trial, you cannot talk about

6    the case with anyone, including each other.  So you can't

7    discuss the case in the jury room.  You can't go home and talk

8    about the case.  You can't talk to your family about it.  You

9    can't talk to your friends about it.

10        It is very tempting.  Of course, you'll go home and your

11   family is going to say, What kind of case are you on?  Tell me

12   about the case you're on.  And you can't talk about it.

13        Just blame me.  Just say the judge told me I can't do it.

14   I can't do it.  That's a convenient person to blame.  I'm glad

15   to take the blame.

16        It's also true.  I'm ordering you not to do it.  So

17   pursuant to your oath, pursuant to your obligation as jurors,

18   you simply cannot discuss the case with anyone, and that does

19   include each other.

20        So as the trial is going on, you can't, during a break,

21   lean over to your fellow juror and say, what do you think

22   about Witness X?  Did you believe what he was saying?  Did

23   you?  What was your reaction to that exhibit?  You can't do

24   it.  It is off limits until all of the evidence is in, I've

25   instructed you.  At that point, I'll release you to

1   deliberate, then you'll have to talk about it.  But until

2   then, you will have to refrain from it completely the entire

3   time.

4        Now, as you go around the courthouse, you might pass the

5   lawyers.  You might pass the parties.  You might pass people

6   connected to the case.  None of them are going to talk to you.

7   They're not going to greet you.  They're not going to exchange

8   pleasantries with you.  They're not going to talk about the

9   weather with you.

10        They're not doing that because they're rude, but because

11  they're protecting the integrity of the trial.  They know they

12  should not have any personal contact with you.  These are all

13  pleasant people, friendly people.  In another context I know

14  they would be glad to talk to you.

15        But in a trial, they have got to maintain a professional

16  distance from the jurors.  So don't take it personally.  I've

17  told them to do that.  Bear that in mind.  If they walk past

18  you and don't greet you, make eye contact, speak to you, it is

19  because they're fulfilling their obligations as part of this

20  trial.

21        Of course, it would be inappropriate for anyone to

22  contact you pertaining to the case.  That's highly unlikely.

23  In the very unlikely event someone contacted you out of the

24  blue about this case, you should not talk to that person and

25  you should alert the Court to that immediately.  That would be

1    extremely rare.  In the event that should happen, let the CSO

2    know and I will involve myself as needed.

3         Now, as I told you, you can't try to educate yourself in

4    any way or research the case.  We're all curious people.  We

5    have all got the Internet.  It is right at your fingertips.

6    And so it would be tempting, when you hear a fact or a phrase,

7    or a topic or an idea or about a person, it would be tempting

8    to go do some research.

9         What does this mean?  Where is this location?  Who is

10   this person?  What can I learn about this?  That's all

11   completely off limits and would be inconsistent with your oath

12   if you engaged in any of that conduct.

13        Your verdict has got to be based on the evidence.  The

14   witnesses, the exhibits I admit, and my instructions.  So you

15   simply cannot go anywhere you've heard about in the case to

16   find out about it.  Any research, any reading, any outside

17   material, it is all off limits.  I know you'll all follow this

18   admonition.

19        Finally, you have to intentionally avoid evaluating the

20   case, forming opinions, doing an assessment of what the proof

21   is telling you.  You really just have to take it in and wait.

22        Now, that sounds hard to do.  I understand.  Let me

23   suggest to you that we all do this regularly in different

24   contexts.

25        So, for example, when you go to the movies, you're

1    halfway through a movie, you know you haven't seen the whole

2    thing.  You are waiting.  You're waiting to assess the movie

3    until you've seen it all.

4        You're reading a book.  You're three chapters in, you

5    know there is more to come.  You know you haven't seen it all.

6    So you're waiting to evaluate that full work until you've seen

7    the whole work.

8        Same thing here in a much more serious and consequential

9    context.  So as the proof is coming in, just take it in,

10   absorb it, but don't evaluate it.  Don't assess it until the

11   conclusion of the case when I release you to do that.

12       Now, those are the admonitions, and I'll repeat them to

13   you almost every time we take a break.  That's how important

14   they are.

15       And then, when you come back from a break -- especially

16   an overnight -- I always say, Has everyone followed the rules

17   that I have given you?  Has anyone not followed those rules?

18   I expect you to comply with them the entire time.  If you

19   don't, I need to know about that.  If you are aware that

20   another juror has not followed the rules, I need to know about

21   that.  It is central to the fairness of the process, integrity

22   of the trial.  Take them all seriously.  I take them

23   seriously.  I know you will as well.

24       Now, do they have their notebooks?

25            COURTROOM DEPUTY:  Yes, Your Honor.

1        THE COURT:  Okay.  You have notebooks there, and

2    those are available to you.  Here is what I would say about

3    notebooks.  Write your number on the outside.  That will be

4    your notebook.  Nobody else is going to look at it.  Nobody

5    else is ever going to read it.  Use that notebook in a way

6    that would be helpful to you.

7        And we all take in information differently.  Some people

8    learn just by listening.  Some people are note takers.  So you

9    are free to use that notebook to take notes if you want.  It

10   is completely voluntary.  If you think it is going to help you

11   take notes, by all means, take notes.  You might be an hour or

12   two in and think this isn't helping me, and you might stop

13   taking notes.  That's totally fine.

14       You might not be taking notes to begin with and think I

15   wish I would have started taking notes, and start taking

16   notes.  That's fine, too.  Whatever is going to be most

17   helpful to you, that's what you can do.  It's an individual

18   decision.  Nothing more.

19       I would say, if you do take notes, I want you to

20   segregate the parts of the case you're taking notes about.

21   So, for example, the lawyers are going to make arguments or

22   opening statements here in a few minutes.  So I would write in

23   my notebook "Opening Statement" so that you know under that

24   part, you are hearing from the lawyers.

25       Why is that important?  What the lawyers say is not

1    evidence.  What I say is not evidence.  And so if you are

2    taking notes about what the lawyers are saying, that is --

3    that's notes about advocacy.  It is not notes about the

4    evidence itself.

5        That's different from a witness on the stand who is

6    testifying.  Taking notes about that.  That's notes about

7    evidence.  So I want your notebooks to reflect what part of

8    the notes you're taking notes about, if you elect to do that.

9        You'll leave your notebook in your chair every night.

10   We'll collect the notebook, my case manager will.  She will

11   lock them up.  No one is going to look at them.  You'll get to

12   take your notebook with you only when you go back to

13   deliberate at the end of the case.  At that point, you'll be

14   able to use it if you want.  I'll give you more instructions

15   about that.

16       But you have my word, nobody is ever going to read what

17   you write.  You can safely write in there whatever you want

18   and nobody will ever review it.  I promise you that.

19       Okay.  Any questions about my instructions so far for

20   anybody?

21       Okay.  All right.  I will invoke Rule 615.  Any witnesses

22   would need to wait outside the courtroom until called and

23   released, except for the exception stated in the rule.

24       I believe that we now are ready for opening statements.

25   And, Mr. Smith, glad to hear from you.

1            MR. SMITH:  Thank you, Your Honor.

2            THE COURT:  Yes, sir.

3            MR. SMITH:  Just one moment to have our technology up

4     and running.

5        Ladies and gentlemen, is the screen on in front of you?

6     Can you see that?  Okay.  Your Honor, may I proceed?

7            THE COURT:  Yes, you may.

8            MR. SMITH:  May it please the Court.  Counsel.

9     Ladies and gentlemen, let me begin by saying to you, thank you

10    for your time.  Thank you for serving.  The judge has told you

11    about the importance of jury service.  Everything about it.

12       Our justice system boils down to this:  It doesn't work

13    without you here.  We know you are busy.  We know you have

14    lives.  We don't take that for granted, so thank you for being

15    here.

16       In January of 2019, a man named Shawn Brown drove about

17    four hours from Knox County, Kentucky to this building.  This

18    was Gateway Medical Associates, supposedly a medical clinic in

19    Clarksville, Tennessee.

20       And although it was called "Gateway Medical Associates,"

21    Mr. Brown wasn't there looking for a good doctor.  Instead,

22    Mr. Brown, like others who visited this place, was a drug

23    addict, and he was looking for a supply of pills that he could

24    abuse, a supply of pills that he could sell.

25       When Shawn Brown walked into that building, he had a

1    number of drugs in his body that shouldn't have been there,

2    including hydrocodone, hydromorphone, oxycodone, Xanax, a

3    variety of drugs that are dangerous to take, that are

4    dangerous when any interact with other drugs.

5         On his first visit, he paid several hundred dollars.  He

6    waited and he saw the defendant, Dr. John Stanton.

7         And after a brief visit, without any meaningful medical

8    decision making, he got prescriptions for oxycodone and

9    oxymorphone.  Two very powerful and addictive opioid

10   painkillers, both with high street value.

11        Dr. Stanton didn't wait to see what the results of the

12   drug screen were before writing those prescriptions.  And that

13   drug screen would, and did, reveal the presence of those drugs

14   I just told you about running through Mr. Brown's body.

15        Shawn Brown walked out with those prescriptions.  He

16   found his next supply.

17        And you'll hear that shortly thereafter, his wife, Misty

18   -- who was also an addict -- joined up at this clinic.  For

19   months in a row, they came and obtained pills from this

20   clinic.  Pills that they could use.  Pills that they could

21   sell.  And that's what's this case is about.

22        It is about patients like Misty and Shawn Brown, and

23   others that visited this clinic, who were addicted and looking

24   for an opportunity to use the pills to make money, to profit

25   off other people's addiction, and how this clinic operated as

1    an innocent looking supply for drug traffickers.

2         And ultimately, this case is about the defendant, John

3    Stanton, who had an obligation as a physician to prescribe

4    properly, but who knowingly conspired to profit off of

5    people's addiction.

6         Now, I want to talk a little bit about how this clinic

7    operated and the facts of the case that I anticipate you'll

8    hear based on the evidence.

9         But before we do that, I need you to hear a little bit

10   about how federal law works with controlled substances.  You

11   probably heard the term controlled substances, at least used

12   during voir dire this morning.

13        Controlled substance is a drug that Congress has decided,

14   and in conjunction with the DEA and other agencies, to

15   schedule.  A "schedule" means that they are controlled, that

16   only certain people can dispense or handle them.

17        So there is a Schedule II controlled substance, that's

18   the strongest that can lawfully be prescribed, down to a

19   Scheduled V controlled substance.  They're scheduled based on

20   their potential for addiction, abuse, and harmfulness.

21        Now, as you may be aware, there are certain types of

22   people who can handle and dispense controlled substances.

23        But the default rule in our country under federal law is

24   that no one can dispense or distribute them.

25        If you dispense and distribute a controlled substance

1     without an authorization, you're a drug dealer.  That

2     authorization is limited.

3         In the case of doctors, they can prescribe controlled

4     substances, but not just for any reason.  Not when they feel

5     like it, and not just on a whim.

6         They have to do it -- and you'll hear this term over and

7     over and over again in this case.  They have to do it for a

8     legitimate medical purpose while acting in the usual course of

9     professional practice.  It's a mouthful.

10        But as you'll hear, essentially, what that means is the

11    doctor has to behave like a doctor.  They have to behave

12    consistent with acceptable standards of practice, and

13    standards that are outlined and were clear in Tennessee when

14    all of this conduct occurred.

15        So think of it like this:  A doctor is authorized, when

16    they are prescribing within the usual course of professional

17    practice and for a legitimate medical purpose.  But if they're

18    not, and they're in that red area, then they are distributing

19    controlled substances, just like anyone else.  If they

20    knowingly do that, then that's unlawful.  And that's what this

21    case is about.

22        Now, you're going to hear that there are standards for

23    prescribing controlled substances.  That's how we know what

24    the usual course of professional practice is.

25        The biggest thing to remember with all of this is just

1    because someone is in pain, doesn't mean they need a pain

2    pill.  That's kind of common sense.

3        But controlled substances, particularly opioid

4    painkillers, have a lot of different bad side effects,

5    including overdose, addiction, and a number of things that it

6    does to the body.

7        And it actually is only used to treat certain kinds of

8    pain in certain circumstances.  It is not meant to treat every

9    pain all the time.  So just because you're in pain, doesn't

10   mean you need a pill.

11       You'll hear that in Tennessee there are pain guidelines

12   that addressed how and when a doctor should prescribe

13   controlled substances.  And you'll hear about a variety of

14   things that -- the work of a doctor should do when they're

15   prescribing.

16       This includes taking a history, diagnosing a problem,

17   coming up with a treatment plan, considering nonopioids first.

18       And then, if you do choose opioids, as a measure of last

19   resort, using the lowest effective dose.  Using the various

20   things that help prevent risk of diversion and abuse.  I'm

21   going to talk about that in a moment.

22       And the doctor's supposed to measure functional

23   improvement.  So, again, a doctor can prescribe these pills,

24   but only when acting within the usual course of professional

25   practice, consistent with guidelines like the ones you are

1   seeing.

2       Doctors are also supposed to keep and maintain accurate

3   medical records.  Every doctor is supposed to do that.

4       Now, in this case, a particular important issue that I

5   would like you to listen out for is the concept of abuse and

6   diversion.

7       Abuse is, probably you already understand, that is using

8   the pills as you are not supposed to, become addicted.

9       Diversion is a concept that you'll hear a lot about in

10  this case.  Diversion means that somebody is diverting the

11  controlled substances outside of where it is intended to go.

12      So it's supposed to go from a manufacturer to the

13  pharmacy.  Only supposed to be dispensed pursuant to a good

14  prescription, and then the person who gets the drugs is

15  supposed to keep those drugs, take them as prescribed.

16      Diversion happens when those pills go outside that

17  intended stream and used for unintended or illegitimate

18  purposes.

19      Pain doctors can, and should, do certain things to pick

20  up on abuse and diversion.  These pills are sought after.

21  They're addictive.  It is known in this community that these

22  drugs are sought out for that reason.  So doctors have to take

23  care before they write that prescription.  You don't just

24  believe everything somebody says when they walk in the door.

25      You need to use objective measures to figure out what the

1    patient's doing.

2         One of things is called a "pill count."  A pill count is

3    kind of like it sounds like.  You count the pills.  A doctor

4    will call a patient in, or a pharmacy will call a patient in,

5    at a certain point in time and at that point in time they will

6    analyze how many pills somebody should have at that point in

7    the month.

8         If the patient is short, they have less than they should

9    have, that means they're either taking them too fast or

10   something else happened to the pills, including giving them to

11   someone, selling them.  So that's a pill count.  An objective,

12   honest way to measure if somebody is complying.

13        The other thing you'll hear a lot about is drug testing.

14   Doctors drug test patients to figure two things out.

15        One, is the drug I'm prescribing, is that in the

16   patient's body?

17        And then the second is, is there something else in the

18   patient's body that shouldn't be there?  Like an illicit drug

19   or some type of pharmaceutical drug.

20        Both of those things matter, right?  If a patient is not

21   taking the drug a doctor is prescribing, then the doctor

22   should wonder why.  Is that pill being diverted?  Is is not

23   being used?  Is it not useful?

24        If they're testing positive for things that are not

25   prescribed, that they shouldn't have in their body, again, the

1   doctor should wonder why, take action.  Dangerous drug

2   interactions can also be an indicator that that person is

3   abusing drugs.

4         So you'll hear two kinds of drug tests, results.  One is

5   called a "consistent result."  That's when you have the drugs

6   that are being prescribed.  They're in your system, and you

7   don't have anything else.

8         But there is also "inconsistent results."  An

9   inconsistent negative is when you don't have the drug in your

10   system that the doctor has prescribed.  Inconsistent positive

11   is when a drug that isn't prescribed is in your system.

12         So, for instance, if you were positive for a street drug,

13   heroin, fentanyl, meth.  That would be an inconsistent

14   positive.  That would be a big deal because you're getting a

15   Schedule II painkiller like oxycodone or oxymorphone.

16         When abuse and diversion occurs, there's really two kinds

17   of scenarios with that particular problem.  You'll hear about

18   this in this case.

19         First is when a patient walks into a clinic.  They give

20   the clinic money, they get their pills, and then the patient

21   either abuses the drugs themselves or that patient then

22   diverts the drugs.  They share it with a friend, they sell it

23   to a friend.  Either of those are a clear sign of abuse and

24   diversion.

25         Either of those things are reasons that the doctor should

1     not prescribe controlled substances.  It is common sense.

2          The other thing that will happen -- and this is something

3     that you'll hear about directly in this case -- is when

4     third-parties get involved to gain access to pills.

5          You'll hear about a concept called "sponsorship."

6     Sponsors are hooked to find a patient and provide assistance

7     to that patient so the patient can go to the clinic.  They

8     give the patient money, give the patient transportation.

9          And so the patient goes through the same process.  They

10    go to the clinic, pay their money, get their prescription.

11    And then somewhere, all of the drugs make their way back to

12    the sponsor who then obtains them, sells them, diverts them.

13         Okay.  So that is how pills end up on the street that are

14    sold, that are abused.  This is how it often happens, as

15    you'll hear in this case.

16         Unfortunately, neither of those are just hypotheticals.

17    Those happened with GMA, the clinic you're about to hear

18    about.  This happened at this clinic where Dr. Stanton, as

19    you'll hear, was the medical director.

20         Now, in July of 2016, you'll hear that Tennessee was

21    already regulating pain clinics.  So these were special

22    clinics that were regularly subject to rules and regulations

23    under Tennessee law.

24         One of those rules changed slightly in July of 2016.

25    That required clinics to have a certain type of qualification

1        for the medical director.  So they had to have a medical

2        director that's a physician, and that medical director had to

3        have certain qualifications.

4            And now GMA, as you will hear -- as I'm calling it

5        Gateway Medical Associates, GMA, you'll hear, I'm using those

6        interchangeably -- was owned by a Dr. James Maccarone.

7        Dr. James Maccarone, he owned GMA.  He established it well

8        before 2010.  And after 2010 began transitioning more and more

9        to pain practice.  He did not qualify to be medical director.

10           So in July of 2016, Defendant John Stanton agreed to

11       serve as the medical director at Gateway Medical Associates,

12       at GMA.

13           As the medical director, as you will hear, there were

14       rules.  And rule number one was that he was required to

15       oversee all of the pain management services provided at the

16       clinic.  The same applies.  He's the medical director.  He's

17       supposed to oversee what happens at the clinic.

18           You'll also hear there were other regulations and

19       requirement variations by having policies in place,

20       regulations about medical records keeping.

21           And so while Dr. Stanton, who was a trained orthopedic

22       surgeon, who was the medical director because he had that

23       higher level qualification, was a pain management specialist,

24       during his tenure as medical director, this is what happened

25       at GMA:

1     Patients would travel to GMA.  Dr. Maccarone, for the

2     first period of time here, was the one who was primarily

3     prescribing to patients.  Maccarone would see patients at all

4     the hours of the night.  Routinely seeing patients past

5     midnight.  1:00 a.m., 2:00 a.m., 3:00 a.m.

6     A number of patients traveled to this clinic from right

7     here in Laurel County, surrounding areas of Kentucky.  Driving

8     four or five hours each way.  The patients, keep in mind, that

9     are supposedly in so much pain that they need heavy opioid

10    painkillers.  They would wait around for hours and hours,

11    sometimes not getting out of there until very early morning

12    hours.

13    They would walk out with prescriptions, often for a

14    combination of oxycodone and oxymorphone, both of which are

15    sought after and diverted medications.  They would pay fees

16    not with their insurance, but out of pocket.  These are

17    prepaid debit cards and credit cards, regularly exceeding $400

18    a month, sometimes even 5 and $600.

19    You heard about pill counts earlier.  I told you about

20    that being one of the ways that you could combat diversion and

21    abuse.  Listen in this case to how GMA did pill counts.

22    Patients could pay something called a "no-show fee" if they

23    didn't come.  So if they don't have their pill count, extra,

24    $150.  No pill count.  That was allowed to continue and

25    persist.

1      You will see a patient -- I've also talked about drug

2   screens.  Patients frequently failed drug screens in various

3   and different ways.  They were negative for the drugs that

4   were being prescribed, and were positive for things that --

5   not just trivial amounts or trivial drugs.  The heaviest, most

6   addictive drugs that we know.  Fentanyl.  Heroin.

7   Methamphetamine.

8      This all happened while defendant, Dr. John Stanton, was

9   medical director.

10      And you will hear directly that that sponsorship idea

11   that I told you about, that happened at GMA.  You will hear

12   from three of the sponsors.

13      Terry Prince, John Pasternak and Jeff Ghent.  They're

14   shown there.  We'll talk to you about how they brought the

15   sponsored patients to Gateway Medical Associates because it

16   was a supply of pills that they could sell, pills that were

17   thousands of dollars to them every month.

18      All of this happened all while the defendant, John

19   Stanton, was medical director.  But you will hear that in

20   addition to just being the medical director, his involvement

21   grew with the facility.  After he stepped away briefly in

22   early 2018, he returned to the clinic in -- later in 2018.

23      And Dr. Maccarone, who had been largely prescribing to

24   patients suffered several health conditions.  He was

25   increasingly away from the clinic, including sometimes for

1    months on end.

2         When that happened, the defendant, John Stanton, was the

3    only doctor there.  He was seeing patients.  He was admitting

4    patients.  He was prescribing to patients.  He was both the

5    medical director, but he was also a doctor who admitted and

6    prescribed to patients.

7         And when he did that, he prescribed very similarly to

8    Dr. Maccarone.

9         Prescribed oxycodone and oxymorphone repeatedly to

10   patients, to patients who failed drug screens, drug screens

11   for heroin.

12        For instance, in this example, you'll see in trial a

13   patient who tested positive for heroin four months in a row

14   and still received a prescription or two prescriptions from

15   Dr. John Stanton.

16        You will hear in the medical records a lot of things that

17   are going to be difficult to understand or believe actually

18   existed in medical records.

19        For instance, this patient who tested positive for heroin

20   four times in a row, who had said he was given, quote, strong

21   counseling about that.

22        You will hear about patients who were supposedly

23   dismissed from this clinic, as they should have been.  But

24   patients dismissed from GMA often weren't really dismissed.

25   They could keep coming back.  You'll see notes indicating that

1    the patient is being dismissed because they keep having

2    inconsistent urine drug screens and then they (indiscernible)

3    the following four weeks.

4        If that doesn't look like it is legitimate medicine, it's

5    because it is not.  This is giving people who are addicted to

6    drugs and abusing these pills, drugs that they shouldn't have

7    had.

8        You will hear that what Stanton did at the clinic

9    generated money for Stanton.  Everything he did there ends up

10   with money in his pocket.  Got a salary for being a medical

11   director, or just being there when Maccarone wasn't.

12       On top of that, he got paid for something called a

13   medical director visit and for doing injections.  Listen

14   throughout this case for what those medical director visits

15   and injections really entail.

16       You'll hear that this all persisted until October of

17   2020.  So his involvement in this clinic was almost four years

18   with Maccarone.

19       And it wasn't any of those warning signs I just talked

20   about, the late hours with Maccarone, the failed drug tests,

21   any of that cause Dr. Stanton to leave.

22       Instead, the DEA had begun investigating this clinic.  In

23   October of 2020 they executed a search warrant at GMA.  And

24   from that point forward, Dr. Stanton went to damage control.

25       You'll hear evidence that he resigned after that, and

1   brought to Dr. Maccarone two letters that he, Dr. Stanton,

2   typed up, authored, essentially, claiming that he didn't know

3   anything was going wrong and wanting Dr. Maccarone to sign

4   those letters.  Maccarone refused.

5       You'll hear that Maccarone was eventually charged and

6   arrested.  That happened in March of 2021.  And shortly after

7   that, Dr. Stanton gave an interview with Investigator

8   Sizemore.  You'll hear a recording of that interview and

9   statements that the defendant made.

10      They include that he claimed, even though he's medical

11  director, he claimed (indiscernible) the doctor prescribing

12  these controlled substances, that he didn't review medical

13  records.  Said it wasn't his job to control medications.  He

14  claimed he did not see patients consistently failing drug

15  tests.

16      I submit to you, ladies and gentlemen, you'll see

17  evidence to the contrary to each of those things throughout

18  this case.

19      But he did admit a few things.  Like he knew patients

20  were travelling long distances from London and Manchester,

21  other locations in Kentucky.  He knew Maccarone was staying

22  late.

23      You'll hear that during this time Dr. Stanton was also

24  the medical director of several other clinics.  He also owned

25  another clinic, and that the clinic that he owned, he told

1    Investigator Sizemore, he doesn't prescribe oxycodone and

2    oxymorphone because they're both too addictive.

3         Throughout this case, you'll hear about the government's

4    investigation and how Gateway Medical Associates functioned.

5    You'll hear from patients there.  You'll hear from sponsors.

6    You'll hear from employees of the clinic.  You'll hear from

7    law enforcement investigators.

8         You'll hear from Jill Lee, who was a pharmacist, and will

9    talk to you about the pharmacy and properties of how these

10   drugs work and what they're used for.

11        You'll hear from witnesses from the Tennessee Department

12   of Health.

13        As you'll see in this case, there is one charge for you

14   to decide.  One count.  Conspiracy to unlawfully distribute

15   controlled substances.

16        And in this case, because we're dealing with a physician

17   who was registered with the DEA, you'll hear those words that

18   we talked about at the beginning.  He was allowed to prescribe

19   in the usual course of professional practice.

20        The allegation, and what we believe the evidence will

21   show, is that Dr. Stanton and Dr. Maccarone repeatedly agreed

22   to serve as a supply of illegitimate drugs that were

23   prescribed outside the usual course of professional practice.

24        As I said, when they do that, they are distributing

25   drugs.  That is unlawful, just like anyone else.

1    So the count is a conspiracy to do that.  Unlawfully

2    prescribing controlled substances knowingly.

3    And this is what the conspiracy looked like.  You'll hear

4    that Stanton and Maccarone agreed with each other for GMA to

5    act as a supplier.  That's throughout Tennessee and into

6    Kentucky.

7    You'll hear directly from these sponsors.  We'll talk

8    about how they took patients to GMA to get these pills.

9    You'll hear from patients who went to GMA who then diverted

10    the pills.

11    And what you'll hear is that a conspiracy -- which you

12    probably have some idea in your head of what that word

13    means -- but under the law it is not as complicated as it

14    sounds.

15    Please listen to the Judge for instructions on the law.

16    But conspiracy is just an agreement to do something unlawful.

17    It doesn't require a dark-room meeting, like we might think

18    about it in our mind.  It doesn't require a sit-down and a

19    handshake and say, Okay, we'll be drug dealers.

20    All that's required is an agreement, spoken or unspoken,

21    to do something that the law forbids.

22    And what you'll hear is that conspiracy involves working

23    together for a common purpose.  And in this case, it was pills

24    for cash.

25    So you'll see there was this interdependence by each of

1   these layers.  We're going to ask you to please pay attention

2   and see how this works in real life.

3       The clinics serve as the source of supply, the patient

4   comes in, gives his money, the pills go to the sponsor.  Those

5   go out to customers, the money comes in, and that money goes

6   back to the clinic, and on and on it goes.

7       Not all of these people know each other.  That's not

8   required.  A conspiracy just requires to agree with at least

9   one other person.

10      And as you'll hear, in drug conspiracies it is frequently

11  the case that people don't know everybody at every level.

12      So that's the case.  That's what you are asked to decide,

13  again, at the end of the proof.

14      Ladies and gentlemen, I'll end with this.  You're going

15  to hear a lot about doctors and medical facilities and

16  diagnostic testing.

17      But I really ask you to do the following:  Please use

18  your common sense when you're thinking about this.  People who

19  are taking heroin, people who are taking fentanyl, people

20  taking meth, should not be given oxycodone.  That's well

21  known.

22      But do you know who definitely knows that?  The proof is

23  going to show that the trained and expert pain management

24  physician, Dr. John Stanton, knew that.  And yet, he agreed to

25  do that over and over again with Dr. Maccarone for money.

1          At the end of the trial, we're going to ask that you hold

2     him accountable and return a finding of guilty.

3          Thank you again for your time.

4          THE COURT:  Thank you, Mr. Smith.

5     Mr. Strianse.

6          MR. STRIANSE:  Thank you, Your Honor.

7     Good afternoon.  On behalf of Dr. Stanton we also want to

8     thank you for your time and attention that you are going to

9     bring to this trial over the next week or so.

10         Like the Judge said, as you take in the proof in this

11    case, don't form any judgment until you get to the end.

12         I do believe that it is going to be increasingly apparent

13    as you hear that proof that Dr. Stanton is being blamed for

14    the sins of Dr. Maccarone, for sins of Dr. Maccarone's

15    complicit staff, and the sins of the patients that

16    Dr. Maccarone enabled.

17         I want to talk a little bit about Dr. Stanton to give

18    some context to the story that I would like to tell you this

19    afternoon.  And it is not proof.  It's not argument.  It's

20    just what I think you may expect to hear over the next seven,

21    eight, or nine days here in this courtroom.

22         But I think this starts with telling you all a little bit

23    about John Stanton.

24         John Stanton was an orthopedic surgeon for 30 years.  He

25    was board certified in orthopedic surgery.  There came a point

1    in time of 2015 when he was 62 years old, that the years of

2    being an orthopedic surgeon at a very, very physically

3    demanding practice had caught up with him a little bit.  And

4    he got interested in studying for another discipline known as

5    pain management, and he took that very, very seriously.

6        Just like he was board certified in orthopedics, he

7    became board certified in pain management and did all of the

8    work necessary to become board certified.  Not by some

9    fly-by-night place where you can send in $125 and get a

10   certificate, but he became board certified by the American

11   Board of Interventional Pain Physicians.

12       And through the years he's renewed his orthopedic surgery

13   board.  After he became board certified in pain management, he

14   opened up his own pain clinic in Clarksville, Tennessee known

15   as the Joint and Spine Clinic.

16       Initially he was still doing a little orthopedic work and

17   some pain management.

18       In 2018 he stopped the orthopedic facet of that practice

19   to focus on exclusively musculoskeletal pain.  And given his

20   background in orthopedics, he was particularly suited for

21   that.

22       He then began to function as a medical director.  You've

23   heard a little bit about that already this afternoon.  And as

24   a medical director he had some sort of a unique role, not

25   seeing patients as much, but it was more of him supervising

1    nurse practitioners, physician's assistants, reviewing charts,

2    seeing new patients, making sure that they got off on the

3    right foot in the practice.

4         And he would see special patients, patients that had a

5    high dosage, people that had been given pain pills over the

6    years and had a high, what they call Morphine Milligram

7    Equivalent.

8         In 2016, you're going to hear that he became the medical

9    director at Dr. Maccarone's practice, Gateway Medical

10    Associates in Clarksville, Tennessee.  And in his role as a

11    medical director, he did not have to review charts or see

12    patients.

13         In 2017, he stepped away from GMA for a short time.  He

14    was replaced by another medical director for nine months or

15    so.

16         And in 2018 he returned to be GMA.  And, again, he was

17    performing the role of a medical director.  He was seeing that

18    special class of patients that had the high Morphine

19    equivalent.

20         But even all of his background, I think that it's

21    important to know that he had all of the training and

22    experience, but he really had limited experience in

23    prescribing Schedule II opioids.

24         The reason for that was, all of those years as an

25    orthopedic surgeon, he was only used to doing surgery on a

1    patient, and then giving them a short-acting prescription for

2    pain medicine just to deal with the pain that they would have

3    right in the wake of the surgery.

4        He was not really in the practice of writing

5    prescriptions.  Again, his main duty as medical director was

6    to evaluate patients, to pursue alternative treatment.  And

7    you are going to hear about his efforts to pursue alternative

8    treatments before turning to prescribing prescription drugs.

9        In November of 2018, when he was functioning as medical

10   director at Gateway Medical Associates, Dr. Maccarone had a

11   pretty busy practice, he had a lot of patients, and then

12   something pretty cataclysmic happened.

13       On November 15, 2018, Dr. Maccarone suddenly falls ill,

14   not in a slight way, but in a profound way.  He goes into

15   diabetic shock.  He goes into septic shock.  He has a blood

16   pressure of 210 over 100.  When they take him to the hospital,

17   he had a blood sugar of over 500.  So shaky, unable to even

18   sign his own name as he was being admitted to the hospital.

19   He had to be transferred from a hospital in Clarksville,

20   Tennessee to Nashville, to another hospital.

21       And it was at that time that the office manager at GMA, a

22   woman by the name of Emilie Jackman, who you will hear -- I

23   think the government's going to be calling her as a witness in

24   their case in chief -- called Dr. Stanton, understandably in a

25   panic, knowing that Dr. Maccarone was sick, he would be out,

1   they didn't quite know how long he would be out, they hoped

2   only a month or so.  You'll learn that it turned out to be

3   much longer than that.

4        And she was expressing concern that Dr. Maccarone has all

5   of these patients, they need access to care.  They need

6   continued access to their medicine so they don't experience

7   withdrawing.  They need their prescriptions.

8        So she talks to Stanton.  And I don't think "beg" is too

9   strong of a word, but impresses upon him that these patients

10   need the coverage of another doctor.  And that he is the only

11   one who can really step in the breach and move from this role

12   of being the medical director to more of a hands-on role of

13   dealing with patients on a daily basis.

14        The rest of this story, I think will conjure in your

15   minds, that old expression "No good deed goes unpunished."

16   Remember that you're going to hear Dr. Stanton was not the

17   owner of Gateway Medical Associates.  Dr. Maccarone was the

18   owner.  Dr. Maccarone had the financial stake in Gateway

19   Medical Associates.

20        Dr. Stanton could have easily said to GMA, this is not

21   what I signed up for.  I thought I was going to be a medical

22   director.  I thought I would have a very limited role.  And he

23   could have walked away from GMA and walked away from all of

24   those pain patients that were currently on the rolls of GMA.

25        But I think you'll see -- and Dr. Stanton will testify in

1    this case.  You'll see that he recognized and embraced his

2    duty as a doctor, not to abandon those patients, which I think

3    is going to become a very important issue in the case.

4          He stepped into the breach at that point in time, in

5    November of 2018.  And he also stepped into really saving

6    Dr. Maccarone's clinic, and to save, in part, Dr. Maccarone's

7    livelihood when he was unable to function as a doctor.

8          But I think he also unwittingly stepped into all of this,

9    all of what we're going to be about over the next week or so

10   in this courtroom.

11         In November of 2018, when he made this transition, he

12   already had an incredibly busy schedule, Dr. Stanton did.  He

13   had his own clinic where he was serving as a medical director.

14   There were two Clarksville clinics known as Clarksville Pain

15   Institute, where he was also serving as a medical director.

16         And you may be wondering, How can somebody be a medical

17   director of all of these clinics?  In Tennessee, doctors can

18   be a medical director of up to four clinics at one time.

19         So in November of 2018, when Dr. Stanton took this on for

20   Dr. Maccarone and GMA, he was conservatively responsible for

21   1,600 or so patients spread among those four clinics who are

22   supposed to be seen every 28 days.

23         Prior to the emergency that arose in November of 2018

24   with Maccarone, a typical medical director schedule for

25   Dr. Stanton at GMA was something like this:  He would spend

1    Tuesday and Thursday afternoons, after doing whatever he had

2    to do when he was doing procedures in the morning, and he

3    would see patients at Gateway Medical Associates in the

4    afternoon.

5        In that limited role, he would do injections.  He would

6    see those patients that have a high MME.  And by the way,

7    Maccarone was not board certified in pain management.

8        And in Tennessee, from 2016 on, Maccarone had to have a

9    board certified pain management doctor involved in the

10   practice.

11       Now, after Maccarone fell ill, that duty that he had as a

12   medical director, where he was sort of sitting back and

13   evaluating and looking at charts and things like that, quickly

14   morphed into having to see 20 or 35 patients four afternoons a

15   week.  Monday, Tuesday, Wednesday, Thursday.  And that was

16   after working at his clinic and surgical center at the same

17   time earlier in the day.

18       And again when Dr. Maccarone first fell ill in November

19   of 2018, it seemed like he was going to be out a short time.

20   At least that's how it was pitched to Dr. Stanton, that he

21   might be out four to six weeks.

22       Dr. Stanton was concerned about the patients.  He

23   concluded that, really, he was the only one that was available

24   and qualified to perform the function of the coming in and

25   dealing with those patients.

1     So I think you'll hear, as the proof develops in this

2   case, that he met with the office manager, Emilie Jackman.

3   And it was really a daunting task for Dr. Stanton, because

4   he's moving from medical director role to a more hands-on

5   role.  He's unfamiliar with these patients.  So he's trying to

6   balance getting somewhat familiar with these patients with the

7   reality of having to see and treat 20, 30 patients four

8   afternoons a week.

9     To help him do this, to facilitate this in the afternoon,

10   these marathon sessions of trying to see Maccarone's patients

11   while Maccarone is out, Ms. Jackman, I think will tell you,

12   that she assembled paper packets for Dr. Stanton.

13     That way, he could more efficient.  He sees these

14   patients in these afternoon sessions.  In that packet, there

15   would be the Controlled Substances Monitoring Database

16   information; the so-called and prescription information for

17   each of the patients that he would be seeing.  There would be

18   x-ray results.  There would be lab work.  There would be

19   prescriptions.

20     Given the urgency of the situation that was going on at

21   GMA when Maccarone fell out of the picture so suddenly,

22   Dr. Stanton would not raise any of these patients'

23   prescriptions, any of the dosages.

24     At that point in time when he's covering for

25   Dr. Maccarone, it seems rational and prudent to him to keep

1    those patients on the same dose.  And, in fact, he was

2    actively trying to -- and you'll see this -- lower the doses,

3    the higher doses that some of these people were on.

4        Another thing that I think you'll see during the course

5    of this trial is, Dr. Stanton was consistently suggesting

6    alternative therapies and injections in lieu of opioid pain

7    pills.

8        Also, if a patient refused to lower their medications, or

9    if a patient refused alternative treatments like injections,

10   he would either -- Dr. Stanton would either lower the dosage

11   or discharge the patients.

12       I think you'll see, as you hear the proof over the next

13   week or so, that four to six weeks of Maccarone being absent

14   turned into four months.

15       Then came back for a short time, but in mid 2020, in the

16   height of COVID, Maccarone is gone unexpectedly for now three

17   months with complications from the amputation, partial

18   amputation of his foot that he sustained back in November when

19   this crisis arose.

20       I think you'll also hear that he even -- when

21   Dr. Maccarone returned to work, Emilie Jackman, office

22   manager, would still call Dr. Stanton and say, Hey, there are

23   patients in the waiting room waiting to be seen.  That they

24   have been here since morning and Maccarone just called and

25   he's not coming in.

1          And Mr. Smith talked a little bit about this in the

2     government's opening statement.  Dr. Maccarone is a different

3     individual.  Sort of a quirky individual, to say the least.

4     And you may see him in this -- at this trial, and you can form

5     your own judgment about Dr. Maccarone.

6          But he was the kind of doctor -- and I don't know if

7     there is another one like this -- that would decide on a daily

8     basis if he was going to come in and when he was going to come

9     in.

10          He would call the office and -- again, this is all

11     without any knowledge by Dr. Stanton of what he was thinking

12     or what he was doing.

13          But he would call the office staff and say, Well, how

14     many people are there today?  And if there wasn't enough,

15     enough people there, if there weren't enough patients there --

16     and this is Maccarone we're talking about -- he would say,

17     Well, I'm not going to come in.

18          Another thing that you are going to hear about Maccarone

19     is that it was all about money for Dr. Maccarone.  There are

20     some text messages that the government was able to obtain from

21     a search warrant that was served on the office manager's cell

22     phone.

23          And those text messages are very telling about the

24     relationship that existed between the office manager and

25     Dr. Maccarone.

1          You know, Mr. Smith was talking about a conspiracy and

2     agreement.  Well, when you hear about and see some of those

3     text messages, that is evidence of an agreement between the

4     office manager and Dr. Maccarone.  All unbeknownst to

5     Dr. Stanton.

6          They would text back and forth about the number of

7     patients available.  Maccarone was always concerned about

8     hitting a monetary quota for that day.  He would be exhorting

9     the people at the practice.  You know, we need to get $8,000

10    in today.  We need to get $10,000 in today.  All very telling.

11         Also, I want to talk about something that's obvious.  You

12    know, we're here in federal court.  And it is a criminal case.

13    It is not a civil case.  It's not a medical malpractice case.

14         As Mr. Smith said, Dr. Stanton is charged with being a

15    member of a criminal conspiracy.  And as Mr. Smith said, that

16    Dr. Stanton allegedly reached an agreement to violate the law

17    with Maccarone, Jeffrey Ghent, and Terry Prince.

18         Maccarone, of course, the doctor.  Ghent and Prince were

19    patients.

20         I would ask you to listen very carefully to the proof

21    that you are going to hear this week, and maybe into next

22    week.  As you listen to the proof, I would ask you -- and you

23    listen to the testimony -- to consider the absence of proof.

24    The absence of proof that Dr. Stanton was a member of any

25    conspiracy.

1       And I think, ladies and gentlemen, you're going to find

2   when we get to the end of this, an utter lack of proof of any

3   agreement between Dr. Stanton and anyone else at GMA, or any

4   patient, to violate the law.

5       Dr. Stanton never communicated with anyone by phone,

6   text, email in any way to discuss or advance a scheme to

7   distribute drugs in violation of the law.

8       He had -- they're going to be calling in a witness this

9   afternoon, perhaps, by the name of Terry Prince.  Dr. Stanton

10  never had any communication whatsoever with Terry Prince.

11      Terry Prince was utterly unknown to Dr. Stanton.

12      There is another patient that you may hear over the next

13  week that the government may call, an individual named Jeffrey

14  Ghent.  He was a patient and Dr. Stanton saw him when

15  Maccarone was out, probably seven or eight times.

16      And listen to his testimony.  When he presented himself

17  to Dr. Stanton, he never had an abnormal urine test, meaning

18  this:  There were no illicit street drugs in his urine.  And

19  if he was on a prescription, the metabolites from that

20  prescription were present in his urine.

21      He presented himself as a real patient when he came to

22  Gateway Medical Associates.  The records reflect when he was

23  seen by Maccarone initially that he had a doctored history.

24  He was claiming intractable pain from a shoulder injury, a

25  rotator cuff injury, degenerative arthritis in his thumb.

1    There were radiological studies that confirmed that.

2         When Stanton dealt with him, he dealt with him as a

3    doctor would deal with him.  He sent Ghent to surgery.  He

4    prescribed a brace for him.  There's nothing in Mr. Ghent's

5    chart, or the way that Mr. Ghent presented himself to

6    Dr. Stanton, that his pain was not legitimate.

7         Interestingly, and importantly, you're going to see that

8    Dr. Stanton never communicated with Jeffrey Ghent outside of

9    the office.  Never communicated with him outside of the

10   office.

11        I'm repeating that because Maccarone had a much different

12   way of dealing with his patients and associating with his

13   patients.

14        Dr. Stanton functioned as a doctor.  These patients were

15   not his friends.  They were not his colleagues.  They didn't

16   have Dr. Stanton's cell number where they could text on a whim

17   or call on a whim.  That's a relationship that Maccarone had

18   with his patients.  Stanton had a professional,

19   physician/patient relationship with his.

20        Another thing that you'll see is that, for whatever

21   reason, Stanton and Maccarone didn't communicate.

22        I think at the end of all of this, the Judge will

23   instruct you as to the law of the conspiracy.

24        But as a factual matter, I think that you are going to

25   find, after you hear all of the proof, that as far as

1      Dr. Stanton is concerned, he shared no common goals with

2      Maccarone.  They did not have any agreement together.

3             The only thing that they had was really disagreement and

4      discord.  And the reason for that was that Stanton was

5      functioning as a real doctor.  He would reduce people's

6      prescriptions.  He would increase them, you'll see that, in

7      some of the exhibits that the government will be presenting to

8      you, where they have taken a look at those prescription

9      records, those controlled substance records, and you'll see

10     the ying and yang between Stanton and Maccarone where Stanton

11     is decreasing the prescription and then Maccarone would push

12     it right back up.

13            The exact opposite of an agreement or a conspiracy to

14     violate the law.

15            Also, Stanton would consistently discharge patients and

16     then Maccarone would readmit them.  And you might say, Well,

17     maybe Maccarone is doing that because he's a passionate caring

18     doctor.  Well, I don't think you're going to hear that in this

19     courtroom.

20            He was readmitting them because these patients were

21     prepared and able to pay a readmission fee set by Maccarone.

22            Another thing that I would ask you to look for is what

23     would the financial inducement have been for Dr. Maccarone,

24     Dr. Stanton, to become involved in this type of a conspiracy?

25            You'll see how he was paid.  If he wrote one prescription

1     or if he wrote a hundred prescriptions, his compensation at

2     GMA would be the same.

3           If the object of the conspiracy was to distribute drugs,

4     I think you're going to find that Dr. Stanton was doing the

5     opposite by decreasing medications that he prescribed.

6           I want to thank you for your attention this afternoon.

7     I think after you hear all of the proof in this case -- and

8     there is one charge in the indictment.

9           You're going to hear a lot over the next week or so, but

10    it is going to go boil down to one charge.  And the government

11    is going to have to prove to you that Dr. Stanton -- and prove

12    beyond a reasonable doubt -- that Dr. Stanton was a member of

13    a conspiracy.

14          And I think when you objectively evaluate all of the

15    evidence that you hear, and hear Dr. Stanton's testimony, the

16    government will not be able to prove beyond a reasonable doubt

17    that he reached agreement with anyone to violate the law.

18          Thank you.

19          THE COURT:  Thank you, Mr. Strianse.

20          All right.  We have been going about an hour and 15

21    minutes.  I think we'll take a break before we begin the

22    proof.  Let's take 20 minutes.

23          During this and every break, avoid discussion.  Don't

24    read or look anything up about the case.  Keep a wide open

25    mind as we get into the proof.  Form no opinion.  Begin no

1    evaluation until released to do so.  I'll excuse you now for a

2    20-minute break.

3         You'll now exit to the jury room.  This direction.  Thank

4    you, and just leave your notebooks behind.

5         (The jury exited the courtroom at 2:48 p.m.)

6              THE COURT:  All right.  The jury has exited the

7    courtroom.  Everybody can be seated.  I thought we would take

8    a short break and relocate the podium.  We have been going,

9    you know, long enough.  I thought it would make sense to take

10   a break now.

11        Who is your first witness going to be?

12             MR. SMITH:  Shawn Brown, Your Honor.

13             THE COURT:  Anything to take up?

14             MR. SMITH:  No, Your Honor.

15             THE COURT:  Mr. Strianse.

16             MR. STRIANSE:  No, Your Honor.

17             THE COURT:  Okay.  Thank you, both.  We'll be in a

18   break now for 20 minutes.

19        (Recess from 2:24 p.m. - 3:06 p.m..)

20             THE COURT:  Thank you.

21        Juror 613, do you want to switch to the end?  One seat

22   over?

23             UNIDENTIFIED JUROR:  Thank you, sir.

24             THE COURT:  Stretch that leg out a little bit.

25   Okay.

1          We're back on the record with all counsel present and

2     Dr. Stanton present as well.

3          The jury has returned to the courtroom after our first

4     break as we prepare to dive into the proof.

5          Has everybody followed the rules I've given you so far?

6     Anyone no?  Okay.  Appreciate that very much.

7          Mr. Smith, the government can call its first witness.

8               MR. SMITH:  Thank you, Your Honor.

9          The United States calls Shawn Brown.

10              THE COURT:  Shawn Brown.

11               SHAWN BROWN, GOVERNMENT'S WITNESS, SWORN

12              THE WITNESS:  Yes, I do.

13              COURTROOM DEPUTY:  Thank you.

14              THE COURT:  Good morning, sir.

15              THE WITNESS:  Good afternoon.

16              THE COURT:  Do try to speak directly toward that mic

17     in a clear voice so we can hear you during your testimony.

18          Would you first tell me your full name and spell your

19     last name?

20              THE WITNESS:  Shawn Travis Brown.  And my last name

21     is Brown, B-R-O-W-N.

22              THE COURT:  Thank you.

23          And ladies and gentlemen of the jury, if you are taking

24     notes, you are now into the proof section of the trial.  Do

25     note that in your notebook.

*S. BROWN - Direct Examination*                                      49

1          Mr. Smith.

2                    MR. SMITH:   Thank you, Your Honor.

3                              DIRECT EXAMINATION

4     BY MR. SMITH:

5     Q.   Good afternoon, sir.  We've already got your name.

6          Can you tell us the city and state where you live?

7     A.   Barbourville, Kentucky.

8     Q.   How old are you, sir?

9     A.   33.

10    Q.   Do you work?

11    A.   Not -- I've been trying to work a little bit.  I've been

12    trying to log some.

13    Q.   What have you done when you've worked?

14    A.   Logging.

15    Q.   I realize this is a personal question to start off, right

16    off the bat with, but just to get to it.

17         Sir, at one point in your life were you addicted to

18    drugs?

19    A.   Yes.

20    Q.   Are you currently recovering?

21    A.   Yes, I've recovered.

22    Q.   Have you gone to rehab several times?

23    A.   Yes, I have.

24    Q.   What kind of drugs were you addicted to?

25    A.   About everything.  I'm not going to say "everything," but

 1   need to know the names or?

 2   Q.   What kind of drugs did you initially become addicted to?

 3   A.   On the end, I was addicted to oxycodone and Opana and

 4   meth.

 5   Q.   Now, at some point in your life, did you start going to

 6   what is sometimes called pain clinics?

 7   A.   Yes.

 8   Q.   When did you start doing that?

 9   A.   Like 2012, '13.  Something like that.

10   Q.   And where were these pain clinics that you first went to?

11   A.   Fishersville, Virginia; Westville, Virginia; Richmond,

12   Virginia.  I could keep going.

13   Q.   It was a number of pain clinics?

14   A.   Yes.

15   Q.   When you went to the clinics, what were you looking for?

16   A.   To make money.

17   Q.   How's that?

18   A.   I could come back here and resell and -- and you make

19   some money, and get well with me is what I thought.

20   Q.   Now, when you went to these pain clinics, were you

21   looking for a legitimate doctor who scrutinized you and give

22   you a thorough examination and treat you?

23   A.   It is -- what was that word again?

24   Q.   Sure.  Were you going for a doctor that you thought would

25   really take a lot of time, take good care of you?

1  A.   No.   No.   Not really.   I was just going for medicine to

2  bring back to resell.

3  Q.   Did you go with anybody else?

4  A.   Me and my wife.

5  Q.   Was your wife's name?

6  A.   Misty Brown.

7  Q.   When you started visiting these pain clinics in Virginia,

8  did you take any of the medication that you obtained?

9  A.   I would have to take like one a month to pass the urine

10  test.

11  Q.   Explain that to the jury.   Why would you have to take one

12  a month?

13  A.   To pass the urine test, you could take like one a month

14  and it would show up in your system.   So, you know, get passed

15  on to the next month.   That way, you would get your

16  prescription.

17  Q.   So were you trying to trick the pain clinics?

18  A.   Yes.

19  Q.   How hard is it to trick these pain clinics?

20  A.   It -- it wasn't that hard at all.

21  Q.   Were they paying really close attention and watching you

22  and scrutinizing you and looking for a reason not to

23  prescribe?

24  A.   Not really they wasn't.

25  Q.   Now, you mentioned you started taking some of the pills

1    for that reason.

2         What about your wife, Misty?

3    A.   She had -- she was going with me, and she had to start

4    taking some, get in her system, you know, to pass the urine

5    test.

6    Q.   What was her job before she started doing this?

7    A.   She was a school teacher.

8    Q.   School teacher?

9    A.   Yes.

10   Q.   At some point, did she start taking more of the pills?

11   A.   Yes.

12   Q.   Did she become addicted?

13   A.   Yes.

14   Q.   What did you see that makes you say that?

15   A.   Well, we were going to the clinics and all of that, and

16   we were making all of this money.  And I seen her, like,

17   like -- well, I seen my friend.  I have him a selling.

18        And he's like, "Shawn, she's back rebuying them off me."

19   He says, "How are you going to make money like that?"  I was,

20   like, "Well, I was trying to find out something."

21        And then I find her like passing out on the floor and

22   nodding out and stuff like that.

23        She just rebuying them back off me.  I had my friend

24   selling it, and she was coming back through, you know, behind

25   my back.

S. BROWN - Direct Examination                                    53

1    Q.   And so did you start using and taking more of the pills?

2    A.   After so long, I -- I couldn't get her to quit, just got

3    aggravated, wasn't interested in the money no more.  I just

4    wanted to straighten back up and get my life back together.

5    And so I just started.  I couldn't beat her, so I just joined

6    her.

7    Q.   Now, did you have injuries in your life?

8    A.   Yes.

9    Q.   What kind of --

10   A.   I've got scoliosis.  I've got bulging disks.  I mean, I'm

11   guessing I was born like that.  But I've got some bad back

12   problems.

13   Q.   So you have times when you were in pain; is that fair?

14   A.   Yes, I was in pain.

15   Q.   When you were taking these medications, was it to

16   legitimately take care of your pain?

17   A.   No, not really.  I wanted to fit in with her and not be

18   arguing and, you know, kind of live a normal life of what I

19   thought at the time.

20            THE COURT:  Be careful on the leading, Mr. Smith.

21            MR. SMITH:  Oh, okay, Your Honor.

22   BY MR. SMITH:

23   Q.   Sir, at some point, did you go -- did you start going to

24   Gateway Medical Associates?

25   A.   Yes.

S. BROWN - Direct Examination                                    54

1    Q.   Do you remember when?

2    A.   It was 2018, somewhere in there.

3    Q.   Okay.  Do you remember the first time that you went?

4    A.   Yes.

5    Q.   Do you?

6         Can you describe that to the jury, please?

7    A.   Well, I had an appointment.  I got me an appointment over

8    there.  I had to show up, like, at 10:00 or 11:00 that

9    morning.  I went in the triage, drug test, all that.

10        And I go to -- or they told me just go on out and sit in

11   the car.  Said it would be four or five hours before the

12   doctor gets here, so I go out and sit in the car.

13        And patients -- after 4:00 or 5:00 that evening, patients

14   pulled up.  They were, like, "Man, you going to figure this

15   out.  You just going to have to come round..."  I looked at

16   them, like, "Late in the evening?"  They said, "They tell you

17   to be here early, but don't listen.  Just come late."

18   Q.   Do you remember how much you paid?

19   A.   It was, like, around 385, I think.

20   Q.   How did you pay?

21   A.   With a card.  Debit card.

22   Q.   Now, did you eventually see a doctor that day?

23   A.   Yes.

24   Q.   What doctor?

25   A.   Dr. Stanton.

*S. BROWN - Direct Examination*                                        55

1    Q.   Do you see him here today?

2    A.   Yes.

3    Q.   Where is he?

4    A.   Over there.

5              MR. SMITH:  Okay.  That's the identification noted

6    for record, Your Honor.

7              THE COURT:  It will be noted.

8              THE WITNESS:  Could I get some water?

9              THE COURT:  I'm sorry?

10             THE WITNESS:  Could I get a drink of water?

11             THE COURT:  Yes, of course.

12   BY MR. SMITH:

13   Q.   Now, when you saw Dr. Stanton, where did the visit occur?

14   A.   Dr. Maccarone's office.

15   Q.   Okay.  And can you describe the room that you were in?

16   A.   It was like a little-bitty office.

17   Q.   Okay.  Was it an exam room with a paper on the exam

18   table?

19   A.   No.  It was just like a little, small room, like an

20   office.

21   Q.   Okay.  And this was your first visit to the clinic?

22   A.   Yes.

23   Q.   Okay.  How long did that visit last?

24   A.   It didn't last long at all.

25   Q.   What was your interaction like with Dr. Stanton?

1    A.   When I went in, he was real nice.  He hit my legs with a

2    hammer.  I bent over and touched my toes.  And he asked me

3    where I was from and I told him.

4    Q.   Did you walk out of there with a prescription?

5    A.   Yes.

6    Q.   Describe to me how that happened.

7    A.   Well, let's see.  Describe to you how that happened.  I

8    was just sitting in there and, you know, he starts out filling

9    his paperwork out.  I look over and so I see what he's doing.

10        He's, like, my prescriptions are already laying there.

11   He's already filled them out.  Just signing them real quick

12   and trying to make it fast.

13   Q.   Did he explain to you why you were getting those

14   particular prescriptions?

15   A.   I can't recall.  I can't hardly remember back that far

16   really.  But I just knew I wanted more.  I was, like, not

17   satisfied with what I got.

18   Q.   Did you ask for more?

19   A.   Yes, I did.

20   Q.   Did you get a response?

21   A.   Yes.

22   Q.   What was the response?

23   A.   He told me if I wanted more, I would have to see the

24   regular doctor, Maccarone there.

25   Q.   Did you have a long discussion about your medical

*S. BROWN - Direct Examination*                                          57

1    condition with Dr. Stanton?

2    A.   Not that long.

3    Q.   Did you ever -- did you have a discussion about

4    addiction?

5    A.   No.  If I did, I can't remember it.

6    Q.   And the prescriptions that you just described, what

7    were -- what drugs were they for?

8    A.   I -- I'm guessing just for pain.

9    Q.   I'm sorry.  What were the drugs?  What kind of drugs?

10   A.   Oh, what kind of drugs?  Oxycodone, oxymorphone,

11   gabapentin.  Something else I forget, like, Narcan or

12   something like that.

13   Q.   Did he talk to you about one being an extended release

14   and one being immediate release?

15   A.   To be honest, I can't really remember back that far.

16   Q.   Now, where did you travel from to that clinic?

17   A.   I travelled from home, Barbourville, Kentucky.

18   Q.   How long did that take?

19   A.   Four hours.

20   Q.   Did you talk to Dr. Stanton about where you were coming

21   from?

22   A.   I was, told him.

23   Q.   Did he ask you why you were driving?

24   A.   I think he's like, I think, seems like he's telling me,

25   he's like, you're driving a long way to come over here, or

1    something like that.

2    Q.   Was there any discussion about how that trip affected

3    your back?

4    A.   I can't remember.  He was just telling me he was familiar

5    with that area over there in Middlesboro, the Pinnacle and all

6    of that over there.  He just told me that.

7    Q.   Did you take a drug test when you went to the clinic that

8    day?

9    A.   Yes, I think I did.

10   Q.   Okay.  Do you know if you passed or failed that test?

11   A.   I don't know if I did or not.

12   Q.   Were you told anything about the result of that test

13   before you had -- before you left with prescriptions?

14   A.   I can't remember.

15   Q.   But you did leave with prescriptions?

16   A.   Yes.

17   Q.   Now, at that point in your life, how were you using these

18   pills?

19   A.   Well, before I started there, I always used my drugs

20   snorting them because -- that's what you mean?  But when I

21   started there, when I got introduced to the oxymorphone, me

22   and my wife had never shot up before, and we started shooting

23   up because we heard that was the best way to do it.

24   Q.   Does shooting up mean injections with a needle?

25   A.   Yes, injection with needle.

*S. BROWN - Direct Examination*                                          59

1    Q.   Did that leave marks on your arm?

2    A.   Yes.

3    Q.   I'm not asking you what anybody else saw.  But just to be

4    clear:  From what you could see, were those marks visible on

5    your arms?

6    A.   Yes, I've got scars on me.

7    Q.   Was that visible when you went to Gateway Medical

8    Associates?

9    A.   Not -- not at the first few visits.  But after, you know,

10   I started shooting, yes, it was very visible.

11   Q.   Now, do you recall if you saw Dr. Stanton again?

12   A.   I know I saw him a couple of more times.  You know, like,

13   maybe got an injection or something like that.

14   Q.   Now, when you went to the next visit with Dr. Stanton,

15   did you have any discussions about drug tests?

16   A.   I can't recall.  I can't remember.

17   Q.   Do you recall him telling you whether you failed or

18   passed the drug test?

19   A.   I do remember being, like, my -- they had cut my medicine

20   for like five or ten pills.  And I'm, like, "What happened

21   there?" Or something like that.  Seems like he said, "Your

22   drug test came back and you were dirty and we had to cut you

23   some."

24   Q.   But, you know, on that day, did you still walk out with a

25   prescription?

*S. BROWN - Direct Examination*                                60

1     A.    Yes.

2     Q.    For what drugs?

3     A.    Same.  Well, oxycodone, oxymorphone, gabapentin.

4     Q.    Did you also see Dr. Maccarone at that clinic?

5     A.    Yes.

6     Q.    What were those visits like?

7     A.    They were all the hours.  You would have to be there, but

8     I got to learning the place, and I would be there around 3:00,

9     4:00 that day, and sometimes I would leave out 3:00 or 4:00

10    that morning.

11    Q.    Now, can you compare what a visit with Dr. Maccarone was

12    like to what a visit with Dr. Stanton was like?

13    A.    Set around waiting all night, and can't wait to get out.

14    But when I seen Stanton, it was, I guess you would say, short

15    and sweet.  Five and ten minutes and you was out.

16    Q.    The actual time in the room with Dr. Stanton on your

17    follow-up visits, how long were they?

18    A.    I don't even think they were longer than five minutes.

19    Q.    Now, when you heard that you had been cut to five pills

20    because you failed a drug test, what was your -- what was your

21    reaction to that?

22    A.    I didn't like that because it was cutting my money or

23    my -- you know taking from me.

24    Q.    Did you regard losing five or ten pills as a serious

25    consequence for failing a drug screen?

*S. BROWN - Direct Examination*                                61

1    A.   Oh, no.

2    Q.   What was latest that you ever stayed at Gateway?

3    A.   3:00 or 4:00 a.m. in the morning.

4    Q.   And on those visits, how much did you pay?

5    A.   I think the most expensive visit I had was, like, 800.

6    Q.   So you drive four hours, pay that amount of money, and

7    stay for that period of time.

8         Why would you be willing to do all that?

9    A.   To get what I want.

10   Q.   What do you want?

11   A.   I wanted prescriptions.  Oxymorphone and oxycodone.

12   Q.   Now, had you seen doctors at these other pain clinics

13   that you went to in Virginia?

14   A.   Yes.

15   Q.   So you think in all of those visits that you went to at

16   these various pain clinics, including Gateway, how did the

17   speed of Dr. Stanton compare to all of the other doctors?

18   A.   He's just very fast.

19   Q.   Was there another doctor that was faster?

20   A.   I don't think so.

21   Q.   Now, if we were to open your medical records and we were

22   to see failed drug tests for things like methamphetamine or

23   Suboxone, would you deny that you took those drugs?

24   A.   No.

25   Q.   You mentioned a moment ago, I think you said that you may

1    have had an injection or injections from Dr. Stanton.

2        Did you tell us that?

3    A.   Yes.

4    Q.   Why did you agree to get those?

5    A.   I think after some time I started going there, he did

6    tell me I was required to get that.  And if I was required to

7    get that, they said the good thing about it is you get to see

8    Stanton and not be here all day.  So that sounded good.  I

9    would rather pay an extra 75 or 150 where I don't have to sit

10   there all night.

11   Q.   Okay.  And was there a follow-up visit with, Hey, how did

12   the injection work out?  How did that help you?

13   A.   I can't recall.  I don't remember.

14   Q.   Now, at some point did your wife, Misty, also go to

15   Gateway Medical Associates?

16   A.   Yes.

17   Q.   How did that happen?

18   A.   I got in there and she saw I was doing, you know, pretty

19   good and she was like, Honey, I have got to start going with

20   you, get me some medicine, too, so I won't be taking all of

21   yours.

22   Q.   Would you go to visits at the same time?

23   A.   We would go together.  We might have went to the same

24   visit a couple of times.  But usually we would go and come

25   back, stay a night and take her back.

S. BROWN - Direct Examination                                      63

1   Q.   So would you go on different dates?

2   A.   Yes.

3   Q.   Why was that?

4   A.   Because we couldn't afford both to go.

5   Q.   When you went with her on these visits, were you in a

6   position to see which drugs she got from the clinic?

7   A.   Yes.

8   Q.   What kind of drugs?

9   A.   She got the same thing I did.

10  Q.   What were those?

11  A.   Oxycodone, oxymorphone, gabapentin.

12  Q.   So oxymorphone, oxycodone, and gabapentin?

13  A.   Yes.

14  Q.   Are those, all three of those drugs, drugs that you could

15  sell?

16  A.   Yes.

17  Q.   Did they all have value you to you?

18  A.   Yes.

19  Q.   Did she also get a prescription for something called

20  Adipex?

21  A.   Yes.

22  Q.   Could you sell those as well?

23  A.   Yes.

24  Q.   Based on your observation, was your wife, Misty, taking

25  those medications as prescribed?

*S. BROWN - Direct Examination*                                          64

1    A.   No.

2    Q.   How quickly would she take them?

3    A.   I -- me and her both if we went, like, just say if we

4    went today, within three days we would be out.

5    Q.   Do you know what a pill count is?

6    A.   Yes.

7    Q.   What is a pill count?

8    A.   It was when they call you in and you supposed to bring

9    your pills for the count.

10   Q.   How did the pill count work at Gateway Medical

11   Associates?

12   A.   I never did get to go to one because I never did have

13   pills to go back to count.  I just paid.

14   Q.   And how did you like that?

15   A.   That was real good.

16   Q.   Had you ever been to another clinic that allowed that

17   practice?

18   A.   I went to I think maybe one or two more that set required

19   pill counts, but I never did have to.  But I -- I don't think

20   I had to pay, like, if I didn't have it.

21   Q.   Now, during this time when you're at Gateway Medical

22   Associates with your wife, Misty, what other kind of drugs

23   were you using?

24   A.   I was using methamphetamine.  Suboxone.  Heroin.

25   Anything that I could get my hands on.

1    Q.   Did you or your wife ever overdose?

2    A.   I have and she has, too.

3    Q.   How many times has she overdosed?

4    A.   Like four times.

5    Q.   Did you ever have to take her to the hospital?

6    A.   Yes.

7    Q.   Did you ever overdose?

8    A.   Yes.

9    Q.   When?

10   A.   It was back -- couple year ago I overdosed myself.

11   Q.   Did your wife ever have to give you Narcan?

12   A.   Yes.

13   Q.   Can you describe that?

14   A.   Describe how it happened?

15   Q.   Yes.

16   A.   We --

17        MR. STRIANSE:  I hate to interrupt, but there is

18   really no connection between this overdose --

19        THE COURT:  Let's talk here.

20   (Sidebar conference.)

21        THE COURT:  Sit down beside the mic.

22   Okay.  Your objection.

23        MR. STRIANSE:  My objection is there really is no

24   connection between this overdose testimony and Dr. Stanton.

25   Temporally, there is no foundation that the pills were

*S. BROWN - Direct Examination*                                          66

1    received from Stanton.  And based on that, I'll object.

2               THE COURT:  Okay.

3               MR. SMITH:  Your Honor, we'd submit that his drug

4    use, his behavior, and her behavior during that time period

5    are probative for the jury to consider what somebody would

6    have seen and do, how they would behave during the time

7    period.  And this is during the time period when they're going

8    to GMA when Dr. Stanton was there.

9               THE COURT:  It wasn't clear to me it was during the

10   same time period, so I think you need to revisit that

11   foundation.  If that's true, then I would let him talk about

12   those events.

13          I think that would address your objection.

14               MR. STRIANSE:  Yes, sir.

15               THE COURT:  Okay.

16               MR. SMITH:  Thank you, Your Honor.

17          (Sidebar conference concluded.)

18   BY MR. SMITH:

19   Q.   Just to be clear about something:  These overdose events

20   that you are talking about, can you describe approximately

21   when it was in your life?

22   A.   Couple of year ago.  I mean, it has happened the last

23   three or four year ago.  Something like that.

24   Q.   Is that during the same time that you were going to

25   Gateway Medical Associates?

*S. BROWN - Cross-Examination*                                    67

1    A.   Yes.

2    Q.   Now, is your wife still with us?

3    A.   No.  She overdosed.

4    Q.   When did she pass away?

5    A.   Yesterday made two months ago.

6    Q.   After leaving Gateway Medical Associates, did you go to

7    substance abuse treatment?

8    A.   Yes.

9    Q.   How are you doing now?

10   A.   I'm doing fine.

11        MR. SMITH:  Your Honor, that's all the questions I

12   have.

13        THE COURT:  All right.  Thank you.

14      Mr. Strianse.

15                    CROSS-EXAMINATION

16   BY MR. STRIANSE:

17   Q.   Good afternoon, Mr. Brown.

18   A.   Good afternoon.

19   Q.   When you went to Gateway Medical Associates for your new

20   patient visit, I think that that was January 31 of 2019.

21        Does that sound right to you?

22   A.   Sound about right.

23   Q.   And you were coming from Commonwealth Pain Specialists in

24   Lexington; is that right?

25   A.   Yes.

S. BROWN - Cross-Examination                                    68

1   Q.   You had been treated by Commonwealth Pain Specialists and

2   then decided to go to Clarksville and to Dr. Maccarone's

3   clinic; is that right?

4   A.   Yes.

5   Q.   Now, when you presented yourself for that new patient

6   visit on January 31, 2019, you brought with you some imaging

7   studies from Hoskins Medical Center in London, Kentucky.

8        Do you remember that?

9   A.   That sound about right.

10  Q.   Because I think you told the Court and jury that you and

11  Misty sort of developed a plan of going to different pain

12  clinics to try to get pills to resell; is that right?

13  A.   Yes, that's what we did.

14  Q.   And I guess getting involved in that practice you learned

15  what you would need to bring with you to look like a

16  legitimate pain patient; is that right?

17  A.   Yes.

18  Q.   And really, in many ways, you were a legitimate pain

19  patient?

20  A.   I really was.  I needed medicine, but I -- I mean, after

21  so long I started, you know, misusing them.

22  Q.   Yes, sir.

23       And when you walked into Gateway Medical Associates on

24  January 31st of 2019, you had a real medical record from

25  Hoskins Medical Center here in London; is that right?

1    A.   Yes.

2    Q.   And you had radiological studies that showed that you had

3    some significant problems -- and I'm not a doctor -- but looks

4    like in your back?

5    A.   Yes, I do.

6    Q.   Bulging disks at one, two, three, four, five different

7    points; is that right?

8    A.   That sound about right.

9    Q.   Okay.  And you were able to demonstrate that to Gateway

10   when you had this appointment; is that correct?

11   A.   Yes.

12   Q.   Now, and you were given a drug test when you came for

13   that new patient visit; is that right?

14   A.   I think it is, yes.

15   Q.   I know this is going to test your memory, but part of the

16   new patient process, I assume, you filled out some forms and

17   then they took a urine sample from you; is that right?

18   A.   I think they did.

19   Q.   Okay.  And you didn't -- I'm sure you didn't know the

20   results when you walked out the door on January 31, 2019?

21        But they found that -- I guess it had been prescribed by

22   Commonwealth -- OxyContin, oxymorphone, hydrocodone and

23   gabapentin.

24        Do you remember coming back to Gateway and saying that

25   those prescribed drugs were in your urine at your very first

S. BROWN - Cross-Examination                                70

1    visit?

2    A.   I don't remember that.

3    Q.   Okay.  But that would have been consistent with what

4    Commonwealth was prescribing for you?

5    A.   I knew that I had something like that in my system, like,

6    oxycodone that -- where they would know I could handle

7    something like that.

8    Q.   I mean, were you actually a patient at Commonwealth Pain

9    Specialists before you went to --

10   A.   Is that in Lexington, Kentucky?

11   Q.   Yes, sir.

12   A.   Yes.

13   Q.   Okay.  Had they prescribed you pain pills?

14   A.   Yes, but not oxymorphone.

15   Q.   But you gave this drug sample at Gateway Medical

16   Associates.

17        And when you came back to Gateway, did they tell you that

18   that's what your urine drug screen showed?

19   A.   I can't remember, man.  It's been so long ago.

20   Q.   Okay.  Well, that wouldn't have raised any red flags to

21   anybody.  They could have assumed that that's what you got at

22   Commonwealth; is that right?

23             MR. SMITH:  Objection.

24             THE COURT:  I'll sustain that.

25   BY MR. STRIANSE:

*S. BROWN - Cross-Examination*                                        71

1    Q.   Now, the very first visit that you had was with
2    Dr. Stanton; is that right?
3    A.   Yes.
4    Q.   And that was January of '19.
5         Did Dr. Stanton tell you that he was filling in for
6    Dr. Maccarone?
7    A.   Yes, he did.
8    Q.   Okay.  You saw Stanton again in March of 2019.
9         Does that sound right?
10   A.   I guess it does.
11   Q.   Okay.  And you remember having a drug test when you
12   returned in June of 2019?
13   A.   I -- I had a drug test about every time I went.  Yes.
14   Q.   Do you remember having a drug test when it was negative
15   for everything?
16   A.   Negative?  Like?
17   Q.   Negative where your prescription pills were not showing
18   up in your urine.
19   A.   Yes, I remember that.
20   Q.   And, obviously, that's a problem if they have given you a
21   prescription and you come and give a sample and none of that
22   metabolite is in your urine; is that right?
23   A.   That's right.
24   Q.   Because you and Misty had gone to other pain clinics
25   before GMA, correct?

S. BROWN - Cross-Examination                                       72

1    A.   Yes.

2    Q.   You all went to the one in Lexington; is that right?

3    A.   Yes.

4    Q.   And you started to tell the jury before that you went to

5    a number of them in Virginia; is that right?

6    A.   Well, I went to, like, three in Virginia and some over in

7    Murfreesboro, Tennessee.

8    Q.   Do you remember when that process began, where you and

9    Misty started --

10   A.   We started out in 2012 or '13.

11   Q.   Okay.  So by the time that you showed up at Gateway in

12   2019, you and Missy were pretty sophisticated on going to

13   these pain clinics?

14   A.   Yes.

15   Q.   Knowing what you needed to present in order to appear to

16   be legitimate pain patients?

17   A.   We also know like -- yes.

18   Q.   Okay.  After you had that all negative urine result, do

19   you remember having a later drug test that had some

20   methamphetamine in it?

21   A.   Yes.

22   Q.   Okay.  And at that point in time the records reflect that

23   you were given a warning, correct?

24   A.   Yes.

25   Q.   You were given some counseling; is that correct?

1   A.   Counseling?  I don't know what you mean by "counseling."

2   Q.   Well, somebody would just give you a good talking to.

3   A.   Oh.

4   Q.   You don't need to be taking that?

5   A.   Oh, yes.

6   Q.   And then your next two visits, your urine was very good.

7   It had the metabolites in it; is that right?

8   A.   Probably was.

9   Q.   Okay.  And then you were finally discharged by

10  Dr. Maccarone when your final drug test had oxymorphone,

11  hydrocodone, Morphine, and gabapentin?

12  A.   Which time are you talking about?

13  Q.   That was in -- at the end of your visits to GMA, about

14  fall of 2020.  September 24, 2020.

15  A.   I was dismissed two or three times from him.

16  Q.   Do you remember the last one when you had some things in

17  your urine that you weren't supposed to?

18  A.   I can't remember.  I got dismissed two or three times.

19  Q.   I know it's been a long time.

20       Just a couple of other things I wanted to ask you.

21       You talked about an $800 visit at GMA.

22  A.   Yes.

23  Q.   That was a Dr. Maccarone visit; was it not?

24  A.   Yes.

25  Q.   Do you remember that your initial visits were with

*S. BROWN - Redirect Examination*                                          74

1    Stanton because Stanton was filling in for Maccarone; does

2    that --

3    A.   Yes.

4    Q.   -- sound right?

5         And then Maccarone came back to the practice; is that

6    right?

7    A.   Yes.

8    Q.   And you started seeing him?

9         And he's the person that you had to wait for until --

10   A.   Right.

11   Q.   -- after midnight maybe?

12   A.   Yes.

13              MR. STRIANSE:  Your Honor, may I have one moment?

14              THE COURT:  Of course.

15        (Off-the-record discussion.)

16              MR. STRIANSE:  Those are my questions.

17              THE COURT:  I'm sorry?

18              MR. STRIANSE:  Those are my questions.

19              THE COURT:  Thank you.

20        Mr. Smith.

21                        REDIRECT EXAMINATION

22   BY MR. SMITH:

23   Q.   Now, Mr. Brown, just a couple of questions.

24        You were asked a couple of questions by Mr. Strianse

25   about your significant problems with your back and whether you

1    really needed medication.

2         Do you remember that?

3    A.   Yes.

4    Q.   Okay.  Just so the jury is very clear on this:  Do you

5    feel like you needed the amount of medications that you got

6    from GMA?

7    A.   Not that amount.  No, I don't.

8    Q.   Now, you also talked about this first drug screen.  And

9    you were asked, Hey, weren't you getting the prescription from

10   another pain clinic.  That would explain kind of the result of

11   that drug test.

12   A.   Yes.

13   Q.   Were you getting prescriptions before then for three

14   different benzos?

15   A.   Benzo?

16   Q.   The Xanax and others.

17   A.   No.

18   Q.   So if you had Xanax, would you have been using it?

19   A.   Yes.

20   Q.   What about hydromorphone or hydrocodone?

21   A.   I would.  I don't remember.  I don't remember the

22   hydro stuff.  I remember oxycodone, but I don't know how the

23   hydromorphine would have been in there.

24   Q.   If there was hydromorphone in your system, would that be

25   a legitimate source?

1   A.   It probably would, but I don't know.  I don't remember

2   how I would have got that.

3   Q.   Just to be clear:  When I say "legitimate sources," it

4   means you don't remember being prescribed that?

5   A.   No.

6   Q.   Do you remember filling out a new patient questionnaire

7   when you came to the clinic?

8   A.   Yes.

9   Q.   Do you recall writing on there that hydrocodone didn't

10   work?

11   A.   Hydrocodone?  I'm -- I'm getting lost here.  Hydrocodone

12   is -- yes, I remember that.

13   Q.   Is hydrocodone also sometimes called Norco?

14   A.   Yes.

15   Q.   Do you remember saying "Norco doesn't work"?

16   A.   Yes.

17   Q.   Did you ever have a discussion with Dr. Stanton about,

18   Hey, why did you say in your questionnaire that hydrocodone

19   doesn't work and there's hydrocodone and hydromorphone -- or

20   hydromorphone in the drug test?

21   A.   I think I wrote on my paperwork that I was allergic to it

22   or something like that.

23   Q.   So the question to you is:  If you're saying you're

24   allergic to it and doesn't work, did Dr. Stanton look at that

25   as the doctor and say, then why is it in your body?

1      A.   I can't remember.

2             MR. SMITH:  That's all the questions I have.

3             THE COURT:  Okay.  Is he finally excused?

4             MR. SMITH:  Yes, Your Honor.

5             THE COURT:  Do you agree?

6             MR. STRIANSE:  Your Honor, I had one other question.

7      I don't remember the Court's ruling on that.

8             THE COURT:  All right.  Let's talk about it.

9         (Sidebar conference.)

10            THE COURT:  Okay.  I don't allow recross

11     automatically.  If you'll tell me what you want to ask about.

12            MR. STRIANSE:  I wanted to ask about, he started off

13     on a very low dose with Dr. Stanton and Dr. Maccarone raised

14     him up is what I wanted to ask him.

15            THE COURT:  Low dose of which?

16            MR. STRIANSE:  A low dose of the combination of drugs

17     that he was prescribed.

18            THE COURT:  I'll let you ask him if Dr. Maccarone

19     raised his prescription, but limit it to that.

20            MR. STRIANSE:  Yes, sir.  Thank you.

21            THE COURT:  Okay.

22         (Sidebar conference concluded.)

23            THE COURT:  Mr. Strianse.

24                         RECROSS-EXAMINATION

25     BY MR. STRIANSE:

1    Q.   Mr. Brown, just one more question.

2    A.   Okay.

3    Q.   You saw Dr. Stanton initially when you came to GMA.

4         Do you remember leaving with a relatively low dose of

5    drugs?

6    A.   Yes.

7    Q.   And then when Dr. Maccarone came back to work, he raised

8    that up?

9    A.   Yes, he did.

10             MR. STRIANSE:   That's all.

11             THE COURT:   Whenever a lawyer says "one more

12   question," be skeptical.

13        That was two, though, so pretty good.

14        Okay.  He's finally excused.

15        Mr. Strianse, do you agree?

16             MR. STRIANSE:   Yes, Your Honor.

17             THE COURT:   Thank you, sir.  That concludes your

18   testimony.  You are free to go.

19        Counsel, let me say one thing to you.

20        (Sidebar conference.)

21             THE COURT:   So on direct examination, for both sides,

22   lawyers have a real tendency to want to encapsulate a thought

23   and have the witness endorse it.

24        So I don't like it when a lawyer says, in direct

25   examination, "so just to be clear, X", or "so the jury sees

1   this clearly, X."

2       That kind of editorializing is leading and it's a

3   commentary on the questioning.  It is not proper for direct

4   examination.

5       You've done it a couple of times, Mr. Smith.  I just want

6   you to stay away from that.

7       The same for you on direct, Mr. Strianse.

8       Understand?

9           MR. SMITH:  Understood.

10          THE COURT:  Okay.

11      (Sidebar conference concluded.)

12          THE COURT:  All right.  Next witness.

13          MR. SMITH:  Your Honor, the United States calls

14   Diversion Investigator, Kyle Sizemore.

15           KYLE SIZEMORE, GOVERNMENT'S WITNESS, SWORN

16          THE WITNESS:  I do.

17          THE COURT:  Sir, good afternoon.

18          THE WITNESS:  Good afternoon.

19          THE COURT:  Do try to speak toward that mic in a

20   clear voice so we can hear you during your testimony.

21      If you would start by telling me your name and spelling

22   your last name.

23          THE WITNESS:  Kyle Sizemore.  And it's

24   S-I-Z-E-M-O-R-E.

25          THE COURT:  Thank you.

1          And do you want the instruction now, Mr. Smith, or --

2               MR. SMITH:  Yes, Your Honor, I think that would be

3     helpful.

4               THE COURT:  As I told you, I'll occasionally give you

5     an instruction during the trial.  We call that a midtrial

6     instruction.  I'm going to give you one now that addresses

7     this witness, what we call a "dual role," as both a fact and

8     opinion witness.

9          You're about to hear, or are hearing, the testimony of

10    Investigator Sizemore who is expected to testify regarding

11    both facts and opinions.  You should give each of these types

12    of testimony as much weight as you think it deserves,

13    considering the factors I will instruct you on at the end of

14    the proof.

15         These factors generally include the witness's ability or

16    inability to perceive relevant events, his memory, his

17    behavior while testifying, and any potential motives.  Another

18    relevant factor is how believable the testimony is in light of

19    all of the other evidence.

20         You should consider these factors, which I'll explain in

21    more detail when I give my final instructions at the end of

22    the proof, in weighing the credibility of this witness and

23    considering his factual testimony.

24         As to the witness's testimony regarding his opinions, you

25    do not have to accept any of the witness's opinions in

1    addition to the general factors that I just described.  In

2    deciding how much weight to give an opinion, you should

3    consider the witness's qualifications in how he reached his

4    conclusions.

5         You should also consider this witness's dual fact and

6    opinion roles in determining what weight, if any, to give his

7    opinion testimony.

8         Remember, that you alone decide how much of a witness's

9    testimony to believe and how much weight it deserves.

10        All right.

11        Mr. Smith.

12                         DIRECT EXAMINATION

13   BY MR. SMITH:

14   Q.   Sir, could you introduce yourself to the jury one more

15   time?

16   A.   My name is Kyle Sizemore.

17   Q.   Where do you work?

18   A.   With the Drug Enforcement Administration.

19   Q.   And what is your title there?

20   A.   Diversion investigator.

21   Q.   How long have you been a diversion investigator?

22   A.   Since around 2012, around ten years.

23   Q.   Can you describe, in general terms, what a diversion

24   investigator does?

25   A.   A diversion investigator conducts investigations, whether

1   that be administrative, civil or criminal, all in the effort

2   of ensuring that -- that diverted pharmaceuticals aren't

3   diverted from legitimate channels into illegitimate channels.

4   Q.   Have you received training on drug trafficking and drug

5   diversion?

6   A.   Yes, sir.

7   Q.   What kind of cases have you worked in your career?

8   A.   Variety of cases.  Again, they're administrative, civil,

9   criminal in nature.  Almost always involving diverted

10  pharmaceuticals.

11  Q.   Have you worked cases involving diverted pain pills?

12  A.   Yes, sir.

13  Q.   Approximately how many?

14  A.   At least a dozen.

15  Q.   I want to talk about that.  If we can step back, first.

16  What is a -- what is a controlled substance?

17  A.   A controlled substance is a substance that has been

18  deemed to be controlled based on its medicinal value in

19  conjunction with the potential for abuse and addiction.

20  Q.   Have you heard the term "closed system distribution"?

21  A.   Yes, sir.

22  Q.   Can you explain to the jury, please?

23  A.   The closed system is the legitimate channel that a

24  controlled substance would travel, starting from your

25  manufacturer.  Once the substance is manufactured, down to the

1  distributor, down to the pharmacy, which eventually, it leaves

2  the closed system via prescription, to the end user.

3  Q.   Your -- give us your title again.

4  A.   Diversion investigator.

5  Q.   So the first word there, "diversion."

6       What does that mean?

7  A.   A diversion would be whenever a controlled substance or a

8  listed chemical is diverted from its legitimate channel into

9  illegitimate channels.

10  Q.   In your experience, what are some of the commonly

11  diverted controlled substances?

12  A.   Oxycodone, oxymorphone, Xanax.

13  Q.   Based on your training and experience, do those drugs

14  have a value on the street?

15  A.   Yes.

16  Q.   Can you give the jury a sense of the street value for

17  oxycodone?

18  A.   It varies based on milligrams.  And it varies based on

19  supply and demand, and then how -- how many times that that

20  drug has been resold.

21       For example, it's usually around a dollar a milligram.

22  So that you would see an oxycodone 30 milligram at $30, but

23  I've also seen them as high as 55 to $60.  Again, just based

24  on supply and demand, based on how many times it's been

25  resold.

1    Q.   What about oxymorphone?

2    A.   Again, depends on milligrams.  And I've seen that

3    about -- as high as $100 per pill.

4    Q.   Not to put you on the spot.  But if -- at that rate, how

5    much would a pill bottle filled with 60 oxymorphone pills be

6    worth?

7    A.   $6,000.

8    Q.   Now, in your experience and training, you told us that

9    these have a street value.

10        Can you give the jury a sense of how these pills get to

11   the street, in your experience?

12   A.   In the cases that I have worked, it usually ends up with

13   people finding clinics that are willing to write those types

14   of drugs in high quantities or dosages, which are then

15   presented via prescriptions to the pharmacies, and then

16   they're just resold multiple times on the street.

17   Q.   Now, are you familiar with kind of a more typical or

18   classic drug distribution conspiracy for a more illicit drug

19   like heroin or meth or something like that?

20   A.   Yes.

21   Q.   Okay.  Can you just explain to the jury how that is

22   typically structured?

23   A.   A drug trafficking organization with like an illicit

24   drug?

25   Q.   Yes, please.

1    A.   So, typically, you're going to have an ultimate source of

2    supply at the top and it's going to -- it's going to flow down

3    to -- there's multiple different levels of the organization,

4    all having a common goal of selling whatever that illicit drug

5    is for profit.

6    Q.   Is there often direct communication between those various

7    different levels?

8    A.   No.

9    Q.   Can you explain how a pill trafficking distribution

10   system works, in your training and experience?

11   A.   In a very similar fashion, except we imagine that the

12   ultimate source of supply, would be the registrant, which is

13   an individual or -- or business that is registered with the

14   DEA to handle dispensing and prescribing controlled

15   substances.   Those would be the ultimate source of supply and

16   the supply would float down multiple levels of the

17   organization.

18   Q.   Have you heard the term "sponsoring"?

19   A.   Yes.

20   Q.   Can you explain that to the jury?

21   A.   A sponsor is when someone provides a means to another

22   person or group of people to travel to a clinic.   That might

23   be in the form of money.   Might be in the form of

24   transportation, food on the trip, things like that.   And in

25   exchange, they usually get the prescription, or they will get

1   part of the prescription, or they will get proceeds from the

2   sales of the prescription, or combination of them both.

3   Q.   In your experience, is there a lot of direct and overt

4   communication between the clinic, the sponsors, and anybody

5   who's using the drugs?

6   A.   No.

7   Q.   Are you trained to identify something called "red flags"?

8   A.   Yes.

9   Q.   What are red flags?

10  A.   Red flags are indicators that are indicative of

11  diversion.

12  Q.   Can you walk us through some of the common red flags that

13  you might use in your investigation?

14  A.   Yeah.  So first we look at something like the geography,

15  like how far the distance between the patient and provider.

16  We would look to see if there is patients that have the same

17  address, that are getting prescriptions written on the same

18  day, indicating they're all traveling together those long

19  distances.

20       We would take a look at the types of drugs that are being

21  prescribed.  Is it addictive combination of the cocktails?  Is

22  it high-dosage, high-quantities?

23       And then we take a look at something that we call

24  "pattern of prescribing."  Is it everyone seems to be getting

25  a very similar treatment from the clinic, all similar

1    prescriptions?

2    Q.   And can you explain in your training and experience why

3    that pattern and prescribing constitutes a red flags?

4    A.   Because these -- the patients should be receiving what is

5    called individualized treatment.  And the pain should be

6    treated differently.  So we consider that a red flag when

7    everyone is getting the same type of treatment, having the

8    same level of pain.

9    Q.   Have you had the opportunity, in the course of your work,

10   to compare prescribing patterns of various practitioners?

11   A.   Yes.

12   Q.   And in practices that you have observed that don't have

13   these kind of red flags, what does that prescribing typically

14   look like?

15   A.   It typically varies.  You don't see -- you don't see --

16   you know, everyone having the same high dosage or same

17   quantity or some type of combination.

18   Q.   Now, do you use those red flags at the kind of initial

19   parts of your investigation work when you are working a case?

20   A.   Yes.

21   Q.   As the investigation is moving along, you learn more

22   about what goes on inside a clinic, are there also red flags

23   that you are looking for about the clinics as a practice?

24   A.   Yes.

25   Q.   Can you explain some of those?

1    A.   We'll take a look at how the clinic treats drug screens.

2    Are they using those properly?  Are they using the pill counts

3    properly?  Are they requiring imaging?  Are they using that

4    properly?  Things like that.

5    Q.   Now, do any of those red flags, standing alone, mean

6    something illicit or illegal is going on?

7    A.   No.

8    Q.   What are you looking for as an investigator?

9    A.   We're looking for red flags in the totality of the

10   situation.

11   Q.   In your experience, do clinics that prescribe

12   illegitimately, outside of the bounds of practice, do they

13   undertake efforts to make themselves look legitimate?

14   A.   Yes.

15   Q.   Can you explain that?

16   A.   They will typically have, you know, medical facility.

17   They will have equipment.  They will have staff.  They will

18   have hours on the door.  It would be a typical business that

19   when you drove by, you just see it as a typical business.

20   Q.   Have you ever had an investigation that didn't make

21   themselves look at least somewhat legitimate?

22   A.   No.

23        MR. SMITH:  Your Honor, that's all the questions I

24   have at this time for Investigator Sizemore, but ask that he

25   be subject to recall.

1          THE COURT:  Yes.  Thank you.

2      Mr. Strianse.

3          MR. STRIANSE:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. STRIANSE:

6   Q.   Good afternoon, Special Agent Sizemore.

7   A.   The same to you.

8   Q.   I wanted to ask you -- you talked about you look at

9   prescribing patterns in your role as diversion investigator;

10  is that right?

11  A.   Yes, sir.

12  Q.   GMA was Dr. Maccarone's clinic; is that right?

13  A.   Yes.

14  Q.   And you were familiar with the fact that Dr. Stanton was

15  working there as a medical director in 2016 and 2017 before he

16  stepped in for Maccarone when Maccarone was out?

17  A.   Not at the onset in the investigation.  I didn't learn

18  that until later on.

19  Q.   But did you learn it at some point in time?

20  A.   Yes, sir.

21  Q.   And when you -- when you were looking at the prescribing

22  pattern as you characterized it, I assume that you looked at

23  the CSMD?

24  A.   Yes.

25  Q.   And explain to the jury what is the CSMD.

1    A.    That is Tennessee's version of a Prescription Drug

2    Monitoring Program.

3    Q.    What is a prescription drug monitoring program?

4    A.    It is a, basically, a log of all of the prescriptions,

5    controlled prescriptions, that an individual gets dispensed

6    from a pharmacy.

7    Q.    And it's listed by the provider?

8    A.    Yeah.  I mean, you can get -- well, there is multiple

9    different reports that you get from the -- from a PMP.

10   Q.    But you could search by provider, I guess?

11   A.    You can do a request for providers over a certain time

12   frame, yeah.

13   Q.    And then -- and what is the KASPER monitoring system?

14   A.    It is Kentucky's version of a Prescription Drug

15   Monitoring Program.

16   Q.    And the court reporter probably already knows this, but

17   could you spell it for the record?

18   A.    K-A-S-P-E-R.

19   Q.    In the course of this investigation, did you access the

20   CSMD in Tennessee and the KASPER in Kentucky regarding the

21   prescribing practices of John Stanton in the years 2016 and

22   2017?

23   A.    Yes.

24   Q.    And what did you see in 2016 and 107?

25         THE COURT:  Hang on.  Just a moment.  Let's talk for

1    a moment.

2         (Sidebar conference.)

3         THE COURT:  So the government was very careful in

4    only using this investigator to talk generically about red

5    flags.  He did not -- I don't think he said a word about this

6    clinic or this investigation.

7         Now, I expect he's going to later; is that right?

8         MR. SMITH:  That's correct, Your Honor.

9         THE COURT:  The government is bifurcating that

10   testimony.  Now, of course, you're on cross here, and you've

11   got to stay within the scope of the direct, and so going to

12   the specifics of the clinic is outside of the scope of direct.

13        I don't want to confuse the jury because the direct

14   testimony to this point was only generically about red flags

15   and investigations of this type.

16        What's your view, Mr. Smith?

17        MR. SMITH:  Your Honor, I didn't want to jump in too

18   early, but, yes.  My view is that he will, at some point,

19   probably talk about his investigation, at which point this

20   kind of cross-examination would be proper.  But it's not

21   really related to what I asked.

22        THE COURT:  Yeah.  I mean, you're going to get your

23   full shot on that, I just don't think yet.

24        MR. STRIANSE:  Okay.  That's fine.

25        THE COURT:  Okay.

1        (Sidebar conference concluded.)

2              MR. STRIANSE:  Those are all my questions.  Thank

3    you.

4              THE COURT:  Thank you.  And do you have any redirect?

5              MR. SMITH:  No, Your Honor.  Thank you.

6              THE COURT:  Thank you.  So that concludes part of

7    this witness's testimony.  He may be recalled at a later

8    portion of the government's case, but for now you can step

9    down, sir.  Thank you.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Mr. Smith.

12             MR. SMITH:  Your Honor, the United States calls

13   Darian Williams.

14             THE COURT:  Darian Williams.  If you ever need to

15   stand up and stretch during a break when we bring witnesses

16   in, feel free to do that.

17         DARIAN WILLIAMS, GOVERNMENT'S WITNESS, SWORN

18             THE WITNESS:  Yes.

19             THE COURT:  Good afternoon, sir.

20             THE WITNESS:  Hi.

21             THE COURT:  Do try to speak directly towards that

22   microphone in a clear voice so we can hear you.

23        The mic moves, the chair does not.  So you can pull it

24   close toward you.  Thank you.

25        Would you start by telling me your name and spelling your

*D. WILLIAMS - Direct Examination*                                          93

1    last name?

2            THE WITNESS:  Darian Williams.  W-I-L-L-I-A-M-S.

3            THE COURT:  Thank you.

4        Mr. Smith.

5            MR. SMITH:  Thank you, Your Honor.

6                          DIRECT EXAMINATION

7    BY MR. SMITH:

8    Q.   Sir, where are you employed?

9    A.   Currently employed as a detective with the Kentucky

10   Office of the Attorney General.

11   Q.   Where did you work before that?

12   A.   Clay County Sheriff's Department.

13   Q.   Can you give us and explain to the jury, just a high

14   level background, of your career in law enforcement?

15   A.   Sure.  I've been a police officer since 1999.  I've --

16   prior to that, I was a police dispatcher for about four years.

17   During that time, I did a short stint at the Cincinnati

18   International Airport police, right after 9-11.

19       Most of my time, though, was spent at the Hazard Police

20   Department, in Hazard, Kentucky.

21   Q.   Have you previously worked cases involving the

22   trafficking of prescription controlled substances?

23   A.   Yes.

24   Q.   Were you involved in an investigation of Gateway Medical

25   Associates?

1    A.    Yes.

2    Q.    When you were involved in that investigation, who were

3    you employed by?

4    A.    Clay County Sheriff's Department.

5    Q.    Did you have any association with the DEA?

6    A.    I did.  I was assigned as a task force officer with the

7    DEA during that period.

8    Q.    Can you explain to the jury what a task force officer

9    means?

10   A.    Sure.  It's basically when an officer from a local law

11   enforcement agency is contracted to a federal law enforcement

12   agency, in this case, it was with the DEA.

13        The DEA would provide me with equipment, provide me with

14   a vehicle, desk, office space, resources mainly.  And in

15   return, I would help them with their investigations.

16   Q.    When you became involved in the investigation, what

17   agency was leading the investigation?

18   A.    I believe it was the DEA.

19   Q.    Were you involved in that investigation as it went

20   forward?

21   A.    Yes.

22   Q.    And what year did you get involved?

23   A.    2019.

24   Q.    If we can, let's talk about some of the steps that you

25   took in your investigation.

*D. WILLIAMS - Direct Examination* 95

1      First, where is Gateway Medical Associates located?

2   A.   Clarksville, Tennessee.

3   Q.   Did you, in the course of your investigation, personally

4   travel to the clinic?

5   A.   Yes.

6   Q.   Did you conduct surveillance there?

7   A.   Yes.

8   Q.   If we can, for the witness, can we please bring up

9   Government's 2?  2A.

10      Sir, could you just let us know when you see something on

11   the screen in front of you?

12      Sir, can you see anything on your screen?

13   A.   No, sir.

14          MR. SMITH:  I can't see anything on ours, either.

15   Your Honor, I think I've been advised to try a different cable

16   if that's all right.

17      Apologies, Your Honor.  It was working before.

18          THE COURT:  No.  No.  Got the seal?

19          AGENT SIZEMORE:  Just the seal.

20          MR. SMITH:  Well, Your Honor, I hate to do this, but

21   might we take a five-minute break to figure this out?

22          THE COURT:  Sure.  We'll do that.  And we might need

23   to reboot.  Common occurrence.  So we'll take about -- let's

24   just go head and take 15 minutes at this point, and then we'll

25   come back and try to push through to the end of the day.

*D. WILLIAMS - Direct Examination*                                      96

1    Same admonitions as always.  Leave your notebooks behind.

2    No discussion, research.  Keep a wide open mind in the case.

3    I'll excuse the jury for 15 minutes now.  Thank you.

4         (The jury exited the courtroom at 4:05 p.m.)

5         THE COURT:  Thank you.  The jury has exited.

6    Sir, you can step down, and I would just ask you, you can

7    leave the courtroom and just don't discuss your testimony

8    during the break and be ready to go in 15 minutes.  Thank you.

9    Okay.  We'll take that break and I'm sure as soon as we

10   take the break, it's fixed.  But you can run it through some

11   trials and make sure it is working, and we'll come back in a

12   few minutes.

13   My hope is we can get through the witness's direct and

14   cross, and that might get us to the end.  But I would at least

15   like to get this witness finished if we can.

16   All right.  Thank you.

17        (Recess from 4:07 p.m. until 4:18 p.m.)

18        (The jury entered the courtroom at 4:18 p.m.)

19        THE COURT:  Thank you.  We're back on the record with

20   all counsel present.  The jury is back in the courtroom.

21   Naturally, the moment the door shut behind you everything

22   started working, so that's how life goes.

23   Mr. Williams, you're still under oath.  Do you understand

24   that?

25        THE WITNESS:  Yes, sir.

1          THE COURT:  You may continue your direct examination.

2          MR. SMITH:  Thank you.

3   BY MR. SMITH:

4   Q.   All right.  When we left off, I was asking to bring up

5   Government Exhibit 2A.

6          Can you see that, sir?

7   A.   Yes.

8   Q.   Sir, what is shown on 2A?

9   A.   That's the front entrance to Gateway Medical Associates.

10          MR. SMITH:  And can you also show the witness 2B?

11   BY MR. SMITH:

12   Q.   Just for the sake of time, what is 2B, sir?

13   A.   That's Gateway Medical Associates.

14   Q.   Okay.  Who took those pictures?

15   A.   I did.

16   Q.   Okay.  Does that accurately reflect how Gateway appeared

17   during the time of your investigation?

18   A.   Yes, sir.

19          MR. SMITH:  Your Honor, we move to admit Government

20   Exhibit 2A and 2B.

21          MR. STRIANSE:  No objection.

22          THE COURT:  Those will be admitted and may be

23   displayed.

24          MR. SMITH:  Can we please publish those to the jury?

25          THE COURT:  Yes, you may.

1    BY MR. SMITH:

2    Q.   Sir, just to explain, what is 2A for the jury?

3    A.   It's the front entrance to Gateway Medical Associates.

4    Q.   And 2B?

5    A.   2B is an overall view of Gateway Medical.

6    Q.   Okay.  You referenced before we took a break

7    surveillance.

8         Can you explain to the jury what the purpose of doing

9    surveillance at GMA was?

10   A.   We did surveillance early on in the investigation because

11   we heard that they kept really odd hours, late at night.

12   Patients staying up in the -- into the early morning, and

13   we -- we did surveillance basically to verify that and to look

14   for any other red flags.

15   Q.   What is a pole camera?

16   A.   A pole camera is a camera that we use in investigations

17   sometimes.  It is usually mounted on a utility pole.  It is

18   done covertly or secretly to monitor a location, and they

19   typically record 24/7, and we usually have access to monitor

20   those remotely if we need to.

21   Q.   And it is called a pole camera because it is sometimes

22   affixed to a pole?

23   A.   Usually it's on a utility pole.

24   Q.   Did investigators install a pole camera in this case?

25   A.   Yes.

*D. WILLIAMS - Direct Examination*                                    99

1    Q.   Have you reviewed portions of that pole camera footage?

2    A.   Yes.

3            MR. SMITH:  If we can, just for the witness, can we

4    please bring up Government Exhibits 3A through G, and start

5    with the Exhibit 3A.

6    BY MR. SMITH:

7    Q.   Sir, what are Government Exhibits 3A through G?

8    A.   Those are screenshots taken from the pole camera video.

9    Q.   And when a pole camera is recording, how long is it

10   recording?

11   A.   It's typically recording 24/7.

12   Q.   Basically a continuous thing?

13   A.   Yes, continually.

14   Q.   And for purposes of the trial day, rather than lengthy

15   video shots, did you take screenshots of certain videos?

16   A.   Yes.

17   Q.   Okay.  Do those screenshots accurately depict what you

18   see in those videos in your review of it?

19   A.   Yes.

20   Q.   What time periods are Exhibits 3A through G captured

21   from?

22   A.   Late night.

23   Q.   Sorry.  Bad question.

24       Time period, as dates.  Month and year.

25   A.   December of 2019.

*D. WILLIAMS - Direct Examination*                                100

1   Q.   Were you conducting surveillance and operations in that

2   time frame?

3   A.   Yes.

4           MR. SMITH:  Your Honor, we move to admit Government

5   Exhibits 3A through G.

6           THE COURT:  Any objection?

7           MR. STRIANSE:  No objection.

8           THE COURT:  Thank you.  Those will be admitted and

9   may be displayed.

10          MR. SMITH:  If we can, please, publish 3A.

11  BY MR. SMITH:

12  Q.   Sir, do you see that?

13  A.   Yes.

14  Q.   Okay.  Now, is there a time stamp on the upper left-hand

15  corner of the image?

16  A.   Yes.

17  Q.   Based on your review and familiarity with the videos,

18  does that seem to generally depict the local time of the pole

19  camera?

20  A.   Yes.

21  Q.   Where was that?

22  A.   It was across the street from Gateway Medical Associates.

23  Q.   In what city?

24  A.   Clarksville Tennessee.

25  Q.   What time zones are they?

*D. WILLIAMS - Direct Examination*                                    101

1    A.   Central time.

2    Q.   So these depict times, central time; is that fair?

3    A.   Yes.

4    Q.   What time, approximately, is captured in

5    Government Exhibit 3A?

6    A.   11:00 to 12:00 p.m.

7    Q.   What do you see in that screenshot?

8    A.   Vehicles in the parking lot, lights on inside of the

9    business.

10   Q.   Okay.  Did you review the screenshots from another day

11   later that week?

12   A.   Yes.

13            MR. SMITH:  Can we bring up Exhibit 3B, please?

14   BY MR. SMITH:

15   Q.   What do you see in 3B?

16   A.   It is a screenshot from December 10th at 10:23 p.m.  It

17   looks to be at least five vehicles in the parking lot and

18   someone standing in the parking lot.

19            MR. SMITH:  And if we can turn to 3C, please.

20   BY MR. SMITH:

21   Q.   Please describe that.

22   A.   December.  It's a screenshot from December 11, 2019, at

23   8:51 p.m.  Again, four.  It looks like four vehicles in the

24   lot and someone getting into one of those vehicles, or

25   standing outside one of those vehicles.

*D. WILLIAMS - Direct Examination*                                     102

1   Q.   Are each of these screenshots that you've taken from

2   various points in December of 2019?

3   A.   Yes.

4            MR. SMITH:   So just for efficiency, let's take a look

5   at Government's Exhibit 3F.

6   BY MR. SMITH:

7   Q.   What was the date and time of this one?

8   A.   December 23, 2019, at 8:24 p.m.

9            MR. SMITH:   And is that 3F?  Can we go to 3F, please?

10  Can we go to the next one?  K.

11  BY MR. SMITH:

12  Q.   What date and time does this depict?

13  A.   December 30, 2019, at 10:26 p.m.

14  Q.   Again, what do you see in the video clip?

15  A.   A lot of vehicles in the parking lot, lights on inside

16  the clinic.

17  Q.   Now, what significance did that have to you as an

18  investigator?

19  A.   If it were an emergency room or like an urgent care

20  center, something like that, it's not uncommon for someplace

21  like that to be open, like an emergency room to be open all

22  night.

23       But a regular medical clinic, or a specialty clinic, it's

24  very unusual to see them operating at those hours.

25  Q.   Now, in addition to the pole cam --

1    MR. SMITH:  You can go ahead and take that down.

2    Thank you.

3    BY MR. SMITH:

4    Q.   In addition to the pole cam, did you conduct in-person

5    surveillance at Gateway Medical?

6    A.   Yes.

7    Q.   Did that include after dark?

8    A.   Yes.

9    Q.   What did you see when you did that surveillance?

10   A.   Pretty much what was reflected in those still images.

11   Vehicles in the parking lot, late, after dark.  After normal

12   business hours.

13   Q.   Did you also go to the clinic during daylight hours?

14   A.   Yes.

15   Q.   What did you see?

16   A.   I was able to see a lot of vehicles with license plates

17   from eastern Kentucky.  A lot of these vehicles would have

18   multiple occupants.  People out.  In the summertime, when it

19   was warm out, there would be a lot of people out milling

20   around the parking lot.  People would bring coolers with them,

21   get out, socialize.  Eat, drink, share food.  It was -- it was

22   almost like a tailgating party-type of atmosphere.

23   Q.   Did you take any photos or videos when you were doing

24   that surveillance?

25   A.   I did.

1        MR. SMITH:  If we can, let's take a look at Exhibit

2    23 for the witness.

3    BY MR. SMITH:

4    Q.   Do you remember approximately what time period this was?

5    A.   I don't.

6    Q.   Okay.  Well, when were you doing surveillance at GMA?

7    A.   Summer of 2019, I think.

8    Q.   Okay.  Okay.  And what is depicted in Exhibit 23A?

9    A.   A lady walking across the parking lot pulling a cooler

10   behind her.

11   Q.   Okay.  Where is that?

12   A.   Toward my vehicle.

13   Q.   Where is this picture taken?

14   A.   She would have been almost directly in front of the front

15   entrance of GMA.

16        MR. SMITH:  Your Honor, we move to have admitted

17   Government Exhibit 23A.

18        THE COURT:  Any objection?

19        MR. STRIANSE:  No objection.

20        THE COURT:  Thank you.  That will be admitted and may

21   be displayed.

22   BY MR. SMITH:

23   Q.   If you could, just -- now that the jury can see it,

24   please describe what it is that you captured on that picture.

25   A.   I was parked in the front parking lot of GMA and this

*D. WILLIAMS - Direct Examination*       105

1  lady was parked across the parking lot and -- and dragging a

2  cooler over towards my direction.

3  Q.   Okay.

4        MR. SMITH:  Can we also show now the witness

5  Government's Exhibit 23B?

6  BY MR. SMITH:

7  Q.   Sir, what is captured in Exhibit 23B?  Just generally,

8  what is it?

9  A.   Three people standing around a couple coolers in the

10  parking lot of GMA.

11  Q.   Where did you take that picture?

12  A.   In the parking lot of GMA.

13  Q.   Is the same true of 23C?

14        MR. SMITH:  You can show that to him.

15        THE WITNESS:  Yes.

16        MR. SMITH:  Okay.  We move to admit 23B and C.

17        THE COURT:  Any objection?

18        MR. STRIANSE:  No objection.

19        THE COURT:  Those will be admitted and may be

20  displayed.

21  BY MR. SMITH:

22  Q.   Can you please just briefly describe to the jury what you

23  took a picture of with 23B and C?

24  A.   Those are three people standing around coolers in GMA's

25  parking lot.  Again, they would be almost directly in front of

*D. WILLIAMS - Direct Examination*                                      106

 1    the main entrance.

 2    Q.   Did you also take video when you were doing surveillance?

 3    A.   I did.

 4         MR. SMITH:  Okay.  Let's bring up 23D.

 5    BY MR. SMITH:

 6    Q.   Sir, are you familiar with what 23D is?

 7    A.   I believe so.

 8    Q.   Just in general terms, can you describe it for the Court?

 9    A.   It's video taken in the parking lot of GMA.  Same day.

10    I -- there -- a person had backed in next to me when I was

11    parked there, and --

12    Q.   Sir, you're going too far with that description.

13         MR. SMITH:  We move to admit 23D.

14         THE COURT:  Any objection?

15         MR. STRIANSE:  No objection.

16         THE COURT:  That will be admitted.

17    BY MR. SMITH:

18    Q.   For the sake of efficiency, is 23E -- can you explain

19    what that is?

20    A.   Video taken in GMA's parking lot.

21         MR. SMITH:  Also move to admit 23E, Your Honor.

22         THE COURT:  Any objection?

23         MR. STRIANSE:  No objection.

24         THE COURT:  23E will also be admitted.  Both can be

25    displayed.

*D. WILLIAMS - Direct Examination*                                    107

1          MR. SMITH:  Can we please play the Exhibit 23D,

2     please.

3          (Video clip played in open court.)

4     BY MR. SMITH:

5     Q.   All right.  Sir, based on your review and observations

6     that day, what does 23D appear to capture?

7     A.   When we were doing surveillance that day, the gentleman

8     operating that vehicle backed in next to my vehicle.  I saw

9     him retrieve something out of the cooler in his backseat.

10    Later found out it was some type of sandwich and popped the

11    hood, and put the sandwich in under his hood to heat it up, we

12    assume.

13         And that video was then checking it to see if it was

14    heated to his satisfaction, I guess, and then later he came

15    back and got it and ate it.

16    Q.   Okay.  So the pictures of coolers, of heating up food,

17    can you explain to the jury the significance of that to your

18    investigation at the time?

19    A.   You just don't see that in a normal clinic.

20    Q.   Okay.

21         MR. SMITH:  Can we look at the final video 23D,

22    please?  I mean, E.  I apologize.

23         (Video clip played in open court.)

24    BY MR. SMITH:

25    Q.   If you could, just as this is playing, explain to the

*D. WILLIAMS - Direct Examination*                                    108

1    jury what you saw that day.

2    A.   Several people gathered at the back of the black car that

3    was parked next to me.  Somebody caught something on fire.  I

4    don't know, a rag or something, on top of the wall and tossed

5    it over into the grass and just left it there and let it burn.

6    All having a social gathering.

7         Still a flame there on the right.

8              MR. SMITH:  Okay.  Rebecca.  That's fine.

9    BY MR. SMITH:

10   Q.   So, again, same question asked of you at the last video.

11   What is this kind of activity?  What was the significance of

12   that to you?

13   A.   You just don't see that in a normal clinic.

14   Q.   With -- basing your observations and these videos just

15   more generally, how long were people waiting at this clinic?

16   A.   Hours.  Long periods of time.

17   Q.   Were people waiting long enough, such that they had to

18   bring and prepare food?  And did it appear that way to you?

19   A.   Yes.

20   Q.   All right.  In addition to surveillance that we have just

21   gone over, did investigators use any confidential sources in

22   this investigation?

23   A.   Yes.

24   Q.   Can you explain what a confidential source or C.S. is?

25   A.   It is someone who agrees to cooperate with detectives or

*D. WILLIAMS - Direct Examination*                                      109

1    investigators in the case.

2    Q.   And what type of things do investigators sometimes ask

3    cooperating or confidential sources to do?

4    A.   Record conversations, wear wires, things like that.

5    Q.   In this case, do you know of somebody named John

6    Pasternak?

7    A.   Yes.

8    Q.   Okay.  What was Mr. Pasternak's relevance to your

9    investigation?

10   A.   He was a confidential source during the investigation.

11   Q.   How was he identified?

12   A.   The Barbourville, Kentucky Police Department got enough

13   information to conduct a search warrant at his residence, and

14   based on the information that he gave them, they told us that

15   we might want to come talk to him, and someone from DEA spoke

16   with him and he provided us information regarding GMA.

17   Q.   And I don't want to get into the exact substance of

18   anything he said.

19        But generally, based on the information, what did DEA

20   understand Mr. Pasternak was doing vis-a-vis GMA?

21             MR. STRIANSE:  Objection.  Sounds like it's hearsay.

22             THE COURT:  Yeah.  Let's talk about that.

23        (Sidebar conference.)

24             THE COURT:  Can you hear, Mr. Strianse?

25             MR. STRIANSE:  I can hear fine.

*D. WILLIAMS - Direct Examination*                                                110

1          THE COURT:  Mr. Smith.

2          MR. SMITH:  Yes, Your Honor.

3          THE COURT:  All right.  So I mean, I agree,

4    generally.

5       Tell me what you are anticipating him to say here.

6          MR. SMITH:  I'm not.  What I'm anticipating him to

7    say is just explaining that he was identified as a sponsor,

8    and that's why they then used him to engage in undercover

9    operations.

10      So I'm just trying to establish his role.  It's not for

11   the truth of whether he was doing something, but it's kind of

12   why him, out of anybody, would start doing that.

13         THE COURT:  Well, I don't want him saying that he was

14   a sponsor.  I don't want that characterization.

15      Can you just lead him around that?  And I mean, so they

16   began using Pasternak, that's the point, right?

17         MR. SMITH:  It is.  It's a little confusing

18   because -- we don't have to use the word "sponsor," but can

19   just as a proffer, what he told investigators was "I'm taking

20   people to this clinic."

21      And so what happened is the investigator says, "Okay.

22   Can you take people to the clinic unwittingly, but under our

23   observations?"

24      So that's what happened next.  I'm trying to put the time

25   line together.

1        THE COURT:  I mean, I think -- did he cooperate with

2    the investigation?  Did he facilitate the investigation

3    through making trips to GMA?  I think that's fine.

4        You okay with that?

5            MR. STRIANSE:  Yes, sir.

6            THE COURT:  But I don't want him relaying a

7    characterization of him being a sponsor as a predicate for his

8    involvement.  Thank you.

9        (Sidebar conference concluded.)

10           MR. SMITH:  Thank you, Your Honor.

11   BY MR. SMITH:

12   Q.   Okay.  So I think you've already told us this, but did

13   Mr. Pasternak agree to cooperate with investigators?

14   A.   He did.

15   Q.   What is it that he agreed to do?

16   A.   He agreed to do what he had done in the past and take

17   people to GMA to get prescription drugs.

18   Q.   Okay.  Now, the people -- and so did he, in fact, do

19   that?

20   A.   He did.

21   Q.   The people that he initially took to Gateway Medical

22   Associates, did they have any direct contact with the DEA

23   while this was occurring?

24   A.   No.

25   Q.   Can you explain that to the jury, just so they understand

1    it?

2    A.   Sure.  So John Pasternak, after he began cooperating with

3    us, we asked him to show us basically what he had done in the

4    past.  And that was to transport patients to GMA, and he would

5    pay -- he would normally pay their way, pay for an office

6    visit.  They would go in, get the prescriptions, come back out

7    and give him the prescriptions, and then he would go get them

8    filled.  He would pay to have them filled, and then he would

9    get to keep the pills, and sometimes he would give them pills

10   in exchange for them going in and doing that.

11       But he would keep the majority of the pills and then turn

12   around and sell those at a profit.

13   Q.   When he did that, when he agreed to cooperate and you

14   said he did, in fact, participate and exercise with the DEA,

15   do you remember the date, the first time that was?

16   A.   December 5, 2019.

17   Q.   Do you remember how many individuals were involved at

18   that time?

19   A.   He took two down on that day.

20   Q.   And who were those individuals?

21   A.   Susan Jones and Charles Wooten.

22   Q.   Can you just, in general terms, describe how that first

23   operation went.

24   A.   Sure.  We met with John Pasternak in Barbourville where

25   he was from and provided him with a prepaid money card, like a

1    Visa gift card type thing, because that was the type of

2    payment this clinic accepted.  They didn't accept cash or

3    anything like that.  They wanted it on a prepaid Visa card.

4    So we provided him with one of those.

5         With his consent, we put a tracking device on his vehicle

6    so we could monitor, and he left and picked up Susan Jones and

7    Charles Wooten and transported them to GMA in Clarksville

8    while we were close by and monitoring everything he did.

9         Once he got there, he let them out.  They went inside,

10   and it was after about five hours they came back out and told

11   him that -- that they were told that no doctor would be coming

12   in that day to see them, and that they needed to come back the

13   next day.

14   Q.   So --

15   A.   So then we drove all the way back to Barbourville, about

16   four-hour drive, and he dropped them off.  And the next day we

17   did it again.

18   Q.   Okay.  Describe what happened that next day.

19   A.   Same thing.  We met with him, gave him the card.  And

20   like I said, tracking device is on his vehicle again.  And

21   followed him, monitoring him all the way to Clarksville,

22   Tennessee.  He dropped them off.  They went in.  Susan Jones

23   and Charles Wooten went in the clinic.  And when they came

24   back out, Susan Jones had seen a doctor and gotten

25   prescriptions.  Charles Wooten was told that he needed an

*D. WILLIAMS - Direct Examination*                               114

1    x-ray before they would see him.

2        So then we went back, followed them back to Barbourville.

3    He took them home, dropped them off and then he came back and

4    met with us and gave us the prescriptions that Susan Jones

5    got.  When she came out of the clinic, she just handed them

6    over to him.  And then, when he got back to Barbourville, he

7    gave them to us.

8    Q.   Did investigators later, in a monitored way, fill that

9    prescription with Mr. Pasternak?

10   A.   Yes.  The next day we met with him again.  Gave him the

11   -- we didn't give him all of the prescriptions.  I think, we

12   give him prescriptions, I think for oxycodone and oxymorphone

13   that had been written to Susan Jones from the day before.

14       We gave those back to him and asked him to go fill them,

15   and he did that, and then brought the pills back to us.  We

16   kept the pills.

17   Q.   And there was another individual named Mr. Wooten who had

18   gone on these trips.

19       What happened with him?

20   A.   So Charles Wooten eventually, a week or so later,

21   eventually went and got an x-ray.  And then John Pasternak

22   picked him up again, with us following, and took Charles

23   Wooten back to GMA.

24       Several hours, Charles Wooten came back out.  He had

25   prescriptions that he turned over to John Pasternak.  And the

*D. WILLIAMS - Direct Examination*                                    115

1    same thing.  They came back.  John Pasternak took him home,

2    and then met with us and gave us those prescriptions.

3          And then I think it was the day after that we got --

4    because it was so late -- the day after that, we got back up

5    with John Pasternak and gave him Charles Wooten's

6    prescriptions back for oxymorphone and oxycodone, and asked

7    him to go get those filled like he normally does.

8          So he did he that, and then brought those pills back to

9    us.

10   Q.   If we can, let's bring up Government Exhibit 6.

11        What is Government Exhibit 6?

12   A.   It's a prescription written to -- for oxycodone --

13   written to Charles Wooten by John Stanton.

14   Q.   What dose the second page depict?

15   A.   It's a prescription for oxymorphone written to Charles

16   Wooten, written by John Stanton.

17        MR. SMITH:  Your Honor, we move to admit Government's

18   Exhibit 6.

19        THE COURT:  Any objection?

20        MR. STRIANSE:  No objection.

21        THE COURT:  Okay.  That's one exhibit?  Two pages,

22   one exhibit?

23        MR. SMITH:  Correct, Your Honor.

24        THE COURT:  Okay.  That will be admitted and may be

25   displayed.

*D. WILLIAMS - Direct Examination*                              116

1    BY MR. SMITH:

2    Q.   Just so we're all tracking.  Can you explain what that

3    prescription is, relative to what you were just describing to

4    the jury?

5    A.   These are prescriptions that were written to Charles

6    Wooten on the date that we followed he and John Pasternak down

7    there to GMA.

8    Q.   Okay.  Did the DEA then, in a controlled manner, fill

9    this prescription with Mr. Pasternak?

10   A.   He did.

11   Q.   Okay.  What pharmacy was that filled at?

12   A.   It was filled at Parkway Pharmacy in Barbourville,

13   Kentucky.

14   Q.   Okay.  And what happened once Mr. Pasternak obtained

15   those prescription drugs?

16   A.   He brought them back to the detectives.

17        MR. SMITH:  Okay.  Your Honor, if I may, I would like

18   to hand up Government Exhibit 7A and B, which is a physical

19   exhibit.

20        May I approach the witness?

21        THE COURT:  You may.

22   BY MR. SMITH:

23   Q.   Okay.  Sir, can you please explain to us what

24   Government Exhibits 7A and B are?

25   A.   These are the pills filled at Parkway Pharmacy on

1    December 20, 2019.  One is for oxymorphone.  The other one is

2    for oxycodone, prescribed to Charles Wooten by John Stanton.

3            MR. SMITH:  Your Honor, I move to admit

4    Government Exhibit 7A and B.

5            THE COURT:  Any objection?

6            MR. STRIANSE:  No objection.

7            THE COURT:  They will be admitted.  Can you just hold

8    those up toward the jury?  Thank you.

9    BY MR. SMITH:

10   Q.   Sir, to just kind of sum up:  The drugs that you're

11   holding in front of you -- I should have clarified.

12        Are there pills currently in those bottles?

13   A.   Yes.

14   Q.   And in whose custody have those remained since they were

15   filled?

16   A.   Custody of the DEA.

17   Q.   In general terms, just if you can sum up for the jury:

18   How did those drugs that were prescribed end up in the DEA's

19   possession?

20   A.   John Pasternak to Charles Wooten to the GMA.  They were

21   -- Charles Wooten received a prescription from John Stanton.

22   Charles Wooten then turned those prescriptions over to John

23   Pasternak.  John Pasternak got those filled under our

24   supervision at Parkway Pharmacy, and then he brought the pills

25   back to us.

*D. WILLIAMS - Direct Examination*                                    118

1    Q.   Okay.  Now, you mentioned the name Susan Jones when we

2    were talking about these initial visits.

3    A.   Yes.

4    Q.   What occurred with Susan Jones after these December

5    visits?

6    A.   So after she went down with John Pasternak and got her

7    prescriptions and turned them over to him, we approached her.

8    Told her we knew what she was doing and asked her if she would

9    be willing to cooperate in this investigation and she agreed

10   to.

11   Q.   Okay.  Did she, in fact, cooperate?

12   A.   Yes.

13   Q.   What did she do?

14   A.   She made I think a couple of more visits with a recorder

15   to GMA on our behalf.

16   Q.   Okay.  Were any doctors captured on -- doctor or

17   doctors -- captured on those recordings?

18   A.   Yes.

19   Q.   Which doctor or doctors?

20   A.   James Maccarone.

21   Q.   Was Dr. Stanton ever captured on undercover video or

22   recordings?

23   A.   No.

24   Q.   Did investigators know who was going to be at the clinic

25   on a given day?

1     A.   No.

2     Q.   Did that make it difficult to identify and plan visits

3     out?

4     A.   Extremely difficult.

5     Q.   At a certain point after these visits that you just

6     described, did the DEA cease using Ms. Jones to use these

7     recording?

8     A.   Yes.

9     Q.   Can you explain in general terms why that was?

10    A.   Well, for one thing, we felt we had enough information at

11    that point to obtain a search warrant at the premises.

12         Also, when we use a confidential source and we send them

13    in with recording devices, things like that, their safety is

14    our number one priority.  It takes a lot of resources, a lot

15    of manpower to travel four or five hours away.  Some of those

16    visits we had up to ten detectives around the perimeter of

17    that place just to make sure that our sources were safe.

18         And that -- it was just very resource intensive.

19    Q.   Okay.  What else was going on in that time period in

20    2020?

21    A.   It was also when COVID was at its height.  Our office was

22    shut down a lot during that time due to exposures, due to

23    infections and it's -- if you're taking that many people on a

24    long trip, everyone riding together, it was -- it was

25    difficult, to say the least.

*D. WILLIAMS - Cross-Examination*                    120

1    Q.   Okay.  And you mentioned a search warrant.

2         At a certain point in time, did investigators execute a

3    search warrant at Gateway Medical Associates?

4    A.   Yes.

5    Q.   Approximately when did that occur?

6    A.   I think maybe October 2020.

7    Q.   Did you help and participate in the search?

8    A.   Yes.

9         MR. SMITH:  Your Honor, that's all the questions I

10   have for this witness.

11        Thank you.

12        THE COURT:  Thank you.

13        Mr. Strianse.

14                    CROSS-EXAMINATION

15   BY MR. STRIANSE:

16   Q.   Good afternoon, Detective Williams.

17   A.   Hello.

18   Q.   I want to make sure I understand Mr. Pasternak's role

19   completely.

20        Are you saying that after he took Charles Wooten down to

21   GMA, Wooten was issued a prescription?

22   A.   Yes, sir.

23   Q.   And then I guess Mr. Wooten turned the prescription over

24   to Mr. Pasternak?

25   A.   Yes.

1   Q.   And then Mr. Pasternak is able to present himself at a

2   pharmacy here in the Eastern District of Kentucky with a

3   prescription that bear's somebody else's name?

4   A.   Yes.

5   Q.   And get it filled?

6   A.   Yes.

7   Q.   You talked about it was under your supervision, I think

8   was word that you used.

9        That would not be a normal occurrence, would it?  That if

10  I walk in with a prescription in the name of Darian Williams,

11  I don't think they would give it to me?

12  A.   Correct.

13  Q.   So can you tell us about that?

14  A.   Well, we later ended up serving a search warrant at that

15  pharmacy and arresting the pharmacist.

16  Q.   Well, I didn't mean to get into that.

17       It just seemed od that somebody could get a prescription

18  with another name.

19  A.   It was.

20  Q.   You identified the video from December of 2019 at GMA.

21  Do you recall that?

22  A.   Yes, sir.

23  Q.   And I think it was Exhibit 3A through the G.

24       Does that sound right?

25  A.   Yes.

1    Q.   What you just identified?

2    A.   Yes, sir.

3    Q.   At that point in time you all were able to determine that

4    Dr. Maccarone was back at the office?

5    A.   Yes.

6    Q.   Is that fair?

7    A.   Yes.

8    Q.   And then in the summer of 2019, Government's Exhibit 23,

9    you were able to determine that Maccarone was back at the

10    office?

11    A.   I'm not sure that -- I know that we did surveillance

12    during that time, but I'm not sure that -- exactly when we

13    established that he was in the office.

14    Q.   Okay.  So you were not able to establish that Maccarone

15    was back functioning at GMA in the summer of 2019?

16    A.   I believe he was --

17    Q.   Okay.

18    A.   -- but I don't remember the exact date that we were able

19    to establish that.

20         MR. STRIANSE:  Those are my questions.

21         THE COURT:  Thank you.

22    Redirect.

23         MR. SMITH:  None, Your Honor.

24         THE COURT:  Okay.  Is he finally excused?

25         MR. SMITH:  From our perspective.

1            THE COURT:  Do you agree, Mr. Strianse?

2            MR. STRIANSE:  Yes, sir.

3            THE COURT:  Let's have a CSO pick those up.

4        Mr. Smith, let's just confer.

5        (Sidebar conference.)

6            THE COURT:  Who do you anticipate next?

7            MR. SMITH:  Your Honor, it's Tony Janutolo, who is

8    one of the investigators.  He's going to talk about the search

9    warrant.  We're going to intend to move some of the evidence,

10   uncover the search warrant into evidence.

11       I can certainly start and make good progress.  We won't

12   finish.  I guess, the only thing to highlight for the Court is

13   that because we have limited resources, he is also helping us

14   marshal witnesses back and forth.

15       So if he's off the stand, we would still have contact for

16   that but, obviously, not discuss the substance of it.  I just

17   wanted the Court to be aware that he's still involved in case

18   prep.

19           THE COURT:  Okay.  Why don't we go maybe 30 minutes

20   and knock off about 5:15.  That's not going to get through the

21   direct, I wouldn't expect, but that will get a 30-minute block

22   in and then we'll knock off.

23       Does that sound workable?

24           MR. SMITH:  Yes, Your Honor.

25           THE COURT:  Mr. Strianse.

124

1          MR. STRIANSE:  Yes, Your Honor.

2      (Sidebar conference concluded.)

3          THE COURT:  Okay.  Thank you.

4      We're going to call one more witness and go about 30

5  minutes and then quit for the day, so about 5:15.  Well, let's

6  go about 20 minutes with this witness, then -- my clock does

7  not sync with my watch, so go ahead and call your next

8  witness.

9          MR. SMITH:  Yes, Your Honor.  We would call Tony

10  Janutolo.

11          ANTHONY JANUTOLO, GOVERNMENT'S WITNESS, SWORN

12          THE WITNESS:  Yes, ma'am.

13          COURTROOM DEPUTY:  Thank you.

14          THE COURT:  Good afternoon, sir.

15          THE WITNESS:  Good afternoon.

16          THE COURT:  Do try to speak directly toward that mic

17  in a clear voice so we can all hear you.

18      Would you begin by stating your name and spelling your

19  last name.

20          THE WITNESS:  Yes, sir.  My name is Anthony Janutolo.

21  And you spell my last name J-A-N-U-T-O-L-O.

22          THE COURT:  Thank you.

23      Mr. Smith.

24

25

*A. JANUTOLO - Direct Examination*                    125

1          MR. SMITH:  Okay.

2                    DIRECT EXAMINATION

3    BY MR. SMITH:

4    Q.   Mr. Janutolo, what do you do for a living?

5    A.   I'm a detective with the Attorney General's Office and

6    I'm assigned to the DEA task force.

7    Q.   Are you a task force officer?

8    A.   Yes, sir.

9    Q.   Can you give us just an overview of your background in

10   law enforcement?

11   A.   Yes, sir.  I -- I began my law enforcement career in 1995

12   as a Kentucky State trooper.  I worked as a uniform trooper

13   for approximately eight years.  I worked in Clay, Laurel and

14   Rockcastle counties.

15        I was transferred to the Drug Enforcement Special

16   Investigative Unit as a detective there in the state police

17   and then I covered drug investigations in the eastern part of

18   Kentucky.

19        I -- during that time, I was assigned to two drug task

20   forces.  I worked on the Lake Cumberland Area Drug Task Force

21   where we focused on street level and mid or upper-level drug

22   trafficking organizations.

23        And then I was later assigned as a task force officer

24   with the FBI, where we focused on multi-state drug trafficking

25   organizations.

1          After I retired from the State Police, I began working

2     for the Attorney General's Office out of their criminal

3     investigations branch, and I was assigned to a drug diversion

4     task force where we focussed mainly on registrants that were

5     operating outside of the standard practice.

6          And then I later became assigned to the Drug Enforcement

7     Agency as a task force officer and task force commander on

8     their criminal diversion.

9     Q.   Were you involved -- in the course of your work for the

10    DEA, were you involved in an investigation of Gateway Medical

11    Associates?

12    A.   Yes, sir, I was.

13    Q.   Based on your familiarity and involvement in the

14    investigation, did the DEA use cooperating or confidential

15    sources?

16    A.   Yes, sir.

17    Q.   Were you a part of those operations?

18    A.   Yes, sir.  Yes, sir.

19    Q.   And just not to the day and minute, but general time

20    frame, when did those occur?

21    A.   Those occurred in winter 2019.

22    Q.   Okay.  Can you just briefly describe your involvement in

23    those?

24    A.   Yes, sir.  We developed a cooperating witness and sent

25    them into the practice to gain evidence on -- on the -- on the

*A. JANUTOLO - Direct Examination*                                    127

1    practice there.  We --

2    Q.   Okay.  When individuals went into the practice, did they

3    have to pay for their visits?

4    A.   Yes, sir.

5    Q.   How did the DEA handle that?

6    A.   We learned through interviews that you had to pay cash or

7    pay cash at the clinic through a debit card.  You could use a

8    prepaid debit card, and we purchased those and gave them to

9    the witness, and they paid the fees associated with the visit.

10   Q.   Did you keep records of that?

11   A.   Yes, sir.

12   Q.   Let's look at Government Exhibit 4, briefly, if we can.

13        Sir, what is shown in Government Exhibit 4?  Just page

14   through.  It's several pages long.

15        What is captured on Government Exhibit 4?

16   A.   Those are the prepaid debit cards that we used during the

17   cooperating witness visits.

18   Q.   Okay.  Did you keep or make copies of those?

19   A.   Yes, sir.

20   Q.   Okay.  And are these copies accurately reflecting what

21   you obtained and used in the course of those operations?

22   A.   Yes, sir.  I think so.

23             MR. SMITH:  We move to admit Government Exhibit 4.

24             THE COURT:  Any objection?

25             MR. STRIANSE:  No objection, Your Honor.

1     THE COURT:  Thank you.  4 will be admitted and may be

2     displayed.

3     BY MR. SMITH:

4     Q.   Can you very briefly describe to the jury what we're

5     looking at here?

6     A.   It is a prepaid debit card purchased from Walmart on

7     December 4, 2019.

8     Q.   What kind of sums were required to go to these visits at

9     Gateway Medical Associates?

10    A.   Anywhere from 300, to five, $600.

11    Q.   Did you help arrange and set up the appointments for

12    those individuals?

13    A.   The cooperating witness set the appointments up.  Yes,

14    sir.

15    Q.   And it's --

16         (Indiscernible crosstalk.)

17    A.   -- at our direction.

18    Q.   And based on your understanding of the investigation,

19    were these debit cards then used to pay for the fees at GMA?

20    A.   Yes, sir.

21    Q.   Okay.  Let's fast forward, if we can, in the

22    investigation.

23         Did you participate, in fact --

24         MR. SMITH:  Will you take that down?  Thank you.

25    BY MR. SMITH:

1    Q.   Did you participate in any search warrant at Gateway

2    Medical Associates?

3    A.   Yes, sir, I did.

4    Q.   Do you remember approximately when that occurred?

5    A.   That would have been October of 2020.

6    Q.   And did the investigators seize evidence from Gateway

7    Medical Associates in the course of that search?

8    A.   Yes, sir, we did.

9    Q.   And based on your involvement in the investigation and

10   participation, are you familiar with that evidence?

11   A.   Yes, sir, I am.

12   Q.   Okay.  If we can, I would like to review a few items with

13   you.

14        Let's begin, if we can, with Government Exhibit 8A

15   through D.

16        What are -- are Government Exhibit 8A through D?

17   A.   8A is -- are -- it's a photograph of -- well, they're all

18   photographs.

19   Q.   Okay.  They're all photographs of what?

20   A.   Things that were witnessed at Gateway Medical Associates.

21   Q.   Okay.  Were these taken in the course of the search

22   warrant?

23   A.   Yes, sir.  Photos were taken during the course of the

24   search warrant.

25   Q.   Okay.

1          MR. SMITH:  If we could, I would move to admit

2    Government Exhibits 8A through D.

3          THE COURT:  8A through D?

4          MR. SMITH:  Delta.  D, Delta.

5          THE COURT:  Any objection?

6          MR. STRIANSE:  No objection.

7          THE COURT:  Thank you.  Those will be admitted and

8    may be displayed.

9          MR. SMITH:  If we can, Rebecca, just walk through

10   Exhibit 8A, B, C, and D.

11   BY MR. SMITH:

12   Q.   And if you can, Mr. Janutolo, please just describe what

13   we're looking at.

14   A.   Yes, sir.  There's a -- this is a sheet listing of what

15   appears to be charges for office visits for patients there at

16   the clinic.

17   Q.   Roughly where in the practice was this posted?

18   A.   That was posted in the -- as you come in the front door

19   of GMA, there is an office area, like a reception area, off to

20   the left.  It was inside of that office there hanging on a

21   pegboard.

22   Q.   Okay.  Was it -- when you walked in, was it in plain

23   view, such that you could see it?

24   A.   Not at -- not in plain view of the lobby.  But as you

25   walked into the office area, yes, sir, it was in plain view.

*A. JANUTOLO - Direct Examination*                              131

1    Q.   That's what I meant.  For employees, was it in plain

2    view?

3    A.   Yes, sir.  For employees, yes, sir, it was in plain view.

4    Q.   Can we go to the next exhibit?  8B.

5    A.   Yes, sir.  This is a photo of an office that was

6    described to us as Dr. John Stanton's office.

7    Q.   What is 8C?

8    A.   This is a photo of an exam room, where the EKG room.

9    Q.   And when you executed the search warrant in October of

10   2020, did you go throughout the office?  And are you familiar

11   with its layout?

12   A.   Yes, sir.

13   Q.   Okay.  Does GMA -- when you went in, in October of 2020,

14   does it have -- did it have exam rooms?

15   A.   Yes, sir, it does.

16   Q.   Do you know how many?

17   A.   I'm -- just an approximation, there's a -- probably ten

18   exam rooms.  Somewhere like that.

19   Q.   Did the -- did the facility have an electronic medical

20   record system?

21   A.   Yes, sir.

22   Q.   Did it have a computer for that use?

23   A.   Yes, sir.

24   Q.   Did it have other things that a medical facility would

25   have to include, for instance blood pressure cuffs?

*A. JANUTOLO - Direct Examination*                                    132

1    A.   Yes.

2    Q.   Let's go to Government Exhibit 8C real a quick.  I'm

3    sorry.  End of the day.  I apologize.  Exhibit 8D.

4         What is exhibit -- Exhibit 8D?

5    A.   That's a photograph of the lobby area.  The front door is

6    off to the right-hand side there, and then as you come in the

7    front door, you're looking at the lobby.  And this is the

8    left-hand side view of the lobby.

9         MR. SMITH:  All right.  We can -- let's take that

10   down.

11   BY MR. SMITH:

12   Q.   When you and the other investigators were executing the

13   search warrant, were you looking for evidence related to how

14   Gateway Medical Associates was charging its patients or

15   customers?

16   A.   Yes, sir.

17   Q.   Okay.  Let's bring Government's Exhibit 9.

18        What is Government Exhibit 9?

19   A.   Exhibit 9 is a listing of charges charged to patients

20   there at Gateway Medical.

21   Q.   Was that seized from Gateway Medical Associates in

22   October of 2020?

23   A.   Yes, sir, it was.

24   Q.   Is this a fair and accurate copy of what was seized?

25   A.   Yes, sir, it is.

*A. JANUTOLO - Direct Examination*                                      133

 1           MR. SMITH:  Your Honor, move to admit
 2   Government Exhibit 9.
 3           THE COURT:  Any objection?
 4           MR. STRIANSE:  No objection.
 5           THE COURT:  That will be admitted as well.
 6   BY MR. SMITH:
 7   Q.   Okay.  Sir, just to kind of, so we're all on the same
 8   page.
 9       This image looks familiar, given the photographs that we
10   just looked at.
11   A.   Yes, sir.
12   Q.   Can you explain that?
13   A.   Yes, sir, it does.  It's a replica of the photograph that
14   was hanging in the office area.
15   Q.   Okay.  And I'm not allowed to lead the witness, but does
16   the picture that we saw earlier of what was hanging up, is
17   that the document?
18   A.   Yes, sir.
19   Q.   Okay.  Can we just briefly walk through what charges are
20   reflected on the document?
21   A.   Yes, sir.  A new patient is charged $385.  For their
22   second visit, they're charged $410.  A no-show fee or a
23   cancellation fee of $150.  Mandatory pill counts are $65.  And
24   you're due three per year.  But a no-show fee for a pill count
25   is $150.

*A. JANUTOLO - Direct Examination*                                    134

1      A pain panel is $125.  A wellness panel, $250.  An EKG is

2    $45 every three months.  Pregnancy test is $20 every month.

3    Q.   Okay.  And I want to return to the various fees and

4    charges at Gateway Medical Associates, if we can.

5      But did you also uncover evidence related to how patients

6    were paying at GMA in the course of your investigation?

7    A.   Yes, sir.

8    Q.   I think you already told us about the prepaid debit cards

9    that you went and acquired.

10     If you can, let's look at Government Exhibit 9.  And if

11   you can identify and explain that for the Court.  Sorry.

12   Exhibit 10.  We were just on 9.

13   A.   Yes, sir.  This is a copy of an -- Exhibit 10 is a copy

14   of a waiver of insurance billing.  It was my understanding

15   that patients would sign this and agree not to -- agree to pay

16   cash for their office visit instead of using insurance.

17   Q.   Is Government's Exhibit 10 a fair and accurate copy of

18   what was found at the search warrant?

19   A.   Yes, sir.

20          MR. SMITH:  We move to admit Government Exhibit 10.

21          THE COURT:  Any objection?

22          MR. STRIANSE:  No objection.

23          THE COURT:  That will be admitted.

24          MR. SMITH:  If we can display that to the jury.

25          THE COURT:  Yes, you may.

*A. JANUTOLO - Direct Examination*                                    135

 1   BY MR. SMITH:

 2   Q.   Okay.  If you can, can you just read aloud the larger

 3   paragraph in the middle there?

 4   A.   Yes, sir.

 5        "You have registered as a self-pay patient.  This means

 6   that at the time of service you will be paying by a credit

 7   card or cashier's check.  We will not bill for services

 8   provided under this arrangement.  No forms or itemized

 9   statement will be produced now or in the future for you or us

10   to submit for insurance billing, or if you want to self claim

11   for any visits through your insurance company.

12        This waiver of insurance billing is valid for one year

13   from the date signed."

14             MR. SMITH:  Your Honor, I just want to make sure I'm

15   not running afoul of your schedule.  Have I been going for 20

16   minutes?  I can keep going.

17             THE COURT:  It's pretty close.  You're at a breaking

18   point?

19             MR. SMITH:  It's as good as any other.

20             THE COURT:  It is?  All right.  Thank you.

21        That's going to get us to the end of trial day one.

22   Appreciate your patience throughout the long first day of the

23   trial, which can be a little bit jumbled, but now we're into

24   the proof.

25        So we're going to break for the night.  We'll pick up in

1    the morning promptly at 8:30.  Do be here by 8:15.

2        Over the night, studiously follow the rules I've imposed.

3    No discussion, no research or reading, exploration about the

4    case.  Proof is coming in.  Receive it, but keep a wide open

5    mind.  Don't begin any evaluation or the formation of any

6    opinions.  Leave your notebooks in your chair.

7        I thank you, and you are free to go for the night.

8        (The jury exited the courtroom at 5:10 p.m.)

9        THE COURT:  Okay.  Thank you.  The jury has exited.

10   Everybody can be seated.

11       Officer Janutolo, this is going to conclude your

12   testimony today.  I know you may have contact with the

13   prosecutor about witness logistics over the night, that's

14   fine.  But don't talk about your testimony over the course of

15   the night with the prosecutor or anybody else, okay?

16       THE WITNESS:  Yes, sir.

17       THE COURT:  Thank you.  You can step down, exit the

18   courtroom, the Court would appreciate that.  Just be back here

19   in the morning ready to go.

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Okay.

22       (Officer Janutolo exited the courtroom.)

23       THE COURT:  Okay.  Mr. Smith, just give me a forecast

24   on -- obviously, Mr. Janutolo is going to take some time for

25   both sides.

1      Once we get past him, give me a half day forecast on who

2  would be coming next.

3              MR. SMITH:  Next witnesses, Your Honor?

4              THE COURT:  Yes.

5              MR. SMITH:  I believe after him we will call -- I

6  need to confirm about the travel arrangements -- but I think

7  in potentially this order will be will be David Silvus,

8  Department of Health.  Jill Lee, Jennifer Belisle, and Terry

9  Prince.  I guess I need to coordinate with the marshals.

10             THE COURT:  Okay.

11             MR. SMITH:  But perhaps another incarcerated witness.

12             THE COURT:  Okay.  Very good.  I always like, just

13  like, giving the other side and the Court just a little bit of

14  lead so we know roughly what is coming in the next half day.

15  And I know that it is not always perfect, and if something

16  gets -- you know, you have to make a replacement because of

17  transport or something like that, that's fine.  But that gives

18  us some notice about what is to come.

19     Okay.  Is there anything we have to take up for you,

20  Mr. Smith?

21             MR. SMITH:  No, Your Honor.  Thank you.

22             THE COURT:  Thank you.

23     How about for you, Mr. Strianse?

24             MR. STRIANSE:  No, Your Honor.

25             THE COURT:  Okay.  Appreciate the good, efficient

1    work today.  I'll be here in the morning by 8:00.  If there is

2    anything we can take up, I'm glad to do that.

3         Jury is here at 8:15.  If they're all here and, you know,

4    ready to go at 8:20 or 8:25, I'm glad to bring them in and get

5    to work.

6         But if there is something we need to talk about, that's

7    fine, too.  8:30 is when I intend to start at the latest.  If

8    you don't have anything in the morning -- I mean, you don't

9    have to be here for no reason.  I certainly want you here by

10   8:15.

11        But if there is nothing to take up, you don't have to be

12   here at 8:00.  You guys confer.  If there is something, I'll

13   be here.  If not, I'll always query about 8:15, Is there

14   something to take up?  If not, that's fine.  If there is,

15   fine, too.

16        We'll come in right at 8:30 and get going, assuming there

17   is nothing else that needs our attention.  Okay.

18        I think that's it.

19        Anything else to take up?  Anybody?  No?  Okay.  Thank

20   you all.  Have a pleasant evening.  I'll see you in the

21   morning.

22        (Proceedings concluded at 5:14 p.m.)

23                              - - -

24                  C E R T I F I C A T E

25        I, KIMBERLEY ANN KEENE, RMR, certify that the
     foregoing is a correct transcript from the record of

139

1    proceedings in the above-entitled case.

2

3    /s/ Kimberley Ann Keene, RMR          December 7, 2022
     KIMBERLEY ANN KEENE, RMR             Date of Certification
4    Official Court Reporter

140

1                         INDEX

2    **GOVERNMENT'S WITNESSES**

3    SHAWN BROWN
     Direct Examination.............................. Page 49
4    Cross-Examination............................... Page 67
     Redirect Examination............................ Page 74
5    Recross-Examination............................. Page 77

6    KYLE SIZEMORE
     Direct Examination.............................. Page 81
7    Cross-Examination............................... Page 89

8    DARIAN WILLIAMS
     Direct Examination.............................. Page 93
9    Cross-Examination............................... Page 120

10   TONY JANUTOLO
     Direct Examination.............................. Page 125

11

12   **DEFENSE WITNESSES**

13                        - - -

14   **GOVERNMENT'S EXHIBITS**

15

| Exhibit | Description | Identified | Admitted |
|---------|-------------|-----------|----------|
| 2A | Photograph.  GMA - Entrance | 97 | 97 |
| 2B | Photo.  GMA.  Front of Building | 97 | 97 |
| 3A | Screenshot from pole camera | 99 | 100 |
| 3B | Screenshot from pole camera | 99 | 100 |
| 3C | Screenshot from pole camera | 99 | 100 |
| 3D | Screenshot from pole camera | 99 | 100 |
| 3E | Screenshot from pole camera | 99 | 100 |
| 3F | Screenshot from pole camera | 99 | 100 |
| 3G | Screenshot from pole camera | 99 | 100 |

16
17
18
19
20
21
22
23
24
25

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 23A | Photo.  Woman pulling cooler in GMA parking lot | 104 | 104 |
| 23B | Photo.  People standing around cooler in GMA parking lot | 105 | 105 |
| 23C | Photo.  People standing around cooler in GMA parking lot | 105 | 105 |
| 23D | Video.  GMA parking lot | 106 | 106 |
| 6 | Prescription.  Oxycodone. (Wooten) | 115 | 115 |
| 7A | Pain pills | 117 | 117 |
| 7B | Pain pills | 117 | 117 |
| 4 | DEA Receipts.  Prepaid debit cards | 127 | 128 |
| 8A | Photo.  Scenes of GMA from search warrant | 129 | 130 |
| 8B | Photo.  Scenes of GMA from search warrant | 129 | 130 |
| 8C | Photo.  Scenes of GMA from search warrant | 129 | 130 |
| 8D | Photo.  Scenes of GMA from search warrant | 129 | 130 |
| 9 | GMA list of charges | 132 | 133 |
| 10 | GMA insurance waiver | 134 | 134 |

**DEFENSE EXHIBITS**

- - -