1

<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                     SOUTHERN DIVISION at LONDON
                                 - - -
 3
     UNITED STATES OF AMERICA, : Docket No. 6:21-CR-00019
 4                             :
                    Plaintiff, : London, Kentucky
 5                             : Wednesday, August 24, 2022
     versus                    : 8:00 A.M.
 6                             :
     JOHN L. STANTON,          :
 7                             : Trial Day 2 of 7
                   Defendant.  :
 8
                                 - - -
 9                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE ROBERT E. WIER
10            UNITED STATES DISTRICT COURT JUDGE
                                 - - -
11
     APPEARANCES:
12
     For the United States:       ANDREW E. SMITH, ESQ.
13                                U.S. Department of Justice - KY
                                  260 West Vine Street, Suite 300
14                                Lexington, KY 40507-1612

15   For the Defendant:          PETER J. STRIANSE, ESQ.
                                  Tune Entrekin White
16                                Capitol View
                                  500 11th Avenue North, Suite 600
17                                Nashville, TN 37203

18   Court Reporter:             KATHLEEN E. MALONEY, RMR, FCRR
                                  Official Court Reporter
19                                310 South Main Street, Room 370
                                  London, KY 47041
20                                kathleen_maloney@kyed.uscourts.gov

21

22

23

24
         Proceedings recorded by mechanical stenography;
25   transcript produced by computer.
</pre>

2

1                          *      *      *

2          (Proceedings continued on August 24, 2022, at 8:00 A.M.;

3      jury not present.)

4          THE COURT:  All right.  Thank you.  Good morning to

5      everybody.

6          We're back in U.S. versus Stanton.  I see counsel present

7      for both sides and Dr. Stanton present as well.  I hope

8      everybody had a good evening.

9          I think our jury is all here.  So let me just query

10     whether the parties have anything to take up before we get

11     started.

12         Mr. Smith?

13         MR. SMITH:  Nothing, Your Honor.

14         THE COURT:  Mr. Strianse?

15         MR. STRIANSE:  No, Your Honor.

16         THE COURT:  The yawn of a Nashvillean, an hour early

17     to his body.  We've got a son down there, and we constantly

18     debate which time -- which time is better.  It depends when in

19     the day the question comes up, I think.

20         So on the -- on the issues from yesterday, anything new

21     on the witness or witnesses with a COVID concern or --

22         MR. SMITH:  We're still working on it.  We may have

23     found a way to get the witness I referenced with the child.

24     Apparently, the other child has not tested positive, but there

25     may be a way for her to travel with the child, stay at a

3

1    hotel.  We'll have a law enforcement officer chaparone.

2         But the point is we are working through it.  It may

3    happen later this week.  I don't think that's going to impact

4    the trial schedule.  It could be -- obviously, we have not

5    moved to continue, recess, or -- the trial, but it could be

6    that I move for a brief recess to allow to try to facilitate.

7    I hope not.

8         It sounds like for her it is more likely it could happen

9    on Friday.  You know, the further back it is -- she has a

10   doctor's note for one child through Friday.  So otherwise I'm

11   just vomiting information right now.

12        THE COURT:  Okay.

13        MR. SMITH:  The other one told us -- had tested

14   positive, had -- first had symptoms last Wednesday, and we are

15   now having trouble reaching this witness.  We're trying to

16   coordinate transportation of this witness but also have to be

17   mindful, if we have a law enforcement officer do that, make

18   sure she's not contagious.  So that may be later in the week

19   so that --

20        THE COURT:  This last Wednesday?

21        MR. SMITH:  Yes.  So was symptomatic as recently as,

22   I think, Monday or Tuesday.  We're working through it.  The

23   point is that's likely going to occur later in the week.  I

24   don't think it's ultimately going to mess with the timeline we

25   talked about being done with the case, but I could be asking

4

1    for an hour or two grace period on Friday, but we will try to

2    make that up.

3          THE COURT:  Thank you.  And then on the 501 series

4    summaries, did you guys make any progress on that?

5          MR. STRIANSE:  Not yesterday, Your Honor.  We'll try

6    to do that.

7          THE COURT:  Okay.

8          MR. SMITH:  We are on our end working on the topics

9    we talked about.  There were a lot of specifics, as we raised

10   yesterday, but the things we do think were addressed we are

11   working on.  That -- that analyst is doing it, updating on

12   instructions I have given.  I hope to have a new set to give

13   them, and then we'll see what's left as far as dispute, and

14   maybe we can focus on those.

15         THE COURT:  Okay.  And the way it sets up, as with

16   any exhibit, the proponent has the burden of, you know,

17   proving that it's properly admissible, if it's a type of

18   summary that would be submitted or otherwise properly used at

19   trial.

20       So, you know, the government will have to have a witness

21   to lay the foundation on that, absent a stipulation, and, you

22   know, maybe it's the kind of thing that we need to carve out

23   some time and, you know, have a sub-hearing on that.

24       I'm reluctant to -- I don't want to have a trial within

25   the trial over a particular exhibit.

1     I think the standard -- if it's a *Brey* Category 3

2  exhibit, you know, the standard is that the exhibit has got to

3  be accurate and reliable and there has to be underlying

4  evidence in the record that's, you know, voluminous but -- in

5  evidence but voluminous in that the exhibit would, you know,

6  be a fair and accurate summary tool relative to that.

7     So, you know, it's got to be accurate and reliable.  I

8  don't think that means it has to be flawless.  I mean, if

9  there are -- I mean -- if there's an error here or there, you

10  know, that's just a weight matter.  If it's -- if it's just --

11  if it's strewn with error to the point I think it's not

12  reliable or accurate, then that's a different matter.  Of

13  course, I haven't analyzed it.  Probably won't until I have to

14  analyze, you know, the base versus the summary in terms of

15  accuracy, but that's generally my thinking on how the rubric

16  would go.

17     Anything else you want to say on that at this point?

18          MR. STRIANSE:  No, Your Honor.

19          THE COURT:  Okay.  All right.  Everybody here?

20          COURT SECURITY OFFICER:  Yes, Your Honor.

21          THE COURT:  Okay.  Let's bring them in.

22     (Jury present.)

23          THE COURT:  Good morning to everyone.

24     If the clerk would call the case, please.

25          COURTROOM DEPUTY:  Yes, Your Honor.

1     London Criminal No. 6:21-CR-19, United States of America

2     versus John L. Stanton.

3          THE COURT:  Thank you very much.

4     And, Counsel, will you state your appearances beginning

5     with the government?

6          MR. SMITH:  Good morning, Your Honor.

7     Andrew Smith on behalf of the United States.

8          MR. STRIANSE:  Good morning, Your Honor.  Peter

9     Strianse of the Nashville bar here with defendant,

10    Dr. Stanton.

11         THE COURT:  Good morning, Mr. Strianse.

12    Good morning, Dr. Stanton.

13    Ladies and gentlemen of the jury, good morning to you.

14    So good to see you this morning.  Appreciate you being here on

15    time, ready to go.  I'm grateful for that.

16    Has everybody followed the rules I have given you over

17    the course of the night?  Anyone no?

18    I appreciate your attention to those protective rules.

19    All right.  We are here for Day 2.  Officer Janutolo was on

20    the witness stand.  You can come on forward.  I will have you

21    resworn since we have gone over -- over an evening.

22         THE WITNESS:  Yes, sir.

23    **TONY JANUTOLO, GOVERNMENT'S WITNESS, DULY SWORN**

24         THE COURT:  Good morning, sir.

25    I think we were 15 or 20 minutes into direct examination.

*T. JANUTOLO - Direct Examination (Cont'd)*                                    7

1        Mr. Smith, you can continue.

2            MR. SMITH:  Thank you, Your Honor.

3                    DIRECT EXAMINATION (Cont'd)

4    BY MR. SMITH:

5    Q.   All right.  Good morning, sir.

6    A.   Good morning.

7    Q.   When we left off yesterday, I believe we were talking

8    about -- if we can bring up Government's Exhibit 9, just to

9    reorient ourselves.

10       All right.  Can you see that, sir?

11   A.   Yes, sir.

12           MR. SMITH:  And, Your Honor, this was admitted in the

13   record yesterday?

14           THE COURT:  Yes.

15   BY MR. SMITH:

16   Q.   So, sir, we were talking about evidence found at Gateway

17   Medical Associates related to the finances and fees charged to

18   patients.  Do you recall that?

19   A.   Yes, sir.

20   Q.   To reorient us, what is this that we are looking at here?

21   A.   It's a list of the patient fees that were charged at

22   Gateway Medical.

23   Q.   Okay.  And was this recovered from the facility, from the

24   clinic?

25   A.   Yes.  Yes, sir.

T. JANUTOLO - Direct Examination (Cont'd)                    8

1    Q.   Okay.  Did investigators also search for information

2    showing -- so this is how much they charge.  They look for

3    information showing receipts, how much money actually came in

4    the door at a given time?

5    A.   Yes, sir.

6              MR. SMITH:  Okay.  Can we bring up Government's

7    Exhibit 11, please.  And Exhibit 11A just for the witness,

8    please.

9         If we could just arrow briefly through that, Rebecca.

10   BY MR. SMITH:

11   Q.   Sir, do you recognize what's been marked as Government's

12   Exhibit 11A?

13   A.   Yes, sir.

14             MR. SMITH:  And if we could just show the witness 11B

15   as well.

16   BY MR. SMITH:

17   Q.   Sir, do you also recognize what's been marked as

18   Government's Exhibit 11B?

19   A.   Yes, sir.

20   Q.   Are you familiar with these records?

21   A.   Yes, sir.

22   Q.   Okay.  In just very broad terms, can you describe for the

23   Court what these are?

24   A.   They are financial documents recovered from Gateway

25   Medical.

T. JANUTOLO - Direct Examination (Cont'd)                    9

1    Q.   Are these in the same order and condition, except

2    electronic copies, as they were found at the scene?

3    A.   Yes, sir.

4    Q.   Okay.  And do these generally show -- appear to show

5    receipts from the activity at Gateway Medical Associates?

6    A.   Yes, sir.  Generally, yes, sir.

7             MR. SMITH:  Your Honor, we move to admit Government's

8    Exhibit 11A and B.

9             MR. STRIANSE:  No objection.

10            THE COURT:  Those will be admitted and may be

11   displayed.

12        (Government's Exhibit No. 11A and 11B were received in

13   evidence.)

14   BY MR. SMITH:

15   Q.   Sir, I don't want to try to cover the entire record.  Can

16   you just describe -- when these were found, were they just one

17   or two pages or were they long?

18   A.   There was a lot of financial records recovered, yes, sir.

19   Q.   Did investigators essentially find stacks?

20   A.   Yes, sir.

21   Q.   And so this first, 11A, is this one of those stacks?

22   A.   Yes, sir.  It's one of them, yes, sir.

23   Q.   Okay.  And so if we just look through, are there records

24   that show, for instance, this page here.

25            MR. SMITH:  Can we zoom that in?

1    BY MR. SMITH:

2    Q.   What are we looking at here?

3    A.   It's a list of patients that were seen on October 13th,

4    2020, and the charges that they were charged.  Sorry.  And the

5    charges.

6    Q.   Was this -- October 13th, was that just before the search

7    warrant?

8    A.   Yes, sir.

9    Q.   Okay.  If we can go to the next couple pages, were there

10   also handwritten notes reflecting accounting information?

11   A.   Yes, sir.

12   Q.   Okay.  Is this an example of that?

13   A.   Yes, sir.

14   Q.   Okay.  In addition to that, were there records showing

15   payments for injections?

16   A.   Yes, sir.

17   Q.   Do you have an understanding what the MD means in this

18   document?

19   A.   I'm sorry.  The MC?

20   Q.   MD.

21   A.   MD?  It's my understanding that it was the medical

22   director visit, and the patient was charged $150 for that.

23   Q.   Okay.  And, to your knowledge, who is the medical

24   director at Gateway Medical Associates?

25   A.   Dr. Stanton.

1    Q.   Okay.   In this stack are there also individual receipts

2    reflecting how much individual patients paid?

3    A.   Yes, sir.

4          MR. SMITH:  If we can, for example, can we go to

5    page 72?

6    BY MR. SMITH:

7    Q.   Sir, what is this?

8    A.   It's a receipt from Gateway Medical for $500.

9    Q.   Are you able to determine who signed that?

10   A.   It appears that Kimber Nantz signed the receipt.

11         MR. SMITH:  Okay.  Can we also go to page 244?

12   BY MR. SMITH:

13   Q.   What is this?

14         THE COURT:  This is all within 11A, right?

15         MR. SMITH:  Yeah, we're just moving within 11A.

16   Thank you, Your Honor.

17         THE WITNESS:  This is also a receipt from Gateway

18   Medical Associates.  The amount is listed as $620.

19   Misty Brown has signed the receipt, and the date is October

20   the 2nd, 2020.

21   BY MR. SMITH:

22   Q.   Okay.  You had discussed yesterday, when doing the

23   cooperating witness operations, obtaining those prepaid debit

24   cards?

25   A.   Yes, sir.

1   Q.   And that was for the purpose of paying for the fees at

2   Gateway Medical Associates?

3   A.   Yes, sir.

4   Q.   So when you executed the search warrant, did you see

5   evidence that patients were paying generally the way that the

6   cooperating individual did?

7   A.   Yes, sir.

8   Q.   And is that based on records like the ones we are looking

9   at here?

10  A.   Yes, sir.

11       MR. SMITH:  And if we could just look at 11B very

12  briefly.

13  BY MR. SMITH:

14  Q.   Sir, is this a similar collection of documents?

15  A.   Yes, sir.

16  Q.   Is it also quite long?

17  A.   I'm sorry?

18  Q.   Is it quite long as well?  Lengthy?  Is it lengthy?

19  A.   Yes, sir.

20       MR. SMITH:  Okay.  If we could just go through a few

21  pages of that, Rebecca.

22  BY MR. SMITH:

23  Q.   The first several pages, what do they contain?

24  A.   They look like deposit receipts at Planters Bank.  It

25  lists the last few numbers on the account.

1    Q.   Were investigators able to identify the bank that the

2    practice used?

3    A.   Yes, sir.

4    Q.   What bank was it?

5    A.   Planters Bank, I believe.

6    Q.   All right.  Let's go to a few other items as the search

7    warrant progressed.

8         Subject to your investigation, do you know whether there

9    are guidelines in Tennessee related to prescribing controlled

10   substances for chronic pain?

11   A.   Yes, sir.

12   Q.   Is that a published document?

13   A.   Yes, sir.

14        MR. SMITH:  Can we bring up Government's Exhibit 12,

15   please?

16   BY MR. SMITH:

17   Q.   Sir, what is Government's Exhibit 12?

18   A.   It's the -- the cover of the Tennessee Chronic Pain

19   Guidelines Second Edition.

20   Q.   Where was this found?

21   A.   That was found I believe in Dr. Maccarone's office.

22   Q.   Was this found at Gateway Medical Associates?

23   A.   Yes, sir, inside the building.

24   Q.   Is this a copy of those guidelines you referenced a

25   moment ago?

1    A.   Yes, sir.

2          MR. SMITH:   Your Honor, we would move to admit

3    Government's Exhibit 12.

4          THE COURT:   Any objection?

5          MR. STRIANSE:   No objection.

6          THE COURT:   Thank you.   That will be admitted and may

7    be displayed.

8        (Government's Exhibit No. 12 was received in evidence.)

9          MR. SMITH:   I can display the cover briefly, and then

10   we'll go to Government's Exhibit 13, but if we could publish

11   that for the jury briefly.   Could we also bring up now

12   Government's Exhibit 13.

13   BY MR. SMITH:

14   Q.   What's Government's Exhibit 13?

15   A.   It's the Tennessee Chronic Pain Guidelines.   It's the

16   third edition.

17   Q.   Was this found at Gateway Medical Associates?

18   A.   Yes, sir, it was.

19   Q.   Okay.   And is both -- I meant to ask you this before, and

20   I apologize.   Both Government's Exhibit 12 and Government's

21   Exhibit 13 -- they are obviously electronic copies -- are

22   these in substantially the same form as they were found at the

23   scene?

24   A.   Yes, sir, they are.

25          MR. SMITH:   Okay.   We move to admit Government's

*T. JANUTOLO - Direct Examination (Cont'd)*                    15

1    Exhibit 13, Your Honor.

2              THE COURT:  Any objection?

3              MR. STRIANSE:  No objection.

4              THE COURT:  13 will also be admitted and be

5    displayed.

6         (Government's Exhibit No. 13 was received in evidence.)

7              MR. SMITH:  We'll take a look at these later in the

8    trial, but if you can, Rebecca, just arrow through just to

9    give them a sense of what's in the document.

10   BY MR. SMITH:

11   Q.   Is there various information relating to prescribing

12   controlled substances?

13   A.   Yes, sir.

14   Q.   And you are not a physician?

15   A.   No, sir.

16   Q.   I'm not going to ask you to explain or talk about the

17   information in there.

18        But this is what was found at the scene; is that fair?

19   A.   Yes, sir.

20   Q.   Okay.  Was there other information relating to pain

21   clinic rules or regulations in Tennessee that were found at

22   the clinic?

23   A.   Yes, sir.

24             MR. SMITH:  Can we bring up Government's Exhibit 14,

25   please?

1  BY MR. SMITH:

2  Q.   What's Government's Exhibit 14, sir?

3  A.   Those are the Tennessee Pain Clinic Rules and

4  Regulations, is what the cover is.

5        MR. SMITH:  Can you just arrow through it briefly,

6  Rebecca?

7  BY MR. SMITH:

8  Q.   Was this found at Gateway Medical Associates during the

9  search warrant?

10  A.   Yes, sir, it was.

11  Q.   Is this in the same condition as it was found?  It's just

12  an electronic copy?

13  A.   Yes, sir.

14        MR. SMITH:  Okay.  Your Honor, we move to admit

15  Government's Exhibit No. 14.

16        THE COURT:  Any objection?

17        MR. STRIANSE:  No objection.

18        THE COURT:  14 will also be admitted and may be

19  displayed.

20     (Government's Exhibit No. 14 was received in evidence.)

21  BY MR. SMITH:

22  Q.   Sir, if we just walk through a few pages of this, can you

23  just generally describe what's contained in this document for

24  the jury?

25  A.   Yes, sir.  It's a set of rules and guidelines from the

1    state of Tennessee directing how to treat pain --

2    Q.   Okay.

3    A.   -- management.

4    Q.   Okay.  So we've talked about guidelines and regulations

5    from the state that were found in those last couple exhibits.

6         Did investigators also search for any evidence for

7    whether Gateway Medical Associates had internal policies or

8    rules or guidelines?

9    A.   Yes, sir.

10   Q.   And were you able to identify any documents relevant to

11   that?

12   A.   Yes, sir.

13   Q.   Can we look at Government's Exhibit 16, please?  I'm

14   sorry.  15.  I jumped the gun there.

15        Okay.  Sir, what are we looking at here?

16   A.   That's the -- a -- I believe it was a binder, and the

17   title of it was Gateway Medical Associates Original Forms.

18   Q.   And is this collection of documents kept in the same

19   condition as it was found at the scene?

20   A.   Yes, sir.

21        MR. SMITH:  Your Honor, we would move to admit

22   Government's Exhibit 15.

23        THE COURT:  Any objection?

24        MR. STRIANSE:  No objection.

25        THE COURT:  Thank you.  15 will be admitted and may

1    be displayed.

2           (Government's Exhibit No. 15 was received in evidence.)

3               MR. SMITH:  Rebecca, if we could advance the page.

4    One more.

5    BY MR. SMITH:

6    Q.   If we just look through this table of contents, can we,

7    please, walk the jury through the forms that were in place at

8    Gateway Medical Associates?

9    A.   Yes, sir.  The table of contents lists a pharmacy list,

10   triage forms, new patient contract, various documents that the

11   clinic used to operate.

12              MR. SMITH:  Can we go one more page, Rebecca?  Okay.

13   BY MR. SMITH:

14   Q.   And then behind this table of contents, are there copies

15   of these various records and documents themselves?

16   A.   Yes, sir, there are.

17   Q.   Okay.

18              MR. SMITH:  Rebecca, just so the jury has an

19   opportunity to review it, can we just advance page by page,

20   and I'll ask you to stop in a moment.

21   BY MR. SMITH:

22   Q.   As Rebecca is doing this, Officer Janutolo, are these all

23   blank kind of template forms that were used at Gateway Medical

24   Associates as far as you could discern?

25   A.   Yes, sir.

1    Q.   If we could, let's take a look -- couple more pages.

2    Let's stop there.

3        Among other documents that were contained in this binder,

4    was there a pill count policy?

5    A.   Yes, sir.

6    Q.   And is that what we're looking at here?

7    A.   Yes, sir.

8    Q.   Okay.  Can you please read for the jury what the pill

9    count policy was at Gateway Medical Associates according to

10   this document?

11   A.   Yes, sir.

12       "Pill counts are required by the State of Tennessee

13   Department of Health.  As a patient in an active pain

14   management clinic, you are required by Gateway Medical

15   Associates to present for three pill counts per calender year.

16   Please understand these are mandatory, not optional.  We can

17   call you to have you come in unannounced and require you to

18   present for a pill count with a 24-hour notice twice per year.

19   You were made aware of this when you signed the Patient

20   Responsibility Agreement For Controlled Substances.  Once

21   called in to present medication or pill counts are scheduled,

22   you must comply.  If you do not comply, you are in breach of

23   contract and risk of being dismissed."

24   Q.   Okay.  So as an investigator, when you reviewed this, did

25   this appear to be consistent with your expectations of pain

1    clinics' proper operations?

2    A.   Yes, sir.

3    Q.   Okay.  Let's advance a couple more pages and allow the

4    jury to continue seeing what's in this document.

5         Sir, are there a variety of templates and questionnaires

6    that were used, appears to be, for patients to fill out at the

7    practice?

8    A.   Yes, sir.

9    Q.   Again, do these appear to be the blank templates that

10   were used for that purpose?

11   A.   Yes, sir, they do.

12   Q.   Were there also records relating to internal operations

13   like employee hours, overtime, things of that nature?

14   A.   Yes, sir.

15   Q.   Okay.  Is that what we're looking at here?

16   A.   Yes, sir.

17   Q.   Based on those records, does it appear the clinic had

18   been in operation throughout October?

19   A.   Yes, sir.

20   Q.   And we'll talk about this in a bit, but some of the

21   documents and records found at Gateway, were those also

22   indicating that the clinic had been open and functioning all

23   the way up to October 14th or thereabouts?

24   A.   Yes, sir.

25   Q.   Okay.

1        MR. SMITH:  Carry on.

2    BY MR. SMITH:

3    Q.   Were there also guidelines or instructions relating to

4    things like urine drug testing in this information?

5    A.   Yes, sir.

6    Q.   Okay.  Okay.  If we can, let's look at this portion.

7        MR. SMITH:  And, Rebecca, if you are able to blow

8    this up.

9    BY MR. SMITH:

10   Q.   What is this?

11   A.   It's the Medical Screening Policy and Compliance Plan.

12   Q.   Can we please walk the jury through this document?

13   A.   Yes, sir.  It advises the patients that "All new patients

14   will submit a urine/oral specimen for screening upon initial

15   consultation where opioid medications may be prescribed.

16   Follow-up visits will consist of random urine/oral screen

17   every other month for insurance, one month in-house and one

18   month send-out for self-pay.  In the event of patient refusal

19   to submit a specimen, he or she will not be denied treatment;

20   however, no controlled substances will be prescribed."

21   Q.   Okay.  What else does it say about screening for

22   medications?

23   A.   Under the "Additional Policy for Medication Screening,"

24   "When a patient arrives to his or her appointment, a urine

25   sample should be collected.  If not able to give a urine

1    sample, then an oral sample will be taken.  Upon being asked

2    for a specimen collection, the patient must remain in the

3    reception area until a specimen is collected."

4    Q.   Okay.  And if we go to the next page, is there additional

5    information about the kind of -- type of testing and what --

6    how it will be used?

7    A.   Yes, sir.

8    Q.   Okay.  Can you go to the second bullet point there and

9    please tell us what that says?

10   A.   "No prescriptions for controlled medications will be

11   prescribed in the event of positive POC results for cocaine,

12   methamphetamine, or methylenedioxymethamphetamine, MDMA.

13   Rather, the patient will be scheduled for follow-up office

14   visit upon receipt of confirmatory laboratory results."

15         MR. SMITH:  Rebecca, if we can go back out and go

16   down a few more bullets.

17       If we can go down to the "positive confirmatory."  There

18   we go.

19   BY MR. SMITH:

20   Q.   At the bottom of the page, sir.

21   A.   Yes, sir.

22   Q.   What is that?

23   A.   "Positive confirmatory results for illicit drug,

24   methamphetamine, cocaine, heroin, immediate discharge.

25   Marijuana, return to clinic every one to three weeks for

1   office visit and collection."

2   Q.   Okay.  Can we go to the next page, please.  If we can go

3   to positive confirmatory results?

4   A.   "Positive confirmatory results for currently unprescribed

5   medications, repeat specimen collection, send to confirmation

6   laboratory.  No controlled substances prescribed.  Return to

7   clinic one time a week for office visit and specimen

8   re-collection."

9   Q.   So is that first section you read if there's a

10  confirmation drug screen for an unprescribed drug?

11  A.   Yes, sir.

12  Q.   Okay.  Is there also a section that talks about results

13  for prescribed medication?

14  A.   Yes, sir.

15  Q.   What does it say?

16  A.   "Positive confirmatory results for currently prescribed

17  medications without metabolites, immediate discharge."

18  Q.   As an investigator, what is the significance of a urine

19  drug screen that has -- that's negative for prescribed

20  medication?

21  A.   It could mean that the patient is either not taking the

22  medication as prescribed, meaning they are taking the

23  medication and running out prior to their next urine sample,

24  or they are diverting or selling their medication.

25  Q.   Okay.  If we can go down the page a bit.  What does it

1    say at the next part?

2    A.   "Negative confirmatory results for currently prescribed

3    medications.  If a patient is currently prescribed a

4    long-acting or short-acting medication without a valid reason

5    with supporting for negative confirmatory result, you'll

6    repeat the specimen collection, send to confirmatory lab.  One

7    to two weeks of medication may be prescribed upon the

8    discretion of the provider."

9          MR. SMITH:  Can we go to the next page, please,

10   Rebecca?  Sorry.  You can just blow up the whole text on the

11   page.

12   BY MR. SMITH:

13   Q.   And just -- you were reading some of those bullet points.

14   If you can finish it.

15   A.   Yes, sir.  "Return to clinic in one to two weeks for an

16   office visit and specimen re-collection or may discharge

17   without warning per provider discretion or no prescriptions

18   for controlled substances.  Noncontrolled medications and/or

19   procedure only per provider discretion."

20   Q.   I'm not asking to interpret this.  But, generally

21   speaking, does this document outline consequences for

22   inconsistent urine drug tests?

23   A.   Yes, sir.

24   Q.   Do those consequences, according to the policy, include

25   patient dismissal or only limited amounts of medications?

1    A.   Yes, sir.

2          MR. SMITH:   Okay.   Rebecca, if we can go to the next

3    page, please.

4    BY MR. SMITH:

5    Q.   Is there also -- was there a document in this collection

6    regarding tapering medications?

7    A.   Yes, sir.

8    Q.   Okay.   Can you please tell us what that document says?

9    A.   The header is "Protocol For Tapering Medications."

10         "Taper controlled medication downward as quickly and

11   safely as possible.   Medications may be prescribed for a

12   period of one week with an accompanying written tapering

13   schedule.   If suspicion exists for diversion, (i.e. no

14   metabolites present on confirmatory laboratory report,

15   unexplained negative confirmatory laboratory reports of

16   prescribed medications), it is expected that no tapering

17   controlled medications will be prescribed and subsequent

18   discharge from the clinic."

19   Q.   So according to this policy, if a physician were to taper

20   a patient including, as discussed, for an inconsistent urine

21   drug screen, according to the policy, what was going to be

22   included?

23   A.   They would be tapered as quickly as possible, and the

24   medications would -- may only be prescribed for a period of

25   one week.   And they would have a written tapering schedule.

1     Q.   Okay.  And we discussed a moment ago an inconsistent

2     negative, meaning the absence of a prescribed medication.

3         According to this policy at Gateway Medical Associates,

4     what was the policy about that?

5     A.   If they don't have the medication in your system -- and

6     I'm summarizing here.  If you don't have the medication in

7     your system, you are going to be tapered, and you're not going

8     to have -- could be discharged from the clinic.

9             THE COURT:  I think the jury can evaluate this.  This

10    is really not this witness's area.

11            MR. SMITH:  I didn't mean to stray into that.  My

12    apologies, Your Honor.

13    BY MR. SMITH:

14    Q.   Okay.  If we can, let's move past this document and go to

15    Government's Exhibit 16, please.

16        During the time of the search warrant, do you know

17    whether Dr. Stanton was associated with any other clinics in

18    the Clarksville area?

19    A.   Yes, sir.

20    Q.   Okay.  Let's look at -- what is Government's Exhibit 16

21    here?

22    A.   It's the Joint and Spine Pain Center Policy and

23    Procedures Treatment for Chronic Nonmalignant Pain, and it's

24    dated November 2015.

25    Q.   Do you know -- is the name the Joint and Spine Pain

1    Center familiar to you?

2    A.   Yes, sir.

3    Q.   Okay.  How so?

4    A.   I believe Dr. Stanton is associated with that clinic.

5    Q.   Okay.  So just for -- well, this is entitled the Joint

6    and Spine Center, but just so the Court understands, where was

7    this found?

8    A.   That was found in Gateway Medical.

9    Q.   And if we could arrow through, what does this document

10   contain?

11   A.   This also contains policies and procedures and forms.

12        MR. SMITH:  Your Honor, we move to admit Government's

13   Exhibit 16.

14        THE COURT:  Any objection?

15        MR. STRIANSE:  No objection.

16        THE COURT:  16 will be admitted and may be displayed.

17   (Government's Exhibit No. 16 was received in evidence.)

18        MR. SMITH:  If we can just arrow through a few pages.

19   BY MR. SMITH:

20   Q.   Sir, does this -- as I think you have already described,

21   does this contain various templates and example records?

22   A.   Yes, sir, it does.

23   Q.   All right.  So we've talked about guidelines and policies

24   and also various forms, templates that were found.

25        Did investigators find any hard copy medical records at

1    the scene at Gateway Medical Associates?

2    A.   Yes, sir.

3    Q.   Okay.  If we can, let's look at Government's Exhibit 17A.

4    Can you describe to us what's contained in 17A?

5    A.   It's my understanding that this is a --

6    Q.   I don't want you to interpret the document.

7    A.   I'm sorry.

8    Q.   Just describe it physically, what you are looking at, and

9    where it was found.

10   A.   Yes, sir.  It was found inside Gateway Medical.  It's

11   titled "Wednesday, March the 18th, 2020."  "John Stanton,

12   M.D.," is listed on it, and there is a list of patients and

13   times documented on it.

14   Q.   Okay.  Did you find a number of documents like this?

15   A.   Yes, sir.

16   Q.   Do those documents bear handwriting?

17   A.   Yes, sir.

18   Q.   Okay.  Was that handwriting on the document when you

19   found it?

20   A.   Yes, sir.

21           MR. SMITH:  Your Honor, we move to admit Government's

22   Exhibit 17A.

23           THE COURT:  Any objection?

24           MR. STRIANSE:  No objection.

25           THE COURT:  17A will be admitted.

1      (Government's Exhibit No. 17A was received in evidence.)

2           MR. SMITH:  Okay.  If we can just blow up the whole

3      thing, I think.

4      BY MR. SMITH:

5      Q.   Okay.  Now, sir, did you find a collection of these,

6      meaning more than just one day of these?

7      A.   Yes, sir.

8      Q.   Just to orient the jury, can you just kind of explain

9      what it is we're looking at?

10          You already did it once, but they didn't have the

11     opportunity to see it while you were doing it.

12     A.   Okay.  It's entitled "Wednesday, March 18th," and there's

13     a list of patients on the document and some handwritten notes

14     beside each patient's name, and "Dr. John Stanton" is listed

15     at the top of the page.

16     Q.   Are there letters -- are there hand markings here that

17     say -- well, let's just blow up the one at 12:00 P.M. there,

18     if we can.  What does the handwriting next to it seem to say

19     to you?

20     A.   Yes, there's -- it says, "no metab minus five."

21     Q.   As an investigator, did you have an understanding of what

22     "metab" meant?

23     A.   It was metabolites.

24     Q.   Okay.  Now, you didn't write that down?

25     A.   No, sir.

*T. JANUTOLO - Direct Examination (Cont'd)*                    30

1    Q.   This handwriting was already on the document when you

2    found it?

3    A.   Yes, sir.

4            MR. SMITH:   Okay.   Can we go to Government's

5    Exhibit 17B?

6    BY MR. SMITH:

7    Q.   Sir, what is this?

8    A.   It's the same document.   It's for Monday, March the 23rd,

9    2020.   Dr. Stanton is listed at the top of the document.   And

10   there's also numerous handwritten notes on it.

11   Q.   Okay.   Is this the -- in the same condition as it was

12   found at the scene at Gateway Medical Associates?

13   A.   Yes, sir.

14           MR. SMITH:   Your Honor, we move to admit Government's

15   Exhibit 17B.

16           MR. STRIANSE:   No objection.

17           THE COURT:   That will be admitted as well.

18       (Government's Exhibit No. 17B was received in evidence.)

19   BY MR. SMITH:

20   Q.   What is the date on this document?

21   A.   March the 23rd, 2020.

22           MR. SMITH:   And if we can, can we blow up at the

23   bottom.

24   BY MR. SMITH:

25   Q.   What does the handwriting at the bottom say?

1   A.   "3:45 P.M., Tammy Myers checked in.  Heroin, fent,

2   morp" -- m-o-r-p -- "oral, minus five, OxyC, 75 to 70."

3   Q.   Okay.  Now, as an investigator who's worked narcotics

4   cases, you have told us -- are there any drugs that start with

5   the letters f-e-n-t?

6   A.   Fentanyl, yes, sir.

7   Q.   Are there any drugs that start with m-o-r-p?

8   A.   Morphine.

9   Q.   And what about o-x-y-c?

10  A.   OxyContin or oxycodone.

11          MR. SMITH:  Can we please look at Government's

12  Exhibit 17C?

13  BY MR. SMITH:

14  Q.   Sir, what is this?

15  A.   That's a -- it's a document.  It's titled "Thursday,

16  March the 26th.  John Stanton, M.D.," is listed at the top of

17  the document.  There are numerous patients listed on the

18  document, also with handwritten notes beside them.

19  Q.   Okay.  Is this a copy but in the same condition that was

20  found at the scene?

21  A.   Yes, sir.

22          MR. SMITH:  I would move to admit Government's

23  Exhibit 17C, Your Honor.

24          MR. STRIANSE:  No objection.

25          THE COURT:  Thank you.  That will be admitted.

1     (Government's Exhibit No. 17C was received in evidence.)

2           MR. SMITH:  Can we just blow up the middle?

3     BY MR. SMITH:

4     Q.   Sir, can you read for us what is written there in the

5     middle of the document?

6     A.   Yes, sir.  There's "Francis Broussard," and the

7     handwritten notes are, Oral send-out and oral meth, fentanyl,

8     morphine, OxyC and OxyM, and c-o-c, comma, Suboxone, or Subox.

9     Q.   As an investigator, are you familiar with any drugs that

10    begin with the letters c-o-c?

11    A.   Oh, yeah, cocaine.

12    Q.   Are you familiar with any drugs that begin with

13    S-u-b-o-x?

14    A.   Suboxone.

15    Q.   What about the next name down?

16    A.   The next name down is Freddie Hubbard.  In-house,

17    hydrocodone, hydromorphone, or hydromor, and n-o-r

18    hydrocodone.

19    Q.   And the patient or the name below that?

20    A.   Sherry Smith.  The handwritten notes are five, slash,

21    zero methadone, 17 pounds 437 EDDP 11,103, plus meds.

22    Q.   Do you know what EDDP is?

23    A.   No, sir.  I'm not familiar with what that is.

24          MR. SMITH:  Okay.  Okay.  Rebecca, can we go to --

25    that was 17C, correct?

1    Okay.  Can we go to 17D just for the witness, please.

2  BY MR. SMITH:

3  Q.  Sir, what is this?

4  A.  That's another document.  It's titled, "Monday, March

5  the 30th, 2020."  Dr. John Stanton, M.D.," is listed at the

6  top, and, again, it's got the patients and handwritten notes

7  there.

8  Q.  Okay.  And is this in the same form as -- as was found at

9  the scene except it's an electronic copy?

10  A.  Yes, sir, it is.

11    MR. SMITH:  Your Honor, we move to admit Government's

12  Exhibit 17D.

13    THE COURT:  Any objection?

14    MR. STRIANSE:  No objection.

15    THE COURT:  Thank you.  That will be admitted as

16  well.

17    (Government's Exhibit No. 17D was received in evidence.)

18    MR. SMITH:  Can we go to the middle third of the

19  page?  That's fine.

20  BY MR. SMITH:

21  Q.  Sir, can you read -- there's a name "Thornton" there.

22  Can you please read that for us?

23  A.  I'm sorry.  I didn't hear you.  The name where?

24  Q.  Just any of the handwriting.

25  A.  Oh, I'm sorry.

1    THE COURT:  I don't think he heard the name you

2 referenced.

3    MR. SMITH:  I apologize.

4 BY MR. SMITH:

5 Q.  Let's just start at the top, to be easy.

6 A.  Yes, sir.

7 Q.  Can you start with the first handwriting and the name

8 next to it?

9 A.  It's Marlene Thornton, oral, m-o-r-p, f-e-n-t, heroin,

10 dismissed.

11    "Paula Stuart, in-house, dismissed."

12    Robby Bush, no pee, dash, urine in 3, dash, 2.

13 Q.  And at the bottom what name do we see there?  Do you see

14 Misty Brown's name?

15 A.  Yes, sir.  Misty Brown, oral, fentanyl, slash, Suboxone

16 last pee.

17    MR. SMITH:  Can we go to Government's Exhibit 17E.

18    I guess so -- if we can step back.  If we go to 17A very

19 briefly, Rebecca.

20 BY MR. SMITH:

21 Q.  Sir, what is the date on that document?

22 A.  March the 18th.

23 Q.  March 18th.

24    If we can go to 17B.

25 A.  March 23rd, 2020.

1     Q.   17C?

2     A.   March the 26th, 2020.

3     Q.   And 17D?

4     A.   March the 30th, 2020.

5     Q.   Okay.  Were each of those lists in a, give or take, you

6     know, two-week span within March of 2020?

7     A.   Yes, sir.

8     Q.   Did you also find documents indicating they were from

9     April of 2020?

10    A.   Yes, sir.

11         MR. SMITH:  Can we look at 17E, please?

12    BY MR. SMITH:

13    Q.   Sir, what is 17E?

14    A.   It's a document titled, "Monday, April 13, 2020."  "John

15    Stanton, M.D." is listed at the top with patients and

16    handwritten notes.

17         MR. SMITH:  Okay.  And, Your Honor, we move to admit

18    Government's Exhibit 17E.

19         MR. STRIANSE:  No objection.

20         THE COURT:  Thank you.  17E will be admitted.

21    (Government's Exhibit No. 17E was received in evidence.)

22    BY MR. SMITH:

23    Q.   Can we please pull up 17E.  If we can just look at the

24    top third, please.

25         Sir, beginning with the 10:15, could you just read down a

1    few entries?

2    A.   Yes, sir.  3, slash, B, no metab, ND.  3-17, dash,

3    norfent ND 5, slash, O.  3-17 fent, slash, m-o-r-p, 5,

4    slash, O.  3-17 fent, slash, heroin, 5, slash, O.

5    Q.   And then what's the bottom say?

6    A.   3-13, 5, slash, O, c-o-c, THC, slash, S-u-b, slash,

7    f-e-n-t, ND.

8    Q.   Sir, this is for what date?

9    A.   The date is April the 13th, 2020.

10   Q.   Can we go to Exhibit 17F, please.

11        Sir, same questions.  What's 17F?

12   A.   It's a -- the same type of document.  Titled "Monday,

13   April 27th."  "John Stanton" is listed at the top of the

14   document with patients and handwritten notes.

15        MR. SMITH:  Okay.  Your Honor, we move to admit 17F.

16        MR. STRIANSE:  No objection.

17        THE COURT:  That will be admitted.

18   (Government Exhibit No. 17F was received in evidence.)

19        MR. SMITH:  Okay.  Can we just go to the middle half

20   there?  Yeah.  Thank you.

21   BY MR. SMITH:

22   Q.   Sir, in reviewing this document, did you see any

23   notations relating to some of the drugs we talked about?

24   A.   Yes, sir.

25   Q.   Okay.  Can you explain where you see those?

*T. JANUTOLO - Direct Examination (Cont'd)*                    37

1   A.   Misty Brown, meth; Kristi Holland, slash, fentanyl or

2   fent, Eleace Eldridge, all negative or all neg; Gregory

3   Hatfield, meth, slash, THC, fent, heroin, slash, m-o-r-p.

4   Connie Jones, methadone, slash, EDDP.

5   Q.   Okay.  If we could zoom out of that.  All right, sir.  I

6   appreciate your patience.

7            MR. SMITH:  If we could go to Exhibit 17G.

8        And, Your Honor, if it's agreeable with you and counsel,

9   I have 17G through 17O, which I'll represent are similar type

10  of documents.  I can walk them briefly through with Officer

11  Janutolo and then move them in collectively.  I don't want to

12  waste the Court's time.

13           THE COURT:  Let's just confer on that for a moment.

14       (Sidebar conference.)

15           THE COURT:  Can you hear me, Mr. Strianse?

16           MR. STRIANSE:  Yes, sir.

17           THE COURT:  You know, I'm all for efficiency, but I

18  don't want to put the defense in a position of, you know,

19  objecting to that and suggesting to the jury that it's

20  causing, you know, this process.

21       So whatever you say, Mr. Strianse.

22           MR. STRIANSE:  We have no objection to that

23  suggestion, Your Honor.

24           THE COURT:  So that group from 17F through O would go

25  in by stipulation?

1          MR. STRIANSE:  Yes, sir.

2          MR. SMITH:  I'll still cover them with the witness.

3    I'm trying to save time.

4          THE COURT:  I can tell the jury those will be

5    admitted as a group, and then you can cover them to the extent

6    you feel you need to, but they'll be in.

7       Are you okay with that?

8          MR. STRIANSE:  That's fine.

9          MR. SMITH:  Thank you, Your Honor.

10      (Sidebar conference concluded.)

11         THE COURT:  So for -- for efficiency, I'll tell the

12   jury that the collection of records from -- I think F was

13   already in.

14      Michelle, is that right?

15      Okay.  From 17G through 17O, those will all be admitted.

16      Counsel may take you through some of those, but that

17   group is already admitted.  Okay.

18      (Government's Exhibit No. 17G through 17O was received in

19   evidence.)

20         MR. SMITH:  Okay.  If we can publish these, I would

21   like to walk the jury through these just briefly, if we can.

22   So starting with 17G.

23   BY MR. SMITH:

24   Q.   Do you see again any handwritten notations --

25   A.   Yes, sir.

1  Q.   -- on this document?

2  A.   Yes.

3  Q.   Give us an example.

4  A.   Minus five f-e-n-t for Ethel Williamson; minus ten for

5  Robert Gray; minus five for Gary Potts; minus ten for Kia

6  Doswell; minus ten and then the number 270 for Tara

7  Blankenship.

8  Q.   Okay.

9  A.   Misty Brown minus ten meth.

10 Q.   Can we go to 17H next?

11 A.   Yes, sir.

12 Q.   If you could, just cover the top two entries there for

13 us?

14 A.   Yes, sir.  Minus five, no metab.  Minus ten fent, slash,

15 m-a-r.

16        MR. SMITH:  Could we go to 17I, please?

17 BY MR. SMITH:

18 Q.   So what -- what date are we at now?

19 A.   May the 6th, 2020.

20 Q.   So the previous two sets have been from March and

21 April of 2020?

22 A.   Yes, sir.

23 Q.   Okay.  And in May of 2020, what do we see in this

24 document?

25 A.   "Dr. John Stanton" is listed at the top in the same

1    handwritten notations, minus 5 OxyC, various numbers, 5,

2    slash, 0.

3    Q.   Okay.  And at the bottom of the page, what notation is

4    there?

5    A.   At the bottom of the page, it's "Minus five Oxy and

6    fent."

7    Q.   That was May 6, 2020.  Can we please go to 17J?  What

8    date is that, sir?

9    A.   May the 17th, 2020.

10   Q.   Does that appear to be the next day?

11   A.   Yes, sir.

12   Q.   And what's at the first couple names listed there?

13   A.   "Minus ten, OxyC, heroin, minus ten, OxyC,

14   buprenorphine."

15        MR. SMITH:  Okay.  Can we go to 17K, please.

16   BY MR. SMITH:

17   Q.   What's the date for this?

18   A.   May the 11th, 2020.

19   Q.   Do you see any notations referencing the substances we

20   have talked about?

21   A.   Yes, sir.

22   Q.   Can you identify a couple of those for us?

23   A.   Fent, slash, bup, fent, slash, m-o-r-p, minus five, no

24   metab, no metab, minus ten, OxyC, fentanyl, minus five, Oxy,

25   minus five, Oxy.

*T. JANUTOLO - Direct Examination (Cont'd)*                    41

1    Q.   What does it say next to "Anita Fralix"?

2    A.   It says -- can you make that up a little bit?  I can't

3    hardly make that out.  I'm sorry.

4         "Anita Fralix, fent, minus five, OxyC."

5              MR. SMITH:  Okay.  Can we go to 17L, please?

6    BY MR. SMITH:

7    Q.   Do you see any notations with regard to the substances

8    we've talked about?

9    A.   Yes, sir.

10   Q.   Can you give us an example?

11   A.   Benzo, slash, fent, slash, no meds.

12   Q.   What date is this, sir?

13   A.   It's May the 12th, 2020.

14             MR. SMITH:  If we can go just a couple more.

15   BY MR. SMITH:

16   Q.   17M, please?  Just for the name Britain there, do you see

17   any notations?

18   A.   Yes, sir.

19   Q.   What does it say?

20   A.   Fent, no metab, slash, fent.

21   Q.   Further down do you see the name Ginny Parker?

22   A.   Ginny Parker, meth, slash, fent.

23   Q.   Okay.  And then next to the name Holland?

24   A.   Kristi Holland, no metab, slash, fent.

25   Q.   Okay.  And what was the date of this, sir?

1    A.   May the 21st, 2020.

2         MR. SMITH:  Okay.  Can we go to 17N, please.

3    BY MR. SMITH:

4    Q.   And just at the bottom of the page, what do you see, sir?

5    A.   "Lona Frazier, minus five, Oxy, fentanyl."

6    Q.   What is the date of this one, sir?

7    A.   July the 29th, 2020.

8    Q.   Okay.  And let's look at one more if we can.

9         Sir, what is the date for 170?

10   A.   July the 30th, 2020.

11   Q.   And what's reflected on this one?

12   A.   Seven, slash, two, negative MS cont, c-o-n-t, minus five,

13   Oxy.

14   Q.   Okay.

15   A.   And at the bottom, "Fent, minus five, Oxy."

16   Q.   Okay.  So this is one type of record that was in hard

17   copy and paper that was located at GMA.  Did you find any

18   other hard copy paper records --

19   A.   Yes, sir.

20   Q.   -- at the scene?

21   A.   Yes, sir, we did.

22        MR. SMITH:  Okay.  Can we, please, for the patient

23   [sic] bring up Government Exhibit 18.  And if we can just

24   arrow through it, please.

25   BY MR. SMITH:

*T. JANUTOLO - Direct Examination (Cont'd)*                    43

1    Q.   Sir, do you recognize what's been marked as Government's

2    Exhibit 18?

3    A.   Yes, sir.

4    Q.   Can you just, in general terms, describe that for the

5    Court, please?

6    A.   It appears to be the patient records that we seized from

7    the clinic.

8    Q.   Okay.  And just without getting to the contents yet, but

9    I'm just trying to get you to describe the physical condition

10   of what you found, were these found in stacks, spread out?

11   How were they found at the scene?

12   A.   They were found in folders and jackets.

13   Q.   Okay.  And did investigators later scan those in?

14   A.   Yes, sir.

15   Q.   And, to the best of your knowledge, has this maintained

16   the same condition in ordering of those records?

17   A.   Yes, sir.

18          MR. SMITH:  Your Honor, we move to admit Government's

19   Exhibit 18, please.

20          MR. STRIANSE:  No objection.

21          THE COURT:  That will be admitted.

22      (Government's Exhibit No. 18 was received in evidence.)

23          THE COURT:  Is the redaction original, or is that --

24          MR. SMITH:  Thank you, Your Honor.  That's a good

25   question.

*T. JANUTOLO - Direct Examination (Cont'd)*                              44

1    BY MR. SMITH:

2    Q.   Sir, who applied the redaction?

3    A.   We did -- we did, or the government did.

4    Q.   And was the redaction made in advance of trial to

5    protect --

6    A.   Yes, sir.

7    Q.   -- the patient's name?

8    A.   Yes, sir.  Yes, sir.

9            THE COURT:  So it's admitted.  The blacked-out part,

10   do you have that in front of you?  Yes?  The blacked-out part

11   is specific identifiers for the particular patient applied by

12   the government.  So, otherwise, just be aware of that, that

13   that's a difference from the original.

14           MR. SMITH:  One other thing I should note, Your

15   Honor.

16   BY MR. SMITH:

17   Q.   Sir, can we look at the bottom of the page, sir?  Is

18   there also a footer applied with the patient's initials?

19   A.   Yes, sir, there was.

20   Q.   Does that just enable us to track as we go forward?

21   A.   Yes, sir.

22   Q.   All right.  If we look through this document, what does

23   it -- if we can just walk through and describe what it

24   contains.  Sorry.  If we start at the front.

25   A.   The -- this is the first sheet.  It's -- I believe I've

T. JANUTOLO - Direct Examination (Cont'd)                45

1    heard it referred to as the superbill.  It's what was --

2    Q.  You didn't work there.  I don't want you to describe

3    that.

4    A.  Yes, sir.

5    Q.  Just, if we could, give a little bit of information of

6    what we're looking at as we walk through it.

7    A.  Yes, sir.

8    Q.  What's the next page?

9    A.  It appears that it's a record for that patient.

10   Q.  Okay.  Now, in reviewing these as an investigator, did

11   you see signatures or initials on these pages?

12   A.  Yes, sir.

13   Q.  Okay.  Continue on.  For instance, what is this document

14   titled?

15   A.  "In-house UDS."

16   Q.  And does it bear a signature at the bottom?

17   A.  Yes, sir.

18   Q.  Do you know whose signature that is?

19   A.  I'm sorry?

20   Q.  Do you know whose signature that is?

21   A.  John Stanton, M.D.

22   Q.  Can we go to the next page?  Do you know what this

23   document is?  Is that familiar to you at all?

24          MR. SMITH:  I don't know if we can rotate perhaps.

25          THE WITNESS:  Yes, sir.  It's a prescription

1    monitoring document for Tennessee.

2    BY MR. SMITH:

3    Q.   Do you know what prescription drug monitoring databases

4    are?

5    A.   Yes, sir.

6    Q.   Can you just, in very general terms, explain what that

7    is?

8    A.   Each time a controlled substance is filled at a pharmacy,

9    the pharmacy is responsible for entering that data into a

10   system that documents each of those prescriptions, and this is

11   Tennessee's version of that program or database.

12   Q.   Okay.  Does this document also appear to bear a

13   signature?

14   A.   Yes, sir.

15   Q.   And do you recognize that signature?

16   A.   John Stanton, M.D.

17        MR. SMITH:  Okay.  Now, if we go back to the first

18   page, Rebecca.

19   BY MR. SMITH:

20   Q.   What was the -- is there a date for this document or

21   perhaps the next page.

22        MR. SMITH:  It may be easier -- I'm sorry -- on the

23   third page.  I'm sorry.  Keep going.

24   BY MR. SMITH:

25   Q.   Is there a date on this document?

1  A.   Yes, sir.  10-13 of '20.

2  Q.   Now, for these paper records of this type, did you find

3  ones for every day going back to the inception of the clinic?

4  A.   No, sir.

5  Q.   Okay.  What were -- how recent did the ones that you

6  found appear to be?

7  A.   Within the last month or so of the execution of the

8  search warrant.

9  Q.   For instance, this document, what is the date that

10  appears on the top of the document?

11  A.   10-13 of '20.

12  Q.   How close in time was that to the execution of the search

13  warrant?

14  A.   Within days.

15  Q.   Okay.  So based on all that information, did this packet

16  of information -- this document that the pages that are

17  contained in there, did it appear to be fairly recent?

18  A.   Yes, sir.

19  Q.   Okay.  Did you find other documents like this collection

20  here?

21  A.   Yes, sir, we did.

22       MR. SMITH:  Okay.  Can we go to Government's

23  Exhibit 19?

24  BY MR. SMITH:

25  Q.   Okay.  Sir, what's Government's Exhibit 19?

1    A.   It appears to be the same type of packet of information

2    that was recovered from the clinic as we just previously

3    viewed.

4    Q.   Okay.  What does it say at the top?

5    A.   "John Stanton, M.D., Gateway Medical Associates, P.C."

6             MR. SMITH:  Okay.  Your Honor, we move to admit

7    Government's Exhibit 19.

8             MR. STRIANSE:  No objection.

9             THE COURT:  That will be admitted as well.

10       (Government's Exhibit No. 19 was received in evidence.)

11   BY MR. SMITH:

12   Q.   Now, if we could walk through this, were there some

13   records that appeared to have been filled out by hand, so

14   either forms or otherwise that bear handwriting?

15   A.   Yes, sir.

16   Q.   So, for instance, what's this second page here, say, on

17   the left side?

18   A.   It says "Triage Notes."

19   Q.   Okay.  And do those bear handwriting notations?

20   A.   Yes, sir.

21   Q.   And, again, I should have clarified, as Your Honor

22   already did.  Does this document contain redactions just like

23   the previous documents we talked about?

24   A.   Yes, sir, it does.

25   Q.   Did the United States make those redactions?

1    A.   Yes, sir.

2    Q.   Other than that, is it in the same format?

3    A.   Yes, sir, it is.

4         MR. SMITH:   If we go to the next page.   Carry on,

5    please.   If we can just keep arrowing through it.   Does it --

6    okay.   Go back one, please.

7    BY MR. SMITH:

8    Q.   Earlier we looked at some template forms that you walked

9    us through.   Do you remember that, sir?

10   A.   Yes, sir.

11   Q.   And those were blank; is that fair?

12   A.   Yes, sir, they were.

13   Q.   Okay.   Based on your review, does it appear that those

14   forms were then used and put into these packets of

15   information?

16   A.   Yes, sir, they were.

17   Q.   All right.   If we can go one more page.   Okay.   So we

18   just talked about forms that contained handwriting notations.

19        Were there also forms in this printed-out stack of paper

20   that appeared to be electronically generated?

21   A.   Yes, sir.

22   Q.   Okay.   For instance, what is -- what is this page, if you

23   know?

24   A.   It appears to be a billing sheet.

25   Q.   Okay.   We discussed this yesterday when you were walking

1    through things that you physically saw in the search warrant.

2        Were you able to determine whether Gateway Medical

3    Associates used electronic medical records?

4    A.   Yes, sir.

5    Q.   And just in very general terms, can you just explain what

6    you mean when we use the term "electronic medical record"?

7    A.   Yes, sir.  An electronic medical record is kept by a lot

8    of practices.  The records are scanned in and then kept in

9    some sort of storage device like a cloud or a -- you'll have

10   to forgive me.  I'm not a tech person.  But they are stored

11   electronically, and they can be retrieved by anyone with a

12   login or anyone granted access to the electronic medical

13   records.

14   Q.   Okay.  And if we look at the bottom of this page, the

15   footer, were investigators able to identify who the provider

16   was that carried this practice's electronic medical records?

17   A.   Yes, sir.  It was Quest Diagnostics Incorporated.

18   Q.   We will turn back to that in a moment.  Can we move to

19   the next page, please?  Just arrow through.  And stop there.

20       Sir, do you know what we're looking at here?

21   A.   It appears to be a note, a clinical note.

22   Q.   Okay.

23   A.   It's titled "Gateway Medical Associates."

24   Q.   And based on your review of this document, does this

25   appear to be an electronically generated document that was

1   printed out?

2   A.   Yes, sir.

3   Q.   For instance, at the top right corner, what does it

4   indicate?

5   A.   It's -- it appears to be generated by Ms. Heidtman.

6   Q.   When it says "generated," what does it says?

7   A.   It says, "Printed 9-25-2020 at 11:26 A.M. CDT by

8   Mrs. Jeneline Heidtman."

9   Q.   So this appears -- I don't want to put words in your

10  mouth.  But does this appear to be a document that was printed

11  out and then you found it in paper copy?

12  A.   Yes, sir.

13  Q.   Okay.  I'm just trying to make clear.  Now, if we can go

14  back to the first couple pages, and we'll return to this page

15  in a moment.  Go to the next page, please.

16      Okay.  Approximately what date does this collection of

17  records appear to be from?

18  A.   It appears to be from 9-9 of '20.

19  Q.   So is that September of 2020?

20  A.   Yes, sir.

21  Q.   Okay.  Can we go back to the note, please?

22      Okay.  So what is -- what is the date of this note?

23  A.   It's dated 9-25 of 2020.

24  Q.   Sorry.  That's the print date?

25  A.   I'm sorry.

1   Q.   Is there a reference to when the provider visit occurred?

2   A.   "Visit with provider on 8-28-2020."

3   Q.   Okay.  If we could just advance through this document

4   briefly.

5        Now, did investigators -- did investigators obtain a

6   search warrant for medical records related to Gateway Medical

7   Associates?

8   A.   Yes, sir, we did.

9   Q.   And from which entity -- can we go back?  Sorry.  Back

10   two.  One, two.  That's perfect.

11        And are you generally familiar with -- again, I'm not

12   asking you to play doctor, but are you just generally familiar

13   with what Quest Diagnostics produced to the government

14   pursuant to that search warrant?

15   A.   Yes, sir.

16   Q.   Does the format of those medical records appear

17   consistent with what we are looking at that was in hard copy

18   here?

19   A.   Yes, sir.

20        MR. SMITH:  If we can go to the -- just under plan of

21   care, that kind of four or five paragraphs under that,

22   Rebecca.

23   BY MR. SMITH:

24   Q.   Can you go to the fifth line down, which begins with

25   "Reviewed"?

1    A.   Yes, sir.

2    Q.   What does that say?

3    A.   "Reviewed with patient urine drug screen performed on

4    7-28-2020, which is inconsistent with prescribed medications.

5    Negative for MS Contin and oxycodone.  Patient was given

6    strong counseling to take medications as described.  Due to

7    his" --

8    Q.   Stop right there, if you can.

9         So, Officer Janutolo, was that language that you just

10   read -- was that in a document that was printed out and in

11   this packet of information as investigators found it?

12   A.   Yes, sir.

13   Q.   Okay.  Can we go to the next page, please?  One more

14   page.  Sorry.

15        Okay.  Sir, do you know what we're looking at here?

16   A.   It is a drug monitoring report.

17   Q.   Have you reviewed these before?

18   A.   Yes, sir.

19   Q.   Okay.  Are you familiar with it enough to know what the

20   checks or Xs at the top mean?

21   A.   It's the medication that's prescribed to the patient.

22   Q.   And if there's an X next to it, what does that mean?

23   A.   It means it wasn't present.

24   Q.   Okay.  Does this document bear any handwriting?

25   A.   Yes, sir.  There's a "J" and "S" initials on it.

1      MR. SMITH:  Okay.  Rebecca, we can take that document

2 down.

3 BY MR. SMITH:

4 Q.   Okay.  Now, you have just described for us the search

5 warrant relating to Quest Diagnostics, the electronic medical

6 records.

7      Did investigators serve a series of warrants to Quest

8 Diagnostics?

9 A.   Yes, sir.

10 Q.   And did it obtain certain paper files -- medical records

11 in return?

12 A.   Yes, sir.

13      MR. SMITH:  If we can -- just for the witness, can we

14 bring up Government's Exhibit 100, please?

15 BY MR. SMITH:

16 Q.   Pursuant to that search warrant, did investigators obtain

17 a medical record for patient Misty Brown?

18 A.   Yes, sir.

19 Q.   What is Government's Exhibit 100?

20 A.   It's a -- the patient -- electronic medical record of --

21 Q.   Does this also bear redactions?

22 A.   Yes, sir.

23 Q.   Does it also bear a footer at the bottom?

24 A.   Yes, sir.

25 Q.   Other than that, is this in the condition as it was sent

1    from Quest Diagnostics?

2    A.   Yes, sir, it is.

3         MR. SMITH:  Your Honor, we move to admit Government's

4    Exhibit 100.

5         MR. STRIANSE:  No objection.

6         THE COURT:  Thank you.  That will be admitted.

7         (Government's Exhibit No. 100 was received in evidence.)

8         MR. SMITH:  Okay.  And if we can just arrow through

9    that.

10   BY MR. SMITH:

11   Q.   Sir, have you reviewed some of these medical records just

12   to familiarize yourself with the general layout or contents?

13   A.   Yes, sir.

14   Q.   And, again, I don't want you to speak to or opine on any

15   of the contents, but just if we can walk the jury through some

16   of the records that we see in here.  So, for instance, these

17   records, do you recognize, generally speaking, what those are?

18   A.   Yes, sir.

19   Q.   Okay.  What are those?

20   A.   That's a drug monitoring report.

21   Q.   And we'll just advance through a series of those.

22        Did the electronic medical records obtained from Gateway

23   Medical Associates -- did they contain urine drug test

24   results?

25   A.   Yes, sir.

1    Q.   So we looked at a version of that in the paper record

2    that we talked about a moment ago at Government's Exhibit 19.

3          In the electronic medical records, were there, similarly,

4    urine drug screen results?

5    A.   Yes, sir.

6              MR. SMITH:   Okay.   If we could arrow through a few

7    more.   Please continue.

8    BY MR. SMITH:

9    Q.   Are there also results from diagnostic testing and other

10   labs?

11   A.   Yes, sir.

12   Q.   And I don't want to go through every page, but do these

13   records also contain what you identified as patient notes?

14   A.   Yes, sir.

15   Q.   And then does it also contain scanned-in information?

16   A.   Yes.

17   Q.   Okay.   So that was patient Misty Brown.

18          Did investigators also ask for a medical record for Shawn

19   Brown?

20   A.   Yes, sir.

21             MR. SMITH:   Can we bring up Government's Exhibit 101?

22   BY MR. SMITH:

23   Q.   Sir, what's Government's Exhibit 101?

24   A.   I'm sorry.   It's a medical record.

25   Q.   And --

1    A.   And it's redacted and has "SB" at the bottom left-hand

2    corner.

3    Q.   To the best of your knowledge, whose medical record was

4    this?

5    A.   Shawn Brown's.

6    Q.   Same question.  To the best of your knowledge, is this in

7    the same format as it was produced from Quest Diagnostics?

8    A.   Yes, sir, it is.

9         MR. SMITH:  Okay.  Your Honor, we move to admit

10   Government's Exhibit 101.

11        MR. STRIANSE:  No objection.

12        THE COURT:  Thank you.  That will be admitted.

13   (Government's Exhibit No. 101 was received in evidence.)

14        MR. SMITH:  Just briefly arrow through a few pages.

15   BY MR. SMITH:

16   Q.   Generally speaking, do these records contain similar

17   types of information?

18   A.   Yes, sir.

19   Q.   Okay.  Did investigators identify and request a record

20   for a patient named Donald Cozart?

21   A.   Yes, sir.

22        MR. SMITH:  Can we bring up Government's Exhibit 102?

23   BY MR. SMITH:

24   Q.   What's Government's Exhibit 102?

25   A.   It's an electronic medical record.

1   Q.   Has it been redacted?

2   A.   Yes, sir.

3   Q.   By whom?

4   A.   By the government.

5   Q.   Does it contain initials -- a footer at the bottom?

6   A.   "DC."

7   Q.   And was that added by the government?

8   A.   Yes, sir.

9   Q.   Other than those notations or alterations, is it in

10  substantially the same format from when it was received from

11  Quest Diagnostics?

12  A.   Yes, sir.

13           MR. SMITH:  We move to admit Government's 102.

14           MR. STRIANSE:  No objection.

15           THE COURT:  Are those the Cozart records?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  Okay.  It will be admitted.

18       (Government's Exhibit No. 102 was received in evidence.)

19  BY MR. SMITH:

20  Q.   Sir, did -- did investigators also seek the medical

21  records of a patient named Anita Fralix?

22  A.   Yes, sir.

23           MR. SMITH:  Can we bring up Government's Exhibit 103

24  please.

25  BY MR. SMITH:

T. JANUTOLO - Direct Examination (Cont'd)                    59

1    Q.   Sir, what's Government's Exhibit 103 for the Court?

2    A.   It's an electronic medical record that has been redacted

3    and "AF" put at the bottom of it.

4    Q.   Whose medical record is this?

5    A.   Anita Fralix's.

6    Q.   Is this in substantially the same form, to the best of

7    your knowledge, as it was obtained from Quest Diagnostics?

8    A.   Yes, sir, it is.

9              MR. SMITH:  Your Honor, we move to admit Government's

10   Exhibit 103.

11             MR. STRIANSE:  No objection.

12             THE COURT:  That will be admitted as well.

13        Can we confer for a moment?

14             MR. SMITH:  Yes.

15        (Sidebar conference.)

16             THE COURT:  Can you hear me, Mr. Strianse?

17             MR. STRIANSE:  Yes, sir.

18             THE COURT:  So are we going to do this 20 times and

19   do the same song and dance 20 times?  I say we cut through it

20   by stipulation.  There's no sense.  It's not needed.

21             MR. SMITH:  I didn't want to propose it again -- I

22   didn't want to put the defense in the position you referenced

23   last time.  I'm happy to do --

24             THE COURT:  You can ask to confer.  I mean, I see --

25   I don't know how many you are planning to go through.

*T. JANUTOLO - Direct Examination (Cont'd)*                    60

1        MR. SMITH:  It goes --

2        THE COURT:  Through 120?

3        MR. SMITH:  Correct, Your Honor.

4        THE COURT:  And so that would be Fralix, Ghent,

5    Harris, Jones, Nantz, Parchman, Pooler, Rather, Sasser,

6    Vardaman, Elzie Wagers, Raleigh Wagers, Waynick, Wooten, Keta

7    Abner, Penny Parish, Bonnie Hibbard, Susan Henderson, correct?

8        MR. SMITH:  That's correct.

9        THE COURT:  Any objection to those?

10       MR. STRIANSE:  No objection.

11       THE COURT:  Okay.  So you can identify them as you

12   see fit, but I'll instruct the jury that Exhibit 100 -- I

13   think we're on 103 through 120 -- patient records will be

14   admitted so then you can just use them as you see fit.

15       MR. SMITH:  With Your Honor's permission, I may just

16   read the patient's name and confirm, knock them out that way,

17   so they hear the name, but I won't go through.

18       MR. STRIANSE:  That's fine.

19       THE COURT:  How much longer do you think of this

20   witness?

21       MR. SMITH:  This is, I believe, the last thing I'm

22   covering with him.

23       THE COURT:  Okay.  Thank you.

24     (Sidebar conference concluded.)

25       THE COURT:  By stipulation, I am admitting a series

T. JANUTOLO - Direct Examination (Cont'd)                    61

1    of medical records that will be Exhibits 103 through 120

2    inclusive.  And Mr. Smith is going to identify the patient

3    records covered, but that will make it a little more

4    efficient.  They are admitted.  They can be shown to the jury.

5    They'll be available to you in deliberations.

6         (Government's Exhibit Nos. 103 through 120 were received

7    in evidence.)

8              THE COURT:  Okay.  Proceed.

9              MR. SMITH:  Thank you, Your Honor.

10   BY MR. SMITH:

11   Q.   I believe we left off with the patient named Anita

12   Fralix, and we were referencing Government's Exhibit 104.

13   Jeffrey Ghent?

14   A.   Yes, sir.

15   Q.   Government's Exhibit 105, isn't that a patient file for

16   Florence Harris?

17   A.   Yes, sir.

18   Q.   Government's Exhibit 106 for a patient named Susan Jones?

19   A.   Yes, sir.

20   Q.   Is the name Susan Jones known to you?

21   A.   Yes, sir.

22   Q.   How?

23   A.   She was a cooperating witness in this case.

24   Q.   And did you describe some of her activities earlier in

25   your testimony?

1    A.   Yes, sir.

2    Q.   Okay.  Next exhibit is Government's Exhibit 107, and is

3    that Kimber Nantz?

4    A.   Yes.

5    Q.   The file for Kimber Nantz?

6    A.   Yes, sir.

7    Q.   Is Government's Exhibit 108 the file for Cleavon

8    Parchman?

9    A.   Yes, sir.

10   Q.   Government's Exhibit 109 is for Jonathan Pooler?

11   A.   Yes, sir.

12   Q.   Is Government's Exhibit 110 for a patient named Adam

13   Rather?

14   A.   Yes, sir.

15   Q.   Is Government's Exhibit 111 for a patient named Joey

16   Sasser?

17   A.   Yes, sir.

18   Q.   Government's Exhibit 112 for Jennifer Vardaman?

19   A.   Yes, sir.

20   Q.   Government's Exhibit 113 for a patient named Elzie

21   Wagers?

22   A.   Yes, sir.

23   Q.   Government's Exhibit 114, is that a record for a patient

24   Raleigh Wagers?

25   A.   Yes, sir.

1    Q.   Is Government's Exhibit 115 for a patient named Lisa

2    Waynick?

3    A.   Yes, sir.

4    Q.   Is Government's Exhibit 116 for a patient named Charles

5    Wooten?

6    A.   Yes, sir.

7    Q.   Is that name known to you?

8    A.   Yes, sir.

9    Q.   Can you explain how?

10   A.   He was an unknowing witness in one of the visits to the

11   clinic, to Gateway Medical.

12   Q.   Okay.  Keta Abner, is that the record for Government's

13   Exhibit 117?

14   A.   Yes, sir.

15   Q.   Government's Exhibit 118, is that patient a Penny Parish?

16   A.   Yes, sir.

17   Q.   Is Government's Exhibit 119 the record for patient Bonnie

18   Hibbard?

19   A.   Yes, sir.

20   Q.   And, finally, Government's Exhibit 120, is that for a

21   patient named Susan Henderson?

22   A.   Yes, sir.

23           MR. SMITH:  Your Honor, thank you for your patience,

24   and that's all the questions I have.

25           THE COURT:  Thank you.

*T. JANUTOLO - Cross-Examination*                                      64

1        Mr. Strianse we're going to break right at 10:00.  So you

2    can go ahead and start your cross, and then we'll take a break

3    after about 10 to 12 minutes.  Proceed.

4            MR. STRIANSE:  Your Honor, this is going to be very,

5    very short.

6            THE COURT:  No objection from me.

7                          CROSS-EXAMINATION

8    BY MR. STRIANSE:

9    Q.   Good morning, Detective Janutolo.

10   A.   Good morning, sir.

11   Q.   I just have a few questions for you this morning.

12        Do you remember the series of government exhibits

13   numbered 17?

14   A.   Yes, sir.  I'm sure I will.

15   Q.   Okay.

16   A.   Once I lay my eyes on them.

17   Q.   These are the ones that were the appointment sheets.

18   Does that refresh your recollection a little bit?

19   A.   Yes, sir, if I could see those.

20            MR. STRIANSE:  Could he just be shown one?

21            THE WITNESS:  Yes, sir.  I'm familiar with them.

22   BY MR. STRIANSE:

23   Q.   Okay.  I just had some general questions about those.

24        Those are appointment sheets; is that right?

25   A.   It's my understanding they are, yes, sir.

1    Q.   Okay.  Were they seized in and around the front desk area

2    of Gateway Medical Associates?

3    A.   Yes, sir.  In the -- they were in the -- either in the

4    front desk area or in the -- like the nurses' station right in

5    behind the lobby is where they were seized, yes, sir.

6    Q.   Now, as part of your investigation, I think you had the

7    opportunity to interview the office manager of GMA, a woman by

8    the name of Emilie Jackman; is that right?

9    A.   Yes, sir.

10   Q.   And did you also talk to the scribe at GMA, a woman by

11   the name of Shanna Armijo?

12   A.   Yes, sir.

13   Q.   Did you have an opportunity to sit down with them and go

14   through what these appointment sheets were trying to convey?

15   A.   I did not personally go through the sheets with them.

16   Q.   Now, you found them in the front -- front of the office,

17   not in any of the doctors' offices or the examining rooms; is

18   that right?

19   A.   Yes, sir.

20          THE COURT:  Hang on.  That's right?

21          THE WITNESS:  Yes, sir.  That's right.

22          THE COURT:  I just wanted to get his answer.

23          MR. STRIANSE:  Forgive me.

24   BY MR. STRIANSE:

25   Q.   You noted on these sheets that there were notes made by

1    someone, things like "no metabolite," that sort of thing?

2    A.   Yes, sir.

3    Q.   And then you also show that were -- told us that you

4    would see on these sheets that there might be "minus five,

5    minus ten," reflecting a decrease in what the prescription

6    might ultimately be that day; is that right?

7    A.   There's a "minus five" and a "minus ten" on the sheets

8    with "OC" next to it, yes, sir.

9    Q.   And was it your understanding that, because of whatever

10   may have been found in that presumptive test done, when the

11   patient arrived at the clinic that day, that whoever was at

12   the front desk was suggesting by writing "minus five, minus

13   ten" that the doctor might consider reducing the prescription

14   by that amount?

15   A.   That's not my understanding, sir.

16   Q.   Okay.  Well, this is somebody at the front desk that's

17   making these notations; is that right?

18   A.   Yes.

19   Q.   Fair?

20   A.   Someone is making the notations, yes, sir.

21   Q.   But certainly not the doctor?

22   A.   As far as I know, it wasn't the doctor, no, sir.

23   Q.   Okay.  So you don't know what the doctor ultimately did

24   after the visit with the patient in terms of either adjusting

25   the prescription downward or just refusing to give a

1   prescription?

2   A.   I only know what -- what's documented in the patient

3   file, sir.

4   Q.   Now, as you went through these sheets that comprise the

5   collective Exhibit 17 with all the subparts, you talked about

6   your interpretation of something as 5, slash, 0.  Do you

7   remember that?

8   A.   Yes, sir.

9   Q.   Many times you were characterizing it as 5, slash, 0?

10  A.   Yes, sir.

11  Q.   What you were seeing on these appointment sheets?

12  A.   Yes, sir.

13  Q.   Okay.  Now, could it be possible that it's really "SO,"

14  for "send out," as it was written right after what was being

15  found in the presumptive test that's being done when the

16  patient arrives?

17  A.   It could be, sir.

18  Q.   Okay.  Because there's a difference between the urine

19  drug screen and the urine drug test.  Is that a fair

20  characterization?

21  A.   Yes, sir.

22  Q.   The urine drug screen is when the patient presents

23  themselves for their appointment; is that right?

24  A.   I'm sorry.  Can you repeat the question?

25  Q.   The urine drug screen occurs when the patient presents

1    themselves at the front desk for their appointment; is that

2    correct?

3    A.   Yeah.   The patients take a drug screen when they arrive

4    at the clinic, yes, sir.

5    Q.   A so-called point-of-care cup where they provide a urine

6    sample; is that right?

7    A.   I don't know exactly.   It's my understanding they took a

8    swab test.

9    Q.   Right.   Either a swab from the mouth or a urine test?

10   A.   Yes, sir.

11   Q.   And then there's some presumptive test that's done right

12   away before the person has their appointment.   Is that a fair

13   characterization?

14   A.   That's my understanding, yes, sir.

15   Q.   And that's what causes who's ever at the front desk to

16   make that notation on the patient appointment sheet?

17   A.   I can't speak to that, sir.   It would be whoever made

18   those notes.

19   Q.   Okay.   So does it sounds logical to you that if they are

20   recording something that they are finding in that presumptive

21   test and then they have the S, slash, O that that means send

22   out for the confirmatory test?

23   A.   You'd have to ask whoever made those notes, sir.   I

24   wouldn't be able to comment on that.

25   Q.   And I think you touched on this in your -- earlier in

1    your direct examination.

2         When "no metabolite" is found in that presumptive test, I

3    think you indicated to the jury that could mean that a patient

4    maybe ran out of their prescription?

5    A.   It could mean they weren't taking the medication --

6    Q.   Right.

7    A.   -- the way they should, yes, sir.

8    Q.   They could have run out, or there could be a more

9    sinister explanation that they were selling their

10   prescription?

11   A.   Yes, sir.

12   Q.   Okay.  Government Exhibit 18, when you were identifying

13   the medical record of TS, I think you told the jury the date

14   of that was October the 13th of 2020.  Is that right?

15   A.   I would have to look at the date to be sure, sir.

16   There's a date on the third page that says October

17   the 13th, '20, yes, sir.

18   Q.   I think you told the jury that that was days before the

19   search warrant was served; is that right?

20   A.   Um-hum.

21   Q.   Did October 13th mark the last day that Dr. Stanton was

22   seeing patients at GMA?

23   A.   I don't know, sir.

24   Q.   You identified for the jury Government's Exhibit 101 that

25   dealt with the medical record of Shawn Brown.

1    In the course of your preparation for your testimony, did

2    you take a look at the medical records, for example, for Shawn

3    Brown?

4    A.   I briefly looked at it, yes, sir.

5    Q.   Is it a fair characterization that Dr. Stanton was not

6    seeing patients like Shawn Brown or a number of these patients

7    each time they came to GMA?

8    A.   I believe Dr. Stanton saw Shawn Brown the first -- his

9    initial visit, yes, sir.

10   Q.   Yes, sir.

11       But Dr. Maccarone started seeing him when he came back;

12   is that right?

13   A.   Dr. Maccarone saw Shawn Brown, yes, sir.

14   Q.   Once he returned to the office?

15   A.   I suppose so, yes, sir.

16           MR. STRIANSE:  Your Honor, may I have one moment?

17           THE COURT:  Of course.

18           MR. STRIANSE:  Those are my questions.

19           THE COURT:  Thank you, Mr. Strianse.

20       Redirect?

21                     REDIRECT EXAMINATION

22   BY MR. SMITH:

23   Q.   Officer Janutolo, if we can go back to Government's

24   Exhibit 17, just as an example, I believe you were just asked

25   a question by counsel as to whether investigators -- I think

1   he asked whether investigators confirmed whether prescriptions

2   were still issued or modified, something to that effect.  I

3   don't want to put words in his mouth, but I think it was a

4   question to that effect.  Do you remember that, sir?

5   A.   Yes, sir.

6   Q.   Did investigators look into these patients to see whether

7   Dr. Stanton wrote them prescriptions on or after this date?

8   A.   Yes, sir.

9   Q.   And what did they find?

10  A.   He wrote them prescriptions, sir.

11         MR. SMITH:  Okay.  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.

13      Is he finally excused, Mr. Smith?

14         MR. SMITH:  Yes, from our perspective.

15         THE COURT:  Do you agree, Mr. Strianse?

16         MR. STRIANSE:  That's fine.

17         THE COURT:  Thank you, sir.  That concludes your

18  testimony.  You may step down.

19      (Witness excused.)

20         THE COURT:  All right.  That will get us to our

21  morning break.  I appreciate your good attention throughout

22  the first session.  We will take a 20-minute break at this

23  time.  Continue to abide by the admonitions you have been

24  under all the way through.  No discussion, no research or

25  exploration.  Keep an open mind as the proof comes in.  Don't

1    begin to form any opinions.  With my thanks, I'll excuse the

2    jury now for 20 minutes.

3         (Jury not present.)

4         THE COURT:  Thank you.  The jury has exited.

5    Anything we need to take up before the break?

6    Mr. Smith?

7         MR. SMITH:  No, Your Honor.

8         THE COURT:  Mr. Strianse?

9         MR. STRIANSE:  No, Your Honor.

10        THE COURT:  Who is the next witness?

11        MR. SMITH:  Next is Jennifer Belisle.

12        THE COURT:  Thank you.  We'll take the break and come

13   back for her testimony.

14        (Recess taken from 9:59 A.M. until 10:19 A.M.)

15        THE COURT:  Okay.  Thank you.  We're coming out of

16   our morning break with all counsel present, Dr. Stanton

17   present, the jury here, all present and accounted for.

18   Thank you for that.

19   Mr. Smith, you can call the government's next witness.

20        MR. SMITH:  Thank you, Your Honor.

21   The government calls Jennifer Belisle.

22        THE COURT:  Jennifer Belisle.

23        **JENNIFER BELISLE, GOVERNMENT'S WITNESS, DULY SWORN**

24        THE COURT:  Good morning, ma'am.

25        THE WITNESS:  Good morning.

1          THE COURT:  If you'll try to speak directly toward

2   that mic in a clear voice so we can hear you, I'd appreciate

3   that.  The chair does not move, but the mic does move.  So you

4   can pull it toward you, if needed.

5      Would you start by telling me your name and spelling your

6   last name.

7          THE WITNESS:  My name is Jennifer Belisle,

8   B-e-l-i-s-l-e.

9          THE COURT:  Thank you.

10     Mr. Smith.

11         MR. SMITH:  Thank you, Your Honor.

12                         DIRECT EXAMINATION

13  BY MR. SMITH:

14  Q.  Ma'am, can you please just start out by telling us where

15  do you currently live?

16  A.  I currently live in Moore, Oklahoma.

17  Q.  What do you do for a living?

18  A.  I'm a child welfare assistant with the department of

19  human services.

20  Q.  Where did you live before Oklahoma?

21  A.  Clarksville, Tennessee.

22  Q.  Are you familiar with a place called Gateway Medical

23  Associates?

24  A.  I am.

25  Q.  How are you familiar with it?

1    A.   I was employed there.

2    Q.   What was your job there?

3    A.   I was a medical assistant.

4    Q.   What time frame were you employed at Gateway Medical

5    Associates?

6    A.   I started my externship in October of 2018 and was

7    employed there in January of 2019.

8    Q.   How long in total did you work there?

9    A.   13 months.

10   Q.   So what month did you leave?

11   A.   I left in February of 2020.

12   Q.   When you started in January 2019, what was your initial

13   job?

14   A.   I was working front desk.

15   Q.   When you were hired, were there any physicians working at

16   Gateway Medical Associates?

17   A.   Dr. Stanton was working as the provider there because

18   Dr. Maccarone was on medical leave.

19   Q.   When you started that initial time frame, you said front

20   desk.  Can you explain to the jury, just very generally, what

21   your duties were?

22   A.   I would call and confirm appointments.  I would take

23   payments, get patients checked in, return phone calls.

24   Q.   As time went on, did you assume a different job at

25   Gateway Medical Associates?

1    A.   I did.  I was moved to back office.  I was a medical

2    assistant.

3    Q.   What does a medical assistant do?

4    A.   Take vitals, medical history, go over any changes since

5    the last time they were seen, confirm their medications.

6    Q.   Now, when you were hired, what kind of practice, what

7    kind of doctor's office did you understand GMA to be?

8    A.   A pain management clinic.

9    Q.   Had you ever worked in a pain management clinic before?

10   A.   No.

11   Q.   Had you worked in any doctor's office before?

12   A.   No.

13   Q.   So when you started in January 2019, can you walk the

14   jury through what a typical day at Gateway Medical Associates

15   was like?

16   A.   The clinic opened at 10:00.  Staff would arrive by 9:45

17   to get the clinic ready for daily operations.  Sometimes there

18   would be patients waiting already by the time we got there.

19   We would open the door, and we would -- they would come up to

20   the front desk and make their payment, and then the medical

21   assistants in the back would bring them -- bring them back and

22   get them checked in, do their vitals, their medical history,

23   those sorts of things, and then the patients would go back out

24   to the lobby and wait for the doctor to arrive.

25   Q.   You referenced taking payment.  How would patients pay

1    for their visits?

2    A.   By card.

3    Q.   What type of money are we talking about here?

4    A.   Meaning?

5    Q.   How much?

6    A.   Regular office visits were 285, and then twice a year,

7    there would be blood work that needed to be done, which would

8    be around 410, 410.

9    Q.   Were there other fees that were sometimes charged?

10   A.   Yes.  If a patient needed an EKG, or if they had missed a

11   pill count, there would be a no-show fee.

12   Q.   So based on your review, how common was it for patients

13   to pay in excess of, let's say, $400?

14   A.   Very common.

15   Q.   Based on your position and observations, did you have an

16   awareness of where patients were traveling from?

17   A.   Yes.  Patients would travel from all over.  Many of our

18   patients would travel three or four hours one way to get to

19   our clinic.

20   Q.   From what state?

21   A.   Kentucky.

22   Q.   Okay.  So patients would begin arriving, as you said,

23   sometimes even before the clinic opened.

24        What time -- when Dr. Stanton was there, what time would

25   they see a doctor?

*J. BELISLE - Direct Examination* 77

1    A.   About 3:00 or 4:00.

2    Q.   So patients would wait several hours at the facility

3    until a doctor arrived?

4    A.   Yes.

5    Q.   Okay.  What would they do in that time frame?

6    A.   Some patients went out shopping.  Most of them just

7    stayed and chitchatted with each other in the lobby or went

8    outside to smoke.

9    Q.   Now, did staff make any preparations in advance of the

10   doctor arriving at the clinic?

11   A.   We used paper charts that were prepped the week before.

12   Q.   And when the patients were taken back to see the doctor,

13   what was your role?

14   A.   My role was to -- there was a line of exam rooms next to

15   Dr. Stanton's office, and we would put patients in those rooms

16   to wait their turn.  That way it was easy to get them in and

17   out.

18   Q.   Where did the patients actually see Dr. Stanton?

19   A.   In his office.

20   Q.   So did they wait in an exam room?

21   A.   Yes.

22   Q.   But they went to their visits into an office?

23   A.   Yes.

24   Q.   Now, did you go into that office?

25   A.   No.

*J. BELISLE - Direct Examination* 78

1    Q.   So you weren't inside the office, but were you in a

2    position, given your job duties, to observe how long patients

3    would typically spend in that office?

4    A.   Yes.  The medical assistants' desks were right next to

5    the office.

6    Q.   How long were the typical visits with Dr. Stanton?

7    A.   Less than five minutes.

8    Q.   How long in total would Dr. Stanton typically spend at

9    the clinic?

10   A.   On average, an hour, hour and a half.

11   Q.   And how many patients is he seeing in that time period?

12   A.   15 to 20.

13   Q.   Now, you mentioned preparing information for Dr. Stanton

14   before he arrived.  Can you explain that in a little bit more

15   detail to the jury, please?

16   A.   Meaning what was included?

17   Q.   Please, yes.

18   A.   We would include the review of system sheets that we

19   would go over with the patients when we checked them in, also

20   the demographic sheet.  We would include their narcotics

21   history, their previous urinalysis results and the last

22   clinical notes, and, if they had any blood work done, that

23   would also be included.

24   Q.   I used the word "urinalysis."

25   A.   Um-hum.

1    Q.    Could you describe to the jury what you mean by that?

2    A.    Their urine drug screen.

3    Q.    What type of urine drug screens did the practice use?

4    A.    Every other month.  We would go back and forth between an

5    in-house that the medical assistant would read and then a

6    send-out to a separate company to test the urinalysis.

7    Q.    So was a patient tested every month, but it depended,

8    alternating months, which type?

9    A.    Yes.

10   Q.    And those tests generated reports or results?

11   A.    Um-hum.

12   Q.    Is that right?

13   A.    Yes.

14   Q.    So when you prepared this packet of information for

15   Dr. Stanton --

16   A.    Um-hum.

17   Q.    -- how many drug test results would be included and made

18   available?

19   A.    Typically two.  The one from that day and the one from

20   the month before.

21   Q.    To your knowledge, did Gateway use an electronic medical

22   recordkeeping system?

23   A.    Yes.

24   Q.    Does that mean that some of the information was generated

25   on a computer electronically?

1    A.   Yes, sir.

2    Q.   Did Gateway also use paper forms?

3    A.   Yes.

4    Q.   And were those paper forms filled out by hand, either by

5    a staff, patient, whoever?

6    A.   Yes.

7    Q.   We'll talk about this a little later, but what happened

8    to the paper forms that were signed or filled out with pen,

9    paper, or pencil?

10   A.   We would gather all of the information back into the

11   physical folder, and that would be handed to the provider to

12   look through.  The provider would sign all of the paperwork,

13   and then they would be put back into a file until after the

14   notes were completed.  And then the medical assistants would

15   tear apart those folders, and we would upload the results that

16   were not already in the computer.

17   Q.   Okay.

18   A.   Electronically.

19   Q.   So that last part, the results that were not already in

20   the computer --

21   A.   Yes.

22   Q.   -- do you mean the ones that had to be filled out by

23   hand?  Is that fair?

24   A.   Yes.

25   Q.   What kind of results were -- what kind of documents were

1    already in the computer, as you described it?

2    A.   The previous note was already in the computer.  When the

3    send-out drug screens came back, those were already uploaded

4    into the computer.

5    Q.   So the laboratory urine drug screen?

6    A.   Yes.

7    Q.   That, although it was printed out in the packet, it was

8    not re-uploaded because it was already in the electronic file?

9    A.   That's correct.

10   Q.   All right.  So this packet of information contained the

11   previous note, urine drug testing.  Can you just tell me what

12   else was in it again?

13   A.   The narcotic drug history, the review of systems.  There

14   was also a pain questionnaire.

15   Q.   And was it part of your job to assemble those packets and

16   ensure they were put together and complete?

17   A.   Yes.  We would go through those packets multiple times a

18   day and make sure they had everything they needed to before

19   they got to the doctor.

20   Q.   Would you personally hand that packet of information to

21   the doctor, including Dr. Stanton?

22   A.   Not when I first started, but, yes, when I got more

23   comfortable, I would personally hand those to the doctor.

24   Q.   And based on that, your firsthand knowledge of that, do

25   you believe that the results of urine drug tests and urine

J. BELISLE - Direct Examination                          82

1    drug screens were provided to Dr. Stanton in advance of seeing

2    a patient?

3    A.   Yes.

4    Q.   We'll talk about those urine drug test results or sheets

5    in a moment.  But just to make sure we're on the same page,

6    the flip side of this, when the provider, including

7    Dr. Stanton, finished with the packet, what did you get back?

8    A.   I got all of the paperwork back with his signature.

9    Q.   Okay.  Can you describe what you mean by his -- "with his

10   signature"?

11   A.   He would initial each page, and then on the in-house and

12   the review of systems, it would actually be his total

13   signature.

14   Q.   Now, if I were to open up an electronic medical record

15   and look for a signed version of a lab urine drug screen

16   result, am I going to see that with Dr. Stanton's signature on

17   it?

18   A.   No, because the results would have been inputted already.

19   Q.   But based on your firsthand observations, did you see lab

20   urine drug screen results that were signed by Dr. Stanton?

21   A.   Yes, I did.

22   Q.   Did you see that on a daily basis?

23   A.   Yes.

24   Q.   Okay.  Speaking of lab test results, would you, given

25   your position, see what the actual result was?

1    I have been using the word "results."  What I mean is the

2    sheet itself.

3    A.   Yes.

4    Q.   Now what I'm trying to orient you to is the actual -- the

5    content of it, what the actual results showed --

6    A.   Yes.

7    Q.   -- the patient.

8         Did you have an opportunity to see that?

9    A.   Yes.

10   Q.   Did you see patients failing urine drug screens at

11   Gateway Medical Associates?

12   A.   Daily.

13   Q.   Okay.  Are we talking about one or two patients?

14   A.   Five or six --

15   Q.   Okay.

16   A.   -- a day.

17   Q.   What kind of drugs?

18   A.   We called them the big three: heroin, cocaine, and meth.

19   Q.   Did you see patients that tested positive for drugs like

20   that, heroin, cocaine and meth -- did you see them walk out

21   the door with prescriptions for controlled substances?

22   A.   Yes, I did.

23   Q.   How commonly?

24   A.   Every day.

25   Q.   Did you see them walk out of GMA with prescriptions for

1    controlled substances signed by Dr. Stanton after failing drug

2    tests like that?

3    A.   Yes.

4    Q.   Did you personally ever relay urine drug test results to

5    Dr. Stanton?

6    A.   Yes.  I would give Dr. Stanton a heads-up when I handed

7    him the paper chart.

8    Q.   Okay.  A heads-up to say what?

9    A.   This patient was positive for meth or cocaine, or

10   whatever it was, or whether or not they were positive for

11   their prescribed medication.

12   Q.   Now, at some point did Dr. Maccarone return to the

13   practice?

14   A.   Yes.  He returned in March.

15   Q.   And how did -- if at all, how did things change when

16   Dr. Maccarone came back?

17   A.   Dr. Maccarone was much later coming into the clinic, but

18   our day-to-day operations stayed the same.

19   Q.   What -- what -- what was the latest you ever worked at

20   Gateway Medical Associates when Dr. Maccarone was there?

21   A.   The latest I ever worked was 5:15, 5:30 in the morning.

22   Q.   Did you ever talk to or hear Dr. Stanton talk about

23   Maccarone's late hours?

24   A.   No.

25   Q.   Did you, when working for Dr. Maccarone, did you

1    generally follow the same workflow that you've described?

2    A.   Yes.

3    Q.   Were you in a position to see the amount of time patients

4    spent with Dr. Maccarone?

5    A.   Yes.

6    Q.   How did that compare to the time Dr. Stanton spent with

7    patients?

8    A.   Dr. Maccarone would spend upwards of an hour, hour and a

9    half, two hours with a patient.

10   Q.   Okay.  And how long would Dr. Stanton spend?

11   A.   Five minutes.

12   Q.   Okay.  Now, when you saw the urine drug test results, you

13   referenced being negative for a prescribed medication.  Did

14   you see that?

15   A.   Yes.

16   Q.   Did you understand the significance of that?

17   A.   Yes.

18   Q.   What was it?

19   A.   They weren't taking their medication as prescribed or

20   doing something illegal with the medication.

21   Q.   In your experience, were patients dismissed very often

22   from Gateway Medical Associates?

23   A.   Not super often.

24   Q.   When a dismissal happened, can you describe to me who

25   made that determination?

J. BELISLE - Direct Examination                                    86

1    A.   Mostly it was the practice manager, Emilie, pushing for a

2    patient to be dismissed due to failed urine drug screens or

3    something of that nature.

4    Q.   Did you ever hear Dr. Stanton tell you or anyone else to

5    dismiss a patient himself?

6    A.   Very rarely.  Once or twice.

7    Q.   The prescriptions that GMA used, can you explain to the

8    jury how those were generated?

9    A.   Those were generated -- after we had checked in a

10   patient, we would put them all in pile.  They would go to

11   Shanna, who was the scribe, and she would print out the

12   prescriptions.  That way they were ready for Dr. Stanton to

13   sign.

14   Q.   So they were preprinted and then provided to the doctor?

15   A.   Yes.

16   Q.   How often were adjustments made to that preprinted

17   prescription by Dr. Stanton?

18   A.   Not very often, but it did happen.

19   Q.   Now, were there times where medications were reduced

20   because of a drug screen result?

21   A.   Yes.

22   Q.   And was it by -- how was that done?

23   A.   Shanna.  Shanna would take five off or take ten off,

24   depending on the results of their UDT.

25   Q.   When you say, "Take five off or take ten off," five or

1    ten what?

2    A.   Five or ten of their oxycodone, oxymorphone.

3    Q.   Did you ever understand the logic to five or ten pills?

4    A.   Yes.

5    Q.   Okay.  What was the logic?

6    A.   The logic was, if they weren't going to take their

7    medication as prescribed or they were using other substances,

8    that they didn't need as many.

9    Q.   Now, if somebody came in and tested positive for

10   heroin --

11   A.   Um-hum.

12   Q.   -- or something like that, is that something you saw?

13   A.   Yes.

14   Q.   Did it make sense to you to give them 85 oxycodone as

15   opposed to 90?

16   A.   Yes.

17   Q.   Did it make sense to you to give them oxycodone at all?

18   A.   No, it didn't make sense to give them oxycodone at all if

19   they were using other drugs.

20   Q.   So when that five off or ten off happened, based on your

21   observations, who was making that determination?

22   A.   Shanna or Emilie.

23   Q.   Did you ever hear Dr. Stanton give an instruction to

24   someone to lower a prescription because of a failed UDT?

25   A.   Very rarely.

J. BELISLE - Direct Examination                                88

1    Q.   When -- as time went on, as you were working at this
2    practice, did you develop concerns about it?
3    A.   Yes.
4    Q.   Are you glad that you worked there?
5    A.   No.
6    Q.   Did -- in addition to your other duties, did you witness
7    Dr. Stanton giving patients injections?
8    A.   I did.
9    Q.   What was your role in that?
10   A.   I would often draw up those injections so they were
11   prepped for Dr. Stanton.
12   Q.   Can you describe to me, just in terms of time, how much
13   time was given to talking to the patient and preparing for
14   those injections?
15   A.   Five or seven minutes.
16   Q.   Okay.
17   A.   It wasn't very long.
18   Q.   Did you experience or witness any detailed conversations
19   about all the things the injection entailed?
20   A.   No.
21   Q.   Were these quick procedures?
22   A.   Yes.
23   Q.   Based on your observations, did the clinic seem to follow
24   up with a patient and really check to see what happened after
25   the injection?

*J. BELISLE - Cross-Examination*                                        89

1    A.   The patients were scheduled with Dr. Stanton for the

2    injection, but they were not scheduled with him to follow up

3    on how those injections worked.  They would just mention them

4    to Dr. Maccarone the next month.

5    Q.   So witnessing these and helping with these injections

6    over a period of time, what was your impression of it?

7    A.   My impression was the patients hated them.  They said

8    they didn't work, that they made things worse even, and they

9    were very angry that they were required to get these

10   injections.

11   Q.   At what point did you leave Gateway Medical Associates?

12   A.   I left in February of 2020.

13   Q.   Okay.  And you now live in Oklahoma?

14   A.   I live in Oklahoma.

15   Q.   Have you worked in a pain clinic since?

16   A.   No.  I worked in urology.

17        MR. SMITH:  Your Honor, I believe that's all the

18   questions I have.

19        THE COURT:  Thank you.

20      Mr. Strianse.

21        MR. STRIANSE:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MR. STRIANSE:

24   Q.   Good morning, Ms. Belisle.

25   A.   Good morning.

1   Q.   I think you told us you started with your externship in

2   2018; is that right?

3   A.   That's correct.

4   Q.   And then in January of '19, you began functioning as an

5   employee; is that right?

6   A.   That's correct.

7   Q.   And you are aware that Dr. Maccarone had that health

8   crisis in November of 2018; is that right?

9   A.   Yes.

10  Q.   Where he was out of the office?

11  A.   Yes.

12  Q.   And that's when Dr. Stanton had to step in and start

13  seeing patients; is that correct?

14  A.   That is correct.

15  Q.   So I think Maccarone came back around March of 2019; is

16  that right?

17  A.   Yes, that's correct.

18  Q.   So you would have been working with Dr. Stanton for a

19  couple months, January and February?

20  A.   Yes.

21  Q.   And then Maccarone came back?

22  A.   Yes.

23  Q.   And you were asked by Mr. Smith about were you happy or

24  were you glad that you had worked at GMA.  And let me ask you

25  just, quite frankly, Dr. Maccarone made this kind of a hostile

1    work environment, did he not?

2    A.   Yes, he did.

3    Q.   And I think even some of the female employees at one

4    point in time staged a strike; is that right?

5    A.   That's correct.

6    Q.   And what sort of things would Dr. Maccarone do that would

7    be really unsettling and upsetting to the female staff?

8    A.   He would parade me around in his office just to look at

9    me.  I was sexual assaulted by a patient during work hours,

10   and he told me that my scrubs were too tight.

11   Q.   And did -- were any steps taken to correct

12   Dr. Maccarone's behavior?

13   A.   No.

14   Q.   When the women gathered together and said, hey, we're

15   going to quit, we're going to go on strike, how did

16   Dr. Maccarone get you -- you women to come back to the office?

17   A.   Dr. Maccarone had nothing to do with that.  It was

18   Emilie.

19   Q.   Emilie?  The office manager?

20   A.   The office manager.

21   Q.   A very strong personality?

22   A.   Yes.

23   Q.   Is that right?

24   A.   Yes.

25   Q.   So -- and Emilie and Dr. Maccarone had a particularly

1    close relationship; is that right?

2    A.   Yes.

3    Q.   She was sort of his alter ego in many ways; is that

4    right?

5    A.   I don't know that I would use the word "alter ego."

6    Q.   Okay.

7    A.   I would use angel on his shoulder, trying to keep him on

8    the right track.

9    Q.   But it's safe to say they had a really -- from your

10   observation, a close relationship?

11   A.   Uh-huh.

12   Q.   She would go and pick him up at home and bring him to the

13   office, that sort of thing?

14   A.   Emilie and Shanna both would pick him up when necessary.

15   Q.   And he would ask Shanna and Emilie to bring GMA patient

16   charts to him at home; is that right?

17   A.   Yes.

18   Q.   Okay.  You talked about, when Dr. Stanton took over, that

19   he was seeing patients at 3:00 or 4:00 in the afternoon?

20   A.   Yes.

21   Q.   Now, that was different than the way Maccarone operated

22   in the sense that Maccarone just was at home until 3:00 or

23   4:00 in the afternoon?

24   A.   I have no idea where Dr. Stanton was prior to arriving at

25   the clinic.

1    Q.   You didn't know that he was working those mornings either

2    at his clinic or other pain clinics or surgical centers?

3    A.   No.

4    Q.   Okay.  Maccarone had a sort of a laissez-faire attitude

5    toward his workday.  Is that a fair characterization?

6    A.   Yes.

7    Q.   So he would be home doing whatever he was doing and then

8    roll in maybe at 4:00 in the afternoon?

9    A.   Correct.

10   Q.   And these poor patients were literally in the waiting

11   room from 10:00 A.M. on?

12   A.   Yes.

13   Q.   He would get to the office, and then he would meet with

14   Ms. Jackman in his office for about an hour or so; is that

15   right?

16   A.   It changed daily.  Sometimes it was Shanna and Emilie.

17   Sometimes I was in there.  And -- and he would just chat.

18   Q.   Okay.  You remember being interviewed by the agents in

19   connection with this case; is that right?

20   A.   Yes.

21   Q.   They even traveled out to Moore, Oklahoma, to see you?

22   A.   Yes.

23   Q.   Is that right?

24        Do you remember telling them that, when Maccarone would

25   finally get there late in the afternoon, Emilie would go in

1    his office.  And I won't say exactly the colorful way you said

2    it, but they would just, I guess, chat in there for an hour or

3    so?

4    A.   Yes.

5    Q.   And then the spirit would move him, and he would start

6    seeing patients?

7    A.   Yes.

8    Q.   Roughly 6:00 P.M. or something like that?

9    A.   Correct.

10   Q.   And some of these patients were not seen until the early

11   morning hours of the next day; is that right?

12   A.   That is correct.

13   Q.   And I think you told the jury that you left maybe 4:45,

14   5:00 A.M.?

15   A.   I left 5:15, 5:30.

16   Q.   You indicated that your recollection was that you helped

17   actually draw up the injections; is that right?

18   A.   Yes.

19   Q.   Okay.  Now, you were trained as a medical assistant; is

20   that right?

21   A.   Yes.

22   Q.   And how long is that course or program to become a

23   medical assistant?

24   A.   Four months.

25   Q.   Four months.

1      You know that Dr. Stanton was an orthopedic surgeon for
2  many years?
3  A.   Yes.
4  Q.   And he was the one that was, of course, administering
5  these injections?
6  A.   Yes.
7  Q.   Are you sure he wasn't the one that took care of that
8  himself since he was going to be the provider of a procedure
9  like that?
10 A.   No.
11 Q.   Okay.  When Dr. Maccarone had this odd schedule of not
12 coming in until late in the afternoon and seeing patients late
13 in the evening and in the early morning hours, do you remember
14 asking him about that, like why do you do this?
15 A.   No.  I never asked.
16 Q.   You never asked him?
17      Did you not tell the agents that he basically told you,
18 "This is my clinic; I'm in charge; I do what I want"?
19 A.   Yes.
20 Q.   You do remember that?
21 A.   Yes.
22 Q.   Okay.  You were never in the office with Dr. Stanton when
23 he was seeing a patient; is that right?
24 A.   That is correct.
25 Q.   Okay.  You indicated that it was your belief that the

1   patients didn't like the injections; is that right?

2   A.   Yes.

3   Q.   Didn't -- didn't Dr. Stanton with these patients try to

4   suggest alternative therapies to them, like injections?

5   A.   The injections were enforced.  They were required to at

6   least try once.

7   Q.   Right.  That was going to be my next question.  At least

8   try one before they just refused to try any other alternative?

9   A.   Yes.

10   Q.   Okay.  Even after Dr. Maccarone came back from that

11   medical emergency, he would call in sick pretty often; is that

12   accurate?

13   A.   The one year I was there, Dr. Maccarone would call out

14   every single week besides two weeks.

15   Q.   And I think at least one time during the week?

16   A.   One time consistently.

17   Q.   And that -- and that would set Emilie on the path of

18   calling Dr. Stanton to see if he could come and see the

19   patients that were assembled in the waiting room?

20   A.   Yes.

21   Q.   Because often Dr. Maccarone would wait to the day of to

22   announce to the staff that, "Hey, I'm not coming in today"?

23   A.   It would be 4:00, 5:00 before he would call and say

24   anything.

25   Q.   Even on the day that he was not coming?

1    A.   He was not coming.

2    Q.   And that would cause a little bit of a panic with Emilie

3    to see if Dr. Stanton could come in?

4    A.   Yes, but Dr. Stanton didn't always come in.

5    Q.   Okay.  I think you told the investigators that

6    Ms. Armijo, Shanna, and Ms. Jackman --

7              MR. SMITH:  Your Honor, objection.

8         (Sidebar conference.)

9              THE COURT:  Can you hear me, Mr. Strianse?

10             MR. STRIANSE:  I can hear you, Judge.

11             MR. SMITH:  I'm objecting to hearsay.  It sounds like

12   he has previously used her statements in the form of

13   impeachment.  Here it seems like he's moving on to a new topic

14   and beginning that topic with statements she made to an

15   investigator.  I don't think it's proper to summarize her

16   out-of-court statement.  It's not impeaching her if he hasn't

17   established an inconsistency.

18             MR. STRIANSE:  I'm not trying to impeach her.  I can

19   ask it another way.

20        (Sidebar conference concluded.)

21             THE COURT:  Disregard that objection.  And

22   Mr. Strianse is going to rephrase.

23             MR. STRIANSE:  Thank you.

24   BY MR. STRIANSE:

25   Q.   You do remember when an agent or agents came out to

1    Moore, Oklahoma, to interview you; is that right?

2    A.   Yes.

3    Q.   Did you talk to them about how patient files were

4    maintained there at GMA?

5    A.   Yes.

6    Q.   Did you talk about the role that Ms. Jackman and

7    Ms. Armijo had in regard to those patient files?

8    A.   Yes.

9    Q.   Do you remember what you told them?

10   A.   Not verbatim.  Shanna would -- Shanna and Emilie would

11   take those home and complete and sign the note under the

12   doctor's --

13   Q.   Okay.  Do you remember talking to the agents about any

14   additions or deletions or edits that you felt like Ms. Armijo

15   or Ms. Jackman might be making?

16   A.   There was one particular time that they added about a

17   drug screen or -- I'm not clear on the details.  It's been a

18   few years.

19   Q.   Okay.  Because I think you used a pretty colorful phrase

20   with the investigators about they were covering their things,

21   but that's my characterization of it.

22        Do you remember that exchange with the investigators?

23   A.   Vaguely.

24   Q.   Okay.  What do you remember about it?

25   A.   That was two years ago.

1    Q.   I'm sorry?

2    A.   That was two years ago.

3    Q.   Okay.

4    A.   I don't remember verbatim.

5    Q.   Okay.  Would it help you to take a look at it, maybe

6    refresh your recollection?

7    A.   Yes.

8    Q.   And in advance of your testimony here this morning, did

9    you have a chance to review the DEA -- they call it a DEA 6

10   report that the agent would have typed up, summarizing his

11   trip to Oklahoma and your interview?

12   A.   No.

13   Q.   You did not.  Okay.

14        MR. STRIANSE:  Your Honor, may I show her, see if it

15   refreshes her recollection?

16        MR. SMITH:  Your Honor, can we go up?

17        THE COURT:  Yes.

18    (Sidebar conference.)

19        THE COURT:  Mr. Smith.

20        MR. SMITH:  I would object to using that document for

21   the purpose of refreshing recollection.  It's not her

22   statement.  She's never reviewed it.  It's a summary written

23   by a different agent.  I understand counsel's purpose, but I

24   don't think that that's a proper use of something she just

25   said she's never reviewed.

1          THE COURT:  It doesn't have to be her document under

2    Rule 612.  He's asked, Do you remember this encounter?  She's

3    like, I don't remember it.  Two years ago.  Not really

4    verbatim.

5        So, you know, how he gets to use it is one thing, but

6    letting her see it to refresh her recollection, given what

7    she's testified to, seems proper to me.

8          MR. SMITH:  I think what I'm concerned about is that

9    if it turns into reading from the DEA 6 as if that's her

10   statement.  I don't know if he intends to do that, but that's

11   commonly the next step.

12         THE COURT:  I think we talked about that at the

13   pretrial.  I don't know what the question and answer is going

14   to be.  I agree it's not her statement, so it's not going to

15   be admitted.  But let her see it, see if it refreshes her

16   recollection.  Then you can ask her, her testimony about the

17   particular events.  If it's inconsistent with something that

18   she purports to have said in that record, I'm going to let you

19   ask her, Did you tell them this, if that's contradictory, and

20   if she says yes or no, that's going to be it at this point for

21   that.  Okay?

22         MR. SMITH:  Thank you, Your Honor.

23       (Sidebar conference concluded.)

24         THE COURT:  You may show the document.

25         MR. STRIANSE:  Thank you.

*J. BELISLE - Cross-Examination*                                        101

1          Your Honor, may I approach Ms. Belisle?

2               THE COURT:  You may.

3     BY MR. STRIANSE:

4     Q.   Ms. Belisle, of course, you can read anything you want to

5     in this report of investigation, but to save time, I have

6     turned to a page that I'm going to ask you to take a look at

7     and read to yourself and see if that refreshes your

8     recollection.  Take as much time as you need.

9          Have you had a chance to read it?

10    A.   Yes.

11    Q.   For the record, you have been reading a report of

12    investigation that purports to memorialize an interview that

13    you had on October 5, 2020?

14    A.   Yes.

15    Q.   By some DEA agents at your home in Moore, Oklahoma; is

16    that right?

17    A.   Yes.

18    Q.   Does that refresh your recollection about the interaction

19    that Ms. Armijo and Ms. Jackman were having with the patient

20    charts?

21    A.   Yes.

22    Q.   Well, tell us how it refreshes your recollection.

23               THE COURT:  Or what you remember.  Tell us what you

24    remember.

25               THE WITNESS:  I remember that Shanna -- I would drive

1    Shanna to her car because her boyfriend worked down the street

2    and around the corner.  So I would take Shanna to her car, and

3    she -- we would often put medical records in my car for her to

4    take with her so she could work from home.

5    BY MR. STRIANSE:

6    Q.   Okay.  Did you see anything that refreshed your

7    recollection about any changes that were made to records and

8    the impression that that made on you?

9    A.   There was one patient in particular that I know something

10   was added to their chart to protect ourselves, and that was

11   when a patient brought extra medication to the clinic and it

12   was given to Dr. Maccarone.

13   Q.   Okay.  Did Dr. Maccarone -- you had identified some

14   pricing at GMA, I think, earlier in your direct testimony here

15   today; is that right?

16   A.   Yes.

17   Q.   Did Dr. Maccarone have a practice of calling in to GMA to

18   see how much money had been turned in or gathered on a given

19   day?

20   A.   Yes.

21   Q.   And would he set quotas on a given day?

22   A.   Yes.

23   Q.   And give the jury some kind of an example as to the kinds

24   of quotas that he expected on a daily basis at GMA.

25   A.   The quotas that he expected were $10,000, $12,000,

*J. BELISLE - Redirect Examination*                               103

1    depending on how many patients we had that day.

2    Q.   Okay.  And how did he react if he wasn't hitting that

3    target of $10,000 a day?

4    A.   We were required to charge patients for extra services

5    such as EKGs or blood work.

6    Q.   And this was at Dr. Maccarone's insistence?

7    A.   Yes.

8              MR. STRIANSE:  Your Honor, may I have one moment?

9              THE COURT:  Yes, of course.

10        (Defendant and counsel conferring.)

11             MR. STRIANSE:  Those are my questions.

12             THE COURT:  Thank you, Mr. Strianse.

13        Mr. Smith.

14             MR. SMITH:  Thank you, Your Honor.

15                        REDIRECT EXAMINATION

16   BY MR. SMITH:

17   Q.   You were asked a series of questions about -- we used the

18   term "covering your bases."  There's other colorful terms like

19   "CYA," if Your Honor will permit?

20   A.   Yes.

21   Q.   And that's the conversation Mr. Strianse was just asking

22   you about?

23   A.   Yes.

24   Q.   When you're using that term, when you are talking about

25   CYA, were you referring to any effort to hide something from a

1   provider?

2   A.   No.  We never hid anything from a provider.

3   Q.   When there are questions about altering a chart or adding

4   things to a chart, was that ever something done, to your

5   knowledge, with respect to information given to Dr. Stanton?

6   A.   (No verbal response.)

7            THE REPORTER:  I'm sorry.  I didn't --

8            THE COURT:  I got it.  Just answer orally so she can

9   hear you.

10           THE WITNESS:  I'm sorry.  No.

11  BY MR. SMITH:

12  Q.   Was -- was that something that you discussed with Emilie?

13  A.   Yes.

14  Q.   Was it something that she seemed concerned with and

15  imparted to you and other staff?

16  A.   I voiced my concerns about it, and she said that we --

17  she was doing everything in her power to make sure we did not

18  end up like Dr. Orusa.

19  Q.   Who is Dr. Orusa, to your knowledge?

20  A.   Dr. Orusa was a pain management provider who had been

21  busted for drug trafficking shortly before I started.

22  Q.   Based on your conversations, was that the motivating

23  factor to making sure that all the documents were in order?

24  A.   Yes.  Emilie was a stickler for making sure that we were

25  doing exactly what we needed to do, exactly how we needed to

1    do it.

2    Q.   Meaning what documentations and forms were provided?

3    A.   Yes.

4    Q.   But as to what actual medical decisions were made, who

5    was that up to?

6    A.   That was up to the providers.

7    Q.   When you started, for the first several months there, who

8    was the provider there?

9    A.   Dr. Stanton.

10   Q.   What was Dr. Stanton's role?  What was his title, to your

11   knowledge?

12   A.   He was the medical director.

13   Q.   So when Mr. Strianse asked you these questions about the

14   late hours by Dr. Maccarone, the clearly out-of-bounds

15   behavior with sexual harassment, all these things that

16   happened there, who was the medical director at the clinic

17   when those things happened?

18   A.   Dr. Stanton.

19        MR. SMITH:  Thank you, Your Honor.

20        THE COURT:  Anything else, Mr. Strianse?

21        MR. STRIANSE:  No.

22        THE COURT:  Is she finally excused, Mr. Smith?

23        MR. SMITH:  Yes.

24        THE COURT:  Mr. Strianse?

25        MR. STRIANSE:  Yes, sir.

1    THE COURT:  Okay.  Thank you, Ms. Belisle.  You are

2    free to go.  You can leave that document up there.

3        Mr. Strianse, do you want to retrieve your --

4        MR. STRIANSE:  Yes.  Thank you.

5    (Witness excused.)

6        THE COURT:  Mr. Smith.

7        MR. SMITH:  Thank you, Your Honor.

8    The United States calls David Silvus.

9        THE COURT:  David Silvus.

10    MR. SMITH:  While he's walking up, can we go on the

11    headphones for a minute?

12    THE COURT:  Yes.

13    (Sidebar conference.)

14    THE COURT:  Can you hear me, Mr. Strianse?

15    MR. STRIANSE:  Yes, sir.

16    MR. SMITH:  I have not thought to ask for any

17    instruction on him.  I noticed this up pretrial.  He's the

18    witness from the department of health who's going to talk

19    about the regulations.  So I just wanted to flag that that

20    testimony was coming.  I don't know that we need to give a

21    contemporaneous instruction, but I also wouldn't object if you

22    want to clarify that you are the sole lawgiver and consistent

23    with what we talked about at the pretrial conference.

24    THE COURT:  What do you think, Mr. Strianse?

25    MR. STRIANSE:  Judge, I have no objection to the

1    Court giving an instruction and reminding them that you are

2    the source of the law.

3         THE COURT:  What I tinkered with saying is something

4    like this witness is going to talk about Tennessee law and

5    Tennessee regulations.  He's doing that to provide context for

6    other evidence you'll hear in the case.  To the extent the

7    jury needs an understanding of the law to decide this case,

8    instructions on that will come solely from the Court,

9    something like that.

10        MR. STRIANSE:  That's fine.

11        THE COURT:  Are you okay with that?

12        MR. SMITH:  Yes, sir.

13        THE COURT:  I'll give that at the start of his

14   testimony.

15        MR. SMITH:  Yes.  I think that's a good idea.

16        THE COURT:  Okay.  Thank you.

17     (Sidebar conference concluded.)

18        **DAVID SILVUS, GOVERNMENT'S WITNESS, DULY SWORN**

19        THE COURT:  Good morning, sir.

20        THE WITNESS:  Hi.

21        THE COURT:  Do try to speak directly toward that mic

22   in a clear voice so we can understand you during your

23   testimony.

24     Would you first state your name and spell your last name.

25        THE WITNESS:  David Silvus, S-i-l-v-u-s.

1     THE COURT:  Thank you, sir.

2     I'm going to give the jury another mid-trial instruction.

3     I think Mr. Silvus is going to refer to and offer some

4     testimony that will include reference to Tennessee law, some

5     Tennessee statutory and regulatory law that pertains to the

6     issues in this case.

7     I'm going to allow him to do that because it will provide

8     you some context for considering and understanding other

9     evidence and the sequence of alleged events that you'll hear

10    about.  So I think it's going to be helpful in that way.

11    Ultimately, the law you'll need to decide this case will

12    come only from me.  And so I'll instruct you on the law, the

13    framework of the law, what you'll need to evaluate the issues

14    in the case.  That will come solely from the Court in my

15    instructions.  So be aware of that.

16    If a witness talks about the law, it's only to give you a

17    point of reference or a better way to understand the facts

18    that you'll hear in the case.

19    So do take that in mind during this testimony and

20    testimony from any other witness that touches on what the law

21    does or does not require.

22    All right.  Thank you.

23    Mr. Smith.

24     MR. SMITH:  Thank you, Your Honor.

25                       DIRECT EXAMINATION

1    BY MR. SMITH:

2    Q.   Sir, I can't remember if you did it when you first sat

3    down, but if you could just tell everybody your name.

4    A.   David Silvus.

5    Q.   Did you already spell your name?

6    A.   Yes, I did.  S-i-l-v-u-s.

7    Q.   I'm sorry.  I'm out to lunch here.

8         Can you please tell the jury what it is you do for a

9    living?

10   A.   Currently I'm employed by the Tennessee Department of

11   Health.  My job title is chief deputy general counsel.

12   Q.   And just in a couple sentences, can you give them a sense

13   of what that means, what you do on a daily basis?

14   A.   I am in charge of the office -- the portion of the office

15   of general counsel that provides support for health-related

16   boards, board of medical examiners, the board of nursing,

17   those types of boards.

18        We -- my office advises those boards and also enforces

19   the law and regulations with respect to physicians, nurses,

20   pain management clinics, podiatrists, massage therapists, the

21   whole gamut of boards that are attached to the department of

22   health, that relate to health.

23   Q.   You used the word "pain management clinics" in your

24   answer just a moment ago.

25        Are pain management clinics something that are specially

1    regulated under Tennessee law?

2    A.    They are.  The department of health, through the

3    commissioner of the department of health, will -- has to grant

4    a license for somebody to operate a pain management clinic,

5    and there's certain criteria and requirements that go into

6    that application of who can and can't operate a pain

7    management clinic.

8    Q.    When -- just kind of stepping back, when did Tennessee

9    begin regulating pain management clinics in that fashion?

10   A.    The process started, I guess, in 2011 with -- at that

11   time it was a certificate process.  The owner of the clinic

12   would apply for and receive a certificate to own and operate a

13   pain management clinic.  At that time they had to have a

14   medical director of that clinic who was identified in that

15   application process.

16         There was a pretty sizeable shift in 2016, though, when

17   the State of Tennessee required that that medical director who

18   was in charge of the daily operations of the clinic become a

19   pain management specialist or a pain specialist, and that

20   requires some additional training, some board certification,

21   some eligibility to sit for exams, different criteria that

22   would satisfy that.  But the gist of it was beginning in 2016

23   the medical director had to have specialized training in

24   providing pain management services.

25   Q.    Okay.  So to kind of unpack a little bit, in Tennessee to

1    be a pain management clinic, does a clinic have to submit

2    certain information to the department of health?

3    A.   Yes.  And that was true in 2011.  It's true today.

4         What has to be submitted has evolved over time as the

5    laws have changed.  But, yes, always.

6    Q.   Essentially, you have to apply to become a pain

7    management clinic, and then you get approved?

8    A.   Correct.  And we define pain management clinics -- if you

9    operate a pain management clinic without a license, that's

10   actually criminal behavior.  So it's an important process to

11   be able to provide these types of medical services.

12   Q.   Now, you mentioned a moment ago the term "medical

13   director."  What -- generally speaking, is there a requirement

14   for pain management facilities in Tennessee to have a medical

15   director?

16   A.   Yes.  Now it's -- I mentioned the shift we had in 2016.

17   We had another shift in 2017, and the medical director now is

18   the person who applies for and receives the license from

19   Tennessee to operate the pain management clinic.

20        Prior to 2017, it was the owner who got a certificate.

21   Beginning in 2017, we sort of -- the law in Tennessee evolved

22   to emphasize the medical director.  It's the medical director

23   who applies for the actual license now.  So he's even more

24   so -- without a medical director, you don't even have an

25   application for the pain management clinic.

1  Q.    Did the law change in 2016 with respect to who could be a

2  medical director?

3  A.    Yes.  Prior to July 1 of 2016, any licensed physician who

4  didn't have an encumbered license, hadn't been disciplined,

5  didn't have any limitations on his or her license could serve

6  as a medical director.

7        Beginning in July of 2016, Tennessee required that that

8  medical director be defined as a pain specialist and the

9  statute had the criteria to meet, but it was generally extra

10  training, board certification in certain areas of medicine

11  beginning on July 1 of 2016.

12  Q.    So for that point forward -- and I want to focus on the

13  time period of 2016 to 2020.  During that time period -- it

14  sounds like the majority of it, at least -- could a pain

15  clinic even submit an application without a medical director?

16  A.    No.

17  Q.    Could a pain clinic operate without a medical director?

18  A.    No.

19  Q.    Could a medical clinic give controlled-substance

20  prescriptions out without a medical director?

21  A.    No.

22  Q.    And beginning in July of 2016, just very succinctly, what

23  level of training was required to be a medical director?

24  A.    It's set forth in the statute.  Essentially, you either

25  had to be board-certified in pain or anesthesiology or be

1    eligible to sit for certain exams to get that certification.

2    So by training and coursework and hours of experience,

3    clinical experience, if you were eligible to sit for an exam

4    but hadn't sat for the test, you would also be qualified.

5    Q.   I don't want you to give me an opinion on what you think

6    a particular law means, but just kind of factually tell us how

7    this came into being.

8         Why was there an elevated requirement?

9         Why did Tennessee bump up who needed -- what kind of

10   qualifications someone needed to be a medical director?

11   A.   Well, it was the recognition of the types of services

12   that were being provided in those clinics, and we needed to

13   have somebody overseeing and in charge of that who had the

14   training to do that versus a physician whose only training was

15   an OB-GYN.

16        Prior to 2016, any physician could be the medical

17   director, whether he or she had training or not.  And so with

18   the recognition of the specialized nature of the treatment

19   being provided and the risks to the patients of this -- parts

20   of that treatment, we realized we needed somebody who had

21   expertise and training in charge.

22   Q.   You said risks for parts of that treatment.  What are you

23   talking about there?

24   A.   Well, for those patients who are receiving opioids, there

25   is just a risk of accidental overdose, diversion, those types

1    of things.

2         Not all pain patients receive opioids, thankfully.  There

3    are other treatment modalities.

4         But the focus of the laws and the regulations of pain

5    management clinics revolve around the opioid prescribing.

6    Q.   And it was those concerns, that risk, that, to the best

7    of your knowledge, was why this elevated requirement of

8    medical director exists?

9    A.   Correct, and we went a step further in 2017, a year

10   later, when we switched to the medical director actually gets

11   the license.  The medical director is the focus now

12   completely.  The owners -- we still care who the owners are,

13   but not nearly as much as we did prior to 2017 because it's

14   the care that's being provided to the clinic that matters.

15   That's where the risk of harm to the public is.  And the

16   medical director is in charge of that care.  So the medical

17   director comes to us and asks for the license and has to

18   submit all the information and the forms to be able to operate

19   as a pain management clinic.

20   Q.   I would like to now, if I can, walk through some of the

21   specific laws and regulations in Tennessee that apply.  And

22   again consistent with the judge's instructions a moment ago, I

23   would like to just identify and read these for background

24   purposes.

25   A.   Okay.

1  Q.   To begin with, did Tennessee law, Tennessee statutes, did

2  it define the term "medical director"?

3  A.   Yes.

4        MR. SMITH:  Can we bring that up -- not to be

5  admitted, but just for display purposes -- what we've marked

6  as Government's Exhibit 30 with the Court's permission?

7        THE COURT:  Yes.

8  BY MR. SMITH:

9  Q.   So just at the top here, just to familiarize yourself,

10 what are we looking at generally?

11 A.   This -- this is a copy of a Tennessee statute that became

12 effective July 1 of 2017.  So this would be the current

13 version of our statutory scheme with respect to pain

14 management clinics once we made the shift to medical directors

15 being the applicants and the license holders.

16 Q.   And in this section of the statute, I see it's entitled

17 "Definitions."

18       You are a lawyer.  Do statutes often kind of define

19 certain terms?

20 A.   Yes.

21 Q.   That are used later in the laws?

22 A.   Correct.

23       MR. SMITH:  Okay.  Can we scroll down, please,

24 Rebecca?

25 BY MR. SMITH:

1   Q.   Is there a definition of "medical director" in this

2   portion of the law?

3   A.   There is.

4   Q.   Can you please read that to the jury?

5   A.   "Medical director means an individual who is licensed as

6   a physician" --

7           MR. SMITH:  I'm sorry.  Let me stop for a second.

8   Has this been published to the jury?

9           THE COURT:  Not yet.

10          MR. SMITH:  My apologies, Your Honor.  I should have

11  been a little clearer.  Let me ask -- he's identified it.  We

12  would ask to publish it but not admit it.

13          THE COURT:  Any objection?

14          MR. STRIANSE:  No objection.

15          THE COURT:  Okay.  That can be published to the jury.

16          MR. SMITH:  My apologies, Your Honor.

17          THE COURT:  No problem.

18          MR. SMITH:  Okay.  All right.  Can everybody see that

19  now?  All right.

20  BY MR. SMITH:

21  Q.   Sir, same question.  Can you -- now that we can see it,

22  can you please tell us how "medical director" is defined?

23  A.   Sure.  "Medical director means an individual who is

24  licensed as a physician under Chapter 6 or 9 of this title and

25  who practices in this state with an unrestricted and

1    unencumbered license, provides oversight relative to the

2    operations of a pain management clinic and is a pain

3    management specialist on or after July 1, 2016."

4    Q.   So B there, under Tennessee law, was a medical director

5    defined to be someone who provided oversight relative to the

6    operations of a pain management clinic?

7    A.   Yes.

8    Q.   Now, in the law, there's also something called a

9    regulation.  Are you familiar with that?

10   A.   Yes, very much so.

11   Q.   In very general terms, can you explain what a regulation

12   is?

13   A.   Sure.  The General Assembly of Tennessee, which is our

14   state senate and house of representatives, passes legislation

15   that authorizes, in our case, the department of health to do

16   certain things, and it authorizes the department of health to

17   create regulations in order to accomplish what the General

18   Assembly sets out in these statutes.

19        So there -- there is -- there are places in this statute

20   for the pain management clinic that authorizes the commission

21   of the department of health to create rules to regulate those

22   clinics to accomplish what the general assembly sets forth in

23   its statutory scheme.

24   Q.   And in the case of this medical director requirement, was

25   there a mandate to make regulations that spelled out what

1   medical directors' responsibilities were?

2   A.   Yes.

3   Q.   With the Court's permission, we'll bring up Government's

4   Exhibit 31, briefly for the witness first.  And before we turn

5   to that regulation, did -- what are we looking at here with

6   63-1-306?

7   A.   I'm sorry?

8   Q.   Are you able to see what's --

9   A.   Yeah, 63-1-306.

10   Q.   Okay.  That first part, just generally what is this part

11   of the law?

12   A.   This is another statute in our codification of our -- of

13   the statutory language regarding pain management clinics.  You

14   want me to read some of it or --

15   Q.   Well, with the Court's permission, we'll publish it.

16          THE COURT:  Any objection?

17          MR. STRIANSE:  No objection.

18          THE COURT:  31 may be shown to the jury.

19   BY MR. SMITH:

20   Q.   A question for this part, just simply, is this the part

21   of the law -- we've talked about the definition of the medical

22   director.  Is this the part of the law that says a clinic has

23   to have a medical director?

24   A.   Yes.

25   Q.   Now, turning it back to the regulations that we just

1    talked about -- can we please bring up Government's Exhibit 32

2    for the witness.

3         You mentioned the concept of regulations and that

4    regulations were promulgated about the medical director

5    requirement.

6    A.   Yes.

7    Q.   Can you tell us what we're looking at?

8    A.   This is the codification of one of the rules promulgated

9    by the department of health in accordance with that statute

10   that we -- the statute we were just looking at regarding the

11   regulation of pain management clinics in Tennessee.

12        MR. SMITH:  Okay.  Your Honor, may we have permission

13   to publish this to the jury?

14        THE COURT:  Any objection?

15        MR. STRIANSE:  No objection.

16        THE COURT:  32 may be published to the jury.

17   BY MR. SMITH:

18   Q.   All right, sir.  What's this portion of the regulation

19   entitled?

20   A.   Well, we're looking at -- I mean, the name of the

21   regulation is "Medical Director Responsibilities," and that's

22   what it is.  It sets forth what requirements by rule medical

23   directors of a pain management clinic have.

24   Q.   Scroll down to No. 1 there.  Can you please explain what

25   it says there?

1    A.    It just says, "The medical director of a pain management

2    clinic shall oversee all of the pain management services

3    provided at the clinic," and, I mean, that just means what it

4    says.  They have to oversee all the pain management services

5    provided.

6    Q.    Okay.  On that point, are you aware of any limitation

7    under the law or is there anything elsewhere in this document

8    that says that doesn't apply if there's another doctor at the

9    pain management facility?

10   A.    No, not that I'm aware of.

11   Q.    What's the second requirement?

12   A.    "Be onsite at the clinic at least 20 percent of the

13   clinic's weekly total number of operating hours."  And that

14   requirement -- that's -- has been the requirement I believe

15   since 2011, but certainly since 2016.

16       That -- the medical director has to be actually onsite

17   20 percent of the time the clinic is open and operating.

18   Q.    Okay.

19   A.    So typically one day out of five.  If a clinic operates

20   8:00 to 5:00 Monday through Friday, the medical director would

21   need to be onsite one full day or two half days, however it's

22   broken up, but the equivalent of one full day out of five.

23   Q.    Point 3?

24   A.    "Ensure that each supervising physician for each of the

25   healthcare providers working at the clinic complies with the

1   supervision requirements contained in Tennessee Comprehensive

2   Rules and Regulations Chapter 0880-03 and Chapter 0880-06 or

3   Rule 1050-02-.15, as applicable, and is a pain management

4   specialist."

5   Q.   Okay.  So we talked -- I asked you a question about if a

6   clinic has another doctor working.  This No. 3, can you

7   explain the types of circumstances that applies to?

8   A.   Certainly.  It is oftentimes the case in pain management

9   clinics that a nurse, an APRN, advanced practice registered

10  nurse, or a physician assistant will provide patient care at

11  that clinic.

12       In Tennessee, APRNs and PAs cannot practice

13  independently.  They have -- this still uses the old language,

14  "supervision."  They -- it used to be they had to have a

15  supervisory relationship with a physician.  Now we use the

16  term "collaborative relationship," but it's -- the obligations

17  haven't changed to be able to practice.

18       So this regulation requires that any mid-level nurse or

19  PA working at a pain management clinic has to be -- has to

20  have a collaborative relationship or supervisory relationship

21  with a physician who is a pain management specialist.

22       It can't just be a relationship with a physician who's a

23  general practitioner or OB-GYN, again, used as an example.

24  They have to work under the auspices of a pain management

25  specialist.

1    Q.   Can you walk us through No. 4 and 5?

2    A.   Sure.  4, "Ensure that all healthcare providers employed

3    by or working at the pain management clinic comply with

4    applicable state and federal laws and rules relative to the

5    prescribing of controlled substances in the pain management

6    clinic."

7         And, No. 5, "Ensure the establishment of protocols for

8    the healthcare providers employed by or working at the pain

9    management clinic as provided in Tennessee Comprehensive Rules

10   and Regulations Chapter 0880-03 and Chapter 0880-06 and ensure

11   that providers comply with such protocols as well as any other

12   established policies and procedures."

13   Q.   Okay.  Can we go down?  Okay.  6 I don't want to belabor,

14   but if you could just generally address what 6 talks about.

15   A.   6 requires that the -- that the medical director have

16   an -- in essence a backup medical director for the clinic in

17   the event that the medical director goes on vacation, is sick,

18   is unable to fulfill his or her duties on a short-term basis,

19   to have somebody there as a backup.  It also is clear --

20   clearly sets forth explicitly that the medical director is

21   still responsible for everything that goes on at the pain

22   management clinic even if there is an alternate medical

23   director in place due to the primary medical director's, you

24   know, time away for whatever reason.

25   Q.   Okay.  Can we go to Item 7 now, which I think starts at

1    this page, so we'll begin there, and then we'll arrow down for

2    you.

3    A.   You want me to read it or just summarize what it means?

4    Q.   No, please read it.

5    A.   No. 7, "Establish quality assurance policies and

6    procedures which, at a minimum, include, but are not limited

7    to, documentation of the background; training; licensure and

8    certifications for all pain management clinic staff providing

9    patient care; a written drug screening policy and compliance

10   plan for patients to include random urine drug screens as

11   clinically indicated but, at a minimum, upon each new

12   admission and once every six months thereafter; use of

13   substance-use disorder risk-assessment tools on new patient

14   admission and periodic review or reassessment; evaluating and

15   monitoring the quality and appropriateness of patient care,

16   the methods of improving patient care, as well as identifying

17   and correcting deficiencies and the opportunities to improve

18   the clinic's performance and quality of care."

19   Q.   Okay.

20   A.   "Medication counts for any controlled substances

21   prescribed by the clinic to the clinic's patients; use of pain

22   agreements and periodic review of such agreements; healthcare

23   provider access to and review of patient information contained

24   in the controlled substance monitoring database in accordance

25   with Tennessee Code Annotated Sections 53-10-301

1    through 53-10-309, as clinically indicated, but, at a minimum,

2    upon each new admission and once every six months thereafter;

3    documentation of requests for records from other healthcare

4    providers; and creation of a written process for clinical

5    practice evaluation and evidence of regular or appropriate

6    supervisory action based on results of the clinical practice

7    evaluation."

8    Q.   So if you could go back up to just No. 7 to orient

9    ourselves.

10   A.   Okay.

11   Q.   All the way up to where it says No. 7, please.  So that's

12   entitled "Established Quality Assurance Policies and

13   Procedures," which at a minimum include those things that you

14   just told us.

15        Then let's go to No. 8.  What is No. 8?

16   A.   No. 8 is "Establish an Infection Control Program."  Do

17   you want me to read that one?

18   Q.   No.  That's generally what that --

19   A.   Okay.  Correct.

20   Q.   Okay.  For the sake of time.

21   A.   No. 9 requires they establish written policies and

22   procedures so patients have access to their records in the

23   event that a clinic closes.

24   Q.   Can we go to No. 10, please?  It's -- now it's No. 2

25   there.  Okay.  What does this portion address?

1    A.    This is -- again, we are still under the laundry list of

2    requirements for the medical director.  This is sort of a

3    different category of requirements.  This pertains to the

4    records, reporting requirements, and the billing procedures.

5    Q.    Okay.  And what does A require?

6    A.    I can read it, I guess, is probably the easiest way.

7          "The medical director shall ensure that each healthcare

8    provider employed by or working at a certified or licensed

9    pain management clinic shall maintain complete and accurate

10   medical records of patient consultation, examination,

11   diagnosis, and treatment which shall include but not be

12   limited to the following."

13         Do you want me to read the list?

14   Q.    I think, for sake of time, let's keep going down.  Keep

15   going.

16         Just No. 9.  What does No. 9 say?

17   A.    No. 9 requires that "The results of urine drug screens to

18   be performed as clinically indicated but, at a minimum, upon

19   each new admission and once every six months thereafter."

20   That is, the documentation has to include that.

21   Q.    What does B say?

22   A.    "The medical director's responsibilities shall include

23   having a system in place to ensure adequate medical

24   documentation and responsibility for addressing inadequate

25   documentation.  Medical records must at all times be available

1    to clinicians to review onsite but may be maintained at a

2    separate location."

3    Q.   So under this portion, who is tasked with having a system

4    in place to ensure adequate medical documentation?

5    A.   The medical director.  The medical director is tasked

6    with having all processes and procedures -- they all flow

7    through the medical director, including documentation.

8    Q.   Paragraph 3 I don't want to cover in detail there.  Does

9    that address billing and adequate billing records?

10   A.   It does.

11        "The medical director has the obligation to ensure that

12   billing records are kept and maintained in an appropriate

13   way."

14   Q.   Okay.  If we can continue down.  Are there

15   record-retention requirements under the law?

16   A.   These are.  The medical director -- generally physicians

17   have an obligation to maintain their own records, but the

18   medical director, superimposed on top of that, has an

19   obligation to maintain the records of the pain management

20   clinic, whether or not the medical director -- whether or not

21   there are records of the medical director's actual treatment.

22   So the medical director has to ensure that the records are

23   maintained for ten years after the patient's last visit;

24   billing records maintained for seven years.

25   Q.   If we go to No. 7.

1    A.    "The medical director shall ensure the delivery of

2    quality care and quality services at the clinic."

3    Q.    So the very first responsibility we talked about up above

4    at 1, remind me of that.  It was overseeing?

5    A.    They were -- they were to oversee all of the providing of

6    all pain -- I can't remember the exact wording -- pain

7    services provided at the pain management clinic.

8    Q.    And No. 7 says what?

9    A.    No. 7 is a little broader.  It just requires they are

10   responsible for ensuring the delivery of quality care and

11   services at the clinic.  So it's a little broader universe

12   than just simply the pain treatment.

13   Q.    Okay.  Can we scroll down, please?

14       I'm sorry.  And then No. 9 deals with patient access to

15   the medical records?

16   A.    Correct.  The medical director is responsible for

17   ensuring that patients have access to the records in the event

18   the clinic closes and also that they -- that the department,

19   which is the department of health, has access to the records

20   upon request.

21           MR. SMITH:  Okay.  All right.  We can take that down.

22   Thank you, Rebecca.

23   BY MR. SMITH:

24   Q.    So as you told us, there's a licensure -- certificate and

25   a licensure process in Tennessee for pain management clinics.

1          So from time to time, do pain clinics submit records and

2     other materials to the department of health as part of the

3     licensure and oversight process?

4     A.   Yes.  There are two things that happen every two years,

5     but they are actually not directly tied to one another.

6          One is the renewal process.  Every two -- the clinic's

7     license is only good for two years.  And they have to renew,

8     and there's a process of documentation submission of

9     documentation information to the department that's then

10    reviewed prior to issuing the renewal.

11         Also every two years, the department of health inspects

12    the pain management clinic.  We'll come out, send an

13    investigator out, pull billing records, pull some patient

14    charts, interview people, make sure that the scheduling and

15    protocols are in place.

16         Ideally we'd like that inspection to happen sort of in

17    conjunction with the renewal, but it doesn't always match up

18    right.  But both those things happen every two years.

19    Q.   Okay.  Does the department of health maintain a file for

20    each pain clinic it regulates?

21    A.   Yes.

22    Q.   Does it store and maintain those in the regular course of

23    its business?

24    A.   Yes.

25    Q.   Does the Tennessee Department of Health have such a file

*D. SILVUS - Direct Examination*                                            129

1    for Gateway Medical Associates?

2    A.   Yes.

3    Q.   Did -- in the course of its investigation, did the United

4    States obtain certain records from the department of health

5    from that file?

6    A.   Yes.  We received a subpoena for those records, and they

7    were provided.

8              MR. SMITH:  Okay.  If we can, just for the witness,

9    let's look at Government's Exhibit 20, please.  And if we can

10   just arrow through that collection of pages that are on this

11   document just to allow him to familiarize himself with it.

12   Can you continue through, Rebecca?  Okay.

13   BY MR. SMITH:

14   Q.   So what's been marked as Government's Exhibit 20, can you

15   just explain it in very general terms for the Court?

16   A.   This is a letter that was sent to Dr. Mitch Mutter, who

17   at that time was the -- employed by the department of health

18   as the medical director for special projects.

19        This letter is indicating that Dr. Maccarone has had

20   difficulty identifying a pain management specialist to

21   serve --

22   Q.   Let's --

23   A.   Okay.

24   Q.   This letter was sent at what approximate date?

25   A.   It's dated March 1, 2016.

1    Q.   Okay.  And does -- to the best of your knowledge, given

2    your position, was this maintained in the regular course of

3    your operations?

4    A.   Yes.  This would have been part of the pain management

5    clinic file maintained by the department.

6         MR. SMITH:  Okay.  Your Honor, I would move to admit

7    Government's Exhibit 20.

8         THE COURT:  Any objection?

9         MR. STRIANSE:  No objection.

10        THE COURT:  Thank you.  That will be admitted.  It

11   may be displayed.

12        (Government's Exhibit No. 20 was received in evidence.)

13   BY MR. SMITH:

14   Q.   All right.  If we can just back out a little bit, who is

15   this letter from?

16   A.   Dr. Maccarone.  He's a doctor of osteopathy in

17   Clarksville, Tennessee.

18   Q.   And was he associated with Gateway Medical Associates?

19   A.   He was the owner and sole provider, healthcare provider,

20   at that clinic.

21   Q.   Okay.  And that's as of this time period in 2016?

22   A.   Correct.

23   Q.   Okay.

24   A.   And he served as the medical director, too, so he was the

25   owner, medical director, and sole provider at that clinic.

1    Q.   And in the re -- the subject line, it says, "January 2016

2    letter regarding pain management specialist requirements."

3         Are you familiar with an initiative in January of 2016 to

4    update clinics about those requirements?

5    A.   Yes.  The statute that required that medical directors

6    for pain management clinics be pain specialists was passed

7    prior to its effective date.  The effective date was July 1

8    of 2016.

9         To provide a runway to all of the pain management clinics

10   in Tennessee, to allow them to get a qualifying specialist,

11   the department of health sent letters out to pain management

12   clinics -- sent multiple letters, actually, advising them of

13   the change in the law and the fact they would be on July 1st

14   required to have a pain specialist as their medical director.

15   Q.   Okay.  So you told us about this change in 2016 about the

16   qualifications for medical director requirement, and so the

17   state told clinics, hey, this is coming down the pike?

18   A.   Correct.

19   Q.   And in this response is Dr. Maccarone addressing that

20   issue?

21   A.   Correct.

22   Q.   Okay.  And in substance -- I don't want to, just for the

23   sake of time, read every word, but in substance what is

24   Dr. Maccarone relating to the state?

25   A.   I mean, he's saying I'm not a pain specialist, I don't

1    really have a good, clear path to get there before July 1.

2    We've got a lot of patients here.  I have been operating since

3    2012.  I mean, he's essentially asking for some grace to allow

4    him either more time to get --

5    Q.   Okay.

6    A.   I'm sorry.

7    Q.   It's a bad question on my part.

8    A.   All right.

9    Q.   The third paragraph down, can you just read that first

10   sentence?

11   A.   "Unfortunately, at the present time, I do not meet the

12   qualifications for designation as a pain management specialist

13   and cannot serve as GMA's medical director after July 1,

14   2016."

15   Q.   Okay.  So the state received this letter, I think you

16   told us, in March of 2016.  Did it receive additional

17   correspondence from Dr. Maccarone on this issue?

18   A.   It's entirely possible.  I don't, as I sit here, have any

19   specific memory of exactly what we did or didn't get.  But I

20   think -- ultimately I know he obtained the services of

21   somebody to serve as medical director who qualified as a pain

22   specialist.

23        MR. SMITH:  Let's, if we can, for the witness, bring

24   up Government's Exhibit 21, please.

25   BY MR. SMITH:

1    Q.   Okay.  All right.  Sir, do you recognize what's been

2    marked as Government's Exhibit 21?

3    A.   I do.  This is a letter from Dr. Maccarone to Ashley Dao

4    who at that time was the executive director for the pain

5    management clinic program.

6    Q.   Is this maintained in the files at the department of

7    health?

8    A.   Yes.

9    Q.   Was that produced to the United States?

10   A.   Yes.

11        MR. SMITH:  Your Honor, we would move to admit

12   Government's Exhibit 21.

13        THE COURT:  Any objection?

14        MR. STRIANSE:  No objection.

15        THE COURT:  That will be admitted.

16   (Government's Exhibit No. 21 was received in evidence.)

17        MR. SMITH:  And can we publish it, please?

18        THE COURT:  Yes, you may.

19   BY MR. SMITH:

20   Q.   Can you just read the first paragraph of that letter?

21   A.   "In response to your letter dated April 7, 2016, John L.

22   Stanton, M.D., will begin serving as the medical director for

23   Gateway Medical Associates, PC, on July 1, 2016."

24   Q.   All right.  And then, if we can, the last thing I would

25   like to cover with you is:  You referenced earlier that,

1    throughout kind of the course of the state's oversight of

2    these pain clinics, that there are interactions, sometimes

3    materials submitted to the state?

4    A.   Yes.

5             MR. SMITH:  Let's, if we can, look at Government's

6    Exhibit 22 for the witness.

7        Your Honor, just for your reference, 22 is a collection

8    of documents that we subdivided into A, B, and C.  So I'm

9    going to ask the witness to review the collection first, and

10   then I'll only address, for efficiency, the subparts, if

11   that's acceptable.

12   BY MR. SMITH:

13   Q.   Okay.  Sir, do you recognize what's been marked as

14   Government's Exhibit 22?

15   A.   I do.

16   Q.   Was this collection of documents submitted to the

17   department of health?

18   A.   Yes, it was.

19   Q.   And on -- for which clinic?

20   A.   I'm sorry?

21   Q.   For which clinic?

22   A.   Gateway Medical Associates.

23   Q.   Was this produced to the United States as the other

24   documents were?

25   A.   Yes.

1          MR. SMITH:  Okay.  Your Honor, we would move to admit

2     this collection of documents as Government's Exhibit 22.

3          THE COURT:  Any objection?

4          MR. STRIANSE:  No objection.

5          THE COURT:  Is that A through E subparts?

6          MR. SMITH:  So 22 itself is an entire longer

7     collection of documents.  A through E are subparts of that

8     that are kind of broke up into just the identifiable sections

9     and policies.

10          THE COURT:  All within 22?

11          MR. SMITH:  They all fall within 22.

12          THE COURT:  I'll admit 22.

13      (Government's Exhibit No. 22 was received in evidence.)

14          MR. SMITH:  I would ask to admit 22A through E since

15     they are parts of that, and I'll just address them with the

16     witness.

17          THE COURT:  If they are part of 22, then they are

18     admitted.

19       Mr. Strianse, any objection?

20          MR. STRIANSE:  No, sir.

21          THE COURT:  Those are all in under the 22 umbrella.

22          MR. SMITH:  Okay.  Let's first just pull up

23     Exhibit 22A.

24     BY MR. SMITH:

25     Q.   Okay.  Sir, from your perspective, were these documents

1   sent to the state as a representation of what Gateway Medical

2   Associates was doing?

3   A.   Yes.  This would have been either in the application or

4   the renewal process.

5   Q.   And in the course of that oversight, does the state want

6   to know if clinics have policies and procedures in place like

7   the ones you talked about, the regulations, a moment ago?

8   A.   Yes.  The medical director is obligated to provide that

9   information to us.

10  Q.   Okay.  What is 22A entitled?  What is that title?

11  A.   This is a written statement -- this is not a department

12  of health form, but this document checks all the boxes that

13  are required by the department of health for the medical

14  director to represent to the department in the course of the

15  application process to either get or renew a license for a

16  pain management clinic.

17  Q.   What does 1 say?

18  A.   "The medical director has read and understood the

19  statutes and rules governing pain management clinics as well

20  as the Tennessee Chronic Pain Guidelines and Tennessee Pain

21  Clinic Guidelines, both of which are attached to this

22  verification."

23  Q.   And in No. 3, what does just the header say?

24  A.   "The medical director is aware of the responsibilities

25  set out at 1200-34-01-.10."

*D. SILVUS - Direct Examination*                                137

1    Q.    And that long number there, is that the regulation that

2    you read to us a moment ago?

3    A.    It is.  That's the regulation that is the medical

4    director responsibilities.

5    Q.    And the first subpart, No. 1 there, what does that say?

6    A.    "Oversee all of the pain management services provided at

7    the clinic."

8    Q.    Is that the same language that appears in the regulation?

9    A.    Correct.  It appears this was just a copy and paste from

10   that regulation into this form, which, from the department's

11   point of view, is certainly fine.

12   Q.    And does that include the 20 percent requirement you

13   talked about?

14   A.    It does.

15   Q.    Please scroll down, please.  Does it also contain those

16   quality assurance policies and procedures?

17   A.    It does.

18         MR. SMITH:  And not walking through all those, please

19   continue down.  Sorry.  Go one page.  Sorry.

20   BY MR. SMITH:

21   Q.    What does No. 12 there say?

22   A.    No. 12?  "Creation of a written process for clinical

23   practice evaluation and evidence of regular appropriate

24   supervisory action based on results of the clinical practice

25   evaluation."

*D. SILVUS - Direct Examination* 138

1    MR. SMITH:  Can you continue down, please, Rebecca?

2    Sorry.  I'm just -- if we can go to the second part of 2A.

3    Keep going.

4    BY MR. SMITH:

5    Q.   Okay.  I think the language may be slightly different.

6    But that B there that we've talked about, does that track what

7    the regulation is saying about --

8    A.   Yes.  "The medical director shall ensure adequate medical

9    documentation and shall be responsible for addressing

10   inadequate documentation."

11   That's not a direct quote from the regulation we looked

12   at earlier, but it's functionally probably the same.

13   Q.   Okay.  So what did the -- what did GMA represent to the

14   state that the medical director was going to do with regard to

15   documentation?

16   A.   Well, GMA -- I mean, it's -- through its medical

17   director -- I mean, through Dr. Stanton, as the medical

18   director, represented that it would -- that Dr. Stanton, the

19   medical director, would ensure adequate medical documentation

20   and be responsible for addressing deficiencies in that.

21   MR. SMITH:  If we scroll all the way to the bottom,

22   Rebecca.

23   BY MR. SMITH:

24   Q.   And was this signed and dated?

25   A.   Yes.

1        MR. SMITH:  Okay.  Okay.  Can we bring up 22B,

2   please?

3        THE COURT:  We are getting pretty close to our lunch

4   break, Mr. Smith.  I'm fine -- if you got less than five

5   minutes on your direct, I'm fine waiting five minutes to

6   conclude that.  If not, then we can go ahead and take our

7   lunch break and come back after.

8        MR. SMITH:  Why don't I try to move through it.  I

9   think it's about ten minutes, but if I hustle, maybe I can get

10  it in five and get him out of here.

11       THE COURT:  Okay.  Five will be the number.

12       MR. SMITH:  I asked for it.  All right.

13  BY MR. SMITH:

14  Q.   Sir, do you see what's at 22B?

15  A.   I do.

16  Q.   Okay.  What does that say?

17  A.   This is titled "The Medication Screen Policy and

18  Compliance Plan."  It's from Gateway Medical Associates.

19       This is one of those policies and procedures that are

20  required by the statute and actually the regs from pain

21  management clinics.

22  Q.   And is that a regulation regarding how drug testing for

23  controlled substances is going to be handled?

24  A.   Correct.  That, urine drug screens, pill counts, all

25  those kinds of things fall under that umbrella for medical

1    screening, yes.

2    Q.   And was this a representation to the state that these

3    guidelines are in place and by the medical director?

4    A.   Correct.  Yes.

5    Q.   What about 22C?

6    A.   This is the specific pill count policy from Gateway

7    Medical Associates.  Again, this would have been their

8    representation to the department of health that this is the

9    policy that they have in place for their pill counts.  Again,

10   when I say "the clinic," it's really the medical director on

11   behalf of the clinic, but the medical director and the clinic.

12   Q.   Okay.  Are you familiar with the concept of something

13   called a pain agreement?

14   A.   I am.

15   Q.   Is that something that the State of Tennessee wants to

16   have in place at a medical clinic?

17   A.   The State of Tennessee requires it for pain management

18   clinics.

19            MR. SMITH:  Can we bring up 22D, please?

20            THE WITNESS:  This is the Gateway Medical Associate's

21   template of their pain agreement that they had -- that they at

22   least represented to us that they had in place at the time of

23   this application.

24   BY MR. SMITH:

25   Q.   Now, in Subsection G, they represented a policy.  What

1    does that say?

2    A.   "You will be tested at every visit for the presence of

3    prescribed medications and illegal 'street drugs.'"

4    Q.   What's it say below that?

5    A.   On H?

6    Q.   Yes.

7    A.   "If you are positive for any controlled substances not

8    prescribed by this clinic and/or illegal street drugs, you may

9    be dismissed as a patient."

10   Q.   And then I?

11   A.   "If you are negative for the presence of the controlled

12   substances' metabolites of the medications we have prescribed

13   for you, you also may be dismissed as a patient."

14   Q.   Okay.  And then is there a representation about pill

15   counts or medication counts?

16   A.   Yes.  That's in J.  Um-hum.

17   Q.   Okay.  And then, finally, E.  Okay.  Are you aware of

18   another agreement -- patient responsibility agreement?  Was

19   this also sent?

20   A.   Yes.  Again, this is an agreement between the clinic and

21   each patient that is required by the department.

22   Q.   Scroll down.  Was this something that was sent to the

23   department of health on behalf of the clinic?

24   A.   Yes.

25        And when I say it's required, I don't mean this exact

1    template.  The state doesn't create these agreements.  We

2    require the presence of an agreement, and that would have been

3    Gateway's effort at that.

4              MR. SMITH:  Okay.  Your Honor, that is all the

5    questions I have.

6              THE COURT:  Okay.  Very good.  That will get us to

7    our lunch break.

8         Ladies and gentlemen, I do appreciate your careful

9    attention through the morning.  We're going to break.  I have

10   got about ten till.  We'll break until 1:00 P.M.

11        Do avoid any discussion of the case.  Don't do any

12   reading or research.  Keep a wide-open mind as you take the

13   proof in.  Don't begin evaluating or forming opinions.

14        With my appreciation, I'll excuse the jury now for the

15   lunch break.

16        (Jury not present.)

17             THE COURT:  The jury has exited.

18        Mr. Silvus, you can step down.  Of course, you'll have to

19   be back at 1:00 for your cross-examination.  During the break

20   do avoid discussing your testimony with anyone.  If you'll be

21   back here at 1:00, I would appreciate it.  Thank you.

22        Anything we need to take up, Mr. Smith?

23             MR. SMITH:  No, Your Honor.

24             THE COURT:  Mr. Strianse?

25             MR. STRIANSE:  No, Your Honor.

1          THE COURT:  Okay.  Thank you.  We'll be in a break

2    then until 1:00 P.M.

3          (Recess from 11:53 A.M. until 1:00 P.M.)

4          THE COURT:  We are back on the record with the

5    parties and Dr. Stanton.  The jury is not in the courtroom.

6          Is there an issue?

7          MR. SMITH:  I just kind of wanted to flag an issue

8    with the Court after I consulted with my office.  We are not

9    going to call Dr. Smyth in this case as an expert.  I have

10   explained that to Mr. Strianse.  We're hoping and proposing to

11   a call different expert in the same timeline but in a much

12   more condensed version.  I realize there's more discussion, as

13   I'm dropping this on the Court, but I wanted to flag that as

14   soon as I kind of knew what we were going to do, which is now,

15   so I'm happy to address any of that.  But I just wanted to

16   tell the Court as early as possible so I could go ahead.

17         THE COURT:  Your reaction, Mr. Strianse?

18         MR. STRIANSE:  Your Honor, I understand that there

19   are things beyond the control of Mr. Smith and the United

20   States Attorney's Office.  It is unusual, to say the least.  I

21   don't know when the new substitute expert would be giving his

22   condensed or lighter report, and I would have to get it to my

23   expert, Dr. Hilgenhurst.  So I think we're in a little

24   uncharted area.

25         MR. SMITH:  The only thing I would flag -- and I

*D. SILVUS - Direct Examination*                                    144

1    appreciate the response -- is the mechanics of this are

2    governed by Rule 16 under your order.  Again, I'm not saying

3    this because I'm sandbagging or anything.  It's truly

4    late-breaking news.  But Rule 16 triggers our obligations.  We

5    opposed and their expert -- said their expert was sufficient.

6    They responded by saying, we never asked for an expert, so it

7    didn't trigger our obligations to respond because we never

8    asked for one.

9        Of course, we had already preemptively given a

10   disclosure.  I do that all the time, and I will do that as

11   soon as possible.

12       But according to the way this particular case has been

13   litigated, we don't have an obligation to disclose our expert

14   witness.  With the mechanics of the Court's governance of the

15   trial schedule, that is where we are.

16            THE COURT:  Well, you know, all I can say is we'll

17   see.  I appreciate the news.  I think if you have a witness to

18   call and you have an objection to it, I'll hear it.

19       I mean, I saw that argument.  I'm not -- I'm not sure at

20   the time -- you tell me.  Did you think, well, that's right,

21   we weren't requested, and so there weren't -- the

22   corresponding reciprocal obligations, or did you treat it like

23   any other case, it's been requested and you gave it?

24            MR. SMITH:  Honestly, my practice is I don't even

25   wait for a request.  I just think it's right to give an expert

1     notice as soon as I can, and I'll do that in this case again.

2     So I'm -- what I do in my practice and what the rules require,

3     I always try to do more than that.  So I did not -- that did

4     not factor into my decision of my initial disclosures.

5               THE COURT:  Why is Smyth being dropped?

6               MR. SMITH:  In the very tail end of our preparations,

7     up until the day before trial, he identified some information

8     that gave me concern that I needed to obtain, consistent with

9     my constitutional obligations.

10          He did not feel comfortable disclosing it to me, thought

11    that certain portions of it were governed by Tennessee

12    licensing laws being confidential.

13          I spoke with counsel for Dr. Smyth, and we reached the

14    position where I did not feel that and do not feel that we can

15    call him without obtaining, reviewing, and making a

16    determination about that information as potential *Giglio*, and

17    without it, I don't feel comfortable calling him.

18          I understand the impact of that on my case, but I felt

19    like -- I obviously stayed in careful consultation with my

20    supervisor, and that was our collective decision.  Certainly

21    not planned or intended at all.

22              THE COURT:  We are on the schedule we are.  We are

23    going to stay on the schedule that we are on.

24          So none of these machinations are going to impact getting

25    this case concluded on time.

1    Yeah, you wanted to say something?

2         MR. STRIANSE:  Judge, I know the Court wants to move

3    forward, as we want to move forward as well, and I know the

4    Court has seen me being a little obsessed about the grand jury

5    practice in this case, I guess, based on my prior life as a

6    federal prosecutor.  But the grand jury that returned this

7    indictment did that on the strength of the report that was

8    provided by Dr. Smyth, that he is the lynchpin to proving that

9    the practice of Dr. Stanton was beyond the bounds of

10   legitimate medical practice.

11        Now in this 11th hour, there's going to be some

12   substitute brought in.  I don't know what the problem is with

13   Dr. Smyth.  I don't know what the grand jury considered, but

14   without that kind of proof, I'm not sure that the grand jury

15   could have returned an indictment in a case like this.

16        It's not -- as the Court is well aware, it's not a

17   street-drug case where the agents come in and tell the members

18   of the grand jury about the investigation and what happened.

19   This is a very specialized prosecution.

20        So I just --

21        THE COURT:  Yeah, I get you.  We'll talk -- I'm not

22   going to burn jury time kicking that around.  We'll talk about

23   all that.

24        What's the other issue?

25        MR. SMITH:  The other issue is just Your Honor had

1    asked if there were cases that had given jury instructions.

2         I identified one in Nashville recently.  So I was going

3    to tender a copy for you to consider.

4         MR. STRIANSE:  Judge, I'm familiar with that case,

5    and I think it's going to be particularly unhelpful.

6         The lawyer that represented the defendant in that case

7    did not mention *Ruan* to the trial judge, excellent trial

8    judge, and it's my understanding that those -- that pamphlet

9    of instructions doesn't have anything in it about *Ruan* and the

10   lawyer that tried that case had recently been elected into a

11   state judge position, and now I think the Court is going to

12   have to appoint a lawyer to that defendant in the Middle

13   District of Tennessee to sort out why all that wasn't done.

14   So that --

15        THE COURT:  The trial judge was not aware of *Ruan* at

16   the time of the -- at the post-*Ruan* trial?

17        MR. STRIANSE:  I can't speak to that.

18        THE COURT:  Okay.

19        MR. STRIANSE:  I don't know how that happened, but

20   there was a lot of discussion around the federal courthouse

21   about that case, and I don't have any hope that it's really

22   going to help us.

23        THE COURT:  Okay.  Well, I just appreciate -- it's

24   worth what it's worth, but I appreciate that being offered.

25        Okay.  Let's forge on.

*D. SILVUS - Cross-Examination*                                          148

1           Anything else for you, Mr. Strianse?

2                 MR. STRIANSE:  No, Your Honor.

3                 THE COURT:  Okay.  Let's bring the jury in.

4           (Jury present.)

5                 THE COURT:  We are back on the record after the lunch

6      break.  The jury is assembled, present, and accounted for.

7      Thank you for that.

8           Mr. Silvus is still on the witness stand.

9           You understand you are still under oath?

10                THE WITNESS:  Yes.

11                            CROSS-EXAMINATION

12     BY MR. STRIANSE:

13     Q.   Good afternoon, Mr. Silvus.

14     A.   Hello.

15     Q.   In your testimony before lunch, you were telling the jury

16     about the rules and regulations of the pain management board;

17     is that right?

18     A.   Correct.

19     Q.   And you talked about that the rules contemplate

20     inspections of facilities; is that correct?

21     A.   Correct.

22     Q.   And in advance of your testimony, did you -- before you

23     left Nashville, did you take a look at the inspections that

24     had been done of GMA, the --

25     A.   I didn't look at them before I got in the car and drove

1    yesterday, but I have -- I looked at them probably last week.

2    Q.    Okay.   Great.   So you are familiar that on November

3    the 4th of 2020 an inspector with your office by the name of

4    Cynthia Avros -- for the court reporter that would be

5    A-v-r-o-s -- did an inspection of GMA?

6    A.    I don't specifically know who did an inspection on what

7    specific date.   I am generally aware that inspections were

8    done at the clinic and would have been in 2018 and 2020.   That

9    would have been the cycle for that.

10   Q.    And GMA passed those inspections that were done?

11   A.    Yes.   Yes.   The clinic continued to have its license,

12   yes.

13   Q.    And I think this morning you talked about the rules of

14   the Department of Health Division of Pain Management Clinics;

15   is that right?

16   A.    That is correct, yes.

17   Q.    And those rules complicate inspections and

18   investigations?

19   A.    Yes.   Inspections and investigations are different

20   things, but yes.

21   Q.    And are you familiar with the pain management rule that

22   ends in 34-01-.08?

23   A.    I am.

24   Q.    Okay.   And that contemplates that inspections can be done

25   and those inspections shall include the inspection of

1    documentation not limited to medical records and business

2    records.  So it's a pretty full inspection of the clinic; is

3    that right?

4    A.   Well, I mean, "full," I guess, is subjective.

5         Typically how it works, as a practical matter, when we do

6    the inspection, the inspector will come and look at the

7    schedule of patients that day and say, "I want these five

8    patients' charts," and just picks five patients at random.

9    That will then come back.

10        The investigator -- that's the title of the person who

11   does an inspection -- doesn't handle the assessment of whether

12   those records are okay or not.  Then they'll pull protocols

13   and those types of things as well.  So I don't know if I'm

14   answering your question.

15   Q.   I think you are.

16        The inspector can come in and demand to look at certain

17   patient charts and things like that?

18   A.   Yes.

19   Q.   And they -- they typically will go in and take pictures

20   of the facility?

21   A.   Well, sometimes they will, yes.  Sometimes not.  If

22   everything appears to be appropriate and fine, they won't

23   necessarily take pictures.

24   Q.   When you -- when you looked at the inspections -- the

25   older inspections last week, in advance of coming here today,

*D. SILVUS - Cross-Examination*                                     151

1    did you actually look at the one that Ms. Avros did in

2    November?

3    A.   November of 2020 or --

4    Q.   Yes, sir.  November of 2020.

5    A.   Yes.

6    Q.   Do you remember that there was a sheath of photographs

7    that were appended to that report?

8    A.   I don't specifically know that I looked at the

9    photographs.  It's -- I'm not quibbling with you.  It's

10   entirely possible there were photographs included there, but I

11   would -- my focus was on the written words.

12   Q.   Okay.

13   A.   Not on the photographs.

14   Q.   Would it refresh your recollection to take a look at that

15   inspection?

16   A.   Absolutely.

17        MR. STRIANSE:  Your Honor, may I approach the

18   witness?

19        THE COURT:  You may.

20   BY MR. STRIANSE:

21   Q.   For the record, I'm going to show you the inspection

22   report of one of your investigators, Cynthia Avros, that was

23   done November 4th of 2020.  Just take a look at that and --

24   A.   Certainly.

25   Q.   -- see if it refreshes your recollection.

*D. SILVUS - Cross-Examination*                                         152

1    A.   I have seen this.  I have looked at it.

2         Is there a particular page you wanted me to go to?

3    Q.   No.  I just wanted you to get the general contours of

4    what it looks like.

5              THE COURT:  Were you asking about the photos as well?

6              MR. STRIANSE:  Yes, sir.

7              THE COURT:  So maybe look at those.

8              THE WITNESS:  Okay.  I'm back to the photographs.  Do

9    you want me to flip through or look at a specific one?

10   BY MR. STRIANSE:

11   Q.   I wanted you to generally look at it so the jury will

12   know what an inspection is like.

13   A.   Okay.

14   Q.   And did that refresh your recollection that Ms. Avros did

15   a pretty comprehensive inspection?

16   A.   I'm sure she did a comprehensive.

17   Q.   And took photographs of the facility?

18   A.   Correct, and of fentanyl and things like that, it looks

19   like.

20   Q.   In your role as general counsel, can you tell the jury

21   what's the purpose of the pain management board sending an

22   investigator out to a specific clinic to do an inspection?

23   A.   Correction on one thing.  I'm not general counsel.

24   Q.   I'm sorry?

25   A.   That's Mary Katherine Bratton.  I'm chief deputy general

1    counsel.

2    Q.   Forgive me.

3    A.   That's okay.  I just didn't want to take a title I hadn't

4    earned.

5         The purpose is -- I guess I've got to take a step back.

6    We -- we don't have the right generally to go into a

7    practitioner's practice and pull charts and ask questions and

8    interview people.  As a general rule, unless we get a

9    complaint and we open an investigation, we don't have a right

10   to do that.

11        So with respect to pain management clinics and their

12   facilities and other things that the department has some

13   authority to go conduct inspections, we have the right to go

14   in every two years and conduct an inspection, and the purpose

15   of the inspection is to, hey, make sure we still have

16   protocols in place and things like that and to hopefully,

17   again, by pulling those five patient charts, get some evidence

18   that those protocols are being followed and to ensure we know

19   who's working there, who's providing patient care, because we

20   don't always get that information, and sadly sometimes it's to

21   make sure the pain management clinic is where it's supposed to

22   be because the location matters to us a great deal.  So to do

23   all of those things.

24   Q.   You are not suggesting that there would be no sanction to

25   a pain management clinic if they barred the door to one of

*D. SILVUS - Cross-Examination*                                        154

1    your investigators?

2    A.   That would be up to the consultant who reviewed that.

3         So structurally how that happens is the investigator -- I

4    know I'm using the term "investigator" as who does the

5    inspection, but that's a title we have in our office.

6         The inspection is performed.  It comes back, and I have

7    a -- now it's an employee, but in 2020 we had outside folks

8    because we didn't have the position filled within the

9    department -- who reviews those inspections and passes on

10   whether they are okay or not okay, if there needs to be a

11   corrective action plan.

12        You know, as I said before, the inspection is not

13   directly tied to the renewal.  It's not part of that renewal

14   process.  But in the perfect world, it happens we get the

15   inspection done before the renewal so we have that to kind of

16   look at.

17        But if the renewal has already been granted and the

18   inspection gets reviewed, if appropriate, we would seek to

19   discipline that license if the consultant believes that that

20   would be necessary.

21   Q.   But the regulation requires an inspection every two

22   years?

23   A.   Every two years.

24   Q.   Is that right?

25   A.   We had the emergency order pause -- that's why I was a

1    little vague on my dates.  With the pandemic, we had a -- we

2    were ordered by executive order -- we weren't allowed to go

3    into the field.  So those inspections didn't happen.

4          We still renewed licenses, but those inspections didn't

5    happen, and then they got all -- all the backlog was done at

6    one time, and then the review of those inspections happened

7    much later as we worked through that process.

8          So it wasn't -- during this time frame, things weren't

9    working exactly how you would draw them up, but that was true

10   for everybody.

11   Q.   And you've had some contact with law enforcement in

12   connection with GMA; is that right?

13   A.   I have.

14   Q.   That's what brings you here today?

15   A.   You would have to ask them what brought me here, but

16   presumably yes.

17   Q.   So you have some general idea of the timeline.  For

18   example, a search warrant was served on GMA on October

19   the 14th of 2020.

20   A.   Very much aware of.

21   Q.   So your office was aware of that?

22   A.   Correct.

23   Q.   And you were aware of it when Ms. Avros was tasked to go

24   out there and do her inspection?

25   A.   Correct.

1    Q.   Okay.  So October the 14th of 2020, a few weeks later,

2    she's there and does her inspection and passes GMA; is that

3    right?

4    A.   I don't -- I don't know when this was reviewed by the

5    consultant.  That's why I'm hedging a little bit on you

6    because I don't have personal knowledge, as I sit here, when

7    this inspection was actually reviewed by the consultant

8    because we -- we have open investigations on the pain clinic,

9    on Dr. Stanton, on Dr. Maccarone, but we haven't been able to

10   get patient charts because we lack the ability to issue search

11   warrants to get the charts to have the charts reviewed.

12        So I don't -- I don't -- I don't want to misspeak.  We

13   have a lot of balls in the air with respect to this clinic,

14   but we are somewhat stymied in our ability to do what we do

15   because we -- we don't have the tools.

16   Q.   Well, by the time Ms. Avros got there, the government

17   already had all the charts?

18   A.   Well, presumably the U.S. Attorney's Office did.  We, the

19   Tennessee Department of Health, did not.

20   Q.   Right.  And then the Tennessee Department of Health had

21   access to whatever records were there on November the 4th of

22   2020?

23   A.   Correct, to perform that inspection.  But we have a list

24   of charts that were identified for the investigations that we

25   are not able to obtain because the clinic was closed and the

1    EMR holder wouldn't provide them to us.

2              THE COURT:  I'm sorry.  When you say, "EMR holder,"

3    what does that mean?

4              THE WITNESS:  Electronic medical record holder.

5        Very commonly physicians will use an outside company to

6    house their electronic records, and they don't -- the

7    physicians don't physically possess them.

8          Dr. Stanton wasn't the medical director when we hit that

9    wall.  He had left, and there was another medical director

10   there.  And we have been trying to get those charts and have

11   been unsuccessful because we can't issue search warrants.  We

12   don't have that kind of authority.

13   BY MR. STRIANSE:

14   Q.   I think you were interested in some 29 charts or so; is

15   that right?

16   A.   That number sounds right.  That number sounds right.

17   Q.   And you contacted -- and this is perfectly fine.  Don't

18   misunderstand.

19        You contacted Dr. Stanton directly, and he went and found

20   those 29 charts; is that right?

21   A.   Well, we don't have those 29 charts.  We don't have the

22   charts we asked for last year.  We know where they are, but

23   Dr. Stanton is not, according -- you know, we rely on what

24   this EMR company tells us.  I think they are out of Georgia --

25   that Dr. Stanton is not authorized to -- authorized to release

1    the charts.  Dr. Maccarone is.

2         And the name escapes me, the medical director who came in

3    behind Dr. Stanton is a gentleman out of Knoxville who was the

4    medical director for a very short period of time.

5    Q.   Is that Dr. Chavin, C-h-a-v-i-n?

6    A.   That's it.  We communicated with Dr. Stanton -- and I

7    assume you were his lawyer for that.  I can't specifically

8    remember -- and Dr. Chavin and his attorney to try to get

9    those charts, and, to my knowledge, we have not gotten those

10   charts.

11   Q.   Okay.  And that's because of this EMR provider?

12   A.   Correct.  We don't have jurisdiction over the EMR

13   provider.  We can't force them to do anything.  And -- and we

14   can discipline a physician for the willful refusal to provide

15   charts, which we don't have in this instance, except possibly

16   maybe with Dr. Maccarone, and we do have the language in the

17   Pain Management Clinic Act, the medical director's

18   responsibilities, but Dr. Stanton wasn't the medical director

19   when we reached out for those charts.  I want to be clear on

20   that.

21   Q.   Effective of October 2020, he was gone?

22   A.   Yeah.  He made it very clear he was not going to be

23   associated with that clinic anymore.

24   Q.   And I think you-all made it abundantly clear to

25   Dr. Chavin that he could suffer some licensure ramifications

1    if he was unable to provide those charts?

2    A.   That is true.

3         As the medical director, tasked with respond- -- ensuring

4    the department has access to those charts.

5    Q.   I think, in addition to your familiarity with the

6    Department of Health Division of Pain Management Clinic's

7    regulations that you talked about this morning, you are also

8    familiar with the Tennessee code statutes that relate to these

9    regulations; is that right?

10   A.   Yes, I'm generally familiar with all of that.  Yes.

11   Q.   Okay.  And not that I'm going to have you try to work

12   from memory.  Are you familiar with Tennessee Code Annotated

13   63-1-306?

14   A.   I believe -- is that the medical director --

15   Q.   Yes, sir.

16   A.   -- statute?

17        Yes.  I don't know it word for word, but I am familiar

18   with that statute.

19        MR. STRIANSE:  Your Honor, would it be all right if I

20   showed him 63-1-306?

21        THE COURT:  You certainly can.  Is that one of the

22   exhibits for display only?

23        MR. SMITH:  I believe it was.  I believe it was

24   Exhibit 31.

25        THE COURT:  31?

1    However you want to do it, Mr. Strianse.  If you want to

2    put it up as it was displayed earlier, that's fine.  Or if you

3    want to use your paper copy, that's fine, too.

4         MR. STRIANSE:  Can you put it up?  Thank you.

5         THE COURT:  Can you see that, ladies and gentlemen of

6    the jury?

7    Can you put it up for the jury as well?  How about now?

8    BY MR. STRIANSE:

9    Q.   Mr. Silvus, can you see that?

10   A.   I can.

11   Q.   We are talking about 63-1-306?

12   A.   Correct.

13   Q.   And, just generally, what is that chapter -- what is the

14   statute of that chapter in the Tennessee code, and what do

15   they relate to?

16   A.   306, through the last one of that 300 series, relate to

17   pain management clinics.

18   Q.   If you would read 63-1-306 a2 and 3 to yourself, and then

19   I have a quick question about it.

20   A.   Okay.

21   Q.   And you are familiar with this situation.  Dr. Maccarone

22   was a licensed physician in Tennessee at the relevant time of

23   these events?

24   A.   Correct.

25   Q.   Is that a fair characterization?

1    A.    That is.

2    Q.    That means that there would have been no duty for

3    Dr. Stanton in his role as the medical director to collaborate

4    with Dr. Maccarone?

5    A.    Is that -- as that term is used in Chapter 7 and 19,

6    correct.  Yes.

7    Q.    Because the collaboration that's dictated by 63-1-306 is

8    that a registered nurse is to collaborate with a pain medicine

9    specialist; is that right?

10   A.    Correct; a3A pertains to advanced practice registered

11   nurses, and a3B pertains to physician, yes.

12   Q.    PA, physician assistants, registered nurses, they are

13   statutorily required to collaborate with the pain management

14   specialist?

15   A.    Yes, they are statutorily required to collaborate with

16   somebody all the time, but in a pain management clinic

17   setting, with a pain management specialist, yes.

18   Q.    Well, when you have a situation like this where you have

19   a physician in Dr. Maccarone who needs a medical director by

20   law effective 2016, there's still no requirement that he

21   collaborate with Dr. Stanton?

22   A.    Correct.  Physicians in Tennessee have independent

23   practice.

24   Q.    Okay.  I wanted -- you had mentioned the 20 percent rule

25   for medical directors this morning.

1    A.   Yes.

2    Q.   You've -- you know a little bit about the way that

3    Dr. Maccarone ran his practice.  Is that a fair

4    characterization?

5    A.   I don't have any firsthand knowledge.  I mean, I have

6    never been in the clinic, but I have reports, and we have

7    complaints, and we have done some investigations.  We just

8    don't have charts to look at.  So I'm generally familiar, yes.

9    Q.   At a baseline, it's fair to say that he kept some unusual

10   hours?

11   A.   That would probably be a fair -- I mean, especially there

12   towards the end we were getting a lot of complaints that he

13   wasn't coming in, he was coming in late, working late, just

14   all atypical hours.

15          THE COURT:  Okay.  Let's stop -- stop.  Stop.

16       Ask your next question.

17   BY MR. STRIANSE:

18   Q.   You were talking about him coming in late in the

19   afternoon and then working into the early morning hours of the

20   next day?

21   A.   I don't know that I specifically remember early morning

22   hours, but working late.

23   Q.   Okay.

24   A.   Presumably not seeing patients in the wee hours of the

25   morning.

1    Q.   And I don't want to give you a math assignment, but if

2    you have a physician that has a pain clinic open for perhaps

3    14 hours or so a day, given the fact that he comes into work

4    late and then stays until the early morning hours of the next

5    day, how is someone going to adequately calculate what the

6    20 percent of the time that the medical director is supposed

7    to devote to that practice?

8    A.   That's the medical director's job, and the fact that

9    Dr. Maccarone might have been in the office is not

10   particularly germane to us.  It's open and seeing patients.

11   It's -- you know, lots of physicians and nurses and PAs stay

12   after hours to chart and do those kinds of things.  That's not

13   when the clinic is open and operating.

14        But it's the medical director's responsibility to make

15   sure that he or she is onsite 20 percent of the operating

16   hours of a given week.

17        So we -- somebody has to tell us here are the hours of

18   the clinic, and then we say, so when is the medical director

19   here and we get the schedule.  We don't have any way of

20   independently knowing that.  We have to come on a day that the

21   medical director is supposed to be there, according to the

22   schedule.  I mean, we just don't know.  We don't have

23   inspectors who sit outside clinics.  So I don't know how to

24   answer.  How would you calculate it?  That's a medical

25   director's job.

1    Q.    Right.  But you have a practice that is owned by a

2    physician, Dr. Maccarone?

3    A.    Correct.

4    Q.    Who decides to keep unusually long hours in the middle of

5    the night.

6    A.    But it's Dr. Stanton's pain management clinic.  That's, I

7    think, where you and I have a little disconnect.

8          We don't give the license to Dr. Maccarone.  We don't

9    give the license to Gateway Medical Associates.  They don't

10   hold that license to operate.  Dr. Stanton holds that license

11   to operate.

12         So it is -- while he doesn't own it -- or he could own

13   it.  I don't know if he has an ownership interest.  He's --

14   it's the medical director that has the ability to run that

15   clinic.

16         Gateway Medical Associates could open and work and

17   function, just not as a pain management clinic.

18   Q.    In that 20 percent time that Dr. Stanton is supposed to

19   be at the clinic, is it appropriate to calculate in the time

20   that he spends with patients that have high MME numbers?

21   A.    You mean while he's at the clinic?

22   Q.    Yes.

23   A.    There's no limit -- I guess, if Dr. Stanton was there

24   seeing other patients, that might be a problem, but if he's

25   seeing patients of that clinic, that would be, from our

1   standpoint, considered entirely appropriate to be included in

2   that 20 percent.

3   Q.   And was your office aware that there came a point in time

4   in November of 2018 when Dr. Maccarone had a health crisis and

5   was out of the office for months?

6   A.   Yes.  We -- we were aware of that.

7   Q.   Okay.  And were you aware that Dr. Stanton stepped in and

8   saw Maccarone's patients?

9   A.   We -- we are generally aware of that, yes.

10       Again, that was our understanding of what was happening

11  at the clinic, but we don't have firsthand knowledge.  But

12  yes.

13  Q.   And, obviously, you-all were not concerned about

14  calculating this 20 percent time for Stanton when all of this

15  was going on with Maccarone?

16  A.   From our perspective, the number one thing is make sure

17  the patients are covered, and that's a problem when we lose a

18  practitioner suddenly or medical director suddenly.  We try to

19  find solutions because you have patients who have been on

20  opioids for extended periods of time and simply stopping them

21  is really problematic for lots of reasons.

22       So from the health department -- health perspective,

23  that's the primary focus, is the patient covered and patients

24  being taken care of.  All the other stuff we deal with after

25  the fact.

1    Q.   So from your perspective, for patient safety, it was a

2    good thing that Dr. Stanton stepped in the breach and gave the

3    coverage to those patients?

4    A.   Assuming he provided appropriate care, yes, absolutely.

5    Q.   In fact, in Tennessee, physicians -- and I'm sure it's

6    this way in Kentucky as well -- Tennessee physicians, Kentucky

7    physicians, I assume, have a duty under the law not to abandon

8    patients; is that correct?

9    A.   That is correct.

10          MR. STRIANSE:  Your Honor, may I have a moment?

11          THE COURT:  Of course.

12   BY MR. STRIANSE:

13   Q.   Just one other question.  After the clinic was inspected

14   by Ms. Avros on November 4th of 2020, the license was renewed

15   and given to GMA.  You do know that?

16   A.   I know that the license renewal in that cycle for GMA was

17   granted.  I don't know if -- I don't have -- if I had all the

18   information in front of me, I could give you the dates, but I

19   don't know the exact dates and the timing.

20          MR. STRIANSE:  Thank you, Mr. Silvus.

21          THE COURT:  Thank you, Mr. Strianse.

22       Mr. Smith.

23                    REDIRECT EXAMINATION

24   BY MR. SMITH:

25   Q.   Mr. Silvus, you were asked a number of questions

*D. SILVUS - Redirect Examination*                                    167

1    including that last one about inspections at GMA.  To your

2    knowledge, has the department of health reviewed files and

3    given GMA a clean bill of health for this time period we're

4    talking about?

5         Particularly that --

6              THE COURT:  I'm sorry.  I couldn't understand.

7              MR. SMITH:  I apologize.  I apologize.  If I can ask

8    another question.

9              THE COURT:  Let's clear it and reask it.

10   BY MR. SMITH:

11   Q.   Just to be clear, in that November time frame, you

12   discussed not being able to find patient charts, you hadn't

13   gotten the patient charts.  So what I'm asking is:  Were you

14   able to give a clean bill of health to GMA without those

15   patient charts?

16   A.   Well, Gateway Medical Associates had their license to

17   operate.  They were granted -- their license was renewed in

18   that cycle.  Things were not -- as I said, we were pandemic,

19   and the inspections and the renewals really got off synch, and

20   we got the renewals done, and we had so many to get through.

21   We had only just caught up on those.  I don't know when the

22   timing of the review and inspection happened, but they had a

23   license to operate.  There is no question in 2020 Gateway

24   Medical Associates was given a license to operate or renew a

25   license to operate as a pain management clinic.

1      We had open investigations into Gateway Medical

2  Associates, Dr. Stanton, and Dr. Maccarone based on complaints

3  and concerns we had, but we -- there's a process for those.

4  We can't just summarily decide, absent very clear facts, that

5  we are going to take someone's license away from them.

6  There's a process.

7  Q.   So what I should have asked -- thank you for that.  What

8  I should have asked, that process you talked about, the

9  complaints, that investigation, that process, that process has

10  not been resolved?

11  A.   Has not.

12  Q.   Because you don't have the medical records?

13  A.   Do not have the medical records.

14  Q.   You were asked questions about -- if we can bring up the

15  same 63-1-306.

16      You were asked questions about the term collaborate or

17  collaboration in this subsection?

18  A.   Yes.

19  Q.   Those apply, if I understood your testimony -- do those

20  apply when we are talking about things like physician

21  assistants and nurse practitioners?

22  A.   Correct.  These specific provisions pertain to APRNs and

23  PAs in a pain clinic setting.

24  Q.   Okay.  So that part that's on the screen right now, that

25  little part of the statute is concerned with that concept,

1    physician assistants, nurse practitioners?  Is that correct,

2    sir?

3    A.    This pertains to PAs and APRNs in a pain management

4    setting, yes.

5    Q.    Does that language that is excerpted right here -- does

6    that language have any effect on those other regulations we

7    talked about, including the obligation to oversee all pain

8    management services at a pain clinic?

9    A.    No, other than part of it.  The medical director doesn't

10   have to be the collaborating physician with the mid levels at

11   the clinic, for example, but the medical director is still

12   responsible for all the care provided at the clinic.  So if a

13   nurse at a clinic has another pain specialist as a

14   collaborating physician, that doesn't absolve the medical

15   director responsibility for the care of the clinic, too.  They

16   are just -- they are both going to be responsible.  So if it's

17   another physician there providing care, the medical director

18   is still responsible for that care that's provided at that

19   clinic.

20   Q.    And that's a separate concept from when you were

21   responding about whether a physician has a duty to collaborate

22   with another physician?

23   A.    Yes.  That's the term sort of early on in my direct

24   examination.  We used to call it "supervision."  So it's a

25   "supervised by."

1      But the statutes were changed regarding the practice acts

2    for nurses and physician assistants to change that term to

3    "collaboration" to try to convey more of a side-to-side

4    concept.

5         So all of that is -- that's what allows an APRN and a PA

6    to practice, is collaborating with a physician, currently in

7    Tennessee.

8              MR. SMITH:  Can we bring 32 up, please?

9         And, Your Honor, may I publish this briefly to the jury?

10             THE COURT:  Yes.

11   BY MR. SMITH:

12   Q.   Okay.  So with what you just told us in mind, your

13   response about whether a physician has to collaborate, as that

14   term is understood, with physician assistants and other

15   extenders, does that have any impact on No. 1 there?

16   A.   No.

17   Q.   Does it have any impact on any of the other regulations

18   that you talked about?

19   A.   Well, like, No. 3 pertains to the collaboration because

20   the No. 3, Tennessee Comprehensive Rules and Regulations

21   Chapter 088-03 [sic], that's where we had the rules regarding

22   physician assistants.  That's moved because they have come out

23   from under the PAs, and the 06 is for the PRNs.

24   Q.   I believe you talked about that in the direct exam where

25   you told us about that.

1    A.    Right.

2    Q.    The remainder of these, if we go down, including, for

3    instance, the quality procedures that we talked to?

4    A.    Correct.  The protocols, all of those apply to the clinic

5    as a whole.  The medical director is responsible for

6    implementing those and ensuring that they are being followed

7    in the clinic regardless of who the health care provider is at

8    the clinic.

9    Q.    So even if the situation is there's a physician there and

10   not these other extenders, do all of these apply?

11   A.    Yes.  With the exception of that No. 3 that I said.

12   Q.    Understood.

13   A.    Yes.  Yes.

14   Q.    Last couple questions.  You were asked questions about,

15   if a doctor goes out and patients don't have coverage, whether

16   that's a good thing from the department of health's

17   perspective.

18   A.    It's a good thing to get patients covered, yes.

19   Q.    Okay.  Does --

20   A.    Again, assuming it's appropriate care, yes.

21   Q.    Well, can you explain that last part you just told us?

22   A.    Well, it doesn't do the patients or the public of

23   Tennessee any good for a patient to -- to be seen by a

24   physician who's not practicing at an appropriate level.

25         So that just metes out more harm to the patient and

1    possibly to the public at large in the context of opioid

2    prescribing.

3    Q.   Last, you were asked a question about the concept of

4    patient abandonment under Tennessee law.

5    A.   Correct.

6    Q.   Is abandonment the same thing as discontinuing

7    prescribing when it's improper?

8    A.   Well, I guess it could be the same.  Context matters.  I

9    mean, if -- if a prescriber determines that a patient doesn't

10   need or shouldn't be receiving prescriptions anymore and stops

11   prescribing, that's not abandonment.

12       If the provider is suddenly no longer available for their

13   patients, that's abandonment.  So if you close up your shop

14   and head to Alaska without telling your patients, you have

15   abandoned.

16   Q.   Do the patient abandonment referenced on

17   cross-examination, do those somehow require a physician to

18   continue prescribing improperly?

19   A.   Well, no, but standard of care might come into play a

20   little bit because, if you have a patient, for example, who's

21   been on benzodiazepines for years, simply stopping that

22   prescribing could be fatal for that patient.  So there has to

23   be -- medical decision goes into it when you look at each

24   individual patient.  But simply not prescribing to a patient

25   is abandonment.  The patient is not entitled to receive their

*D. SILVUS - Recross-Examination*                                             173

1    next prescription of drugs, I guess.

2    Q.   So if you needed to wean or these other tapering things,

3    that would be legitimate prescribing?

4    A.   Correct.  And we would expect the physician who's taken

5    that on to come up with a plan how we're going to tackle this

6    particular patient in that situation.

7            MR. SMITH:  Your Honor, that's all the questions I

8    have.  Thank you.

9            THE COURT:  Mr. Strianse, anything else at this time?

10           MR. STRIANSE:  Just one area.

11                         RECROSS-EXAMINATION

12   BY MR. STRIANSE:

13   Q.   You're obviously a lawyer.  You are obviously a lawyer?

14   A.   Been one for 27 years, 26 years.

15   Q.   You are not a doctor?

16   A.   No, I'm not.

17   Q.   And you have not had the opportunity to review any of the

18   charts that are --

19   A.   I have not.

20   Q.   -- at issue in this case?

21   A.   I have not.

22   Q.   So it's clear you are not offering an opinion to this

23   jury that the care that Dr. Stanton gave was outside the

24   bounds of legitimate medical practice?

25   A.   Inside or outside, I don't have any idea.

*D. SILVUS - Recross-Examination*                              174

1      MR. STRIANSE:  Thank you.

2      THE COURT:  Is he finally excused?

3      MR. SMITH:  Yes, Your Honor.

4      THE COURT:  Mr. Strianse?

5      MR. STRIANSE:  Yes, sir.

6      THE COURT:  Thank you, Mr. Silvus.  That concludes

7  your testimony.  Do you still have papers?  Just leave them

8  there.

9      Mr. Strianse can retrieve them, if you would.  Or take

10  them off.  That would be fine, too.  Thank you, sir.

11      (Witness excused.)

12      THE COURT:  All right, Mr. Smith.

13      MR. SMITH:  The United States calls Jill Lee.

14      THE COURT:  Jill Lee.

15      **JILL LEE, GOVERNMENT'S WITNESS, DULY SWORN**

16      THE COURT:  Good afternoon, ma'am.

17      THE WITNESS:  Good afternoon.

18      THE COURT:  Try to speak directly toward that mic in

19  a clear voice so we can all hear you.  The chair is fixed, but

20  the mic moves.  You can pull it towards you if you need to be

21  more comfortable.

22      Would you begin by telling me your name and spelling your

23  last name?

24      THE WITNESS:  Jill Lee, L-e-e.

25      THE COURT:  Thank you.

J. LEE - Direct Examination                                    175

1    Mr. Smith.

2         MR. SMITH:   Thank you, Your Honor.

3                     DIRECT EXAMINATION

4    BY MR. SMITH:

5    Q.   Could you please tell the jury what you do for a living?

6    A.   I am a pharmacist for the cabinet of health and family

7    services and inspector general's office.

8    Q.   What does that mean?  What do you do?

9    A.   I investigate and review any violation of the Controlled

10   Substance Act.  So I investigate forgeries, anything that

11   might be some improper prescribing or inappropriate.  I

12   consult with boards, licensure boards, law enforcement.  And I

13   also do a lot of consulting, educating health practitioners in

14   our state, helping them abide by the rules, doing

15   presentations, whatnot, on that.

16   Q.   And what did you do before your current position?

17   A.   I was -- I have done this for ten years, and then I was a

18   pharmacist at Kroger for 17 years before that as a -- just

19   your regular pharmacist in a community pharmacy, and then I

20   did two years of long-term care health before that.

21   Q.   So do you have training and experience as a pharmacist

22   with respect to controlled substances?

23   A.   Just by virtue of my knowledge of school, I have -- know

24   drug classifications, drug schedules, drug dosage forms, and

25   commonly abused drugs, anything like that.

*J. LEE - Direct Examination*                                                      176

1    Q.   Now, you are not a physician?

2    A.   No.

3    Q.   But as a pharmacist, is part of your job requirement to

4    know what medications do, what they should be prescribed for,

5    when they are proper and improper?

6    A.   Absolutely.  We are required to know that.

7    Q.   And with controlled substances, have you had additional

8    either training or experience with respect to the proper use

9    of controlled substances in pain management?

10   A.   Yes.  So after -- for about ten years, I have been in

11   this job and been -- reviewed hundreds of providers or their

12   records, prescription records, to determine if there's any

13   kind of improper or inappropriate, illegal prescribing and

14   worked with -- investigated lots of cases to determine if

15   they've done such.

16   Q.   Okay.  Now, in the course of your job, you mentioned

17   reviewing records.  Can you explain to the jury what -- what

18   PDMPs are?

19   A.   Yes.  So in Kentucky we have a prescription monitoring

20   program called KASPER, and KASPER records all the dispensing

21   of any controlled substance in the state of Kentucky.  So if

22   you get a prescription at a pharmacy for a controlled

23   substance, it is entered into our prescription monitoring

24   thing.  And then, as I work for the prescription monitoring

25   program, which is in that same office I work for, inspector

1    general, I can review all of these records.  So I can look at

2    any prescriber and see every dispensing that he has wrote a

3    prescription for, or I can see any patient and every

4    prescription they have obtained.

5    Q.   Are pharmacies required by law to input that information

6    into the KASPER system?

7    A.   Yes.  They have 24 hours to report to us what they have

8    dispensed.

9    Q.   Do other states -- based on your position, do you know if

10   other states have similar prescription drug monitoring

11   programs?

12   A.   Every state has one except Missouri at this point so --

13   Q.   Is that --

14   A.   -- and we all have interstate data-sharing capabilities

15   where I can review records from other states as well.

16   Q.   Does that include Tennessee?

17   A.   Yes.

18   Q.   Based on your experience in reviewing -- how many times

19   do you think you have reviewed KASPER or other PDPM data?

20   A.   Oh, a thousand times, I would say.  Patients, doctors,

21   yeah, pharmacies, we do look at all their records.

22   Q.   Is that something you look at on a daily basis?

23   A.   Every day.

24   Q.   Based on your experience, is that information typically

25   reliable?

*J. LEE - Direct Examination*                                    178

1   A.   Yes.   Overwhelming, data is accurate in KASPER and very

2   useful.

3   Q.   Okay.   I would like to talk to you a little bit about --

4   we've heard a little bit about controlled substances in this

5   case.

6        Can you just tell us, based on your training and

7   experience as a pharmacist, why are certain drugs determined

8   to be controlled substances and others aren't?

9   A.   Well, every drug that is, you know, manufactured or after

10  it's been approved by the FDA goes through the DEA to

11  determine if it has acceptable medical use and if it has any

12  kind of abuse or addiction potential.   So they classify them

13  in five distinct categories.   So Category 1 are Schedule I

14  drugs, have no medical use at this point -- at this time, and

15  they have high risk of addiction and abuse potential, and then

16  it decreases from there, where Schedule Vs have the least.   So

17  Schedule II are the highest prescription drugs with the most

18  addiction potential and most abuse potential.

19  Q.   Are there limitations as to when controlled substances

20  can be either prescribed or dispensed?

21  A.   Well, the main limitation is you have to have a DEA

22  registration to be able to do such.

23  Q.   And then once you have a DEA registration, either as a

24  physician or a pharmacist, can you just give a controlled

25  substance out to a buddy or whenever you feel like it?

1    A.   No.  There's a thousand CFR regs that tell you exactly

2    how and when you can prescribe or a pharmacist can dispense a

3    controlled substance, and that's just federal.  And there's

4    lots of state laws as well.

5    Q.   Federally, what's the core requirement for a legitimate

6    prescription?

7    A.   The main requirement is it has to be for a legitimate

8    medical need and given in the usual course of practice, so the

9    doctor has to determine, you know, the diagnosis; if there's

10   something -- what's wrong with the patient; do a medical exam;

11   do, you know, all these certain steps to determine if there's

12   a legitimate medical need.

13   Q.   Have you heard the term "opioid" before?

14   A.   Yes.

15   Q.   What's an opioid?

16   A.   An opioid is a narcotic, and it works on the opioid

17   receptors in your brain to basically decrease pain.  But it

18   also decreases kind of your central nervous system, as well,

19   so you'll get a lot of side effects of slowing down, like

20   drowsiness, sedation, as well as the decreased pain.

21   Q.   Are there risks associated with prescribing opioids?

22   A.   Yes.  There's -- the main risk is the potential for

23   addiction that opioids can cause.

24   Q.   Is there a risk of overdose?

25   A.   There's a risk of overdose.  The higher the opioid or the

1    higher potency of the opioid or if it's given with other

2    drugs, you are going to increase your side effect risk, which

3    is, when you have a decreased breathing, you are going to have

4    an increased chance of accidental overdose due to respiratory

5    depression.

6    Q.   All right.  Is oxycodone a controlled substance?

7    A.   Oxycodone is a Schedule II controlled substance, opioid.

8    Q.   What about oxymorphone?

9    A.   Same.

10   Q.   Do you know what benzodiazepines are?

11   A.   Yes.

12   Q.   Can you explain that?

13   A.   Benzos are a sedative drug.  It has a benzene ring.  So

14   it has a CNS, or your central nervous system -- a calming

15   effect on your central nervous system.  So they are used for

16   anxiety or insomnia.  Sometimes used for epilepsy, as well.

17   Q.   Are those controlled substances?

18   A.   Yes.

19   Q.   What schedule?

20   A.   They are Schedule IV.

21   Q.   Can you give us some examples of common ones?

22   A.   Valium, Xanax, Ativan.  The generics would be the

23   lorazepam, diazepam, and clonazepam.

24   Q.   Are you familiar with the drug called gabapentin?

25   A.   Yes.

1    Q.   What is that?

2    A.   Gabapentin is Schedule V in Kentucky.  It's a drug that's

3    commonly used for epilepsy.  It works on the GABA receptors in

4    your brain and also slows down the central nervous system in

5    your brain if it acts on those GABA receptors.

6    Q.   Is gabapentin scheduled under federal law?

7    A.   No, not yet.

8    Q.   Those drugs we just talked about -- the opioids,

9    benzodiazepines, the gabapentin -- based on your training and

10   experience as a pharmacist, are there dangers in patients

11   taking each of those drugs?

12   A.   Yes.  Every drug that you prescribe that's in the

13   schedule, I through V, there's a danger.

14   Q.   Based on your experience, are those drugs commonly

15   diverted or sought after by drug diverters?

16   A.   Yes.

17   Q.   Are there risks associated with drugs interacting with

18   each other?

19   A.   Yes.  So any of those drugs, even prescribing two opioids

20   together or opioid with a benzo and opioid and a benzo and a

21   gabapentin, they all potentiate the effects of each other.  So

22   it may enhance the effects of the drug itself.  So a lot of

23   people that take opioids will take a benzo or a gabapentin,

24   and that actually enhances the effects of the opioid.  So you

25   should get more pain relief, but you are also getting the side

1    effects, and you are going to increase your risks of side

2    effects with that as well.

3    Q.   Because of that potentiating effects, do drug users seek

4    out not just these drugs individually but then in combination?

5    A.   Yes.

6    Q.   Based on your training and experience in your job

7    description now, are you required to be familiar with the

8    prescribing standards for opioids and for controlled

9    substances for chronic pain?

10   A.   Yes.  I'm very versed at the ones in Kentucky.  I have

11   read Tennessee's and know -- some from this case, but, yes,

12   they all have a prescribing standard.  Every state does.

13   Q.   Okay.  And those standards in Kentucky, to the best of

14   your knowledge, are those based on consensus, national

15   information?

16   A.   Right.  They are all essentially about the same.  They

17   all require the exam, the diagnosis, the treatment plan.

18   Q.   Did you have an opportunity to review the Tennessee

19   Chronic Pain Guidelines?

20   A.   Yes.

21   Q.   Okay.  I would like to ask you about a few concepts that

22   are discussed in those chronic pain guidelines.

23        MR. SMITH:  And if we could bring up Government's

24   Exhibit 13, which is previously admitted, Your Honor.  And can

25   we go to page 7, please?  Okay.  Can we blow up A, please?

1  BY MR. SMITH:

2  Q.   Given your training as a pharmacist, what -- what is your

3  understanding of when an opioid should be prescribed to a

4  patient?

5  A.   It should be, you know, a last-ditch effort.  Everything

6  should be tried.  Most all prescribers or probably the United

7  States population knows the danger and risk of opioids.  So

8  you are going to try all the nonpharmacological treatment; you

9  are going to try all the modalities, PT, decrease weight,

10  increase -- anything that you can do to help decrease their

11  pain, you want to help the patient get better without having

12  to prescribe an opioid.  If you have to, you want to start

13  very, very low.

14           MR. SMITH:   Okay.  If we can go down to D, please,

15  Rebecca.

16  BY MR. SMITH:

17  Q.   Are you familiar with the concept of risk of abuse?

18  A.   Yes.

19  Q.   Is that part of your focus in your current position, is

20  targeting and reviewing potential abuse of these medications?

21  A.   Yes.

22  Q.   Okay.  Based on your experience generally with

23  prescribing guidelines, Kentucky and Tennessee or elsewhere,

24  is that pretty universally accepted as something prescribers

25  need to think about when they are prescribing opioids?

1    A.    Yes.  They are all required to determine the patient's

2    risk or the -- or their addiction potential.  And the risk

3    could be not just somebody that has an addiction.  It could be

4    a risk that they are overweight, if they have sleep apnea, if

5    they have some other comorbidity that could also increase

6    their chances of this drug being harmful or more abused by

7    this person.

8    Q.    Are you aware of the tools at doctors' disposals to

9    identify risk factors?

10   A.    Yes.  They make -- you can search them online.  They are

11   little questionnaires to help determine the patient risk

12   scores prior to prescribing.

13   Q.    Is urine drug testing another one of those tools?

14   A.    Yes.

15   Q.    And pill counts?

16   A.    Pill counts.

17   Q.    Can we go to page 10, please.  And you can go to A1.

18         Now, are you familiar with the concept "MED" or "MEDD"?

19   A.    Yes.

20   Q.    All right.  Can you try to explain that to all of us?

21   A.    It's -- Morphine Equivalent Dosing is a tool providers

22   use to equivalate the potency of different opioids so they all

23   have a different -- and they all correlate to morphine being

24   one.  So they are all going to determine the relative potency

25   to morphine.  So if it's stronger, it would have a higher

1    number.  If it was less, it would have a lower number.

2         And then we can add up all this per day and determine how

3    many they are taking, which will -- in turn, the provider can

4    use to help them, dose them, taper them, determine their

5    addiction risk or risks or side effects, and the doctor --

6    all -- usually the DMPs show this number at the top of their

7    score card to see how they should -- the higher the MME,

8    probably the more often you are going to do a drug test or you

9    are going to do a pill count or you are going to maybe

10   prescribe them naloxone or anything that -- the higher the MME

11   is.

12   Q.   As the MME goes up, does the risk of overdose or other

13   effects go up exactly the same way?

14   A.   It goes up significantly higher.  So I think over 90,

15   it's -- you have a ten times higher risk of overdose than if

16   you weren't taking medications.  So it's -- dramatically goes

17   up.  The higher the MME, the higher the risk.

18   Q.   Okay.  What does the Tennessee guidelines say about this

19   concept?

20   A.   So they -- they start at 40.  They say your risk starts

21   if you are higher than 40, that your overdose risk is

22   significantly higher.  And it is tenfold if it's 100 or they

23   even think maybe even an 81 morphine equivalent, that your

24   rate of dying is ten times higher because you are on this

25   opioid, which is significantly higher.

*J. LEE - Direct Examination*                                      186

1    Q.   Okay.  So because of that --

2             MR. SMITH:  If we can go down to B1, please.

3    BY MR. SMITH:

4    Q.   Have you heard of the concepts of the lowest effective

5    dose in your practice as a pharmacist?

6    A.   Right.  Practitioners are trained to provide the lowest

7    effective dose, start really, really low.  That way you are

8    not increasing the patient's harm by adding more drugs and

9    more drugs and more drugs.

10   Q.   Okay.  And, in your experience, is that an ongoing

11   process that practitioners constantly evaluate and try to

12   find?

13   A.   Constantly.  They are all reevaluating a patient,

14   especially a chronic pain patient.

15   Q.   Now, if a patient takes opioids for a long time, is there

16   something called tolerance?

17   A.   Right.  Tolerance and then usually you have to escalate

18   the dose because they become tolerant of the dose.

19   Q.   So because of that, because the body becomes tolerant, is

20   that a factor in trying to find that lowest effective dose

21   and --

22   A.   You want to really start low and then not use

23   combinations of drugs.  Combinations of drugs also increase

24   your tolerance and you have to increase your dose.

25   Q.   Okay.  Can we go to page 46 , please.

*J. LEE - Direct Examination*                                              187

1    Are you -- again, being familiar with the, kind of, way

2    these drugs work on the body, are you familiar with the

3    concept of withdrawal?

4    A.   Yes.

5    Q.   Can you explain what that means to the jury?

6    A.   Opioids -- opioids are a really hard drug to -- because

7    they decrease your pain.  Humans want to decrease their pain

8    and increase their pleasure.  And it's -- opioids do that

9    perfectly.  They decrease your pain, but they also increase

10   your pleasure.  They increase your euphoria.  They actually

11   increase the dopamine -- increase your dopamine in your brain

12   where you feel pleasure.  You feel -- your mind is decreased.

13   The thoughts that are going through your mind are let -- you

14   are calm.  So when you take that away, these people that are

15   on opioids that are withdrawn, they are -- you are going to be

16   depressed.  They are anxious.  They are more in pain.  They

17   are sweating.  They are sick from withdrawal.

18   Q.   Okay.  So is there -- pharmacologically, with regard to

19   the drugs, is there -- are there recognized ways to take

20   someone off drugs in a principled way?

21   A.   You have to taper these drugs very slowly for patients

22   not to feel those side effects.  So probably like ten percent

23   taper dose, you know.

24   Q.   If we can look down in the Tennessee guidelines, for

25   instance -- sorry to cut you off.

J. LEE - Direct Examination                                          188

1    A.    Okay.

2    Q.    Are there -- are there different recommendations about

3    how you could wean?

4    A.    Um-hum.  I mean, they recommend ten percent reduction in

5    the original dose per week.  I've seen even slower than that

6    so...

7    Q.    Either way, is there usually some principled way you do

8    it according to a schedule?

9    A.    Right.  You take the total daily dose that the patient is

10   taking, and then you reduce it only by ten percent, and you

11   only do that on a scheduled -- you know, at least a week

12   apart.  I would probably suggest more.

13   Q.    Okay.  Now, is just taking five or ten pills off at

14   random intervals -- is that the same thing as tapering?

15   A.    No.  There's -- it's exact dose.  You take the milligram,

16   and you decrease it by ten percent, whatever.  If you are on

17   100 milligrams, you should decrease it to 90 milligrams the

18   next week.

19   Q.    So withdrawal is one concern.  Is another concern whether

20   the patient is misusing the drugs with other drugs?

21   A.    Right.  They could be doing that.

22   Q.    So if they are doing that, are there situations where a

23   patient might withdraw but it's still more dangerous to

24   continue prescribing?

25   A.    It's always dangerous to keep prescribing if you have a

1   patient that is exhibiting any of these aberrant behaviors

2   that you think that they might be having addiction of a drug.

3           MR. SMITH:  Okay.  If we can go down to five here.

4   BY MR. SMITH:

5   Q.   Does Tennessee talk about when tapering might not be

6   indicated at all?

7   A.   If it looks like -- if it's suspected that they are

8   diverting their drugs, they are giving them to somebody else

9   or they are selling them or whatnot, that's more risk for the

10  patient or the community, and they tell you to not prescribe

11  any more.

12  Q.   So if drug diversion is suspected, the recommendation is

13  don't give them more drugs?

14  A.   Right.

15  Q.   What about the next one?

16  A.   I see No. 5.

17  Q.   You told us about the first part of No. 5.  I thought we

18  were on the second sentence now of No. 5.

19  A.   About if the patient has -- if diverting?  I'm sorry.

20  Q.   I thought you were referencing that first sentence in

21  paragraph 5, and then I was just talking about the next

22  sentence.

23  A.   Okay.  Well, if they -- if prescribing is going to

24  increase this patient's risk of, you know, any kind of

25  overdose or it's going to risk, you know, your community, if

1    they are prescribing, the potential is -- then they shouldn't

2    prescribe any more opioids in those cases.

3    Q.   All right.  So putting those concepts you just told us

4    about into practice, do you apply something called "red flags"

5    in your work as an investigator?

6    A.   Yes.

7    Q.   And is that something you are trained to recognize?

8    A.   Yes.  We were trained in pharmacy school as well, not

9    just my job.

10   Q.   So you told us before that you will look at prescribing

11   data, and you will do an investigation, do an analysis as part

12   of investigations; is that fair?

13   A.   Right.

14   Q.   When you are doing that, are you looking for red flags?

15   A.   Yes.

16   Q.   Can you talk to the jury about some of the red flags you

17   look for as an investigator?

18   A.   Okay.  Well, red flags are just kind of signals I use to

19   determine, you know, maybe -- maybe this prescription wasn't

20   prescribed in an appropriate manner, maybe not for a

21   legitimate medical need, or it wasn't dispensed according to

22   the law.

23        So I will look for -- and I have all this data in front

24   of me.  So in the patient sector, I'll look are patients

25   traveling far away to this provider.  Do patients all have the

1     same last name or live at the same address and they are all

2     obtaining the same medications -- because that would be kind

3     of unusual that everybody has the same diagnosis in the

4     house -- or if they are paying cash.  So those are some

5     patient ones I look for.

6          And then there's a provider prescribing.  I'm looking at

7     are they prescribing high doses, high morphine equivalents,

8     similar drugs or similar combinations, not individualizing

9     treatment.  If they are all obtaining similar things, that's a

10    red flag for me.

11    Q.   Do you know -- are you familiar with the concept of

12    immediate release versus extended release?

13    A.   Yes.

14    Q.   Can you explain that as a pharmacist?

15    A.   So drugs are either immediately released into your blood

16    stream, so as soon as you take the pill, you know, you are

17    going to digest it and you are going to, you know, get the

18    effects within 15, 30 minutes, depending on the drug, and it

19    will last anywhere from 30 minutes to a couple hours in a

20    short amount of time.  But if it's extended release, there's a

21    mechanism of the way the drug was made where it will gradually

22    release throughout your bloodstream and it will release over a

23    long period of time, which gives you a longer duration of

24    treatment.

25    Q.   What is -- when we are talking about treatment for

1    chronic pain, what are the guidelines or recommendations about

2    IR versus ER medication, so immediate release versus extended

3    release?

4    A.   They always want you to start -- if you're opioid naive

5    or you have already tried everything else, they want you to

6    start with an immediate-release pill.  They would never start

7    you on extended release because we don't know how long it's

8    going to affect you or how long it's going to last.

9         So you would always start with an immediate-release pill

10   on an as-needed basis, and that tends to work the best for

11   acute pain anyway.

12             MR. SMITH:  And if we can go back to Exhibit 13 at

13   page 10, and can we go to A3, please.

14   BY MR. SMITH:

15   Q.   Do the Tennessee guidelines talk about this concept?

16   A.   Yes.  It looks like Tennessee has the same guideline.

17   You need to start with immediate release opioid instead of an

18   extended release or a long-acting opioid.

19             MR. SMITH:  Okay.  We can take that down.  Thank you,

20   Rebecca.

21   BY MR. SMITH:

22   Q.   So that's when you use one or the other?

23   A.   Um-hum.

24   Q.   Are there concerns if you prescribe them both at the same

25   time?

1    A.    Yeah.   Just like I talked about before, two opioids

2    together, you are increasing your risk.   It's -- the benefits

3    usually don't outweigh the risk.   And occasionally you do need

4    to do that in particular patients that have around-the-clock

5    pain or palliative pain, but usually the risk is not worth the

6    benefit for the patient.   And it also increases that tolerance

7    I was talking about earlier, where you need more drug when you

8    are adding drugs like those two in combination.

9    Q.    We've talked about drugs.   In your role as an

10   investigator, do you also look for red flags with respect to

11   the patients who are getting prescriptions?

12   A.    Yes.

13   Q.    Can you tell the jury a little bit about that?

14   A.    Well, I was just telling you about the patients before.

15   I'm looking at their address.   I'm looking at where they are

16   from.   I'm looking at their miles away from the provider.

17        So when I see -- a red flag to me would be a lot of

18   patients traveling to a particular provider, especially

19   bypassing other providers to get to that provider.   I'm

20   looking at similar names, in similar locations, in the same

21   household.   If you are traveling, it looks like several of

22   them are obtaining the same medication from that provider.   I

23   said cash before.   If they are paying cash, that's another

24   patient red flag I look for.

25        Providers, I look for a lot of others that you can see

*J. LEE - Direct Examination*                                        194

 1   without -- I can see KASPER.  Providers have a lot of other

 2   things you can see when the patient comes in.

 3   Q.   Finally, do the dosages of medications -- is that

 4   something that you look at when you are doing your analysis?

 5   A.   Yes.

 6   Q.   You told us about MMEs before?

 7   A.   So using -- a red flag to me would be always using the

 8   higher dose.  You know, drugs come in different strengths.  So

 9   if you are constantly using a higher strength, that's a red

10   flag for me.

11   Q.   All right.  Now, were you asked by the United States and

12   investigators earlier to review prescribing data for

13   Dr. Maccarone and for Dr. Stanton?

14   A.   Yes.

15   Q.   Did you do that?

16   A.   Yes.

17   Q.   Did you apply the same kind of analysis we have just

18   discussed to that prescribing data?

19   A.   Yes.

20   Q.   Okay.  With respect to the prescribing data applicable to

21   Dr. Stanton, did you identify any red flags?

22   A.   Yes, all those red flags I mentioned earlier.

23   Q.   Okay.  Can you walk through a couple of things you saw

24   when reviewing the data?

25   A.   Yes.  So the data I reviewed was -- it's -- were commonly

1    the same medications prescribed for individuals.  So I usually

2    saw some kind of OxyContin with oxymorphone or the gabapentin

3    or OxyContin with the morphine with the gabapentin.  Basically

4    a short-acting opioid, a long-acting opioid, and then a

5    gabapentin, which we talked about before, or sometimes with a

6    benzodiazepine.  These were multiple patients obtaining the

7    same thing.

8    Q.   What was -- when you looked at the drugs being

9    prescribed, what were the two most common ones that you saw?

10   A.   Oxycodone and oxymorphone.

11   Q.   I think you talked a little bit earlier about

12   individualized treatment or individualized prescribing.  Did

13   you seem to see a lot of that based on the data you reviewed?

14   A.   No.  Typically it was the same prescriptions, which is

15   odd.  That's what I do for a living.  When I look at

16   providers, I usually see -- you know, everybody has different

17   ailments and everybody has different sizes and everybody has

18   different tolerance levels.  So you usually see this person

19   getting this and this person getting this.  Not everybody

20   getting the same thing.

21   Q.   Are there other drugs that could be prescribed other than

22   oxycodone and oxymorphone?

23   A.   There's all kinds of drugs you can give.

24   Q.   Are there Schedule IV pain killers, for instance?

25   A.   Yeah.  So like Ultram would be one or tramadol -- the

J. LEE - Direct Examination                                         196

1    generic for tramadol.  So if I went in to the doctor, they

2    would probably give me tramadol because I have never had an

3    opioid; I probably wouldn't do so well on it.

4    Q.   So, in your review as a pharmacist, if a practice is

5    operating legitimately, you would expect to see some variance

6    in some of those drugs?

7    A.   Different schedule, different drugs, different amounts.

8    Q.   Did you see that in the data you reviewed for

9    Dr. Stanton?

10   A.   No.  There wasn't a lot of individualization.  It

11   appeared everybody got what you got.

12   Q.   Were you able to see from the data you reviewed where

13   patients seemed to be coming from?

14   A.   Yes.

15   Q.   And how far did they seem to be traveling?

16   A.   Far.  All the way from here and past London.  There's a

17   lot of cities in this area that were traveling.  I think there

18   was four and a half, five hours to get to the clinic.

19   Q.   What about the dosages or MMEs that you talked about?

20   A.   The MMEs were high.  So we were telling everybody

21   usually -- you know, I tend to see medical, even pain

22   providers, try to stay in that 40 to 50 MME realm, and these

23   are -- these are way higher than that.

24   Q.   Now, did you see from time to time adjustments to the

25   dosages or quantities?

*J. LEE - Cross-Examination*                                              197

1   A.   Sometimes, um-hum, but, majority, it was the same.

2   Q.   And did you have an opportunity to review, you know,

3   individual patients' kind of histories to see how that

4   unfolded?

5   A.   Yes.

6   Q.   In some instances, would Dr. Maccarone prescribe one

7   month and Dr. Stanton prescribe --

8   A.   Right.  They went back and forth, I guess.  Whoever was

9   there that day.  I don't know how that worked.

10  Q.   Were you able to identify any kind of consistent pattern

11  going up or down?

12  A.   No.  Sometimes it went up.  Sometimes it went down.  Most

13  of the time it stayed the same.  It was month after month the

14  same.

15          MR. SMITH:  Your Honor, that's all the questions I

16  have.  Thank you.

17          THE COURT:  Mr. Strianse.

18          MR. STRIANSE:  Thank you, Your Honor.

19                         CROSS-EXAMINATION

20  BY MR. STRIANSE:

21  Q.   Good afternoon, Ms. Lee.

22  A.   Good afternoon.

23  Q.   I think you told the jury you accessed the CSMD data

24  for -- and the KASPER data for Drs. Maccarone and Stanton; is

25  that right?

*J. LEE - Cross-Examination*                                      198

1    A.   Yes.

2    Q.   And did you take a look at the prescribing practices for

3    Dr. Stanton in 2016 and 2017?

4    A.   No.

5    Q.   You didn't go back that far?

6    A.   No, sir.

7    Q.   Okay.  Did you look at it for 2018 through 2020?

8    A.   Part of that.

9    Q.   Okay.

10   A.   I did.

11   Q.   Which part did you look at?

12   A.   '19, '20, '21.

13   Q.   Okay.  So you would have looked at the slice from

14   January of 2018 through November of 2020 for both Maccarone

15   and for Stanton?

16   A.   January '19 through '20, present, '22.

17   Q.   But you didn't go back to 2018?

18   A.   No, sir.

19   Q.   And did you add up the number of prescriptions that were

20   issued by Maccarone during the period that you looked versus

21   the number of prescriptions that were issued for Stanton?

22   A.   I probably did a long time ago.  I wouldn't remember.

23   Looking at them individually and then looking at them together

24   is a lot of numbers so --

25   Q.   Okay.  And I don't know how much you know about the

1    investigation or what you've been told.  Were -- when you were

2    tasked to take a look at the CSMD, were you told that there

3    came a point in time in November of 2018 where Dr. Stanton

4    moved from the role of a medical director to actually filling

5    in for Dr. Maccarone?

6    A.   No.  I don't know that, all the details.

7    Q.   Okay.  You were talking about red flags that you became

8    familiar with in your education and your training; is that

9    right?

10   A.   Yes, sir.

11   Q.   Okay.  Now, as far as these red flags are concerned, they

12   are not mentioned at all in the CDC Chronic Pain Guidelines;

13   is that right?

14   A.   You mean prescribe pain -- no, I don't think they

15   specifically say "red flag."  They say words like don't

16   combine benzos with opioids, if possible, and if patients

17   have -- show signs of kind of addiction, do urine test

18   screens, stuff like that.  I don't think they say the word

19   "red flag."  That is a pharmacist practitioner word.

20   Q.   I assume you keep up with drug safety communications that

21   are promulgated by different state and federal agencies; is

22   that right?

23   A.   Yes.

24   Q.   And how long have you held your position?

25   A.   Ten years.

1    Q.    Ten years.  So you are familiar that the Food and Drug

2    Administration from time to time will issue these drug safety

3    communications; is that right?

4    A.    Yes.  Like they did in '17, a big one.

5    Q.    Are you familiar with a somewhat recent safety

6    communication that they put out about identifying the harm

7    reported from sudden discontinuation of opioid pain

8    medications?

9    A.    I'm familiar with that.  I wouldn't be able to tell it to

10   you verbatim because I didn't read it.

11   Q.    But you were a practicing pharmacist for 17 years?

12   A.    Um-hum.

13   Q.    And you have been doing this job for a while?

14   A.    Um-hum.

15   Q.    And based on all your training and experience, you know

16   there can be some immediate harsh collateral consequences to a

17   patient that may have been taking pain pills for years and

18   years to be suddenly and abruptly cut off from those

19   medications?

20   A.    Correct.

21   Q.    And what would be some of those physical and mental and

22   emotional consequences if a patient that I'm describing like

23   that was suddenly cut off?

24   A.    You would be really dope sick.  You would be nauseous,

25   vomiting, diarrhea; you would be anxious, probably more in

*J. LEE - Redirect Examination*                                    201

1    pain because opioids actually can increase your pain.

2    Q.   And I think the CDC really agrees with you.  They talk

3    about withdrawing, uncontrolled pain, psychological distress,

4    and even suicide.

5    A.   Um-hum.

6    Q.   Is that consistent with your training?

7    A.   Yes.

8            MR. STRIANSE:  Those are my questions.

9            THE COURT:  Mr. Smith.

10                        REDIRECT EXAMINATION

11   BY MR. SMITH:

12   Q.   Based on your training and experience -- we just talked

13   about the risks of withdrawal.  Is there any basis as a

14   pharmacist or otherwise in this world that you know of that

15   says it's proper for a doctor to give a patient an opioid to

16   stop them from withdrawing, let's say, from heroin?

17   A.   No.  There's drugs made for that reason.  We have lots of

18   tools in our toolbox.  You would prescribe Suboxone,

19   buprenorphine.  There's a lot of different alternatives you

20   could prescribe that patient that is showing those signs.

21           MR. SMITH:  Your Honor, that's all the questions I

22   have.

23           THE COURT:  Thank you.  Ma'am, is MME and MEDD -- is

24   that the same thing?

25           THE WITNESS:  Pretty much.  One is the whole daily

1    dose.  You know, this drug has morphine equivalent, maybe ten.

2    So when they say MED, that's the whole day.  So if I took

3    three ten milligrams hydrocodone, my MED maybe -- would be 10,

4    20, 30 milligrams.  So my morphine equivalent per day MED

5    would be 30 milligrams, essentially about the same.

6             THE COURT:  Okay.  And what -- if you say MME, what

7    do those letters stand for?

8             THE WITNESS:  Morphine milliequivalent.  So they have

9    a -- your MME is your potency level I was telling you.  So

10   your Oxys are 1 -- I mean 1.5; your hydrocodones are 1; your

11   oxymorphone is 3.  That's your potency level.

12            THE COURT:  All relative to morphine?

13            THE WITNESS:  All relative to morphine.

14            THE COURT:  Anything else on that, Mr. Smith?

15   BY MR. SMITH:

16   Q.   Is there also a term called "mEq" that we'll sometimes

17   see?

18   A.   That's milliequivalent; so sometimes you'll see that.

19            MR. SMITH:  Thanks, Your Honor.

20            THE COURT:  Mr. Strianse?

21            MR. STRIANSE:  Nothing further.

22            THE COURT:  Is she finally excused?

23            MR. SMITH:  Yes.

24            THE COURT:  Thank you, ma'am.  That concludes your

25   testimony.  You are free to go.

1       Do you have any papers that were handed to you?

2              THE WITNESS:  I don't.

3              THE COURT:  Okay.  Thank you.

4       (Witness excused.)

5              THE COURT:  I think we'll go ahead and take our first

6       break of the afternoon.  Everybody stretch -- stretch their

7       legs for a few minutes.  Why don't we take -- take a 20-minute

8       break at this point.

9       Follow the same admonitions you have been under.  It's

10      2:25 on my watch.  So let's come back at 2:45 to continue

11      testimony.

12      I'll excuse the jury now with my thanks at this time.

13      (Jury not present.)

14             THE COURT:  The jury has exited.  Everybody can be

15      seated.

16      It's funny how every trial is a little bit different.

17      Both of you guys were drifting to the right side of the

18      podium, and you are stepping into the little gap on that right

19      side, which is fine, but you are straying away from the

20      microphone.  So it might help you both to sort of turn that

21      podium so you are facing the witness, and maybe that will help

22      both of you.  I'm fine if you want to do that, but I would

23      rather you not sort of get on that right corner where the mic

24      is not picking you up.  It might help to push that mic over.

25      Anyway, it would help me get you amplified.  That will help

1    everybody pick up what you are saying.

2        Okay.  Who's going to be next, Mr. Smith?

3            MR. SMITH:  Terry Prince, Your Honor.

4            THE COURT:  All right.  Anything else to take up at

5    this time?

6            MR. SMITH:  No, Your Honor.

7            THE COURT:  Mr. Strianse?

8            MR. STRIANSE:  No, Your Honor.

9            THE COURT:  We'll take our break and be back at

10   2:45.

11       (Recess taken from 2:25 P.M. until 2:45 P.M.; jury

12   present.)

13           THE COURT:  All right.  Thank you.  We're back on the

14   record with all counsel present, Dr. Stanton present.  The

15   jury is here after the afternoon break.  Thank you for that.

16       I believe we're ready for the next government witness,

17   Mr. Smith.

18           MR. SMITH:  Yes, Your Honor.  The United States calls

19   Terry Prince.

20           THE COURT:  Terry Prince.

21       **TERRY LEE PRINCE, GOVERNMENT'S WITNESS, DULY SWORN**

22           THE COURT:  Sir, good afternoon to you.  Good

23   afternoon.

24           THE WITNESS:  Good afternoon.

25           THE COURT:  Would you try to speak directly toward

1    that mic so we can hear you during your testimony?

2         First state your name and spell your last name.

3              THE WITNESS:  My name is Terry Lee Prince.  Last name

4    is P-r-i-n-c-e.

5              THE COURT:  Thank you.

6         Mr. Smith.

7              MR. SMITH:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MR. SMITH:

10   Q.   Mr. Prince, are you currently incarcerated?

11   A.   Yes, sir.

12   Q.   Before you were incarcerated, where were you from?

13   A.   Barbourville, Kentucky, Knox County.

14   Q.   Did you live in Knox County?

15   A.   Yes.

16   Q.   How old are you?

17   A.   55.

18   Q.   Sir, have you pleaded guilty to a felony?

19   A.   Yes, sir.

20   Q.   What crime did you plead guilty to?

21   A.   Conspiracy.

22   Q.   Can you tell us just in a sentence or two what it is you

23   did?

24   A.   On the conspiracy charge, sir?

25   Q.   Yes, sir.

1   A.   I had took some money and give to some folks, and they

2   had went and purchased some of my medication at a clinic in

3   Tennessee that they had to get medication for.

4   Q.   And what did you do once those patients got prescriptions

5   and got drugs?  What did you do?

6   A.   They got the medication -- brought the medication back to

7   me, and I got the medication from them.

8   Q.   And what did you do with the medication?

9   A.   I sold it.

10  Q.   Did you sell that in Knox County?

11  A.   Yes.

12  Q.   Now, did you enter into a plea agreement with the

13  government?

14  A.   Pardon?

15  Q.   Did you enter into a plea agreement with the government?

16  A.   Yes.

17  Q.   Have you been sentenced yet?

18  A.   No, sir.

19  Q.   Are you hoping to receive a more lenient sentence in

20  exchange for your testimony?

21  A.   I'm wishing for that, yes, sir.

22  Q.   Have you been promised anything?

23  A.   No, sir.

24  Q.   Sir, have you ever heard the word or the term "sponsor"?

25  A.   Yes, sir.

T. PRINCE - Direct Examination                                    207

1   Q.   Were you a sponsor?

2   A.   Yes, sir.

3   Q.   Can you please explain what that means to the jury?

4   A.   A sponsor is like a -- for instance, it's like you give

5   money to these people and -- who can't afford their

6   medication, and you sort of help them out to afford that

7   medication, and when they afford it, they come back to you,

8   and then they give you money or medication for that -- for

9   what you sent them for.

10  Q.   Do you do this for profit?

11  A.   Yes.

12  Q.   Did you profit doing that, sir?

13  A.   Yes, I did, sir.

14  Q.   Now, have you heard of a clinic called Gateway Medical

15  Associates or GMA?

16  A.   I have.

17  Q.   Have you heard of a Dr. Maccarone?

18  A.   I have.

19  Q.   Have you heard of a Dr. Stanton?

20  A.   Both of them, yes, I have.

21  Q.   Now, did you sponsor people to Gateway Medical

22  Associates?

23  A.   Yes, I have.

24  Q.   When you did that, how far were the people that you were

25  sponsoring -- how far did they travel to get to the clinic?

*T. PRINCE - Direct Examination*                                    208

1  A.   I'm going to say that clinic from Knox County,

2  Kentucky -- from Knox County, Kentucky, to there in Tennessee

3  would have to be at least three to three and a half hours

4  away.

5  Q.   Okay.  And do you remember approximately when you started

6  sponsoring people to Gateway?  Do you remember when?  A year?

7  A.   Around -- somewhere around 2018.

8  Q.   Do you know how many different people you sponsored to

9  Gateway?

10 A.   There was a few.  Anywhere from 12, maybe 15.

11 Q.   Now, sitting here today, can you remember each one of

12 those individuals' names?

13 A.   Probably not all, but I can some.

14 Q.   Do you know the name Brandon Smith?

15 A.   Brandon Thomas Smith, yes.

16 Q.   Did you sponsor Brandon Smith?

17 A.   Yes.

18 Q.   Do you know the name Susan Henderson?

19 A.   Yes.

20 Q.   Did you provide her assistance to go to the clinic?

21 A.   Yes.

22 Q.   Do you know somebody named Teague?

23 A.   There was a Clyde Teague.  I never really sponsored him.

24 I did Brandon.  And Brandon and him sort of worked out deals.

25 Q.   Understood.

1   A.   Now, Brandon's mother, there's a Nadine or Modine Smith.

2   I also gave money, you know, for both of them.

3   Q.   Okay.  Now, did you have an understanding of how much a

4   visit to Gateway cost, how much money it took to go to the

5   clinic?

6   A.   It was different for different individuals because of

7   the -- according to how much medication they got.

8   Q.   How much -- to the best of your recollection, how much

9   would you have to provide to an individual you were sponsoring

10  for them to go to Gateway?

11  A.   Well, if they got a -- a 60 count of oxycodone, it would

12  be an amount for that 60 count of oxycodone, or if it was a 90

13  count, it was different for the 90 count.

14       Do you need the amount of cash?

15  Q.   I think you maybe misunderstood my question.

16       I'm talking about the fees to go to the clinic, how much

17  you pay to go to the clinic itself.

18  A.   Oh, the clinic?

19  Q.   Yeah.

20  A.   It would usually run about -- about $400.

21  Q.   Now, did you yourself ever go to the clinic?

22  A.   No.

23  Q.   What did you do instead of going to the clinic?

24  A.   I would just give the person -- the person the money, the

25  cash, and they would make the trip.

1    Q.   Did you ever give them transportation, a vehicle?

2    A.   I have a few times.

3    Q.   Now, when you sponsored folks to Gateway Medical, what

4    kind of pills were you hoping to obtain?  What kind of drugs

5    were you looking for?

6    A.   Oxycodone and oxymorphone and gabapentin.

7    Q.   Do each of those drugs have a value to you to resell?

8    A.   Sure.

9    Q.   Can you give the jury a sense of how much and did you, in

10   fact, sell each of those drugs?

11   A.   Yes.

12   Q.   Okay.  Can you tell me -- just roughly give the jury a

13   sense of how much you could sell those drugs for.

14   A.   Well, on -- say, for instance, like the oxycodone, the

15   oxycodone would be, if you got oxycodone 30, you would pay

16   anywhere from 30 to $40 apiece for that, for that person that

17   had it filled, and then you could sell it for double.  And

18   also during that time, it was also when the medication -- it

19   was probably during when the stimulus checks were out, and you

20   could also, you know, get a little more for it at that time.

21   Q.   So what about oxymorphone?

22   A.   Oxymorphone was even more because it's much harder to

23   get.  It's a very high potent medication.

24   Q.   Let's say you had a pill bottle of, let's say, 60 of 15

25   milligrams.  Give me a ballpark of what that pill bottle would

1    have been worth to you?

2    A.    The oxymorphone, which is called Opana.  15s did you say?

3    Q.    Yes.

4    A.    15s would probably be double.  You could probably give --

5    let's see, 15, 15.  You could probably get $60 apiece for a 15

6    and turn it around and sell it for $100 value.

7    Q.    Does that mean each of these pill bottles would have been

8    worth thousands of dollars to you?

9    A.    Sure.

10   Q.    Now, when you sold the drugs and obtained money for doing

11   that, did you use that money -- some of that money to send

12   people back to the clinic?

13   A.    Sure.  You just totally rotate.

14   Q.    Did the money that you made selling these drugs on the

15   street go back to pay office fees at Gateway Medical

16   Associates?

17   A.    It would.

18   Q.    Now, let's talk a little bit about these trips to Gateway

19   Medical Associates.  This is you personally.  Of all the

20   clinics in the world, of all the medical places that somebody

21   could go to, what made you sponsor people at Gateway Medical

22   Associates?

23   A.    These people could go to this clinic, and they wouldn't

24   have to have insurance.  They will just -- they would need a

25   certain amount of money, and they could get that medication

1    there.  You just furnish them the money.  They could get that

2    medication, get it, come back.

3        You can't find that medication here.  Medication is

4    high -- it's a high potent medication, and you can't find it

5    around here.  It's very, very hard to find.

6    Q.   Okay.

7    A.   So you get it.  They bring it.  You buy it.  You can

8    rotate it and make money very fast.

9    Q.   Did it prove to be reliable for you, as far as sending

10   people down there, that you would get drugs back?

11   A.   Repeat that, sir.

12   Q.   Yeah.  Was it a reliable place that you would send people

13   that you would get drugs back if you gave them money?

14   A.   Yes.  Pretty reliable, yes.

15   Q.   So if you were selling these drugs, who was your

16   supplier?  Who supplied you these drugs?

17   A.   All the ones that I sponsored, that I would give them

18   the -- my patients, my patients -- their patients.  I give

19   them the money, and then they would bring it back to me, and I

20   would -- all my sponsors.

21   Q.   Who supplied them the prescriptions?

22   A.   Dr. Maccarone and Dr. Stanton.

23   Q.   Now, when you sent or you had these sponsorship deals

24   with people, you just told us you didn't typically go on the

25   trips yourself; is that right?

1    A.   No.

2    Q.   Did people sometimes go together?

3    A.   Yeah.  They would take trips together, keep making, you

4    know, separate trips, and they would carpool together.

5    Q.   Okay.  Would you kind of keep tabs on people after they

6    were gone with your money?

7    A.   Sure.

8    Q.   And why?

9    A.   To see where they are at or located or why aren't they

10   back or something had happened.  I have people to call me late

11   at night and said we've had a flat on the way back or there's

12   always something.

13   Q.   Now, did you have a sense of how long -- the folks you

14   were sponsoring, how long they would be gone when they went on

15   these trips?

16   A.   Most -- most would be gone one day and be back the next.

17   Q.   When you gave people money to go on these trips to

18   Gateway Medical Associates, what was your understanding?  Did

19   you have an understanding of what you were doing?

20   A.   Yes.

21   Q.   What was the understanding?

22   A.   The understanding, they would go get the medication, and

23   they would be back, and if they told me when it was, then I

24   expect them to be, you know, truthful with me.

25   Q.   And what was your understanding about the clinic?

1  A.   Sometimes they would leave late and I would say why are

2  you leaving so late, and they would say my -- my appointment

3  is not until 8:00.  And then sometimes they wouldn't even get

4  around to filling them, and they would either have to wait

5  until that next day or something would happen on the pharmacy

6  and they would have to wait until the next day of getting that

7  order in before they could have it filled at the pharmacy the

8  next day.

9  Q.   Do you believe that the people you were sponsoring were

10  addicts?

11  A.   Sure.

12  Q.   Let's kind of bring us to how we got here today.  Were

13  you arrested in late 2020?

14  A.   Pardon?

15  Q.   Were you arrested in late 2020?  Did you get arrested?

16  A.   Yes.

17  Q.   And what were you charged with?

18  A.   I was charged with trafficking.

19  Q.   Did you agree to cooperate and provide information to the

20  government?

21  A.   I did.

22  Q.   Now, when you were sponsoring people to this clinic, did

23  you ever talk directly to Dr. Stanton or Dr. Maccarone?

24  A.   No, sir.

25  Q.   Did you know them?

*T. PRINCE - Cross-Examination*                                                215

1    A.   No, sir.

2    Q.   Did you have an understanding with them and their clinic?

3    A.   Yes, just through the people that I helped pay for their

4    medication, yes.

5    Q.   And what was the understanding?

6    A.   The understanding that these people could go there and

7    get medication there at that clinic.

8            MR. SMITH:  Your Honor, that's all the questions I

9    have.

10           THE COURT:  Thank you.

11       Mr. Strianse.

12           MR. STRIANSE:  Can I have one moment?

13           THE COURT:  Yes, of course.

14                        CROSS-EXAMINATION

15   BY MR. STRIANSE:

16   Q.   Good afternoon, Mr. Prince.

17       I think you told the jury that you never personally

18   traveled to GMA, Gateway Medical Associates, in Clarksville,

19   Tennessee; is that right?

20   A.   That's right.

21   Q.   And you never spoke to Dr. John Stanton; is that right?

22   A.   Never have.

23   Q.   Whether that be on the telephone, by text, by email, you

24   never communicated with John Stanton; is that right?

25   A.   Never have.

1   Q.   Okay.  You talked about this sponsoring scheme that you

2   had engaged in.  How many years had you done that?

3   A.   I done it in -- started in 2018 or '19.  Just a couple

4   year -- maybe two and a half year.

5   Q.   And did you send any of the people that you were

6   sponsoring to other pain clinics?

7   A.   No, sir.

8   Q.   Now, I think you would agree it takes some level of

9   sophistication to find the right person to sponsor.  Is that a

10  fair characterization on my part, if you understand my

11  question?

12  A.   Pardon?

13  Q.   It takes some level of planning to figure out who you

14  want to sponsor to send to a medical clinic is my question.

15  A.   Sure.

16  Q.   I think these people that you sponsored had some history

17  of injury or trauma or pain or something like that; is that

18  right?

19  A.   Maybe.

20  Q.   Okay.  Well, you -- some of the people that you mentioned

21  had been seen by pain physicians before, had they not?

22  A.   I don't know.

23  Q.   Okay.  Did you ever have a discussion with them about,

24  well, when you go for that first visit, you might need to

25  bring an X-ray or something like that?

1    A.   I'm not a doctor.  I don't ask them what they want it

2    for.  I just help -- give them their money, send them on their

3    way.

4    Q.   So you never had a discussion about whether they could be

5    successful patients that were going to these clinics?

6    A.   No.

7    Q.   Okay.  Now, do you remember being interviewed by the DEA

8    on January 27, 2021?

9         Do you remember meeting with the agents, maybe met at

10   your lawyer's office with some agents?

11   A.   Sure.

12   Q.   And you interviewed into what was known as a proffer

13   agreement.  Does that sound familiar to you?

14        And if it doesn't, that's fine, Mr. Prince.

15   A.   Not to my recollection.

16   Q.   Do you remember that when you met with the agents that

17   you signed a piece of paper that set the ground rules for that

18   meeting?

19   A.   Yes.

20   Q.   Okay.  And if you don't understand me, please stop me.

21        Where basically that letter said that anything that you

22   told them at that proffer meeting would not be used against

23   you directly in a criminal case; is that right?  Does that

24   sound correct?

25   A.   Yes.

1    Q.   That way you could talk to them and not incriminate

2    yourself directly.  Does that sound familiar?

3    A.   Yes.

4    Q.   And then you proceeded to tell them what you knew about

5    GMA; is that right?

6    A.   Yes.

7    Q.   Gateway Medical Associates?

8    A.   Yes.

9    Q.   And this scheme that had been concocted to send fake

10    patients to GMA?

11    A.   I don't -- I don't understand them being by fake because

12    they had prescriptions and stuff.  I don't believe they would

13    be fake.

14    Q.   Right.  But they came there sort of parading under false

15    colors, that they were posing as real pain patients, but the

16    scheme that you had come up with, it didn't matter; they just

17    were going there to try to get pills?

18    A.   I don't know.

19    Q.   Okay.  I mean, that was the purpose here, to send people

20    to this clinic to try to get prescriptions?  Is that what the

21    plan was?

22    A.   That's -- I guess that is their plan.  That's -- all I

23    know is they get their medication, and that's it; they bring

24    it to me.

25    Q.   Well, did you-all have some discussion about what the

1   plan was before they jumped in a car and drove to Clarksville,

2   Tennessee?

3   A.   Well, sure.

4   Q.   That's what my question is about.

5        In the course of that proffer meeting that you had at

6   your lawyer's office when you were talking to the government,

7   you never mentioned Dr. Stanton's name at all.  Do you

8   remember that?

9   A.   Sure.

10  Q.   It was all about sending these people to Dr. Maccarone.

11  Does that sound right?

12  A.   Right.

13  Q.   And I think you would agree with me that Dr. Maccarone is

14  the only doctor that's mentioned; is that correct?

15  A.   That's correct.

16  Q.   Okay.

17       MR. SMITH:  Your Honor, can we go on the headphones

18  just briefly on one item?

19       (Sidebar conference.)

20       THE COURT:  Can you hear me, Mr. Strianse?

21       MR. STRIANSE:  Yes.

22       MR. SMITH:  There might be a little bit of factual

23  confusion here.

24       There was a January interview with Mr. Prince where there

25  was not -- I was not present at that time, and there was no

*T. PRINCE - Cross-Examination*                                    220

1     proffer letter, to my knowledge, for that.

2          This was just his initial meeting with the DEA.

3          There was a later meeting, and I did supply -- it could

4     be that Mr. Strianse just kind of confused the two.  I would

5     kind of correct that.

6          I don't know that his memory will be good enough to

7     remember and distinguish what a proffer agreement and all that

8     is.  I think he's confused.

9          It's true there was one for that second time, and I don't

10    know if it matters.

11              THE COURT:  When was the second time relative to the

12    January?  Or what's the date of the *Kastigar* letter?

13              MR. SMITH:  Your Honor, I would have to --

14              MR. STRIANSE:  Judge, I may have it.

15              THE COURT:  I thought you had it out, waving that

16    around.

17              MR. STRIANSE:  No, sir.  That was DEA 6.

18              THE COURT:  Okay.

19              MR. STRIANSE:  June 24, 2021.

20              THE COURT:  Do you agree, Mr. Strianse, that the

21    proffer letter applies to the June and not the January?

22              MR. STRIANSE:  Yes, sir.  I thought it was the same

23    event.

24              THE COURT:  Well, I can have Mr. Strianse sort of

25    clarify that, or you can do that on redirect.  What's your

1    preference?

2             MR. SMITH:  I think the former, just since it's just

3    happening.

4             THE COURT:  Okay.  Can you clean that up,

5    Mr. Strianse?

6             MR. STRIANSE:  Yes, sir, I will.

7             MR. SMITH:  Thank you, Your Honor.

8        (Sidebar conference concluded.)

9    BY MR. STRIANSE:

10   Q.  Mr. Prince, let me see if I can clarify something.

11       You told us that you remembered your interview with the

12   DEA in January of 2021; is that right?

13   A.  Yes.

14   Q.  And then later you were given one of these so-called

15   proffer letters.  Does that sound correct to you?

16   A.  Yes.

17   Q.  Okay.  But suffice it to say, you have never met with

18   John Stanton?

19   A.  No.

20   Q.  And you have never spoken to him?

21   A.  No.

22   Q.  And you have never communicated to him in any way?

23   A.  No.

24            MR. STRIANSE:  Thank you, sir.

25            THE COURT:  Thank you, Mr. Strianse.

*T. PRINCE - Cross-Examination*                                    222

1       Mr. Smith.

2              MR. SMITH:  I don't think we have anything.

3              THE COURT:  Is he finally excused?

4              MR. SMITH:  He is.

5              THE COURT:  Is he finally excused, Mr. Strianse?

6              MR. STRIANSE:  I'm sorry?

7              THE COURT:  Is he finally excused?

8              MR. STRIANSE:  Yes, sir.

9              THE COURT:  Thank you, sir.  You can step down.  That

10      concludes your testimony.

11         (Witness excused.)

12              THE COURT:  All right, Mr. Smith.

13              MR. SMITH:  Your Honor, the United States calls

14      Margarette Anderson.

15              THE COURT:  Margarette Anderson.

16         **MARGARETTE ANDERSON, GOVERNMENT'S WITNESS, DULY SWORN**

17              THE COURT:  Good afternoon, ma'am.

18              THE WITNESS:  Good afternoon.

19              THE COURT:  Do try to speak in a clear voice toward

20      that mic so we can all hear you.

21         Will you please tell me your name and spell your last

22      name.

23              THE WITNESS:  Margarette Anderson, A-n-d-e-r-s-o-n.

24              THE COURT:  Thank you.  Everybody is using that same

25      chair and mic.  So there ought to be some wipes up there and

1    hand sanitizer.  If you want to use any of that, you feel free

2    to do so to feel comfortable.

3              MR. SMITH:  Thank you, Your Honor.

4         Do you want to take a second to get situated?

5              THE WITNESS:  I'm good.

6                         DIRECT EXAMINATION

7    BY MR. SMITH:

8    Q.   Ma'am, can you tell us what city and state you live in?

9    A.   Clarksville, Tennessee.

10   Q.   What do you currently do for a living?

11   A.   I work at Tennessee Orthopedic Alliance.

12   Q.   What do you do there?

13   A.   I'm a scheduler.

14   Q.   Have you heard of a clinic called Gateway Medical

15   Associates?

16   A.   Yes.

17   Q.   And how do you know about that clinic?

18   A.   I worked there.

19   Q.   What was your position when you worked there?

20   A.   I worked the front desk.

21   Q.   Can you give me the approximate time frame, just month

22   and year that you worked there?

23   A.   March 20th or March 2020 to April '21.

24   Q.   Now, when you started there in March of 2020, what had

25   you done before?  What was your job before that?

1  A.   I was a server at O'Charley's, and I worked for my sister

2  cleaning houses.

3  Q.   Whose house did you clean?

4  A.   We had different clients, but Dr. Maccarone was one of

5  our clients.

6  Q.   And so had you known Dr. Maccarone in the course of doing

7  the housecleaning work?

8  A.   Yes, sir.

9  Q.   Is that how you found out about the job at GMA?

10  A.   Yes, sir.

11  Q.   Was that the first time you worked in a medical practice?

12  A.   Yes.

13  Q.   Do you know Dr. John Stanton?

14  A.   Yes.

15  Q.   How do you know him?

16  A.   He was our -- he was our medical director at Gateway.

17  Q.   Was he at GMA when you started there?

18  A.   Yes.

19  Q.   All right.  If I could, I would like to just talk to you

20  a little bit about the clinic generally and kind of how it was

21  set up.

22       What kind of medical practice was Gateway?

23  A.   Pain management.

24  Q.   Where did the patients come from?

25  A.   Different places, from Kentucky.  We had some local

M. ANDERSON - Direct Examination                           225

1   patients but mostly a lot from Kentucky.

2   Q.   Do you remember any parts of Kentucky that you saw

3   patients traveling from?

4   A.   A lot from London, Kentucky, and Manchester area.

5   Q.   So from right here in London?

6   A.   Yes.

7   Q.   Now, when you worked, where did you physically sit in the

8   office typically?

9   A.   At the front desk.

10  Q.   So you worked at the front desk, and that's typically

11  where you sat?

12  A.   Yes, sir.

13  Q.   Were you in a position to see people coming and going?

14  A.   Yes, sir.

15  Q.   Just give me a ballpark here.  The patients that walked

16  in the front door of Gateway Medical Associates, what percent

17  of patients walked out the door with a controlled substance

18  prescription?

19  A.   All of them, as far as I knew.

20  Q.   Who prescribed the drugs for those prescriptions?  Who

21  wrote those prescriptions?

22  A.   If Dr. Maccarone was there, it would be Dr. Maccarone.

23  If Dr. Stanton was there, it would be Dr. Stanton.

24  Q.   What were the most common drugs that you saw prescribed?

25  A.   I never knew -- I would know from, like, hearsay or what

1    the -- see in the paperwork it would be oxycodone or Oxy.  It

2    would be a controlled substance.

3    Q.   In the paperwork did you see oxycodone and oxymorphone?

4    A.   Yes.

5    Q.   Was that an everyday occurrence?

6    A.   Yes, sir.

7    Q.   Now, as part of your job responsibility, did you have

8    anything to do with the fees and collecting fees at the

9    office?

10   A.   That was my responsibility, yes, sir.

11   Q.   So were you familiar with the amounts that Gateway

12   charged to patients?

13   A.   Yes, sir.

14        MR. SMITH:  Let's bring up Exhibit 8A, please.

15        Your Honor, this is previously admitted.  May I publish

16   it?

17        THE COURT:  Yes, you may.

18   BY MR. SMITH:

19   Q.   Do you recognize that, ma'am?

20   A.   Yes.  That was on the memo board above my desk.

21   Q.   So this picture was taken above your desk?

22   A.   Yes, sir.

23        MR. SMITH:  And just to see a better view, can we

24   pull up Exhibit 9, please, Rebecca?

25   BY MR. SMITH:

1    Q.   All right.  If you can, can you walk the jury through how

2    pricing worked?  Depending on how many times a patient had

3    been there and the factors, just explain how fees were set.

4    A.   If they were a new patient, it was just wrote -- it was

5    385.  So the first visit as a new patient, it would be 385.

6    Their second visit was to include blood work; so it was 410

7    with the blood work.  And then their monthly visits from then

8    on are 285 as long as they didn't have a no-show fee or a pill

9    count or no-show fee for an appointment or they weren't

10   getting an injection.  Or if they had a medical director visit

11   with Dr. Stanton, there was an extra charge for that.

12        So it would just depend on what they were being seen for

13   that day.  If they had to have an EKG done, then that was an

14   extra fee on top of the 285.  So their visit could be -- it

15   could vary from -- it would depend on what fee they were

16   paying or what they were having done that day.

17   Q.   So given what you just told me, I understand it's

18   difficult to give a precise mathematical figure, but just give

19   us a ballpark of what you saw people typically pay on a

20   monthly basis at Gateway Medical Associates.

21   A.   It would usually be upwards of $500 to -- it would

22   depend.  Not very much patients just paid the base pay of 285.

23   So it was very rarely just the 285.  It was usually a lot

24   more.  I have seen them pay three and four times that amount.

25   Q.   Now, at the bottom there, there's a reference to primary

M. ANDERSON - Direct Examination                                    228

1    care?

2    A.   Yes.

3    Q.   Do you see that?

4    A.   Yes.

5    Q.   Did GMA see some primary care patients?

6    A.   Not as far as I know, no, sir.

7         We were listed as primary care, but I was told that, if

8    somebody called and asked if we were accepting new patients,

9    we at the time were not accepting new patients.

10   Q.   Was it ever explained to you why there was a -- why the

11   fee was $185 for a primary care patient but 385 for a pain

12   patient?

13   A.   Because that was the reason why they wanted pain

14   patients, because it was more money.

15   Q.   Now, what were the hours posted on the door at Gateway?

16   A.   From 10:00 A.M. to 7:00.

17   Q.   What's the latest you ever worked at Gateway?

18   A.   The latest I personally worked was probably between 7:30

19   and 8:00.

20   Q.   Can you explain that?

21   A.   As soon as the front desk would have all the patients for

22   the day, like we would have taken their money for that day and

23   they were signed in, we could leave at 7:00.  Like our workday

24   ended at 7:00.

25        Dr. Maccarone and the scribe and the patients would stay,

M. ANDERSON - Direct Examination                    229

1   but myself and the other front desk person would be able to

2   leave at 7:00.  We never had to stay.  I have stayed -- if I

3   stayed 7:30 or 8:00, it was because a patient was coming from

4   Kentucky and they hadn't got there yet and so we were waiting.

5   So I could close out the credit card machine and close out the

6   papers for the day, I would wait.  But the latest I ever

7   waited was 8:00 maybe.

8   Q.   How often would you leave at, let's say, 7:00 and

9   everything be done and taken care of and you were the last one

10  out?

11  A.   Like, the patients and everybody were gone?  That didn't

12  happen very often.  The only time that happened was when

13  Dr. Stanton was the doctor that day.

14  Q.   Explain to me, if you can, the difference between the two

15  doctors' schedules?

16  A.   Dr. Stanton usually came after he saw patients at his

17  other clinic next door at the bone and joint group.  So he

18  usually was there midafternoon.

19       And Dr. Maccarone -- I'm sorry.  I call him Dr. Mac.

20  Dr. Maccarone -- we were lucky if we saw him before 5:30 or

21  6:00.

22  Q.   How long did Dr. Stanton stay at the clinic compared to

23  Dr. Maccarone?

24  A.   Dr. Stanton was usually there less than two hours.  He

25  would come in, see the patients, and leave.

M. ANDERSON - Direct Examination                    230

1    Q.   Let's talk about medical records for a moment.

2         Did Gateway have an electronic medical recordkeeping

3    system?

4    A.   Yes.

5    Q.   Did the practice also have paper forms that were filled

6    out in the course of a patient's visit?

7    A.   Yes.

8    Q.   How did GMA employees access medical records?

9    A.   We all had our own login.

10   Q.   Do you know who at the practice had log-ins?

11   A.   Everybody did.

12   Q.   Did that include the doctors?

13   A.   Yes.

14   Q.   Now, in advance of a patient's visit, did staff prepare

15   information for the doctor?

16   A.   Yes.

17   Q.   And to be specific, did staff prepare information for

18   Dr. Maccarone when he was there?

19   A.   Yes.

20   Q.   And for Dr. Stanton when he was there?

21   A.   Same thing, yes, sir.

22   Q.   Okay.  Was it usually the same packet of information?

23   A.   Yes.

24   Q.   Do you know what was in that packet of paper?

25   A.   It would be the urine -- we had a lab there.  So it would

1    be their urine test results, their notes from, like, the last

2    visit, their CSMD, their eKASPER, their EKG results if they

3    had EKG results, if they had blood work or whatever and the

4    results were in, it would be in that packet.

5    Q.   Now, after the papers were used after a visit, did some

6    of them get scanned back into the system?

7    A.   Yes.

8    Q.   Did all of them get scanned?

9    A.   No.   There were certain things that did not get scanned

10   in.

11   Q.   Were the items that were electronically generated or

12   available, were those taken out so that you scanned in the

13   paper records?

14   A.   I don't understand.

15   Q.   Well, maybe I should just ask it this way:   What was kept

16   and what was taken out?

17   A.   It's been awhile; so I can't remember everything that was

18   kept, but the superbill would not be kept with our

19   demographics and stuff, but the chronic pain questionnaire,

20   their USDS, their eKASPER, their CSMD.   Those were some of the

21   things that were scanned.   Anything from like Quest or

22   something, like the lab work and stuff, that was shredded.

23   Q.   So, like, the Quest urine drug screen, the lab result,

24   not the in-house one, that lab result, that was one --

25   A.   Yeah.   But like the drug screening itself, which we

1    call -- would be like the USDS, it would be scanned in, and

2    that could be accessed by anybody that had the code.

3    Q.   Is that the in-house one that has --

4    A.   Yes.

5    Q.   So just --

6              THE COURT:  Just let him finish his question before

7    you answer.

8              THE WITNESS:  Okay.

9              THE COURT:  You are cutting him off a little bit.

10   They need to be able to hear the full question.

11       Go ahead.

12   BY MR. SMITH:

13   Q.   Long story short, the information that had kind of

14   handwriting, whether it's a questionnaire or other

15   information, that would get scanned in, but the items that

16   were already in the electronic medical record, including those

17   lab urine drug test results, those didn't get scanned back in?

18   A.   Correct.

19   Q.   Okay.  When you got this information back -- so the

20   packet of information that went to a doctor -- did it bear the

21   doctor's signatures?

22   A.   Yes.

23   Q.   Did they sign the various pages of these documents?

24   A.   Yes.

25   Q.   And in the course of you doing your, just, paperwork, the

M. ANDERSON - Direct Examination                             233

1   way you just described to us, did you have an opportunity to

2   view that?

3   A.   Yes.

4   Q.   Did you see Dr. Stanton's signature on that paperwork?

5   A.   Yes.

6   Q.   Now, do you know -- you have already referenced it, but

7   did GMA use urine drug testing?

8   A.   Yes.

9   Q.   Were urine drug test results part of that packet

10  information that went to the doctors?

11  A.   Yes.

12  Q.   As far as you saw at the practice from your vantage

13  point, were those urine drug tests included in the packet of

14  information that was given to Dr. Stanton?

15  A.   Yes.

16  Q.   Now, are you aware of any effort to hide or take out

17  information about drug tests to keep it from Dr. Stanton?

18  A.   No.

19  Q.   How were prescriptions prepared at Gateway Medical

20  Associates?

21  A.   The scribe would prepare them beforehand, and they would

22  be put in the -- we would have a folder, and it would be put

23  in the folder, and they would be stacked up on the desk of

24  whichever doctor was working, and they would be the first page

25  that would be seen in that packet.  So it would be in front of

1    the -- the first thing, when we would take them in there or

2    hand them to Shanna, would be the superbill.  So she would put

3    the prescription or the script on top of that so when you

4    would pick it up, if the doctor or you would pick it up to

5    hand it to the doctor, you would see the script.  So it was

6    the script in the front.

7    Q.   When, in the course of a visit or relative to the

8    visit -- I think you just explained to us, but when were those

9    prescriptions printed out?  Before or after the doctor saw the

10   patient?

11   A.   Before.

12   Q.   Then who signed the prescriptions?

13   A.   Whichever doctor was seeing patients that day.

14   Q.   Did you ever see a doctor sign a prescription before

15   seeing a patient?

16   A.   Yes.

17   Q.   Does that include Dr. Stanton?

18   A.   Yes.

19   Q.   Now, over the course of time you worked at the practice,

20   did you see things that gave you concerns?

21   A.   Yes.

22   Q.   Did patients travel to Gateway from long distances?

23   A.   Yes.

24   Q.   Did they travel in groups?

25   A.   Yes.

1    Q.   Did you ever see somebody else pay for another patient's

2    visit?

3    A.   Yes.

4    Q.   Did people ever try to pay to be seen faster?

5    A.   Yes.

6    Q.   Did you ever see any patients that appeared to be

7    intoxicated?

8    A.   Yes.

9    Q.   Do you know what a pill count is?

10   A.   Yes.

11   Q.   Can you describe what a pill count is?

12   A.   Every 30 days the patients are supposed to bring in their

13   medicine and the nurse is supposed to count them and they are

14   supposed to do a pill count and they are supposed to do three

15   in a year.  And then, if they didn't do their pill count, they

16   were charged a no-show fee, and the patient would pay $65.

17        The day of their pill count, the nurse would count their

18   pills, and they would leave.  They wouldn't see the doctor

19   that day.

20   Q.   So at GMA could people pay $150 to miss their pill

21   counts?

22   A.   Yes.

23   Q.   Did there seem to be a consequence from that, meaning the

24   patient getting dismissed?

25   A.   No.

M. ANDERSON - Direct Examination                                236

1    Q.   Did you see the urine drug test results that we just

2    talked about a minute ago?

3    A.   Yes.

4    Q.   Is that because you handled a lot of the paperwork?

5    A.   Yes.

6    Q.   Did -- did you see patients fail urine drug screens?

7    A.   Yes.

8    Q.   How commonly?

9    A.   Not daily, but it was a pretty common occurrence.

10   Q.   Did people that you saw who had a failed drug screen

11   result -- did they still walk out the door with a

12   prescription?

13   A.   Yes.

14   Q.   Did patients test negative for drugs at Gateway they were

15   prescribed?

16   A.   Repeat the question.

17   Q.   Sure.  Did they come back -- did they fail a drug test

18   for being negative for prescribed medications?  Did you see

19   that?

20   A.   Yes.

21   Q.   Do you understand whether that's a concern?

22   A.   Yes.

23   Q.   Okay.  What did you understand?

24   A.   Under normal circumstances, that would be a concern.  Was

25   it a concern at Gateway?  No, it was not a concern.  For a

1    normal circumstance, yes, it should be a concern.

2    Q.   Fair point.

3         Do you know under normal circumstances, just your

4    understanding as a nonmedical professional, just a layperson,

5    working there, what did you understand the concern to be?

6    A.   It was never like something for them to be dismissed.  It

7    was -- it was mentioned, and it was -- the patient still was

8    seen, and the patient still got a script.

9    Q.   Maybe I should ask this better.  What's the problem with

10   somebody coming back negative on --

11   A.   They are not taking their medicine.

12   Q.   Did you ever witness patients receiving prescriptions

13   even after seeing in their file that the patient had been

14   dismissed?

15   A.   Yes.

16   Q.   Did you see that more than once?

17   A.   Yes.

18   Q.   Okay.  I may have asked you.  What was Dr. Stanton's role

19   at the clinic when you were there?

20   A.   He was our medical director, and he would fill in when

21   Dr. Mac was out.

22   Q.   Now, did you ever have a conversation with Dr. Stanton

23   about the practice or any of its operations?

24   A.   No.

25   Q.   Did you ever observe Dr. Stanton holding a meeting to

M. ANDERSON - Direct Examination                                      238

1    talk about staff and talk about the office policies?

2    A.   No.

3    Q.   If he was the medical director, what did he direct?

4    A.   He was supposed to -- we were -- I was told -- when I

5    asked that, I was told we were legally bound to have a medical

6    director and he was that role.

7    Q.   Now, do you know if Stanton was paid to serve as medical

8    director?

9    A.   Yes.

10   Q.   At the time you worked there, did you have some role in

11   providing him --

12   A.   Yes.

13   Q.   -- his paycheck?

14        Do you remember how much he made?

15   A.   No.  Honestly, I -- I don't.  I want to say it was

16   between 4 and $6,000, but I don't remember the amount.

17   Q.   Was it -- how frequently was he paid?

18   A.   The same as us, weekly.

19   Q.   Do you know -- do you know whether there was some time

20   requirement for Dr. Stanton?

21   A.   Yes.

22   Q.   What was your understanding of the time requirement?

23   A.   I would -- no matter what time he was there, I was to put

24   a certain amount of hours in there.  It was six hours.  So

25   Emilie would tell me, okay, Dr. Stanton came in at this time

1    and he left at this time.  Whether he came in and left at that

2    time, I would put in the computer -- I had a Microsoft Excel

3    worksheet saved on my computer, and I would put in the hours

4    that I was told that day.

5    Q.   Did he ever actually work the amount of hours?

6    A.   No.

7    Q.   Now, did -- did Dr. Stanton also get paid for other

8    services or practices?

9    A.   If they had a medical director visit or they did

10   injections.

11   Q.   And did you have a role with tracking those at the front

12   desk?

13   A.   Yes.

14   Q.   And were those then tabulated to provide --

15   A.   Yes.  I would write it on a calendar.  Our office

16   manager's Emilie's desk, I would have the word "injection,"

17   i-n-j, and M.D., and I would break it down into how many

18   people had injections and how many people had medical director

19   visits.

20   Q.   And would some of that money for the injections or the

21   medical director visits, would that go to Dr. Stanton as well?

22   A.   Yes.

23   Q.   So the salary and those other components?

24   A.   That was my understanding, yes.

25   Q.   Did you have a role with respect to his paycheck?

1    A.   I would hand it to him if Emilie told me to.

2    Q.   How often did you do that?

3    A.   Not very often.

4    Q.   Was there ever a time where his paycheck wasn't ready?

5    A.   Yes.

6    Q.   And what happened?

7    A.   He was very upset.

8    Q.   Can you describe what happened?

9    A.   He -- we were at lunch, and he come in.  I believe he had

10   come in from surgery because I remember him being in a scrub

11   cap.  And he asked Emilie where his check was, and she said it

12   wasn't ready, that we didn't have checks yet, and he got upset

13   and, for lack of a better word, stomped his feet and left, and

14   he did not come in for his visits that day.  He was supposed

15   to do M.D. visits that day.

16   Q.   Now, when Dr. Stanton came into the office, where did he

17   typically see patients?

18   A.   He had an office.

19   Q.   Did --

20   A.   If Dr. Mac -- the time -- let me rephrase that.

21        If Dr. Mac wasn't there, he would sit in Dr. Mac's

22   office.  The couple times that I remember that Dr. Mac was

23   there or Dr. Mac was coming in, he had a separate office on a

24   different hallway.

25        But for the brief time that Dr. Mac was out, probably

1   three or four months that Dr. Stanton came to see patients on

2   a daily basis, he sat in Dr. Mac's office.

3   Q.   So we talked about the records and the availability of

4   records on the electronic system.

5        Did you ever hear Dr. Stanton complain about access to

6   medical records?

7   A.   No.

8   Q.   Did you ever hear him say anything about wanting more

9   information --

10  A.   No.

11  Q.   -- being available to him?

12       Were you in a position to see how long patients spent in

13  the office?

14  A.   Yes.

15            THE COURT:  Let him finish his full question.  Just

16  slow down just a little bit.

17       Go ahead.

18            MR. SMITH:  Did we get the last question?

19            THE COURT:  She's jumping in a little bit on your

20  last couple words.  That's okay.  Just try to just wait.  And

21  you make sure you get your question in before she answers.

22            MR. SMITH:  Thank you, Your Honor.

23  BY MR. SMITH:

24  Q.   So I think the question was were you in a position to see

25  how long patients went into the room with Dr. Stanton when he

1    was there for visits?

2    A.   Yes.

3    Q.   And, again, I know it may have varied a little bit, but

4    can you tell me generally how much time that took?

5    A.   Like how -- how long he was in a room with a patient?

6    Q.   When the patient came in and came out, how long did that

7    take?

8    A.   It varied by patient.

9    Q.   Can you give me a sense?

10   A.   Maybe five, ten minutes.

11   Q.   Okay.  Did you ever see less than that?

12   A.   Yeah.

13   Q.   What were -- you already told us this a bit.  What were

14   Dr. Stanton's hours like on a typical day?

15   A.   He would come in -- after he was done with clinic, he

16   would come in and he would ask Emilie how many patients, and

17   they would discuss how many patients, and he would say, okay,

18   send the next -- the one in, and he usually would be there for

19   maybe an hour, hour and a half.

20   Q.   Okay.

21   A.   Everybody wanted to see Dr. Stanton because he got them

22   in and out.  There was never a time where Dr. Stanton was

23   there more than two hours.

24   Q.   How many patients did he typically see?

25   A.   It just depended how many patients we had that day.

1    Q.   Do you have a sense of how much that could have been?

2    A.   It really did vary.  It depended how many patients,

3    like -- if Dr. Mac and Dr. Stanton were both seeing patients,

4    sometimes there wouldn't be as many patients for Dr. Stanton

5    to see because they were just doing injections or medical

6    visits.  So it would depend.

7    Q.   Did you have a typical patient amount at GMA each day?

8    A.   Yes.  Usually probably about 25 to 30 patients a day.

9    Q.   25 to 30.

10    On the days when there would be 25 to 30 patients and

11    Dr. Stanton was the only one there, you just told us that he

12    was typically there an hour, hour and a half, no longer than

13    two hours?

14    A.   Exactly.

15    Q.   So he saw that many patients in that amount of time?

16    A.   Yes.  We generally would close -- we would close the

17    office because there was no point in staying.

18    Q.   Now, after you started, did Dr. Maccarone go out for a

19    long period of time?

20    A.   Yes.

21    Q.   How long?

22    A.   About three and a half months.

23    Q.   Do you remember when that was?

24    A.   I think it was either late April, May, and he wasn't back

25    until like -- it was late -- late July.  He went out, and

1    Dr. Stanton saw patients at that time.

2    Q.    And so who saw the patients when Dr. Maccarone was out?

3    A.    Dr. Stanton.

4    Q.    Now, how -- did the schedule change when that was the

5    case, when he was the only doctor there?  Or is it just as you

6    just described to us?

7    A.    Explain how you mean "change."

8    Q.    Meaning, if he's the only doctor there, does that mean

9    he's coming 9:00 to 5:00?

10   A.    No.  He would still come in after clinic and see the

11   patients, and then the patients, we would all be done, and

12   generally we will -- if we didn't have medical records to scan

13   in or anything, we'd just close the office.

14   Q.    And so the times that Dr. Stanton would see patients

15   would be either -- No. 1, on days when Dr. Maccarone was out?

16   A.    Yes.

17   Q.    And sometimes was that for an extended period of time?

18   A.    Yes.

19   Q.    And sometimes would it just be a day here or there?

20   A.    Yeah.

21         Dr. Mac would decide he didn't want to come in that day

22   because there wasn't the amount of patients he wanted or the

23   amount of money in the window, and so he would cancel clinic,

24   and Emilie would call Dr. Stanton and have Dr. Stanton come

25   in.

1   Q.   And were there also times where Dr. Maccarone was there

2   and Dr. Stanton was also there?

3   A.   Yes.

4   Q.   Now, I think you have already explained this to us, but

5   you typically left kind of towards the end of the normal hours

6   there.  Was your perception that the hours were later when

7   Dr. Maccarone was working?

8   A.   Oh, yes.  Yes, sir.

9   Q.   Okay.  Did you ever either hear or talk to Dr. Stanton

10  about Dr. Maccarone's odd hours?

11  A.   I personally never had a conversation with Dr. Stanton

12  about it, but I overheard Emilie, our office manager, and him

13  discussing it, and I have heard comments that Dr. Stanton

14  would make.  Like, when he would get here, come in, "Oh, is

15  the boss here?  Did he bother to come in today?"  Or he would

16  question whether Dr. Mac was there yet or not.

17  Q.   Would he make any references about how late?

18  A.   About how late, yeah.

19  Q.   Did there ever seem to be any effort to change --

20  A.   No.

21  Q.   -- or stop that practice?

22  A.   No.

23  Q.   Now, did the practice perform injections?

24  A.   Yes.

25  Q.   Did the patients -- I think you told us they paid extra

M. ANDERSON - Direct Examination                                    246

1    for those injections?

2    A.   Yes.

3    Q.   And was Dr. Stanton paid for each injection?

4    A.   Yes.

5    Q.   Did patients ever, when they came to the front desk, kind

6    of express anything about those injections?

7    A.   They would ask if Dr. Stanton was coming in that day

8    because they -- the patients pretty much knew the days

9    Dr. Stanton was there, and they would say, "Can we get an

10   injection because he'll get us out quicker?"

11   Q.   So comments like that, was it, you know, I'm really in

12   pain and I need some treatment here, or was it the speed?

13   A.   No.   Nobody would say -- they would say, "Is Dr. Stanton

14   here today?"

15        And we'd be like "Yes."

16        And then they would say, "We want" -- "Can we see

17   Dr. Stanton?"

18        And we would be like, "Is there a reason you want to see

19   Dr. Stanton"?

20        "Yeah, so we can get out earlier."

21             MR. SMITH:   Your Honor, if I can have just a moment.

22             THE COURT:   Yes, of course.

23   BY MR. SMITH:

24   Q.   Last couple questions.

25        We've sometimes heard injections referred to as an

*M. ANDERSON - Cross-Examination*                                          247

1    alternative treatment, meaning, let's try something other than

2    the opioids.

3         At Gateway Medical Associates were injections an

4    alternative to the drugs?

5    A.   No.

6         MR. SMITH:  Thank you, Your Honor.  That's all the

7    questions I have.

8              THE COURT:  Thank you.

9         Mr. Strianse.

10             MR. STRIANSE:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. STRIANSE:

13   Q.   Good afternoon, Ms. Anderson.

14   A.   Good afternoon, sir.

15   Q.   If I understand things, before you came to work at

16   Gateway Medical Associates, you had never worked in the

17   medical field; is that right?

18   A.   That's correct.

19   Q.   What kind of -- I think you said you did work --

20   A.   I was a server, and then I worked as -- I was a

21   housekeeper.  My sister has a family business, and I worked

22   for my sister.

23   Q.   How far did you go in school?

24   A.   Actually a junior in college.

25   Q.   Great.

1      Did you take any sort of medical assistant course or

2   anything before you took this job?

3   A.   No.  I was an education major.

4   Q.   Okay.  And I think you came to GMA in March of 2020; is

5   that right?

6   A.   Yes.

7   Q.   And I guess, when you arrived then, you had learned that

8   Maccarone had been sick back in November of '18?

9   A.   I had known that Dr. Mac was sick.  I worked for him.

10  Q.   And when you got there, he was sick again; is that right?

11  A.   Not again.  He was pretty much sick that whole time.

12  Q.   Okay.

13  A.   Yes.

14  Q.   He had a flare-up in March of 2020, problems with that

15  first amputation; is that right?

16  A.   He cut his foot, and it got infected.  When I went to go

17  work at GMA, he hadn't had the amputation yet.  That's why he

18  was out at that time because they amputated it in March right

19  after I started working for him at the clinic.

20  Q.   I think you told the jury that kept him out until about

21  July; is that right?

22  A.   Yes.

23  Q.   And who hired you at GMA?

24  A.   Dr. Mac hired me, and then Emilie -- I pretty much --

25  Dr. Mac told Emilie, "I'm sending Margarette for an interview;

1   I want her hired."  So essentially Dr. Mac.

2   Q.   And you were stationed at the front desk; is that right?

3   A.   Yes.

4   Q.   I think you told the jury that you would get phone calls

5   from Dr. Maccarone, wanting to know what -- I think the phrase

6   you used was, "How the window looked"?

7   A.   Yes.

8   Q.   And that was how many heads were there, people that were

9   there?

10   A.   No.  That was how much money had we brought in for the

11   day.

12   Q.   Right.  I was going to get to that.  But the number of

13   patients would have dictated the amount of money; is that

14   right?

15   A.   Not necessarily, no.

16   Q.   Okay.  But he was calling to see how much money was

17   available, whether it was worth his while to come in?

18   A.   Yes.

19   Q.   And would that be a function of how many patients were

20   there that day?

21   A.   No.  That would be how much -- like how much no-show

22   fees, how many injections, EKGs, how much blood work had been

23   done, that kind of thing.  We had a goal every day to make,

24   and if -- that's what he was calling to see.

25   Q.   And even when Dr. Maccarone was not physically unable to

1    come in and was able to return to work, he would call in and

2    abruptly cancel and say, "I'm not coming in"?

3    A.   Yes, sir.

4    Q.   And that would set Emilie Jackman on the path of trying

5    to find Dr. Stanton to come in and cover those patients?

6    A.   Yes.

7    Q.   I think it's fair to say that the hours of operation,

8    when Dr. Stanton was covering for Maccarone, when Maccarone

9    was sick, were much more regular; is that right?

10   A.   Regular, yes.

11   Q.   Regular in the sense that, although Stanton couldn't come

12   in until the afternoon, he had a good reason for not coming

13   in; he was at another clinic?

14   A.   Yes.

15   Q.   And then he would come in and get everybody out of there

16   by 6:00 P.M. or so?

17   A.   Yes.

18   Q.   Now, with your work at the front desk, could you -- did

19   you have a line of sight to where Stanton's office was where

20   he was seeing patients?

21   A.   No.

22   Q.   Okay.  You talked about those packets?

23   A.   Yes.

24   Q.   And you were a front-desk employee.  Was the assembling

25   of the documents that went into that packet that went to

1    Dr. Stanton or Dr. Maccarone -- was that typically the back

2    office staff that would put those documents together?

3    A.   Yes.  The MAs or the scribes, yes, sir.

4    Q.   Okay.  Because, really, you had your hands full at the

5    front desk, trying to deal with the patients as they came in

6    to --

7    A.   Yes.

8    Q.   -- to present themselves; is that right?

9    A.   Yes.

10   Q.   Did you know who physically uploaded the urine drug tests

11   to the electronic health record or downloaded them, for that

12   matter, in making the packets?

13   A.   The MA.

14   Q.   Okay.  And who was the MA?

15   A.   We had several MAs.

16   Q.   Okay.  But you had no role in that?

17   A.   No, sir.

18   Q.   So you never really saw the content of the packets that

19   were being handed to Dr. Stanton?

20   A.   Yes, I did.

21   Q.   Okay.  And you were able to inspect each one?

22   A.   Not every single one, but I have -- like, I have been

23   handed the packet and said, "Hey, take this into the office,"

24   or I have been handed them in a whole -- after Dr. Stanton or

25   Dr. Maccarone had seen them and would break them up to be

1    scanned.

2    Q.   And I think you told Mr. Smith that you had never had any

3    conversation with Dr. Stanton about the concerns that you had?

4    A.   No.

5    Q.   Now, do you remember overhearing a conversation where

6    Dr. Stanton was asking Ms. Jackman, who is the office

7    manager -- is that right?

8    A.   Yes.

9    Q.   And for all intents and purposes, this was -- Ms. Jackman

10   really ran the office; is that right?

11   A.   Yes.  She was our officer manager, yes, sir.

12   Q.   Do you remember this where --

13            MR. SMITH:  Your Honor, can we go on the headphones?

14   Objection.

15       (Sidebar conference.)

16            THE COURT:  Can you hear me, Mr. Strianse?

17            MR. STRIANSE:  Yes, I can.

18            THE COURT:  Go ahead.

19            MR. SMITH:  So the objection is to hearsay.  This is

20   not impeachment.  I know we have gone through this with

21   refreshing recollection.  This is just reading a statement of

22   a third party from a DEA report, which is a self-serving

23   hearsay.

24            THE COURT:  What's the -- what's the question coming?

25            MR. STRIANSE:  Your Honor, the question coming is she

1    overheard a conversation between Dr. Stanton and Ms. Jackman

2    where Stanton was inquiring, was patient John Wooten paying so

3    much for a service, and the response that Ms. Jackman gave was

4    that Wooten had failed a UDS but that Maccarone would take him

5    back as long as he paid a special fee.

6            THE COURT:  Give me your analysis, Mr. Smith.

7            MR. SMITH:  Candidly, I don't have a problem putting

8    that into evidence, but it does sound like he's eliciting his

9    own client's out-of-court statement.

10           THE COURT:  Why is it not hearsay?  Tell me your

11   non-hearsay theory on it through this witness in particular.

12           MR. STRIANSE:  It's a statement of the defendant.  I

13   don't think it's a self-serving statement.

14           THE COURT:  If it's an out-of-court statement of the

15   defendant that you are offering for the truth of it, then

16   that's hearsay, right?

17           MR. STRIANSE:  Right.

18           THE COURT:  Unless it's an admission and --

19           MR. STRIANSE:  It's not an admission.

20           THE COURT:  Right.

21           MR. STRIANSE:  Okay.

22           THE COURT:  I'll sustain.

23           MR. STRIANSE:  Okay.

24        (Sidebar conference concluded.)

25   BY MR. STRIANSE:

1   Q.   When you were there at GMA, was there a practice that

2   Dr. Maccarone had started where, if a patient was discharged

3   for a failed drug screen with street drugs, some illicit drug

4   in their system, that they could come back to the practice and

5   he would reinstate them if they paid a higher fee?

6   A.   Yes.

7   Q.   Okay.  And is that -- that was something that

8   Dr. Maccarone did; is that right?

9   A.   Yes.

10   Q.   Do you remember what the fee was after Maccarone

11   discharged someone and then let them come back?

12   A.   $500.

13   Q.   Okay.

14        MR. STRIANSE:  Those are my questions.

15        THE COURT:  Thank you.

16   Mr. Smith.

17        MR. SMITH:  Sorry.  Can we go back on the headphones

18   real quick?  Same issue.

19   (Sidebar conference.)

20        THE COURT:  Can you hear, Mr. Strianse?

21        MR. STRIANSE:  Yes, sir.

22        THE COURT:  Okay.

23        MR. SMITH:  So he wanted to elicit a statement saying

24   that someone had told Stanton about this, and the impression

25   was left this was all of Maccarone's deal.

1    Did I understand the testimony correctly?

2    I only kind of caught the tail end of it.

3         THE COURT:  I didn't understand that questioning as

4    pertaining to the part you objected to.  This was a

5    reinstatement fee that Maccarone implemented and charged.  The

6    other one was he'll just let them back in anyway or something,

7    right?

8         MR. STRIANSE:  The other one, I was asking it from

9    the standpoint of Dr. Stanton having a conversation with

10   Jackman.  Based on the ruling, I abandoned that and just went

11   right to the issue.

12        THE COURT:  Right.

13        MR. SMITH:  Okay.  Understood.  Very good.  Thank

14   you, Your Honor.

15   (Sidebar conference concluded.)

16        THE COURT:  Okay.  Redirect?

17        MR. SMITH:  No, Your Honor.  Thank you.

18        THE COURT:  Is she finally excused?

19        MR. SMITH:  Yes, Your Honor.

20        THE COURT:  Do you agree, Mr. Strianse?

21        MR. STRIANSE:  Yes.

22        THE COURT:  Thank you, ma'am.  That concludes your

23   testimony.  You are free to go.

24        THE WITNESS:  Thank you.

25   (Witness excused.)

1        THE COURT:  We'll take a break in about ten minutes,

2   if you want to go ahead and call your next, but we will take a

3   break shortly thereafter.

4        MR. SMITH:  This is an in-custody witness.

5        THE COURT:  Given the machinations of moving in and

6   out, it might make sense to take the break now.  The jury

7   doesn't usually complain about an earlier break.  So let's

8   take 15 minutes now.  Well, let's make it 20.  Take

9   20 minutes.  I have got ten till on my watch.  So 4:10 come

10  back, and we'll pick up after the break.

11       Continue to follow the rules I've given you.  No

12  discussion, no research or reading.  No evaluation of the case

13  at this point.

14       I'll excuse the jury now for 20 minutes.  Thank you.

15       (Jury not present.)

16       THE COURT:  Be seated.

17       Who's going to be next?

18       MR. SMITH:  Jeffrey Ghent.

19       THE COURT:  Jeff Ghent.

20       Okay.  And on the expert issue, I admit I'm a little

21  flummoxed and have been since the issue came up.

22       So I don't know where it's going to go.  I'll tell you

23  the things I want to see.

24       I do want to see the government's disclosure

25  communication to the defense.

1          And so is it accurate, Mr. Strianse, that you did not --

2     you didn't make any requests under Rule 16?  Is that right,

3     or you --

4          MR. STRIANSE:  I didn't make any special request.

5     And I can't remember the language of whatever the standing

6     discovery order may be.

7          THE COURT:  Okay.  Well, I'm sure it tracks Rule 16,

8     but you didn't -- you didn't make -- you didn't send a letter

9     and say, "Give me the information I'm entitled to under

10    Rule 16"?

11         MR. STRIANSE:  Not a separate letter, no, sir.

12         THE COURT:  Or any request, any email, or anything

13    that would constitute a request?

14         MR. STRIANSE:  No.  I would just rely on whatever the

15    local rule was here and Rule 16, the obligations imposed by

16    that.

17         THE COURT:  And you're -- and so you disclosed

18    everything under Rule 16 as you typically would if there had

19    been a request?

20         MR. SMITH:  I think that's fair, yeah, Your Honor.

21         THE COURT:  And so when you disclosed your expert

22    disclosure -- I don't know if there's more than one.  I don't

23    know if it's at the same time or over the course of time,

24    but -- but you effectively were saying, our -- our opinion

25    witnesses will be the following, and this is what -- this is

1    their information under Rule 16; is that right?

2         MR. SMITH:  I did that with all of our -- yeah.  So

3    everyone from Lee to Dr. Smyth.  I just, as a rule, do that

4    regardless if they trigger or not.

5         THE COURT:  Well, you know, I'm just -- I just

6    heard it.  I have been thinking about it and worrying about

7    it.

8         I'm not making any decision, but I will say I'm dubious

9    about the prospect of allowing the government at this point to

10   drop a new expert into the case.  And I'm not making a ruling

11   on it, but I'm just telling you my concern is the government

12   telling the defendant, here's the -- here's the expert proof

13   you are going to face, and so the defense got that --

14   Mr. Strianse got that, and, in part, you know, he said it at a

15   hearing months ago, you know, I have got this expert, and I

16   want to consult my own expert, and there was some fighting

17   over the timeliness of that.

18        I ultimately let it happen in part because we continued

19   the case.

20        Mr. Strianse goes and gets his expert, and his expert

21   responds to Smyth.  And so here we are.

22        And the idea of the new expert plugging in, just I

23   can't -- it's hard to imagine a situation where it doesn't

24   create prejudice for the defense even if -- I'm just thinking,

25   you know, anticipating, even if the new expert had exactly the

1    same opinions, still, the analysis of that expert, that

2    expert's CV and background, I'm just -- I'm dubious about it.

3        And here we are.  Jeopardy is attached.  And I'm very

4    worried about what that would do to the fairness of the case.

5    So we'll see.

6        I'm telling you the things I'm worried about and the

7    things I want to see in terms of what -- you know, what was

8    communicated to the defense.

9        So if you want to say anything else about it now, that's

10   fine.

11       My reaction really is, well, get Smyth here, warts and

12   all.  That's one option.  Or, you know, forego an expert in

13   that area.  That's another option.

14       I'm not sure putting a new one in is an option I can live

15   with.  But I'm not making that decision.  I'm just telling you

16   the worries I have got as I'm listening to proof and thinking

17   about that as well.

18       So if you've got something else to say, at this point,

19   I'm glad to hear from you.  I don't have to hear from you now.

20           MR. SMITH:  Just a couple points.  Get Smyth here,

21   warts and all, that was our preferred course of action.  It is

22   a situation where I'm not aware of my ability to use the

23   compulsory process on my own expert witness.  He did not want

24   to provide the information, and I just felt like ethically I

25   could not move forward.  So this is not a situation where I

1     wanted this in any way manufactured, and it was literally

2     discovered --

3               THE COURT:  Well, I'll order him to be here, if you

4     are asking will I issue a subpoena to order him to be here.  I

5     don't know why you couldn't order him to be here through a

6     subpoena.

7               MR. SMITH:  Then to turn over the items that --

8               THE COURT:  You are saying you can't get what you

9     need to get him to turn over?

10              MR. SMITH:  That's what I'm saying.  He says, after

11    consulting his attorney, he believes it's confidential under

12    state law.  He does not want to disclose it for them to

13    potentially review and produce it.

14         So because of that, I do not feel I can ethically put him

15    on the stand, knowing that there may be something.

16         Again, I don't know the full contents, but I heard enough

17    to trigger that sixth sense that I need to inquire.

18         I can make him be here, and I can put him on the stand,

19    but I can't disclose, you know, discharge my *Giglio*

20    obligations.

21              THE COURT:  He's basing it on a Virginia state law

22    privilege of some kind?

23              MR. SMITH:  It's a Tennessee statute.

24              THE COURT:  I'm sorry.  Tennessee.

25              MR. SMITH:  Which, again, I explained, if it's

1    something I need to disclose under *Giglio*, that wouldn't be a

2    basis for us not to produce.  A federal prosecution would

3    trump any of that.

4             THE COURT:  Yep.

5             MR. SMITH:  That's our analysis, but we couldn't, as

6    we saw that, figure out a way to -- we can make him be here.

7    You are certainly right, I can issue a subpoena to him.  He's

8    not a fact witness.  But, I mean, it's -- it's not a situation

9    I ever imagined encountering in the case, Judge.

10        That's where we are.  That's our analysis.  So he, in our

11   view, is not an option and will not be called.

12        And so we're in a situation now where we obviously -- you

13   know, the interest of justice requires us to pursue the case.

14   We still have -- I think we have to represent, you know, the

15   government, our client, as best we can.

16        And while, even if this was a Rule 16 violation -- I

17   think our position, for the record, is it was not because it

18   was not triggered and they said as much in the record.  And my

19   voluntary compliance with it, just as a matter of practice, I

20   don't think does anything to change the plain text of the

21   rule.

22        But putting that aside, even if it was a Rule 16

23   violation, under the Court's analysis, we can still -- the

24   reason for the late disclosure, the prejudice to the

25   defendant, analyze it under that rubric.

1          Undoubtedly, it's a late disclosure.  It's nothing that

2    was intended.  There's no gamesmanship.  This is not an

3    advantage we are getting as to prejudice.

4          I ask the Court to consider -- you are right.  It's a new

5    expert.  But, one, the expert would be necessarily much more

6    confined.

7          If it's reviewing the same patient files or even if it's

8    one or two of the same patient files, their expert has had the

9    opportunity to look at those patient files and render an

10   opinion.

11         I know he may not know the exact words our expert would

12   say, but he would have a basis to say, I think the prescribing

13   to this Patient X is appropriate.  He's already looked at

14   that.

15         And so the difference is somewhat marginal compared to a

16   new expert disclosure or completely new set of information.

17         THE COURT:  Do you even have it yet?  Do you even

18   have the disclosure?

19         MR. SMITH:  We are hopeful to draft one tonight or

20   put one together tonight.  But it's been -- at a minimum what

21   we're hoping to do is tender him for the purpose of just

22   prescribing standards of prescribing generally, which is a

23   little less fact-specific and obviously would be a little less

24   prejudicial, given they could have an expert who presumably

25   would testify about, for instance, the Tennessee Chronic Pain

1     Guidelines or prescribing generally.

2         So our plan right now -- our intention would be to have

3     him do that and look at a smaller subset of information that

4     Smyth had already looked at, that the defense has already

5     looked at, that the defendant's expert has already looked at.

6         Again, I'm not saying this is ideal or anything I would

7     voluntarily choose to do.  But I think -- respectfully, I

8     think there may be a way to do it that mitigates prejudice to

9     a degree so it would be acceptable so we are not without an

10    expert altogether in a case like this.

11               THE COURT:  Listen, I have told you I'm not making a

12    ruling.  I'm telling you the things bothering me.

13        I'm certainly going to look at the specifics when it

14    comes to that.  So, you know, we'll see.

15        All right, Mr. Strianse, I'm not expecting a full -- I

16    just wanted to kind of unburden -- so you guys know what I'm

17    struggling with already.

18        If you want to say something else, I'm glad to hear from

19    you now.

20               MR. STRIANSE:  I just want to be clear for the

21    record.  You know, when this was disclosed after lunch, I did

22    get on my feet and say, well, there are things that are out of

23    the control of Mr. Smith, and I understand all that.

24        But I don't want that to be misunderstood.  For the

25    record here, I do object to any expert coming in in this very

1    bizarre and irregular way in the middle of a trial after

2    jeopardy is attached.

3        I don't know why this is shrouded in so much mystery.

4    Perhaps the Court can hear from the government in camera on

5    this.  I don't understand how an expert can hold themselves

6    out to provide expert services to the United States of America

7    and then hire a lawyer and say, "I'm not going to testify."

8    There are some obscure privilege that he's relying on.

9        I have never heard of anything like this in my

10    experience.

11                THE COURT:  Nor have I.

12                MR. STRIANSE:  So I don't know if the government is

13    not able to say it because I'm here.  I don't know if

14    Dr. Smyth is in some trouble.  Anytime I hear that he's got a

15    lawyer at his elbow, he must have some issue going on at this

16    point in time.

17        But I think the Court at least needs to know what's going

18    on with Dr. Smyth so the record can be complete.

19                THE COURT:  Well, listen, I hear that.  And let's see

20    what develops.  I'll certainly hear from both sides on the

21    issue.

22        I'm not -- I'm not -- I'm not convinced that -- if he's

23    withholding information, I'm not convinced that he can't be

24    forced to divulge it.  I feel like, if -- if I, the judge in

25    this trial where he's a putative expert, if I tell him, "Be

1    here and bring file X," you know, he can show up and bring his

2    lawyer and convince me that it -- that his Tennessee privilege

3    somehow trumps this federal proceeding, I'm skeptical about

4    that.  So I guess I feel like there's a way to get him here,

5    warts and all, and let that analysis go forward.

6         But could the government say, "Look, we are just not

7    going to call him"?  I think that's fine.  But plugging in the

8    new person, that's the part that I'm --

9              MR. STRIANSE:  Yes, sir.

10             THE COURT:  So -- so I didn't take what you said is

11   in any way -- I assumed you would object.  I said, if you

12   object, you have the right to make that objection.

13        So, listen, I don't -- Mr. Smith, to be clear, you have

14   always been a straight shooter with me.  I know you to be an

15   ethical lawyer.  I have got -- I have got no criticism of you

16   like you are playing games.  I don't think that at all.

17        I know you are in a situation where you are in a pickle

18   not of your own making, but here we are.  I have got to sort

19   it out the best way that I can.

20        And, you know, a fair trial and the defendant's rights

21   are going to get obviously sent for consideration.

22        So all right.  That's probably as far as we can go right

23   now.

24        All right.  We'll take -- we'll take the remainder of our

25   break for a few minutes and then reconvene with the jury.

*J. GHENT - Direct Examination*                                    266

1     Thank you.

2          (Recess taken from 4:03 P.M. until 4:12 P.M.; jury

3     present.)

4          THE COURT:  We are back on the record with the

5     parties and counsel here and the jury assembled as we round

6     the turn and head for home on the day.

7        We're going to take another segment of proof.  And,

8     Mr. Smith, you can call your next witness.

9          MR. SMITH:  The United States calls Jeffrey Ghent,

10    Your Honor.

11         THE COURT:  Jeffrey Ghent.

12         **JEFFREY GHENT, GOVERNMENT'S WITNESS, DULY SWORN**

13         THE COURT:  Good afternoon to you.

14         THE WITNESS:  Good afternoon.

15         THE COURT:  Do try to speak directly toward that mic

16    in a clear voice so we can hear your testimony.

17        Would you start by stating your name and spelling your

18    last name?

19         THE WITNESS:  Jeffrey Lyon Ghent, G-h-e-n-t.

20         THE COURT:  Thank you.

21       Mr. Smith.

22                    DIRECT EXAMINATION

23    BY MR. SMITH:

24    Q.   Mr. Ghent, where are you from?

25    A.   Clay County.

1    Q.   How old are you?

2    A.   59.

3    Q.   Are you currently incarcerated?

4    A.   Yes, sir.

5    Q.   Have you pleaded guilty to a felony offense?

6    A.   Yes, sir.

7    Q.   What crime did you plead guilty to?

8    A.   Conspiracy and intent to distribute.

9    Q.   Can you tell us in just a couple sentences what you did?

10   A.   I was going to the doctor, getting drugs, and coming --

11   bringing them back, reselling them.

12   Q.   Did you do that by yourself?

13   A.   I took two gentlemen with me at times.

14   Q.   Where did you take them?

15   A.   At a clinic in Tennessee.

16   Q.   What's the clinic called?

17   A.   Gateway Medical.

18   Q.   Is this the first time you have been convicted of a

19   crime?

20   A.   No, sir.

21   Q.   What other crimes have you been convicted of?

22   A.   I have been convicted of AI and trafficking back -- like

23   18 year ago.

24   Q.   Trafficking what?

25   A.   Lortab.

1      Q.    Are those prescription pills, too?

2      A.    Yes, sir.

3      Q.    Did you enter into a plea agreement with the government

4      in this case?

5      A.    Yes, sir.

6      Q.    Have you been sentenced yet?

7      A.    No, sir.

8      Q.    Is it your hope to receive a better or more lenient

9      sentence in exchange for testifying?

10     A.    I just agreed to be a plant with the case I'm on.

11     Q.    Has anything been promised to you?  Have you been

12     promised any particular result?

13     A.    No, sir.

14     Q.    Sir, do you know what a sponsor is?

15     A.    Yes, sir.

16     Q.    What is it?

17     A.    It's a person that gives you pills to get rid of or

18     sponsors you when you buy them.

19     Q.    So with a pain clinic, what does a sponsor do?

20     A.    I was going to the doctor, getting prescriptions, and

21     filling them and selling the narcotics.

22     Q.    Were you also a patient at the clinic?

23     A.    Yes, sir.

24     Q.    And did you yourself have pain issues?

25     A.    Yes, sir.

*J. GHENT - Direct Examination*                                           269

1    Q.   Did you have injuries?

2    A.   Yes, sir.

3    Q.   So you had injuries, you had pain issues, but is that why

4    you were going to that clinic?

5    A.   I was going for them and also to make a little money,

6    truthfully.

7    Q.   Did you need all the medications that were being given to

8    you?

9    A.   No, sir.

10   Q.   Did you sell those medications?

11   A.   Yes, sir.

12   Q.   Now, in addition to being a patient, did you sponsor

13   folks to GMA?

14   A.   At times I did.

15   Q.   Okay.  What were their names?

16   A.   Raleigh Wagers and Elzie Wagers.

17   Q.   Now, were Raleigh and Elzie Wagers also from the same

18   area as you?

19   A.   Yes, from Manchester.

20   Q.   From Manchester.  So the three of you are in Manchester,

21   Kentucky.  Why of everywhere in the world did you go to

22   Gateway Medical Associates in Clarksville, Tennessee?

23   A.   We was told you could get better narcotics there and make

24   pretty good money.

25   Q.   So what was your understanding of going there?  What were

*J. GHENT - Direct Examination*                                    270

1    you hoping to get?

2    A.   We was going to get the best we could get, narcotics,

3    make money.

4    Q.   How much did a visit at Gateway cost?

5    A.   Anywhere from 4 to $500.  It varies.

6    Q.   Do you know what a pill count is?

7    A.   Yes, sir.

8    Q.   How often did the folks that you sponsored have to do

9    pill counts at Gateway?

10   A.   Once maybe every third month or second month they do a

11   pill count.

12   Q.   Now, if you didn't go, what could you do?  What could you

13   do instead?

14   A.   If you didn't show up, they would fine you $50, and you

15   go ahead and pay the $50.

16   Q.   Did any of either you or the folks you sponsored ever get

17   dismissed for failing a pill count?

18   A.   No, sir.

19   Q.   Now, you referenced the narcotics, the drugs that you

20   would get from the clinic.  What kind of drugs were those?

21   A.   Just pain pills and sometimes nerve pills.

22   Q.   Do you know what oxycodone is?

23   A.   Yes, sir.  They are Oxys 30s and oxymorphone and

24   Neurontins, gabapentins, or something like that, they call

25   them.

1    Q.   Did one of the Wagers also get Xanax?

2    A.   At times, yes.

3    Q.   So oxycodone, oxymorphones, Xanax, gabapentin.

4         Could you sell all those drugs?

5    A.   Yes, sir.  Yes, sir.

6    Q.   Did you sell all those drugs?

7    A.   Most of the time.

8    Q.   Did -- when you sold the drugs, the times you did sell

9    the drugs, was that near Manchester?

10   A.   Yes, sir.

11   Q.   That's here in Eastern Kentucky?

12   A.   Yes.

13   Q.   Can you give the jury a sense of how much those pills

14   were worth when you sold them, how much you could charge folks

15   for them?

16   A.   The 30s you could get $50 a piece; the Opanas, $100; and

17   the Xanaxes, $10.

18   Q.   So if you had 60 Opanas, how much could you get for that?

19   How much was that worth to you?

20   A.   $6,000.

21   Q.   Was it easy for you to find Opanas in Kentucky?

22   A.   Never did get none before.

23   Q.   When you went to Gateway, how far would you have to

24   drive?  How long would it take you?

25   A.   It would take you four hours and a half to get there and

1    four hours and a half to get back.

2    Q.   And how long would you have to wait for your visits?

3    A.   Sometimes eight or nine hours.

4    Q.   Were there times that you drove one of the Wagers to

5    their visits when you didn't have a visit?

6    A.   Yes, sir.

7    Q.   Okay.  And when Dr. Maccarone was the doctor that was

8    there, was it the same kind of thing where you had to wait a

9    long time?

10   A.   Yes, sir.

11   Q.   Have you ever been to any other doctor where you had to

12   wait that long at night?

13   A.   No, sir.

14   Q.   What was the parking lot like at Gateway?

15   A.   It was a little crowded.

16   Q.   Did anyone ever approach you to buy pills in the parking

17   lot?

18   A.   I have been offered pills, yeah.

19   Q.   Did you ever see anyone using drugs in the parking lot?

20   A.   Yes, sir.

21   Q.   What did you see?

22   A.   I seen them using needles, and I've seen them snort

23   pills.

24   Q.   Now, do you know what a drug test is?

25   A.   Yes, sir.

1   Q.   Do you know how to do anything to pass that drug test?

2   A.   No, sir.  I never did try.  I did not pass.

3   Q.   Did you keep drugs back to take them before?

4   A.   Yes, sir.

5   Q.   And did you do that?

6   A.   Yes, sir.

7   Q.   Do you know if you ever failed a drug test at Gateway?

8   A.   I was never notified of me failing one.

9   Q.   So were you ever notified that you failed a pill count?

10  A.   No, sir.  Just got fined $50.

11  Q.   Now, did you see both Dr. Maccarone and Dr. Stanton when

12  you went to the clinic?

13  A.   Yes.

14  Q.   With Dr. Maccarone, were the hours late at night?

15  A.   Yes, sir.

16  Q.   What about with Dr. Stanton?

17  A.   He just come in around 5:00 and would -- they would call

18  our names, and we'd go in and see him and get our scripts and

19  leave.

20  Q.   How long would your visits with Dr. Stanton last?

21  A.   Maybe two to three minutes, four minutes, tops.

22  Q.   The prescriptions that you got, were they printed out?

23  A.   Yes, sir.

24  Q.   Were they already printed out when you went in the room?

25  A.   Yes, sir.

1    Q.   Did you have long discussions with Dr. Stanton about the

2    doses and the types of drugs?

3    A.   No, sir.  We just described that all to the nurse

4    upfront.  He just reads them, signs them, and reads them to

5    me.

6    Q.   Did he ever talk to you about addiction?

7    A.   Not to my knowledge.

8    Q.   Did he ever talk to you about diverting, making sure you

9    weren't selling your pills?

10   A.   No.

11   Q.   Did Dr. Stanton ever talk to you about where you were

12   traveling from?

13   A.   Yes.  He just described that he had a different clinic in

14   Lexington, and he said you won't have to drive that far, and I

15   told him I would rather stick with Maccarone at the time.

16   Q.   Do you -- did you ever get any injections from

17   Dr. Stanton?

18   A.   Yes, sir.

19   Q.   Did you pay extra for that?

20   A.   Yes.  I paid $75 for that.

21   Q.   Now, the first time you got an injection, did you know

22   you were going to get an injection that day?

23   A.   No, sir.

24   Q.   Tell me about that.

25   A.   They just -- when I got there, they said they got a

1    doctor giving injections today and it's $75, and I said I

2    didn't bring no extra money with them, and they set me up with

3    the next time I come to bring $75 with me for the injection.

4    Q.   Now, did you -- had you talked to Stanton about getting a

5    shot before?

6    A.   That day there when I didn't have the money, he explained

7    to me about the injections, and I told him what my experience

8    had been with my back, and I told him -- and my arms helped a

9    lot, and he said, "Well, we'll go with arm," and I got them in

10   my arm.

11   Q.   Now, what was the consequence if you didn't get an

12   injection?

13   A.   Well, they told me, if you didn't take the injection,

14   that you would get cut ten pills.

15   Q.   So what was your thought process with whether to get the

16   injection?

17   A.   Well, it varies.  Either lose $75 or lose $500.  If you

18   are going for the money, you need to -- $500 sounds a lot

19   better taking home than losing -- losing it.

20   Q.   So those extra pills were worth you getting the injection

21   and paying the $75?

22   A.   Yes, sir.

23   Q.   So let's talk about what brings you here today.

24        In March of 2021, did you get a prescription from

25   Dr. Maccarone for Opana?

*J. GHENT - Cross-Examination*                                    276

1    A.   Yes, sir.

2    Q.   And did you get caught selling those pills?

3    A.   Yes, sir.

4    Q.   How many pills did you sell?

5    A.   Five.

6    Q.   For how much?

7    A.   $500.

8    Q.   So $100 a piece?

9    A.   Yes, sir.

10   Q.   Okay.  Now, you have already told us this with some of

11   your past.  Have you bought and sold drugs before?

12   A.   Yes, sir.

13   Q.   Okay.  When you sell drugs, do you need a supplier?

14   A.   Yes, sir.

15   Q.   Okay.  In this case, who was your supplier?

16   A.   The clinic.

17        MR. SMITH:  Your Honor, that's all the questions I

18   have.

19        THE COURT:  Thank you.

20      Mr. Strianse.

21        MR. STRIANSE:  Thank you.

22                         CROSS-EXAMINATION

23   BY MR. STRIANSE:

24   Q.   Good afternoon, Mr. Ghent.

25   A.   Good day.

1    Q.   I think you really had two purposes, if I understand your

2    testimony, when you went to the clinic in Tennessee.  One was

3    maybe get pills to resell here, but you also needed pain pills

4    for some of the conditions you've described; is that right?

5    A.   Yes, sir.

6    Q.   Now, do you remember when you went to GMA and saw

7    Dr. Stanton and described the conditions that you had?

8    A.   Yes, sir.

9    Q.   I think you presented there at GMA with a rotator cuff

10   injury; is that right?

11   A.   That's right.

12   Q.   When you went to GMA, did you actually bring copies of

13   X-rays and those sorts of things?

14   A.   Yes, sir.

15   Q.   And that was a pretty significant injury, was it not?

16   A.   Yes, sir.

17   Q.   And you also suffered from, I think, some degenerative

18   arthritis in one of your thumbs; is that right?

19   A.   And my back and stuff, yes.

20   Q.   Okay.  And when Dr. Stanton examined your shoulder, he

21   suggested that you really needed some surgery; is that right?

22   A.   I was prescribed surgery later on.

23   Q.   Okay.  And by Dr. Stanton?

24   A.   Well, by Maccarone and the hospital took the MRIs.

25   Q.   So you actually went and got some surgery on your

*J. GHENT - Cross-Examination*                                      278

1    shoulder?

2    A.   I was getting ready to go through to it.

3    Q.   Did you ever get that done?

4    A.   No, sir.

5    Q.   Okay.  And I think he prescribed a brace for you as well;

6    is that right?

7    A.   Yes, sir.

8    Q.   So some of the pills you would bring back and sell here,

9    but I assume you had to take some of them for your own medical

10   issues?

11   A.   Yes, sir.

12   Q.   Did you -- you never communicated with Dr. Stanton

13   outside of the visit, did you?

14   A.   No, sir.

15   Q.   Did you ever communicate with Dr. Maccarone by text?

16   A.   No, sir.

17   Q.   Okay.  Did any of the people that you were sponsoring --

18   did they have Dr. Maccarone's cell number?

19   A.   No, sir.

20   Q.   Okay.  When you went to GMA, you presented yourself as a

21   real patient; is that right?

22   A.   Yes, sir.

23   Q.   And I think you said that, when Maccarone -- when you saw

24   Maccarone, those were the times that you had to wait until

25   very late in the evening, night, or in the early morning

*J. GHENT - Redirect Examination*                                279

1   hours; is that right?

2   A.   Yes, sir.

3   Q.   But it was more efficient when you saw Stanton; is that

4   correct?

5   A.   Yes, sir.

6   Q.   Did it appear to you the way that he was dressed that he

7   was coming from another clinic to see patients of

8   Dr. Maccarone?

9   A.   Yes, sir.

10          MR. STRIANSE:  Your Honor, may I have one moment?

11          THE COURT:  Yes, of course.

12       (Defendant and counsel conferring.)

13          MR. STRIANSE:  Those are my questions.  Those are my

14   questions.

15          THE COURT:  Thank you, Mr. Strianse.

16       Mr. Smith.

17                     REDIRECT EXAMINATION

18   BY MR. SMITH:

19   Q.   Mr. Ghent, you were asked if you had, I think, the cell

20   phone number for Dr. Stanton?

21   A.   Yes.

22   Q.   And you were asked if you had to send any text messages

23   to Dr. Stanton?

24   A.   Yes.

25   Q.   Did you ever need to send him a text message to get a

*J. GHENT - Redirect Examination*                        280

1    prescription from him?

2    A.   No.

3    Q.   What did you have to do?

4    A.   I just called his secretary, and she set up appointments

5    for me.

6    Q.   What did you have to bring to the clinic any given

7    appointment?  What was the thing they needed to get your

8    prescription?

9    A.   Cash for -- started out.  Then a credit card, money put

10   on it from Walmart.

11             MR. SMITH:  Thank you, Your Honor.

12             THE COURT:  Is he finally excused, Mr. Smith?

13             MR. SMITH:  Yes.

14             THE COURT:  Mr. Strianse?

15             MR. STRIANSE:  Yes.

16             THE COURT:  Thank you, sir.  That concludes your

17   testimony.  You can step down.

18        (Witness excused.)

19             THE COURT:  Mr. Smith?

20             MR. SMITH:  I apologize, Your Honor.  I was flipping

21   pages.

22        Did you recognize me for the next witness?

23             THE COURT:  I did.

24             MR. SMITH:  The United States calls John Pasternak.

25             THE COURT:  John Pasternak.

1      **JOHN PASTERNAK, GOVERNMENT'S WITNESS, DULY SWORN**

2              THE COURT:  Good afternoon, sir.

3              THE WITNESS:  Good afternoon.

4              THE COURT:  Do try to speak toward that mic in a

5      clear voice.  That chair won't move.  You can pull it towards

6      you, if you need to.

7         First state your full name and then spell your last name.

8              THE WITNESS:  John David Pasternak,

9      P-a-s-t-e-r-n-a-k.

10             THE COURT:  Thank you.

11        Mr. Smith.

12             MR. SMITH:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14     BY MR. SMITH:

15     Q.  Sir, you're currently incarcerated?

16     A.  Yes, sir.

17     Q.  Before then where did you live?

18     A.  Barbourville, Kentucky.

19     Q.  What county is that?

20     A.  Knox County.

21     Q.  How old are you?

22     A.  I'm 54 years old.

23     Q.  Now, as we just referenced, you're currently

24     incarcerated.  Have you pleaded guilty to a felony?

25     A.  Yes.

J. PASTERNAK - Direct Examination                              282

1    Q.   And what crime did you plead guilty to?

2    A.   Conspiracy.

3    Q.   Conspiracy to do what?

4    A.   Distribute drugs.

5    Q.   What kind of drugs?

6    A.   Namely, oxycodone, oxymorphone, and I don't know.  I'm

7    sorry.  Hydrocodone.

8    Q.   Prescription pain killers?

9    A.   Yes, sir.

10   Q.   Did you enter into a plea agreement with the government?

11   A.   No.  Just a guilty plea, yes.

12   Q.   Have you been sentenced yet?

13   A.   No, sir.

14   Q.   Are you hoping to receive a better or more lenient

15   sentence because of your testimony?

16   A.   I'm hoping to get some sort of consideration.

17   Q.   Okay.  Has anyone from the United States or the Court or

18   otherwise promised you anything?

19   A.   No, sir.  No one has.

20   Q.   Sir, do you know what the term "sponsor" means?

21   A.   Yes, sir.

22   Q.   Were you a sponsor?

23   A.   Yes.

24   Q.   Approximately how many clinics have you sponsored people

25   to go to?

1    A.    Approximately three.

2    Q.    Have you heard of a place called Gateway Medical

3    Associates?

4    A.    Yes, sir.

5    Q.    And how do you know that name?

6    A.    That's one of the places that I sponsored people to go

7    to.

8    Q.    Do you have a rough time frame of when you started doing

9    that?

10   A.    Early 2016 to 2019.

11   Q.    Did you sponsor more than one person to go to Gateway?

12   A.    Yes, sir.

13   Q.    Sitting here today, can you remember precisely everybody

14   that you took to Gateway?

15   A.    Yes, sir.

16   Q.    Can you tell us who?

17   A.    Charles Wooten, Clyde Teague, Florence Harris, Danny

18   Mills, and Susan Jones.

19   Q.    When you would sponsor these people to the clinic, what

20   would you do?  What would your role be?

21   A.    My role would be to provide them with funds,

22   transportation, any medical availability issues that they

23   needed to have taken care of.

24   Q.    How much money are we talking about for going to this

25   clinic?  How much did that cost the people you sponsored?

1    A.   Anywhere from 4 -- 400 to $900.

2    Q.   Do you know what a pill count is?

3    A.   Yes, sir.

4    Q.   What's a pill count?

5    A.   A pill count is where the doctor calls and wants that

6    particular person to come in and get their -- their medication

7    checked to see if their count is right.

8    Q.   Okay.  Now, did the folks you sponsored to Gateway -- did

9    they have to go in for their pill counts?

10   A.   No, sir.

11   Q.   What could you do instead?

12   A.   They had the option, if they didn't want to go, they

13   could pay a fine or penalty.

14   Q.   Did you ever have any person you sponsored get dismissed

15   because of a failed pill count?

16   A.   No, sir.

17   Q.   What did you think about this arrangement where you could

18   pay more to avoid a pill count?

19   A.   Thought it was a little ridiculous that you had -- you

20   pay a fine or a penalty for a pill count, but it was

21   convenient for the fact that the person didn't have to go all

22   the way back to the clinic.

23   Q.   So where were the folks you sponsored -- where were they

24   traveling from?

25   A.   Usually four to five hours away.

1    Q.    And did you ever travel with them to the clinic?

2    A.    Yes.

3    Q.    I want to talk about that in a second.

4          Now, in Kentucky there's doctors' offices; is that right?

5    A.    Yes, there is.

6    Q.    Why of all the places in the world that you could have

7    gone to did you go to Gateway Medical Associates in

8    Clarksville, Tennessee?

9    A.    It was easier to get the medication that people wanted

10   versus Kentucky clinics.  They didn't write the strong --

11   stronger medication.

12   Q.    What kind of medications or drugs did you get from the

13   prescriptions you got from Gateway?

14   A.    Mainly oxycodone and oxymorphone.

15   Q.    Did you ever get gabapentin?

16   A.    Yes.

17   Q.    Those three drugs, did those drugs have a value to you?

18   A.    Yes.

19   Q.    Okay.  Did you sell those drugs?

20   A.    Yes.

21   Q.    Can you give the jury a sense of how much you charged

22   when you sold those drugs?

23   A.    Each drug represented a different amount, but just an

24   average pill of oxymorphone would sell for 50 to $60;

25   oxycodone, 45 to 50; gabapentin, 2 to $3 a piece.

1   Q.   So let's say you had a prescription of 100 -- 100

2   oxycodone, 15 milligrams.  Real quick, what do you think

3   that's worth to you?  What's that pill bottle worth to you?

4   A.   Oxycodone, 15 milligrams, a hundred of them, $2000 to

5   $2,500.

6   Q.   What about the Opanas?  Were they worth more?

7   A.   Yes, they were higher.

8   Q.   Was it easy to find places that would write prescriptions

9   for Opana?

10  A.   No, sir.

11  Q.   Now, the trips to Gateway, how long would that take?

12  A.   One direction, usually four hours, four and a half.

13  Q.   Would you sometimes take more than one person at a time?

14  A.   Yes.

15  Q.   Now, were you a patient at Gateway?

16  A.   No, sir.

17  Q.   Did you ever physically go into the building?

18  A.   Yes, I did.

19  Q.   Tell me about the time you went into the building.

20  A.   I went into the building with one of the patients that I

21  took, one of the people that I took, and I looked for a seat,

22  but there was only one seat available.  And I used the

23  restroom, and it was very crowded there.  So a couple of

24  people were standing up.  I don't know if they were waiting

25  for a seat or -- it was just really crowded.  So I went back

J. PASTERNAK - Direct Examination                        287

1    outside.

2    Q.   Did you ever wait in the parking lot while somebody you

3    were sponsoring was going in?

4    A.   Yes.

5    Q.   Okay.  How long were the waits?

6    A.   The normal wait would be anywhere from 5 hours to

7    16 hours.

8    Q.   What's the latest you ever stayed there?

9    A.   Almost 6:00 A.M. in the morning.

10   Q.   Were there times you would have to come back the next

11   day?

12   A.   Yes.

13   Q.   Now, when you were waiting on someone while they were

14   inside the clinic, would you wait in the parking lot

15   sometimes?

16   A.   Yes.

17   Q.   Okay.  What was the parking lot like at Gateway?

18   A.   You mean the activity in the parking lot?

19   Q.   Yeah.  I don't mean the concrete itself.

20        What was going on in the parking lot?

21   A.   There was multiple cars.  I mean, it was pretty much, you

22   know, a full lot, but it was kind of what I would describe as

23   chaotic, people always out of their vehicles, doing different

24   things.  They just -- it was just -- you know, like a tailgate

25   party, what I would call it.

J. PASTERNAK - Direct Examination                    288

1    Q.   Did -- did you ever see anyone under the influence of a

2    drug or a -- or just intoxicated generally?

3    A.   Yes.

4    Q.   Did you ever see anybody use drugs in the parking lot?

5    A.   Yes, sir.

6    Q.   Can you describe what you saw?

7    A.   I saw one individual snorting a substance off of a CD

8    case.

9    Q.   Now, the time that you went into the clinic and there was

10   only one chair available, what time was that?

11   A.   I don't know the exact time.  It was dark, though.

12   Q.   So when you went to these trips, you said you traveled

13   several hours each way, wait times up to 16 hours, pay several

14   hundred dollars.  Why would you do that?  Why would you wait

15   all that time and pay all that money?

16   A.   Because the amount of medication that you were getting

17   and the value that I could resell it for was -- the difference

18   in the money and the time, the profit was -- it was more

19   profitable and worth my time.

20   Q.   Was it difficult for the folks you sponsored to get

21   prescriptions from GMA?

22   A.   No.

23   Q.   Do you know what a drug test is?

24   A.   Yes, I do.

25   Q.   Do you know if any of the folks you sponsored failed any

1    drug tests?

2    A.    Not that I'm aware of.

3    Q.    Do you know if you ever had anyone dismissed because of a

4    failed drug test?

5    A.    No.

6    Q.    Now, what would the patient do with the prescription once

7    they came out of the clinic?

8    A.    They handed me the prescription.

9    Q.    And what would you do?

10   A.    I would read it to make sure that it was properly filled

11   out and signed by a doctor.

12   Q.    Why?

13   A.    Because if they are not signed, then the prescription is

14   no good.  I made sure that it's dated right, has the right

15   date, because the pharmacy will not fill it without a right

16   date and signature of the acting physician.

17   Q.    Did you hold onto the prescription after they gave it to

18   you?

19   A.    Yes.  I either locked -- I didn't lock them.  Put them in

20   the console or glove compartment.

21   Q.    Why did you want to be the one to hold onto them?

22   A.    To make sure that nothing happened to them until they got

23   filled the next day when we went -- you know, when we got

24   back.

25   Q.    If you paid $500 to get that prescription or series of

J. PASTERNAK - Direct Examination                              290

1   prescriptions, were they worth more than that once you got

2   them in hand?

3   A.   Yes.  They were worth several thousand dollars.

4   Q.   So these were valuable pieces of paper?

5   A.   Valuable pieces of paper.

6   Q.   Were you in a position to read the prescriptions and see

7   whose doctors' names were on the prescriptions?

8   A.   Yes.

9   Q.   What doctors' names did you see on those prescriptions?

10  A.   Maccarone and Stanton.

11  Q.   Were there times where you learned that Dr. Stanton was

12  at the clinic?

13  A.   Yes.

14  Q.   Okay.  When that was the case, how long was the wait?

15  A.   When Dr. Stanton was there, the visits -- it was a lot

16  shorter than they were when the other doctor was there.

17  Q.   Did you notice any difference in either the types of

18  medications or the amounts of medications you got from either

19  doctor?

20  A.   I didn't.  There was no difference.

21  Q.   Now, you mentioned, I believe, the name Florence Harris

22  is one of the folks that you sponsored?

23  A.   Yes.

24  Q.   Who was she to you?

25  A.   She's my sister-in-law.

1    Q.   What would she do with her pills?

2    A.   She would turn them over to me.

3    Q.   Is that same -- true of the other people that you

4    sponsored?

5    A.   Yes.

6    Q.   Would they sometimes sell some of their pills and give

7    you the money?

8    A.   Yes, sir.

9    Q.   Now, at some point in time, did you stop taking folks to

10   Gateway Medical Associates?

11   A.   Yes.

12   Q.   And when was that?

13   A.   That was in August of 2019.

14   Q.   Okay.  Why did you stop?

15   A.   I was served with a search warrant and arrested.

16   Q.   At that time did you agree to cooperate with law

17   enforcement?

18   A.   Yes.

19   Q.   Did you provide them information about your activities as

20   a sponsor?

21   A.   Yes, sir.

22   Q.   What is it that you agreed to do?

23   A.   I agreed to help in their investigation with Gateway

24   Medical, and I took the people that I had sponsored to

25   Gateway.

1    Q.   When you were cooperating, which people did you take?

2    A.   Charles Wooten and Susan Jones.

3    Q.   Did Charles Wooten or Susan Jones know that you were

4    cooperating?

5    A.   No.

6    Q.   Did they know that -- and when you were doing this, what

7    was your understanding of what law enforcement was doing?

8    A.   They were trying to get information on the --

9    Q.   Sorry.  It was a bad question.

10        Physically, when you were making the trip while

11   cooperating, what were the officers doing at that time?

12   A.   Oh, they were monitoring and -- monitoring my trip and

13   following in another vehicle.

14   Q.   Okay.  Now, the first visit down when you were

15   cooperating, did you take both Wooten and Jones?

16   A.   Yes.

17   Q.   Did they both get prescriptions?

18   A.   Not at the same time.

19   Q.   Who got prescriptions that first time?

20   A.   Susan Jones.

21   Q.   From whom?

22   A.   I don't actually recall the doctor that was on the --

23   Q.   What about with Wooten?

24   A.   He did not get one.  We had to go back for him.

25   Q.   And what did you have to do with Wooten?

1   A.   I had to take him in and get an MRI and stuff before they

2   would accept him back.

3   Q.   Okay.  And did you go get the imaging that was needed?

4   A.   Yes.  We got the imaging, and they set up another

5   appointment, and we went back.

6   Q.   What -- ultimately, what happened to the drugs that you

7   got from those visits?

8   A.   They were -- the medication was sold.

9   Q.   Okay.  Now, when the folks you sponsored needed

10  appointments, did you ever make calls to the clinic?

11  A.   Yes.

12  Q.   Okay.  Did you ever talk to Dr. Maccarone or Dr. Stanton?

13  A.   I'm not sure who I talked to.

14  Q.   To your knowledge, have you ever met Dr. Stanton or

15  Dr. Maccarone?

16  A.   No.

17  Q.   Did you need to be able to talk to them to get

18  prescriptions?

19  A.   No.

20  Q.   So just to be frank with you, sir, are you a drug dealer?

21  A.   I guess you would say that, sir.

22  Q.   When you deal drugs, do you need a supply?

23  A.   Yes, sir.

24  Q.   Okay.  Who is your supplier?

25  A.   My supplier is the pain clinics.

*J. PASTERNAK - Cross-Examination* 294

1    Q.   In this case was that Gateway Medical Associates?

2    A.   Yes, sir.

3    Q.   If you took people to Gateway Medical Associates and they

4    took your money in that you gave them, what was your

5    understanding of what you were going to get in return?

6    A.   Could you repeat the question?

7    Q.   If you gave somebody money and they went into the clinic

8    with that money, what was your understanding of what you were

9    getting in return?

10   A.   I was getting prescriptions.

11   Q.   Okay.  And were those prescriptions that you could sell

12   for a profit?

13   A.   Yes, sir.

14   Q.   And did you sell those for a profit?

15   A.   Yes, sir.

16   Q.   Did you do that here in Kentucky?

17   A.   Yes, sir.

18        MR. SMITH:  Your Honor, that's my questions.  Thank

19   you.

20        THE COURT:  Thank you.

21      Mr. Strianse?

22        MR. STRIANSE:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. STRIANSE:

25   Q.   Good afternoon, Mr. Pasternak.

*J. PASTERNAK - Cross-Examination*                                    295

1    A.   Good afternoon.

2    Q.   You talked about using this -- this sponsor scheme at

3    three clinics; is that right?

4    A.   Yes, sir.

5    Q.   Where were the other two clinics?

6    A.   One clinic was in Chilhowee, Tennessee.

7    Q.   Where was the third?  Do you remember?

8    A.   The other one was in Murfreesboro, Tennessee.

9    Q.   And these five patients, we have Harris, Wooten, Teague,

10   Mills, and Jones; is that right?

11   A.   Yes.

12   Q.   I understand what you got out of this arrangement.  What

13   were they compensated with for their time and involvement in

14   the scheme?

15   A.   They were compensated either with money or pills.

16   Q.   Okay.

17   A.   Or both.

18   Q.   So they got to either keep some of the pills and get some

19   of the money?

20   A.   Yes, sir.

21   Q.   Okay.  You talked about Mr. Wooten, Charles Wooten, I

22   guess, presenting himself at Gateway Medical Associates in

23   Clarksville, and he was turned away; is that right?

24   A.   At the end of the day, yes, sir.

25   Q.   And do you remember which physician he might have seen?

1   A.   No, sir.  I'm not certain on that.

2   Q.   Whoever he saw that day was requiring some imaging study

3   before they would prescribe pills.  Is that a fair

4   characterization?

5   A.   Yes, sir.

6   Q.   So then Mr. Wooten came back to Eastern Kentucky; is that

7   right?

8   A.   Yes, sir.

9   Q.   And did he go to a real doctor's office for this imaging

10  study?

11  A.   He went to the local hospital.

12  Q.   And what did you understand the physical ailment that

13  Mr. Wooten suffered from?

14  A.   Just a back injury.

15  Q.   So he got an imaging study; is that right?

16  A.   Yes, sir.

17  Q.   An X-ray, and then you drove him back to GMA?

18  A.   That's correct.

19  Q.   And whoever he saw there was -- whoever the physician was

20  was satisfied with that imaging study.  Is that your

21  understanding?

22  A.   Yes, sir.

23  Q.   Since you had done this at other clinics, had you

24  developed any sort of a plan with the people that you were

25  sponsoring?

1    A.   We had a plan in place, I mean, of sorts.

2    Q.   And did the plan include that they needed to present

3    themselves as real patients suffering from real pain?

4    A.   Yes, sir.

5    Q.   And what sort of a discussion would you have -- I think

6    you said -- was it your sister-in-law that was involved in

7    this too?

8    A.   Yes, sir.

9    Q.   When you-all would meet and discuss before you would take

10   the trip, what sort of thing -- what sort of advice would you

11   give them as to how they would act when they presented

12   themselves at the clinic?

13   A.   Typically, you just went in and paid for the visit and

14   filled out the form that they give you and --

15   Q.   Now, I know that Mr. Wooten had to go and get some --

16   some medical records.

17        Did the other people that you used -- did they carry

18   medical records with them when you first went down there?

19   A.   Some had imaging, and some didn't -- did not.

20   Q.   Okay.

21        MR. STRIANSE:   Your Honor, those are my questions.

22   Thank you.

23        THE COURT:   Thank you.

24        MR. SMITH:   Your Honor, if I could just have one

25   moment.

1          (Mr. Smith conferring at counsel table.)

2              MR. SMITH:  Your Honor, that's all the questions I

3      have.

4              THE COURT:  Is he finally excused?

5              MR. SMITH:  Yes, Your Honor.

6              THE COURT:  Do you agree?

7              MR. STRIANSE:  Yes, sir.

8              THE COURT:  Thank you, sir.  That concludes your

9      testimony.  You can step down.

10             THE WITNESS:  Thank you, Your Honor.

11         (Witness excused.)

12         (Sidebar conference.)

13             THE COURT:  Can you hear me, Mr. Strianse?

14             MR. STRIANSE:  Yes.

15             THE COURT:  Mr. Smith, can you hear me?

16             MR. SMITH:  I can, yeah.

17             THE COURT:  Okay.  So it's 5:00.  I'm fine knocking

18     off now.  If you had, like, a five-minute witness, that would

19     be fine, or short witness, but we have gotten a lot of work

20     done today.  I'm okay breaking now.

21         Who would be next for you?

22             MR. SMITH:  I've got to look with people's travel,

23     but it's probably one of the GMA employees.  So it's going to

24     be more than a five-minute witness.

25             THE COURT:  Any problem with stopping now?

1          MR. SMITH:  No.

2          THE COURT:  I think the jury has worked really hard

3    today.  I'd kind of let them go ahead and go.  Any problem

4    with that?

5          MR. STRIANSE:  Not at all.

6          THE COURT:  That's what we'll do.  Thank you.

7       (Sidebar conference concluded.)

8          THE COURT:  All right.  That's going to conclude our

9    proof for today.  I really appreciate the attentiveness and

10   diligence you have all shown.  I expected you would when we

11   went through selection, but you have certainly done your part

12   for the first two days, and I'm grateful for that.

13      Over the course of the night, continue to follow the

14   rules I have given you.  No case discussion with anyone

15   including each other.  No looking at anything else outside the

16   case, research, exploration.  Continue to keep an open mind.

17   The proof is coming in.  Just absorb it, but don't begin

18   evaluating it or forming opinions until all the proof is in

19   and you've heard the arguments and been instructed.

20      We'll be on the same schedule tomorrow.  Check in at

21   8:15.  We'll try to start promptly with proof at 8:30 for

22   Day 3.  So thank you for your attention, and I'll excuse you

23   now for the evening.

24      (Jury not present.)

25          THE COURT:  Everybody can be seated.  Jury has left

1     for the day.

2         All right.  I do want to see what the disclosure looks

3     like.  And, Mr. Smith, if you can email that to Wier chambers

4     sometime this evening, that would be great.  Just send

5     whatever transmittal you used to send the expert disclosure

6     pertaining to Smyth, and I just want to see what that looks

7     like or looked like.

8         And then who are your next witnesses going to be?

9             MR. SMITH:  Sorry, Your Honor.  I just want to make

10    sure I'm sending the right thing.  Like the transmittal letter

11    I sent at the time?

12            THE COURT:  Yes.

13            MR. SMITH:  Okay.  If it's helpful, I'll certainly

14    send it.  My recollection is that I -- I think this was what

15    you were asking about before.

16        I believe in all our letters we cite like Rule 16.  So I

17    do think -- I would readily concede that we say, pursuant to

18    Rule 16, I'm providing this, if that's helpful, but I will

19    also send a copy.

20            THE COURT:  I appreciate that, but I do see -- want

21    to see a copy.

22            MR. SMITH:  Okay.

23            THE COURT:  Next witnesses?

24            MR. SMITH:  Next witnesses should be Shanna Armijo,

25    Emilie Jackman, Keeley Quinlan, Jonathan Pooler, and a number

1    of other potentials that we just kind of need to figure out

2    with travel and schedule, if that's sufficient.

3         THE COURT:  That should give us a good -- good start

4    on the day.

5         All right.  What else do we need to take up at this point

6    for the government, Mr. Smith?

7              MR. SMITH:  Nothing, Your Honor.

8              THE COURT:  Mr. Strianse?

9              MR. STRIANSE:  Nothing, Your Honor.

10             THE COURT:  You guys do get working on that summary

11   exhibit issue because I just want -- whatever the legwork you

12   guys can do to thin that down in terms of disputed matters

13   will be great.  And then, you know, whatever is left we're

14   going to have to figure out how to tee that up.

15        As I said, the government -- the proponent will have the

16   burden, of course, of proving that the -- that any exhibits

17   that included should be admitted.

18        It's a little different because, Mr. Strianse, you have

19   kind of requested a little bit of an out-of-the-box, you know,

20   104-type hearing where you might want to put on proof on

21   specific disputed items.

22        I'm not signing off on that yet, but I know you have made

23   the request, and I want to be sure that you've ironed out what

24   you can iron out and what remains -- I want to hear what

25   remains and then talk about the process to best and most

1    fairly conclude the way to handle that issue.  So I just -- I

2    want to -- that's why I'm continuing to flag it, because I

3    don't want it to pop up and us not be in a position to deal

4    with it effectively.  So be thinking about that.

5        All right.  I'll be here by 8:00 in the morning and glad

6    to talk, if we need to, before we begin the proof no later

7    than 8:30.

8        All right.  Everybody have a pleasant evening.  We'll

9    stand adjourned.

10       (Proceedings recess at 5:02 P.M. until August 25, 2022,

11   at 8:30 A.M.)

12                      REPORTER'S CERTIFICATE

13       I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

14

15                              Date:   November 5, 2022

         /s/ Kathleen Maloney, RPR, FCRR
16            United States Court Reporter

17

18

19

20

21

22

23

24

25

303

1                    I N D E X - VOLUME 2 (August 24, 2022)

2        WITNESS FOR THE GOVERNMENT: Direct Cross Redirect Recross

3        TONY JANUTOLO (Continuing)    7    63    70
         JENNIFER BELISLE             73    89   103
4        DAVID SILVUS               108   148   166      172
         JILL LEE                   175   197   201
5        TERRY LEE PRINCE           205   215
         MARGARETTE ANDERSON        223   247
6        JEFFREY GHENT              266   276   279
         JOHN PASTERNAK             281   294

7
         EXHIBITS RECEIVED:
8
         Government's Exhibit 11A........................9
9        Government's Exhibit 11B........................9
         Government's Exhibit 12.........................14
10       Government's Exhibit 13.........................15
         Government's Exhibit 14.........................16
11       Government's Exhibit 15.........................18
         Government's Exhibit 16.........................27
12       Government's Exhibit 17A.......................29
         Government's Exhibit 17B.......................30
13       Government's Exhibit 17C.......................32
         Government's Exhibit 17D.......................33
14       Government's Exhibit 17E.......................35
         Government's Exhibit 17F.......................36
15       Government's Exhibits 17G-17O..................38
         Government's Exhibit 18........................43
16       Government's Exhibit 19........................48
         Government's Exhibit 20.......................130
17       Government's Exhibit 21.......................133
         Government's Exhibit 22.......................135
18       Government's Exhibit 100.......................55
         Government's Exhibit 101.......................57
19       Government's Exhibit 102.......................58
         Government's Exhibit 103-120...................61

20

21

22

23

24

25