<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                                 - - -
 3
     UNITED STATES OF AMERICA,      : Docket No. 21-CR-019
 4                                  :
                         Plaintiff, :  London, Kentucky
 5                                  :  Thursday, August 25, 2022
                                    :
 6   versus                        :  8:15 a.m.
                                    :
 7   JOHN L. STANTON,              :   Jury Trial.  Day 3 of 7
                                    :
 8                     Defendant.   :

 9                                 - - -
                       TRANSCRIPT OF JURY TRIAL
10                   BEFORE ROBERT E. WIER
                UNITED STATES DISTRICT COURT JUDGE
11                                 - - -

12   APPEARANCES:

13   For the United States:      ANDREW E. SMITH, AUSA
                                 U.S. Attorney's Office
14                               260 West Vine Street
                                 Suite 300
15                               Lexington, Kentucky 40507

16   For the Defendant:          PETER J. STRIANSE, ESQ
                                 Tune, Entrekin & White
17                               5000 11th Avenue N.
                                 Suite 600
18                               Nashville, Tennessee 37203

19

20   Court Reporter:             KIMBERLEY KEENE, RMR
                                 Official Court Reporter
21                               Room 317
                                 310 South Main Street
22                               London, Kentucky  47041
                                 (606) 877-7968
23

24       Proceedings recorded by mechanical stenography,
     transcript produced by computer.
25
</pre>

1      (Proceedings commenced at 8:18 a.m.)

2          THE COURT:  Thank you very much.  My mic is not on.

3          COURTROOM DEPUTY:  I'm sorry.

4          THE COURT:  Thank you.  Good morning to everyone.

5   We're back on the record in U.S. versus Stanton with counsel

6   present and Dr. Stanton present, as well.

7      The jury is not yet in the courtroom.  They're all

8   present, though?

9          COURT SECURITY OFFICER:  All of the jurors are in the

10  jury room.

11         THE COURT:  Okay.  Thank you.

12     Happy birthday to Officer Grigsby today.

13         COURT SECURITY OFFICER:  Thank you, sir.

14         THE COURT:  Marks number 56.

15     The defense had an issue, I understand.

16         MR. STRIANSE:  Yes, sir.  I wanted to revisit with

17  the Court the government expert witness issue that we're

18  dealing with.  I think it's inappropriate that --

19         THE COURT:  Yeah.  Let me tell you what I want to say

20  about that.

21         MR. STRIANSE:  Okay.

22         THE COURT:  So I saw an email come in.  We couldn't

23  open it, and my case manager got a copy of it.  I've not had

24  time to do any more than a cursory read of it.

25     If the defense objects to the use of Dr. King, then I

1   want to have a hearing on it.

2           MR. STRIANSE:  Yes, sir.

3           THE COURT:  And the options would be, Mr. Strianse,

4   we can break with proof today at 4:30 and have the hearing at

5   the end of the day or we can, you know, go until we -- until

6   we end today and then come in, in the morning.  I can have the

7   jury come in at, let's say, 8:45 instead of 8:15, start with

8   them at 9:00.

9       We call the case at 8:00 and have a hearing in the

10  morning.  I'm not going to let Dr. King testify until we have

11  a hearing and I rule on it.

12      So if you're planning to call him today, that's not going

13  to work.  We have got to have the hearing first.  So I haven't

14  made any decision, but I want there to be a hearing on it.

15      So are you objecting?

16          MR. STRIANSE:  That would be fine.  4:30 this

17  afternoon, I think would a good time to have the hearing.

18          THE COURT:  Okay.

19          MR. STRIANSE:  Thank you, Judge.

20          THE COURT:  All right.  Are you okay with that,

21  Mr. Smith?

22          MR. SMITH:  The sooner, the better.  We don't plan to

23  call him today.

24          THE COURT:  That sounds good.  We'll -- I'll hear

25  fully from both sides.  I'll certainly have some questions

1     about the sequencing chronology, and we'll see where it goes
2     from there.

3         Anything else to take up this morning, Mr. Smith?

4         MR. SMITH:  I didn't have anything to take up, I
5     don't believe.  We're continuing to work through the summary
6     exhibits, and so I guess we can just report back to the Court
7     at the appropriate time on that.  But I don't -- I don't think
8     there is anything else.

9         MR. STRIANSE:  Yes, Your Honor, we're continuing to
10    try to resolve that.  Dr. Stanton put together some revised
11    charts and we have given them to the government and,
12    hopefully, we can work out those disputes.

13        THE COURT:  Okay.  I appreciate everybody's efforts
14    on that.

15        On the -- I don't know if I brought them in here or not.
16    On the jury instructions you gave, Mr. Smith, I appreciate you
17    tendering those.  I looked at them and honestly, Mr. Strianse,
18    I -- I feel like they're pretty close and maybe the lawyer
19    there did not, you know, bring up *Ruan*, but it looks to me
20    like the judge had.

21        Did you read the substantive instruction?

22        MR. STRIANSE:  I did not, Your Honor.

23        THE COURT:  Yeah.  I didn't bring it in, but it
24    specifically includes the *Ruan* mens rea.

25        MR. STRIANSE:  Okay.

1    THE COURT:  So that's what I saw, anyway.

2    Did you read them, Mr. Smith?

3    MR. SMITH:  Yes, Your Honor.  And I think that the --

4    I think that the kind of three big issues that are going to be

5    kind of disputed, as far as I can figure is:

6    One, how do you formulate the elements themselves, the

7    *Ruan* mens rea.  And where do you put the knowingly part?  And

8    I think that the jury instructions, looks to me like they do

9    it the right way.

10    Second issue is:  After *Ruan*, is there still a good faith

11    defense?  Is that still a thing?  It's a really contorted

12    history because the government kind of saw a good faith-ish

13    standard and that was rejected.  And the Supreme Court looked

14    at it and said that's nowhere in the statute --

15    THE COURT:  Yeah.

16    MR. SMITH:  -- good faith isn't a thing.  And that

17    was, to the extent it was kind of imported from *Moore* and

18    other, you know, Supreme Court juris prudence.

19    THE COURT:  And it was never truly a defense.  It

20    wasn't truly a defense anyway.  It was sort of a -- anyway, I

21    understand.

22    MR. SMITH:  No, I agree.  And I've always had an

23    issue with, I mean, we have a good -- good faith defense at, I

24    think Chapter Ten of the Sixth Circuit Pattern Instructions

25    for specific crimes.  But it specifically says that that has

1      limited applicability and it shouldn't apply to

2      (indiscernible) anyway.

3         So the whole point of the outcome of that is, I think it

4      is fair to say after that, that it would not be proper to give

5      a good faith defense.  They probably feel differently.  But

6      the Court can probably consider that as why it's not in those

7      jury instructions.

8         And then third is the issue of deliberate ignorance.

9      Again, deliberate ignorance is just a way in the law that we

10      infer or show knowledge.  I think it is entirely appropriate

11      in the mens rea here that the Supreme Court said is knowledge.

12         So the Court, I believe, in that *Ashland* case gave that

13      instruction, I believe on that basis.  So I think it is

14      consistent, and we can take that up at the appropriate time.

15         THE COURT:  Thank you.

16      I agree those seem to be kind of the sticking points

17      between the -- between the parties.

18         And on the deliberate ignorance, you know, courts -- the

19      Sixth Circuit says "Give the instruction when it is warranted.

20      Give it sparingly."  You know, there's got to be proof of that

21      kind of ostrich-like behavior to justify it.

22         And I guess the only thing I'm worrying about -- I do

23      want the parties to give some thought to it.  You know, the

24      way that the Supreme Court addressed that mens rea.  Part of

25      it seemed to be that motivation from the underlying

substantive context and the effect of that regulation.

And, obviously, the Supreme Court had some critical remarks about that regulation.  It is still a regulation.  And the Supreme Court said, This defines the boundary of authorization.

But at the same time, the court was very aware of the kind of, you know, lack of clarity in that standard perhaps, or gauziness in it.  And so that was part of, we need a strong mens rea to counteract that, to be sure that a doctor who is operating in this gray zone is not, you know, not hooked on criminal liability.

So I'm just worried about:  Does that impact, you know, where the Court should determine, yes, I'm going to give a deliberate ignorance?  No, I'm not.  Should that play into that?

Now, that's not the holding, but I don't want to ignore what the Supreme Court said, either, about why it picked the standard that it picked.

So we'll talk about that at length, but I just appreciate the instruction.  I thought it was helpful.

And I don't know Judge -- is it Trauger?

MR. STRIANSE:  Yes, Your Honor.

THE COURT:  I don't know that Judge but, you know, typically I would think a federal judge dealing with a charge like this is going to be very aware of *Ruan*, even if the

1    lawyer doesn't flag it.  So seemed to reflect *Ruan* to me.

2    But everybody decides his or her own cases at the trial level.

3        All right.

4        Anything else, Mr. Smith?

5            MR. SMITH:  No, Your Honor.

6            THE COURT:  Mr. Strianse.

7            MR. STRIANSE:  No, Your Honor.

8            THE COURT:  Okay.  Thank you.  Let's bring them in.

9        (The jury entered the courtroom at 8:26 a.m.)

10           THE COURT:  Good morning to everyone.

11       If the clerk would call the case, please.

12           COURTROOM DEPUTY:  Yes, Your Honor.

13       London Criminal Number 21-CR-19.  United States of

14   America v John L.  Stanton.

15           THE COURT:  Thank you.

16       Counsel, if you would state your appearances, please.

17           MR. SMITH:  Good morning.  Andrew Smith on behalf of

18   the United States.

19           THE COURT:  Good morning.

20           MR. STRIANSE:  Good morning, Your Honor.  Peter

21   Strianse on behalf of defendant, John Stanton.

22           THE COURT:  Good morning.

23       And, Dr. Stanton, good morning to you.

24       Ladies and gentlemen of the jury, good morning.

25   Welcome back.  Appreciate you being here on time, ready to go

for day three.

Has everyone continued to follow the rules that you have been under? Anyone no? Okay. Thank you very much for your diligence on that. I did want to say just a word about jury service historically.

Here we are in 2022, fast-paced, modern world. But this exercise we're going through, it really goes all the way back to the origins of our nation.

And if you look at the Declaration of Independence, what that document did, of course, it declared our independence from Great Britain, but the document itself was really a justification for that.

There was a list of grievances against the king and the signers called it "a long list of abuses and usurpation." That's a fancy way of saying, these are our complaints and grievances.

And one of them was the denial of the right to trial by jury. So that was part of the motivation for the colonists in declaring independence from the king.

We gained our independence. And then, in the Constitution -- that is still in place today -- the framers put the jury trial in, mentioned it in several contexts.

And specifically included it in the Bill of Rights, in the Sixth Amendment. That assures anyone accused of a crime the right to a speedy public trial by a fair and impartial

1  jury.

2      So as you are serving today, I just want you to think

3  about the historical context you're in.  You're Americans in

4  2022 serving in this federal court, but what you are doing is

5  something that George Washington and Thomas Jefferson and

6  Benjamin Franklin and Alexander Hamilton all thought about,

7  planned for, envisioned as part of the foundation of our

8  country.

9      So there is a lot of complaints about government.  We all

10  like to engage in that.  But good government is really good

11  people and that's what you're here doing today.  You are

12  investing in our democracy and the functioning of our court

13  system.

14      And what you're doing echos all the way back over the

15  centuries to the founding of our country.  So it is a very

16  important role.  I always want to highlight it and just

17  express my appreciation for your chapter in what has been a

18  long book of freedom and liberty in our nation.

19      So that civics detour aside, we will now turn to the

20  proof today.

21      And, Mr. Smith, you can call the next government witness.

22      MR. SMITH:  Thank you, Your Honor.  United States

23  calls Shanna Armijo.

24      THE COURT:  Ms. Armijo.

25      SHANNA ARMIJO, GOVERNMENT'S WITNESS, SWORN

1          THE WITNESS:  Yes, ma'am.

2          COURTROOM DEPUTY:  Thank you.

3          THE COURT:  Ma'am, good morning to you.

4          THE WITNESS:  Good morning.

5          THE COURT:  Do try to speak toward that mic in a

6     clear, loud voice so we can all hear your testimony.

7        The chair is fixed, but the mic can move, if you need to

8     move it.

9        If you would state your name and spell your last name.

10         THE WITNESS:  Shanna Armijo.  A-R-M-I-J-O.

11         THE COURT:  Thank you.

12       Mr. Smith.

13                        DIRECT EXAMINATION.

14    BY MR. SMITH:

15    Q.   Good morning.  Could you please tell the jury the city

16    and state you live in.  Not your street address, but city and

17    state?

18    A.   Knoxville, Tennessee.

19    Q.   And what do you do for a living?

20    A.   I'm a medical assistant.

21    Q.   Have you ever heard of a place called Gateway Medical

22    Associates?

23    A.   Yes, sir.

24    Q.   Did you work there?

25    A.   Yes, sir.

1    Q.   What was your position?

2    A.   A medical assistant.

3    Q.   If I sometimes call that GMA instead of Gateway Medical

4    Associates, would we understand each other?

5    A.   Yes, sir.

6    Q.   Okay.  Apologize if I didn't hear you.

7         But what was the time period that you worked there?

8    A.   2016 to mid 2021.

9    Q.   2016 to 2021.

10        Where did you work before you worked at GMA?

11   A.   At a cardiologist in Kentucky.

12   Q.   What kind of medical office is GMA?  What kind of

13   medicine was it?

14   A.   It was pain management, sir.

15   Q.   Okay.  And had you had any training or experience in pain

16   management?

17   A.   No, sir.

18   Q.   Now, do you know the defendant, John Stanton?

19   A.   Yes, sir.

20   Q.   Okay.  How do you know him?

21   A.   He's the doctor that I worked for.

22   Q.   And did he work at GMA?

23   A.   Yes, sir.

24   Q.   Do you currently work for Dr. Stanton?

25   A.   Yes, sir.

1   Q.   Now, does he own the practice where you work?

2   A.   Yes, sir.

3   Q.   Is that still true today, do you know?

4   A.   I'm not sure, sir.

5   Q.   Okay.  Why is that?

6   A.   Just because what I have heard.

7   Q.   Okay.  Is your understanding that somebody else may own

8   the practice now?

9   A.   Yes, sir.

10  Q.   Either way, did you work with Dr. Stanton also at GMA?

11  A.   Yes, sir.  Yes, sir.

12  Q.   Okay.  Now, when you worked at GMA, can you just give,

13  just in kind of general terms, an idea for the jury as to what

14  you did day in and day out?

15  A.   I would get the chart for the doctor.  The M.A.s would,

16  obviously, triage the patients, would make sure the charts are

17  prepped for the doctor and scripts are printed for the doctor.

18  Q.   Did you consider yourself a scribe?  Is that what you

19  said?

20  A.   Yes, sir.  Yes, sir.

21  Q.   Okay.  Scribe.

22       When you were at GMA, did you have a sense of where

23  patients were coming from to the clinic?

24  A.   Yes, sir.

25  Q.   Where were they coming from?

1    A.   Some are from Tennessee and Kentucky, sir.

2    Q.   Did patients at GMA get prescriptions for controlled

3    substances?

4    A.   Yes, sir.

5    Q.   What kinds of drugs?

6    A.   The oxycodone, oxymorphone, Morphine, OxyContin,

7    fentanyl.

8    Q.   Do you have an idea of how much money patients paid to

9    come to Gateway?

10   A.   For private pay, yes, sir.

11   Q.   By "private pay," you mean I'm paying out of pocket?

12   A.   Yes, sir.

13   Q.   How much is that, typically?

14   A.   From 410 to 800.

15   Q.   So $4,800 out of pocket?

16   A.   Yes, sir.

17        THE COURT:  I'm sorry.  Let's confer on that.

18        (Sidebar conference.)

19        THE COURT:  Can you hear me?  Can you hear me,

20   Mr. Strianse?

21        MR. STRIANSE:  Yes, sir.

22        THE COURT:  My mic is not working, or my headphones

23   are not working, one.  Okay.  That's better.

24        Can you hear me, Mr. Strianse?

25        MR. STRIANSE:  Yes, sir.

1          THE COURT:  So I heard her say 410 to $800.

2      And then you said, I thought you said 48.  48.

3      It's off.

4      Okay.  I thought you said $4,800.  I just want to --

5  maybe I misheard it.

6          MR. SMITH:  Well, that would just be a tired mind

7  saying it.

8      What I meant to say is four to eight --

9          THE COURT:  Okay.

10         MR. SMITH:  -- hundred.  I'm sorry.

11         THE COURT:  Okay.  Maybe I misheard hear that.

12     Kim, what did you hear?

13         THE COURT REPORTER:  I heard 48.

14         THE COURT:  Okay.  Can you clarify that?

15         MR. SMITH:  Absolutely.  I think it was the mumbling

16 my words together when I asked you that question.  Certainly

17 try to again.

18     (Sidebar conference concluded.)

19 BY MR. SMITH:

20 Q.  The last question that I meant to ask was, just

21 confirming:  Was it 400 to $800?

22 A.  Yes, sir.

23 Q.  And that was typically out of pocket, as you just

24 explained?

25 A.  Yes, sir.

1        MR. SMITH:  Your Honor, is that fair?

2        THE COURT:  Yes, thank you.  Yes.

3    BY MR. SMITH:

4    Q.   When you started, what doctors or doctor worked at

5    Gateway Medical Associates?

6    A.   Dr. Maccarone.

7    Q.   When Dr. Maccarone was there, what were the hours like at

8    GMA?

9    A.   Very long.  I would come in, in the afternoon or

10   sometimes 10:00 and stay until midnight or past midnight.

11   Q.   Okay.  And was that the case in 2016?

12   A.   Yes, sir.

13   Q.   Did that hold true in 2017?

14   A.   Yes.

15   Q.   2018?

16   A.   Yes, sir.

17   Q.   All the way through the time that you worked there?

18   A.   Yes, sir.

19   Q.   What do you think the latest that you ever worked at GMA

20   was?

21   A.   4:30 a.m.

22   Q.   And you would get in at what time?

23   A.   Round afternoon-ish.  Like 12:00.

24   Q.   So compare that with your previous work at the

25   cardiologist office.

1    Did you ever work until 4:30 a.m. in the cardiologist's

2    office?

3    A.    No, sir.

4    Q.    Just kind of curious:  In your shoes, what was that like?

5    What was your reaction to working until 2:00, 3:00, 4:00 in

6    the morning?

7    A.    It was kind of stressful, but I would just tell myself, I

8    need my job.

9    Q.    Now, if a patient, let's say -- well, I should ask this:

10   Did patients have appointment times?

11   A.    Yes, sir.

12   Q.    Okay.  So might a patient have an appointment time at,

13   let's say, 11:00 a.m.?

14   A.    They would not be seen at 11:00 a.m.

15   Q.    You anticipated my next question.

16        So most of us go to the doctor, have an appointment at

17   11:00.  The doctor might be running behind a little bit, but

18   usually expect to be seen around then?

19   A.    Yes.

20   Q.    Is that how it worked at Gateway?

21   A.    No.

22   Q.    Okay.  Now, you mentioned the drugs that were being

23   prescribed.

24        Was it your understanding that most of these patients

25   were chronic pain patients?

1   A.   Yes, sir.

2   Q.   And what was the most common type of pain or complaint

3   that you saw?

4   A.   Low back pain and neck pain.

5   Q.   So with a lot of patients who had low back pain, how long

6   were they typically waiting around the office to be seen by a

7   doctor?

8   A.   At least maybe six to ten hours.

9        MR. STRIANSE:  Your Honor, object to this.  I don't

10  think the record supports that.  I want the jury to be able to

11  differentiate between Dr. Stanton and Dr. Maccarone.

12       The government could ask a more precise question.

13       THE COURT:  You'll have your cross-examination,

14  certainly.

15       I'll overrule that.  You can continue.

16  BY MR. SMITH:

17  Q.   Okay.  Now, when -- when you arrived, was the practice

18  set up with a network?

19  A.   At Gateway?

20  Q.   Yes.

21  A.   No.

22  Q.   Okay.  At some point, did Gateway have an electronic

23  medical record system?

24  A.   Yes, sir.

25  Q.   And do you remember what that system was?

1   A.   Quest Diagnostics or Quantum 360.

2   Q.   Now, who can access that medical record system?

3   A.   Me, Emilie, the M.A.s, the front desk.

4   Q.   Okay.  Did the doctors have access to it?

5   A.   Yes.

6   Q.   And are you -- are you pausing there because are you

7   wondering did doctors actually access it?

8   A.   No.

9   Q.   So in your experience, did either Dr. Stanton or

10  Dr. Maccarone use the electronic medical records system?

11  A.   No.

12  Q.   Whole time you were there?

13  A.   Yes, sir.

14  Q.   Compare that to when you worked at the cardiologist

15  office.

16       The cardiologist that you worked for, did he or she keep

17  their own notes?

18  A.   Yes, sir.

19  Q.   Did they spend time going over those notes?

20  A.   Yes, sir.

21  Q.   Was there an EMR system?

22  A.   Yes, sir.

23  Q.   Is that what Dr. Stanton and Dr. Maccarone did?

24  A.   No.

25  Q.   Now, you mentioned part of your job was preparing

1   information for the doctor and doctors, I guess, visits or

2   work that day?

3   A.    Yes, sir.

4   Q.    Can you just walk us through very briefly what kind of

5   information would be prepared in advance of the doctor's

6   arrival?

7   A.    In the charts it would always be the triage notes, pain

8   questionnaire, the face sheet with the medications, the last

9   note, the urine drug screen or any blood work.  The CSMD and

10  KASPER.  And if they had an in-house urine drug screen, that

11  would be in there.

12  Q.    So what was your role specifically with respect to

13  reassembling that information?

14  A.    Just to make sure everything was in order for the doctor,

15  make sure that, like, the chart was complete.

16  Q.    And who would hand that information to the doctor?

17  A.    For Dr. Maccarone, it would be on his desk.  I would hand

18  it to him.

19  Q.    What about for Dr. Stanton?

20  A.    Same.

21  Q.    Okay.  So you would not be the one who always printed

22  this information out, but you would have that packet, make

23  sure it was there, and then hand it to the doctor?

24  A.    Yes, sir.

25  Q.    Okay.  You already referenced this, but you are -- did

1    Gateway Medical Associates use urine drug testing?

2    A.   Yes, sir.

3    Q.   Okay.  And were there different types of urine drug

4    testing?

5    A.   There was in-house for -- we would see what the immediate

6    results were, and then we would send it out if it needed to be

7    sent out.

8    Q.   Okay.  And did that alternate each month?

9    A.   Yes, sir.

10   Q.   And so when you referenced the packet of information that

11   would be given to each doctor, you referenced the drug test

12   result and then the in-house result?

13   A.   Yes, sir.

14   Q.   So let's say a patient came in, in January.  And in

15   January, they gave a sample that was sent out to the lab, and

16   then that lab came back later in January.

17   A.   Yes, sir.

18   Q.   So at that February visit, would that result be in that

19   packet of information?

20   A.   Yes, sir.

21   Q.   Let's say also on that February visit, the patient then

22   gave an in-house immediate drug screen.

23   A.   Yes, sir.

24   Q.   And was that completed on a piece of paper?

25   A.   Yes, sir.

1   Q.   Would that also go into the packet of information?

2   A.   Yes, sir.

3   Q.   So that's two kinds of drug screens that are put into

4   that packet?

5   A.   Yes, sir.

6   Q.   Now, you also mentioned the previous note?

7   A.   Yes, sir.

8   Q.   What is a previous note?  Can you explain what that means

9   to the jury?

10  A.   Say a patient was seen in February, then January's note

11  would be in there.

12  Q.   Okay.  And based on your experience, where did that note

13  come from?

14  A.   The EMR, or Quantum 360.

15  Q.   Was that printed out from the EMR?

16  A.   Yes, sir.

17  Q.   Now, that patient note, did that have information in it,

18  typically, about a prior urine drug screen?

19  A.   Yes.

20  Q.   So in our example we talked about, January and February.

21  That January note is what you had available in February,

22  right?

23  A.   Yes, sir.

24  Q.   Okay.  Would that January note typically discuss the

25  results of, let's say, the December drug test?

1    A.   Yes, sir.

2    Q.   So is that a third drug test that was in this packet of

3    information, or third drug test that would have been

4    referenced in that packet of information?

5    A.   No, it would -- I don't understand.

6    Q.   Fair enough.  It's a confusing question.

7         So just -- if we're on the same page.

8         This packet of information would include a note that

9    would have covered, let's say in our example, the December

10   drug test.

11   A.   Yes.

12   Q.   So that's one.

13        It would also include that January test that had been

14   sent out.

15        That's two?

16   A.   Yes, sir.

17   Q.   And then it would include the paper drug test from

18   February, if that had been done that day?

19   A.   Yes, sir.

20   Q.   So, potentially, three different drug test results?

21   A.   Yes, sir.

22   Q.   In your experience, were those files typically made

23   complete and checked before they were given to the doctor?

24   A.   Yes, sir.

25   Q.   And is that because that was your job to do it?

1    A.   Yes, sir.  Yes, sir.

2    Q.   Is that true of Dr. Stanton?

3    A.   Yes, sir.

4    Q.   Do you have any knowledge, did you ever witness anybody

5    taking anything out of those packets before giving them to

6    Dr. Stanton?

7    A.   No, sir.

8    Q.   Did you do that?

9    A.   No, sir.

10        MR. SMITH:  Let's, if we can, go to Government

11   Exhibit 19.

12        And, Your Honor, this has been previously admitted.

13        May we publish it to the jury?

14        THE COURT:  Yes, you may.

15        MR. SMITH:  Thank you, Your Honor.

16   BY MR. SMITH:

17   Q.   Ma'am, I don't expect you to remember this particular

18   document.

19        MR. SMITH:  But if we can, Rebecca, if we can sort of

20   arrow through the page so she can see its contents generally.

21   BY MR. SMITH:

22   Q.   So, ma'am, does this -- not this specific patient, but

23   does this layout of this collection of documents look familiar

24   to you?

25   A.   Yes, sir.

1   Q.   What is it?

2   A.   Well, the first was the triage, the second was the pain

3   questionnaire, and then the face sheet.

4   Q.   Oh, sorry.

5        Does this appear consistent with those packets that you

6   referenced?  The information that you would prepare?

7   A.   Yes, sir.

8            MR. SMITH:  If we can go forward, Rebecca.  Yeah.

9   BY MR. SMITH:

10  Q.   So these are handwritten notes that are filled out that

11  day?

12  A.   Yes, sir.

13           MR. SMITH:  Okay.  Continue to advance, please.

14  BY MR. SMITH:

15  Q.   And then there seems to be a printout from the EMR.

16       Is that what you were referencing?

17  A.   Yes, sir.

18           MR. SMITH:  If you could keep going there.

19       Continue, please.  Couple more.  Okay.

20  BY MR. SMITH:

21  Q.   Is this the previous note?

22  A.   Yes, sir.

23  Q.   So, for instance, this is dated -- this is a note from

24  August of 2020.

25       Does that look right?

1    A.   Yes, sir.

2    Q.   And when was it printed?

3    A.   September 25, 2020.

4    Q.   As you were describing, in -- for a September visit, you

5    would print out the August note and make that available?

6    A.   Yes, sir.

7         MR. SMITH:  If we can go forward three days.  One

8    more, please.  One more in the notes.

9    BY MR. SMITH:

10   Q.   Did you have a familiarity with what the notes generally

11   said and how they were organized?

12   A.   Yes, sir.

13   Q.   Did that note typically -- in this section under "Plan of

14   Care," "Plan Text," did that typically state a previous

15   month's urine drug test results?

16   A.   Yes, sir.

17   Q.   Do you see the fifth line down there that says, "Reviewed

18   with patient"?

19   A.   Yes, sir.

20   Q.   Can you read that out loud for me?

21   A.   "Performed urine drug screen in office today.  Reviewed

22   with patient.  Urine drug screen performed on July the 28th,

23   2020, which is inconsistent with prescribed medications.

24   Negative for MS Contin and oxycodone.  Patient was given a

25   strong counseling to take medications as prescribed."

1    Q.   So, again, I don't want to get bogged down in this

2    particular patient.

3         But just as you explained to us.  This is in September,

4    and the note from August was printed out?

5    A.   Yes.

6    Q.   And that, the note from August contains drug tests from

7    July?

8    A.   Yes, sir.

9         MR. SMITH:  If we go forward again.

10   BY MR. SMITH:

11   Q.   What is that document?

12   A.   It's a urine drug screen that was sent out to Quest.

13   Q.   When was that sent out?

14   A.   August -- no.  August 28, 2020.

15   Q.   Okay.  So again this is -- this is in September.  This is

16   printed out.  This is the preceding month, the August urine

17   drug screen result?

18   A.   Yes, sir.

19   Q.   We have the note that reflects the July result.  And now

20   this reflects the August result?

21   A.   Yes, sir.

22        MR. SMITH:  Okay.  If I could go forward a couple of

23   more pages.

24        Please continue.  Keep going.  Stop there.

25   BY MR. SMITH:

1    Q.   The documents that are shown here, do you have a general

2    familiarity with those?

3    A.   Yes, sir.

4    Q.   What are those?

5    A.   This is the CSMD.  It's a report that shows when patients

6    fill narcotics for any type of controlled substances.

7              THE COURT:  When you say "CSMD," what do those

8    letters stand for?

9              THE WITNESS:  Controlled Substance Monitoring

10   Department of Health.

11             THE COURT:  Thank you.

12   BY MR. SMITH:

13   Q.   Did the office typically check those databases or reports

14   from those databases and print those out?

15   A.   Yes.

16   Q.   And that was part of these prep packets?

17   A.   Yes.

18   Q.   Do you know what those were used for?

19   A.   Typically, would be like if a patient filled early, too

20   early, or maybe might have gotten another prescription from

21   another doctor.

22             MR. SMITH:  Rebecca, can you go back or go forward

23   one page?  Oh, I'm sorry.  Go back one page.

24   BY MR. SMITH:

25   Q.   Do you see this document?

1    A.    Yes, this one is the KASPER for Kentucky.

2    Q.    And can you just give the jury a sense of how you would

3    typically read this.  Just what information is contained in

4    that.

5    A.    It shows when the last patient filled a medication at

6    what pharmacy and the date that they filled the medication of

7    controlled substances.

8    Q.    So that first, can you just read that?

9    A.    The July or August?

10   Q.    The top line there.  July 29, 2020.

11   A.    For -- they filled July 29, 2020.  They filled Morphine

12   E.R., 15 milligrams.  The patient's date of birth.  Number 60

13   tabs for 30 days.

14         The prescriber's name, Dr. Maccarone.  The city is

15   Clarksville.  The pharmacy Harris Family Pharmacy, and it is

16   Clarksville.  The location of the pharmacy is Clarksville.

17         And the daily M-E-D, and the patient I.D.

18             MR. SMITH:  And go back couple of pages, Rebecca.

19         One more.  One more.  I'm sorry.  My bad.

20         (Indiscernible.)  Whoops.  Okay.

21   BY MR. SMITH:

22   Q.    So putting this together, you just told us about that

23   first line that said on the 29th of July, the patient filled a

24   Morphine sulphate prescription?

25   A.    Yes, sir.

1   Q.   I think you said that was for a 30-day prescription?

2   A.   Yes, sir.

3   Q.   Okay.  And so the patient was prescribed -- and also

4   there was other prescriptions there.  I don't want to leave

5   those out.

6   A.   Yes, sir.

7   Q.   And then on this drug test, what did that say?

8   A.   It is inconsistent for Morphine.

9   Q.   Is the idea that you look at what had a patient filled

10  and what's on the drug test, and are those consistent?

11  A.   No, sir.  No, sir.

12  Q.   And that's how those two tools are supposed to be used

13  together?

14  A.   Yes, sir.

15  Q.   Do you recognize the initials on that drug screen?

16  A.   Yes, sir.

17  Q.   Whose initials is that?

18  A.   It is Dr. Stanton's.

19       MR. SMITH:  All right.  Rebecca, would you take that

20  down?

21  BY MR. SMITH:

22  Q.   Now, you mentioned the packets of information that were

23  prepared, and you looked at and provided to the doctors.

24       Was there also a list of patients or roster of patients

25  that the office prepared?

1    A.    Yes, sir.  The schedule.

2    Q.    And would you -- do you work on that schedule and take

3    notes?

4    A.    Yes, sir.

5    Q.    And what was the purpose of that?

6    A.    To make sure that the doc knew, like, the patients have

7    inconsistent urine drug screens.

8          MR. SMITH:  Can we bring up Government Exhibit 17C up

9    for example.

10   BY MR. SMITH:

11   Q.    Okay.  Do you recognize this?

12   A.    Yes, sir.

13   Q.    Whose handwriting is on that?

14   A.    That's my handwriting.

15         THE COURT:  Do you have that yet?  Okay.  Go ahead.

16         MR. SMITH:  Sorry.

17         THE COURT:  That's all right.

18   BY MR. SMITH:

19   Q.    So that's your handwriting?

20   A.    Yes, sir.

21   Q.    And at the top there, what doctor is listed?

22   A.    John Stanton.

23   Q.    Can you tell me why there is a doctor's name at the top?

24   A.    Because patients wanted to be seen by Dr. Stanton, not

25   Dr. Mac or Maccarone.

1    Q.   So based on your understanding, remembrance of this, the

2    doctor that was listed at the top of this list was seeing

3    those patients that day?

4    A.   Yes, sir.

5    Q.   Okay.  I believe that you just told us that you prepared

6    this piece of paper so that the doctor would have a heads-up

7    about what was going on with each patient; is that fair?

8    A.   Yes.

9    Q.   That included the result of the urine drug test?

10   A.   Yes.

11   Q.   Did you give these pieces of paper to Dr. Stanton?

12   A.   Yes, sir.

13   Q.   If we can look at a couple more.

14        MR. SMITH:  Rebecca, can we pull up 17A.

15   BY MR. SMITH:

16   Q.   Ma'am, do you see that?

17   A.   Yes, sir.

18   Q.   Okay.  Is that your handwriting?

19   A.   Yes, sir.

20   Q.   Can we go to 17B.

21        Is that your handwriting?

22   A.   Yes, sir.

23        MR. SMITH:  Just for the sake of efficiency, I'm

24   going to ask Rebecca to go through each of these patients

25   briefly.  They're some more similar documents.  Just review

1   each one.

2          THE WITNESS:  Okay.

3   BY MR. SMITH:

4   Q.   I'll just narrate which -- which exhibit it is.

5   A.   Okay.

6   Q.   For each one, please confirm whether it is your

7   handwriting.

8   A.   Yes.

9   Q.   So 17D?

10  A.   Yes, sir.

11  Q.   17E?

12  A.   Yes, sir.

13  Q.   17F?

14  A.   Yes, sir.

15  Q.   17G?

16  A.   Yes, sir.

17  Q.   17H?

18  A.   Yes, sir.

19  Q.   17I?

20  A.   Yes, sir.

21  Q.   17J?

22  A.   Yes, sir.

23  Q.   17K?

24  A.   Yes, sir.

25  Q.   17L?

1  A.  Yes, sir.

2  Q.  17M?

3  A.  Yes, sir.

4  Q.  17N?

5  A.  Yes, sir.

6  Q.  Okay.  Can we go forward to 17D.  Okay.

7      Can you explain to the jury what some of this handwriting

8  means?  Let's just start at the top there.

9      When it says the letters "F-E-N-T."

10 A.  Fentanyl.

11 Q.  Okay.  Below that.  When it says "Oral" next to Marlene

12 Thornton, what does that mean?

13 A.  That the patient was given an oral swab because she was

14 positive for Morphine, fentanyl, and heroin.

15 Q.  Okay.  And it says the word "dismissed" next to it.

16 A.  Yes, sir.

17 Q.  Who wrote that word "dismissed"?

18 A.  I did.

19 Q.  Did you write that before you saw the doctor?

20 A.  Yes, sir.

21 Q.  Okay.  Why?

22 A.  To let him know that she's dismissed or is dismissed.

23 Q.  Based on whose decision?

24 A.  Dr. Maccarone's.

25 Q.  But if Dr. Maccarone wasn't there that day, how did he

1    make that decision?

2    A.   I'm not sure.  She is -- she was dismissed, but she was

3    seen again.

4    Q.   We'll get to that second part.

5    A.   Okay.

6    Q.   When you were preparing this information, would you work

7    under the direction of anybody else at the office?

8    A.   Just Dr. Maccarone's --

9    Q.   Who -- did you have an immediate supervisor in the

10   office?

11   A.   Emilie.

12   Q.   Did she have input on things like dismissals?

13   A.   Yes, sir.

14   Q.   When you wrote "dismissal" here before the doctor had

15   seen this information, was that because of direction you had

16   gotten previously?

17   A.   Yes, sir.

18   Q.   Does that include from Emilie?

19   A.   Yes, sir.

20   Q.   To your recollection, did Dr. Stanton ever turn around

21   and tell you, Hey, let's dismiss this patient?

22   A.   No, sir.

23   Q.   Now, and let's look at -- down at the bottom there,

24   there's -- I think we had some confusion about this yesterday.

25        There is a notation that says something/O.

1       Do you see that?

2    A.   For Gary Potts?

3    Q.   Yes.  Is that an "S"?

4    A.   Yes, sir.  Sent out.

5    Q.   Does that mean sent out?

6    A.   Yes, sir.

7    Q.   And that means send it out for confirmation?

8    A.   Yes, sir.

9    Q.   Okay.  Now, if we can go to another, just go to 17 --

10   just the next one, please.

11       THE COURT:  Did you finish your answer?  You sent it.

12   You seemed to hesitate a little bit.

13       THE WITNESS:  Yeah.  Can we go back to that one?

14   BY MR. SMITH:

15   Q.   Yeah, please.  Please tell us what you need to tell us.

16   A.   It says 3-6.  I believe that urine in 3-6 was supposed to

17   be sent out.  I'm not sure if it was.

18   Q.   Okay.  If we go to the date of this document.

19       So is that you notating that a previous urine drug screen

20   should have been sent out?

21   A.   Yes, sir.

22   Q.   Again, I don't want to get bogged in any particular

23   detail, but is the idea here just you're trying to take notes

24   on what the status of each patient is --

25   A.   Yes.

1    Q.    -- to tell the doctor the about it?

2    A.    Yes, sir.

3    Q.    Okay.

4            MR. SMITH:  Can we go to 17E.  17F.

5    BY MR. SMITH:

6    Q.    In each of these instances, are those handwriting

7    notations your abbreviations?

8    A.    Yes, sir.

9    Q.    Okay.  So at the bottom there, just to explain, can you

10   tell us next to Gregory Hatfield, for instance, what do those

11   notations mean?

12   A.    Methamphetamine, THC, fentanyl, heroin, Morphine,

13   Tramadol.  And it was an oral drug screen, oral blue drug

14   screen.

15           MR. SMITH:  Can we go forward to 17G.

16   BY MR. SMITH:

17   Q.    Okay.  Just as an example.  There at the top.

18       Could you explain what it says next to Ethel Williamson's

19   name?

20   A.    Minus five fentanyl.

21   Q.    What are you -- what are you noting there?  What does

22   that mean?

23   A.    That five of the -- of her fentanyl patches was taken off

24   her prescription.

25   Q.    Okay.  What about below that?

1      Let's go down to Misty Brown there.  At 1:00.  5:30.

2  A.   Minus ten pills were taken off original script because of

3  meth.

4  Q.   Now, I don't expect you to remember this.  But that first

5  answer that you gave about the minus five for the fentanyl

6  patches --

7  A.   Yes, sir.

8  Q.   -- could that have also possibly been minus five because

9  of a fentanyl drug screen?  A failed drug screen for fentanyl?

10 A.   Yes, sir.

11 Q.   In this example, it's a little easier because

12 methamphetamine is not a drug that anyone prescribes, right?

13 A.   Yes.

14 Q.   You when wrote "minus five" or "minus ten" on these

15 documents, why were you doing that?

16 A.   It is something that Dr. Maccarone would do if someone,

17 like, failed a urine drug screen.

18 Q.   How did you know whether it was five or it was ten?

19 A.   I was going off of how Dr. Maccarone would have possibly

20 done it.

21 Q.   Okay.  So did you feel like as a physician you were kind

22 of having to guess whether it should be five or ten?

23 A.   Yes, sir.

24 Q.   Do you have any medical training that tells you for a

25 failed meth test that you should just nock someone ten pills?

1   A.   No, sir.

2   Q.   Do you have any idea whether that is the proper medical

3   practice or not?

4   A.   No, sir.

5   Q.   So when this sheet was filled out and you were negative

6   and you wrote "negative ten," would you then provide that to

7   Dr. Stanton?

8   A.   Yes, sir.

9   Q.   Would he ever ask questions about the notations?

10  A.   Sometimes.

11  Q.   Is it kind of like I'm doing here?  What does that

12  handwriting mean, or what does this one mean?

13  A.   Yes, sir.

14  Q.   Did he ever -- so these negative five, negative ten, that

15  is coming from you?  You are the one writing that?

16  A.   Yes, sir.  Yes, sir.

17  Q.   Did Dr. Stanton tell you to write those?

18  A.   No, sir.

19  Q.   And when you were doing that, you thought you were

20  following the directions of which doctor?

21  A.   Dr. Maccarone.

22  Q.   Okay.  So it was Dr. Maccarone's guidance to reduce

23  medications?

24  A.   Yes, sir.

25  Q.   Either way, was this your independent belief, at least,

1    that this is how medicine should be practiced?

2    A.   No.

3    Q.   Did it make sense to you?

4    A.   No.

5    Q.   Did you feel like you, independently, had a say as to

6    whether somebody who had tested positive for heroin got their

7    drugs or not?

8         Do you think you had that role or you got to decide that?

9    A.   Yes.

10   Q.   Do you understand my question?

11   A.   Not really.

12   Q.   Okay.  Did you think sitting there as a scribe at GMA,

13   did you think it is my job to decide whether a prescription

14   gets signed or not?

15   A.   No.

16   Q.   Whose job was that?

17   A.   Dr. Stanton.

18   Q.   Now, those prescriptions, how were -- just, if you can

19   explain to the jury, how was a prescription -- if we can

20   actually bring up an example.

21        MR. SMITH:  Can we bring up Government Exhibit 6.

22   Okay.

23   BY MR. SMITH:

24   Q.   Ma'am, I don't expect you to remember this specific

25   prescription.

1          But just in format, does that look familiar to you?

2     A.   Yes, sir.

3     Q.   What is this?

4     A.   It's a printed script for a patient.

5     Q.   And whose signature is that at the bottom?

6     A.   Dr. Stanton.

7     Q.   So is the prescription, is this consistent with how the

8     prescriptions typically looked at Gateway?

9     A.   Yes, sir.

10    Q.   Was it printed out from an electronic template and then

11    printed out on to paper?

12    A.   Yes, sir.

13    Q.   And what did you do with those prescriptions?

14    A.   I would put them in the chart.  It would be the first

15    documents of the chart.

16    Q.   Whose job was it to print out the prescription?

17    A.   Mine.

18    Q.   Was that blank when you gave it to the doctor?

19    A.   No.

20    Q.   I mean -- I'm sorry.

21         Was the signature line blank?

22    A.   Yes, sir.

23    Q.   In your experience, did Dr. Stanton review and tell you

24    to make changes frequently to the prescriptions?

25    A.   No.

1   Q.   Did he sign them as they were given to him?

2   A.   Yes, sir.

3   Q.   And did that happen day after day when you worked with

4   Dr. Stanton?

5   A.   Yes, sir.

6   Q.   Do you know what pill counts are?

7   A.   Yes, sir.

8   Q.   What is a pill count?

9   A.   A -- typically, a patient will come in with their

10  medication, they would give a urine drug screen and we would

11  count their pills in the office with them, or in the room.

12  Q.   How often did pill counts happen at Gateway?

13  A.   When I first started, never.

14  Q.   Okay.

15  A.   Started.

16  Q.   Okay.  Were you aware of whether there was a payment

17  policy regarding drug screens?

18  A.   You said "a payment policy"?  Yes, sir.

19  Q.   Explain that to the jury.

20  A.   There is like a pill count policy, I believe.  If they

21  don't show up to one, they would have to pay a no-show fee.

22  And I guess they think that would count as a pill count for

23  not showing up.

24  Q.   In your experience, could patients do that?  Could they

25  just pay $150 and not show up?

1    A.   Yes, sir.

2    Q.   And by doing that, could they go long periods of time

3    without ever having their pills counted?

4    A.   Yes, sir.

5    Q.   Do you understand the purpose?  You explained how a pill

6    count worked.

7         Did you understand why you would want to do a pill count?

8    A.   Yes, sir.

9    Q.   Why?

10   A.   To make sure they're taking their medications as

11   prescribed.

12   Q.   And if patients could just pay and not show up, were you

13   and other staff able to confirm whether they were taking their

14   medications as prescribed?

15   A.   No, sir.

16   Q.   Were you able to confirm whether the patients were

17   selling or getting rid of their medication?

18   A.   No, sir.

19   Q.   You talked about -- when we were looking at that document

20   a moment ago, you talked about dismissals.  When you saw the

21   word "dismissed."

22   A.   Yes.

23   Q.   You said that patient was still seen?

24   A.   Yes, sir.

25   Q.   Did you see, when you worked at Gateway Medical

1   Associates, patients who, for instance, you would write

2   "dismissed" and the patient would still be seen?

3   A.   Yes, sir.

4   Q.   And the patient would still get a controlled substance

5   prescription?

6   A.   Yes, sir.

7   Q.   Did that happen with some frequency at Gateway?

8   A.   Yes, sir.

9   Q.   Okay.  Did Dr. Stanton write those prescriptions?

10  A.   Yes, sir.

11  Q.   What do you understand Dr. Stanton's job title to be?

12  A.   Medical director.

13  Q.   Now, counsel alluded to this a moment ago.

14       But when Dr. Stanton would be there during the day -- not

15  Dr. Maccarone, and we'll talk about when that would occur.

16       But just in an example day when Dr. Stanton would be

17  there, give me a sense of what the schedule was like that day,

18  on those days.

19  A.   It was full.  It was like 20 to 30 patients.

20  Q.   And what time would you typically arrive?

21  A.   Around noon.

22  Q.   And what time would Dr. Stanton arrive?

23  A.   Around 4:00.

24  Q.   How long would he stay?

25  A.   To see all of the patients.  About an hour and a half,

1    two.

2    Q.   So he would see -- did you say 25 to 30 patients was

3    typically the workload?

4    A.   Yes, sir.

5    Q.   He would see 25 or 30 patients in an hour and a half to

6    two hours?

7    A.   Yes, sir.

8    Q.   Now, when you worked at GMA, did you have an

9    understanding that there was some kind of time requirement for

10   Dr. Stanton to be there?

11   A.   Yes, sir.

12   Q.   How much time do you think he was supposed to be there,

13   just your understanding?

14   A.   Four hours a day.

15   Q.   For the days he was there, he was supposed to be there

16   for four hours?

17   A.   Yes, sir.

18   Q.   Was he typically there for four hours?

19   A.   No, sir.

20   Q.   Was he ever there for four hours?

21   A.   No, sir.

22   Q.   Now, were there times that Dr. Maccarone -- because of

23   health issues was out of the office for a long period of time?

24   A.   Yes, sir.

25   Q.   And in those instances -- from this time period 2016 to

1   2020 -- when those long breaks happened, who was the doctor

2   there at Gateway?

3   A.   Dr. Stanton.

4   Q.   Okay.  Was there any other physician there?

5   A.   No, sir.

6   Q.   Was there another nurse practitioner there?

7   A.   No.

8   Q.   APRN?

9   A.   No, sir.

10  Q.   Was there anybody else there capable of writing a

11  prescription?

12  A.   No, sir.

13  Q.   On those days when Dr. Stanton was there, or those

14  instances when there were these longer periods --

15  A.   Yes, sir.

16  Q.   -- was this a couple of months on end a couple of times?

17  A.   Yes, sir.

18  Q.   Now, in those instances, would Dr. Stanton come in not

19  just once or twice a week, but multiple times throughout the

20  week?

21  A.   Yes, sir.

22  Q.   Okay.  And in those instances, would the daily schedule

23  still be like you described it to us before?

24  A.   Yes, sir.

25  Q.   Okay.  So, you know, he might come in each day of the

1   week, but each of those days he's coming in later afternoon?

2   A.   Yes.

3   Q.   For an hour and a half to two hours?

4   A.   Yes, sir.

5   Q.   So in this instance -- and just to be fair -- in those

6   instances, Dr. Stanton might be, in total, be at the office

7   more than four or eight hours, whatever the time requirement

8   was; is that fair?

9   A.   Yes, sir.

10  Q.   But in those instances where Dr. Maccarone was back and

11  Dr. Stanton was just coming out for his, you know, two days a

12  week --

13  A.   Yes, sir.

14  Q.   -- in those instances, was he ever working a total of

15  eight hours?

16  A.   No, sir.

17  Q.   Now, you mentioned -- and we can, talked about records,

18  paper records and electronic records.

19       Did Dr. Stanton ever complain to you that he was unable

20  to access the EMR system?

21  A.   No, sir.

22  Q.   Did he ever come to you expressing that he wanted a

23  deeper dive or more information?

24  A.   No, sir.

25  Q.   Did the practice have certain written policies and

1   procedures?

2   A.   Yes, sir.

3            MR. SMITH:  For instance, can we pull up Government

4   Exhibit 22B?

5        And, Your Honor, this has been previously admitted.

6        May we publish it?

7            THE COURT:  Yes, you may.

8   BY MR. SMITH:

9   Q.   Ma'am, what is this?

10  A.   Medications screening policy and compliance plan.

11  Q.   Was that for Gateway Medical Associates?

12  A.   Yes, but I have never seen this.

13  Q.   So you, as an employee at Gateway Medical Associates,

14  never saw this policy?

15  A.   No, sir.

16           MR. SMITH:  Rebecca, we can take that down.

17  BY MR. SMITH:

18  Q.   You worked there for how long?

19  A.   Four and a half years.

20  Q.   And you were the one writing out all these notes about

21  failed drug tests?

22  A.   Yes, sir.

23  Q.   To your knowledge, was there ever a meeting that

24  Dr. Stanton held with staff about following policies?

25  A.   No, sir.

1  Q.  Did he ever have meetings about the completeness of
2  medical records?
3  A.  No, sir.
4  Q.  Did he ever sit anyone down and say we need to change
5  this particular practice or how we're doing things?
6  A.  No, sir.
7  Q.  I think that we have described the difference between the
8  hours that you would work with Dr. Stanton versus
9  Dr. Maccarone.
10 A.  Yes, sir.
11 Q.  And to be fair, as counsel pointed out, the crazy hours,
12 long hours, those late nights.
13     That was when Dr. Maccarone was working?
14 A.  Yes, sir.
15 Q.  Did Dr. Stanton ever reference or talk about those crazy
16 hours?
17 A.  No, sir.
18 Q.  Did he ever -- did you ever overhear him say anything
19 about how late people were working the night before?
20 A.  No, sir.
21 Q.  Ma'am, do you remember meeting with us previously?
22 A.  What?
23 Q.  Before today, have you ever met with investigators to
24 talk about your knowledge of the case?
25 A.  No.

1   Q.   You never met with Investigator Sizemore or myself before

2   today?

3   A.   Oh, yes.  Yes, yes.

4   Q.   I think you might be a little confused about my question.

5   A.   I'm sorry.

6   Q.   Ma'am, in the series of those questions, did we talk

7   about those long hours?

8   A.   Yes.

9   Q.   And in the course of that questioning, did you talk about

10  whether you had overheard Dr. Stanton talk about these long

11  hours?

12  A.   Yes, sir.

13  Q.   Okay.  Does that refresh --

14  A.   Yes.

15  Q.   -- the question?  I think maybe you misunderstood me or

16  let me ask you again.

17       When you worked at Gateway Medical Associates, did you

18  ever overhear Dr. Stanton talking about how late people had

19  been working?

20  A.   Yes.

21  Q.   Can you just describe generally what you heard?

22  A.   Maybe, How late was it last night?  Was it past midnight?

23  Q.   Were there ever jokes made about how late it had been?

24  A.   Yes.

25  Q.   Now, was -- looking back on it, was Gateway an easy place

1    to work?

2    A.   No.

3    Q.   You described to us how late you worked, for instance?

4    A.   Yes, sir.

5    Q.   Did you like working with Emilie?

6    A.   Yes and no.

7    Q.   Fair enough.

8         Were there times that you wanted to leave or wanted to

9    work elsewhere?

10   A.   Yes, sir.

11   Q.   But did you continue working there?

12   A.   Yes, sir.

13   Q.   After everything that you have told us, you then went to

14   work for Dr. Stanton?

15   A.   Yes, sir.

16   Q.   Why did you do that?

17   A.   I needed another job.  I mean, and it was -- I was

18   familiar, somewhat, familiar with pain management.

19   Q.   Now --

20        MR. SMITH:  Your Honor, if could just have one

21   moment.

22        THE COURT:  You may.

23      (Off-the-record discussion.)

24        MR. SMITH:  Your Honor, thank you.  That's all the

25   questions I have you.

1          THE COURT:  Thank you.

2      Mr. Strianse.

3          MR. STRIANSE:  Thank you, Your Honor.

4                      CROSS-EXAMINATION

5   BY MR. STRIANSE:

6   Q.  Good morning, ma'am.

7   A.  Good morning, sir.

8   Q.  I think that you told the jury that after GMA you went to

9   work with Dr. Stanton; is that right?

10  A.  Yes, sir.

11  Q.  And you mentioned that you needed a job?

12  A.  Yes, sir.

13  Q.  But you don't appear to be the type of person that would

14  surrender all of her principles to go work for someone that

15  you didn't have any respect for, if you understand my

16  question?

17  A.  I don't.

18  Q.  When you made the transition from GMA and decided to go

19  work with Dr. Stanton, you said that you needed a job?

20  A.  Yes, sir.

21  Q.  But I don't think that you would have gone to work with

22  Dr. Stanton if you didn't think --

23          MR. SMITH:  Your Honor, objection.

24      (Sidebar conference.)

25          THE COURT:  Can you hear, Mr. Strianse?

1          MR. STRIANSE:  Yes, sir.

2          THE COURT:  What is the objection?

3          MR. SMITH:  Your Honor, I think this is straying into

4    impermissible questioning about character evidence.  I

5    think -- we can understand why she went to the job.  But if

6    it's an opinion about is this someone of good character that

7    you had respect for, we moved in limine about this.

8          It would have to be for a pertinent character trait.  And

9    I don't know what trait that would be that's been identified.

10   I think we're getting a little close to that line.

11         MR. STRIANSE:  I'm talking about her character and

12   her decision making to follow Dr. Stanton.

13         THE COURT:  I think it's fine to ask her.  I see what

14   you are setting up.  You know, if you had concerns about it,

15   why would you go work here?  I think that's fine.

16         I don't want you to ask her, her opinion about

17   Dr. Stanton as a man or a practitioner.  But whether she set

18   aside any reservations to go work for him, I think that is

19   fair game.

20         Overruled.

21         (Sidebar conference concluded.)

22         THE COURT:  You may proceed.

23   BY MR. STRIANSE:

24   Q.   I guess what I'm asking you is:  If you had concerns

25   about Dr. Stanton, you would not have gone to work with him?

1    Do you not understand my question?

2    A.   No, sir.

3    Q.   Okay.  Well, you left GMA?

4    A.   Yes, sir.

5    Q.   And you had options to go to, really, any other place you

6    wanted to try to apply for work; is that right?

7    A.   Yes, sir.

8    Q.   But you made the transition to go work with Dr. Stanton?

9    A.   Yes, sir.

10   Q.   Okay.  And if you had grave concerns about Dr. Stanton as

11   a physician, would you have followed him to his practice?

12   A.   Yes.

13   Q.   So you're saying that you would have followed him

14   regardless?

15   A.   Yes.

16   Q.   Then it was just a paycheck to you.  You didn't care

17   where you worked, what you were asked to do, nothing like that

18   factored in the equation?

19   A.   Well, I know he was looking for an M.A. as well.

20   Q.   I realize that.

21        I know that he had a position and you were interested in

22   the position.  I want to make sure that you understand my

23   question.

24        If you thought that was a bad place to work, that bad

25   things were going on at Dr. Stanton's office, would you have

1   taken the job?

2   A.   Yes.

3   Q.   So regardless --

4        THE COURT:   Mr. Strianse, you've covered it.   Move on

5   to the next thing.

6        MR. STRIANSE:   Okay.

7   BY MR. STRIANSE:

8   Q.   I had some questions about some of the topics that you

9   were asked about in your direct examination.

10       Do you remember seeing all of those exhibits that were

11  the patient scheduling?

12  A.   Yes, sir.

13  Q.   Okay.   Now, that didn't begin until probably March of

14  2020; is that right?

15       The second time that Dr. Maccarone was away from the

16  practice?

17  A.   What do you mean?

18  Q.   The notations being made on those patient scheduling.

19  A.   Well, when Dr. Maccarone was seeing patients, I did the

20  same thing on the schedule.

21  Q.   But do you remember he got sick the first time in

22  November of 2018?

23  A.   Yes, sir.

24  Q.   And Dr. Stanton filled in at that point in time?

25  A.   Yes, sir.

1    Q.   And there were no notations, hand notations, made on

2    charts?  Do you remember that?

3    A.   For November?

4    Q.   Yeah.  November of '18, when he went out, into 2019.

5    That first four months that he was out --

6    A.   Yes, sir.

7    Q.   -- do you remember there were no handwritten notations

8    done by M.A.s on the schedule?

9    A.   No.

10   Q.   You don't remember that?

11   A.   No.

12   Q.   And that the notations only began in March of 2020, when

13   he was out the second time?

14   A.   Yes.

15   Q.   Does that sound right to you?

16   A.   There should always have been notations on the schedule.

17   Q.   Okay.  Now, in the schedules that you saw today, the

18   patient schedules --

19   A.   Yes, sir.

20   Q.   -- they were all dated March 2020; is that right?

21   A.   Yes, sir.

22   Q.   Now, that was --

23        MR. SMITH:  Your Honor, if we can go to the

24   headphones, just an objection on that point.

25        (Sidebar conference.)

1          THE COURT:  Can you hear, Mr. Strianse?

2          MR. STRIANSE:  Yes, sir.

3          THE COURT:  What's the objection?

4          MR. SMITH:  Misstates the record.  The ones we looked

5     at, we went through exhaustively yesterday, not just from

6     March 2020.  They are from subsequent months as well.

7          THE COURT:  Well, beginning in March of 2020?

8          MR. SMITH:  That would be fair.  If we want to

9     clarify that, but it's not just March.

10          THE COURT:  So no earlier than March of 2020 for that

11     17 set; is that correct?

12          MR. SMITH:  That's correct, Your Honor.

13          THE COURT:  Okay.  Thank you.

14        (Sidebar conference concluded.)

15          THE COURT:  Mr. Strianse, just clarify.

16          MR. STRIANSE:  Yes.

17     BY MR. STRIANSE:

18     Q.   The charts that you -- or the schedules that you saw this

19     morning --

20     A.   Yes, sir.

21     Q.   -- were started in March of 2020; is that right?

22     A.   Yes, sir.

23     Q.   And those contain those handwritten notations; is that

24     correct?

25     A.   Yes, sir.

1  Q.    Okay.  Now, I want to ask you about these packets.

2       Do you remember when those packets started?  When you all

3  started assembling those documents and giving the paper file

4  to Dr. Stanton?

5  A.    It was always like that, since 2016.

6  Q.    Okay.  It didn't start in March of 2020, the second time

7  that -- that Dr. Maccarone was out?

8  A.    No, sir.

9  Q.    Okay.  You were asked about a patient that was dismissed

10  and that the patient was seen again by Dr. Maccarone; is that

11  right?

12  A.    Yes, sir.

13  Q.    These two doctors, Stanton and Maccarone, had really

14  different practice styles; is that right?

15  A.    Yes, sir.

16  Q.    Dr. Maccarone would -- Dr. Stanton would dismiss a

17  patient, and then Dr. Maccarone would let that patient come

18  back into the practice; is that right?

19  A.    Yes, sir.

20  Q.    And then when they came back, they had to pay a fee to be

21  reinstated; is that correct?

22  A.    Yes, sir.

23  Q.    Around $500 to be reinstated?

24  A.    Yes, sir.

25  Q.    And that was money that went to Dr. Maccarone --

1    A.   Yes, sir.

2    Q.   -- am I right?

3         You were shown on those patient schedules handwritten

4    notations, "minus five," "minus ten."

5         And that would be a reduction in pills; is that right?

6    A.   Yes, sir.

7    Q.   If there was something that was -- was aberrant in the

8    patient's urine drug screen; is that correct?

9    A.   Yes, sir.

10   Q.   And just so it is clear to me, when a patient would come

11   in for a visit, they would have a urine drug screen; is that

12   correct?

13   A.   Yes, sir.

14   Q.   And was that done typically with a mouth swab, or was it

15   a urine screen, or what is your recollection?

16   A.   It is either/or.  Some patients, like, Medicare patients

17   I believe they would have to give a urine sample every other

18   month.

19   Q.   And those urine drug screen results --

20   A.   Yes, sir.

21   Q.   -- those sort of initial results, were noted on the

22   patient schedule; is that right?

23   A.   Yes, sir.

24   Q.   And if you, at the front desk, saw that there was

25   something in this presumptive test that looked not quite

1    right, you would suggest on the patient's schedule, minus

2    five, minus ten?

3    A.   The front desk, they wouldn't know anything about the

4    drug screens.

5    Q.   The M.A.s is what I'm talking about.  People like you and

6    Emilie.

7    A.   Yes, sir.

8    Q.   Okay.  You were the ones who would make those suggestions

9    on the patient schedule; is that right?

10   A.   Well, it was done, like, if it said minus five, then

11   minus five was taken off the original script.

12   Q.   Right.  And that was something that you all wrote on the

13   patient's schedule?

14   A.   Yes, sir.

15   Q.   Okay.  And that came from a practice that Dr. Maccarone

16   had started; is that correct?

17   A.   Yes, sir.

18   Q.   Were you aware of things that were going on at GMA that

19   were being hidden from Dr. Stanton?

20   A.   No.

21   Q.   Do you remember talking to me on the telephone about your

22   work at GMA?

23   A.   Yes, sir.

24   Q.   And your interaction with Dr. Stanton --

25   A.   Yes, sir.

1   Q.   -- and the time that you spent working with him at GMA?

2   Do you remember talking about topics like that?

3   A.   Yes, sir.

4   Q.   And do you remember the issue coming up about whether

5   certain things were hidden from Dr. Stanton --

6   A.   Yes, sir.

7   Q.   -- at GMA?

8        And do you remember sort of having a vivid and a bit of

9   an emotional moment and saying that there were things that

10  were hidden from Dr. Stanton?

11  A.   Well, I believe it may have been done, but I'm not sure.

12  Q.   So as you sit there right now, you have a recollection of

13  having that conversation with me on the telephone?

14  A.   Yes, sir.

15  Q.   And you have a recollection of that comment being made by

16  you during that conversation?

17  A.   Yes, sir.

18  Q.   Now, what were the things -- when you -- when you told me

19  that, when you said that you believed things were being

20  hidden, what sort of things did you believe were being hidden?

21  A.   Some, I believe, records from the charts.

22  Q.   And what kind of records?  Like urine drug tests?

23  A.   Not sure, sir.

24  Q.   Do you -- do you remember saying anything to me about

25  failed urine drug tests?

1    A.   Yes, sir.

2    Q.   That those were not made known to Dr. Stanton?

3    A.   Well, I know they were in the charts, sir.

4    Q.   Okay.

5    A.   But I don't know if they pulled -- the full chart went to

6    him.

7    Q.   Now, how many pages from the chart would go into the

8    packet?

9    A.   There was the triage, the pain questionnaire, the face

10   sheet, the last note, the drug screen, CSDM, the KASPER.  Like

11   25 pages.

12   Q.   When you say "the drug screen," are you talking about the

13   previous month's urine drug test?

14   A.   Yes, or if they have, like, an in-house.

15   Q.   Okay.  Now, are you saying that the actual piece of paper

16   from Quest that represented the urine drug test was in this

17   packet?

18   A.   Yes, sir.

19   Q.   You sure it wasn't just the chart note that had a

20   sentence that we saw this morning about the results of that?

21   A.   No.

22         THE COURT:  The question is:  Are you sure it wasn't

23   that?  Are you sure?  Is that your answer?

24         THE WITNESS:  Well, I'm sure that the whole chart was

25   given to the doctor with all of the documents.

1          THE COURT:  Including the lab test?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Okay.

4    BY MR. STRIANSE:

5    Q.   In terms of things being hidden from Dr. Stanton -- and

6    I'm referring to that telephone conference that we had.

7         Did you say that you felt like there were things that

8    were altered in patient charts?

9    A.   Yes, I believe so.

10   Q.   And if you know, who would have been making those

11   alterations to the chart?

12   A.   Miss Emilie.

13   Q.   Miss Emilie.

14        You were asked about Miss Emilie by Mr. Smith --

15   A.   Yes, sir.

16   Q.   -- a few minutes ago.

17   A.   Yes, sir.

18   Q.   He asked -- I don't want to misstate anything -- whether

19   you enjoyed working with her or felt comfortable working with

20   her.  And you said, "yes and no."

21   A.   Yes, sir.

22   Q.   Was the "no" portion of this based on the relationship,

23   the very close relationship, that she had with Dr. Maccarone?

24   A.   Yes, sir.

25   Q.   Did you feel like they were working together to maybe

1    keep Dr. Stanton in the dark about some of the things that

2    were going on at GMA?

3    A.   Yes, sir.

4    Q.   You were asked about patients coming from Kentucky?

5    A.   Yes, sir.

6    Q.   And driving long distances.

7         As you sit there right now, do you remember ever having a

8    conversation with Dr. Stanton about, Hey, Dr. Stanton, did you

9    realize this patient drove in from Kentucky?

10   A.   No, sir.

11   Q.   How about people were coming from Kentucky in groups?  Do

12   you have any recollection of telling Dr. Stanton about that?

13   A.   No, sir.

14   Q.   I think that you told Mr. Smith this morning that when

15   you prepared the packet for the patient that he was going to

16   see, that you hand delivered it to Dr. Stanton; is that right?

17   A.   It was either me or Emilie.

18   Q.   And that would be -- the prescriptions would be in there;

19   is that right?

20   A.   Yes, sir.

21   Q.   And tell the jury was it -- as each patient came in,

22   would the packet be delivered?

23   A.   Well, the -- normally, the charts would be given to

24   Dr. Stanton by either me or Emilie before seeing the patient.

25   Q.   Okay.  And would it be on a patient-by-patient basis?

1   Meaning, would somebody escort the patient to the office and

2   hand Dr. Stanton a file then?

3   A.   Yes, sir.

4   Q.   Okay.  When a patient was to be dismissed from GMA, do

5   you know who was responsible for entering that information

6   into the electronic health record, the EMR?

7   A.   That was me.

8   Q.   Okay.  How about when MMEs were being lowered by

9   Dr. Stanton, who would have entered that into the record?

10  A.   That would be me.

11  Q.   You know, you're working at GMA, you're dealing with two

12  different physicians.

13  A.   Yes, sir.

14  Q.   Is it a fair characterization that Dr. Stanton was trying

15  to lower the MME on the patients that he was seeing?

16  A.   No.

17  Q.   Wasn't there some tension between Stanton and Maccarone,

18  where Stanton would try to lower the prescription and

19  Maccarone would raise it back up?

20  A.   Yes, sir.

21  Q.   Okay.  So there was a difference between Stanton and

22  Maccarone on that topic?

23  A.   Yes, sir.

24  Q.   After Dr. Maccarone came back from the surgeries, would

25  he still call in sick and not come to the office?

1    A.   Yes, sir.

2    Q.   And would he usually wait until the very day that he was

3    supposed to come in to let you all know that he was not going

4    to come in it?

5    A.   Latest was 7:00 p.m.

6    Q.   On the very day that patients were there waiting for him?

7    A.   Yes, sir.

8    Q.   When Dr. Stanton came into GMA when Maccarone was out,

9    when he was covering for Maccarone, what was your

10   understanding about where Dr. Stanton had spent the morning?

11   A.   At his -- at the other office.  The Joint and Spine Pain

12   Center.

13   Q.   Actually seeing patients and doing procedures?

14   A.   Yes.  At -- yes.

15   Q.   When Maccarone rolled in on a given day, what was your

16   understanding about where he was?

17   A.   Dr. Stanton?

18   Q.   Dr. Maccarone.

19   A.   In the, like, where would he be in the mornings?

20   Q.   No.  My question is this:  He didn't -- Maccarone didn't

21   come in until the afternoon; is that right?

22   A.   Yes, sir.

23   Q.   Or early evening, correct?

24   A.   Yes, sir.

25   Q.   And Maccarone was at home?

1   A.   Yes, sir.

2   Q.   Doing whatever he was doing.

3        He was not at another clinic --

4   A.   Oh.

5   Q.   -- seeing patients?

6   A.   No, sir.

7   Q.   And he typically arrived at, what, 4:00 in the afternoon?

8   A.   Yes, sir.

9   Q.   And then he would meet with Emilie in his office?

10  A.   Yes.

11  Q.   For about an hour or so?

12  A.   Yes, sir.

13  Q.   And then around 6:00 p.m., he would start seeing

14  patients; is that correct?

15  A.   Yes.

16  Q.   And then you all ended up having to stay until 2:00,

17  3:00, 4:00 in the morning?

18  A.   Yes, sir.

19  Q.   Or later?

20  A.   Yes, sir.

21        MR. STRIANSE:  Your Honor, may I have one moment?

22        THE COURT:  Of course.

23    (Off-the-record discussion.)

24  BY MR. STRIANSE:

25  Q.   Just one other area.

1       We talked about the fact that Stanton was trying to lower

2   the MMEs and Maccarone was bringing them back up.

3   A.   Yes, sir.

4   Q.   Who was putting in the electronic health record that the

5   MME was being lowered when, in fact, it was not?

6   A.   Me.

7   Q.   And who gave you instructions to countermand what

8   Dr. Stanton was saying about the MMEs?

9   A.   What do you mean?

10  Q.   Why would you do that?  If -- if you knew that

11  Dr. Stanton was trying to lower the MME, why would you -- and,

12  in fact, it was being raised -- why would you put that

13  information in the chart that it was being lowered?

14  A.   With some of the patients, he never really lowered them.

15  Q.   And you're talking about Dr. Stanton?

16  A.   Yes, sir.

17  Q.   So the charts would have entries in there about the MME

18  being lowered; is that right?

19  A.   Yes, if it was lowered.  Yes, sir.

20  Q.   But how do you handle reporting that if Maccarone was

21  raising the MMEs?

22  A.   It would be the plan of care.

23  Q.   When -- so you would actually put that in the electronic

24  record?

25  A.   Yes, sir.

1    Q.   That they were being raised by Maccarone?

2    A.   Yes, sir.

3              MR. STRIANSE:  Okay.  That's all.

4              THE COURT:  Thank you.

5         Mr. Smith.

6                      REDIRECT EXAMINATION

7    BY MR. SMITH:

8    Q.   Ma'am, I want to start where you just left off.

9         This idea about, I think counsel asked or stated to you

10   about Dr. Stanton would lower people's medications.

11        Do you remember those questions?

12   A.   Yes, sir.

13   Q.   Okay.  Please stop and think clearly about what I'm

14   asking you.

15   A.   Okay.

16   Q.   You told us on direct examination about the process day

17   after day where you would print the prescription out, you

18   would take five off and you would give it to Dr. Stanton.

19   A.   Yes, sir.

20   Q.   Did Dr. Stanton ever make adjustments to those

21   prescriptions?

22   A.   No.

23   Q.   So was it Dr. Stanton lowering people's prescriptions?

24   A.   No.

25   Q.   And we talked about Dr. Maccarone raising people back up.

1   A.   Yes, sir.

2   Q.   After that happened, when Dr. Maccarone would prescribe a

3   higher level, would Dr. Stanton then sign the next

4   prescription at that level?

5   A.   Yes, sir.

6   Q.   You were asked questions about urine drug screens versus

7   urine drug testing.

8   A.   Yes, sir.

9   Q.   I think -- if we're on the same page.  The screen is the

10  in-house and the test is the lab result that is sent out?

11  A.   Yes, sir.

12  Q.   Did Dr. Stanton ever say we have a urine drug screen that

13  is positive for something, it's going to be sent out.  Let's

14  wait until that result comes back in a couple of days and then

15  talk to the patient?

16  A.   No, sir.

17  Q.   Let's wait until we give that patient a full month's

18  prescription before I know the result.

19  A.   No, sir.

20  Q.   Last thing I want to talk to you about is your questions

21  about whether things were altered or changed or hidden.

22       Do you remember those questions?

23  A.   Yes, sir.

24  Q.   Ma'am, sitting here today, did you ever witness anybody

25  taking something out of a chart?

1    A.    No, sir.

2    Q.    So why did you say that to defense counsel?  Can you

3    explain how that happened?

4    A.    It was brought up when I was questioned.

5    Q.    By whom?

6    A.    Susan Marsh and Mr. Peter.

7    Q.    How many times were you questioned about it?

8    A.    Once.

9    Q.    But in that questioning, did you get repeated questions

10   about it?

11   A.    Yes, sir.

12   Q.    How did it feel?

13   A.    A little confused.

14   Q.    So let's clear -- clear the slate, clear the mind.

15         Sitting here today, do you have any indication, did you

16   ever see anybody pull something out of a file, hide something

17   in the file?

18   A.    No, sir.

19   Q.    Were you familiar, generally, with there was a search

20   warrant at Gateway Medical Associates?

21   A.    I kind of found out later.

22   Q.    Were you working at Gateway Medical Associates when the

23   there was a search warrant?

24   A.    Yes, sir.

25   Q.    That's what --

1          THE COURT:  Just stay in the scope of cross.

2       If you're doing that, that's fine.

3          MR. SMITH:  I think the Court will see where I'm

4    going.

5          THE COURT:  Okay.

6    BY MR. SMITH:

7    Q.  And were you generally aware as the investigation

8    progressed that Dr. Stanton and Dr. Maccarone had been charged

9    in this case?

10   A.  Yes, sir.

11   Q.  Okay.  After Dr. Stanton had been charged, did he come

12   and talk to you about the case?

13   A.  Months later.

14   Q.  Did he come talk to you about the drug screens being

15   hidden from him?

16   A.  Yes.

17   Q.  Before then, did you have any information or any

18   knowledge about drug screens being hidden from anybody?

19   A.  No.

20          MR. SMITH:  Your Honor, that's all the questions I

21   have.

22          THE COURT:  Mr. Strianse, anything else?

23          MR. STRIANSE:  Just one other question.

24                     RECROSS-EXAMINATION

25   BY MR. STRIANSE:

1    Q.   I just want to make sure I'm understanding how the

2    raising of the MMEs were handled in the chart.

3         My understanding, based on what we have been talking

4    about, is that you agree that Maccarone would raise the MME

5    levels of patients; is that --

6    A.   Yes, sir.

7    Q.   Do we agree on that?  Okay.

8         But what I don't understand is why, then, would it be

9    entered into the electronic health record that the MME was

10   being lowered.

11   A.   It's just how Dr. Mac had his templates done.

12   Q.   So that's how Dr. Maccarone wanted it to be reflected in

13   the chart?

14   A.   Yes, sir.

15             MR. STRIANSE:  Thank you.

16             THE COURT:  All right.

17        Is she finally excused?

18             MR. SMITH:  Yes, Your Honor.

19             THE COURT:  Do you agree, Mr. Strianse?

20             MR. STRIANSE:  Yes, sir.

21             THE COURT:  Okay.  Thank you, ma'am.  That concludes

22   your testimony.  You're free to go.

23        All right.  Mr. Smith.

24             MR. SMITH:  Your Honor, United States calls Jonathan

25   Pooler.

1          THE COURT:  Jonathan Pooler.

2      We'll go for about 15 minutes and take our first break,

3  but we'll go ahead and start this next witness.

4          MR. SMITH:  Your Honor, we have a little bit of a

5  mixup.  Mr. Pooler is here.  He's just downstairs, and he's

6  coming up right now.

7          THE COURT:  Okay.

8          MR. SMITH:  It will just take two minutes, and I

9  apologize.

10          THE COURT:  Okay.

11          JONATHAN POOLER, GOVERNMENT'S WITNESS, SWORN

12          THE WITNESS:  Yes.

13          COURTROOM DEPUTY:  Thank you.

14          THE COURT:  Good morning to you, sir.  Try to

15  speak --

16          THE WITNESS:  I can't hear --

17          THE COURT:  We'll get some headphones for you.  Would

18  that help you?  This?  Some headphones.

19          THE WITNESS:  That would help.  Yeah.

20          THE COURT:  Okay.  How is that?  Is that better?

21          THE WITNESS:  Oh, perfect.

22          THE COURT:  Okay.  Good.  Try to speak toward that

23  mic in a clear, loud voice so we can all hear you.

24      Would you tell me your name and spell your last name.

25          THE WITNESS:  Jonathan Reed Pooler.  P-O-O-L-E-R.

1          THE COURT:  Thank you.

2     Mr. Smith.

3          MR. SMITH:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5  BY MR. SMITH:

6  Q.   Sir, what city and state do you live in?

7  A.   I live in Bon Aqua, Tennessee.

8  Q.   Are you able to hear me okay through the microphone right

9  now?

10 A.   Yeah.

11 Q.   If for some reason you can't hear me, or I'm talking too

12 fast -- which I have a tendency to do -- would you just raise

13 your hand and let me know you can't understand me?

14 A.   Okay.

15 Q.   Thank you.  Sir, when you worked, what did you do for a

16 living?

17 A.   Auto mechanic.

18 Q.   Okay.  Have you ever been convicted of any crimes?

19 A.   Yeah.  Yeah.

20 Q.   Okay.  Just generally tell us what those were.  Don't get

21 into the specifics of all of them, just tell us what crimes.

22 A.   Assault.  (Indiscernible).  Kidnapping.  Attempted first

23 degree murder.  First aggravated robbery.

24 Q.   Sir, have you ever taken any pain pills?

25 A.   Yes.

1  Q.  For how long?

2  A.  20 plus years.

3  Q.  Did you become addicted to pain pills?

4  A.  Yes.

5  Q.  Where would you get the pain pills you were addicted to?

6  Where would you get those from?

7  A.  From -- the ideal place would be from a doctor; but if

8  that's not possible, then wherever you can get them.

9  Q.  Sir, did you -- have you ever heard of a place called

10  Gateway Medical Associates?

11  A.  Yes.

12  Q.  Okay.  How do you know that name?

13  A.  It's -- I went there for prescriptions.

14  Q.  Had you been getting prescriptions for -- for pills

15  before that?

16  A.  Yes.

17  Q.  From where?

18  A.  From the regular doctor prior from that.

19  Q.  What happened with that regular doctor?

20  A.  I surely had something in my urine screen that they

21  didn't write me a prescription for.

22  Q.  Did they stop prescribing to you because you failed a

23  drug screen?

24  A.  At the time, physicians aren't supposed to write -- or

25  weren't supposed to write pain medication for long term.

1   Q.   Now, how did you learn about Gateway Medical Associates?

2   A.   My trash man told me to call his wife.

3   Q.   And what were you looking for?  What was it you were

4   looking for in a clinic?

5   A.   Pill mill.

6   Q.   When you use that term, what do you mean by that?

7   A.   It's where you -- a place where you go and you just pay a

8   lot of money and pretty much know you are going to get what

9   you want.

10  Q.   And did you go to GMA?  To Gateway Medical Associates?

11  A.   Yes.

12  Q.   And was that what it was?

13  A.   Yes.

14  Q.   Do you remember roughly -- and not to the day, but, I

15  mean, roughly do you remember when you first went to Gateway

16  Medical Associates?

17  A.   No, I don't.

18  Q.   Is --

19             THE COURT:  If you would move that mic over a little

20  bit.  Over there, it will move.  Just put it right there front

21  of you.

22             THE WITNESS:  Okay.

23             THE COURT:  Just speak toward the mic.  There you go.

24             THE WITNESS:  Okay.

25             THE COURT:  Thank you.

1    BY MR. SMITH:

2    Q.   Now, when you went to Gateway that first time, whenever

3    it was, what was the prescription that you were getting before

4    that from another doctor?

5    A.   Prior to that I was getting oxycodone.

6    Q.   Just oxycodone?

7    A.   Yes.

8    Q.   And was that the provider that you referenced you stopped

9    getting the oxycodone because of the failed drug test?

10   A.   Correct.

11   Q.   When you went to Gateway Medical Associates, what doctor

12   do you remember seeing when you first went there?

13   A.   Dr. Maccarone.

14   Q.   Dr. Maccarone?

15        And what did Dr. Maccarone prescribe to you?

16   A.   Oxycodone, Opana, and two or three other

17   anti-inflammatories.  Vitamin D.

18   Q.   The Opana and the oxycodone, what do you think about

19   that?

20   A.   That's what I went for.

21   Q.   As time went forward, did you see Dr. Maccarone again for

22   visits?

23   A.   Yes, sir.

24   Q.   During this time period, were you using other drugs in

25   addition to the drugs that you were getting from Gateway?

1   A.   Yes.

2   Q.   What were the hours like at Gateway?

3   A.   I think the door was opened at 10:00, and you could be

4   there at any time, 2:00, 1:00, 2:00, 3:00 in the morning.

5   Q.   Did you wait that long ever?  Did you wait until 2:00

6   a.m.?

7   A.   Oh, yeah.

8   Q.   Why would you do that?

9   A.   Because I paid to get what I wanted.  If I had to wait

10  that long to get it, I was going to wait.

11  Q.   What kind of money did you have to pay at Gateway?

12  A.   The first visit was quite a bit because I didn't do any

13  (indiscernible) and blood work, and all of that.  It come up

14  to, I don't know, maybe $800.

15       But your regular monthly visits were between four and

16  500.

17  Q.   Did you spend time in the parking lot while you were

18  waiting for your appointments?

19  A.   Oh, yeah.

20  Q.   Do you ever see anybody use drugs in the parking lot?

21  A.   Yes.

22  Q.   Can you describe what you saw?

23  A.   I saw one fellow in particular crush up some pills on his

24  glove compartment and he snorted them up.

25  Q.   Did anyone ask to buy drugs from you?

1   A.   Yes.

2   Q.   Can you describe that?

3   A.   The people?  I mean, everybody knows what you are there

4   for.  So, I mean, people would walk around and just, you know,

5   ask you if you had, would you give them, what would you give,

6   sell them, try to do them.

7   Q.   When people are waiting in the parking lot when

8   Dr. Maccarone was the doctor that day, would people kind of

9   wait and look out for when he arrived?

10  A.   Yes.

11  Q.   Can you describe that?

12  A.   Usually around 4:00 is when, you know, you really started

13  kind of a looking for him to arrive.  Whenever he did, you

14  know, show up, or somebody seen him pull in, in his car, then

15  it was, you know, like, "He's here.  He's here.  He's finally

16  here."

17  Q.   When you -- at this time period in your life had you had

18  significant injuries?

19  A.   Yes.

20  Q.   Did you have surgeries?

21  A.   Yes.

22  Q.   Had you sought care for those injuries?

23  A.   Yes.

24  Q.   For instance, you went and got surgery for what?  What

25  did you get surgery for?

1    A.   I didn't just go out and get surgeries.  It was like I

2    fell and broke my arm, had two placement screws put in.

3        I had a motorcycle wreck and broke my jaw in two places,

4    screws and plates put in.

5    Q.   Sure.  What I meant is -- yeah.  I don't mean you just

6    went out and got surgery for fun.  I don't think anybody is

7    that -- what I meant is:  When you went and had surgery, which

8    doctors did you go to, to take care of those issues?

9    A.   Usually it's whatever the emergency room doctor was

10   there.  But then, then it was just physical therapy.  And

11   then, if it was long-term, they would set you up in a pain

12   clinic.

13   Q.   When you went to Gateway Medical Associates, at that

14   point in your life were you looking for legitimate pain care?

15   A.   Not necessarily.

16   Q.   What were you looking for?

17   A.   Pills.

18   Q.   Did you ever -- did you have to take a drug test at

19   Gateway?

20   A.   Yes.

21   Q.   Do you know if you ever failed any drug test?

22   A.   They said I had.

23   Q.   For what?

24   A.   They said I had -- they said I tested positive for THC,

25   fentanyl, heroin.

1    Q.   Was that more than one time?

2    A.   Yes.

3    Q.   At any point, did you -- did you see Dr. Maccarone the

4    first time?

5    A.   Yes.

6    Q.   Okay.  Did you see Dr. Maccarone in follow-up visits?

7    A.   Let me refer.  I did not see Dr. Maccarone the first time

8    I went.  I had to reschedule and come back.

9    Q.   Okay.  Explain that to me, please.

10   A.   It -- to me, it seemed to be, because I had noticed there

11   with other people on their first visit, that you don't see the

12   doctor.  You have anticipation that you are going to, but you

13   don't.

14        And I kind of felt in my -- my perspective it was to see

15   if you were going to be a ballplayer, or if you were going to

16   be, you know, more than a waste.  I mean, they didn't want

17   anybody there.  They didn't want anybody there that might...

18   Q.   Now, were there times, any times, that you saw

19   Dr. Stanton?

20   A.   Yes.

21   Q.   Did you -- who do you see more?  Dr. Stanton or

22   Dr. Maccarone?

23   A.   Dr. Maccarone.

24   Q.   The times that you saw Dr. Maccarone, would you go into

25   an office to see him?

1   A.   His office.

2   Q.   Did you ever have an examination at Gateway Medical

3   Associates?

4   A.   I mean, nothing that I would call legitimate.

5   Q.   So when you went and saw Dr. Maccarone in his office, how

6   long would you spend in the office with him?

7   A.   15 minutes, 20 minutes maybe.

8   Q.   How does that compare to when you saw Dr. Stanton?

9   A.   Dr. Stanton was much more quicker.

10  Q.   How quick?

11  A.   Once you -- actually, he come -- first of all, he come to

12  the room you're waiting in.  You didn't go in his office.

13       And when he did come in the room, it was usually within

14  ten minutes.  He reviewed the records, signed the

15  prescription, and out the door he went.

16  Q.   The prescription, was that already printed out?

17  A.   I couldn't see if it was preprinted or not.

18  Q.   Now, when you saw Dr. Stanton, do you remember how many

19  times that was?

20  A.   It wasn't many.  Three, maybe four.

21  Q.   So I appreciate you don't remember the exact time you

22  were there, but if we can try to put some of this in order for

23  the jury.

24       When you failed those drug tests, did you have a

25  discussion with any provider about failing those drug tests?

1    A.   Brief discussion with Dr. Maccarone.  Discussions were

2    mainly with the receptionist and staff.

3    Q.   Were you ever told that you were being dismissed for

4    failing those drug tests?

5    A.   Yes.

6    Q.   What do you remember about that?

7    A.   After the second or third drug test, I was told I was

8    being discharged.  But then for an extra hundred dollars, I

9    can reschedule and have an emergency visit.  And, of course, I

10   didn't -- I didn't have an emergency.  I think I had three

11   emergency visits.

12            THE COURT:  We're to our break, Mr. Smith,

13   if now is a good time.

14            MR. SMITH:  I probably have three questions left on

15   direct.  That's all.

16            THE COURT:  Three questions.  All right.

17   BY MR. SMITH:

18   Q.   Do you remember who the last doctor you saw at Gateway

19   was?

20   A.   No.  I think it was Dr. Mac, but I couldn't swear it.

21   Q.   Did you see Dr. Stanton after you failed those drug tests

22   and after you had been dismissed?

23   A.   Yes.

24   Q.   Did Dr. Stanton ever talk to you about failing those drug

25   tests?

A.   No.

        MR. SMITH:  Okay.  Your Honor, that's all the questions I have.

        THE COURT:  Thank you.  I think we'll take our break before cross-examination.

    During the break -- folks, we'll take 20 minutes.  During the break, continue to avoid any discussion.  Don't read or research anything.  Keep an open mind as the proof comes in. Don't evaluate or form any opinions until released to do so.

    With the Court's thanks, I'll excuse the jury now for a 20-minute break.

    (The jury exited the courtroom at 10:02 a.m.)

        THE COURT:  All right.  The jury has exited.

    Mr. Pooler, so you have finished part of your testimony, but not all of it.  The defense gets a chance to cross-examine you, so be back in here in 20 minutes ready to complete your testimony.

    Do you understand that?

        THE WITNESS:  Yes, sir.

        THE COURT:  During the break, don't talk to anybody about your testimony.  Just go have your break, come back in 20 minutes and we'll finish you up, okay?

        THE WITNESS:  Yes.

        THE COURT:  Thank you, sir.  You can step down.

        THE WITNESS:  Leave them right here?

1          THE COURT:  You can leave them right there and you

2     can use them after the break.  Thank you.

3       Mr. Smith, anything we need to take up?

4          MR. SMITH:  No, Your Honor.

5          THE COURT:  Mr. Strianse.

6          MR. STRIANSE:  No, Your Honor.

7          THE COURT:  Okay.  We'll take that break and be back

8     in 20 minutes.

9       Thank you.

10      (Recess from 10:03 a.m. - 10:20 a.m.)

11      (The jury entered the courtroom at 10:20 a.m.)

12         THE COURT:  All right.  Thank you very much.  We're

13    back on the record with all counsel and Dr. Stanton present.

14    The jury has returned from the morning break, punctual as

15    always.  I appreciate that.

16      And the witness is still on the witness stand.

17      Mr. Pooler, are you hearing me okay?

18         THE WITNESS:  Yes, I am.

19         THE COURT:  Do you understand you're still under

20    oath?

21         THE WITNESS:  Yes.

22         THE COURT:  Mr. Strianse, you may question.

23         MR. STRIANSE:  Thank you, Your Honor.

24                       CROSS-EXAMINATION

25    BY MR. STRIANSE:

1    Q.   Good morning, Mr. Pooler.

2    A.   Good morning.

3    Q.   You live in middle Tennessee, is that right?

4    A.   Correct.

5    Q.   You told us about your time of going to GMA in

6    Clarksville.

7         Did you go to any other pain clinic in the middle

8    Tennessee area?

9    A.   Yes.

10   Q.   Did you go to Dr. Reece's clinic in Clarksville?

11   A.   Not that I know of.

12   Q.   Okay.  Did you go -- and I'm just asking, I'm not

13   suggesting that you went to these places.  I'm just wondering.

14        Did you go to a place called CPS?

15   A.   No.

16   Q.   Did you go to Pain M.D.?

17   A.   No.

18   Q.   Where -- where were the other clinics that you went to?

19   A.   In Dickson and in (indiscernible) area.

20        THE COURT:  What was the second town that you

21   mentioned?

22        THE WITNESS:  Franklin.

23        THE COURT:  Franklin.  Thank you.

24   BY MR. STRIANSE:

25   Q.   Do you remember going to GMA for at least two visits?

1     A.   I -- you would have to remind me who GMA is, then.

2     Q.   It's Gateway in --

3     A.   Oh, then yes.  Yes.

4     Q.   -- Clarksville.

5     A.   Yes.

6     Q.   That's what we're talking about.

7     A.   Yes.

8     Q.   And I think when you first went to Gateway in

9     Clarksville, you were not seen by Dr. Stanton; is that right?

10    A.   That's correct.

11    Q.   And do you remember that you brought some imaging studies

12    with you when you went to GMA for the first time?

13    A.   Yes.

14    Q.   Okay.  And you brought with you an MRI; is that right?

15    A.   Yes.

16    Q.   That was of your spine?

17    A.   Yes.

18    Q.   And I think you had a fusion in your neck; is that

19    correct?

20    A.   Correct.

21    Q.   Was that from a motorcycle accident?

22    A.   No.

23    Q.   What was that from?

24    A.   From a person.  I got rear-ended.

25    Q.   Okay.  And that was a real record that you brought, the

1   MRI, with you about the spine; is that right?

2   A.   A real record?

3   Q.   A real record.  A legitimate record.

4   A.   Yes.

5   Q.   You didn't cook that up in the car or anything.  This is

6   something that you got from a hospital or physician?

7   A.   Correct.

8          THE COURT:  I think it will help you if you'll use

9   the mic.

10          MR. STRIANSE:  Yes.

11          THE COURT:  Thank you.

12  BY MR. STRIANSE:

13  Q.   Then you brought with you another MRI for cervical spine

14  without contrast; is that right?

15  A.   Yes.

16  Q.   And that noted that you had an interior fusion.

17          Do you remember that?

18  A.   Yes.

19  Q.   So that was another legitimate record that you brought

20  with you to GMA; is that right?

21  A.   Yes.

22  Q.   And were you seen by Dr. Maccarone at that first visit?

23  A.   Not the first visit, no.

24  Q.   Who did you see the first visit?

25  A.   No doctor.

1    Q.   No doctor whatsoever?

2         On that first visit you also produced for GMA, or

3    Gateway, an MRI of your shoulder; is that right?

4    A.   Yes.

5    Q.   You had some problems with a rotator cuff?

6    A.   Yes.

7    Q.   And a torn labrum; is that right?

8    A.   Yes.

9    Q.   Those all came from St. Thomas's Imaging Center in

10   Nashville, right?

11   A.   Well, no.  It come from -- from St. Thomas in

12   Centerville.

13   Q.   In Centerville.  Excuse me.

14        But those were legitimate records that you brought with

15   you to GMA?

16   A.   Yes.

17   Q.   When you first went there, you were seen by maybe a

18   physician's assistant or somebody like that?

19   A.   No.  No.  I was -- the first visit was just, I mean, I

20   had an EKG done, went next-door, lab work done.  But to see a

21   doctor and all that, that was rescheduled, come back.

22   Q.   Yes, sir.

23        Did they make you, or ask you to fill out some forms?

24   A.   Yes.

25   Q.   Very first visit?

1    A.   Yes.

2    Q.   And did you fill out one of those so-called pain

3    questionnaires?

4    A.   Yes.

5    Q.   Do you know what I'm talking about?  Where you would

6    grade your pain maybe 1 through 10?

7    A.   Correct.

8    Q.   I don't have a copy of that.  But is that something that

9    you did?

10   A.   Yes.

11   Q.   And when you were presenting yourself at that first

12   visit, how were you characterizing the degree of pain that you

13   were experiencing?

14   A.   Close to an 8.

15   Q.   An 8?

16   A.   Yes.

17   Q.   Number 8 is what you circled on the form?

18   A.   I believe so.

19   Q.   Okay.  Now, on April the 30th of 2018, do you remember a

20   urine drug screen being done that showed that you were

21   positive for oxycodone and oxymorphone?

22        Does that sound familiar?

23   A.   Is that from GMA drug screen?

24   Q.   Yeah.  We're talking about GMA today.

25   A.   Yeah.  Yes.

1  Q.  You saw Dr. Stanton for the first time on May the 30th of

2  2018.

3      Does that sound about right to you?

4  A.  Yes.

5  Q.  And that was for one of those so called MME visits.

6      Do you know what I mean when I say an "MME visit"?

7  A.  No.

8  Q.  That you had a high dosage of pain pills and because you

9  had that high dosage, they wanted you to meet with

10 Dr. Stanton.

11     Does that sound at all familiar to you?

12 A.  Dr. Stanton, during the visit, said that I had taken the

13 maximum or extended the Morphine limit as far as pain pills

14 concern.  He explained that Morphine was the basic drug in

15 which all drugs are applied, as far as, you know, one Opana, I

16 think he said, would be like in 20 milligram of Morphine, and

17 I'm at the limit.

18 Q.  And do you remember that first visit with Dr. Stanton?

19 A.  I mean, I -- I couldn't tell you if that was the first

20 visit or not.

21 Q.  Do you remember at that first visit, or whenever you are

22 remembering, that he took some history of what you are -- what

23 your complaint was?

24 A.  He would, yeah, he reviewed the record.

25 Q.  And did a physical exam of you?

1   A.   Okay.  We'll call it that.

2   Q.   Okay.  But you didn't leave with any pills that day?

3   A.   I believe I did.

4   Q.   Do you remember that when you met with Dr. Stanton that

5   he recommended that you needed an orthopedic consultant --

6   consultation based on what he was seeing in your records?

7   A.   No.

8   Q.   You don't remember that at all?

9   A.   No.

10   Q.   If that is noted in your record, that is just inaccurate?

11   A.   Well, I -- you're asking me if I remember.  I'm telling

12   you no.

13   Q.   And I'm also asking you if Dr. Stanton entered that into

14   the medical record.

15        Are you saying that that didn't happen and that's just an

16   error?

17   A.   I couldn't tell you.  I can tell you I don't remember.

18   Q.   Do you remember at that visit that he was suggesting that

19   you needed, perhaps needed, to consider taking a shot in your

20   back?

21   A.   I do.  I do remember him suggesting a couple of times

22   that I needed to make appointments at his office and come and

23   see him for injections so forth, so on.

24   Q.   If the record indicates that you didn't leave with any

25   pills on May 30th of 2018, would you disagree with that?

1    A.   I would say I don't remember that.

2    Q.   Okay.  And then you came back on September 14, 2018, and

3    you were seen by Dr. Maccarone.

4         Do you remember that?

5    A.   May to September?

6    Q.   Right.  That's what the chart shows.

7    A.   Okay.  Go ahead.

8              THE COURT:  Hang on.  Do you remember?  Do you

9    remember is the question.

10        Do you remember the September 14th visit?

11             THE WITNESS:  No.

12   BY MR. STRIANSE:

13   Q.   Do you remember Dr. Maccarone discharging you after a

14   visit?

15   A.   I remember getting a discharge other than that one.

16   Q.   Because you tested positive for heroin and THC, or

17   marijuana?

18   A.   Correct.

19   Q.   And that was in September.  I know these dates are hard

20   to remember.

21        But you were back for a test on November 13, 2018, where

22   the results of the test came in, where you were positive for

23   oxycodone, THC, heroin, and alcohol.

24   A.   That would be very strange because I don't drink, so...

25   Q.   Now, your last time at GMA was December 17, 2018,

1    according to the records.

2         Does that sound about right?

3    A.   I believe.  I won't dispute it.  I don't remember.

4    Q.   You remember Dr. Maccarone was out and you saw

5    Dr. Stanton?

6    A.   I can't say yes to any specific dates.

7    Q.   Well, do you remember that you were discharged from GMA,

8    Gateway, on that date?

9    A.   Not that date.  I can't remember the dates.

10   Q.   Well --

11   A.   I remember being discharged.

12   Q.   Right.

13        The last time you were there, you were discharged?

14   A.   That would be the second discharge.  Yeah.

15   Q.   Right.

16   A.   Okay.

17   Q.   So Maccarone discharged you, and then somehow you were

18   allowed to come back.

19        Did anybody ever explain to you how that happened?

20   A.   When?  I mean, it takes time to set up another doctor.

21   So I -- I come back through what they considered to be an

22   emergency visit.

23   Q.   I see.  Dr. Maccarone had a policy that if you were --

24   you were discharged you would get maybe a lower number of

25   pills and then come back in 30 days or so?

1    A.   That is pretty much how it worked.

2    Q.   And then you came back, but then you were ultimately

3    discharged; is that right?

4    A.   Yes, ultimately, yeah.

5    Q.   Okay.  Do you remember when you were discharged that

6    Dr. Stanton gave you one of those TENS units for your back?

7    A.   No.

8    Q.   Okay.  And you were being discharged based on that test

9    that you failed in November, urine drug test?

10   A.   Right.

11   Q.   So in addition to taking your prescription pills, you

12   were actively using street drugs; is that right?

13   A.   Some, yes.

14        MR. STRIANSE:  Your Honor, may I have one moment?

15        THE COURT:  Yes, of course.

16   (Off-the-record discussion.)

17   BY MR. STRIANSE:

18   Q.   Just one other question.

19        Do you remember leaving with a prescription on that last

20   time, right before Christmas in 2018, for one of these TENS

21   units?

22   A.   I don't remember.  If he wrote me a prescription, I

23   wouldn't understand why.  I wouldn't have it before.  To me,

24   it is like wearing a tattoo gun.

25   Q.   Suffice it to say you didn't fill that prescription?

1  A.   No, I wouldn't have.

2           MR. STRIANSE:  Thank you.  That's all.

3           THE COURT:  Mr. Smith.

4                    REDIRECT EXAMINATION

5  BY MR. SMITH:

6  Q.   Sir, after you left that, that last visit with

7  Dr. Stanton that you were just being asked about, you were

8  asked if you left with a prescription for a TENS unit.

9       Did you also leave with a prescription for oxycodone and

10 oxymorphone?

11 A.   I left, yes.  But I don't ever remember, other than the

12 first visit, ever leaving without a prescription.

13 Q.   That was after you tested positive three or four times

14 positive for heroin?

15 A.   That's correct.

16          MR. SMITH:  That's all my questions, Your Honor.

17      Thank you.

18          THE COURT:  Is he finally excused?

19          MR. SMITH:  Yes, Your Honor.

20          THE COURT:  Do you agree, Mr. Strianse?

21          MR. STRIANSE:  Yes, Your Honor.

22          THE COURT:  Thank you, Mr. Pooler.  That concludes

23 your testimony.  You are free to go.

24          THE WITNESS:  Right here?

25          THE COURT:  Right there is fine.  Thank you, sir.

1          All right.  Mr. Smith.

2          MR. SMITH:  Your Honor, the United States calls

3     Emilie Jackman.

4          THE COURT:  Emilie Jackman.

5       Officer Hines, if you could get those headphones and

6     return them to the clerk so those can be in the charger.

7     Thank you.

8          EMILIE JACKMAN, GOVERNMENT'S WITNESS, SWORN

9          THE WITNESS:  Yes.

10         COURTROOM DEPUTY:  Thank you.

11         THE COURT:  Ma'am, good morning.

12         THE WITNESS:  Good morning.

13         THE COURT:  That mic will move towards you and you

14    can pull the neck down.  Do try to speak directly toward it,

15    ma'am.  Will you pull it down?  There you go.  And speak

16    directly toward the end.  There you go.

17         THE WITNESS:  Hello?

18         THE COURT:  Very good.  Would you first -- I do need

19    you to speak in a clear, loud voice so we can hear you.

20       If you'll first start by telling me your name and

21    spelling your last name.

22         THE WITNESS:  Emilie Jackman.  J-A-C-K-M-A-N.

23         THE COURT:  Thank you.

24       Mr. Smith.

25         MR. SMITH:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SMITH:

Q.   Where do you live?

A.   In Clarksville.

Q.   Clarksville.  What state?

A.   Tennessee.

Q.   Did you previously work at Gateway Medical Associates?

A.   Yes.

Q.   What was your position there?

A.   Office manager.

Q.   When did you begin working there?

A.   2014.

Q.   Do you have any medical training?

A.   No.

Q.   Are you a nurse, or a physician's assistant, or anything like that?

A.   No.

Q.   Can you tell the jury a little bit about what your responsibilities were at GMA?

A.   I was responsible for the day-to-day operation, making sure schedule, anything that the providers needed.  Staffing. Payroll, time sheets, and interviewing.

Q.   Do you know the defendant, John Stanton?

A.   Yes.

Q.   How?

1    A.   He was our medical director.

2    Q.   Let's talk about how GMA operated generally, if we can.

3    What kind of practice was Gateway?

4    A.   Pain management and primary care.

5    Q.   Where did patients come from who came to GMA?

6    A.   We have Tennessee and Kentucky.

7    Q.   Did you feel like the number of Kentucky patients changed

8    over the course of time that you were at Gateway?

9    A.   Yes.

10   Q.   How so?

11   A.   Well, as I guess we don't have a lot of, as primary care,

12   as when they leave the practice then we have more Kentucky

13   patients showed up.

14        Majority of the time, I know, because of the problem have

15   to wait.  Most of the time people complained about longer

16   drive.  So that was as a result of why more Kentucky patients

17   were there.

18   Q.   Now, did the practice issue prescriptions for controlled

19   substances to patients?

20   A.   Yes.

21   Q.   What controlled substances?

22   A.   You want me to name them or just --

23   Q.   Give me the most common ones.

24   A.   Oxycodone, oxymorphone.

25   Q.   Do you know what benzos are?

1    A.   Like Xanax and Klonopin?  Yes.

2    Q.   Were those issued from GMA?

3    A.   Yes.

4    Q.   Did Gateway have a schedule of fees that it charged to

5    patients?

6    A.   Yes.

7         MR. SMITH:  Can we bring up Government's Exhibit 9,

8    please.

9         Your Honor, this has already been admitted.  Ask to

10   publish it.

11        THE COURT:  You may.

12   BY MR. SMITH:

13   Q.   Ma'am, do you recognize what has been marked there as

14   Government Exhibit 9?

15   A.   Yes.

16   Q.   What is that?

17   A.   Those are our fees.

18   Q.   When a patient first showed up to Gateway as a pain

19   patient, how much did they pay?

20   A.   The 385.

21   Q.   Was it just the 385?

22   A.   For newcomers, as new patient.  Brand new, first patient,

23   yes, 385.

24   Q.   Were they ever charged for additional fees or services?

25   A.   For the second visit.  But if they have a -- for the

1    second visit, if they have blood work or EKG.  But it's 385

2    for brand new.

3    Q.   And as a patient would move forward month after month,

4    how much would a patient typically pay for their monthly

5    office visits?

6    A.   It would be the 285 plus the no-show fee for the pill

7    count, plus additional EKG.  So maybe 435, 485, depending on

8    what they have for that month.

9    Q.   What -- would some patients pay even more than that?

10   A.   Yes.

11   Q.   Did patients pay with credit cards or prepaid debit

12   cards?

13   A.   Yes.

14   Q.   Now, did Gateway keep records of how much money it was

15   bringing in on a given day?

16   A.   Yes.

17        MR. SMITH:  Okay.  If we can, let's bring up

18   Government Exhibit 11A, please.

19      Again, Your Honor, it has previously been admitted.

20        THE COURT:  Yes.  You may display that.

21        MR. SMITH:  Thank you, Your Honor.

22   BY MR. SMITH:

23   Q.   I'm going to -- I'm not asking you to recall this

24   specific day.  But just generally, do you understand the

25   template we're looking at and what this is?

1    A.    Yes.

2    Q.    Okay.  What is it?

3    A.    That's our balance sheet at the end of the day.

4    Q.    And was this your way of tracking how much money the

5    practice made in a given day?

6    A.    Yes.

7    Q.    Now, did the practice have goals as to how much money it

8    wanted to make?

9    A.    Yes.

10   Q.    And who set those goals?

11   A.    Dr. Mac.

12   Q.    Did Dr. Maccarone relay those to you?

13   A.    Yes.

14   Q.    What were his instructions?

15   A.    So repeat that again.

16   Q.    When he would relay this to you, your goals, what would

17   he tell you?

18   A.    He would tell us that we need to make 29 -- it went all

19   the way up to 33,000 a day or -- yeah.  That's pretty much

20   what he was saying to us or to me.

21          MR. SMITH:  Can we go forward a couple of pages,

22   Rebecca?

23          THE WITNESS:  I'm sorry.  That's for the week.

24          MR. SMITH:  Can we stop there?

25   BY MR. SMITH:

1    Q.    What is this record that we're looking at?

2    A.    That is what we take in for that day, October 13, 2020.

3    And those are what the patients paid for that day.

4    Q.    And who would fill that out?

5    A.    Anybody that's taking the payment or is at the front

6    desk.

7    Q.    Did you have any understanding of why the goals were set

8    at 29 or 30 or $31,000?

9    A.    I was told in order for us to make the bills, that's what

10   we have to come out weekly, based on Dr. Maccarone saying his

11   accountant advising him.

12   Q.    What were your -- what was your understanding of the

13   bills?  What bills did the practice have to pay?

14   A.    I don't know.  I mean, I know some of the bills because I

15   do get them in the mail and I forward them to the accountants.

16   Q.    Did the practice have to pay the staff?

17   A.    Yes.

18   Q.    What about the building?  Did it have to pay for that?

19   A.    Yes.

20   Q.    You mentioned Dr. Stanton.

21         What was his role?

22   A.    He's the medical director.

23   Q.    Okay.  How much was he paid?

24   A.    He gets his medical director fees.

25   Q.    Was he -- did he receive a salary?

1    A.   Yes.

2    Q.   Did he receive anything on top of the salary?

3    A.   When he sees his -- the patients that are above the ACME

4    numbers, he gets those, and then for the injection.

5    Q.   So it's a salary, the --

6    A.   Medical director visit.

7    Q.   Medical director visit, and the --

8    A.   -- and the injection.

9    Q.   -- and the injection.

10        MR. SMITH:  Rebecca, can we go back to the exhibit.

11   It was 11A.  Can we go forward a few more pages.  That's good.

12   BY MR. SMITH:

13   Q.   What are we looking at?  What is this?

14   A.   This is injection fees.

15   Q.   What is the purpose of this ledger or this document right

16   here?

17   A.   That's the name of the patient that got an injection that

18   day or medical -- medical director visit.

19   Q.   And did the practice keep track of that?

20   A.   Yes.

21   Q.   For what purpose?

22   A.   So that we know what the patient came in for, how much

23   they paid, and what was the reason of their visit.

24   Q.   Did you take that information and then pass it along for

25   Dr. Stanton's payments?

1    A.   Yes, I will pass it along to the accountants.

2         MR. SMITH:  We can take that down.  Thank you.

3    BY MR. SMITH:

4    Q.   Now, what were the hours that were posted on the door at

5    Gateway Medical Associates when you worked there?

6    A.   I believe 10:00 to 7:00.

7    Q.   What was the latest that you would personally work there?

8    A.   Most of the time I was there until 7:00 or a little bit

9    longer.

10   Q.   Okay.  What time would the practice schedule patients to

11   arrive?

12   A.   At 10:00.

13   Q.   Was there a doctor there at 10:00?

14   A.   No.

15   Q.   Why did you schedule patients to arrive at 10:00?

16   A.   Some patients come in early to get fasting blood work.

17   Q.   And then what happens?

18   A.   And then they just wait.  We get -- we triage them and

19   sit and wait.

20   Q.   What time did Dr. Maccarone typically arrive?

21   A.   I would say late, late afternoon.

22   Q.   So these patients would just sit around until

23   Dr. Maccarone arrived late in the afternoon?

24   A.   Or, yes.  Or they leave the practice and come back.

25   Q.   Were most of these patients chronic pain patients?

1    A.   For the most part, yes.

2    Q.   They complain of things like back injuries?

3    A.   Back pain, yes.

4    Q.   And the practice had them wait around for hours like that

5    before a doctor showed up?

6    A.   Yes.

7    Q.   Did Gateway Medical Associates keep medical records?  Did

8    they have a medical record keeping system?

9    A.   Yes.

10   Q.   What kind of medical records were in the system?

11   A.   The name of the program?

12   Q.   Was it electronic or paper?

13   A.   Electronic.

14   Q.   Who had access to the electronic medical records system?

15   A.   Provider and staff member.

16   Q.   Okay.  Can you explain what you mean by that?  Be

17   specific.

18   A.   Everyone had access to the medical -- the EMR system.

19   Q.   So you said the words "providers had access."

20        Who was it specifically that had this access?

21   A.   Dr. Maccarone, Dr. Stanton.

22   Q.   Did you have knowledge, based on your position, as to how

23   often Dr. Maccarone or Dr. Stanton accessed that records

24   system?

25   A.   No.

1    Q.    You don't know how often they did?

2    A.    No.

3    Q.    Okay.  Do you know whether the practice also used certain

4    patient files?

5    A.    Could you explain?

6    Q.    Did they have patient, specific files.  I mean, you had a

7    file for patient John Doe, right?

8    A.    Yes.

9    Q.    Okay.  In that patient file, were there records kept of

10   the office visits?

11   A.    Yes.  Yes, the account.

12   Q.    Maybe we're not understanding each other.

13   A.    Sorry.

14   Q.    If you went into your electronic medical record keeping

15   system at Gateway Medical Associates, could you bring up a

16   patient's chart by name?

17   A.    Yes.

18   Q.    Okay.  In that patient's chart, would there be records

19   reflect -- relating to a patient's office visits to Gateway

20   Medical Associates?

21   A.    Yes.

22   Q.    In addition -- and were those kept electronically?

23   A.    Yes, it's in a different Kareo system.  It's in a

24   different program.

25   Q.    Is that information that you enter into the computer and

1    that generates the office note?

2    A.   Those are two separate programs --

3    Q.   Okay.

4    A.   -- for the EMR.

5    Q.   Okay.  Explain that to us.

6    A.   So -- we have a -- a Kareo 360 where we keep the EMR

7    system; and then you have a Kareo.  I mean, I guess they talk

8    to each other.  That's where we keep posting payments.

9    Q.   Financially, the payments?

10   A.   Yes.

11   Q.   Okay.

12   A.   Yes.

13   Q.   All right.  Well, what I'm getting at is, for the patient

14   chart -- not the financial side, but the patient chart.

15        Some of that information was entered into a computer; is

16   that fair?

17   A.   Yes.

18   Q.   Okay.  And then some of the information was written out

19   by hand on template forms?

20   A.   Yes.

21   Q.   And did that happen with each patient visit?

22   A.   Yes.

23   Q.   Now, it sounds like you don't know whether the doctors

24   accessed the electronic medical record system or not.

25        Is that what you just told us?

1    A.    That's correct.  I can't see if they did or not.

2    Q.    Okay.  When patients would come in for doctor's visits,

3    was information prepared for the doctor?

4    A.    Yes.

5    Q.    Okay.  Can you talk to the jury about what information

6    was prepared in advance of a patient's visit?

7    A.    So we will do a prep chart, and we will put all necessary

8    documentation in the chart, as far as their last visit, drug

9    screen, x-ray.  Any x-ray that they currently have.

10         Their super bill was in the front.  And any, if they were

11   supposed to be dismissed or not.  They already in the chart.

12   Q.    This packet of information, what happened to that in

13   advance of the doctor's arrival?

14   A.    They prep for the providers and then they get, wait in a

15   folder.  I mean, it just sits there.

16   Q.    Who would prepare it?

17   A.    Every M.A. and also the scribe.

18   Q.    And who ultimately gave that packet of information to the

19   doctor?

20   A.    It will -- depending who is seeing the patient.  If it is

21   Dr. Mac or Dr. Stanton, it would be a different process, but

22   the scribe mostly.

23   Q.    Did you have any role with regard to seeing whether those

24   files had all of the information in it?  Is that something

25   that you would check?

1    A.   Yes.

2    Q.   Okay.  And if we can, just for the jury, go through some

3    of those items that you just discussed.

4         Was the previous month's office note printed out and put

5    in that packet?

6    A.   Correct.

7    Q.   Okay.  Were the urine drug screens from the previous

8    month's lab work, if that's available, that previous month's

9    lab test, was that put in the chart?

10   A.   Correct.

11   Q.   If there was an in-house drug screen completed that day,

12   was that put in the chart?

13   A.   Yes.

14   Q.   Was the KASPER or CSMD, that prescription date

15   information, was that put in the chart?

16   A.   Yes.

17   Q.   And were the other labs and test results also put in the

18   chart?

19   A.   Say it again.

20   Q.   For instance if there had been an EKG, let's say, would

21   that have also been added?

22   A.   Yes.

23   Q.   So was that packet of information, it might have varied a

24   little bit depending on which tests a patient might have, but

25   it -- was it usually the same type of information each month?

1    A.   Yes.

2    Q.   How long was that the practice of preparing those charts?

3    How long did that happen at GMA?

4    A.   I'm not understanding your question.

5    Q.   What year did you start doing that?

6    A.   That's always how it has been since I started.

7    Q.   That didn't just start in March of 2020?

8    A.   No.

9    Q.   Were you responsible for supervising the staff when they

10   prepared these packets of information?

11   A.   Yes.

12   Q.   Did you ever tell any of those staff to take out or hide

13   any information before it went to a doctor?

14   A.   No.

15   Q.   To the best of your knowledge, was all of the information

16   that was in that packet given to each doctor?

17   A.   Yes.

18   Q.   Does that include when it was given to Dr. Stanton?

19   A.   Yes.

20   Q.   Now, we talked about urine drug tests a moment ago.

21        How did Dr. Stanton or Dr. Maccarone, what kind of drug

22   test results would they have received?

23        Can you just describe the two different types?

24   A.   Are you talking -- are we talking about oral?  Or are we

25   talking about urine?

1   Q.   Just tell me what you know.  What do you know about the

2   types of urine drug testing that was used at the practice?

3   A.   We used urine drug screen or oral drug screen.

4   Q.   And were there -- that screen, is that a result that's

5   available that day?

6   A.   We used a point-of-care cup, and that result is available

7   that day.  But they also get sent off to the lab for

8   confirmation.

9   Q.   And then that -- did it alternate between months, between

10  a point-of-care and a lab test?

11  A.   Yes.

12  Q.   Okay.  The lab test -- just talk to the jury about the

13  process.  How that worked.

14  A.   So the lab test, the patient would come in, give a sample

15  and it gets -- we will see the results, whether they have an

16  indication in their system or not, and then we sent it off.

17  Or then there will be another month based on their insurance.

18       Typically Dr. Mac doesn't send them out.  We just do an

19  in-house drug screen, and then we put in the result and will

20  highlight results for the provider to put in there, and put it

21  in their chart.  So that's pretty much alternate.

22       But if they have a dirty or, I guess, illicit the

23  previous month, we will send it out again the next following

24  month.  Or if the patient challenges it, the provider will

25  usually say, Okay, we'll do an oral.

1    Q.   To the best of your knowledge and recollection from the

2    time period you were there, did this staff typically try to

3    relay the results of drug tests to the doctors?

4    A.   Well, yeah.  Yes.  But, I mean, the drug was, the -- the

5    result was also put in the chart, so it's -- it's printed and

6    it is in the chart --

7    Q.   Okay.

8    A.   -- when -- when we prep the chart.

9    Q.   To best of your knowledge, was it always in the chart

10   when it was given to the doctor?

11   A.   Yes.

12   Q.   Were there times you also mentioned to the doctor if

13   there was a failed drug test?

14   A.   It will be on the front of the schedule who they seeing

15   that day.  It would be mentioned.  Or the scribe will prompt,

16   this positive for meth, or positive for -- it will be

17   mentioned to the provider, or we have a paper that we put in

18   that there are no metabolites or positive for something.

19             MR. SMITH:  Can we bring Government Exhibit 17D up.

20   BY MR. SMITH:

21   Q.   Is that what you are referencing, ma'am?

22   A.   Yes.

23             MR. SMITH:  Okay.  Okay.  We can take that down,

24   Rebecca.

25   BY MR. SMITH:

1    Q.   Did Gateway Medical Associates have certain forms that it

2    used it in its practice, standard forms?

3    A.   As far as?

4    Q.   Anything.

5         Did it have any standard forms?

6    A.   Yes.

7    Q.   Okay.  Let's look at -- and, for instance, when a patient

8    came in, was there certain paperwork that the patient would

9    have to fill out at each visit?

10   A.   If they're a new patient packet, if they're a new

11   patient, then they fill out the new patient.

12   Q.   What about follow-up visits?  Would there be pain

13   questionnaires or things like that?

14   A.   So for a medical director visit, yes.

15   Q.   Okay.  In addition to those forms that were filled out by

16   the patient, did the office also have certain written policies

17   or procedures?

18   A.   Yeah, we do have a policy and procedures.

19        MR. SMITH:  Can we look at Government Exhibit 15,

20   please?

21   BY MR. SMITH:

22   Q.   Ma'am, do you recognize this?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's just a Gateway Medical Associates original forms.

1    Q.   Was this kept at the practice?

2    A.   Yes.

3         MR. SMITH:   And, Rebecca, can you arrow through that?

4    BY MR. SMITH:

5    Q.   Did this contain those --

6         MR. SMITH:   Just stop right there the.   Okay.

7    BY MR. SMITH:

8    Q.   So we talked about the template forms that the practice

9    used and also these policies.

10        MR. SMITH:   Can we go forward one page, please,

11   Rebecca?   One more, please.

12   BY MR. SMITH:

13   Q.   So did you have a chance to review that table of

14   contents?

15   A.   Not yet.

16   Q.   Okay.

17        MR. SMITH:   If we can, okay, take that down.

18   BY MR. SMITH:

19   Q.   Did the office have a policy on drug screens?

20   A.   Yes.

21   Q.   Did it have a policy on pill counts?

22   A.   Yes.

23   Q.   Did it follow those policies and practice?

24   A.   No.

25   Q.   Let's talk about the drug screens first.

1      We just talked about kind of how this information was

2  assembled and what it looks like.

3      Again, your position at GMA, were you in a position to

4  see the drug screen results?

5  A.   Yes.

6  Q.   Okay.  Did you see patients fail drug tests?

7  A.   Yes.

8  Q.   How often?

9  A.   Very often.

10  Q.   What kind of drugs would the patient test positive for?

11  A.   Meth, cocaine, fentanyl, THC.

12  Q.   Heroin?

13  A.   Heroin.

14  Q.   Did patients also test negative for prescribed meds?

15  A.   Say it again.

16  Q.   Did they test negative for prescribed medications?

17  A.   Yes.

18  Q.   How often did that happen?

19  A.   I don't know how often, but it happens.

20  Q.   When a patient tested positive or negative unexpected, so

21  there's an inconsistent drug screen test or drug test result,

22  what was your guidance?  What did you do about that?

23  A.   I personally?  What did I do for --

24  Q.   Yeah.  When you saw that, what did you do?

25  A.   When I seen that?  I don't make that call.  The provider

1    makes that call.

2    Q.   Did you ever see in the office an effort to take five or

3    ten pills away when the patient tested positive for something?

4    A.   We would do that.

5    Q.   Okay.

6    A.   For -- yes.

7    Q.   Okay.  And what was that based on?  Where did five or ten

8    pills come from?

9    A.   That was what Dr. Maccarone would take away.

10   Q.   Do you have any idea why?

11   A.   No.

12   Q.   Now, do you know what the -- have you ever heard the word

13   "tapering" before?

14   A.   Yes.

15   Q.   What does tapering mean?

16   A.   Lower their medication.

17   Q.   Is it just lowering it one time?

18   A.   No.

19   Q.   Did Gateway have a tapering protocol that you knew of?

20   A.   No, I don't know.

21   Q.   Do you know if there was any effort by either

22   Dr. Maccarone or Dr. Stanton upon somebody testing positive

23   for a drug that they shouldn't have, or testing negative for a

24   drug that they should have, to implement a tapering protocol

25   and say we're going to take this person off of opioids because

1    they're -- because of their bad drug screen result?

2    A.   No, they determine that based on patient to patient.

3    Q.   Okay.

4    A.   Providers will make that call.

5    Q.   Was there ever a schedule, okay, we're going to take this

6    person ten percent this week and ten percent next week, and

7    we're going to track and monitor that?

8    A.   No.

9    Q.   In the seven years that you worked there, did that ever

10   happen?

11   A.   Just based on what Dr. Maccarone want to do.

12   Q.   I'm not asking if he did.

13        Did you ever see that happen?

14   A.   No, I don't monitor that.

15   Q.   Did you ever see Dr. Stanton do that?

16   A.   No.

17   Q.   Did you ever see Dr. Maccarone do that?

18   A.   No.

19   Q.   Okay.  When that negative five or negative ten was

20   written --

21        MR. SMITH:  If we can, let's bring up 17C again as an

22   example.  Go to the next page, please.  17D.  17E.

23   BY MR. SMITH:

24   Q.   If there was negative something written on these

25   sheets -- do you remember seeing that?  Do you remember seeing

1  that would be written?

2  A.   Okay.

3  Q.   Okay.  Do you remember that or you don't remember?

4  A.   I do.

5  Q.   Who would write that?

6  A.   The scribe.

7  Q.   Who was the scribe?

8  A.   Shanna.

9  Q.   Okay.  When Shanna would write that, would that be before

10 a doctor saw the patient?

11 A.   Yes.

12 Q.   And so was Shanna put in the position where she is the

13 one determining to take five off or ten off?

14 A.   I believe she was just following Dr. Mac's -- how Dr. Mac

15 would do it.

16 Q.   But Dr. Mac's not there.

17      How is she supposed to know whether it is five for this

18 one or ten for this one?

19 A.   She doesn't know.  She just follow what she's used to

20 from working with Dr. Mac daily.

21 Q.   Was she just guessing as to what she thought he would

22 want?

23 A.   I believe so.

24 Q.   Did you have any input on that?

25 A.   No.

1    Q.   Pill counts.  Do you know what a pill count is?

2    A.   Yes.

3    Q.   Okay.  What is a pill count?

4    A.   A pill count is patient bring in their pills and we count

5    them, if they taking it appropriately.

6    Q.   And what is the point of doing that?  Just in plain

7    language, why would you do that?  Why would the practice do

8    that?

9    A.   Well, to make sure that they have the pills, and to make

10   sure that they taking it as prescribed.

11   Q.   Was there concern if they're not doing that?

12   A.   Concern is supposed to be that they're not taking the

13   pills appropriately and that should alert the doctor.

14   Q.   Okay.  How often did you see patients being dismissed or

15   failing pill counts or not showing up for pill counts?

16   A.   Rarely.

17   Q.   Was there a fee for a missed pill count?

18   A.   Yes.

19   Q.   Explain to the jury.  Explain that.

20   A.   The patient will -- if they don't show up for pill count,

21   they will receive a no-show fee for not coming in, showing up

22   for pill count.

23   Q.   So if a patient doesn't show up for a pill count, they

24   have to pay more money?

25   A.   Yes.

1    Q.   Is there any other negative consequences besides having

2    to pay more money?

3    A.   For the most part, no.

4         MR. SMITH:   Now, if we can go to Government

5    Exhibit 22.

6    BY MR. SMITH:

7    Q.   Do you remember when you worked at GMA, from time to

8    time, did the office have to submit information to the

9    Department of Health or to the State of Tennessee?

10   A.   Yes.

11   Q.   Did that include submitting information about the

12   office's policies and policies and procedures?

13   A.   Yes.

14   Q.   Okay.  So before we look at any of them, just look at me.

15   I'll ask you this question:   Those policies that you sent to

16   the state, was Gateway Medical Associates really following

17   those policies?

18   A.   No.

19         MR. SMITH:  Let's look at 22A first.

20        Again, Your Honor, with permission to publish.  This has

21   already been --

22         THE COURT:  You may.

23   BY MR. SMITH:

24   Q.   What is this document called?

25   A.   Medical Director Statement and Verification.

1  Q.   For the majority of the time that you worked at GMA,

2  let's just focus on the time period July of 2016 forward.

3       Who was the medical director at Gateway Medical

4  Associates for most of that time period?

5  A.   Dr. Stanton.

6  Q.   What was your understanding of what the medical director

7  was?

8  A.   To supervise the practice, Dr. Maccarone.

9  Q.   Do you remember submitting this document to the state?

10  A.   I do not.

11       MR. SMITH:  Can we go to the second page of this

12  document?  One more, and we'll continue to the end.

13       Thank you.

14  BY MR. SMITH:

15  Q.   Do you recognize the signature on this document?

16  A.   Yes.

17  Q.   Whose signature is that?

18  A.   Dr. Stanton.

19  Q.   Okay.

20       MR. SMITH:  Let's go to 22B, please.

21  BY MR. SMITH:

22  Q.   Okay.  What is this document, ma'am?

23  A.   Medication Screening Policy and Compliance Plan.

24  Q.   Are you familiar with this document?

25  A.   Sort of.

1    Q.   So you're the office manager at Gateway Medical

2    Associates for seven years, and you're only sort of familiar

3    with this document?

4    A.   Well, we have one that's really just -- this was in a

5    book, so a lot of policy was written and we had help from

6    somebody that Dr. Maccarone hired.

7         MR. SMITH:  Let's go to the next page, please.

8         Let's look at the second bullet point, please.

9    BY MR. SMITH:

10   Q.   What does the second bullet point say, ma'am?  Can you

11   read that?

12   A.   "No prescription for controlled medication will be

13   prescribed for in the event of positive POC results for

14   cocaine, methamphetamine or..."

15   Q.   Don't worry about reading that whole word, just read the

16   --

17   A.   "rather, the patient will be scheduled for follow-up

18   visit.  Upon receipt of confirmatory laboratory results."

19   Q.   So under this policy, if a patient were to test positive

20   at a point of care for these drugs, what was supposed to

21   happen?

22   A.   Not receive medication.

23   Q.   Was that what happened at Gateway?

24   A.   No.

25   Q.   Based on your experience, if somebody tested positive for

1    these at a point of care test, could that patient still walk

2    out the door with a prescription?

3    A.   Yes.

4    Q.   For a full month?

5    A.   Yes.

6    Q.   Did Dr. Stanton prescribe that way?

7    A.   It's the same way.

8    Q.   So --

9    A.   Yes.

10   Q.   Dr. Stanton --

11   A.   Yes --

12   Q.   -- did that?

13   A.   Yes.

14   Q.   Dr. Maccarone did that?

15   A.   Yes.

16           MR. SMITH:  Can we take that down?  Sorry.

17   Apologize.  Let's go back to the same page.  Now can we go to

18   the very bottom?

19   BY MR. SMITH:

20   Q.   Can you read what it says under "Positive Confirmatory

21   Results for Illicit Drug"?

22   A.   "Methamphetamine, cocaine, heroin, immediate discharge."

23   Q.   So under the written policies at Gateway Medical

24   Associates, what was supposed to happen if a patient failed a

25   drug test, like a confirmation test, for heroin, cocaine, or

1    meth?

2    A.   The paper says "immediate discharge."

3    Q.   Is that what happened, in practice, at Gateway Medical

4    Associates?

5    A.   No, they did dot.

6    Q.   Did patients still walk out of the door after testing

7    positive for heroin with a full month's prescription?

8    A.   Yes.

9    Q.   Did Dr. Stanton write those prescriptions?

10   A.   Yes.

11   Q.   Did Dr. Maccarone write those prescriptions?

12   A.   Yes.

13        MR. SMITH:  Go to 22C, please.

14        Can we blow up just the text of the policy?

15   BY MR. SMITH:

16   Q.   Can you read the first two bullets for us, please?

17   A.   "Pill counts are required for the State of Tennessee,

18   Department of Health.

19        As a patient in an active pain management clinic, you are

20   required by Gateway Medical Associates to present for three

21   pill counts per calendar year."

22   Q.   And what's the third say?

23   A.   "Please understand that these are mandatory, not

24   optional."

25   Q.   So that's what the paper says.  That's what the policy

1    says.

2        In practice, when you were working there, were pill

3    counts really mandatory?

4    A.   They were, yes.  They need to -- they were scheduled, and

5    they have to show up for them.

6    Q.   Okay.  And what happened if they didn't show up?

7    A.   They will get a no-show fee.

8    Q.   So other than paying money, were they mandatory?

9    A.   They were mandatory.  They had to be in the book.

10   Q.   I see.  So there had been a piece of paper saying they

11   were mandatory?

12   A.   They were mandatory.

13   Q.   Okay.  For a patient -- if I was a patient there, did I

14   ever have to actually show up physically for a pill count or

15   could I pay money?

16   A.   They pretty much paid an extra fee.

17   Q.   At the bottom says, "If you do not comply, then you are

18   in breach of contract and are at risk of being dismissed."

19       I asked you this question earlier, but just again:  Based

20   on your experience, how common was it for GMA to dismiss

21   customers, patients for not coming in for pill counts?

22   A.   It is very common not to come for pill counts.

23   Q.   How common was it for the practice to dismiss those

24   patients because of that?

25   A.   Very rarely or never.

1    Q.   Ma'am, do you agree with me that there are other written

2    policies in this collection, or other written policies in

3    place at Gateway Medical Associates?

4    A.   Yes.

5    Q.   Does that include pain agreements?

6    A.   Yes.

7    Q.   Just for the sake of time, if I were to open up those

8    various policies, would I see things written down on a piece

9    of paper that did not really happen in the real world, in the

10   years that you worked at Gateway Medical Associates?

11   A.   Correct.

12   Q.   Now, as office manager, were you aware that Tennessee had

13   guidelines relating to the chronic pain and prescribing

14   opioids?

15   A.   Depending on what it is.

16   Q.   Okay.

17        MR. SMITH:  Let's look at Government Exhibit 13,

18   please.

19   BY MR. SMITH:

20   Q.   Do you recognize that?

21   A.   Yes.

22   Q.   Is that document called the "Tennessee Chronic Pain

23   Guidelines"?

24   A.   Yes.

25   Q.   I'm not asking you to play doctor.  I understand.  You've

1    told us that you don't have medical training.

2        You generally understood that policy related to chronic

3    pain treatment in Tennessee?

4    A.   Yes.

5    Q.   Now, if the jury has heard testimony earlier in this

6    trial that investigators found copies of this at Gateway

7    Medical Associates, can you explain the background on how it

8    got there?

9    A.   We would -- that was given to us.  It was given to me or

10   Dr. Maccarone would bring it, and we'll have a copy for him

11   and for the medical director.

12   Q.   So did Dr. Maccarone have a copy?

13   A.   Yes.

14   Q.   Did Dr. Stanton have a copy?

15   A.   Yes.

16        MR. SMITH:  If we go back, please, to 22A.

17        Can we blow up just the first couple of paragraphs there?

18   BY MR. SMITH:

19   Q.   Ma'am, what does number one say?

20   A.   "The medical director has to read and understood the

21   statutes and rules governing pain management clinics, as well

22   as Tennessee Chronic Pain Guidelines, Tennessee Pain Clinic

23   Guidelines, both of which are attached to this verification."

24        MR. SMITH:  Okay.  We can take that down.

25   BY MR. SMITH:

1  Q.   So we have talked about various policies that were in

2  place when you worked at Gateway Medical Associates.

3      I would like to just ask you a few more questions about

4  what the role was really like when you were working there.

5      Did patients travel to GMA from long distances?

6  A.   Yes.

7  Q.   Did patients sometimes travel in groups?

8  A.   Yes.

9  Q.   Did patients ever appear intoxicated?

10  A.   Yes.

11  Q.   Were there times that another person paid for a patient's

12  fees at the front desk?

13  A.   Yes.

14  Q.   We have talked about pill counts.

15      Patients could pay $150 to miss their pill count?

16  A.   Yes.

17  Q.   You've told us that patients failed urine drug tests?

18  A.   Correct.

19  Q.   So we talked about, in those policies, there is this

20  concept of dismissal.

21      Do you know what a patient dismissal means?

22  A.   Yes, I do.

23  Q.   Do you recall who it is that would decide if a patient

24  got dismissed?  Initially, like, who would mark in the file

25  "dismissal" on those sheets, for instance?

1    A.   If anybody is dismissed, Dr. Maccarone makes the

2    decision.

3    Q.   What I'm getting at is:  Before a patient is seen by a

4    doctor, there are records that say "dismissed" on it.

5         Do you know what I'm talking about?  I think you

6    referenced that earlier.

7    A.   On the sheet?

8    Q.   Sure.

9    A.   No.  No, that would be the scribe.

10   Q.   Okay.  How did they know when to mark dismissed or not

11   dismissed?

12   A.   If they came out multiple times with dirty urine, then

13   usually we'll mark them dismissed.

14   Q.   So you just told me "usually we will mark them

15   dismissed."

16        So did you have some involvement in I guess either making

17   a recommendation or writing that down on a piece of paper?

18   A.   "We."  Me and the scribe will talk, yes.

19   Q.   Now, was there -- if a patient was dismissed or marked on

20   a piece of paper as being dismissed, were there times that the

21   patient continued to be seen?

22   A.   Correct.

23   Q.   Were there times that the patient continued to receive

24   prescriptions?

25   A.   Yes.

1    Q.    How did that happen?

2    A.    Provider will take him back just so -- they say so that

3    they don't go to the street or go without any pain medication.

4    Q.    With the dismissal, do you have any recollection that

5    Dr. Stanton went through the records and said, Dismiss this

6    person, dismiss this person?

7    A.    No.

8    Q.    Were there times that you or Shanna would mark and make a

9    recommendation and Dr. Stanton would agree with it?

10   A.    Yes, he'll sign the dismissal.

11   Q.    But that was written by you and sent to him; is that

12   correct?

13   A.    That's -- by me or Shanna, yes.

14   Q.    Now, if a patient continues to be seen after that

15   dismissal, did they pay something called an emergency fee

16   visit?

17   A.    Yes.

18   Q.    What is that?

19   A.    They pay a flat fee of 500.

20   Q.    Now, with respect to the money, who was ultimately

21   responsible for setting kind of the prices and how much people

22   were charged at Gateway Medical Associates?

23   A.    Dr. Maccarone.

24   Q.    Do you have an idea of how Dr. Stanton got paid?

25   A.    No, I don't remember.

1    Q.   Do you remember the mechanics of how he got paid?

2    A.   I think he got paid by the injections, the medical

3    director visit, and he's the medical director.

4    Q.   Now, do you remember if there was a requirement for how

5    long Dr. Stanton was supposed to spend at the clinic each

6    week?

7    A.   I heard the number 20 percent or eight hours, so --

8    Q.   In theory, how was it supposed to work?  What was the

9    schedule supposed to be?

10   A.   That he'll come four hours in one day, and another time

11   that week for another four hours.

12   Q.   In reality, is that what happened?

13   A.   No.

14   Q.   Let's talk a little bit about the days that Dr. Stanton

15   was there.

16        I think you've talked about Dr. Maccarone, how he would

17   arrive much later.

18        What about Dr. Stanton?  What time would he typically

19   arrive on the days he was in the practice?

20   A.   He usually will text me.  It depends if Dr. Maccarone is

21   there or if he's fully covering.  But he'll text me and let me

22   know that he's going to be in at 3:00, or he's running behind,

23   and he covers for our doc -- when he's covering.

24        But just to visit as a medical director when Dr. Mac is

25   there, he shows up and meets with Dr. Maccarone.

1    Q.    Okay.  How long -- you said we use this four hours each

2    day.  And you said that's not what happened.

3         So how long was he there, typically?

4    A.    Different time.  I mean, typically, it may just be very

5    short, five or ten minutes, or longer.  It just depends on the

6    day, what he's doing there.

7    Q.    Do you remember if he ever spent four hours consecutively

8    there?

9    A.    No.

10   Q.    Now, we have looked through all of those policies that

11   are written down.

12        Did you ever have a meeting with Dr. Stanton where he

13   said let's work through these policies and make sure they're

14   being followed?

15   A.    No.

16   Q.    Was there ever an all-staff meeting where the medical

17   director said we need to change this practice or that

18   practice?

19   A.    No.

20   Q.    Now, you described to us before the information that was

21   prepared and given to the doctors in advance of the doctors,

22   or as the doctors were conducting visits.

23        Do you remember that?

24        MR. SMITH:  Can we blow up Government Exhibit 19, I

25   believe, briefly?

1          Your Honor, permission to publish this.

2                THE COURT:  Yes, you may.

3                MR. SMITH:  Thank you.

4     BY MR. SMITH:

5     Q.   Okay.  Do you recognize the general layout of this

6     collection of documents?

7     A.   Yes.

8     Q.   What does that appear to be to you?

9     A.   Something like those goes in the packet.

10    Q.   So the office note is included?

11    A.   Yes.

12    Q.   Also the urine drug test results?

13    A.   Yes.

14    Q.   Now, with respect to the information that was in these

15    packets, do you remember -- you, personally -- did you ever

16    rip anything out of these files before they were given to

17    Dr. Stanton?

18    A.   No.

19    Q.   Did you ever instruct somebody else to do that?

20    A.   No.

21    Q.   Did you ever hide urine drug tests or other medical

22    information from Dr. Stanton?

23    A.   No.

24    Q.   Okay.  Do you remember --

25                MR. SMITH:  We can take that down, Rebecca.

BY MR. SMITH:

Q.   Do you ever remember hearing the concept or something referenced as "alternative treatments"?

A.   Yes.

Q.   What are some alternative treatments?

A.   Getting some injection.

Q.   What else?

A.   Physical therapy.

Q.   How did the injections work at GMA?

A.   Dr. Stanton will be the one performing them.

Q.   Okay.  And did patients have to pay for those extra?

A.   Yes.

Q.   What was the patient's general reaction to them?

A.   Some patients don't want to get them done.

Q.   Did patients ever want them because that would get them out quicker?

A.   Yes.

Q.   Now, what would happen if a patient refused to get an injection?

A.   Their recommendation would be, if they're refused, to lower them.

Q.   By how much?

A.   I have no idea.

Q.   Was it five or ten pills?

A.   Could be, but I don't know.

1    Q.   Okay.  Was there any policy or kind of protocol as to how

2    much we're going to lower folks if they do certain things?

3    A.   No.

4    Q.   Was it ever explained to you why you would lower it if

5    someone refused an injection?

6    A.   No, not really.

7    Q.   Did you have interaction with Dr. Stanton when he was at

8    the practice?

9    A.   Yes.

10   Q.   Okay.  Was that pretty much every time he came out?

11   A.   Yes.

12   Q.   Did he ever express any concerns about Gateway Medical

13   Associates to you?

14   A.   Depends.  He will ask me about when did Dr. Maccarone

15   came in.

16   Q.   Okay.  So let's talk about that.

17        Did he ask you about the hours that Dr. Maccarone was

18   keeping?

19   A.   He did.  He is -- he is asking, like, what time did

20   Dr. Maccarone got in, and then we will -- I will tell him.

21   Q.   Okay.  And what would he -- what would he say about that?

22   A.   "That's crazy."

23   Q.   Was there ever any discussion about Dr. Stanton getting

24   Dr. Maccarone to come in earlier?

25   A.   I believe he did.

1    Q.   Okay.  What happened there?

2    A.   I believe I was -- from what I know, that Dr. Mac just

3    got angry.

4    Q.   And what did Dr. Stanton say about that?

5    A.   I don't know exactly that verbatim word-for-word of the

6    conversation, but he just said, "Every time I bring it up to

7    him, he just gets mad."

8    Q.   What did you tell him in response?

9    A.   I said, "You're the medical director."

10   Q.   Did Dr. Stanton ever tell you that he didn't have access

11   to a particular medical record, or chart, or document?

12        Did he ever complain about that?

13   A.   No.

14   Q.   Did he ever come to you saying he wanted more access to

15   drug test results or more access to anything else in the

16   practice?

17   A.   No.

18   Q.   How often did Dr. Stanton get paid?

19   A.   Every two weeks.

20   Q.   Did he talk to you about his check?

21   A.   He will ask me if he has a check, yes.

22   Q.   Would he text you about that?

23   A.   Yes.

24   Q.   Would he talk to you in person about that?

25   A.   Yes.

1    Q.   Okay.  Were there times that he didn't get paid on time?

2    A.   Yes.

3    Q.   How did he react to that?

4    A.   Not happy.

5    Q.   Now, ma'am, are you -- when you were working for

6    Dr. Maccarone, what kind of work environment was that like for

7    you?

8    A.   I guess I would say, in general, probably hostile.

9    Q.   How did he treat the staff that worked at Gateway Medical

10   Associates?

11   A.   Depends.  Some he has favorites and some he don't like.

12   Q.   And with the money, the demands for money, were there

13   times when Dr. Maccarone wouldn't come into the office because

14   there wasn't enough money to be made that day?

15   A.   Correct.

16   Q.   Did you enforce that?  Did you do his dirty work for him?

17   A.   Define "dirty."

18   Q.   Well, telling staff they had to do certain things,

19   shutting down the office, if he didn't want to come in.

20   A.   I had to let the patient -- I mean, the staff know that

21   if we don't get enough patient, he's not going to come in.  He

22   wants this amount.  We need to add this much more or Dr. Mac

23   will threaten he'll let somebody go.

24   Q.   The things that were happening at Gateway Medical

25   Associates, the failed drug tests, how far people were

1    traveling, how late the practice was open, did you ever make

2    any effort to hide that from Dr. Stanton?

3    A.   No.

4    Q.   Are you aware of anything that you did to hide

5    information from Dr. Stanton?

6    A.   No.

7    Q.   Did you try to -- did Dr. Maccarone tell you not to share

8    information about how much money the practice was making with

9    Dr. Stanton?

10   A.   He never wants us to write down, I guess, what the fees.

11   But, typically, I mean, no.  It's just written in the ledger.

12   I don't understand the question.

13   Q.   Okay.  With respect to the prescriptions, the drugs that

14   were going out the door, did Dr. Maccarone ever tell

15   Dr. Stanton -- that you witnessed -- did he ever tell him that

16   he had to or didn't have to prescribe any particular drug?

17   A.   Can you repeat that?

18   Q.   Did Dr. Maccarone ever give instruction to Dr. Stanton

19   about what he could or could not prescribe?

20   A.   No.

21   Q.   Did he ever tell Dr. Stanton that he couldn't dismiss a

22   patient?

23   A.   No.

24   Q.   Did he ever tell Dr. Stanton that he couldn't do anything

25   with the policies and procedures at the office?

1  A.   No.

2         MR. SMITH:  Your Honor could I have a moment?

3         THE COURT:  Yes.

4      (Off-the-record discussion.)

5         MR. SMITH:  Your Honor, that's all the questions I

6  have.

7         THE COURT:  Mr. Strianse.

8         MR. STRIANSE:  Yes.

9                        CROSS-EXAMINATION

10  BY MR. STRIANSE:

11  Q.   Good morning, Ms. Jackman.

12  A.   Good morning.

13  Q.   Do you remember when the search warrant was served on

14  GMA?  I think it was October the 14th of 2020.

15  A.   Yes.

16  Q.   And do you remember the agents came in GMA and you sat

17  down and spoke to them for quite some time; is that right?

18      And you're going to need to speak up so the court

19  reporter --

20  A.   Yes.

21  Q.   -- can hear you.

22      I think you told the agents that you ran the practice; is

23  that right?

24  A.   Yes, I was -- I was office manager.

25  Q.   And Dr. Maccarone is the one that sets the fees at the

1    practice; is that correct?

2    A.    He sets everything, yes.

3    Q.    We have talked a little bit about the money this morning.

4          Dr. Maccarone had a goal of wanting to get, originally,

5    you said $30,000 a day, but it was at least $30,000 a week; is

6    that right?

7    A.    That's the weekly, yes.

8    Q.    That was a target number that he was interested in?

9    A.    Yes.

10   Q.    And if Dr. Maccarone did not achieve that goal, he would

11   get pretty upset about it; is that right?

12   A.    Correct.

13   Q.    In those weeks where he was having difficulty hitting his

14   target, would he instruct staff to try to get money in other

15   ways by asking patients to take an EKG test?

16   A.    Yes.

17   Q.    And that would be a way for Dr. Maccarone to make an

18   extra $45 or so on a patient during a slow week; is that a

19   fair characterization?

20   A.    Yes.

21   Q.    Do you remember getting calls from Dr. Maccarone where he

22   would ask you or the staff, you know, "How is the money

23   looking today?"

24   A.    Yes.

25   Q.    And he would want an assessment as to how many patients

1    were there; is that right?

2    A.   Yes.

3    Q.   And what that represented in dollars to him; is that

4    right?

5    A.   I'm sure that's what he was getting of.

6    Q.   And if it was, for example, if you reported to him -- or

7    somebody at the front desk reported to him -- Well,

8    Dr. Maccarone, it looks like $2,000, Dr. Maccarone would not

9    come in; is that right?

10   A.   He will ask to work on the schedule.

11   Q.   Meaning that he would tell you all, tell these people to

12   come back tomorrow, something like that?

13   A.   Yes.

14   Q.   Because he was conveying to you that it was not worth his

15   while to drive, whatever it took, a few miles, to come to work

16   for $2,000?

17   A.   Pretty much.

18   Q.   Now, Dr. Maccarone had some significant health problems;

19   is that right?

20   A.   Yes.

21   Q.   He was a diabetic; is that correct?

22   A.   Yes.

23   Q.   And would that -- without getting into his personal life,

24   he didn't take the best care of himself physically; is that

25   right?

1    A.   Probably not.

2    Q.   Well, you knew him well; is that right?

3    A.   I know him when he's at work, yes.

4    Q.   Right.  You had known him since 2014; is that right?

5    A.   Correct.

6    Q.   So by the time that these events were going on, you had

7    known him for five or six years; is that so?

8    A.   Yeah.

9    Q.   You were more than just an employee; is that a fair

10   characterization?

11   A.   Meaning?

12   Q.   Meaning that you're a good person, and he would call you

13   up and he would say, Come pick me up and take me to work,

14   things like that?

15   A.   I don't know if that's meaning a good person.  He just

16   wants me to give him a ride.

17   Q.   Right.  So he wanted you to do a little chauffeuring for

18   him; is that right?

19   A.   Yes, I had to pick him up.

20   Q.   You would take him -- if he wanted ice cream or donuts,

21   all of the things he shouldn't be eating, you would dutifully

22   drive him to those locations?

23   A.   I would drive him to those locations.

24   Q.   Now, Dr. Maccarone was also interested in patients that

25   might be leaving the practice; is that right?

1      Let me give you a specific example.

2      Do you remember a patient by the name of Rocky Holder?

3   A.   Sounds familiar, yes.

4   Q.   He would be pretty hard to forget.

5      He was very belligerent there at the office; is that

6   right?

7   A.   There's a lot of patients belligerent.

8   Q.   Do you remember Mr. Holder?

9   A.   I remember the name, yes.

10  Q.   And I think that some of the staff were sort of

11  physically afraid of Mr. Holder.

12     Do you remember that?

13  A.   Not really.  I don't recall.

14  Q.   Do you recall Dr. Maccarone saying we don't want to lose

15  him as a patient?

16  A.   Could be.

17  Q.   Okay.  Because he wanted to continue to treat --

18         THE COURT:  Hang on.  Do you remember that, or are

19  you saying that could be true?

20         THE WITNESS:  I don't know.  I don't remember all of

21  the patients.  What they -- yes, there is case-by-case that

22  there is patients that he don't want to lose.

23         THE COURT:  Okay.

24  BY MR. STRIANSE:

25  Q.   And the reason for that is -- I'll let you give us the

1    answer.

2        Why did he not want to lose a patient like that?

3    A.    I'm not sure.

4    Q.    Isn't somebody like that, that may have been discharged

5    and coming back, able to pay Dr. Maccarone that $500 fee to be

6    reinstated?

7    A.    Could be, yes.

8    Q.    So Dr. Stanton began to fill in for Dr. Maccarone, I

9    think it was in November of 2018; is that right?

10   A.    I don't know the date, but, yes, he was medical director.

11   Q.    Do you remember day that Mr. Maccarone had his health

12   crisis?

13   A.    Yes.

14   Q.    Does that sound about the right time frame?  November of

15   2018?

16   A.    Sure, I don't know the exact date.

17   Q.    Where he was in serious straits; is that a fair

18   characterization?

19   A.    Yes, when he became septic?

20   Q.    Yes.

21   A.    Yes.

22   Q.    And he was in diabetic shock and he had to be

23   hospitalized; is that right?

24   A.    Right.

25   Q.    So Stanton, at that point, came in and covered his

1    patients for about four months; is that right?

2    A.    Sure.

3    Q.    You were asked questions about the shots that Dr. Stanton

4    would offer, the injections that Dr. Stanton would offer in

5    the practice.

6    A.    Correct.

7    Q.    Those were the cortisone injections; is that right?

8    A.    Cortisone, yes.

9    Q.    Did you ever see Dr. Stanton prepare those injections,

10   where he drew the medicine for shots?

11   A.    Yes.

12   Q.    Okay.  Was that something -- he was an orthopedic

13   surgeon.  You knew that?

14   A.    Yes.  Yeah, I do know that.

15   Q.    Did you actually see him draw his own medication for

16   those injections?

17   A.    Yes.

18   Q.    Those injections were not mandatory; is that right?

19   A.    They weren't mandated, no.

20   Q.    They were recommended to patients; is that right?

21   A.    Yes.

22   Q.    As a form of maybe alternative therapy, or if somebody

23   needed to be tapered off of their opioid medicine; is that

24   right?

25   A.    That's his recommendation.

1    Q.   We talked about Dr. Maccarone having a minimum amount of

2    money that would bring him from home into the office.

3         Dr. Stanton didn't have a minimum like that, did he?

4    A.   No, he does not.

5    Q.   Okay.  He never based his schedule on the number of

6    patients that were there at the office; is that a fair

7    characterization?

8    A.   Right.

9    Q.   Was there some tension between Stanton and Maccarone in

10   terms of trying to lower some of the dosages that some of

11   these patients were on?

12        Do you know what I mean by that question?  Where maybe

13   they had different views about it?

14   A.   As far as I know, the tension became more when the

15   patients don't want to get the injections and then he wants to

16   lower them and Dr. Mac said no.

17   Q.   And Dr. Maccarone was adamant about not lowering the

18   prescription strength in the dosage; is that right?

19   A.   He pretty much make that call, yes.

20   Q.   Because it was really, at the end of the day, his clinic,

21   right?

22   A.   Pretty much.  That's what he would say.

23   Q.   In fact, Maccarone was pretty adamantly opposed to these

24   injections; is that right?

25        Do you know what I mean by that?  He didn't like getting

1    calls from patients on his cell phone about not wanting to

2    consider the injections?

3    A.    Yeah, patients would complain to him.

4    Q.    And Dr. Maccarone had a practice of giving out his

5    personal cell number to patients; is that right?

6    A.    Yes.

7    Q.    And they would contact him directly, and they would be

8    complaining about how Dr. Stanton was trying to treat them; is

9    that a -- does that sound familiar to you?

10    A.    All I know is that patients would call him complaining.

11    Q.    Do you remember Maccarone telling you that he had enough,

12    he didn't want to deal with these complaints about the

13    injections?

14    A.    Yes, he said that.

15    Q.    And didn't want any more scheduled; is that right?

16    A.    No, he didn't say that.

17    Q.    Do you remember him being pretty emphatic -- I'm talking

18    about Dr. Maccarone -- about not lowering the prescriptions?

19    A.    When a patient complained about the injection to

20    Dr. Maccarone, and patients complain about getting lowered

21    because they didn't get the injection due to them, for them

22    not working, he would make a determine or he would get upset.

23    "I'm not -- I'm not doing that."

24    Q.    And do you remember telling Special Agent Sizemore on

25    October 14 of 2020, when they were serving that search warrant

1  that Maccarone would tell you that he was absolutely not going

2  to lower those medications?

3  A.   Correct, he's not.

4  Q.   And I think that you told Special Agent Sizemore that you

5  felt like you were sort of in the middle on that?

6  A.   Was I in the middle between the two providers?

7  Q.   Right.

8  A.   At some times, yes.

9  Q.   Do you remember that Special Agent Sizemore came back to

10  the practice a couple of weeks or so after the service of the

11  search warrant?

12  A.   That he came back?

13  Q.   Came back to GMA.

14  A.   After the serving, came back to GMA?

15  Q.   Right.

16  A.   And he -- the next time that I seen him was when they

17  confiscated the phone.

18  Q.   Right.  And where was that?

19  A.   We were pulled over.  We were pulled over on the side of

20  the street, and they took the phone.

21  Q.   Okay.  Do you remember talking to him on -- on that

22  occasion?

23  A.   Yes, I met with him after.  Got Dr. Maccarone and myself

24  in the building.  I came back outside to discuss why were they

25  taking my phone.

1    Q.   And do you remember that he sort of confronted you about

2    maybe not giving all of the information that you knew back on

3    October 14th?

4    A.   I believe so, yes.

5    Q.   And that he was there to get some answers to some

6    questions; is that right?

7    A.   He was there to get pretty much -- he -- I don't know

8    what happened.  They just got my phone and Dr. Maccarone's

9    phone.

10   Q.   It upset you that they seized your phone; is that right?

11   A.   Yes.

12   Q.   I think you felt a little intimidated by the whole

13   process; is that right?

14   A.   Getting pulled over on the side of street like that, yes.

15   Definitely.

16   Q.   And then being told by the agent that they felt like you

17   were not fully honest or complete with them when they had

18   talked to you a couple of weeks before?

19   A.   Yes.

20   Q.   And then they immediately went into the topic about

21   Dr. Stanton; is that right?

22   A.   I don't know immediate.  I -- I'm not remembering every

23   conversation.  But I guess just asking me again about a

24   certain patient.  I don't know who the certain patient was.

25   Q.   Do you remember telling Agent Sizemore that when Stanton

1  was covering for Dr. Mac --

2          MR. SMITH:  Your Honor, objection.

3          MR. STRIANSE:  I can just ask the question, Your

4  Honor.

5          THE COURT:  I'll hear the objection.

6      (Sidebar conference.)

7          THE COURT:  Can you hear, Mr. Strianse?

8          MR. STRIANSE:  Yes, sir.

9          THE COURT:  Okay.  Go ahead.

10          MR. SMITH:  The objection is hearsay.  He's asking to

11  elicit her out-of-court statement.

12          THE COURT:  What's the question you're asking?

13          MR. STRIANSE:  I think I can ask it in a different

14  way.

15          THE COURT:  Okay.  Go ahead and try it here and let

16  me hear it.

17          MR. STRIANSE:  Just ask her directly for the same

18  information.

19          THE COURT:  Can you ask it so I can hear if there's

20  an objection to it?

21      Let me hear it on the headphone.

22          MR. STRIANSE:  Okay.  Can I get my notes?

23          THE COURT:  Yeah.

24          MR. STRIANSE:  I was going to ask her when

25  Dr. Stanton was covering for Maccarone, that the MME numbers

1   of the patients were going down.

2          THE COURT:  Okay.

3       Any objection to that?

4          MR. SMITH:  No.

5          THE COURT:  Okay.

6          MR. STRIANSE:  Thank you.

7       (Sidebar conference concluded.)

8          THE COURT:  All right.  He'll recraft that question.

9   Go ahead.

10         MR. STRIANSE:  Yes, sir.

11  BY MR. STRIANSE:

12  Q.   We talked about Dr. Stanton covering for Dr. Maccarone.

13       When he was covering for Dr. Maccarone, and he was doing

14  the prescribing, the numbers were going down for the patients,

15  in terms of the dosage of their prescription; is that right?

16  A.   Yes, because we were taking five or ten away.

17  Q.   And when Maccarone was out, those numbers were going down

18  with the patients; is that right?

19  A.   Yes.

20  Q.   And that Stanton was tapering these patients every time

21  that he was signing a prescription; is that right?

22  A.   Yes, they were tapering.

23  Q.   And then there came a point in time after a few months

24  that Maccarone comes back; is that right?

25  A.   Correct.

1    Q.   And then he started raising those prescriptions back up?

2    A.   Yes, patients will mention to him that, you know, they

3    got tapered and he raised them back up.

4    Q.   And that upset Dr. Stanton; did it not?

5    A.   I mean, he mentioned to him that his patients were low,

6    now he's back.

7    Q.   And that caused some friction between the two?

8    A.   I'm sure.

9    Q.   And I think Dr. Maccarone accused you of sort of siding

10   with Dr. Stanton on that issue; is that right?

11   A.   In his word, I pretty much verbatim, saying I'm trying to

12   serve two masters.

13   Q.   And that offended you; is that right?

14   A.   Very much.

15   Q.   And what did you think he was trying to convey to you,

16   Dr. Maccarone, when he made that statement to you?

17   A.   I don't know what happened in between that, between them.

18   But when he made that statement, I guess he is thinking that

19   I'm listening to Dr. Stanton versus to him.  I'm not 100

20   percent sure why that statement was made.

21   Q.   And using Maccarone's characterization, you had one

22   master, Stanton, that is seeking to lower, and you've got

23   Maccarone seeking to raise up.

24        Is that what was going on?

25   A.   If you want to define it that way.

1    Q.   Well, I'm more -- I think the jury is more interested in

2    how you define it.

3    A.   Well, I define it as far as take my character, that he

4    is -- he is the owner.  He is going to be the number one for

5    me.

6    Q.   Okay.  Do you remember Dr. Stanton creating a list of

7    patients that had these high MME numbers?

8    A.   He brought in some paper, yes.

9    Q.   And it was his suggestion that those patients needed to

10   be tapered?

11   A.   Those patients, from what I remember, are at high ACME

12   and to give it to Dr. Mac.

13   Q.   And the ACME is the same as this MME; is that correct?

14   A.   MME number?

15   Q.   The MME number.

16   A.   Yeah.

17   Q.   And Dr. Stanton gave this list of patients to Maccarone;

18   is that right?

19   A.   Yes.

20   Q.   And Maccarone said that he did not want to deal with this

21   stuff.  He didn't -- he used the word the "stuff"; is that

22   right?

23   A.   He took it and put it to the side on his desk.

24   Q.   And it was not anything that he would ever consider,

25   Maccarone, would ever consider doing; is that right?

1  A.  I -- I don't know.  But I mean, he doesn't -- he does

2  what he wants.

3  Q.  Because, again, at the end of the day, it's his business,

4  right?

5  A.  That's what he always say.  It's his practice.

6  Q.  And didn't he characterize this list of patients with

7  suggested decreases in the MME as "just a bunch of stuff" that

8  he didn't want to deal with?

9  A.  He didn't express that.  I don't know.

10 Q.  Did there come a point in time that there were some

11 changes made in patient charts at GMA?

12 A.  Can you repeat that?

13 Q.  Yeah.  Did there come a point in time where there were

14 addendums made by Shanna, or maybe other employees, at the

15 direction of Dr. Maccarone to change the patient chart?

16 A.  He will -- yes.

17 Q.  There would be things that would happen that would

18 concern him -- I'm talking about Dr. Maccarone -- and he would

19 instruct that there be an addendum made to the chart?

20 A.  Usually, when he make an addendum -- case-by-case, again.

21     If somebody had overdosed and end up at the hospital, he

22 automatically will ask, "What was his ACME number?"  And based

23 on that, when we -- when the scribe or it was told to him,

24 he'll say, "Okay.  We didn't..." -- he will use the word, "We

25 didn't kill him," or "It's not our fault."

1    Q.   Maccarone would say that?

2    A.   Yes.

3    Q.   What sort of a change would he suggest to the chart

4    through this addendum?

5    A.   If the ACME number is okay, he wouldn't make any

6    addendums.

7    Q.   If ACME number was high in Maccarone's estimation, what

8    did he direct Shanna or --

9    A.   It would be usually just recommend, you know, this

10   patient is, he is supposed to be dismissed or tapered, or we

11   continue seeing them so that they don't go -- I don't know the

12   word.  They don't go in withdraws.

13   Q.   Okay.  And so that language, it would be added to the

14   chart after the fact?

15   A.   Some.  Yes.

16   Q.   That's in case somebody from -- like Mr. Sizemore or

17   somebody from the State of Tennessee looked at the chart, that

18   would sort of try to cover it in some way; is that right?

19   A.   I guess.

20   Q.   Well, I mean --

21   A.   Yes.

22   Q.   -- that seems to be the obvious purpose of it.

23        Is that how you see it?

24   A.   Maybe addendum get added based on case-to-case, yes.

25   Q.   But the addendum was not reflecting things that actually

1   happened; is that right?

2   A.   Not all the time, no.

3   Q.   Wasn't it just sort of an after-the-fact way for

4   Dr. Maccarone to maybe pad or fix his chart in case somebody

5   came looking for that chart?

6   A.   I really don't know because when I -- when the addendum

7   was done, I'm usually not in the room, so he will instruct the

8   scribe.

9   Q.   What was Dr. Maccarone's discharge policy at GMA with

10  patients?

11  A.   For the most part, he will let the scribe know that this

12  patient is going to be dismissed, give him 30 days.  And then,

13  after the 30 days, if they are still having -- haven't had a

14  pain clinic, or they wasn't accepted by referral, he will send

15  a referral, find him a place.  If they haven't received a

16  place, he will see them again.

17  Q.   Okay.  So he would make them leave for 30 days; is that

18  right?

19  A.   No, he doesn't make them leave for 30 days.  He gives

20  them a prescription just for 30 days.

21       The next, when it's finished, he lets them come back in

22  if they haven't found a place to go.

23  Q.   I think we're talking about the same thing.

24       They would leave with a prescription, correct; and an

25  appointment in about 30 days or so?

1   A.   They don't get an appointment.

2   Q.   Well, how did they come back to the practice and say I've

3   not been able to find another provider?

4   A.   They will text Dr. Mac, or we will call them that they're

5   -- if they want to be seen, or they will call the practice.

6   Q.   And say that have not found another provider; is that

7   right?

8   A.   They will say that.

9   Q.   And then Dr. Maccarone would take them back?

10  A.   Yes.

11  Q.   And then he would charge that $500 fee?

12  A.   Correct.

13  Q.   You were asked some questions on direct examination about

14  these packets, these paper files.

15       Do you remember those questions?

16  A.   Yes.

17  Q.   Now, those packets really didn't begin at GMA until the

18  second time Dr. Maccarone was out; is that right?

19  A.   Those packets always exist because Dr. Mac doesn't -- the

20  paper chart's always there.

21  Q.   But in terms of Dr. Stanton's use of the packet, is that

22  when he started getting those packets?

23  A.   He gets different packet for injection, another packet

24  for medical director, and another packet for just regular

25  visits.

1    Q.   I guess what I'm trying to ask:  In November of 2018,

2    when Dr. Maccarone had to leave the practice suddenly --

3    A.   Uh-huh.

4    Q.   -- was he getting those packets?  Was Stanton getting the

5    packets?

6    A.   Yes.

7    Q.   Okay.  How about the patient scheduling chart, did they

8    change over time?

9    A.   I don't understand the question.

10   Q.   Each day there would be a typed list of patients that the

11   provider would see; is that right?

12   A.   Get scheduled, yes.

13   Q.   There came a point in time that there were handwritten

14   notes made on those scheduling documents?

15   A.   Yes.

16   Q.   Now, those handwritten notes started later; is that

17   right?

18   A.   Yes, when -- when the scribe started doing it.  Yes.

19   Q.   So the scribe was not doing that, Shanna was not doing

20   that, in November of 2018 when Maccarone first went out?

21   A.   I don't remember.

22   Q.   Okay.

23            THE COURT:  Can we confer for a moment, Mr. Strianse?

24            MR. STRIANSE:  Yes.

25        (Sidebar conference.)

1          THE COURT:  Can you hear, Mr. Strianse?

2      Mr. Smith.

3          MR. SMITH:  Yes.

4          MR. STRIANSE:  Yes, sir.

5          THE COURT:  We're really to the point -- I had hoped

6  to break, I don't know if we can finish this witness, but -- I

7  don't want to rush anybody.  It doesn't look like we're at the

8  end.

9      How much more time do you anticipate?

10         MR. STRIANSE:  Probably another ten minutes or so.

11         THE COURT:  Okay.  I think we'll break now and just

12  bring her back and complete after lunch.

13         MR. STRIANSE:  Okay.

14         THE COURT:  Any problem with that, Mr. Smith?

15         MR. SMITH:  No, Your Honor.

16         THE COURT:  Okay.  Thank you.

17     (Sidebar conference concluded.)

18         THE COURT:  All right.  That's going to get us to our

19  lunch break, ladies and gentlemen.  I appreciate your careful

20  attention throughout the morning.

21     It is about five til, by my watch.  So let's take an hour

22  and 15 minutes.  So be back, ready to go at 1:10 for the

23  afternoon.

24     Continue to abide by the rules I've put in place.  No

25  discussion, reading, research, exploration on a case.  Keep a

1    wide open mind as the proof comes.

2        And with my thanks, I'll excuse the jury now until 1:10.

3        (The jury exited the courtroom at 11:55 a.m.)

4        THE COURT:  Okay.  Thank you.  The jury has exited.

5    Everybody can be seated.

6        So, Ms. Jackman, you're almost at the end of your

7    testimony, but you're not there yet.  I do need you back after

8    the lunch break to complete your testimony.  So we'll pick up

9    at 1:10 sharp.  Be back, ready to go at that point.

10       Do you understand that, ma'am?

11       THE WITNESS:  Yes.

12       THE COURT:  During the break, don't discuss your

13   testimony with anyone.  Just come back after the break and

14   we'll complete it, and that will wrap up your role in the

15   case.  Okay, ma'am?

16       THE WITNESS:  Okay.

17       THE COURT:  Thank you.  You can step down and exit

18   the courtroom.

19       All right.  The witness has exited.

20       So sounds like a few more minutes on cross for her and

21   then I assume some fairly brief redirect.

22       And then who are the next witnesses going to be for the

23   government?

24       MR. SMITH:  I think the next one, after that, would

25   be Keeley Quinlan and James Maccarone.

1      Dr. Maccarone will be called this afternoon.

2           THE COURT:  Okay.

3           MR. SMITH:  And I need to discuss with the marshals

4      what the status of him is, and then potentially Brian Grove

5      and Keta Abner.

6           Actually, we're going to talk about it.  I don't mean to

7      be so cryptic, but I just need to put our evidence together at

8      the lunch break.

9           THE COURT:  All right.  That sounds good.

10          And then we'll go until the 4:30 break, send the jury

11     home and take up the expert issue.

12          What else do we need to take up at this point, Mr. Smith?

13          MR. SMITH:  Nothing, Your Honor.

14          THE COURT:  Mr. Strianse?

15          MR. STRIANSE:  Nothing, Your Honor.

16          THE COURT:  Okay.  Thank you all very much, and we'll

17     take a break until 1:10.

18          (Recess from 11:58 a.m. until 1:06 p.m.)

19          THE COURT:  Thank you.  Back on the record after the

20     lunch break with all counsel here and Dr. Stanton here.  The

21     jury is not yet assembled.

22          The marshal came and did want to confer about

23     Dr. Maccarone's testimony.  I believe his attorney, Mr. Todd,

24     is here.

25          Are you Mr. Todd?

1    MR. TODD:  Yes.

2    THE COURT:  Thank you, sir.  Would you just come

3    forward and be part of this discussion?

4    MR. TODD:  Yes, sir.

5    THE COURT:  Thank you.  I appreciate that.  I don't

6    believe I've seen Dr. Maccarone yet.  The marshal indicates

7    that for -- about his health problems, the marshal indicates

8    that he's -- that he came today in a wheelchair.  So I just

9    want to handle his appearance physically in a respectful way.

10    So, Mr. Todd, I suppose one thing I'm curious about is:

11   Do you think he can -- if he's brought into the courtroom in a

12   wheelchair, do you think he can transfer into a regular chair,

13   or what is your view on that?

14    MR. TODD:  I'll tell you what he told me, Your Honor.

15   He told me that he preferred to testify from his wheelchair.

16    THE COURT:  Okay.

17    MR. TODD:  That he could move to a chair, but it

18   would be difficult.  I did speak with a marshal earlier who

19   indicated that he might want to do that out of the presence of

20   the jury, during a break before his testimony, if you wanted

21   him to go to the chair.

22    THE COURT:  Okay.  Well, listen, I've had witnesses

23   testify from wheelchairs before.  I'm glad to try to

24   accommodate that.

25    Let's just talk about, counsel, what is the best way to

1    do it to protect the jury view, Dr. Stanton's right to

2    confront.

3        So the options -- is he going to need to see exhibits,

4    Mr. Smith?

5              MR. SMITH:  Potentially, yes, Your Honor.

6              THE COURT:  Okay.  Now, if we put him kind of -- if

7    we put him sort of in front of where the court reporter is, he

8    could use her monitor to look at exhibits, and he would sort

9    of -- the jury, I think, could see him.

10        I might have Ms. Woolums move back a table.

11        If Dr. Stanton's comfortable, he can see him adequately,

12    sort of right in front of where Kim is.  We can move the

13    podium back, if we need to.

14        How about that as Option A?

15        What do you think, Mr. Smith?

16              MR. SMITH:  That's fine with me, Your Honor.  I'm

17    also fine with the transfer to the chair.  I'll defer to the

18    defendant's preference.

19              THE COURT:  Mr. Strianse.

20              MR. STRIANSE:  It's fine with me, and I also defer.

21              THE COURT:  And, Mr. Todd, are you okay with that

22    setup?

23              MR. TODD:  Yes, Your Honor.

24              THE COURT:  And your client's preference would be

25    something other than having to physically transfer to the

1   chair?

2           MR. TODD:  That's what he told me.

3           THE COURT:  All right.  If we had to transfer him, I

4   was going to do that without the jury in here.  But I think

5   when he's called, normally, an in-custody witness just kind of

6   comes in from the holdover, and I think I'll just have him

7   brought in, in his wheelchair, positioned there in front of

8   Kim, and then in terms of the mic, can we pull one down close

9   to him or what are we going to do on that?  How far can we --

10          (Off-the-record discussion.)

11          THE COURT:  Let's do this.  When we call him, I'll

12  send the jury out.  We'll bring him in and just be sure

13  everybody is okay with the setup.  And if that chair will fit

14  in this gap up here, that will serve everybody's interest.

15          If we need to tinker with it some, we'll have the jury

16  out so we can do that in a way that is respectful of his

17  limitations.

18          MR. TODD:  Okay.  Thank you.

19          THE COURT:  Thank you, Mr. Todd.  All right.

20          What else do we need to take up at this point, Mr. Smith?

21          MR. SMITH:  Nothing.

22          THE COURT:  Mr. Strianse.

23          MR. STRIANSE:  Nothing.

24          THE COURT:  On the schedule, remember we'll break at

25  4:30 this afternoon.  I think afternoons are a little tougher

1   on juries, so I expect, my hope, is we'll go an hour and,

2   obviously, the Maccarone situation might create a break where

3   I otherwise wouldn't have had one.  Go about an hour and 15

4   minutes, take a break, so maybe not quite as long as we go in

5   the morning, and then we'll break early for that hearing at

6   the end of the day.

7        All right.  Let's get as far as we can.  Let's bring the

8   jury in.

9        (The jury entered the courtroom at 1:11 p.m.)

10       THE COURT:  Thank you, all.  The jury has returned to

11  the courtroom.  Sorry that front row is kind of a narrow

12  pathway with that bar there.  And every time I think about

13  taking it out, I know it is much more comfortable to sit there

14  and have a bar to put your foot on.

15       So anyway, I'm sorry it is sort of an uncomfortable path

16  to get through that front row.

17       So we're going to bring Ms. Jackman in -- she can go

18  ahead and come in to finish her testimony.

19       This afternoon our schedule's going to be a little bit

20  different.  We're going to break about 4:30 today.  And so we

21  will get a good strong afternoon of testimony, but we will

22  stop at 4:30.

23       We have got some legal issues we need to tend to, so that

24  will be the end of your day.  You can plan on that.

25       All right.  Come on forward, ma'am.

1      Ms. Jackman, thank you for being back and ready to

2  complete your testimony.

3      You understand that you're still under oath?

4          THE WITNESS:  Yes.

5          THE COURT:  Thank you.

6      Mr. Strianse.

7          MR. STRIANSE:  Thank you.

8                  CROSS-EXAMINATION - Continued

9  BY MR. STRIANSE:

10  Q.   Good afternoon, Ms. Jackman.

11  A.   Hey.

12  Q.   When Dr. Stanton was filling in for Dr. Maccarone, did

13  you ever tell Dr. Stanton that patients were traveling long

14  distances to the clinic?

15  A.   He's aware that they were from far away, yes.

16  Q.   You were asked some questions before lunch about lowering

17  medications.

18      Do you remember those questions generally?

19  A.   Yes.

20  Q.   Do you remember talking to Dr. Stanton about lowering

21  medications for people that failed to appear or didn't show up

22  for an injection appointment?

23  A.   Repeat the question again.

24  Q.   Do you remember talking to Dr. Stanton about lowering

25  medications for patients that didn't show up for an injection

1   appointment?

2   A.   We don't typically discuss that.  That's already written

3   in his paper.

4   Q.   Okay.  So that would be a reason to lower is what you're

5   saying.

6   A.   I'm not saying it's a reason to lower.  We don't have

7   this conversation.

8   Q.   Okay.  You were asked some questions about the time

9   sheets for Dr. Stanton.

10       Do you remember those?

11  A.   Yes.

12  Q.   Now, the time sheets were based on two prescheduled days

13  for Dr. Stanton, Tuesday and Thursdays; is that right?

14  A.   The days that he'd say he will come by, yes.

15  Q.   Now, when Maccarone returned to the practice on a

16  somewhat regular basis, he was still not coming in certain

17  days; is that right?

18  A.   There is days that he doesn't show up, yeah.

19  Q.   He would call in and say he was not going to make it; is

20  that right?

21  A.   Correct.

22  Q.   And on average, it was at least one day a week that that

23  would happen?

24  A.   For the most part, yes.

25  Q.   And you would call Dr. Stanton and see if Dr. Stanton

1    could come and take care of the patients that were there on

2    that day that Maccarone decided not to come?

3    A.   I would not call Dr. Stanton to come and cover if Dr. Mac

4    doesn't come in.  Only if Dr. Mac is already present, the

5    patient that he's seen for injection or medical director, will

6    he see them also for the regular visit.

7    Q.   Okay.  Well, let me make sure I'm understanding.

8         So you would have never called Dr. Stanton to say,

9    Dr. Stanton, we have patients here, Dr. Maccarone has let us

10   know that he's not coming in today, can you come in?

11   A.   Only if Dr. Mac request that Dr. Stanton cover, yes.

12   Yes, but I would not typically make that decision on my own.

13   Q.   I'm not trying to put the decision making on you.  But

14   would that circumstance happen?

15   A.   He doesn't cover.  I would not call him, again, just to

16   cover, just for the patient because Dr. Mac stayed home.

17        Dr. Mac will call out, period.  And we don't ask

18   Dr. Stanton just to cover just because Dr. Mac decided not to

19   come in on a light schedule, or he just decided not to show up

20   or come in.  He just say, Reschedule the patient for the next

21   day.

22   Q.   So you're saying that you would not pick up the phone and

23   call Stanton and have him come in?

24   A.   No, that's not usually the typical thing that we do.

25   Q.   Well, it may not be the typical thing, but did it happen

1   that he --

2   A.  If Dr. Mac asked -- called Dr. Stanton to see if he can

3   see -- go ahead and see the patient, then we would ask him,

4   yes.  But it is not, again, it will not be something that I

5   would say, Dr. Stanton, can you cover this patient?  Dr. Mac

6   is not coming in.

7   Q.  All right.  Well, Dr. Maccarone would ask you to call

8   Stanton, then; is that right?

9   A.  If he wanted to, yes.  He would ask me to do so.

10   Q.  And, again, Maccarone is not going to come in, so he asks

11   you to call Stanton; is that right?

12   A.  If he wants him there, yes.

13   Q.  Now, in those instances, would you add that extra day

14   into his timesheet, into Stanton's timesheet?

15   A.  What extra day?

16   Q.  Well, you're basing the timesheet on the two prescheduled

17   days; is that right?  Tuesday and Thursdays --

18   A.  Yes.

19   Q.  -- is that right?

20   A.  The base, the time that when he's supposed to be there

21   for the visit.

22   Q.  Right.  Go ahead.  I'm sorry.

23   A.  The injection or medical director does not count, or we

24   wouldn't typically account it.  I mean, he's there to see --

25   he's there face-to-face with the patient, in the clinic.

1  And then he comes for a different time just to go see, he

2  sits with Dr. Mac or he goes see his patient.

3  Q.  So you're saying you wouldn't add that in?

4  A.  That is added in.

5  Q.  Now, you worked with Dr. Maccarone at GMA for how many

6  years?

7  A.  I started in 2014.

8  Q.  And you were a pretty key employee there; is that right?

9  A.  I guess, yes.

10  Q.  Probably the most important employee to Dr. Maccarone; is

11  that a fair characterization?

12  A.  Yeah, he relied on me, yes.

13  Q.  And I think you told us earlier that you really ran the

14  office; is that correct?

15  A.  I am office manager, yes.

16  Q.  And you were compensated very well; is that right?

17  A.  I'm paid, yes.

18  Q.  And I think you were paid about $120,000; is that right?

19  A.  Towards the end, yes.

20  Q.  Was your sense of things that Dr. Maccarone was the kind

21  of person that would take care of himself before anybody else

22  at the clinic?

23  A.  What is the question?

24  Q.  I said, Was it your belief that Dr. Maccarone was the

25  type of individual that would watch out for himself, or take

1  care of himself before anybody, any other employees at the

2  clinic?

3  A.   I'm not understanding what is implied to me.  He takes

4  care of him in what way?  I mean, I don't know.  I don't

5  understand the question.

6  Q.   Right.  Well, maybe it's bad question.

7       You remember talking to the agents when they came and

8  served the search warrant?  Do you recall that?

9  A.   Okay.

10 Q.   And do you remember telling the agents that

11 Dr. Maccarone, at the end of the day, would really take care

12 of himself before he would be worried about any of the

13 employees at GMA?

14 A.   If he stated that to me?

15 Q.   No.  No.

16      Did you say that to Special Agent Sizemore?

17 A.   I don't remember that.

18 Q.   Okay.

19          MR. STRIANSE:  Can I have one moment, Your Honor?

20          THE COURT:  Yes, of course.

21      (Off-the-record discussion.)

22 BY MR. STRIANSE:

23 Q.   Last area.

24      There were two other medical directors that were serving

25 around the same time; is that right, at GMA?

1    A.   Yes, there was a lot of different medical directors.

2    Q.   There was a Dr. Chavin; is that right?

3    A.   Yes, Dr. Chavin.

4    Q.   And Dr Atkins; is that correct?

5    A.   That's correct.

6    Q.   Were they able to control the behavior of Dr. Maccarone

7    any better than Dr. Stanton was?

8    A.   Well, two different medical directors.  They both, two

9    different things that they have done for the practice.

10        Were they able to control him?  I really can't say.

11        I can tell you what Dr. Atkins say.  How he was in the

12   practice, what he looked up, how he evaluate the chart.

13        And I can also speak for Dr. Chavin.  Dr. Chavin, he

14   pretty much just sit entire day with Dr. Maccarone in the

15   office.

16   Q.   But Dr. Maccarone was going to do what Dr. Maccarone

17   wanted to do; is that right?

18   A.   I mean, that's -- typically, yes.

19             MR. STRIANSE:  That's all.

20             THE COURT:  Thank you.

21        Mr. Smith.

22                        REDIRECT EXAMINATION

23   BY MR. SMITH:

24   Q.   Ma'am, you were just asked about these two other medical

25   directors.

1       How long were they there?

2   A.  Not for very long.

3   Q.  When they were there, you started describing it.

4       Were they there longer than Dr. Stanton was?

5   A.  No.

6   Q.  Meaning at the beginning of the day, for that day, you

7   described seeing them.

8       So on a given day were they there longer than

9   Dr. Stanton?

10  A.  Yes.

11  Q.  Did they took at files?

12  A.  Dr. Atkins did.

13  Q.  What did he do?

14  A.  He accessed the EMR.  He has his laptop.  He reviewed and

15  make documentation in the -- in notes in the chart.

16  Recommendation of tapering or removing benzos.

17  Q.  Did Dr. Stanton do that?

18  A.  No.

19  Q.  You were asked a number of questions about lowering the

20  medications.

21      And I think that you just gave a response that said it

22  was already in the paper.

23      Do you remember saying that a moment ago?  That that

24  reduction was already in his paper?

25  A.  In the schedule, yes.

1    Q.   Okay.  When you said that, were you saying, as you

2    described when I asked you questions on direct examination,

3    that those recommendations about the negative five or negative

4    ten, those were made by Shanna or you or someone else?

5    A.   Yes, sir.  It was already removed.

6    Q.   So that was made by you guys?

7    A.   Yes.

8    Q.   Before it got to Dr. Stanton?

9    A.   Correct.

10        MR. SMITH:  Your Honor, I think that's all the

11   questions I have.

12        THE COURT:  Thank you.

13      Is this witness finally excused, Mr. Smith?

14        MR. SMITH:  Yes, Your Honor.

15        THE COURT:  Mr. Strianse.

16        MR. STRIANSE:  Your Honor, one more question.

17        THE COURT:  Briefly.

18                   RECROSS-EXAMINATION

19   BY MR. STRIANSE:

20   Q.   You were talking about Dr. Atkins serving as medical

21   director.

22      Did Dr. Maccarone follow Dr. Atkins' suggestions and

23   directions?

24   A.   No.

25        MR. STRIANSE:  That's all.

1          THE COURT:  All right.

2     Is she is finally excused, Mr. Strianse?

3          MR. STRIANSE:  Yes, sir.

4          THE COURT:  Thank you, ma'am.  That concludes your

5     testimony.  You can step down and you are free to go.

6     Mr. Smith.

7          MR. SMITH:  Your Honor, can we go on --

8     (Sidebar conference.)

9          THE COURT:  Mr. Strianse, can you hear?

10         MR. STRIANSE:  Yes, sir.

11         MR. SMITH:  Your Honor, I think I had proposed having

12    one more witness before now.  But given everything we just

13    talked about, I may try to get Dr. Maccarone up here now so

14    that, hopefully, we can get him done.

15         The marshals expressed some concern about transport, and

16    he also needs a shot as a diabetic, apparently, they don't

17    want to administer.

18         So all of that is to say, I think if we just move to

19    Maccarone now, it's probably the best course of action.

20         THE COURT:  I think I'll send the jury out just for

21    five minutes, and we'll get him set up and bring them back in.

22         MR. SMITH:  Sorry to do that.

23         THE COURT:  That's okay.

24    (Sidebar conference concluded.)

25         THE COURT:  A little logistical issue to take up, so

1    I'm going to send you out for a mini break for about five

2    minutes, because I want you to be comfortable while we do

3    that.

4        But I'll bring you back in when we're ready to continue.

5    Thank you.

6        (The jury exited the courtroom at 1:26 p.m.)

7        THE COURT:  Thank you.  Everybody can be seated.  The

8    jury has exited and, Mr. Smith, you are calling Dr. Maccarone

9    next?

10        MR. SMITH:  That's correct, Your Honor.

11        THE COURT:  Okay.  Can we go ahead and get him up

12    here?

13        And, Mr. Todd, he knows you're here in the building,

14    okay?

15        MR. TODD:  Yes, Your Honor.  I instructed him that if

16    at any time he needs to speak with me, he should let you know.

17        THE COURT:  Okay.  That's fine.  Sometimes I have a

18    lawyer stay out in the gallery.  Sometimes the lawyer will

19    come sit behind the client.  If you want to do that, that's

20    fine.  I don't have --

21        MR. TODD:  Not necessary.

22        THE COURT:  Then you can just position yourself out

23    there.  And if he needs to confer, he'll give some kind of

24    signal and I'll jump in, okay?

25        MR. TODD:  Thank you, Your Honor.

1          THE COURT:  Okay.  Thank you.

2      Of course, I'll swear him in front of the jury, so we'll

3  do that a little differently.

4      Mr. Strianse, I want to make sure that Dr. Stanton can

5  see Dr. Maccarone.

6      Can you see him?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Mr. Smith?

9          MR. SMITH:  Yes.

10          THE COURT:  I will bring the jury in and I'll just

11  say that we took a break to facilitate Dr. Maccarone in the

12  courtroom, and then I'll have him sworn from right where he's

13  seated, and we'll commence the examination.

14      You okay with that, Mr. Smith?

15          MR. SMITH:  Yes.

16          THE COURT:  Mr. Strianse.

17          MR. STRIANSE:  That's fine.

18          THE COURT:  All right.  We'll bring them back in.

19      (Jury entered the courtroom at 1:29 p.m.)

20          THE COURT:  You may be seated.

21      Thank you, all.  The jury has returned to the courtroom.

22      I took that mini break to bring the next witness in who

23  has some physical limitations, just wanted to get him set up

24  and ready, and then have you re-enter the courtroom.  That's

25  the reason for that break.  So thank you for that.

1    All right.  So if you would just announce who the witness

2   is, Mr. Smith.

3          MR. SMITH:  Yes, Your Honor.  The United States calls

4   James Maccarone.

5          THE COURT:  And, Madam Clerk, if you would swear the

6   witness.

7          COURTROOM DEPUTY:  Yes, Your Honor.

8       JAMES JOSEPH MACCARONE, GOVERNMENT'S WITNESS, SWORN

9          THE COURT:  Sir, if you would be careful to speak

10  directly toward that mic in a clear, loud voice so we can

11  understand your testimony, I would appreciate that.

12         THE WITNESS:  All right, sir.

13         THE COURT:  Begin, if you would, by stating your name

14  and spelling your last name.

15         THE WITNESS:  James Joseph Maccarone.

16  M-A-C-C-A-R-O-N-E.

17         THE COURT:  Thank you, sir.

18      Mr. Smith.

19         MR. SMITH:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21  BY MR. SMITH:

22  Q.   Sir, are you currently incarcerated?

23  A.   Yes.

24  Q.   Before you were incarcerated, just give us the city and

25  state where you lived.

1   A.   Spencer, Tennessee.

2   Q.   What did you do for a living?

3   A.   I was a primary care physician, internal medicine, and

4   pain management specialist in Clarksville, Tennessee.

5   Q.   Did you own a medical practice?

6   A.   Yes.

7   Q.   What was that practice called?

8   A.   Gateway Medical Associates, P.C.

9   Q.   Were you licensed to practice in Tennessee?

10  A.   Yes.

11  Q.   Sir, before we get further along in your testimony, I

12  wanted to address a couple of points with you.

13       First is, have you pleaded guilty to a felony?

14  A.   Yes.

15  Q.   What crime or crimes did you plead guilty to?

16  A.   Conspiracy to distribute controlled substances.

17  Q.   And just in a sentence or two, can you tell us what you

18  did?

19  A.   For a number of years I operated a pain clinic.  It was

20  actually a pill mill.  I was seeing patients from both

21  Kentucky and Tennessee, all throughout Kentucky.

22       And I saw them, I evaluated them, and I gave them

23  prescriptions for narcotics and controlled substances.

24  Q.   And those prescriptions that you issued, were they

25  outside the course of acceptable medical practice?

1   A.   Many were.

2   Q.   Did you do that over and over again?

3   A.   Yes.

4   Q.   Now, when you first pled guilty, did you have a tough

5   time going before the Court and doing that?

6   A.   Yes, very difficult time.

7   Q.   And in your plea agreement with the Court, did you have a

8   tough time initially admitting to what you were doing?

9   A.   Yes.

10  Q.   Can you explain why?

11  A.   The word "conspiracy," in my mind, is a very bad thing.

12  It's a dirty word.  And my narcissim, which I have been

13  diagnosed with, got the best of me.

14       For a long time I had a difficult time wrapping my head

15  around me conspiring with someone else.

16       I can tell you that with almost six months locked up in

17  the county jail, it gives you plenty of time to reflect and

18  plenty of time to think about what -- what you did in

19  practice.

20       And it took quite a while for me to come to grips with

21  the fact that I did something very bad, and now I'm answering

22  for it.

23       At the time of the plea agreement --

24  Q.   Sir, let me just ask you this question.

25  A.   Sure.

1    Q.   Sitting here today, did you agree with others to
2    unlawfully distribute controlled substances?
3    A.   Yes.
4    Q.   Who do you agree with?
5    A.   Dr. John L. Stanton.
6    Q.   Did you agree to act as a source of supply to people in
7    Kentucky and elsewhere that were diverting their medications?
8    A.   Yes.
9    Q.   Have you been sentenced in this case?
10   A.   No, not yet.
11   Q.   Are you hoping to get a better outcome at sentencing in
12   exchange for your testimony?
13   A.   Yes, request consideration from the Judge.  Ultimately,
14   it is up to him.
15   Q.   Have I or anybody on behalf of the government promised
16   you anything, any guaranteed result, as a result of your
17   testimony?
18   A.   Nothing promised.
19   Q.   Let's go back to Gateway Medical Associates.
20        When did Gateway Medical Associates first open?
21   A.   The primary care, internal medicine practice, opened June
22   1st of 2000.
23   Q.   What kind of practice was it when you first opened the
24   door?
25   A.   Internal medicine, adult primary care, consultation.  And

1    I saw patients and referred them to specialists for also

2    consultation and evaluation.

3    Q.   I don't know that I asked you this:  What was your

4    training as a physician going -- before you entered the

5    practice?

6    A.   I did a residency in internal medicine.

7         I trained.  I was recruited.  I came to Clarksville,

8    Tennessee, and I joined a primary care group called Alpha

9    Medical Associates.

10   Q.   Now, fast forward in time.

11        At some point, did Gateway Medical Associates start

12   seeing more pain patients?

13   A.   Yes.

14   Q.   When was that?

15   A.   2012.

16   Q.   Were you aware, as a practitioner and as the owner of

17   GMA, that Tennessee had begun regulating pain clinics?

18   A.   Yes.

19   Q.   And as time went forward, were there additional

20   requirements that pain clinics had to meet to stay open?

21   A.   Yes.

22   Q.   Did Tennessee impose a requirement related to medical

23   directors?

24   A.   Yes.

25   Q.   Do you remember, did the rules change about medical

1    directors, to require medical directors to have a certain

2    level of qualification?

3    A.    Yes.

4    Q.    Did you have that qualification?

5    A.    No, I did not.

6    Q.    You referred to yourself, when you first started earlier,

7    as a pain management specialist.

8          Do you remember saying that?

9    A.    Yes.

10   Q.    Were you qualified as a specialist that would allow you

11   to -- that would allow you to serve as a medical director at

12   that time?

13   A.    No.

14   Q.    What did you have to do?

15   A.    Come around 2015, 2016, I had to have a person that met

16   the qualifications for the State of Tennessee to serve as my

17   medical director.

18         In other words, I couldn't operate a pain clinic solely

19   based on my credentials.  I needed someone with more

20   credentials than what I had, specifically board certification

21   in pain management.

22   Q.    Do you know the defendant, Dr. John Stanton?

23   A.    Yes, I do.

24   Q.    When did you first meet him?

25   A.    December of 1997.

1    Q.    What was his background?  What was his specialty?

2    A.    He was an orthopedic surgeon.

3    Q.    Did you stay in touch with him over the years?

4    A.    Yes.

5    Q.    When -- in 2016 when you needed to find a medical

6    director with sufficient qualifications, who was ultimately

7    brought in?  Who became the medical director?

8    A.    July 1, 2016, Dr. Stanton.

9          MR. SMITH:  Rebecca, can we bring up Government

10   Exhibit 21?

11       Your Honor, this has already been admitted and ask

12   permission to publish to the jury.

13          THE COURT:  You may.

14   BY MR. SMITH:

15   Q.    Sir, do you recognize this?

16   A.    Yes, I do.

17   Q.    I don't want you to read this word-for-word, but can you

18   tell us, in substance, what it is that you were communicating

19   in this letter?

20   A.    I was announcing to the state, the division of

21   health-related boards, and also the health department, that

22   effective July 1, 2016, John L Stanton, M.D., would serve as

23   my medical director for the practice, Gateway Medical

24   Associates.

25   Q.    Had there been some communication with the state before

1    then indicating you, that you would need to have this medical
2    director?
3    A.   Yes.
4    Q.   There were?
5    A.   Yes.
6    Q.   Now, at that point in time, was the defendant also
7    involved with, or associated with, any other clinics in the
8    area?
9    A.   Yes.
10   Q.   Can you explain that, please?
11   A.   There was a clinic -- there is a clinic in Clarksville
12   called Clarksville Pain Institute.
13        There also, at that time, was a clinic I believe in White
14   House owned by the same people that owned Clarksville Pain
15   Institute.
16        Dr. Stanton was their medical director at that time.
17   Q.   Did he also, at some point, own a pain management clinic?
18   A.   Yes.
19   Q.   What was that called?
20   A.   The Joint and Spine Pain Center.
21   Q.   How close is that to Gateway Medical Associates?
22   A.   Originally, when it first opened, it was across town.
23        It moved a couple of times, and it then, ultimately,
24   moved right-next door to me, in a building where Dr. Stanton
25   is co-owner, and there was sufficient space for his needs for

1    the pain clinic.

2    Q.   So that was in July of 2016 is when Dr. Stanton came

3    aboard as medical director?

4    A.   Yes.

5    Q.   How long did he serve as medical director?

6    A.   From July 1, 2016, through the end of October of 2020,

7    with maybe six to eight weeks leave for -- at that time, he

8    was trying to open a pain clinic in Nashville, Tennessee, but

9    something happened.  That clinic did not open.

10        He was away from my clinic for a very brief period of

11   time.  Ultimately when that clinic didn't come to fruition, he

12   contacted me and resumed his medical director responsibilities

13   at my facility, my practice, Gateway Medical Associates.

14   Q.   Let's talk about what happened at Gateway Medical

15   Associates.

16        And I would like, if we can, to direct our attention to

17   the time period from what you just told us about, July of

18   2016, forward, okay?

19   A.   Yes.

20   Q.   Stepping back:  As a doctor, do you understand why

21   certain drugs are classified as controlled substances?

22   A.   Yes.

23   Q.   Explain that.

24   A.   A drug is controlled when there is a certain danger or a

25   certain concern about that drug in the public, in the layman's

1   hands.

2       Basically, they're medications that, combined with other

3   medicines or other controlled substances, could have very

4   hazardous results, and the worst case scenario, death.

5   Q.   Did you know that drugs like oxycodone and oxymorphone

6   are addictive?

7   A.   Yes.

8   Q.   Did you know that they were Schedule II painkillers?

9   A.   Yes.

10  Q.   Is Schedule II the most dangerous that can be lawfully

11  prescribed?

12  A.   Yes.

13  Q.   Did you know what the term "diversion" meant?

14  A.   Yes, I did.

15  Q.   Okay.  Did you know that in 2016?

16  A.   Yes.

17  Q.   What does diversion mean?

18  A.   Simply put, if I write a patient a prescription and I

19  give it to them, that medication that gets filled doesn't stay

20  with that one patient.  It goes in a different direction.

21      It could either be traded, sold for other meds, other

22  things, and it could also be used for abuse, and for purposes

23  other than what initially or originally meant to be used for.

24  Q.   Did you know in 2016 -- during this time period we're

25  talking about, so 2016 forward -- did you know that the drugs

1  that were obtained through controlled substance prescriptions,

2  so drugs like oxycodone and oxymorphone, they had a resale

3  value on the street?

4  A.   Yes.

5  Q.   Did you know they were valuable?

6  A.   Yes.

7  Q.   Did you know that they were sought after by people who

8  wanted to sell or abuse them?

9  A.   Yes.

10 Q.   Earlier today you said something about a pill mill.

11      Do you remember that?

12 A.   Yes.

13 Q.   What do you mean by that term?

14 A.   It's an ugly term.  It's an unfortunate term, but

15 basically it's a shop where you go, you are evaluated, and

16 you're given prescriptions for controlled substances.

17      Now, whether you need those prescriptions or not is a

18 question.

19      But, basically, on reputation alone, it travels very

20 quickly through the public if a lot of people go to a practice

21 or go to a clinic and, more times than not, they walk in, they

22 pay whatever it is that it costs, and they walk out with

23 narcotics.

24 Q.   What you just described, is that what Gateway Medical

25 Associates was?

1    A.    Unfortunately, to a large degree, yes.

2    Q.    You talked about people traveling.

3          Where did people travel from to go to Gateway Medical

4    Associates?

5    A.    In the State of Kentucky:  Manchester, London, Corbin,

6    Somerset, Oneida, Hyden.

7    Q.    And I didn't mean a laundry list, just --

8    A.    All over the state.  Well, mostly that section, that

9    area.

10   Q.    Do you have a sense of what portion of your patients --

11   calling them "patients," what portion of the people that came

12   to Gateway Medical Associates were from Kentucky?

13   A.    I would say 70 percent.

14   Q.    You were aware of that?

15   A.    Yes.  Yes, I was.

16   Q.    Did you have a sense of how far these people traveled?

17   A.    Yes, sometimes upward, four to five hours one way.

18   Q.    Did patients sometimes travel together to the clinic?

19   A.    Yes.

20   Q.    What were the hours posted on the door at Gateway Medical

21   Associates?

22   A.    Monday through Friday, 10:00 a.m. to 7:00 p.m.

23   Q.    How late would you see patients and write them

24   prescriptions?

25   A.    Oftentimes midnight or beyond.  The latest was 4:00 a.m.

1   Q.   And the patients who you saw at those late hours, do you

2   have a sense of when they arrived at the clinic?

3   A.   They had been sitting in my waiting room or in my parking

4   lot for hours.

5   Q.   What was the most common condition that people reported

6   to have when they came to Gateway Medical Associates?

7   A.   Chronic lower back pain.

8   Q.   Now, as a doctor, were you aware that someone who has

9   chronic lower back pain ordinarily would probably have a tough

10  time sitting in a parking lot or a car for ten hours at a

11  time?

12  A.   Yes.

13  Q.   And yet people who reported having that condition got

14  drugs from your clinic repeatedly?

15  A.   Yes.

16  Q.   How much did patients have to pay to get the

17  prescriptions?

18  A.   It varied.  Anywhere between $285 up toward $500.

19  Q.   Now, as a doctor who is in the field of pain management,

20  were you aware as to whether there were guidelines in

21  Tennessee with regard to chronic pain management?

22  A.   Yes, I was.

23       MR. SMITH:  Can we bring up Exhibit 13, please.

24       Your Honor, this was previously admitted.  I would ask to

25  publish it.

1      THE WITNESS:  Yes, you may.

2      MR. SMITH:  Thank you, Your Honor.

3   BY MR. SMITH:

4   Q.   Do you know what we're looking at here?

5   A.   Yes, sir.

6   Q.   What is it?

7   A.   This is the Tennessee Chronic Pain Guideline, third

8   edition.

9        This is a manual for the State of Tennessee on the proper

10  way of seeing, evaluating patients with chronic pain, and how

11  to treat those patients with chronic pain.

12  Q.   Have you ever heard the term "course of professional

13  practice"?

14  A.   Yes.

15  Q.   Just in your mind, did guidelines like this set forth

16  what the course of professional practice was?

17  A.   Yes.

18  Q.   Were these sent to you as a doctor?

19  A.   Yes.

20  Q.   Were these rules easy to obtain, easy to understand?

21  A.   Yes.

22      MR. SMITH:  Can we open and go to Section 1, please.

23  BY MR. SMITH:

24  Q.   Sir, did you understand what Section 1 of the guidelines

25  was?

1    A.   Yes.

2    Q.   What is it?

3    A.   Basically, if you have seen a patient with chronic pain,

4    and you interview them, you evaluate them, it is important to

5    try nonnarcotic therapies first to see if you could avoid

6    using opioid therapy to start with for these patients.

7    Q.   During the time period we're talking about at Gateway

8    Medical Associates, did you do that?

9    A.   Sometimes, but not often.

10        MR. SMITH:  Can we fast forward?  Can we blow up A1,

11   please?

12   BY MR. SMITH:

13   Q.   What does the first thing in this Section 1 say?

14        Can you read that for us, please?

15   A.   Yes.  1.  "A patient having been prescribed opioids by a

16   previous provider is not, in and of itself, a reason to

17   continue opioids."

18   Q.   Okay.  Did you know and understand that, as a

19   practitioner in Tennessee, during the time period at issue?

20   A.   Yes.

21   Q.   What does number two say?

22   A.   2.  "Reasonable nonopioid treatment should be tried

23   before opioids are initiated.  Opioids should be initiated

24   only after other reasonable, appropriate, and available

25   treatments for the pain condition have been considered."

1  Q.   With respect to the number one.  When you were at GMA,

2  did you prescribe controlled substances in violation of both

3  of those principles?

4  A.   Yes.

5  Q.   Did Dr. Stanton prescribe in violation of both of those

6  principles?

7  A.   Yes.

8        MR. SMITH:  Let's go forward to Section 2, please.

9     And next line.  Sorry.

10  BY MR. SMITH:

11  Q.   What does Section 2, to your understanding, what does

12  that cover?

13  A.   What you should think about when considering using

14  opioids.

15  Q.   Were you aware of the concept of MME?

16  A.   Yes, MEDD.

17  Q.   It has different terms, I think, in different places, but

18  it is also sometimes called ACME?

19  A.   Yes.

20  Q.   Generally speaking, is it a way of measuring potency

21  across different types of drugs?

22  A.   Yes, equating it to Morphine.

23  Q.   And so you reduce them all to one equivalency, and then

24  you measure, in total, how potent is the thing that I

25  prescribed?

1    A.   Yes, that's correct.

2    Q.   Were you aware in 2016, and throughout this time period,

3    that there were risks as you got above certain thresholds of

4    MMEs?

5    A.   Yes.

6    Q.   Was that prominently stated and advertised to

7    practitioners in Tennessee?

8    A.   Yes, it was.

9    Q.   At Gateway Medical Associates, were patients, early on or

10   right away, started out on high levels of MME?

11   A.   Yes, some were.

12          MR. SMITH:  Okay.  Can we go to the third section,

13   please?  Blow up B for us, please.

14   BY MR. SMITH:

15   Q.   Now, were you aware -- I think you've already told us

16   about why drugs are scheduled and the risk of those drugs.

17          You've also told us about diversion.

18          Were you aware of tools or measures that physicians could

19   take to try to combat those risks?

20   A.   Could you repeat that?

21   Q.   Sure.  So the risks of either abusing the drug or

22   diverting the drug.

23          Were there measures that physicians could take to address

24   those risks?

25   A.   Yes.

1   Q.   With respect to urine drug tests, can you explain what

2   your understanding was, as far as the purpose of urine drug

3   testing?

4   A.   A patient would come in, they would supply a sample of

5   their urine.  And what you would look for, typically, is to

6   see if metabolites of your prescriptions were in their urine.

7        Also if there were any other controlled substances in

8   their urine, other than what you prescribed.

9        Also if their urine was completely clean, that was

10  something also to look for.

11  Q.   Can we refer to both of those as inconsistent results?

12  A.   Yes.

13  Q.   During the time period we're talking about, did you

14  understand that when a patient has an inconsistent result,

15  like you just outlined, that that is a serious concern for a

16  prescriber of opioid pain medication?

17  A.   Yes.

18  Q.   Did you repeatedly prescribe to patients who had

19  inconsistent drug results?

20  A.   Yes.

21  Q.   What kind of drugs did patients test positive for?

22  A.   They tested positive for methamphetamine, heroin,

23  cocaine, and often times marijuana.

24  Q.   With drugs like heroin, methamphetamine, fentanyl, did

25  you understand that, as a practitioner, that it was not

1  appropriate to continue prescribing to those patients?

2  A.   Yes.

3  Q.   Did you do it anyway?

4  A.   Yes.

5  Q.   Did patients at GMA repeatedly fail drug screens for

6  drugs like you just talked about?

7  A.   Yes.

8  Q.   Did Dr. Stanton also write prescriptions to those

9  patients after the failed drug tests?

10 A.   Yes, he did.

11       MR. SMITH:  If we can go down to the third page,

12 please.  Sorry.  Go up.  Up one more.  Okay.

13 BY MR. SMITH:

14 Q.   Sir, are you aware that there are a number of additional

15 points in these guidelines, based on your understanding as a

16 physician?

17 A.   Yes, many.

18 Q.   Based on your experience and your observation at GMA, did

19 you and Dr. Stanton follow those guidelines in writing the

20 controlled substances prescriptions?

21 A.   No.

22 Q.   Was it just one or two days that you ran astray of those

23 guidelines?

24 A.   No.

25 Q.   Was it over the course of several years?

1    A.   Over several years.

2    Q.   In addition to those guidelines, the Tennessee Pain

3    Management Guidelines, did GMA have written policies on how it

4    was supposed to operate?

5    A.   Yes.

6    Q.   Why?

7    A.   The state required that all licensed pain clinics submit

8    policies and procedures on how the clinic is run and what

9    guidelines are to be followed.

10   Q.   Based on your observation and experience at Gateway

11   Medical Associates, did you and Dr. Stanton follow the

12   clinic's internal guidelines for prescribing controlled

13   substances?

14   A.   No, we didn't.

15        MR. STRIANSE:  Your Honor, I'm going to object to

16   this.  There is not a proper foundation for him to include

17   Dr. Stanton in this.

18        Obviously, he can --

19        THE COURT:  Hang on.

20   (Sidebar conference.)

21        THE COURT:  Can you hear me, Mr. Smith?

22        MR. SMITH:  Yes, Your Honor.

23        THE COURT:  Okay.  You can just state your objection

24   outside of the jury's hearing.

25        MR. STRIANSE:  So, obviously, Dr. Maccarone can admit

1    to any violations that he wants to.  There is really not an

2    appropriate evidentiary basis for him to be offering these

3    opinions that Dr. Stanton was not compliant with the

4    regulations.

5              THE COURT:  Mr. Smith.

6              MR. SMITH:  If it's a factual foundation, I can lay

7    more foundation about what he saw.  For instance, his

8    interactions with Dr. Stanton, his review of medical records.

9         Being in the practice for years on end, he was very aware

10    of what each practitioner was doing, the prescriptions they

11    were writing, and the drug tests that were being failed.

12         I can lay that foundation, if that's necessary.

13              THE COURT:  Foundation seems adequate to me.  I mean,

14    they were co-practitioners in the practice for years.  I mean,

15    the point that he's described is from mid '16 to late '20.

16         I mean, it's a weight issue.  You can certainly cross him

17    on it.  But he was right there on the ground seeing the same

18    group of patients as Dr. Stanton and he had full access to,

19    familiarity with what the records were, how the practice ran.

20         So I don't -- I don't see a basis for the objection.  I

21    think the foundation is there for it.  Overruled.

22         (Sidebar conference concluded.)

23              THE COURT:  That objection is overruled.  You can

24    continue.

25              MR. SMITH:  I believe the last question I asked him

1    -- I don't mean to repeat myself, Your Honor, but just to be

2    clear that we got an answer for the record.

3    BY MR. SMITH:

4    Q.   Did you and Dr. Stanton repeatedly prescribe controlled

5    substances contrary to internal GMA policies?

6    A.   Yes, we did.

7    Q.   Let's talk about, first, about medical records.

8         Were you taught in medical school the importance of

9    medical recordkeeping?

10   A.   Yes.

11   Q.   Why is that?  Why is it important?

12   A.   It follows the individual throughout their life.  What

13   has happened, what they were given, how they responded, what

14   the reactions that they had to medications.

15        It is extremely important to maintain proper medical

16   records.

17   Q.   Now, did GMA have an electronic medical record system?

18   A.   Yes.

19   Q.   Who had access to it?

20   A.   Myself, Dr. Stanton, my practice manager; my scribe, who

21   is a medical assistant, and the person in the lab.

22   Q.   Now, in advance of a patient coming in for an appointment

23   on a given day, did GMA staff prepare information for the

24   practitioner, for you?

25   A.   Yes.

1    Q.   Do you remember, generally speaking, what that

2    information contained that was prepared for you?

3    A.   Yes.

4    Q.   Can you describe that for the jury, please?

5    A.   The day of the appointment the staff would prepare a

6    small packet that had a demographic for the patient, and that

7    basically outlines their addresses and that type of

8    information.

9         A super bill, which is in the upper left corner of that

10   piece of paper, also mimicked part of the demographic.

11        If this is a pain patient, then it would contain both

12   CSMD and eKASPER.  These are monitoring tools.

13        CSMD for Tennessee, eKASPER for Kentucky, to see where

14   the patient was getting their prescriptions filled and what

15   prescribers were prescribing those physicians, or those

16   prescriptions.

17        Also that packet would contain the last lab, lab work

18   that the patient had, an EKG, if deemed necessary, and any

19   imagining.  If the patient had recent imaging over the last

20   one to two months, that would also be contained in that

21   packet.

22        Also a patient questionnaire asking several relevant

23   questions pertaining to how they felt their medications, how

24   effective they felt their medications were.

25   Q.   So within this packet of information, were there sources

1    of information that revealed the result of urine drug screens?

2    A.   Yes.

3    Q.   I'm using your words, "urine drug screen."

4    A.   Yes.

5    Q.   What I mean is urine drug test more broadly.

6    A.   Yes.

7    Q.   For instance, did the packet of information contain a

8    note or, one or more notes, from prior months?

9    A.   Yes.

10   Q.   Okay.  And was that note printed out from the electronic

11   medical record system?

12   A.   Yes.

13   Q.   In that note, was there a reference to whether that --

14   the previous month, the preceding month's urine drug testing

15   results were consistent or inconsistent?

16   A.   Yes.

17   Q.   Was that one source of information that could tell the

18   result of a preceding urine drug test?

19   A.   That's true, yes.

20   Q.   In that packet of information, was there also the results

21   from a send-out lab confirmation urine drug test?

22   A.   Yes.

23   Q.   And if a urine drug screen, an in-house point-of-care

24   urine drug test, had occurred that day, did that also appear

25   in that packet of information?

1    A.   Most of the time, yes.

2    Q.   So by that count, there would be three, give or take,

3    references to prior, current, or prior urine drug tests in

4    those packets of information prepared for you?

5    A.   That's correct.

6    Q.   So when I asked you before about whether you repeatedly

7    prescribed to people who failed urine drug tests, among other

8    resources was that packet of information what told you that.

9         That's how you knew?  That's how you knew that?

10   A.   Yes.

11   Q.   Now, with respect to inconsistent negative tests, can you

12   explain -- I think you've already told us a little bit -- but

13   can you explain your understanding from 2016 to 2021, what was

14   your understanding of the significance of a drug test coming

15   back that was negative for a drug that you were prescribing to

16   that patient?

17   A.   Basically, you would look in the urine for the metabolite

18   of the drug, the parent drug.

19        A negative test result means that metabolite is not in

20   their urine.  Simply put.

21   Q.   And once you know that, as a doctor, what risk does that

22   put you on notice of?

23   A.   First and foremost, diversion, abuse, misuse of the

24   medication.  And some -- somewhere down the ladder, did the

25   patient just take too much early on in the month and ran out.

1    Q.   Did you prescribe controlled substances to people who had

2    drug screens or drug tests like you just described?

3    A.   Yes.

4    Q.   And as a doctor working in this area, did you understand

5    that some of your patients were taking their pills and selling

6    them?

7    A.   Yes.

8    Q.   Did you prescribe to them anyway?

9    A.   Yes.

10   Q.   Did Dr. Stanton also prescribe to patients who failed

11   drug screens, being negative for prescribed medications?

12   A.   Yes.

13   Q.   We have talked a little bit about drugs and Schedule II

14   controlled substances.

15        Specifically, did GMA -- what were the most common

16   opioids prescribed at that practice?

17   A.   Oxymorphone extended release, the immediate release

18   oxycodone; Percocet 5, 7.5, and 10, and hydrocodone 5, 7.5,

19   and 10.

20   Q.   Which two were the most common?

21   A.   Oxymorphone extended release and oxycodone immediate

22   release, either 10 milligram, 15 milligram, 20 milligram or 30

23   milligram.

24   Q.   Did those prescriptions, amongst the prescriptions, also

25   often include gabapentin?

1    A.   Yes.

2    Q.   Did you also understand that each of those drugs had a

3    higher resale value?

4    A.   Yes.

5    Q.   Now, when the practice took a patient in, did it require

6    patients to bring certain documentation with them?

7    A.   Yes.

8    Q.   And does that include documentation from prior

9    practitioners, if they had been at another clinic or another

10   doctor?

11   A.   Yes.

12   Q.   Did it also include imaging and other diagnostic studies?

13   A.   Yes.

14   Q.   Based on your experience, your observations from 2016

15   forward, did you prescribe controlled substances to patients

16   who had warning signs in that earlier documentation?

17   A.   Yes.

18   Q.   Did you prescribe controlled substances to patients whose

19   documentation may be there in a file, but did not warrant the

20   types or amounts of medications that you prescribed?

21   A.   Yes.

22   Q.   If that's the case, why require having all of those

23   papers in the file?

24   A.   It's like a checklist for new patients.  And check this

25   box, we have this.  Check this box, we have this.  Check this

1    box, we have this.

2         It's basically -- what you're looking for is that the

3    medical records support the imaging and the, either CSMD or

4    the KASPER reflects what the patient was taking and who

5    prescribed and where they got the medication filled.

6    Q.   So I think you just described to me is, in theory, you

7    would use the documentation for that purpose.

8         Does the documentation support the imaging and are they

9    on medications that are either consistent with either their

10   current drug screening or that makes sense for what you are

11   going to prescribe; is that fair?

12   A.   That is fair.

13   Q.   In reality, at this practice, did that happen?

14   A.   Not always, no.

15   Q.   Not always?

16   A.   No.

17   Q.   Did it happen frequently that patients did not have

18   justifying medical conditions for the drugs they got from you?

19   A.   Yes.

20   Q.   Have you ever heard the term "papering a file"?

21   A.   Yes.

22   Q.   Did you do that?

23   A.   Yes.

24   Q.   Did you understand, as a practitioner, that you needed to

25   have certain records or -- and documents in place in case

1   anyone looked at your files to make it appear that you had

2   done all of the work necessary?

3   A.   Yes.

4   Q.   Sir, are you familiar with the patient named Charles

5   Wooten that has come up in this case?

6   A.   Vaguely, yes.

7         MR. SMITH:  If we can, let's bring up Government

8   Exhibit 116, please.

9   BY MR. SMITH:

10  Q.   Sir, do you recognize, just generally, what we're looking

11  at here?

12        MR. SMITH:  Can I apologize, Your Honor?  This was

13  previously admitted.  I'm asking permission to publish.

14        THE COURT:  Yeah.  That's in, right, Michelle?

15        THE WITNESS:  I do recognize that.

16        THE COURT:  Yeah, it may be published.

17  BY MR. SMITH:

18  Q.   Is this consistent with how a printout of GMA's

19  electronic medical record looked?

20  A.   Yes, partially, yes.

21  Q.   It was a bad question.

22        Does this appear to you to be a record from Gateway

23  Medical Associates?

24  A.   Yes.

25  Q.   I will represent to you, with the Court's permission,

1    that the government has redacted the patient names in these

2    files.  But there is a footer at the bottom with the patient's

3    initials.

4         Do you see that?

5    A.   Yes.

6    Q.   And I'll represent to you, sir, that we have already

7    admitted in the record that this is a patient file for

8    somebody named Charles Wooten, okay?

9    A.   All right.

10             MR. SMITH:  All right.  Can we go to page 49?  Can we

11   blow up the top half?

12   BY MR. SMITH:

13   Q.   Sir, we talked about urine drug testing at Gateway

14   Medical Associates.

15        Do you remember talking about that at some length --

16   A.   Yes.

17   Q.   -- already today?

18   A.   Yes.

19   Q.   Is this an example of one of those results?

20   A.   Yes.

21   Q.   Okay.  Is this a confirmation test from a lab, as far as

22   you know?

23   A.   Yes.

24   Q.   What was the result of this test?

25   A.   It shows where the patient is using medicine not

1    prescribed by GMA.

2    Q.   What medications?

3    A.   Well, methamphetamine, number one.

4    Q.   Is there anything else that is inconsistent with this

5    drug test?

6    A.   Several other medications couldn't be ran because there

7    was not a sufficient quantity to test.

8    Q.   Was there a result for oxymorphone for this patient?

9    A.   No.

10   Q.   Assuming that this patient was prescribed oxymorphone,

11   would that be an inconsistent result?

12   A.   Yes.

13   Q.   Is oxymorphone a metabolite of oxycodone?

14   A.   No.

15   Q.   Do you know that?

16   A.   Not that I was aware.

17   Q.   Sir, looking at this urine drug test result that was

18   negative for oxymorphone and positive for methamphetamine, as

19   a physician were you aware that this was a significant

20   inconsistent drug test?

21   A.   Yes.

22   Q.   Now, let's go to page -- and who is the requesting

23   physician listed on this drug test result?

24   A.   James Maccarone.

25        MR. SMITH:  Let's go to page 22, please.

1    BY MR. SMITH:

2    Q.   What is this, sir?

3    A.   This is an office visit, a clinical note.  This is the

4    first visit, it appears.

5    Q.   Well, sir, if you look at the "Reason for Visit," what

6    does it say?

7    A.   "Presents to clinic for medication refill."

8         MR. SMITH:  Okay.  And if we could go forward to page

9    26 and open up a plan of care.

10   BY MR. SMITH:

11   Q.   Okay.  Who signed this note?

12   A.   Myself.

13   Q.   If we go to the fifth paragraph that says, "Reviewed with

14   patient urine drug screen."

15        Can you please read that out loud?

16   A.   Fifth paragraph?

17   Q.   Yes.  Fifth line down.  Just go to the fifth line down.

18        THE COURT:  "Reviewed with," get him there.

19        THE WITNESS:  "Reviewed with patient urine drug

20   screen performed April 24, 2019.  Oral...," -- which is

21   inconsistent with prescribed medicine -- "positive for

22   methamphetamine.  Patient was given strong counseling to have

23   all of his prescribed medications in his UDS.  He states he

24   suspects that people he was staying with might have put

25   illegal substances in his drink, drinks."

1    BY MR. SMITH:

2    Q.   Do you have any recollection of hearing that

3    justification?

4    A.   Honestly, I don't.

5    Q.   What do you make of that explanation?

6    A.   It's probably unlikely.

7    Q.   Okay.  What does it say at the bottom with the line that

8    begins "patient is being..."

9    A.   "Patient is being dismissed due to having illegal

10   substances in urine and oral drug screen.  Patient gets one

11   more visit."

12   Q.   Now, I want to come back to this idea of "one more visit"

13   in a moment.

14            MR. SMITH:  But if we fast forward to page 13.  Can

15   you blow up the top?  There.

16   BY MR. SMITH:

17   Q.   Based on your records at GMA, does it appear that this

18   patient came back to the clinic in December of 2019?

19   A.   Yes.

20   Q.   And this is after the note indicating that the patient

21   had been dismissed for failing the methamphetamine test?

22   A.   Yes.

23   Q.   At this point in time, did you see any reference to that

24   prior dismissal for methamphetamine in this note, up above?

25   A.   No, I do not?

1   Q.   Would that prior dismissal and the fact that the patient

2   testified positive for methamphetamine, would that be a

3   relevant thing to think about when readmitting this patient?

4   A.   Yes.

5   Q.   Do you remember seeing this patient and telling him to go

6   get an x-ray?  Do you have any recollection of that?

7   A.   I do not.

8        MR. SMITH:  Let's look at page 57.  Can we go to the

9   top, just to see the date?

10  BY MR. SMITH:

11  Q.   Do you see a date on this record?

12  A.   I see when it was electronically signed.

13  Q.   At the top, second line, does it say "Date of Service"?

14  A.   Yes.  12-12-2000 or 2019.

15  Q.   What was the -- what is this record?  What are we looking

16  at?

17  A.   This is an x-ray of the lumbar spine.  These are plain

18  films.  Five views of the lumbar spine, an impression read by

19  the radiologist.  No acute pathology.

20  Q.   Sir, if it were established that you had sent this

21  patient out to get an x-ray and the patient came back with

22  this x-ray that says this, does that x-ray somehow make it

23  appropriate to prescribe that patient oxycodone and

24  oxymorphone?

25  A.   No, it does not.

1      MR. SMITH:  Okay.  Let's go to the next page, please.

2  BY MR. SMITH:

3  Q.  What is the impression from this result?

4  A.  This is x-rays of the cervical spine.

5      The five views, "Cervical spine impression:  No acute

6  pathology."

7  Q.  What does "no acute pathology" mean?

8  A.  What the radiologist is trying to elaborate is that there

9  is nothing significant seen on these plain films.

10  Q.  Okay.  Do you recognize the signature on these documents?

11  A.  The initials?

12  Q.  That's what I mean.

13  A.  Yes.

14  Q.  Whose initials are those?

15  A.  Dr. John Stanton.

16      MR. SMITH:  If we go back to page 13, please.

17  BY MR. SMITH:

18  Q.  According to your medical records at GMA, who saw this

19  patient in December of 2019?

20  A.  Dr. John Stanton.

21  Q.  And is that after the date of the x-ray reports that we

22  just looked at?

23  A.  Yes.

24      MR. SMITH:  Let's get that down.

25  BY MR. SMITH:

1    Q.   Sir, do you know what pill counts are?

2    A.   Yes.

3    Q.   What is the purpose of a pill count?

4    A.   The patient comes in, brings all of their medicine

5    prescribed by the clinic, is taken into an exam room, and a

6    medical assistant sits there with the patient and counts the

7    number of pills that the patient has per prescription.

8         This significance is to see whether or not the patient is

9    taking the medication appropriately.  If they're ahead, if

10   they have more than what they should, or if they don't have

11   any at all.

12   Q.   And if they don't have any at all, what concern does that

13   raise?

14   A.   Diversion.  Abuse.

15   Q.   Did you know that in 2016 to 2021?

16   A.   Yes.

17   Q.   At GMA, were patients typically kicked out because they

18   didn't come in for pill counts?

19   A.   No.

20   Q.   What did they do?

21   A.   If you missed a pill count, you were charged a $150 fee

22   for a missed pill count, but you still had to do a pill count.

23   Q.   And did patients repeatedly pay that no-show fee for

24   missed pill counts?

25   A.   Yes.  Over time the missed fee did not act as a

1    deterrent.  People presented, they paid their fee, and went

2    on.

3    Q.   Did those people still get prescriptions from GMA?

4    A.   Yes.

5    Q.   Did you know -- in 2016 until 2020, did you know that

6    that was inconsistent with the standards for prescribing?

7    A.   Yes.

8    Q.   We talked about internal policies.

9         Did GMA have an internal pill count policy?

10   A.   Yes.

11   Q.   In practice, in reality, did GMA actually follow that

12   pill count policy?

13   A.   No, we didn't.

14   Q.   Was there also a drug screen policy?

15   A.   Yes.

16   Q.   In reality, did the practitioners, did you and

17   Dr. Stanton, based on your observation, did you actually

18   follow that pill count policy?

19   A.   No, we didn't.

20           THE COURT:  Pill count policy or drug screen?

21           MR. SMITH:  I'm sorry, Your Honor.  Drug screen

22   policy.  Fair correction.

23           THE WITNESS:  None.

24   BY MR. SMITH:

25   Q.   Now, we talked moment ago and looked in the patient file

1    about the concept of a patient getting one more visit.

2         Do you remember that?

3    A.   Yes.

4         MR. SMITH:  Can we bring up 22B, I believe it is.

5    Can we go to the second page?  And just the bottom third,

6    please.

7    BY MR. SMITH:

8    Q.   Sir, that bullet point there in the middle that begins

9    with "methamphetamine," do you see that, sir?

10   A.   Yes.

11   Q.   Can you please read that aloud for us?

12   A.   "Methamphetamine/cocaine/heroin equals immediate

13   discharge."

14   Q.   We just looked at, as an example in Mr. Wooten's file

15   where he had tested positive for methamphetamine and he was --

16   said "one more visit."

17        Is that consistent with the policy that says "immediate

18   discharge"?

19   A.   No.

20   Q.   Did some patients continue on for longer than one more

21   visit after failing drug tests like this?

22   A.   Yes.

23        MR. SMITH:  Okay.  We can take that down.  Thank you.

24   BY MR. SMITH:

25   Q.   Now, in 2016 through 2020, we talked about this concept

1     of dismissal and whether patients were dismissed.

2          What would have happened to the clinic's income if you

3     dismissed a patient?  What was the effect of dismissing that

4     patient?

5     A.    Less income.

6     Q.    What was your financial situation at the time?

7     A.    What years?

8     Q.    The years we're talking about.  2016 through 2021.

9     A.    I was drowning in debt.  Separated from my wife.

10    Paying temporary support.

11         I believe the IRS, I owed the IRS just shy of $600,000.

12         One son in college and then grad school.

13         A big note on my commercial building due every month.

14         A payroll every two weeks between 25 and $29,000.

15    Q.    And these financial issues that you just referenced, did

16    that impact your decision making?

17         Did that motivate you when you were looking at how to

18    treat patients at Gateway Medical Associates?

19    A.    Unfortunately, yes.

20    Q.    Specifically with respect to dismissing patients, how did

21    it motivate or affect you?

22    A.    In a week's time I could discharge or dismiss 20 to 25

23    patients in one week.

24         And in one week, I may see only six or eight new patients

25    so over time, the income plummets.

1    Q.   During this time period, 2016 to 2020, you told us -- and

2    I would like to talk about your interactions with the

3    defendant, John Stanton.

4         I think you told us earlier that you had known

5    Dr. Stanton for many years before that; is that fair?

6    A.   Yes.

7    Q.   Beginning in 2016, when he started as medical director

8    and forward, did you communicate with Dr. Stanton?

9    A.   Yes.

10   Q.   Did you talk to him?

11   A.   Yes.

12   Q.   Regularly?

13   A.   Often, yes.

14   Q.   Did you talk about personal things with him?

15   A.   Yes.

16   Q.   For instance, did you talk to him about your financial

17   situation and debts, in general terms?

18   A.   He knew about my IRS debt, that I was in debt with the

19   IRS.  I don't think he knew about the temporary support or

20   alimony.

21        He knew about my IRS debt, that I was in debt to them.

22   Q.   Did you express to him that you were under pressure to

23   make money in general terms?

24   A.   Yes.

25   Q.   Now, during this time frame, can you describe to the jury

1   how the defendant was paid at Gateway Medical Associates?

2   A.   He was paid every two weeks, standard fee, and we worked

3   out, between Dr. Stanton and myself, where if he came to the

4   clinic and gave injections, those injections were split 50/50

5   between clinic and Dr. Stanton.

6        Also, in the State of Tennessee, if you have a patient

7   with an ACME or an MEED number of 120 or greater, you are

8   obligated to see them at least once a year, the medical

9   director, to offer them other modalities to manage their

10  chronic pain, other than just prescriptions.

11       That also was split, that fee.  Half to the practice half

12  to Dr. Stanton.

13  Q.   Do you remember how much, initially, Dr. Stanton was

14  paid?

15  A.   I think he was paid 1,500 a week to start with.

16  Q.   Did that change over the course of time?

17  A.   Yes.

18  Q.   How?

19  A.   Just as an example, in 2018, I've got -- I got sick

20  myself, and required to be away from the practice recovering

21  from several surgeries.

22       Instead of the practice folding, closing, Dr. Stanton

23  agreed to stay on and run my practice with the help of the

24  practice manager during my sick leave.

25  Q.   Now, had Dr. Stanton already been associated with the

1    practice for approximately two years at that point?

2    A.    Yes.

3    Q.    And you described to us how there was a time frame where

4    he stepped away, so I don't want to be inaccurate.

5          But including that time where he stepped away, was he

6    otherwise involved with the practice for that two-year period?

7    A.    Yes.

8    Q.    Was he paid regularly during that time period, except the

9    time he stepped away?

10   A.    Yes.

11   Q.    When you were out with the health issues in 2018 -- and

12   did that happen again later in 2020?

13   A.    Yes.

14   Q.    Okay.  In both of those instances, did Dr. Stanton act as

15   the primary doctor at the practice while you were gone?

16   A.    Yes.

17   Q.    Okay.  Did he get paid more to do that?

18   A.    Yes.

19   Q.    Did he ask to get paid more to do that?

20   A.    Yes.

21   Q.    Did Dr. Stanton talk about his compensation with you?

22   A.    Yes.

23   Q.    How often?

24   A.    Weekly.

25   Q.    Now, from that time period 2016 to the time you were out

1    in 2018, for the most part, did Dr. Stanton write any

2    prescriptions himself from the practice?

3    A.   Between 2016 and prior to my getting sick, very few,

4    if -- maybe for physical therapy or for a brace; but for

5    prescriptions, no.

6    Q.   And I should have been more clear.  Specifically for

7    controlled substance prescriptions.

8    A.   Hardly any.

9              THE COURT:  We're about at our break point,

10   Mr. Smith, if this is a logical point.

11             MR. SMITH:  That's fine.

12             THE COURT:  Why don't we take our afternoon break at

13   this point.  We will take 20 minutes.  So I've got 20 til

14   3:00.  Let's reconvene at 3:00.

15        Continue to follow the rules you've been under.  No

16   discussion, no evaluation of the proof or formation of

17   opinion.  Do avoid any outside reading, influence, or

18   information.

19        I'll excuse the jury now for 20 minutes.  Thank you.

20        (The jury exited the courtroom at 2:38 p.m.)

21             THE COURT:  All right.  Thank you.  You can all be

22   seated.  The jury has exited.  We will take the break.  We'll

23   take Dr. Maccarone out for that period, as well.

24        You can go ahead and bring -- bring you back in and

25   complete your testimony, and let's have him back in place

1    before the jury returns.

2         All right.  Thank you.

3         How much longer do you anticipate?

4         MR. SMITH:  Your Honor, I think I would say less than

5    20 minutes.  I'll try to tighten that up a little bit during

6    the break.

7         THE COURT:  All right.  So we'll pick up at 3:00.

8    About 20 minutes of direct, and then cross.

9         Then after, after that, who are your next witnesses for

10   the balance of the day?

11        MR. SMITH:  I think the next is Keeley Quinlan and

12   Brian Grove.

13        THE COURT:  All right.

14        MR. SMITH:  We may -- I think I mentioned, there was

15   a patient, Keta Abner.  So I'll see what their status is, and

16   travel status, but those are three possibilities.

17        THE COURT:  We'll stop at 4:30.  We'll come in at

18   3:00 and pretty much go straight through until 4:30, knock off

19   with the proof at that point, so be prepared for that.

20        Anything else to take up?

21        MR. SMITH:  No, Your Honor.  Thank you.

22        THE COURT:  Mr. Strianse?

23        MR. STRIANSE:  No, Your Honor.

24        THE COURT:  Mr. Todd, if you need to go back and

25   confer, you certainly can do that.  Otherwise, please plan to

 1    have him ready to go, and then we'll reconvene with the jury.

 2        Thank you.

 3        (Recess from 2:41 p.m. until 2:57 p.m.)

 4        (The jury entered the courtroom at 2:57 p.m.)

 5            THE COURT:  All right.  Thank you.  We have

 6    reassembled on the record with all counsel and Dr. Stanton

 7    present.

 8        The jury is in the courtroom after that afternoon break.

 9    Dr. Maccarone is still on the stand.

10        You understand you are under oath still?

11            THE WITNESS:  Yes.

12            THE COURT:  Thank you.

13        Mr. Smith.

14            MR. SMITH:  Thank you, Your Honor.

15    BY MR. SMITH:

16    Q.   Before we took our break, you were talking about that

17    period from 2016, July of 2016, until you were out with an

18    illness in 2018, okay?

19    A.   Uh-huh.

20    Q.   And during that time period, we were discussing whether

21    Dr. Stanton wrote controlled substances.

22        And what was your response?

23    A.   Very few, if any.

24    Q.   Did you talk to him about that and whether he wished to

25    write controlled substance prescriptions at that time?

1   A.   Yes.

2   Q.   What was the rationale?

3   A.   He preferred that I run the show, that I write scripts,

4   and that he act as medical director, doing what he had been

5   doing.  Since I was there, he didn't see a need to have to

6   write prescriptions.

7   Q.   Did he express a preference not to write prescriptions?

8   A.   Yes.

9   Q.   Why?

10  A.   He mentioned the word "exposure."  I had been there, I

11  had been writing scripts.

12       He was at other clinics, he had physician assistants and

13  nurse practitioners writing most of those prescriptions.

14       At my facility, between July 2016 and 2018, prior to my

15  leave, he just felt that I should be the one writing the

16  prescriptions.

17       Now, he didn't have a problem writing for a brace or

18  writing for physical therapy, or something along those lines,

19  but he did not want to write for narcotics.

20  Q.   To the best of your recollection, sir, did he use the

21  word "exposure" when he was talking about this?

22  A.   Yes.

23  Q.   Did you ever talk to Dr. Stanton about the long hours

24  that you told us about earlier?  Working past midnight, 1:00,

25  2:00 a.m.?

1      Did you talk about that with Dr. Stanton?

2    A.   Yes.

3    Q.   And what did he say to you?

4    A.   He said, "It looks bad."  And he asked me what other

5    practice medical office is open those hours, and I told him,

6    "None that I am aware of."

7         He said to me, he said, "I wish you would get out of

8    there by 9:00 p.m. at night," and he made reference to a large

9    multi-specialty group in town, Premier, and they have late

10   hours so many nights a week, and I believe they're in the

11   office until maybe 8:00 or 9:00 at the latest.

12        He felt that being at the office at midnight, 2:00 in the

13   morning or later on rare occasions, threw up you bunch of red

14   flags.  It looked bad, not to mention all of the out of state

15   cars in my parking lot.

16   Q.   Did you talk to him about that as well?

17   A.   Yes.

18   Q.   Did you say that?

19   A.   Yes.

20   Q.   Now, when he began -- well, let me ask you:  When you

21   went out, and then moving forward from that time period, 2018

22   forward --

23   A.   Uh-huh.

24   Q.   -- based on your observations, based on your experience

25   there at the clinic, did the defendant begin writing

1   controlled substance prescriptions himself?

2   A.   Yes.

3   Q.   Okay.  Now, for that time period before then, 2016 to

4   2018 when you were principally writing controlled substance

5   prescriptions, could your clinic have been open without a

6   medical director?

7   A.   No.

8   Q.   Could it have written controlled substances to supposed

9   pain patients without a medical director?

10  A.   No.

11  Q.   And who is your medical director for the majority of that

12  time period?

13  A.   Between July of 2016 and '18, John Stanton.

14  Q.   Now, moving forward.  When he began prescribing

15  controlled substances himself, did you have the opportunity --

16  just in the course of being there at the practice -- to see

17  patients' medical records and other documentation of what

18  Dr. Stanton was doing with patients?

19  A.   Yes.

20  Q.   For instance, did you have familiarity -- did you largely

21  see the same patients he saw?

22  A.   Yes.

23  Q.   You were treating the same group of patients?

24  A.   Same patients.

25  Q.   Now, based on your observations, did he prescribe the

1   same types of medications?

2        And by that I mean, did he prescribe oxycodone or

3   oxymorphone as you described?

4   A.   Yes.

5   Q.   When you were out, did you give him any commands or any

6   limitations on what he could or couldn't prescribe?

7   A.   No, not at all.

8   Q.   Did you tell him he had to a prescribe oxymorphone and

9   oxycodone to any new patients that came in during that time

10  period?

11  A.   No.

12  Q.   What about later on?  When you went out in 2020, did you

13  make any such limitations or request?

14  A.   No.

15  Q.   We talked about the MME or medication levels a little bit

16  earlier.

17       Did you and Dr. Stanton ever talk about the medication

18  levels?

19  A.   Yes.

20  Q.   What did he say?

21  A.   The ACME or the MEED number, overall, needed to come

22  down.

23  Q.   Did he explain why?

24  A.   So it's a big red flag for the state.

25  Q.   Now, are you familiar with the concept of tapering?

1    A.   Yes.

2    Q.   And are you aware that in the world of prescribing --

3    we're talking about pain management -- that there are several

4    different tapering methodologies that a doctor could

5    theoretically use; is that fair?

6    A.   Yes.

7    Q.   One would be you taper ten percent each week on a

8    schedule; is that fair?

9    A.   Yes, if the patient comes in weekly, yes.

10   Q.   The point is, there are -- there are protocols and ways

11   to do it with some rigor; is that fair?

12   A.   Yes.  Yes.

13   Q.   In other words, is a taping protocol, a legitimate

14   tapering protocol, taking five pills here and five pills there

15   but not tracking and following it?  Is that legitimate

16   tapering?

17   A.   No, it isn't.

18   Q.   To your knowledge, did you or Dr. Stanton ever use a

19   what, my words, but a legitimate tapering protocol?

20   A.   No, we didn't.

21   Q.   Were there times that medications have been reduced for a

22   patient Dr. Stanton prescribed to -- to before you?  Did you

23   see that?

24   A.   Yes.

25   Q.   And then when you saw the patient, you would prescribe a

1   higher level?

2   A.   Yes.

3   Q.   Did that happen?

4   A.   Yes.  Yes.

5   Q.   Did you see after that, that Dr. Stanton saw the patient

6   again, did he prescribe, at times, at that same level after

7   you raised it?

8   A.   Yes.

9   Q.   To your knowledge, was there any kind of rigorous or

10  consistent effort to lower everyone's medication at Gateway

11  Medical Associates?

12  A.   No.

13  Q.   Now, we have talked about lowering five or ten pills in

14  the event of some event with the patient.

15       So let's talk about, for instance, a urine drug screen.

16  If a patient fails a urine drug screen result for something

17  like heroin or fentanyl, are you aware of any medical

18  justification in the pain management community that would say

19  just take five oxycodone pills off and keep prescribing to

20  them?

21  A.   No.

22  Q.   Is that what GMA did?

23  A.   Yes.

24  Q.   At times, that minus five or minus ten, was that only

25  applied to the oxycodone, if you recall?

1    A.    The short-acting.

2    Q.    Now, we talked about -- I think we have heard this term

3    "alternative treatments" in the trial.

4          Are you familiar with that concept?  Alternative

5    theories?  You talked about other modalities.

6    A.    Yes.

7    Q.    I think when you described it before, you talked about

8    the role of the medical director, if I understood you

9    correctly, that other modalities were meant to be an

10   alternative.

11         So instead of just giving them a pill, try their fix; is

12   that --

13   A.    That's true.

14   Q.    -- the idea?

15   A.    Yes.

16   Q.    At Gateway Medical Associates from 2016 to 2021 were

17   injections, bracings, were those truly alternatives to

18   medication?

19   A.    No.

20   Q.    Meaning, were they offered in lieu of the medication?

21   A.    No.

22   Q.    Were they incorporated into a real treatment plan where

23   each month a patient was going to be tracked and meaningfully

24   lowered on their medication?

25   A.    No.

1    Q.    Now, did Dr. Stanton do injections at the facility?

2    A.    Yes.

3    Q.    Based on your observation, was there a consistent effort

4    to track how the patient did on the injection and follow that

5    in the course of a plan of care?

6    A.    No.

7    Q.    Did you ever talk to Dr. Stanton about patients who had

8    been dismissed but were still getting prescriptions?

9    A.    Yes.

10   Q.    What did he say about that it?

11   A.    He asked me, "Why are you still seeing them?"

12   Q.    And what was the discussion from then?

13   A.    We talked about they're waiting to get into another pain

14   clinic.  Oftentimes, we tried to help them find another pain

15   clinic and -- and oftentimes closer to home.

16   Q.    If you are dismissing someone because they failed a drug

17   test for something like heroin and fentanyl, did you know

18   then -- and do you know now -- whether it's appropriate to

19   keep just seeing them month after month?

20   A.    It is not appropriate.

21   Q.    And could it be that it is difficult for someone to get

22   into a new pain clinic because you kicked them out for testing

23   positive for heroin or fentanyl?

24   A.    Yes.

25   Q.    So if it is going to be, by definition, difficult for a

1   patient to get in somewhere else, is it a valid justification

2   to say, Hey, I'm still prescribing because you can't get in

3   somewhere else?

4   A.    Across-the-board, no.

5   Q.    Now, in the concept -- in the context of dismissals, did

6   you ever say, Dr. Stanton, you cannot dismiss a patient.  I

7   want to do all of that myself?

8   A.    Never.

9   Q.    Are you aware of any effort to keep urine drug test or

10  pill count information away from Dr. Stanton?

11  A.    No.

12  Q.    Now, at this time period -- well, let me just -- I'll go

13  ahead and wrap up with this.

14        From 2016 to 2021, in this time period we talked about

15  with Dr. Stanton, 2016 to October of 2020, did Gateway Medical

16  Associates generate money from prescribing opioids to patients

17  who shouldn't have gotten those prescriptions?

18  A.    Yes.

19  Q.    Did that include patients from Kentucky?

20  A.    Yes.

21  Q.    Did that include patients from Kentucky who were coming

22  back to Kentucky and abusing or diverting their medications?

23  A.    Yes.

24  Q.    Did those patients repeatedly fail drug tests?

25  A.    Yes.

1    Q.   And did you know that they were filling their

2    prescriptions in Kentucky?

3    A.   Yes.

4    Q.   In fact, your medical records has KASPER information from

5    Kentucky showing where their pharmacies were filling?

6    A.   Yes.  Yes.

7    Q.   So you told us at the outset that you pleaded guilty and

8    you entered into a conspiracy.

9         What was your understanding about what you were doing

10   from 2016 to 2020?

11   A.   Dr. Stanton and I were operating the pain clinic and

12   Gateway Medical Associates.

13        Were seeing patients, refilling their prescriptions.

14        Offering them other types of treatment.  There was quite

15   a bit of resistance from patients of other treatments.  Seems

16   patients mostly just wanted their prescriptions.  Oftentimes

17   patients have had injections and bracing and other things

18   previous.  But we were operating as a pill mill.  I hate to

19   say.

20             MR. SMITH:  Your Honor, that's all the questions I

21   have.  Thank you.

22             THE COURT:  Mr. Strianse.

23             MR. STRIANSE:  Thank you.

24                        CROSS-EXAMINATION

25   BY MR. STRIANSE:

1    Q.   Good afternoon, Dr. Maccarone.

2    A.   Good afternoon, sir.

3    Q.   How many patients did you have at Gateway Medical

4    Associates?

5    A.   Pain patients?

6    Q.   Pain patients.

7    A.   400-plus a month.

8    Q.   400-plus a month.

9         And then you had a few primary care --

10   A.   Yes.

11   Q.   -- patients, as well?

12   A.   Yes.

13   Q.   Now, when Dr. Stanton was approached about becoming the

14   medical director at GMA, it was really never intended that he

15   would be prescribing Schedule II narcotics; is that correct?

16   A.   No.

17   Q.   And although he was an orthopedic surgeon for over 30

18   years, he really wasn't that experienced in prescribing

19   Schedule II narcotics to pain patients; is that a fair

20   characterization?

21   A.   No.  He was boarded.  He had taken the first part of his

22   AB -- it's the ABIPP boards.  He was on track to take a second

23   and third, to my understanding.

24        He satisfied the requirements for the state to practice

25   as a medical director.  And on July 1st of 2016, I hired him

1   to be the medical director of my practice.

2   Q.   I think almost every patient that he saw at GMA in your

3   absence was either an established patient or a new patient

4   that had been coming from another clinic; is that right?

5   A.   That's true.  Yes.

6   Q.   Now, the times that you were out -- and you fell ill in

7   November of '18, and you were out for four months or so?

8   A.   Yes.

9   Q.   And then, unfortunately, fell ill again in around March

10  of 2020; is that about right?

11  A.   Yes, yes.

12  Q.   During those times, were you actually accessing the

13  electronic health records and looking at charts at GMA?

14  A.   No.

15  Q.   And I think you were a physician for over 25 years; is

16  that right?

17  A.   29 years altogether.

18  Q.   And I think at one point you had a very busy primary care

19  practice; is that right?

20  A.   Yes.

21  Q.   Before you went into pain management?

22  A.   Yes.

23  Q.   Correct?

24  A.   Uh-huh.

25  Q.   I think for a time you served as a hospitalist; is that

1    right?

2    A.   That's true.

3    Q.   Where you would go to the hospital and see patients upon

4    admission to the hospital; is that right?

5    A.   Yes.

6    Q.   You also served as medical director of a nursing home; is

7    that right?

8    A.   Yes.

9    Q.   And I'm sure in those roles that you were the kind of

10   doctor that would advocate for your patients; is that right?

11   A.   Absolutely.

12   Q.   And you cared for your patients?

13   A.   Yes.

14   Q.   And wanted to see that they got the right kind of

15   treatment?

16   A.   Yes, sir.

17   Q.   Is that correct?

18   A.   Yes, sir.

19   Q.   And, obviously, you had to put forth great effort to

20   become a physician; is that a fair statement?

21   A.   It is.

22   Q.   And I think you just told us that you had over 400 pain

23   patients at GMA; is that right?

24   A.   Yes, sir.  Yes, sir.

25   Q.   Now, we saw some of those patients this week, people like

1    Mr. Ghent and Mr. Prince and Mr. Pooler, and we may see more.

2         But in fairness, not all of your patients at GMA were

3    drug seeking charlatans that were misrepresenting themselves

4    to physicians, were they?

5    A.    No, that's true.  Not all of them were.

6    Q.    You had many patients that, even after your six months of

7    reflection -- are you at the Grayson County Jail?

8    A.    Yes.  Yes.

9    Q.    -- at the Grayson County Jail in Leitchfield, you're not

10   looking back on it and saying, well, every patient that came

11   through the doors of GMA was a person trying to mislead the

12   physician?

13   A.    That's true.

14   Q.    So you've pled guilty to a conspiracy; is that right?

15   A.    Yes, sir.

16   Q.    And I think that you told the jury that when you appeared

17   before the magistrate judge in this building and went through

18   that change of plea hearing, that that was sort of a difficult

19   process for you?

20   A.    Very.

21   Q.    And yeah.  I think it became sort of a truncated process

22   where you were really wondering can I, in good conscience,

23   admit to being a member of a conspiracy.

24         Is that a fair characterization of what happened?

25   A.    Yes.

1   Q.   And I assume there was a factual basis for that, that was

2   either read into the record or in -- written in your plea

3   agreement, that as part of that question and answer with the

4   Court you really had to acknowledge that those facts were true

5   and correct; is that --

6   A.   Yes.

7   Q.   And you had great difficulty with that?

8   A.   I did.

9   Q.   And I realize that we are months and months removed from

10  that.  And in the quiet time at the Grayson County Jail, and

11  the reflection that you have engaged in, that you've sort of

12  convinced yourself that, yes, I was a member of a conspiracy?

13  A.   Yes.

14  Q.   Now, that's upon reflection.

15       But I really want to ask you about the time frame in the

16  indictment.

17       Let's go back in time when people like Ghent and Prince

18  and Mr. Pooler, and others that we may see, were coming to

19  your clinic and getting prescriptions.

20       Then and there, in that moment of time, which is the

21  moment that the jury is going to be concerned about, did you

22  reach an agreement with them where you knew they were getting

23  Schedule II pills and that they were going to drive back to

24  the streets of southeast Kentucky and sell those pills?

25  A.   No.

1   Q.   You never reached an agreement at that point in time, did
2   you?
3   A.   No, sir.
4   Q.   So now you're looking back on it, and we have heard a lot
5   about red flags this week.
6        So looking back at it, in hindsight, you are sort of
7   punishing yourself or saying I should have done this, I should
8   have recognized that.
9        Is that sort of the way that your mind has processed
10  this?
11  A.   In my mind -- and this is after medication to calm me
12  down so I can sit here and answer you truthfully and
13  wholeheartedly.
14       I wish I never went into pain management, but that's
15  another story.
16       There were so many red flags at my office.  So many.
17  Q.   That we see now?
18  A.   That --
19            THE COURT:  Let him finish his answer.
20            MR. STRIANSE:  I'm sorry.  I'm sorry.
21            THE WITNESS:  That we see now, but that I saw then.
22  You know, ride-sharing to my practice, carpooling.  People
23  paying for others' appointments.
24       There were so many flags, that I just pushed through.
25  But I didn't push through alone.

1    BY MR. STRIANSE:

2    Q.   Now, the things that you have just talked about, that all

3    may be bad medicine and things that shouldn't have happened.

4         But in terms of what the jury has to decide in this case,

5    back during this time, did you actually talk to people about a

6    conspiracy to distribute drugs in the Eastern District of

7    Kentucky?

8    A.   No.

9    Q.   Dr. Maccarone, you talked about the plea agreement that

10   you reached with the United States.

11   A.   Yes.

12   Q.   And we all know that as we sit here right now, you don't

13   know what your sentence is going to be?

14   A.   That's true.  I do not.

15   Q.   And I know that the United States Attorney has not

16   promised you any specific sentence --

17   A.   That's true.

18   Q.   -- because that just would not be proper.

19        But, obviously, human nature being what it is -- and

20   there is nothing wrong with this at all.

21        You hope that by coming in here and cooperating, that at

22   some future point Mr. Smith will make a motion to Judge Wier

23   to consider a departure.

24        Have you heard that word before?

25   A.   Yes.

1    Q.   A downward departure based on your substantial assistance

2    to the United States.

3    A.   A downward departure based on being truthful and telling

4    what happened and what took place at my practice, and no

5    wasted time.  I'm not going to waste the government's time.

6    I'm not going to waste taxpayers' money trying to put a facade

7    together in front of 12 or 13 peers.

8         I'm here to tell the truth, the whole truth, and nothing

9    but the truth.

10   Q.   And I think that you understand how that whole plea

11   agreement and cooperation agreement works; is that right?

12   A.   I hope I do.

13   Q.   That, obviously, Judge Wier makes the ultimate

14   determination as to what your sentence is; you understand

15   that?

16   A.   Yes, sir.

17   Q.   But you also understand that you really need the good

18   graces of the United States, of Mr. Smith, to file that type

19   of motion with Judge Wier?

20   A.   And the help of God.

21   Q.   Of course, and everything.

22        But you understand that that is sort of the paradigm of

23   how this works?

24   A.   Yes.

25   Q.   Meaning that the United States would be the entity that

1    would file that kind of a motion to ask the Court to reduce

2    your sentence; is that right?

3    A.    Yes.  Yes.

4    Q.    Just a couple of other questions.

5          There was a discussion about this procedure at GMA of

6    reducing a prescription by five or ten pills if the

7    point-of-care cup showed that there was some aberrant

8    substance in the urine.

9          Do you remember that discussion?

10   A.    Yes.

11   Q.    Now, that was a plan that you had come up with at GMA; is

12   that right?

13   A.    No.

14   Q.    Okay.  So if we've heard in court that that was one of

15   your practices, that may not be correct?

16   A.    That's true.

17   Q.    Okay.  And you've had some -- during this relevant time

18   period, you've had other medical directors; is that right?

19   A.    Yes.

20   Q.    You had Dr. Chavin?

21   A.    Yes, for the last six months.

22   Q.    And Dr. Atkins; is that right?

23   A.    Dr. Atkins for about a year, yes.

24   Q.    Did either one of those physicians ever try any

25   alternative therapies with the patients or suggest that?

1    A.   Yes.  When I had Dr. Atkins for approximately a year, he

2    saw patients one day a week.  He was there eight-plus hours

3    that day.  He interviewed them.  He examined them.  He advised

4    them, and his notes reflected all of that; and his

5    recommendation of whether or not to keep the patient or not

6    based upon this -- this, this, this and this.

7         The last six months after Dr. Stanton left, I had Michael

8    Chavin.

9         In all honesty, he came to the practice.  He knew that I

10   was in trouble.  He was Dr. Stanton's backup, so he was

11   somewhat familiar with what happened to me.  He served as

12   medical director.  He came one day a week.

13        And what I remember from my time with Dr. Chavin is a

14   very religious, very devout man.  Sat there and watched me see

15   and examine and evaluate patients, and did nothing more

16   because I was in trouble.

17        When you're a doctor in my position and you're in

18   trouble, there is help out there.  It comes with a price.

19   And that price was exorbitant.  That price tipped the scales

20   at my practice.

21   Q.   Okay.

22             THE COURT:  Wait for the next question.  Go ahead.

23             MR. STRIANSE:  May I have one moment, Your Honor?

24             THE COURT:  Of course.

25        (Off-the-record discussion.  )

1           MR. STRIANSE:  Just one other question.

2           THE WITNESS:  All right.

3    BY MR. STRIANSE:

4    Q.   When you got ill in November of 2018 and Stanton took

5    over and gave coverage at the clinic, that was the first time

6    he was prescribing medicine at GMA; is that right?

7    A.   I believe so, yes.

8           MR. STRIANSE:  That's it.  Thank you.

9           THE COURT:  Thank you.

10       Mr. Smith.

11                      REDIRECT EXAMINATION

12   BY MR. SMITH:

13   Q.   Dr. Maccarone, just a couple of questions.

14       You were asked questions, as I think we started your

15   examination earlier today, when I was asking you questions

16   about this concept of conspiracy.

17       Do you remember those questions?

18   A.   Yes.

19   Q.   You telling me about that?

20   A.   Yes.

21   Q.   If you could, I would like to ask you to put out of your

22   mind whatever you think the legal meaning of conspiracy is.  I

23   just want you to think about facts, okay?

24   A.   Uh-huh.  Uh-huh.

25   Q.   Factually, from 2016 to 2020, did you have an

1    understanding with at least one other person that you were

2    unlawfully prescribing controlled substances?

3    A.    Yes.

4    Q.    You talked about all of these red flags.

5          Those red flags, did you see them in 2016?

6    A.    Yes.

7    Q.    Did you see them in 2017?

8    A.    Yes.

9    Q.    Did you see them in 2018?

10   A.    Yes.

11   Q.    Did you see them in 2019?

12   A.    Yes.

13   Q.    Did you see them in 2020?

14   A.    Yes.

15   Q.    We talked through in some detail earlier your

16   understanding of the chronic pain guidelines, about your own

17   internal guidelines, and how all of those red flags were

18   inconsistent with those things.

19   A.    Yes.

20   Q.    Do you remember that discussion?

21   A.    Yes.

22   Q.    Did you know that then?

23   A.    Yes.

24   Q.    Did you know you were prescribing out of bounds?

25   A.    Yes.

1    Q.    Did you agree to do that with Dr. Stanton?

2    A.    I agreed to have him as my medical director and gave him

3    exactly what I had at the practice to help me take care of

4    these patients.

5          Now, my agenda was seeing the patients.

6          His agenda, in my opinion, was procedural oriented.

7          Did we have a clandestine meeting somewhere and sit down

8    and talk about how to do this and not draw attention to

9    ourselves?  That never happened.  Never.

10         But there was a mutual understanding of what I was doing

11   and of what he was doing.

12   Q.    Was it actually even that difficult to see how bad that

13   place was?

14   A.    Remember, I'm am narcissist.  Self-indulgent,

15   self-centered, wanting admonish -- admonishment and wanting

16   acceptance from others and not holding empathy toward anyone.

17   Q.    What I mean is:  You told us earlier that there were so

18   many red flags.

19         Those are your words, right?

20   A.    Yes.

21   Q.    That those weren't hidden?

22   A.    No.

23   Q.    And yet you and Dr. Stanton persisted month after month

24   to issue prescriptions out of bounds?

25   A.    And year after year, yes.

1        MR. SMITH:  Your Honor, that's all the questions I

2  have.  Thank you.

3        THE COURT:  Anything else, Mr. Strianse?

4        MR. STRIANSE:  No, Your Honor.

5        THE COURT:  Is he finally excused, Mr. Smith?

6        MR. SMITH:  Yes.

7        THE COURT:  Mr. Strianse.

8        MR. STRIANSE:  Yes.

9        THE COURT:  Thank you, sir.  That concludes your

10  testimony.

11        THE WITNESS:  Thank you.

12        THE COURT:  We'll go ahead and excuse him from the

13  courtroom.

14     Thank you, sir.

15     Mr. Smith.

16        MR. SMITH:  Your Honor, the United States call Keeley

17  Quinlan.

18        KEELEY QUINLAN, GOVERNMENT'S WITNESS, SWORN

19        THE COURT:  Ma'am, good afternoon.

20        THE WITNESS:  Hi.

21        THE COURT:  Do try to speak directly toward that mic

22  in a clear voice so we can all hear you during your testimony.

23     If you first would state your name and spell your last

24  name.

25        THE WITNESS:  It's Keeley Quinlan.  It's

1    Q-U-I-N-L-A-N.

2            THE COURT:   Thank you.

3        Mr. Smith.

4            MR. SMITH:   Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. SMITH:

7    Q.   Good afternoon, ma'am.  I think you and I have spoken on

8    the phone, but I think this is the first time I have seen you

9    in person, so nice to meet you.

10   A.   Nice to meet you as well.

11   Q.   Can you tell jury what city and state you live in?  Not

12   your street address, just city and state.

13   A.   Clarksville, Tennessee.

14   Q.   What do you do for a living?

15   A.   Currently, I am an editor of a magazine.

16   Q.   Where did you work in February of 2022?

17   A.   At Clarksville Now.

18   Q.   What is Clarksville Now?

19   A.   It is an online or strictly digital news organization.

20   Q.   And in the course of your work, were you a journalist?

21   A.   Yes.  Whoops.  There it is.

22        An investigative news reporter, yes.

23   Q.   So you would research and investigate stories and then

24   write them for Clarksville Now?

25   A.   Correct.

1    Q.   Did you, in the course of your work at Clarksville Now,

2    did you interview a gentleman named John Stanton?

3    A.   Yes.

4    Q.   What was your understanding of how that interview came

5    about?

6    A.   He had reached out to our news organization based on a

7    previous story we had published about a case involving him.

8    Q.   And do you remember approximately when you spoke to him?

9    A.   Yes.  It would have been the morning we published the

10   story, which was February 22nd or 23rd of 2022.

11   Q.   Okay.  And all I would like to do with you today, if

12   possible, is just walk through a few items that -- that were

13   said to you in the course of that interview with Dr. Stanton,

14   okay?

15        Now, when you spoke to him in the interview, was the

16   discussion about a practice called Gateway Medical Associates?

17   A.   Yes.

18   Q.   Did he describe to you what his role was at Gateway

19   Medical Associates?

20   A.   Yes, he said that it was to see patients who had higher

21   levels of narcotics and to see if they got alternate

22   treatment.

23   Q.   Did he say anything about just filling in?

24   A.   Yes.

25   Q.   And what, to the best of your recollection, did he say?

1    A.   He had said he was at one point serving as, like, a

2    substitute, I think was what he said.

3    Q.   Did he say anything about who admitted patients to the

4    clinic?

5    A.   Yes.

6    Q.   Who did he say admitted the patients to the clinic?

7    A.   It was Dr. Maccarone.

8    Q.   It was Dr. Maccarone, not him?

9    A.   Correct.

10   Q.   Did he say anything about deciding which medications to

11   prescribe?

12   A.   Yes.

13   Q.   What did he say?

14   A.   He said that that, too, was all under Dr. Maccarone's

15   direction.

16   Q.   Did he say how often he wrote narcotics prescriptions?

17   A.   Yes.

18   Q.   What did he say?

19   A.   He had done some, but only while Dr. Maccarone was out.

20   I believe it was on sick leave.

21   Q.   How long did he say that he worked or been associated

22   with the clinic?

23   A.   I believe he said he was employed or worked there,

24   rather, for a total of four years.

25   Q.   During that four-year tenure, did he tell you how many

1  prescriptions he wrote?

2  A.   Yes.

3  Q.   How many was it?

4  A.   I believe he said seven or eight.

5  Q.   Seven or eight prescriptions?

6  A.   Correct.

7  Q.   Did he say anything about the levels of medications that

8  the patients were receiving?

9  A.   Yes.

10  Q.   What did he say about that?

11  A.   He said that, essentially, he was aware that there were

12  patients on higher levels of narcotics.

13  Q.   Did he talk about combination of drugs?

14  A.   Yes.

15  Q.   What did he say?

16  A.   He said that there were some patients on combinations of

17  medications that had the potential to be "heavily dangerous"

18  was the phrase, word that he used.

19  Q.   Did he talk about reviewing patients' medical records?

20  A.   Yes.

21  Q.   What did he say?

22  A.   He said that he -- he did so to ensure that the levels of

23  medications that they were receiving corresponded with the

24  level or the type of, I guess, injury or treatment that they

25  needed.

1    Q.   Okay.  So in his statements to you, did he say that he

2    reviewed the medical records of the patients of Gateway

3    Medical Associates?

4    A.   Yes.

5              MR. SMITH:  Your Honor, that's all the questions I

6    have.

7              THE COURT:  Thank you.

8          Mr. Strianse.

9                         CROSS-EXAMINATION

10   BY MR. STRIANSE

11   Q.   Ms. Quinlan, this is a little unusual.

12        Did this develop because you had written an online story

13   about Dr. Maccarone?

14   A.   Did what develop?

15   Q.   Your contact with Dr. Stanton.

16   A.   Yes.

17   Q.   Okay.  So you write an online article about

18   Dr. Maccarone's case here in the Eastern District of

19   Tennessee; is that right?

20   A.   Correct.

21   Q.   And --

22              THE COURT:  Kentucky.

23              MR. STRIANSE:  Forgive me.  Forgive me, Judge.  I'm

24   sorry.

25              THE COURT:  Always important to get that right.

1    BY MR. STRIANSE:

2    Q.   In the Eastern District of Kentucky.

3         And that gets published online?

4    A.   Correct.

5    Q.   And then you are contacted by Dr. Stanton; is that

6    correct?

7    A.   Our organization was contacted.  I was not contacted by

8    him directly.

9    Q.   Okay.  Did you have some direct contact with him?

10   A.   Yeah, we spoke on the phone.

11   Q.   Okay.  And did you prepare an article based on what he

12   had told you?

13   A.   Yes.

14   Q.   Okay.  And did he tell you that he was using this as an

15   opportunity to give his side of the story?  Is that what this

16   was about, or --

17   A.   I mean, that's kind of the basis of it.  Yeah.

18   Q.   Okay.  And the testimony -- and forgive me, I've not read

19   the article.

20        The testimony that you have given here this afternoon,

21   was that included in the online article?

22   A.   Yes.

23   Q.   And did you have notes of the -- contemporaneous notes of

24   the conversation that you had with Dr. Stanton before you

25   composed your online article?

1    A.   Are you asking if I took notes?

2    Q.   Yes.

3         Did you take some notes?

4    A.   Some, but not a ton.

5    Q.   I'm sorry?

6    A.   Some, but, not -- not really.  I -- I -- yeah.

7    Q.   Okay.  Did you bring those notes here with you to court?

8    A.   No.

9         MR. STRIANSE:  Okay.  Those are my questions.

10        THE COURT:  Thank you.  Mr. Smith.

11        MR. SMITH:  No questions, Your Honor.

12        THE COURT:  Is she finally excused?

13        MR. SMITH:  Yes, Your Honor.

14        THE COURT:  Do you agree?

15        MR. STRIANSE:  Yes, sir.

16        THE COURT:  Thank you, ma'am.  That concludes your

17   testimony and you are free to go.

18        Mr. Smith.

19        MR. SMITH:  Your Honor, the United States calls Brian

20   Grove.

21        THE COURT:  Brian Grove.

22          BRIAN GROVE, GOVERNMENT'S WITNESS, SWORN

23        THE WITNESS:  I do.

24        COURTROOM DEPUTY:  Thank you.

25        THE COURT:  Good afternoon, sir.

1          THE WITNESS:  Good afternoon.

2          THE COURT:  Do try to maybe tip that mic down a

3     little bit.  Speak directly towards the end of it.  And

4     everybody is using the same chair, if you want to use those

5     wipes at any point or sanitizer, feel free to do so.

6        Would you state your name and spell your last name?

7          THE WITNESS:  Yes.  My name is Brian Grove.

8     G-R-O-V-E.

9          THE COURT:  Mr. Smith.

10                        DIRECT EXAMINATION

11    BY MR. SMITH:

12    Q.   Sir, can you please tell the jury a little bit about your

13    background?  What you do for a living.

14    A.   Currently, for the last three and a half years, I've been

15    the senior financial investigator for the Drug Enforcement

16    Administration.

17       Prior to that, for almost 28 years, I was a special agent

18    with the Internal Revenue Service, investigating mostly money

19    laundering cases as they related to drug trafficking.

20    Q.   And so what do you do now?

21    A.   I do financial investigations for the entire London DEA

22    and Knoxville DEA.

23    Q.   Now, in the course of your work, were you asked to do

24    some financial analysis related to a clinic called Gateway

25    Medical Associates?

1    A.   Yes.

2    Q.   And did you have an understanding of who the owner of

3    Gateway Medical Associates was?

4    A.   Yes.

5    Q.   Who was that?

6    A.   Dr. Maccarone.

7    Q.   Okay.  Was there another physician associated with the

8    practice?

9    A.   John Stanton.

10   Q.   Okay.  In the course of your investigation, did you

11   obtain financial records for the practice and four individuals

12   related to the investigation?

13   A.   Yes.

14   Q.   Did you identify whether the office, the Gateway Medical

15   Associates office, whether they had an operating account?

16   A.   They did.

17   Q.   And what bank was that with?

18   A.   Planters.

19        MR. SMITH:  Okay.  Can we bring up Government

20   Exhibit 200, just for the witness, please?

21   BY MR. SMITH:

22   Q.   Sir, can you see anything on your screen?

23   A.   No.

24        MR. SMITH:  I can't either.

25        THE WITNESS:  There we go.

1        MR. SMITH:  Can we just arrow through a few pages of

2   those records so the witness can familiarize himself?

3   BY MR. SMITH:

4   Q.   Sir, do you recognize these?

5   A.   Yes.

6   Q.   What are these?

7   A.   These are bank statements from Planters Bank associated

8   with Gateway Medical.

9   Q.   What do you understand this account to be for Gateway?

10  A.   Operating account for Gateway Medical.

11  Q.   Did you obtain these from the bank?

12  A.   Yes.

13  Q.   Okay.  Did they come in electronic format?

14  A.   Yes.

15  Q.   To the best of your knowledge, is the format here, at

16  what has been marked as Exhibit 200, is that the same format

17  as what you received from the bank?

18  A.   Yes.

19        MR. SMITH:  Your Honor, we move to admit Government

20  Exhibit 200.

21        THE COURT:  Any objection?

22        MR. STRIANSE:  No objection.

23        THE COURT:  That will be admitted.

24      Is there a partial redaction by the government on this?

25        MR. SMITH:  There is, Your Honor.  And just to

1    explain, we redacted account numbers and other personal

2    identifying information, but tried to leave several digits so

3    that it could still be identified.

4              THE COURT:  Okay.  Let's go ahead and put that up for

5    the jury so you can see what we're talking about.

6         So that's the records as produced, except redactions

7    would be imposed by the government for privacy reasons.

8         Go ahead, Mr. Smith.

9              MR. SMITH:  One moment, Your Honor.

10             THE COURT:  Yes.

11        (Off-the-record discussion.)

12             MR. SMITH:  I think we're working okay.  It seems

13   like it's hanging on.  Can we just briefly --

14   BY MR. SMITH:

15   Q.  When you analyze an account for a business, let's say, do

16   you look at money coming in and money going out?

17   A.  Yes.

18   Q.  What is money coming in sometimes called?

19   A.  The deposit analysis.

20   Q.  Okay.  And money going out, what is that?

21   A.  The debit analysis.

22   Q.  Debit analysis.

23        Were you able to do that with this bank account?

24   A.  I did that with this bank account, yes.

25   Q.  Okay.  We'll come back to that in a moment.

1      Did you also identify records for John Stanton,

2 Dr. Stanton, that you referenced a moment ago?

3 A.   Yes.

4 Q.   Did you obtain records from a bank called F&M Bank?

5 A.   Yes.

6 Q.   Did you use those in the course of your investigation?

7 A.   I did.

8      MR. SMITH:  Okay.  If we can, can we bring up

9 Government Exhibit 201 for the witness?

10 BY MR. SMITH:

11 Q.   All right.  Sir, what are we looking at here as

12 Government 201?

13 A.   That's the signature page for the John Stanton, M.D.

14 account, ending in 4071.

15      MR. SMITH:  Can we arrow through just a few pages of

16 this to allow the witness to see it?

17 BY MR. SMITH:

18 Q.   Okay.  Sir, is that enough for you to familiarize

19 yourself with what you are looking at?

20 A.   Yes.

21 Q.   Okay.  Same question I had with the last bank account

22 records.

23      Did you obtain these from F&M Bank?

24 A.   I did.

25 Q.   Was it provided now in electronic format?

1    A.   Yes.

2    Q.   To the best of your knowledge, is what appears here on

3    screen in the same format as when you received it?

4    A.   Yes.

5    Q.   This one does not bear any redactions, correct, that you

6    can see?

7    A.   Not that I can see.

8    Q.   Okay.  So this is in the same -- this is in the same

9    format --

10   A.   As when I got it.

11        MR. SMITH:  Your Honor, we move to admit Government

12   Exhibit 200 (sic).

13        THE COURT:  Any objection?

14        MR. STRIANSE:  No objection.

15        THE COURT:  Okay.  Thank you.  201 will be admitted

16   and may be displayed.

17        Michelle, can you take that screen mark off the left

18   side?  Do you see it on your monitor?  Thank you.

19   BY MR. SMITH:

20   Q.   Now, sir, each of these records that we're looking at --

21   I suppose like a lot of bank records that you look at -- is

22   that just one or two pages of information?

23   A.   Oh, no.  Hundreds, if not thousands.

24   Q.   Okay.  And given that, is it easy for you to lay all of

25   those pages out here in front of us --

1    A.   No.

2    Q.   -- and describe what is going on?

3    A.   No.  That would be impractical.

4    Q.   When you work through doing your analysis, do you go

5    through a lot of pages?

6    A.   Yeah.

7    Q.   And then --

8    A.   All of --

9    Q.   -- generally --

10   A.   -- them.

11            THE COURT REPORTER:  Hold on.

12            THE COURT:  Just one at a time.  Let him finish his

13   question.

14            THE WITNESS:  Sorry.

15   BY MR. SMITH:

16   Q.   So these are long records, and when you work through

17   them, do you generate some summaries of these otherwise very

18   long records?

19   A.   I do.

20   Q.   Okay.  And did you do that in this case?

21   A.   I did.

22   Q.   Okay.  At a very basic level, can you describe for the

23   jury what you did as a debit analysis with regard to

24   Dr. Stanton's account?

25   A.   I didn't do a debit analysis --

1    Q.   Sorry.

2    A.   -- for Dr. Stanton.

3    Q.   Bad question.

4         With regard to Dr. Stanton for the GMA account.

5    A.   Yeah.  I did a full debit analysis of the GMA account.

6    Q.   Just plain language, what does that mean?

7    A.   It basically means I have a software package that will

8    convert paper bank records or electronic bank records into

9    Excel spreadsheets, and then I filled in the blanks of, you

10   know, of all the checks that were cashed, any other debits;

11   you know, ATM cards, debits.  It ends up in a 3 to 4,000 line

12   Excel spreadsheet.

13   Q.   And from there were you able to put together a summary of

14   the payments that went from the Gateway Medical Associates

15   account to either Dr. Stanton or an entity associated with

16   Dr. Stanton?

17   A.   Yes.

18   Q.   And were you able to generate a single summary showing

19   all of those payments in one place?

20   A.   Yes, it was three pages.  Yes.

21        MR. SMITH:  Can we look at Government's Exhibit 500A,

22   please?

23   BY MR. SMITH:

24   Q.   Sir, what is 500A?

25   A.   This is a debit analysis summary that I created relating

1   to the Gateway Medical Associates account.

2   Q.   I'll ask you to look at it in a little more detail in a

3   second.

4        But the information that it summarizes, is that

5   Government's Exhibit 200 that we referenced a moment ago, the

6   Planters account?

7   A.   Yes.

8   Q.   Based on your review, is that account extremely long?

9   A.   Yes.

10  Q.   Would it be practical or feasible for you to walk the

11  jury, pulling up page after page right now, to describe its

12  contents?

13  A.   No.

14        MR. SMITH:  Your Honor, we move to admit --

15  BY MR. SMITH:

16  Q.   And to best of your knowledge, is your summary here a

17  fair and accurate representation of the contents of

18  Government's Exhibit 200?

19  A.   Yes.

20        MR. SMITH:  Your Honor, I move to admit Government

21  Exhibit 500A.

22        THE COURT:  Any objection?

23        MR. STRIANSE:  No objection.

24        THE COURT:  Let me confer with you just a moment.

25      (Sidebar conference.)

1          THE COURT:  Can you hear me, Mr. Strianse?

2          MR. STRIANSE:  Yes, sir.

3          THE COURT:  Mr. Smith, can you hear?  You need to

4    flip them.  There you go.  Can you hear me?

5          MR. SMITH:  I can hear.  Sorry.

6          THE COURT:  I normally do a midtrial instruction when

7    I admit a summary of this type, and I think that I sent you

8    guys the language I typically use.

9       I would plan to do that now.

10      Any objection, Mr. Smith?

11         MR. SMITH:  No objection.  Are you planning to give

12   the --

13         THE COURT:  It's the secondary evidence summary

14   instruction.

15         MR. SMITH:  For the third one you shared?  So 1006,

16   but secondary so that --

17         THE COURT:  Yes.

18         MR. SMITH:  No objection.

19         THE COURT:  Any objection?

20         MR. STRIANSE:  No objection.

21         THE COURT:  Thank you.

22      (Sidebar conference concluded.)

23         THE COURT:  Have you displayed that, Madam Clerk?

24         COURTROOM DEPUTY:  Not yet.

25         THE COURT:  Okay.  I will admit it.  You can display

1    it.

2         THE COURT:  I want to give you an instruction on

3    consideration of summaries of this type.

4         You're going to see, or have just seen, certain summary

5    evidence in the form of the chart depicted at Exhibit 500A.

6    This summary was admitted in evidence in addition to the

7    material it summarizes because it may assist you in

8    understanding the evidence that has been presented.

9         But the summary is not itself primary or independent

10   evidence of the material it summarizes, and is only as valid

11   and reliable as such underlying material.

12        The weight of the summary, as with the underlying

13   summarized material, is a matter solely for you to decide.

14        All right.  Thank you.  You can continue.

15        MR. SMITH:  Thank you, Your Honor.

16   BY MR. SMITH:

17   Q.  Okay.  If we can -- are you able to see it okay?

18        MR. SMITH:  Can we -- let's zoom out to show them the

19   whole page, if we can.  All right.

20   BY MR. SMITH:

21   Q.  Now, if you could, just each column you're walking

22   through, could you just explain to the jury what each column

23   represents?

24   A.  Sure.  Obviously, the first one is the bank account,

25   Planters.  Second one is the account number.  The third one is

1    a post date.  That's the date that the check cleared the

2    Gateway Medical Associates' account.

3        Debits is the amount of the check.  And the payee is the

4    person or entity that the check was made payable to.

5    Q.   Okay.  So the "Payee" column, are you getting that

6    information from that check that's in the -- in the records

7    for the operating account?

8    A.   Yes.

9    Q.   There are a number of checks, it looks like, referenced

10   to the Joint and Pain Center.

11   A.   Yes.

12   Q.   Do you understand from your review of other financial

13   records who was associated with the Joint and Pain Center?

14   A.   Yes, there's -- checks were deposited into the F&M bank

15   account that we looked at earlier.

16   Q.   And so based on that, did you conclude that they were

17   related to Dr. John Stanton?

18   A.   That and Google.

19   Q.   Okay.  If we look just at the very first page, can you

20   look at that, please?

21       Based on your review of the records, what was the date of

22   the first payment made to either Dr. Stanton or an entity

23   associated with Dr. Stanton?

24   A.   Based on my recollection -- because what we're looking at

25   is the posted date to the GMA account.

1    My recollection is that -- that that check was actually

2    written and signed on July 31, 2016, if I recall correctly.

3    But it was then posted to this account as cleared on

4    August 8th.

5    Q.   And I think that everybody probably understands that, but

6    just in case, can you please explain the distinction between

7    written and posted?

8    A.   Yes, obviously we've all received checks.  If I write a

9    check and give it -- give it to somebody, until it clears my

10   bank, that check is just out there.  It, you know, it could

11   get lost.  It doesn't have to be deposited.

12   Once it is deposited into the account, it then posts to

13   the -- my account or, in this case, the GMA account.

14   Q.   Okay.  So you've used that because the posted date is

15   when it pops up in the account that you're analyzing; is that

16   fair?

17   A.   Right.  And it also -- the posted date is more important

18   than the written date simply because that means that the

19   actual check was -- there was a transaction that it went

20   through, so it was a completed transaction.

21       MR. SMITH:  And if we can zoom back out, Rebecca.

22   BY MR. SMITH:

23   Q.   Now, for the first let's say year or so of this account,

24   what were the payments?

25   A.   Pretty consistently 2,500.

1    Q.    On what basis?

2    A.    Monthly.

3    Q.    Okay.  Is there a time period where the payments changed

4    over the amount?

5    A.    Yes.  There is a gap between January 24, 2018, and --

6    until May 2nd of 2018.

7    Q.    And then after that point in time, do the payments resume

8    again?

9    A.    They do.

10   Q.    And what happens to the payments at that point?

11   A.    They increase.

12         MR. SMITH:  Okay.  Now, if we -- if we zoom back out

13   on that for a second.

14   BY MR. SMITH:

15   Q.    Is this schedule a list of all of the outgoing debits

16   that you found associated for those two -- for Stanton or

17   Stanton-associated entities?

18   A.    Yes.

19   Q.    In some instances, were there more than one debit per

20   month?

21   A.    Yes.

22   Q.    In some instances, there was only one per month?

23   A.    Correct.

24   Q.    So just for the sake of being able to review it on a

25   monthly basis, did you prepare a second summary that kind of

1  condenses information so you could see how much month after

2  month was debited from this account?

3  A.  I did.

4          MR. SMITH:  Can we bring up Government Exhibit 500B,

5  please.

6  BY MR. SMITH:

7  Q.  Okay.  Let's go to 500B.

8  A.  500B is basically a summary of 500A.  Instead of doing

9  every individual items, I just condensed by month.

10 Q.  Let's just wait until -- yeah.

11         THE COURT:  Was the first one 500A?

12         MR. SMITH:  Sorry.  Your Honor, we actually -- we

13 have the electronic sticker wrong.  That's something that, if

14 it's okay with Your Honor, we can fix later with the

15 understanding that this summary will be Government's Exhibit

16 500B.

17         THE COURT:  You're going to call that 500B?

18         MR. SMITH:  Yeah.

19         THE COURT:  Okay.  You understand that?

20         THE WITNESS:  Yes, Your Honor.

21 BY MR. SMITH:

22 Q.  Same question, sir.  Was this summary prepared by using

23 in reference to Government's 200?  And same question -- are --

24 you need to verbalize --

25 A.  Yes.

1            THE COURT:  Answer.

2            THE WITNESS:  Yes.

3            THE COURT:  Thank you.

4    BY MR. SMITH:

5    Q.   Was that, as you explained to us, that record very long?

6    A.   Yes.

7    Q.   To the best of your ability and knowledge, does this

8    accurately summarize that record?

9    A.   Yes.

10   Q.   Okay.

11           MR. SMITH:  Your Honor, move to admit Government's

12   Exhibit 500B.

13           THE COURT:  Any objection?

14           MR. STRIANSE:  No objection.

15           THE COURT:  I'll admit 500B, as well.  It can be

16   displayed.

17       You're going to see on there a 500A sticker.  500A was

18   earlier admitted.  This is actually going to be 500B.  So when

19   you see that sticker, think B instead of A.

20       Same instruction on this one.  It is a summary of the

21   underlying primary evidence.  It's only as good as the

22   underlying primary evidence of that Exhibit 200, the bank

23   records.

24       So keep that in mind as you evaluate the summary.

25       Okay.  Proceed.

1          MR. SMITH:   Thank you, Your Honor.

2     BY MR. SMITH:

3     Q.   Can we briefly just walk the jury through -- I think they

4     will see it -- but can you walk them through what you are

5     seeing in 500B?

6     A.   Yes.   Again, first two are the bank and account number.

7     The second one or third one, rather, is the month.

8          So that's an accumulation of all checks deposited or

9     debited in each of those months.

10          And then "Total" would be the summary of all the

11     individual checks that was in 500A.

12     Q.   Okay.   And so now, talking about this on a monthly basis.

13     This is kind of easier to see in this summary.

14          Can you just very briefly walk through the jury what you

15     saw happening to these debits over the course of time between

16     2016 and into 2020?

17     A.   Yeah.   Again, it's pretty consistent through the first

18     year.   You see the 2,500s, and then it goes up a little bit,

19     drops to zero for several months, for some reason.

20          And then, in May, the monthly payments -- or the total of

21     the monthly payments seems to increase rather drastically.

22     Q.   And if we go to the next page, does that continue on a

23     different level through October of 2020?

24     A.   Yes.

25     Q.   In total, how much money was paid from Gateway Medical

1   Associates' operating account to either Dr. Stanton or

2   entities associated with Dr. Stanton?

3   A.   $318,300.

4   Q.   All right.  So you're walking through and looking at the

5   line and kind of giving us a sense of whether it was going up

6   or down.

7        To assist with that kind of analysis, did you also

8   prepare a line graph?

9   A.   I did.

10        MR. SMITH:  Can we look at Government Exhibit 500C,

11   please, but only for the witness?

12   BY MR. SMITH:

13   Q.   What is Government Exhibit 500C?

14   A.   This is the same information that was in 500B, but more

15   of a visual line chart to give a better visual of it.

16   Q.   And is the idea there, rather than just looking kind of

17   on the line, that you could just look at a graphic and see

18   what was happening?

19   A.   Right.

20   Q.   Okay.  Same questions:  To best of your ability, did you

21   endeavor to make this an accurate representation of the data

22   contained in Government Exhibit 200?

23   A.   Yes.

24        MR. SMITH:  Your Honor, we will also move to admit

25   Government Exhibit 500C.

1          THE COURT:  Any objection?

2          MR. STRIANSE:  No.  No objection.

3          THE COURT:  I'll admit 500C.  That can be displayed.

4    Same instruction on it.  It's another summary version of 500B.

5    So it's only as reliable as the underlying bank data.

6       Keep that in mind as you evaluate that exhibit.

7          MR. SMITH:  Okay.  Sir, I believe that's all the

8    questions I have.  Thank you.

9          THE COURT:  Thank you.

10      Mr. Strianse.

11                        CROSS-EXAMINATION

12   BY MR. STRIANSE:

13   Q.  Good afternoon, Mr. Grove.

14   A.  Good afternoon.

15   Q.  I just have a few questions for you.

16      You're analysis revealed that Dr. Maccarone was the owner

17   of the GMA Planters bank account; is that right?

18   A.  That's correct.

19   Q.  And the GMA financial records that you analyzed were

20   under Dr. Maccarone's control; is that right?

21   A.  Correct.

22   Q.  And Dr. Stanton was not a signatory on the GMA account at

23   Planters?

24   A.  He was not.

25   Q.  And what I think we have seen are paychecks to

1   Dr. Stanton from that Planters' GMA account; is that right?

2   A.   Yes.

3   Q.   That's over a four-year period of time?

4   A.   2016 through -- yeah, end of 2020.  Yes.

5   Q.   To come up with the $300-odd-thousand total?

6   A.   Yes.

7   Q.   Over four years?

8         MR. STRIANSE:  Thank you.  That's my questions.

9         THE COURT:  Thank you.

10    Mr. Smith.

11         MR. SMITH:  No further questions, Your Honor.  Thank

12  you.

13         THE COURT:  Is he finally excused?

14         MR. SMITH:  Yes.

15         THE COURT:  Do you agree, Mr. Strianse?

16         MR. STRIANSE:  Yes, sir.

17         THE COURT:  Thank you, sir.  That completes your

18  testimony.  You are free to go.

19    Mr. Smith, can we get one more in today?

20         MR. SMITH:  Yes.  Can we confer for a moment?

21         THE COURT:  Uh-huh.

22    (Sidebar conference.)

23         THE COURT:  Could you hear me, Mr. Strianse?

24         MR. SMITH:  Your Honor, can you hear me?  Okay.

25    Your Honor, our next witness is Keta Abner.

1    The one issue that was brought to my attention, I believe
2    Mr. Strianse, we provided a flash drive so he would have a
3    copy of all the -- we, obviously, already produced this
4    earlier, but we provided a flash drive so they could have it
5    handy.
6        Apparently, Ms. Abner's file, on that flash drive, is
7    corrupted, if I understand it correctly.
8        So we conferred about that.  I was -- we kind of assumed
9    that we might not get to her today.  So I didn't want to tell
10   him.  I just want to be fair to him and make sure he has a
11   record in front of him.  We, obviously, produced this.
12       One idea is that we do have a hard copy record
13   downstairs, which I would be willing to run and get real
14   quick.  I don't want to delay, but I think she's probably a
15   30-minute witness or less.
16       But I want to make sure he has a fair opportunity to have
17   her file.
18              THE COURT:  Mr. Strianse.
19              MR. STRIANSE:  I really need to see the record,
20   Judge.  I did not bring it with me today and the exhibits that
21   we got on the external device, for some reason her report was
22   corrupted.
23              THE COURT:  Okay.  Can somebody bring that up?
24              MR. SMITH:  Yes, I think so.  And let me confer with
25   Ms. Woolums and make sure there isn't another electronic copy

1     that we can share with him real quick.

2         THE COURT: Okay. So it's 4:07. We're going to quit

3     at 4:30. So if we can't finish her and there are issues of

4     access, if it makes as much sense to call somebody else, or to

5     say that's it for today, I'm okay with doing that.

6         MR. SMITH: Okay. Well, then, just in fairness, I'm

7     fine calling it a day. I think we're on schedule.

8         THE COURT: You're okay with that?

9         MR. STRIANSE: Yeah. That's great.

10         THE COURT: Okay. That's what we'll do. You'll get

11     the records to him in an uncorrupted way, whatever that looks

12     like.

13         MR. SMITH: I hope so, Your Honor. Yes.

14         THE COURT: Okay. All right.

15      (Sidebar conference concluded.)

16         THE COURT: Okay. You've been such an attentive

17     group, appreciate that. I think instead of -- a little bit of

18     delay to get this witness set up. Instead of doing that --

19     because we are going to break at 4:30 anyway -- I'm going to

20     go ahead and end for the day on proof.

21      So that's going to conclude your work for this third

22     trial day. I'm going to send you home with the same

23     admonitions. No discussion about the case. Don't read

24     anything, look anything up, do any exploration or

25     self-education. Don't go anywhere that's been mentioned.

1          Keep an open mind.  Don't begin to form opinions about it

2     or draw conclusions from it, just take it in, and I'll give

3     you instructions, release you to do that at the appropriate

4     time.  Leave your notebooks.

5          Come in at the same time tomorrow, 8:15.  We'll start

6     proof no later than 8:30.

7          Thank you all so much for your attention today.

8          (The jury exited the courtroom at 4:09 p.m.)

9          THE COURT:  Okay.  Thank you.  The jury has exited.

10    Everybody can be seated.

11         Why don't we take a ten-minute break and then we'll come

12    back and have the hearing on the expert issue.

13         Anything else until then?

14         MR. SMITH:  No, Your Honor.

15         THE COURT:  Mr. Strianse.

16         MR. STRIANSE:  No, Your Honor.

17         THE COURT:  So back in ten minutes for that.  Thank

18    you.

19         (Recess from 4:09 p.m. until 4:20 p.m.)

20         THE COURT:  All right.  We are on the record with all

21    counsel, Dr. Stanton present, the jury gone for the day, to

22    take up the issue of the government and its proposed expert

23    witness.

24         Let me start, Mr. Smith, with you.  You tell me what you

25    want me to know or take into account.

1          MR. SMITH:  Well, Your Honor, just to clarify or make

2     sure we're on the same page:  Has the Court received

3     everything it wanted from the United States as far as

4     disclosures, transmittal letters?  I think that's what you

5     wanted.  What I sent last night, and shared with the Court

6     what I sent to defense counsel last night, as far as the

7     proposal for the new expert.

8          THE COURT:  Did King have a written report?

9          MR. SMITH:  There's no written report.  It's just as

10    written in -- in the summary letter that I put together with

11    Dr. King.

12         THE COURT:  All right.

13         MR. SMITH:  So I think I've elaborated on the

14    background for this situation.  I think our position, for the

15    record, is that our Rule 16 obligations were not triggered,

16    that does not mean they were intentionally, or whatever,

17    intentionally just not disclosed because we're availing

18    ourselves of trying to take advantage of Rule 16.

19         But as a factual matter, just in the record, there was no

20    request, defense has twice confirmed that.

21         THE COURT:  But you did think -- you thought there

22    had been a request, right?

23         You acted like there had been a request.

24         MR. SMITH:  Your Honor, I always just say, "Pursuant

25    to Rule 16, I'm producing this information."  I can't -- I --

1   I probably did or, you know, what I'm saying is those things,

2   we often do get requests as just kind of stock requests early

3   in a case, so I may very well have thought that.  Yes.

4          THE COURT:  Okay.

5          MR. SMITH:  And I certainly put that in the letter,

6   so I don't --

7          THE COURT:  Yeah.

8          MR. SMITH:  I'm not minimizing that.

9      But equally true is that the defense, then, if you recall

10  in the last trial, had not disclosed an expert.  We were, I

11  think about two weeks out from that trial date, when we

12  thought we were going to move forward, he had not disclosed an

13  expert, and again, in fairness, like I said, we should -- we

14  should have a copy of an expert report.

15         Your Honor ordered that.

16         And then we filed motion practice on that, in which I

17  complained about the level of specificity in the report and

18  the level of disclosure.  And the response was the United

19  States did not trigger disclosure application.  I mean, we did

20  not trigger disclosure application by requesting anything from

21  you.

22         THE COURT:  That's what he said.  I mean, even though

23  he used Rule 16 as disclosure.  I mean, right?  That's what he

24  -- in his disclosure, he said, "Pursuant to Rule 16,

25  Dr. Hilgenhurst's report."

1          MR. SMITH:  And I think I then pointed that out in my

2     reply brief, if I recall correctly.  So whipsaw back and

3     forth, correct.

4          THE COURT:  Yep.

5     I'm just -- you know, that's a -- that was a

6     hyper-technical position, inconsistent with how the parties

7     had practiced the case, so I didn't make any ruling based on

8     that argument.

9          Go ahead.

10          MR. SMITH:  Understood.

11     So all of this just to say, whether it's a Rule 16

12     violation or not, the analysis still becomes, under Rule 16,

13     the Court looks at, of course, the reason for the late

14     disclosure, the prejudice to the parties.

15     And the case law, I think, is fairly consistent in the

16     analysis is to try to find the least severe sanction possible.

17          But the government fully acknowledges the timing of this.

18     We're in the middle of a trial and potential for prejudice is

19     there.

20          But I think, as I've thought about this, and what I

21     propose to the Court is that, you know, if we are able to

22     limit and define what an expert might say on our behalf, fully

23     within the confines of what was already disclosed, and what

24     the defense has already had ample time to prepare for, the

25     prejudice will be minimized and hopefully minimized to the

1   degree would be acceptable to kind of account for the

2   countervailing interests.

3        THE COURT:  When did the problem with Smyth arise?

4        MR. SMITH:  He -- we were discussing and working

5   together on Sunday.  It's my best recollection, he mentioned

6   something.  I didn't think a lot of it at the time.  I called

7   him back on Sunday night and said, "Please send me whatever

8   this -- this document or letter, whatever it is, that you

9   mentioned.  I would like to take a look at it to make sure

10  there's no concerns.  I expected that to come.

11       The next day I spoke with him, again, asking for it, I

12  think fairly early that morning.

13       And from there ensued a variety of discussions.  I talked

14  with him and his, I think, partners of his practice.  I talked

15  to one attorney, who represented him; and then later in the

16  day, I talked to his second attorney.  And so I would say,

17  throughout that time, but that was Monday, the day before

18  trial.

19       And we then -- I spoke with my supervisor and we have

20  continued kind of analyzing.  I just had never conceived of

21  this being an issue, or how to address that issue.

22       And so we thought about it, and we continued considering,

23  Do we compel him somehow?  Can we compel him somehow?  Do we

24  retain another expert and try to have a replacement option for

25  the Court?

1      That, of course, required us to, I think our compliance

2  folks thought we had to have a contract, technically, in place

3  before I could make any representation about him being a

4  potential expert.  We cleared that process.

5      And the second that that process was confirmed on

6  Wednesday is when I then told counsel and the Court.

7      I don't know if that's a -- I'm doing my best to be

8  accurate and I can give any other information.  I do --

9      THE COURT:  I appreciate that.  I appreciate that.

10  And I required an ex parte witness list, and you had given

11  one.  I'm not going to talk about the full list.

12      But you had given one pretrial that included Smyth.  And

13  then, I think on -- I think it was on Monday --

14      MR. SMITH:  That's correct.

15      THE COURT:  -- I got an amended one, and Smyth was

16  not on it.  I noticed that.  And I thought -- all I thought

17  was, "Hmmmm."

18      MR. SMITH:  I did not -- to follow that, that was in

19  advance of voir dire.  I didn't know if you or I was going to

20  read the list.  And I will tell you, that's what was in my

21  head, was that if you were going to read the list out loud, I

22  did not want to misrepresent.

23      THE COURT:  Yeah.

24      MR. SMITH:  But I also didn't know for sure what we

25  were going to go do, so I thought that was acceptable.

1          THE COURT:  Okay.  I appreciate that.

2      And so at that point, at the point where we're showing up

3  Tuesday for trial, I mean, as far as what you've said to the

4  Court, Smyth is out and you did not ask to continue the case

5  or raise the issue in that fashion --

6          MR. SMITH:  Correct.

7          THE COURT:  -- obviously.

8      And, you know, it still is very cryptic of what is really

9  going on with Smyth.

10      You represented to me that he would not give you access

11  to what you thought you had to have to make a compliant *Brady*

12  *Giglio* disclosure.

13      Is that fair to say?

14          MR. SMITH:  I think it's *Giglio*.  Based on what I

15  think it is; but, correct, Your Honor.  Yes.

16          THE COURT:  And I mean, I said the other day, I tend

17  to be of the view that it is difficult for me to believe that,

18  A:  I couldn't get him here, his body; and B:  It's difficult

19  for me to believe that there is any kind of state privilege

20  that would keep me from having the power to order him to turn

21  over to you whatever the subject matter is.

22      So that's my view.  I don't know probably enough to make

23  that declaration with 100 percent confidence, but I'm flying

24  blind.  I'm pretty confident of the principles of the

25  supremacy clause and how state privilege interacts with a

1    federal subpoena.

2           So I just put that down as a marker.  I haven't heard

3    anything to convince me otherwise.

4           And so it strikes me, Mr. Smith, ultimately as more of a

5    strategic decision by the government than, you know, my expert

6    got hit by a bus and can't be here.

7           So what is your reaction to that?

8           MR. SMITH:  Well, I mean, my initial reaction is that

9    I assure you of every trial strategy I've ever thought of, not

10   having an expert the day before trial --

11          THE COURT:  I don't mean you would pick that in

12   advance.  But I mean, in the moment, it strikes me as

13   strategic rather than a matter of necessity.

14          MR. SMITH:  Well, candidly, in discussion with our

15   office, we are not aware of -- we believe that we could get

16   him physically here.  I think we could issue him a subpoena

17   and instructions there.

18          We saw some authority in civil cases that indicated that

19   perhaps even unaffiliated experts could potentially be

20   commanded by a Court to appear, kind of as-needed for

21   proceedings.

22          I think there is a Second Circuit case on that.  I

23   forgot.  We did look at this a little bit last night.

24          But that second issue of whether there is an ability to

25   compel someone to produce private papers, documents, whatever

it is, that were not -- they're not evidence of the crime.
They're not evidence to be used, you know, in like I could
with a Rule 17 subpoena.  We weren't sure what basis for
compulsory process there is for there.

I can't say I've run that exhaustively to the ground.
I'm not aware, sitting here today, what that authority would
be.

And after consulting others in my office, they were not
of the mindset that there was something.

But you have a -- you have a much better understanding of
your plenary authority and power.

I agree with you that if I were in position of it -- and
this is what -- this is the -- kind of the gist of where we
were, standoff was.  If I had had it, and I was going to call
him, then there is not, whatever Tennessee state law says
about it does not matter because I have a constitutional
obligation that would trump that.

So I think that analysis is correct and that's been my
analysis all along.

But secondary to that -- and so I don't think it's
strategic in that.  I just think we're in this position where
we're not aware of a basis there is, perhaps there is.

But we're now in a position, this far in.  An expert,
I've now spoken to multiple attorneys with, the day before
trial.  I just -- I don't know how I move forward with that --

1    that individual.

2        So I -- you know, I -- I understand Your Honor's point

3    about that is not the same thing as getting hit by a bus.

4            THE COURT:  Yeah.

5        You're like the great Mike Tomlin.  I know we share a

6    mutual affection for him, for different reasons.  He's a

7    William & Mary grad.  I'm a Steelers fan.  Anyway.  He always

8    says, "We want volunteers, not hostages on the team."

9        And that's what -- it kind of struck me that way.

10   Listen, I understand the difficulty of that.

11       Is this material something that would only be in

12   Dr. Smyth's hands or is there some third-party in the picture

13   that --

14           MR. SMITH:  I think it would be with the State of

15   Tennessee as well.

16           THE COURT:  Yeah.

17           MR. SMITH:  But I think the same analysis, which is,

18   we would have to have a basis, I guess, to seek it that way,

19   and I don't --

20           THE COURT:  I'm not -- I haven't seen what contract

21   the government uses with its retained experts.  But, I mean,

22   does it not include some requirement to cooperate and be

23   responsive and show up when required?

24           MR. SMITH:  I'm certain it does.  I'm certain all of

25   that.  I mean -- again, I've never remotely encountered this,

the fine print enough to know what -- and then I -- I'm sure

that it's something we're going to be looking into and

exploring as far as recourse in terms of the contract and all

of that.

THE COURT:  Okay.  Thank you.

Mr. Strianse.

MR. STRIANSE:  Thank you, Your Honor.

Your Honor, I'm really concerned about the record in this

case.  I think that you used the phrase we're all sort of

"flying blind" on this.

I think that at a minimum, the Court needs to know -- if

for some reason we can't discuss it in open court, and the

best we can do is that the government makes some in-camera

presentation to you.

I just -- I'm thinking down the road.  I don't want to be

in the Sixth Circuit and have one of the judges ask me, Well,

why didn't I do more to protect the record and to elucidate

what was going on in the district court?

I think that we just need to know, frankly -- or you need

to know -- what is the problem with Mr. Smyth?  None of this

makes any sense to me.

The United States hires a person that holds themselves

out to be an expert in pain management.  They pay this person,

round numbers -- and correct me if I'm wrong -- $30,000 to

this point and, obviously, he would have been paid more had he

made the trip to London and testified.

So if -- I'm only speculating here. But let's say that his credentials -- I had made a challenge to this expert, as the Court remembers.

Let's say his credentials were misrepresented to the United States and in reliance on those credentials, the United States hires him and pays him, and he receives that money via wire or mail. I think that Dr. Smyth has some significant problems with that.

I don't know what the problem is with Dr. Smyth.

This notion that he would hold himself out to be an expert, take money from the United States, and then say, Well, there is some obscure Tennessee statute that precludes me from fulfilling my obligation under the contract.

None of that makes any sense to me, Your Honor, and I think we need to know much more.

Another thing is the timing of all of this. I noticed as I sat here on Tuesday morning for jury selection, obviously, I was not privy to the Monday ex parte disclosure about witnesses. And I didn't hear Dr. Smyth's name, and I just assumed, well, I guess the government knew that nobody knew Dr. Smyth, and that's why he was not mentioned.

I think the Court understands the significance of that, in the sense that, if the United States knew on Sunday or Monday that -- that we had this very bizarre problem, then

1    there were all sorts of remedies available to the Court that

2    are not available now.

3        We have, just for the record, concluded the third day of

4    trial.  And the timing of the disclosure, which I saw this

5    morning, which is not Dr. King's report -- it's the

6    government's summary of what his report may look like.  So I

7    don't even know if that's been assembled yet by Dr. King.

8        But based on the quick research that I have been able to

9    do, it just seems like the timing of this disclosure is

10   fundamentally unfair to Defendant Stanton.

11       THE COURT:  And the primary remedial path, had it

12   been raised Monday, let's say, would have been potentially a

13   continuance.

14       MR. STRIANSE:  Yes, sir.

15       THE COURT:  And maybe you would have fought that,

16   maybe you wouldn't have fought it.

17       But once we've picked the jury, jeopardy is attached.

18       MR. STRIANSE:  Yes, sir.

19       THE COURT:  That does have a drastic effect on what I

20   can and cannot do.

21       MR. STRIANSE:  And in making the record complete --

22   whether it's here in open court, or in your chambers just with

23   the United States, to find out really when they knew that this

24   was a big problem.

25       And it sounds like -- and I don't want to read too much

1    into the ex parte disclosure on Monday, or what happened on

2    Tuesday.

3          It seems like the United States was on clear notice,

4    before we started down the road of having a trial, that this

5    was a problem.

6          And I think the remedy would be to exclude Dr. King as a

7    government witness.

8                THE COURT:  You got a -- I haven't looked back at all

9    of the briefing.

10         But there was a full written report on Smyth; is that

11   right?

12               MR. STRIANSE:  A full written report?

13               THE COURT:  By him --

14               MR. STRIANSE:  -- (indiscernible) reports.

15               THE COURT:  -- that he authored.

16               MR. STRIANSE:  That he authored.

17               THE COURT:  Okay.

18         And nothing like that on King, right?

19               MR. STRIANSE:  No, sir.

20               THE COURT:  And you don't anticipate there being

21   that?

22               MR. SMITH:  No.  I don't think that there's time to.

23   No, Your Honor.

24               THE COURT:  Okay.  So talk to me about -- talk to me

25   about prejudice, from your viewpoint, your vantage point.

1           MR. STRIANSE:  I think the prejudice would be we have

2    not seen his report at all.  So it's really difficult to

3    formulate what the cross-examination strategy might be for

4    somebody that you've not even seen his C.V.  You've not even

5    seen his report.

6           THE COURT:  Did you get his C.V.?  I saw it

7    referenced.  I didn't get the attachment.  I saw a reference

8    to it.

9           MR. SMITH:  I did send one in my email to

10   Mr. Strianse.

11          MR. STRIANSE:  Then forgive me.

12          MR. SMITH:  I may not have sent it to the Court.  I

13   think the first email may have been corrupted.  I can send it.

14   But yes.

15          THE COURT:  Okay.

16          MR. STRIANSE:  The C.V. is easy, but --

17          THE COURT:  Okay.

18          MR. STRIANSE:  But I think Dr. King, from what I

19   looked up this morning on the Internet, has testified in many,

20   many cases for the United States.

21       So I think in due diligence, I would have to try to take

22   a look at the transcripts of his testimony, and I think the

23   government's in a better position to quantify the number of

24   times that Dr. King has appeared for the United States.

25       So --

1          THE COURT:  How many would you say?

2          MR. SMITH:  I don't know that I would have a guess.

3   He's been retained quite a few times in the field of pain

4   management.

5       He appeared, you may recall, in an earlier trial we had.

6          THE COURT:  Was he in *Akers*?

7          MR. SMITH:  Yes.  That was the doctor in *Akers*.

8   Correct.

9          THE COURT:  Okay.

10         MR. SMITH:  Yeah.  We have retained him in others.  I

11  mean, there's a reason we called him because we know him and

12  have, you know, somebody who can -- speaks in quick terms.

13      But yeah, I don't think I take issue with Mr. Strianse's

14  point.

15         MR. STRIANSE:  Your Honor, there are a couple of

16  cases I can share with your law clerk, relatively recent

17  cases.

18      One is *United States versus Shulick*.  S-H-U-L-I-C-K.

19      994 F.3d 123.  It's a Third Circuit case from 2021.  I

20  can share the full cite with your law clerk.

21         THE COURT:  That's enough.

22      Tell me what I need to know from it.

23         MR. STRIANSE:  What I know about that case is that

24  the district court properly excluded testimony.  In this case,

25  it was a defense witness.  This seems to happen to defendants

much more than it happens to the United States.

Defense witness, on the ground, that he was untimely --
I'm sorry -- that he was untimely, untimely disclosed expert
witness because the witness's sophisticated analysis was not
mere summary evidence as characterized by the defendant, and
that witness was excluded.

The testimony of that witness would have involved the
witness explaining analytical assumptions and professional
opinions.

There is another district court case from the Northern
District of Illinois, another relatively recent case.

*United States versus Filer.* F-I-L-E-R. That's 2021,
U.S. District. Lexis, 238621. Northern District of Illinois
from December of '21.

THE COURT: All right.

MR. STRIANSE: Your Honor, I had one other request.

THE COURT: Of course.

MR. STRIANSE: Again, I'm concerned about the record.
The Court I know will recall that Dr. Stanton was not named in
the original indictment.

The United States produced Special Agent Sizemore's grand
jury testimony from the return of the original indictment,
which I think was in March of '21, something like that.

I have requested the transcript of his testimony for the
return of the Stanton indictment, which was July of 2021. And

1    the United States is electing not to disclose that.  They say

2    it is protected by 6(e).

3        I don't, at this point -- all I want to do is make sure

4    that the record is complete.  If the Court would order them to

5    give it to you so you could make a court exhibit out of that,

6    so it's in the record.

7        And the reason that I bring that up is, I don't know if,

8    in the July presentation by Special Agent Sizemore, by that

9    point in time he had the benefit of Smyth's report.

10       And I don't know how detailed he took the grand jury

11   through the findings of Dr. Smyth.  And I would like to have

12   that in the record.

13              THE COURT:  All right.

14              MR. STRIANSE:  And some of these cases talk about a

15   harmless error analysis.  I wanted to mention that now for the

16   record.

17              THE COURT:  Okay.

18              MR. STRIANSE:  And the district court in the Northern

19   District of Illinois defined a harmless error analysis in the

20   Seventh Circuit this way:

21       "Whether in the mind of the average juror, the

22   government's case would have been significantly less

23   persuasive had the improper evidence been excluded."

24       And when you take a look at the essential elements of the

25   offense and, Judge, I found a couple of post-*Ruan* cases that I

1  can share with your law clerk.

2      There is a case, *United States versus Kraynak* out of the

3  Middle District of Pennsylvania.  And this -- and they framed

4  the four essential elements, now incorporating *Ruan* -- that

5  the physician distributed the controlled substance outside of

6  the usual course of professional practice and not for

7  legitimate medical purpose.  That's the long-standing element.

8      But in terms of the harmless error analysis, I mean,

9  that's what the expert would be here about.  That he had taken

10  a look at these 17 or so patient charts, and he was -- had

11  formed a judgment that these prescriptions were outside of the

12  usual course.

13      So I think that that goes to an essential element of the

14  offense that I think a court would factor into any harmless

15  error analysis that might be applied to a problem like this.

16          THE COURT:  All right.  Anything else, Mr. Strianse?

17          MR. STRIANSE:  No, sir.

18          THE COURT:  The Smyth -- the scope of Smyth.  Did

19  Smyth give opinions on the Fralix file?

20          MR. SMITH:  Yes.

21          THE COURT:  As to Dr. Stanton?

22          MR. SMITH:  Yes.

23          THE COURT:  Okay.

24          MR. SMITH:  His first -- both of his reports were to

25  both practitioners, I believe.

1    But I think the second one, if I recall, was perhaps more

2    just paying attention, closer detail, to Stanton.  But I think

3    either way his testimony would have been describing what's in

4    the records collectively for each of those 17 patient files.

5    THE COURT:  Okay.  My scheduling order does require

6    the parties to confer right at the beginning of the case on

7    discovery and Rule 16.

8    Did that happen in this case?

9    MR. SMITH:  I think so, Your Honor.

10   As I recall, the first time I spoke with Mr. Strianse he

11   called me once he entered his appearance.  I don't remember

12   how long that was.  But I recall talking about the case, about

13   format of discovery, and what we (indiscernible) and where he

14   stood.

15   And I think we also, then, if my memory serves, did a

16   protective order, signed that, filed that.  But there have

17   been several conversations about the case and discovery.  I

18   can't remember an exact date.

19   THE COURT:  Okay.  Anything else you want to say,

20   Mr. Smith?

21   MR. SMITH:  Well, a couple of points just to respond

22   to the grand jury topic.  He repeatedly identified it as

23   Investigative Sizemore's presentation to the grand jury.

24   Our practice is, we do not disclose, except pursuant to

25   *Jencks*, or for other reason.

1          Suffice it to say for him, to tell him, kind of an

2     extending situation already, that there is no *Jencks* material

3     for Investigator Sizemore for that grand jury, okay.

4          Put a different way, he did not testify at that grand

5     jury.  We're not refusing to provide that under *Jencks* to the

6     defense or otherwise.

7               THE COURT:  It just doesn't exist?  That category

8     does not exist?

9               MR. SMITH:  For Sizemore, correct.

10              THE COURT:  Okay.

11              MR. SMITH:  But we did produce it for the first grand

12    jury presentation because he did testify.

13         Otherwise, the discoverability of the grand jury

14    transcript, or other materials, matters, put before the grand

15    jury, the case law, that's the *Costello* case and otherwise,

16    makes pretty clear that the Court doesn't review the

17    (indiscernible) to review the sufficiency or the propriety of

18    evidence before the grand jury.

19         There's been cases in this district and otherwise that

20    say there isn't a basis to compel disclosure or other

21    disclosure to the defense for the purpose of reviewing and

22    finding something for our motion that they can't even find.

23         And I think I have case law in front of us that cite --

24    for instance, there's a Judge Reeves case.  *United States v*

25    *Morris*, 2021 Westlaw 4241661, that I just paraphrased, but

1    made the same holding.  There's a variety of other cases to

2    that effect.

3        So I don't think that the grand jury or grand jury

4    transcript is at all an issue in this analysis.

5        And then going back to the expert issue, I just --

6    ultimately, what I asked the Court to consider is, again, the

7    analysis is the reason for delay and whether there is any

8    intentional or bad faith conduct, degree of prejudice and

9    whether it can be cured with less severe sanction.

10       I do think, as Your Honor is thinking about it, you know,

11   if, for instance, we were to call Dr. King and put him on the

12   stand and ask him three questions.

13       If we asked him, Is it bad to prescribe if a UDS says

14   this?  And generally speaking, you know, what should you do

15   with this condition?

16       So very narrow, short testimony, just as a hypothetical

17   here.  Two or three questions.

18       I understand the idea that they need to do kind of

19   opposition research on our expert.  That's a category that's

20   definitely new.  They don't know about it.

21       But if we have a fairly narrow set of information, are

22   they in any materially different or worse position than they

23   would have been had Dr. Smyth testified?  And I don't think

24   so.

25       I think all of the information that they're prepared to

1    look at, review, analyze that they would need for cross

2    examination on those principles is no different.  And we don't

3    ever have to provide a verbatim transcript of everything that

4    an expert is going to say.  They wouldn't have known a

5    verbatim --

6            THE COURT:  Yet.  The rule is changing in December.

7    Take note.  Unless Congress acts, but --

8            MR. SMITH:  Yeah.  And that's actually -- there's a

9    second point that I think that relates to as well.

10       But so my point is the more narrowly Your Honor tailors

11   this, I do think there is a way that perhaps the United States

12   could still have some kind of expert opinion.

13       Even if it's not a specific patient review, we still

14   think that's feasible with two patients versus they prepared

15   for 17, so still much narrower class of information.

16       I do think if Your Honor is not inclined to do that, just

17   because we can't generate a really detailed report on that,

18   even if Dr. King would just -- would be permitted to testify

19   generally here are the principles of pain management, here's

20   why certain practices are acceptable, and here's why they're

21   not.

22       Experts are always allowed to respond to hypothetical

23   trial evidence.  That is, you don't have to disclose that.  We

24   noticed that with Dr. Smyth, and that's something that he

25   would have done.  That is something that Dr. Smyth presumably

1     still could do.

2         I don't see any difference in the prejudice or their

3     preparation all through that, again, other than them just

4     wanting to look into the document, King's background about how

5     much he's paid and things like that and otherwise.

6         But the narrower the substance, and the narrower the

7     scope of what he talks about, I think there is significantly

8     less prejudice there.

9         So I just, respectfully, I think there is a way to tailor

10    it to do that.  But I understand what I'm asking, and I

11    understand this is not an easy decision.

12        The other thing I would just raise now, is as -- I don't

13    really consider it an alternative -- but the other thing that

14    we have thought through on our end is in the event the Court

15    is -- is not inclined to allow that to happen, one thing we

16    would ask the Court to explore is having Dr. King present as a

17    rebuttal witness, as a rebuttal expert.

18        As Rule 16 is written, in the text, we only have notice

19    obligation for our case in chief.  I do think -- apparently,

20    that may be changing, as well in December.  I'm not sure.

21        That's not meant to be an end runner out.  And so my

22    fault there, trying to move on it now.  We already disclosed

23    the nature of Dr. King, which is perhaps more than we would

24    have had to do otherwise in a rebuttal case.

25        And I understand Your Honor will be necessarily focused

1  on, you know, this is not my chance to then put on a whole new

2  expert witness and run around what you're saying.

3      But I would still want to flag that for the Court and not

4  do that in reaction to if you deny my motion, and say I'm

5  running around and so that's -- that's what we're thinking

6  about.  Just cards on the table, that's what we're thinking

7  about.

8          THE COURT:  All right.  Okay.

9      So I just -- I'm going to think about this because I

10  wanted to hear the arguments.  It does strike me -- and I'm

11  super sensitive, Mr. Strianse, to the nature of time and

12  trial, and, listen, the speaker matters.

13      You know, when there is somebody sitting up there who's

14  giving opinion testimony, they're not -- they're not stamping

15  out widgets.  I mean, the speaker matters.  And his or her

16  background matters, and training and education and experience

17  and prior cases.  The whole thing matters.

18      How much does it matter?  Well, that depends on the trail

19  behind the expert.  And, Mr. Strianse, anybody preparing to

20  cross-examine has got to have fair time to do that.  And when

21  you're in trial -- I'll use myself as an example.

22      So I'm in this trial.  Every day I've been getting up at

23  5:00.  I've got this to-do list I'm hoping to get to because

24  I've got 300 other cases, and we've all got other things.

25      So I've had this to-do list, and all week long I've been

unable to get to it.  Why?  Because trials are completely

prepossessing.  And so, you know, I'm trying to get to

something, but I'm worrying about instructions in this case.

And I'm worrying about the summary evidence in this case, and

I'm worrying about, as of yesterday, this expert issue.

And so time, a limited resource, we're here all day

grinding, and it is just hard to do more.

And so for me to say to Mr. Strianse, Well, you know,

it's not that big of deal.  You've had an idea of the general

opinions the government is after, and so we're going to switch

speakers and let you fit in your prep for cross within what,

tonight?  Over the weekend?

I know how it is.  And I know you've been working hard

all day.  And so the idea of me saying, Well, you've got two

days over the weekend, be ready.  I'm not saying I couldn't do

that within my discretion, but I understand time is a finite

resource, and you're a flesh and blood person, and so having

been a practitioner, I want to be realistic about what that

means in terms of fairness.

So I'll look at it.  I'm going to consider it.

Now, this grand jury issue.  Look, the indictment is

sacrosanct.  Nobody is looking behind that indictment.  And so

I understand you want to make your record, but that's a

different issue than, am I going to let the government pivot

on the expert, in my view.

1    I do think the rebuttal issue is a different issue.  That

2    -- that's a different category and that's not something I

3    think that falls under the same process we're talking about

4    here with respect to replacing Smyth.

5    So I'll think about all of that.  I'm going to look at it

6    tonight.  I've got to go back to Lexington, but -- but I'm

7    going to look at it tonight and early in the morning.  I'll

8    come in and announce my analysis and ruling and we will go

9    from there.

10    If I let King have a role in the case in chief, it

11    certainly would not be until after the weekend, just to give

12    you some guidance on that.

13    But whether he'll have a role, that's what I'm going to

14    determine and I'll announce that in the morning.

15    All right.  So anything else to say tonight?

16    MR. SMITH:  Other than just schedule-wise -- I do

17    anticipate, that may dictate kind of the close of our proof.

18    It is possible that we would otherwise finish our proof

19    tomorrow, or very early on -- tomorrow's Friday?

20    THE COURT:  I think so.  Yep.

21    MR. SMITH:  And, I'm sorry.  And/or early on Monday.

22    If there is any expert testimony allowed, that would follow

23    it.

24    But I think that earlier I projected handing the case

25    over on Tuesday.  So either way, I think that we're -- we're

1  getting close as far as scheduling.

2        THE COURT:  Okay.  That's good.

3     What do you anticipate the lineup being tomorrow?

4        MR. SMITH:  Right now it's Keta Abner.  We're still

5  just -- we're -- we had subpoenaed a witness, Jennifer

6  Vardaman, who is another patient.  She's the one that I

7  referenced earlier that had COVID, has symptoms, has now gone

8  radio silent.  I don't know if we're going to issue a bench

9  warrant.  So if we can get her here, it would be her.

10     And Marisol Zenika.

11     And I believe we would take up our -- our summary

12  witness.  Her name is Monica Carter from the DEA, and then

13  Agent Sizemore.

14        THE COURT:  All right.

15        MR. SMITH:  There may be one other patient in there,

16  but we're going to go with that.

17        THE COURT:  Okay.  All right.  So I'll be here, try

18  to be here by 8:00.  I'll try to be here by 8:00 and announce

19  my ruling on that issue.

20     Anything else for you, Mr. Smith?

21        MR. SMITH:  No, Your Honor.  Thank you.

22        THE COURT:  Mr. Strianse.

23        MR. STRIANSE:  Yes, Your Honor.  I don't want to

24  belabor this.  Before the Court makes its ruling, I am

25  concerned about the record.  I didn't know what your thoughts

1    were about my request that we either -- you or all of us know

2    what the problem is with Dr. Smyth.

3        And then also that the Court is made aware of exactly

4    when the government knew that they had a problem.

5        THE COURT:  Well, I understand your desire to know.

6    I completely understand it.  I'm judging my need to know, and

7    I have stated, I've stated the problem as I see it.  And

8    Mr. Smith I know is telling me the truth when he says his

9    first perception was on Sunday.

10       And I think he went from there and took steps to try to

11   kind of suss out the degree of the problem and what to do with

12   it.

13       He's told me his chronology, which I accept.  And that

14   chronology tells me that he perceived a problem on Sunday.

15   And I didn't hear about it until, formally, until we were in

16   the middle of trial yesterday.

17       He dropped him from the witness list, and I did notice

18   that.  But that was telling me, in the ex parte filing or

19   tender, that he was not going to be a witness.  And so that's

20   what I'm -- that's what I'm going forward on.

21       And I don't know exactly what the problem is and you know

22   don't what the problem is.  I know no more than you know.  I'm

23   going to make my analysis based on that.

24       If Mr. Smith had wanted to give me a detailed breakdown

25   of, this is the precise problem and this is what Dr. Smyth is

1  saying, he's had a chance to do that, and he's not done it.

2  And so I'm going to go forward based on what I know.

3       You may not be satisfied with that as the record, but I

4  am satisfied.  I don't think I need to know more.  I'm going

5  to analyze based on what I know.

6       And so that's where things stand.

7            MR. STRIANSE:  I understand.  Thank you.

8            THE COURT:  All right.  Okay.

9       Thank you all.  Hope you have a pleasant evening.  We'll

10  be working on this and I'll see you in the morning at 8:00.

11  Thank you.

12       (Proceedings concluded at 4:59 p.m.)

13                          - - -

14            C E R T I F I C A T E

15            I, KIMBERLEY ANN KEENE, RMR, certify that the
   foregoing is a correct transcript from the record of
16  proceedings in the above-entitled case.

17

18  /s/ Kimberley Ann Keene, RMR          December 8, 2022
   KIMBERLEY ANN KEENE, RMR              Date of Certification
19  Official Court Reporter

20

21

22

23

24

25

1                              INDEX

2   **GOVERNMENT'S WITNESSES**

3   SHANNA ARMIJO
    Direct Examination.............................. Page 11
4   Cross-Examination............................... Page 52
    Redirect Examination............................ Page 69
5   Recross-Examination............................. Page 72

6   JONATHAN POOLER
    Direct Examination.............................. Page 75
7   Cross-Examination............................... Page 86
    Redirect Examination............................ Page 97
8
    EMILIE JACKMAN
9   Direct Examination.............................. Page 99
    Cross-Examination............................... Page 141
10  Cross-Examination............................... Page 168
    Redirect Examination............................ Page 174
11  Recross-Examination............................. Page 176

12  JAMES JOSEPH MACCARONE
    Direct Examination.............................. Page 180
13  Cross-Examination............................... Page 234
    Redirect Examination............................ Page 245
14
    KEELEY QUINLAN
15  Direct Examination.............................. Page 249
    Cross-Examination............................... Page 253
16
    BRIAN GROVE
17  Direct Examination.............................. Page 256
    Cross-Examination............................... Page 274
18

19  **DEFENSE WITNESSES**

20                           - - -

21  **GOVERNMENT'S EXHIBITS**

22

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 23 | 200 | Planters Bank records.  GMA operating account | 258 | 258 |
| 24 | | | | |
| 25 | 201 | F&M Bank records.  J. Stanton, M.D. | 260 | 261 |

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 500A | Debit analysis.  GMA (Stanton) | 264 | 266 |
| 500B | Summary of Gov't Exhibit 500A | 270 | 270 |
| 500C | 500B data displayed on line graph | 273 | 274 |

**DEFENSE EXHIBITS**

- - -