UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
- - -

UNITED STATES OF AMERICA,     : Docket No. 21-CR-019
                              :
                 Plaintiff,   : London, Kentucky
                              : Friday, August 26, 2022
                              :
versus                        : 8:00 a.m.
                              :
JOHN L. STANTON,              :  Jury Trial.  Day 4 of 7
                              :
                 Defendant.   :

- - -
TRANSCRIPT OF JURY TRIAL
BEFORE ROBERT E. WIER
UNITED STATES DISTRICT COURT JUDGE
- - -

APPEARANCES:

For the United States:     ANDREW E. SMITH, AUSA
                           U.S. Attorney's Office
                           260 West Vine Street
                           Suite 300
                           Lexington, Kentucky 40507

For the Defendant:         PETER J. STRIANSE, ESQ
                           Tune, Entrekin & White
                           5000 11th Avenue N.
                           Suite 600
                           Nashville, Tennessee 37203


Court Reporter:            KIMBERLEY KEENE, RMR
                           Official Court Reporter
                           Room 317
                           310 South Main Street
                           London, Kentucky  47041
                           (606) 877-7968


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

1   (Proceedings commenced at 7:59 a.m.)

2   THE COURT: All right. Thank you. We're back on the

3   record in U.S. versus Stanton. Good morning to everybody.

4   Both counsel are here. Dr. Stanton is here as well. Seems

5   like a short interval since we were in here last, but I did

6   carefully consider the issue concerning the United States and

7   its proposed expert. And the issue is replacement of

8   Dr. Smyth with Dr. King. The defense has objected to that.

9   I do view Rule 16 mechanics as applicable in this case.

10  The parties have behaved as such all the way through. All of

11  the correspondence and the disclosures I've seen have been

12  under the Rule 16 rubric. My pretrial order tells the parties

13  to confer under Rule 16.1 and cover discovery topics.

14  And looks to me like it has been a normal course of

15  discovery here, including the entry of protective orders. And

16  the government had purported to make disclosures and request

17  reciprocal disclosures, and the defense has ostensibly

18  responded under that rubric. And so I think to now pin

19  anything on there not being a formal request, that's not the

20  reality of the case and not an area that I find persuasive.

21  The United States identified and disclosed on

22  Dr. Smyth -- I don't have all of the records, but it looks to

23  me like there have been two reports on that case. Of course,

24  has been pending as to Dr. Stanton for over a year, and looks

25  like the U.S. has reported on Dr. Smyth all the way through.

1    And then here we are mid trial, and the government

2    elected to drop him from the witness list just before the

3    trial.  On the last list of the Court, he was not named in

4    front of the jury.  Neither he nor Dr. King was named in front

5    of the jury during jury selection.  It's kind of a subissue I

6    would have concern about.  So the jurors were not queried on

7    either of those names.  Is there a likelihood of knowledge?

8    It's not a likelihood of it, but it's an issue I wanted to

9    note.

10    So second day of trial, the government raised the issue

11    of trying to replace with a new expert.  On Monday, did not

12    seek a continuance.  Jeopardy attached on Tuesday when I swore

13    the jury.  So that's where we are.

14    I do view it as a late disclosure issue under Rule 16.

15    And as a matter of, really, fundamental trial fairness in this

16    context, where the government has said -- in a prescribing

17    case, it said, this doctor is our expert.  These are the

18    opinions he's going to give.

19    And the defense, you know, as is true in every case,

20    relied on the disclosure, planned the defense, in part, around

21    responding to that disclosure.  I think Dr. Hilgenhurst, his

22    report mostly is Smyth centered, and now the government seeks

23    to put Dr. King into that chair.

24    I think the rubric is governed by Rule 16.  And that

25    rule, of course, requires the disclosure and also gives, you

know, a framework when there's noncompliance with that rule. It does include power for the Court to prohibit a party from introducing undisclosed evidence or to enter any other order that's just under the circumstances.

The case for a rubric, the government correctly referred to that. I have to look at the reason for a noncompliant disclosure, including whether the party acted intentionally or in bad faith, the degree of prejudice to the opposing party, and whether there's a cure short of suppression. And certainly, the least severe sanction is the measure the Court is to pursue.

I also think there's some Rule 45 influence on the timing issues under the rules and an action outside of the timing rules, and that normally is kind of an excusable neglect standard.

So I think it is important to look at and understand the sequence and the chronology why the issue came to be. And so that's of interest to me as well.

So what did happen? I don't have complete knowledge on it. Mr. Smith has given me what he's given me in terms of an explanation. Many of the details have been withheld. I think that's an election by the government to do that.

So what do I have? I have that Mr. Smith, in pretrial prep on Sunday, in discussions with the expert, became aware of an issue of concern. Smith mentioned something, or talked

about something, or a topic came up that created worry for the prosecutor and his duties under *Giglio*.

*Giglio*, we know, involves material impeachment evidence. Smyth, through some process, you know, lawyers up and won't divulge the papers or records pertaining to the undefined issue. There's some generic or general reference to a Tennessee protection or privilege. I don't know what it is. That's all I know.

I've heard when it came to Attorney Smith's attention. I don't know when the issue arose for Dr. Smyth. And so I don't know how all of that -- is it a sudden issue for him? Is it an issue that's been percolating? I don't know. So I don't know if it was discoverable sooner by the government. That's unknown.

I don't see any basis for bad faith or intentional finding here against the prosecutor. I'm certainly not of that view. Partly it's based on what I know, and partly it's because I've seen Mr. Smith practice in my court for many years, and he is a straight shooter and above-board prosecutor and an ethical lawyer. And so I'm not making any bad-faith finding.

I can't make a finding on diligence. I don't know if it's something that should have been discovered, was out there and earlier vetting would have caused the issue to be expressed and maybe addressed sooner. I just don't know.

My view is that Dr. Smyth is available. He can be made to come here if it came to that. He could be made to appear. I looked at Rule 17 in *Giglio*. I'm firmly of the view that the Court could subpoena Dr. Smyth and tell him to bring with him records X, Y, and Z that pertain to the issue.

Now, there's plenty of Rule 17 law that says *Giglio* material is not available to be produced in advance of trial, kind of a Nixon 17(c) analysis, but we're not talking about that. We're talking about having him here during the trial, bringing material X, Y, and Z, and if that has to be reviewed and brought to bear on his examination, I think it's available and in the offing.

And, you know, that kind of disclosure, listen, nobody is entitled to -- the timing on getting *Giglio* can be a challenge, certainly, but I'm confident that if there's an issue like that that would affect his testimony, if it's disclosed, we could deal with that timing relative to the defense reacting to the impeachment information, I think.

Now, of course, I don't know what it is, so little bit of a black box there. But the point is, Smyth's available. He can be brought here. The impeachment information, whatever it is, I think is accessible. I continue to be doubtful that there's a Tennessee impenetrable wall that's going to keep the Court from getting to that.

The point is, I think the United States is making a

difficult strategic election that Smyth has become unpalatable as a witness. Listen, any litigator, myself included, back in the day, has had an expert go south. And it happens, and that makes for difficult choices. And seems to me that that's what has happened here. That's not a sound reason for a post jeopardy attachment pivot to a new expert. Not bad faith, but also not justified.

Prejudice to the defense. In my view, prejudice is clear and incurable. Why is that? It's because of the timing. The disclosure came up day two of trial. At the end of day two, I think, is when the actual disclosure happened. And this is in a week where we're having full trial days, you know, six, six and a half hours of proof day in, day out. There's no margin to say, "Okay. I'm going to step aside and analyze separately this body of proof or these issues." It's very difficult to do.

So that's where we are. No report from Dr. King compared to Dr. Smyth, who wrote a report, gave his own words. We have here a summary.

Now, I'm not saying the rule requires a report at this stage, but in comparing the situation, with Smyth, they've got his words in two reports to analyze. For King, they've got the government summarizing what it's going to be.

No chance to respond. No chance to analyze the C.V., analyze the background, go through prior testimony. There's

just not a -- time is not flexible enough to allow that, in my experience, based on what I know is going on in this case. And it's just not fair to the defense to say, "Okay. Here's a new expert. Go be prepared to cross-examine him."

The speaker matters. I mean, these are people who sit in the witness chair in front of the jury. And so the expert is giving an opinion, and we're not, on this side, to say, "Well, it's all the same subject matter, and it's roughly the same opinion." But to the jury, it's the speaker, the speaker, who is talking. And the primary way to erode the effectiveness of that speaker is through cross-examination, and that involves the ability to look at the record and analyze the background and make the arguments or end roads that can be made.

And Mr. Strianse is entitled to that, and Dr. Stanton is entitled to that. And I considered, can I do something here to create an opportunity? I mean, we're in the middle of trial. I've picked the jury with an expectation on the trial length. It certainly seems unfair to that jury to say, "Okay. We're going to recess and bring you back a week later, or bring you back two weeks later."

That creates all kinds of alarm bells about the fairness of the trial. And people have conflicts, and it's just out of order in terms of the administration of justice. We would create other fairness concerns that are not attractive to me. Could I just say, "Well, Mr. Strianse is just going to have to

make it happen?" I mean, I could say that. I believe that would be an abuse of discretion to do it, and I'm not willing to go there.

Ultimately, I don't think the prejudice is curable given the timing and how things came about, when they came about, the sequence and the posture of the trial. So I am going to preclude the use of Dr. King in the government's case in chief.

Does it affect the rebuttal possibility? I'm not deciding that either way. I'm not precluding it. I'm not saying I'm automatically going to allow it. If it's proper rebuttal and it's within the rules, then, you know, that door is open. I'm, at this point, neutral on it. I recognize the disclosure duty does not apply in the same way. It doesn't apply -- it's a case in chief issue. So if there is rebuttal proof that's legitimate rebuttal, you know, we'll cross that bridge when we come to it.

Just a few added notes. This is not -- all of this is, is context that has some -- you know, I can't ignore everything that has happened in the trial. So this is a case where, you know, the weekend before trial, I bounced Dr. Stanton's co-counsel from the case. Now, that was a binary circumstance where I thought that the answer was clear. I thought, clearly, Ms. Marsh could not participate in this case, and the trial record has fortified that, in my view.

But that's a -- you know, that's a harsh result given that we're right before trial. Now, she's been new to the case, but she's out.

Mr. Strianse did not come in and complain and moan and seek a continuance. He said he's ready, and off to trial we went. Really the same here. It's a very clear answer, in my view, that it would be unfair to allow this pivot. And I just feel it would be -- I feel particularly uncomfortable with the idea of, in my discretion, letting the government have a new expert here in the same case where I've tossed Dr. Stanton's co-counsel out.

Now, those are not related legal issues, but as I'm trying to be a neutral fair decisionmaker, fair to both sides, you know, calling balls and strikes throughout the case, that's just something that it doesn't sit well as I'm just trying to police my fairness in the case.

So I'm also very aware of the law in the Sixth Circuit on experts in cases like this and what is and is not required, and we'll slug all of that out when it comes to Rule 29, I expect. But, listen, there's a lot of law on alleged pill mills and experts. Undoubtedly, an expert will be helpful to the government here, but there's a lot of law on what a jury can obey on its own in judging these situations.

On the record expansion arguments Mr. Strianse has made, I'm not going to do it. If he's got grand jury arguments, the

1    grand jury testimony, it exists.  It's going to be preserved,

2    I'm sure.  I'm not going to stick my hand into the grand jury.

3    That's inviolate to me.  And until I see some authority

4    telling me to look behind that indictment, I'm not going to do

5    it.

6         So the government has eliminated the path only so far,

7    and I'm ruling on what I've seen and I'm aware of.  And so I'm

8    not going to expand the record or take any further steps on

9    that, but I am going to preclude the government's use of

10   Dr. King for the reasons stated.

11        All right.  Any questions on that, Mr. Smith?

12             MR. SMITH:  No, Your Honor.

13             THE COURT:  Mr. Strianse.

14             MR. STRIANSE:  No, Your Honor.

15             THE COURT:  Okay.  It's 8:20.  What else do we need

16   to take up this morning?

17             MR. SMITH:  Well, a related issue, just for logistics

18   planning.  Does the Court have a view about the propriety of

19   us having -- in some cases, the parties do have their experts

20   attend testimony and view it.  Defense actually intended to do

21   that themselves.

22        Just for planning purposes, so I can -- maybe travel

23   arrangements, does the Court have a concern about us having

24   Dr. King here as a rebuttal witness for that purpose and

25   present to observe defense proof, including expert proof and

the defendant testimony?

THE COURT:  Mr. Strianse.

MR. STRIANSE:  Your Honor, I'm not going to be cagey with the Court.  In light of this ruling, I don't believe we're going to advance Dr. Hilgenhurst.

THE COURT:  What about your view on the request that Dr. King be in here so that he can hear what is said in the event the government wants to call him for rebuttal?

MR. STRIANSE:  I have no objection to him being in here.  I'm not sure what he would be rebutting if we're not advancing Hilgenhurst.

THE COURT:  Well, I don't want to put the cart before the horse.  The request is for him to be able to audit the defense case.

MR. STRIANSE:  Yes, sir.

THE COURT:  That seems appropriate to me.  So I'll say, yes, he can be in here.  That doesn't mean, yes, he can testify.  It means, yes, he can be here.  And if there's a rebuttal scenario, we'll take that up at the time.

MR. STRIANSE:  Yes, sir.

THE COURT:  Okay.  All right.

MR. SMITH:  Thank you, Your Honor.

Second point is, we should have a pretty full day of proof, but our last witness, because of the ongoing issue that I've told you about with respect to Ms. Vardaman, who's a

former patient and fact witness, we spoke with her fairly late last night, and she, according to her, has tested positive for COVID.  Her first symptoms were last Wednesday.  She has had two positive tests this week.  And she, according to her, as of last night, was still having fever, although I think she was doing better.

So the request would be, in the event, let's say, we finish today at 3:30, it goes faster, the government would ask for a brief recess until Monday to keep open the possibility that she might be asymptomatic, be able to travel, and testify on Monday.  I don't mean to interfere with the Court's schedule, but I think, otherwise, we're still very much within the Court's window.

But I just didn't want to -- I mean, otherwise, potentially having to close our proof and her just because of this COVID issue.  I don't know what (indiscernible).

THE COURT:  Where's she coming from?

MR. SMITH:  From Tennessee.

THE COURT:  From Tennessee.

MR. SMITH:  Has a transportation issue.  So it may be that we have to have an agent pick her up.  And I don't want to instruct the agent to have to sit in a car with her if she still has a fever.  So I think the Court can understand that.  We'll see where that is.  It may not even be necessary, because if we run into a (indiscernible).

1           THE COURT:  All right.  Mr. Strianse, any thoughts on
2    that?

3           MR. STRIANSE:  I have no objection to that.

4           THE COURT:  Okay.  Well, I'm okay with that.  I mean,
5    I don't anticipate.  So let's say we got to noon and you were
6    finished then, I would be a little less happy about breaking
7    half day, but that doesn't seem likely based on, you know,
8    what I expect is coming.

9        So I'm okay with put everything on you've got today.  And
10   then if you're left, obviously, with more, we'll go all the
11   way through the end of the day.  But if you are at the end of
12   your proof other than Vardaman and you want to defer and call
13   her Monday and then close Monday morning, I can live with that
14   in context.  And I think we'll just need to be -- we need to
15   be a little thoughtful on the best way to do that.

16       Michelle, does Judge Boom have anything Monday morning
17   here?

18          COURTROOM DEPUTY:  Not Monday morning.

19          THE COURT:  Yeah.  I'm just thinking if we bring her
20   in and we have any concerns about her continued status, we
21   might, like, call her over in courtroom B and let her testify,
22   maybe put her at a little bit -- I don't know.  I have to
23   think about -- maybe have the jury back in the gallery so
24   they're not as close to her.  I don't know.  You see what I'm
25   thinking about.  Have her in courtroom B, and then we can all

1  move back to courtroom A so there's not the idea of being in

2  the room with somebody who's suspected of maybe being

3  contagious.

4      Any thoughts on that?

5          MR. SMITH:  That would be fine with us.  And these

6  are issues that have only started occurring in the last couple

7  of years, so I'm fine with that.

8          THE COURT:  Mr. Strianse.

9          MR. STRIANSE:  Seems very reasonable.

10         THE COURT:  Okay.  Let's wait and see, and we'll plan

11 to -- if we need to, Monday morning, we'll do some last-minute

12 tweaking to get her on as safely as we can.  And I do want,

13 you know, the government to be able to put her on.  And so

14 that seems reasonable to me.  Okay.

15         MR. SMITH:  The last thing is, I anticipate our

16 second witness is going to be Monica Carter, from the DEA,

17 who's going to be presenting various summaries and is --

18         THE COURT:  Right.

19         MR. SMITH:  And data.  So I just want to flag that

20 for the Court and the parties.  We'll just roll into trial and

21 present it, and then if there's anything defense wants to take

22 up on that, they can.

23         THE COURT:  Where are we on that?

24         MR. STRIANSE:  I'm sorry?

25         THE COURT:  The 501 series?

1     MR. STRIANSE:  I think we're very close.  We just

2   need a few minutes to discuss that.

3         THE COURT:  Okay.  Is our jury here?

4         COURT SECURITY OFFICER:  They are.

5         THE COURT:  Okay.  Can you knock that out in five

6   minutes with Mr. Smith?

7         MR. STRIANSE:  I don't think we can compare our

8   charts with their injury.

9         THE DEFENDANT:  I can do it.  I just got them all

10  this morning.

11        THE COURT:  It's going to be your second witness?

12        MR. SMITH:  Yes, Your Honor.

13        THE COURT:  Okay.  I just need to know if there's

14  something we need to take up.

15        MR. STRIANSE:  Are you going to get to her this

16  morning?

17        MR. SMITH:  Yeah.  I'm just.

18     (Off-the-record discussion.)

19        MR. STRIANSE:  Your Honor, I think he can finish his

20  work on those, and maybe at a break, we can -- maybe we can

21  take a break between witness one and two and confer on that.

22        THE COURT:  Who's witness one going to be?

23        MR. SMITH:  Keta Abner.

24        THE COURT:  All right.  Well, if we're ready, let's

25  go ahead and bring them in and call the case and call her.

1          How long is that witness likely to be?  Half an hour?

2               MR. SMITH:  Yeah, I think so.

3               THE COURT:  And then how much time do you need to --

4               THE DEFENDANT:  That should be fine.

5               THE COURT:  Well, how much of a break time do you

6     need?

7               MR. STRIANSE:  Oh, probably 15 minutes or so.

8               THE COURT:  All right.  So do you think that's going

9     to iron the issues out so we can go through with the witness?

10              MR. STRIANSE:  I think so, yes, sir.

11              THE COURT:  All right.  So we'll have her take a

12    short break, and then we'll come back with the second

13    government witness.

14              MR. SMITH:  Just told -- in case the witness,

15    Ms. Carter, has her computer here, if there are revisions that

16    we agree to make, we can make them kind of on the fly pretty

17    quickly.  But she has not been permitted to bring her computer

18    in by courtroom security.

19              THE COURT:  Well, yeah.  Let them know she can bring

20    her laptop in.

21         What's her name?

22              MR. SMITH:  Monica Carter.

23              THE COURT:  Monica Carter can bring her laptop in.

24    Okay.  Everybody is nodding, so that's getting through.

25         All right.  Anything else?

1    MR. SMITH:  No, Your Honor.  Could I run and make

2  sure our witness is here?

3    THE COURT:  Yes.

4    Anything else for you, Mr. Strianse?

5    MR. STRIANSE:  Nothing further.

6    THE COURT:  Okay.  You in good shape?

7    MR. SMITH:  Your Honor, she apparently is parking in

8  the main parking lot right now.  She's been compliant.  She

9  was here yesterday.  We asked her to be here before 8:00 a.m.

10  So I apologize, but she is very close, apparently, but here we

11  are.

12    THE COURT:  All right.  Well, I'll step out.  You

13  guys can be working on that chart.

14    MR. STRIANSE:  Yes, sir.

15    THE COURT:  And as soon as she's here, the CSOs will

16  let me know, and then we'll come in and call the case.  Thank

17  you.

18    MR. SMITH:  Thank you, Your Honor.

19    (Recess from 8:27 a.m. until 8:36 a.m.)

20    (The jury entered the courtroom at 8:36 a.m.)

21    THE COURT:  Thank you so much.  Good morning to

22  everyone.  If the clerk would call the case.

23    COURTROOM DEPUTY:  Yes, Your Honor.

24    London Criminal No. 21-CR-19S, United States of America

25  versus John L. Stanton.

1          THE COURT:  Thank you.  Counsel, state your

2     appearances, please.

3          MR. SMITH:  Good morning, Your Honor.  Andrew Smith

4     on behalf of the United States.

5          THE COURT:  Mr. Smith.

6          MR. STRIANSE:  Good morning, Your Honor.  Peter

7     Strianse here on behalf of the defendant, John Stanton.

8          THE COURT:  Mr. Strianse and Dr. Stanton, good

9     morning to all of you.

10         And good morning, again, to the ladies and gentlemen of

11    the jury.  Appreciate you being here on time ready to go.

12    Sorry we were a little bit delayed getting going this morning.

13         In the words of the immortal George Jones, it's finally

14    Friday.  We're at day four of trial, and you've been so

15    attentive throughout.  We're really grateful for it.

16         Have you all followed the same rules you've been under

17    all the way through?  Anyone no?  Okay.  Thank you very much

18    for that.

19         I believe we're ready for the next government witness,

20    Mr. Smith.

21         MR. SMITH:  Your Honor, United States calls Keta

22    Abner.

23         THE COURT:  Keta Abner.

24           KETA ABNER, GOVERNMENT'S WITNESS, SWORN

25         THE WITNESS:  I do.

1        COURTROOM DEPUTY:  Thank you.

2        THE COURT:  Good morning to you, ma'am.

3        THE WITNESS:  Good morning.

4        THE COURT:  That seat won't move, but the mic will.

5   And just try to speak directly toward it in a clear voice so

6   we can understand your testimony.

7      Would you first tell me your name and spell your last

8   name?

9        THE WITNESS:  Keta Abner, A-B-N-E-R.

10        THE COURT:  Thank you, ma'am.

11      Mr. Smith.

12        MR. SMITH:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.  Good morning, ma'am.

16      Never a polite question to start off, but can you tell us

17   your age, please?

18   A.  46.

19   Q.  And what city and state do you -- it'll move around like

20   this.

21      Can you just pull it a little bit closer to your mouth?

22   A.  Okay.

23   Q.  If you can, just if I ask you a question, wait for me to

24   finish, and then you have to verbalize an answer so that the

25   court reporter can write it down, okay?  All right.

1      MR. SMITH:  And did we get the first question, the

2  age?  Were you able to get that?

3      THE COURT REPORTER:  46.

4      MR. SMITH:  Yeah.  Okay.  Thank you.

5  BY MR. SMITH:

6  Q.   All right.  Can you tell us what city and state you live

7  in, or town and state you live in?

8  A.   Manchester, Kentucky.

9  Q.   Ma'am, have you heard of a place called Gateway Medical

10  Associates, or GMA?

11  A.   Yes.

12  Q.   Did you travel there?

13  A.   Yes.

14  Q.   Can you just tell us a little bit about how you found out

15  about the clinic and then how you came to go there the first

16  time?

17  A.   I had had a car wreck and had been dismissed from my

18  family doctor.  And a friend come and said that she would take

19  me to her doctor that would write some kind of pain medicine

20  for me.

21  Q.   And what was the reason given -- not to get all the way

22  into it, but what was the reason given for your dismissal from

23  the family doctor?

24  A.   They said they would call me in for a pill count the day

25  before my appointment.

1    Q.   All right.  So you were dismissed, gone from your family

2    practice, and you looked for a new clinic.

3         So why GMA?  How did you find that place?

4    A.   A friend come through and told me about it.  If I would

5    give her a ride to the doctor, she would get me into a -- a

6    doctor that would write me some pain medicine.

7    Q.   Did you know where it was?

8    A.   She told me it would be all night.

9    Q.   So did you give your friend a ride?

10   A.   Uh-huh, yes.

11   Q.   And then did she give you directions as to where to go?

12   A.   Yes.

13   Q.   Okay.  And where did she steer you?  Where did you go?

14   A.   Clarksville, Tennessee.

15   Q.   Okay.  And how long did that take?

16   A.   About three and a half, four hours.

17   Q.   And you were aware, going into it somewhere in this, that

18   it would take all night, is what --

19   A.   Yes.

20   Q.   Okay.  Now, at this time in your life, had you suffered

21   injuries that gave you pain?

22   A.   Yes.

23   Q.   Okay.  And does that include a car accident?

24   A.   Yes.

25   Q.   And did you have foot or ankle injuries?

1   A.   I had five broke bones in my foot and ankle and four or

2   five ribs, and a few places in my back.

3   Q.   Before you went to GMA, what kind of medications had you

4   been prescribed?

5   A.   Lorcet 7.5, 60 of those, and my Neurontin for seizures.

6   And after the wreck, U.K. had wrote me 40 or 50 Percocet 5s to

7   take home, and Dr. Hoskins had wrote me, like, 20.  There were

8   a couple of weeks that I went and seen him, because my -- my

9   family doctor couldn't write any more than a 7.5ers.

10  Q.   So you had some Percocets.

11       Is that oxycodone, if you know?

12  A.   I think they test the same, but they're not the --

13           THE COURT:  And if you don't know, that's okay.

14           THE WITNESS:  Okay.

15  BY MR. SMITH:

16  Q.   Just tell me what you know, yeah.

17       So you had some Percocets after the injury and kind of

18  shorter --

19  A.   Breakthrough, I guess.

20  Q.   Yeah.  And then you had some Lorcet from your family

21  doctor, dismissed from your family doctor, and now you've gone

22  to Gateway Medical Associates; is that fair?

23  A.   Yes.

24  Q.   Now, when you got to Gateway Medical Associates, what do

25  you remember seeing?

1    A.    You just sit and wait for hours.  There was people

2    sitting out in the parking lot.

3    Q.    What was the parking lot like?

4    A.    It was about like if you went and sat at McDonald's or

5    somewhere, you know, people coming in and out.  People just

6    parked.  Some people would leave and go get pops.  I don't

7    know.

8    Q.    That first visit there, which doctor did you see?

9    A.    Dr. Maccarone.

10   Q.    Okay.  And did you get prescriptions from Dr. Maccarone?

11   A.    Yes.

12   Q.    For what?

13   A.    Gabapentin.  Roxy 10s, I think, or something.  And

14   oxymorphone, or Opana 7.5s, I think.

15   Q.    Did you know, when you were walking in there -- or I'm

16   sorry, did you know, when you were walking out of the clinic

17   with your prescriptions, what you had been prescribed?

18   A.    No.

19   Q.    When did you realize what you had been prescribed?

20   A.    When I read my prescriptions, when I got in the car.

21   Q.    You didn't know what you had been prescribed until you

22   got in the car and looked at the piece of paper?

23            THE COURT:  Can you answer out loud?

24            THE WITNESS:  Oh, sorry.  Yes.

25            THE COURT:  Thank you.

1    BY MR. SMITH:

2    Q.   Now, that first visit, do you remember what time you

3    actually got out of the clinic, what time you got done?

4    A.   I remember I seen him a few minutes after midnight.  And

5    he probably took 45 minutes, or something, and I was gone.

6    Q.   Now, had you ever been prescribed Opana before, or the

7    oxymorphone?

8    A.   No.

9    Q.   Had you ever been prescribed two painkillers at the same

10   time before?

11   A.   No.

12   Q.   We'll turn back to that in a second.

13   A.   Other than when Hoskins had wrote my family.  He wrote it

14   one time before she dismissed me.

15   Q.   Okay.  I understand.  But had a doctor written you at the

16   same time something like oxycodone and oxymorphone before?

17   A.   No.  No.

18   Q.   Did you take the prescription and get it filled at a

19   pharmacy?

20   A.   Yes.

21   Q.   When you did that, how much did the pills cost?

22   A.   They were five -- 560 something when I started.  I knew

23   when they got higher, that was the amount.

24   Q.   How did you pay for that?

25   A.   Cash.

1   Q.   We'll talk about this a little bit later in your

2   testimony, but just to be direct with you:  That's a pretty

3   healthy amount of cash to have to pay at a pharmacy; is that

4   fair?

5   A.   Yes.

6   Q.   Were there times that you sold some of your pills?

7   A.   Yes, sir.

8   Q.   Now, had you ever taken oxymorphone before?

9   A.   No.

10   Q.   What was it like taking that?

11   A.   Well, it numbed you.  I mean, you -- but it make you a

12   little sick, but -- and the next day, I knew I was hurt worse

13   because I would overdo it.

14   Q.   Do you think that the Opanas ultimately helped you?

15   A.   No.

16   Q.   Did you continue returning to the clinic?

17   A.   Yes.

18   Q.   Did you continue getting prescriptions for oxycodone and

19   oxymorphone?

20   A.   Yes.

21   Q.   Now, you referenced a pill count issue at your former

22   doctor.

23       At Gateway Medical Associates, do you remember how pill

24   counts were handled?

25   A.   When you walked in, you -- and you pay, you got the

1    appointment card and your pill count card that had the date on

2    it and how much it would be if you showed up for the pill

3    count and how much it would be if you didn't.

4    Q.   So could you pay not to show up?

5    A.   Yes.

6    Q.   Did you have to take drug tests at Gateway Medical

7    Associates?

8    A.   Yes.

9    Q.   Did you ever learn that you failed any drug tests?

10   A.   Yes.

11   Q.   What did you test for -- or what drugs did you test

12   positive for, if any?

13   A.   Marijuana, Xanax, and methadone.

14   Q.   Did you, in fact, take those drugs?

15   A.   Yes.

16   Q.   Okay.  Did you have a prescription for any of those

17   drugs?

18   A.   No, sir.

19   Q.   Now, if we reviewed your medical record and saw that

20   there were drug tests where you were negative for drugs you

21   were being prescribed, such as the oxymorphone, why would that

22   be?

23   A.   So I could sell them.

24   Q.   Were you able to continue getting prescriptions from

25   Gateway Medical Associates even after you tested negative?

1   A.   Yes.

2   Q.   Even as you continued to sell your drugs?

3   A.   Yes.

4   Q.   Now, did you see Dr. Maccarone for most of your visits at

5   Gateway Medical Associates?

6   A.   Yes.

7   Q.   Did you also see the defendant, Dr. John Stanton?

8   A.   Yes.

9   Q.   When you saw Dr. Stanton, can you describe for the jury

10  how long those visits took?

11  A.   Oh, they were quick.  They were five minutes, I guess.

12  Q.   Did you get prescriptions from Dr. Stanton?

13  A.   Yes.

14  Q.   When you got the prescriptions, were you able to

15  observe -- were they printed out on a piece of paper?

16  A.   Yeah.

17  Q.   Okay.  And were they already printed out when you walked

18  into the room with Dr. Stanton?

19          THE COURT:  Can you answer out loud?

20          THE WITNESS:  Yes.

21          THE COURT:  Thanks.

22          THE WITNESS:  Thank you.

23  BY MR. SMITH:

24  Q.   And what would he do?

25  A.   Well, if you failed a drug test, I know he dropped you.

1    Q.   To be fair, did that mean that the prescription already
2    had ten taken out?
3    A.   Yes.
4    Q.   So do you know if he dropped you, or do you know if --
5    A.   I don't know.
6    Q.   Okay.  When that prescription was sitting there in front
7    of him, did he, in your view, make any changes or alterations
8    to it?
9    A.   No.
10   Q.   Did he ever talk to you about the amounts you were
11   getting?
12   A.   I don't know if I asked or if he just volunteered and
13   told me that ten were dropped if you failed a drug test.  I'm
14   trying to remember, but...
15   Q.   So the best you can tell, he was indicating to you that
16   you had failed a drug test?
17   A.   Uh-huh.
18   Q.   Now, did he ever talk to you about addiction or abuse?
19   A.   Huh-huh, no.
20   Q.   Did he ever talk to you about where -- the missing pills
21   in your drug screens, anything like that?
22   A.   No.  If he had any questions, he would tell you to ask
23   Dr. Maccarone when he come back.
24   Q.   Did he explain to you why ten pills were taken off?  Why
25   10 instead of 5 or 15, anything about that number?

1   A.   No, not that I can recall.

2   Q.   Were you ever told that you were going to be tapered down

3   off of medication?

4   A.   No.

5   Q.   When the ten pills were taken off, was that off both

6   drugs?

7   A.   No.  I think it was off the roxies.

8   Q.   So looking back on it and what Gateway Medical Associates

9   was like when you went there, was that the type of medical

10  practice you would take your family to?

11  A.   Absolutely not.

12       MR. SMITH:  Your Honor, that's all the questions I

13  have.  Thank you.

14       THE COURT:  Thank you.

15     Mr. Strianse.

16       MR. STRIANSE:  Thank you, Your Honor.

17                       CROSS-EXAMINATION

18  BY MR. STRIANSE:

19  Q.   Good morning, Ms. Abner.  I only have a few questions for

20  you this morning.

21       If I understand your testimony, you were established as a

22  patient at GMA by Dr. Maccarone; is that right?

23  A.   Yes, sir.

24  Q.   And you only started seeing Dr. Stanton when

25  Dr. Maccarone was out sick; is that a fair characterization?

1    A.    Yes, sir.

2    Q.    Now, when you presented yourself at GMA, you really had

3    some significant health issues; is that right?

4    A.    Yes.

5    Q.    You had been in that motor vehicle accident in 2017; is

6    that correct?

7    A.    Yes, sir.

8    Q.    And I think that you had low back pain; is that right?

9    A.    Yes.

10   Q.    You had a problem with your right foot as a result of

11   that accident?

12   A.    Yes, sir.

13   Q.    Do you remember Dr. Stanton prescribing for you something

14   known as a rocker-bottom shoe for your right foot?

15   A.    No, I don't remember.  I'm sorry.

16   Q.    Because you had problems with your foot and your ankle;

17   is that right?

18   A.    I remember Dr. Mac pulled it up for me one time.

19   Q.    Pulled what up for you?

20   A.    The shoes, where I could get the shoes, but I don't --

21   sorry.  I don't remember Stanton --

22   Q.    Do you remember Stanton giving you a prescription for the

23   rocker-bottom shoe?

24   A.    I don't remember it, but --

25   Q.    Okay.

1  A.   -- if it's there...

2  Q.   But you didn't fill that prescription, I assume?

3  A.   No, sir.

4  Q.   Do you remember discussing the benefits of that shoe for

5  somebody that had a compromise or an ankle that was damaged?

6  A.   I don't recall.

7  Q.   That it would give some relief and relieve some of the

8  pressure when you walked?

9  A.   I don't remember.

10  Q.   You don't remember that at all?  Okay.

11       You also had seen Dr. Hoskins, you mentioned, before you

12  went to GMA; is that right?

13  A.   Yes.

14  Q.   And Dr. Hoskins is a physician here in London; is that

15  right?

16  A.   Yes.

17  Q.   And he did some radiology studies of you, some image

18  studies; is that right?

19  A.   Yes.

20  Q.   And you had some significant problems with your spine as

21  a result of that motor vehicle accident; is that right?

22  A.   Yes.

23  Q.   You had bulging discs; is that right?

24  A.   Yes.

25  Q.   Herniated disc?

1    A.   Yes.

2    Q.   Another herniated disc, and then as a result of that, you

3    developed arthritis in the joints?

4    A.   Yes.

5    Q.   So I want to make sure I understand your testimony.

6         When you traveled to Tennessee, was your sole purpose

7    just to try to mislead a doctor to get pills to use for

8    recreation?

9    A.   No, sir.

10   Q.   You had, and have, some very profound medical issues; is

11   that right?

12   A.   Yes, sir.

13   Q.   Did you feel like you needed medication like that to deal

14   with the pain?

15   A.   At that time, yes.

16   Q.   Okay.  Are you under the care of a physician now?

17   A.   No.

18   Q.   How are you dealing with pain now?

19   A.   It's rough.

20   Q.   I'm sorry?

21   A.   It's rough.  It's not easy.

22   Q.   You said it's rough?

23   A.   Uh-huh.

24        MR. STRIANSE:  Thank you, Ms. Abner.

25        THE COURT:  Mr. Smith.

1          MR. SMITH:  Thank you, Your Honor.

2                      REDIRECT EXAMINATION

3     BY MR. SMITH:

4     Q.   Ma'am, you were just asked a number of questions about

5     your problems, your health problems, including your leg?

6     A.   Yes.

7     Q.   Did you feel like the amounts of medications at Gateway

8     Medical Associates were appropriate to help you with what was

9     going on with you?

10    A.   No.  I asked him to switch me once on the Opanas to

11    something that didn't cost as much and wasn't as strong, and

12    he just raised the prescription.

13    Q.   Now --

14          THE COURT:  Which "he" are you talking about?

15          THE WITNESS:  Dr. Maccarone.

16          THE COURT:  Okay.

17          THE WITNESS:  I'm sorry.

18          MR. SMITH:  Thank you, Your Honor.

19    BY MR. SMITH:

20    Q.   Now, you were also asked a number of questions about

21    imaging studies done with a Dr. Hoskins?

22    A.   Yes.

23    Q.   Is he a doctor here more locally?

24    A.   Yes.  He would come to Manchester twice a month and do,

25    like, the car wrecks of the attorneys.

1   Q.   And I think you told us earlier, but what kinds of

2   medications -- what amount of medication did he write for you?

3   A.   Oh, he wrote me, like, 20 Percocet 5s three or four

4   times.

5   Q.   So the doctor who did all of the imaging that

6   Mr. Strianse just ran through, with all of the bulging discs

7   and all of the injuries, he wrote you oxy in those amounts?

8   A.   Yes.

9            MR. SMITH:   Your Honor, that's all the questions I

10  have.   Thank you.

11           THE COURT:   Thank you.

12       Anything --

13           MR. STRIANSE:   Can I ask one more question?

14           THE COURT:   Yes.

15                      RECROSS-EXAMINATION

16  BY MR. STRIANSE:

17  Q.   Dr. Hoskins, I assume, was treating you right in the

18  immediate aftermath of the wreck; is that right?

19  A.   Yes.

20           MR. STRIANSE:   That's all.

21           THE COURT:   Okay.   Is she finally excused?

22           MR. STRIANSE:   Yes.

23           MR. SMITH:   Yes, Your Honor.

24           THE COURT:   Okay.   Thank you, ma'am.   That concludes

25  your testimony.   You're free to go.

1       Let's confer briefly.

2       (Sidebar conference.)

3           THE COURT:  Can you hear, Mr. Strianse?

4           MR. STRIANSE:  Yes, sir.

5           THE COURT:  Can you hear, Mr. Smith?

6           MR. SMITH:  Yes, Your Honor.

7           THE COURT:  Okay.  Are we ready to go with the next

8   witness, or do we need to take a short break?

9           MR. STRIANSE:  I think Dr. Stanton is ready to have

10  this meeting, and I think we can reach an agreement on these

11  charts.

12          THE COURT:  Okay.  Fifteen minutes adequate?

13          MR. STRIANSE:  Fifteen minutes?

14          THE DEFENDANT:  Yes.

15          MR. STRIANSE:  Yes, sir.

16          MR. SMITH:  Your Honor, yeah, we'll move as fast as

17  we can.  In the event we agree to make some revisions, it may

18  just involve -- we'll hustle as fast as we can, but we'll

19  notify the Court, if that's acceptable.  But we will move as

20  fast as humanly possible.

21          THE COURT:  Yeah.  I mean, the jury is here, so I

22  want this minimal.  So let's move expeditiously.

23          MR. SMITH:  Absolutely.

24          THE COURT:  We'll take a break at this point.

25      (Sidebar conference concluded.)

1          THE COURT:  All right.  I hate bringing you in and

2     immediately taking a break.  We've got a little issue that I

3     think is going to add some efficiency down the road.  So we're

4     going to take a break now while we hash that out.  It should

5     be around 15 minutes.

6          So go ahead and take a break under the same rules you've

7     been under.  I'll excuse the jury now for that.  Thank you.

8          (The jury exited the courtroom at 8:57 a.m.)

9          THE COURT:  All right.  The jury has exited.  Get to

10    it, and we'll come back in as close to 15 minutes as we can.

11    Thank you.

12         (Recess from 8:57 a.m. until 9:14 a.m.)

13         THE COURT:  Thank you.  We're reconvened outside the

14    presence of the jury with all counsel and Dr. Stanton present.

15         Are we ready to go, Mr. Smith?

16         MR. SMITH:  Your Honor, sounds like we've reviewed

17    Government Exhibits 501 forward, and it appears we're on the

18    same page.  Defense counsel doesn't have objection.  I'm happy

19    to display those to the Court if you want to preview.  But

20    otherwise we'll just (indiscernible).

21         THE COURT:  I don't want to do more than we need to.

22    Mr. Strianse.

23         MR. STRIANSE:  We're prepared to go forward.

24         THE COURT:  And those are going to be admitted

25    without objection?

1    MR. STRIANSE:  Yes, Your Honor.

2    THE COURT:  And I would plan to give the same kind of

3  instruction I gave yesterday for a third category summary.

4    MR. SMITH:  I think so.  I think in fairness, one of

5  them is more a Category 1 summary.

6    THE COURT:  Okay.

7    MR. SMITH:  But I'm happy with an instruction.

8    THE COURT:  Category 1 I typically would not give any

9  instruction on.  So maybe you can help me.

10    Which one do you think is Category 1?

11    MR. SMITH:  Can you bring up 502 for the Court?

12    THE COURT:  502 would be the one?

13    MR. SMITH:  Yeah.  It's all on the screen, Your

14  Honor, as well, if that helps.

15    THE COURT:  So those are not in the record?

16    MR. SMITH:  Some of them are, but not all of them,

17  just given the volume.

18    THE COURT:  Okay.

19    MR. SMITH:  And so also considering them.

20    THE COURT:  What do you think, Mr. Strianse?  Should

21  I give it for all of them anyway?

22    MR. STRIANSE:  That may be easier.

23    THE COURT:  It won't hurt anything, I don't think.

24    MR. SMITH:  I have no objection.  And, again, we

25  have, for instance, like highlights, which kind of make it a

1  hybrid, if you will.  So I think it's fair to give the

2  instruction.

3          THE COURT:  All right.  I'll plan to do that.

4      And anything else to take up?

5          MR. SMITH:  No, Your Honor.  Thank you.

6          THE COURT:  Mr. Strianse.

7          MR. STRIANSE:  No, Your Honor.

8          THE COURT:  Okay.  Appreciate you guys working

9  through that cooperatively.  We'll bring the jury in.

10      (The jury entered the courtroom at 9:16 a.m.)

11          THE COURT:  Thank you.  Everybody can be seated.  We

12  are back from that break, and I appreciate the jury

13  accommodating that early break.  I do try to avoid that, but I

14  think in this instance, taking a little break then is going to

15  save us some time later.  So well worth it.

16      I think we're now ready to continue with the proof.

17  Mr. Smith.

18          MR. SMITH:  Your Honor, the United States calls

19  Monica Carter.

20          THE COURT:  Monica Carter.

21           MONICA CARTER, GOVERNMENT'S WITNESS, SWORN

22          THE WITNESS:  I do.

23          COURTROOM DEPUTY:  Thank you.

24          THE COURT:  Good morning.

25          THE WITNESS:  Good morning, sir.

1    THE COURT:  Do try to speak directly toward that mic

2  in a clear voice so we can hear your testimony.  That chair

3  won't move, but you can move the mic around to be sure we've

4  got a good capture of your voice.

5    If you first would tell me your name and spell your last

6  name.

7    THE WITNESS:  Monica Carter, C-A-R-T-E-R.

8    THE COURT:  Thank you.

9  Mr. Smith.

10    MR. SMITH:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12  BY MR. SMITH:

13  Q.  Ma'am, could you please introduce yourself to the jury

14  and just tell them what you do for a living?

15  A.  My name is Monica Carter.  I'm an intelligence analyst

16  for the Drug Enforcement Administration.

17  Q.  How long have you been employed?

18  A.  Since 2014 with the DEA.

19  Q.  In just general terms, can you tell them what an

20  intelligence analyst does?

21  A.  So with my last unit, DMX, what we did was we took

22  large -- voluminous amounts of information, documents,

23  records, and what we do is we organize them into charts,

24  graphs, and tables.

25  Q.  In the context of -- do you work on investigations

1    relating to potential diversion or improper prescribing of

2    controlled substances?

3    A.   Yes, that was my team.  When I was creating these

4    projects, I was part of the diversion team.

5    Q.   Let's start with, if we can, do you know what

6    prescription drug monitoring databases are?

7    A.   Yes.  They are kept by the -- each state.  And what they

8    are, are information on what prescriptions a patient receives.

9    So it has normally a patient's name, their address, their date

10   of birth, what pharmacy they went to, what prescription they

11   had, what -- what quantity of prescription they had.

12   Q.   In this case, relating to Gateway Medical Associates, did

13   you obtain prescription drug monitoring database data and

14   assemble it?

15   A.   Yes.  The diversion investigator sent it to our team.

16   And what I did was, with normal prescription monitoring

17   program records, if there's multiple, what we do is we combine

18   the Excel sheets into one.

19   Q.   Okay.  Just so we don't get ahead of ourselves --

20   A.   Okay.

21        MR. SMITH:  -- if we can, just for the witness only,

22   bring up Government Exhibit 300.

23        Can the Court see that?

24        THE COURT:  Yes.

25        MR. SMITH:  Okay.

1    BY MR. SMITH:

2    Q.   Ma'am, do you recognize what has been marked -- it's

3    electronic, but do you recognize what has been marked as

4    Government Exhibit 300?

5    A.   Yes.  These are the prescription monitoring records.

6    Q.   Okay.

7         MR. SMITH:  Your Honor, we would move to admit

8    Government Exhibit 300 at this time.

9         MR. STRIANSE:  No objection.

10        THE COURT:  Are these her records or records

11   produced?  Just explain the foundation for it.

12        MR. SMITH:  Fair enough, Your Honor.

13   BY MR. SMITH:

14   Q.   Ma'am, you were just explaining how that the

15   investigation team obtained prescription drug monitoring

16   database records from the state drug database; is that fair?

17   A.   Yes.  Investigator Sizemore, in all, does the records.

18   Q.   Okay.  What I'm getting at, and I think what the Court

19   wants to know, is the underlying data, where did that come

20   from?

21   A.   Yes.  It came from the state prescription monitoring

22   databases.

23   Q.   Okay.  And based on your familiarity in just the course

24   of your work since 2014, do states mandate that pharmacies

25   input this information into these databases?

1    A.   Yes.

2    Q.   So they're required by law to keep this information?

3    A.   Correct.

4    Q.   Okay.  So this is not a DEA-generated database; this is

5    information obtained from the state databases?

6    A.   That is correct.

7    Q.   Okay.  Did you take that information and then compile it

8    rather than three separate spreadsheets, just put it into one

9    spreadsheet?

10   A.   That is correct.

11   Q.   Did you alter or input any of the substance data in here;

12   for instance, a prescription date or the drug type or any of

13   that?

14   A.   No.

15   Q.   Okay.

16        MR. SMITH:  Your Honor, is that --

17        THE COURT:  All right.  Thank you.  I'll admit that

18   exhibit.  It can be displayed.

19   BY MR. SMITH:

20   Q.   Oh, one other point just -- I want to make sure that

21   we're clear on this.

22        In order to put the two -- the different spreadsheets

23   together, did you create additional columns in order to read

24   and navigate through the information?

25   A.   Yes.  All of the original records are in the yellow

1   headers, and all of the ones that I added are in the gray

2   headers.

3   Q.   So the additional gray headers, for instance, sometimes

4   you've changed a date into, like, for instance, a header 3-15

5   to March 15th, let's say?  Do you see that?

6   A.   Yes.

7   Q.   Okay.  The point is, you did not change or amend any of

8   the substantive information; this is just a data sorting

9   function?

10  A.   Yes.  All of the original data is still there and

11  unchanged.

12          THE COURT:  It's admitted.

13          MR. SMITH:  Okay.

14          THE COURT:  Thank you.

15          MR. SMITH:  All right.  Now, if we can publish that

16  to the jury, please, just to give them a sense of what it

17  looks like.

18      And, Rebecca, if you don't mind, can you just arrow down?

19  Just go about halfway through the spreadsheet and just clear

20  the track.  Just like halfway down.

21  BY MR. SMITH:

22  Q.   Now, based on your work and familiarity with prescription

23  drug monitoring database data, are these typically just, like,

24  one or two lines of data?

25  A.   No.  They're normally hundreds and thousands of lines.

1    Q.   Okay.  In addition to working with PDMP data in your

2    position, do you also help review medical records and

3    summarize them?

4    A.   Yes.  That is all we do in the diversion team.

5    Q.   Okay.  And in this case, were you asked to review and

6    summarize records obtained from Gateway Medical Associates?

7    A.   Yes, I was.

8    Q.   Okay.  Were you asked to create certain summaries of

9    information contained in those charts?

10   A.   Yes, I was.

11   Q.   Okay.

12        MR. SMITH:  Rebecca, we can go ahead and take that

13   down.

14   BY MR. SMITH:

15   Q.   Now, based on your review and familiarity with the

16   records in this case, can you give the jury a sense of how

17   long the medical records are, how big these documents are?

18   A.   Sometimes they were only one PDF with maybe 300 to 600

19   sheets of pages.  Sometimes there were five PDF longs, again,

20   with 300 to 600 pages.

21   Q.   So if I had those medical records sitting here in front

22   of you and I asked you to summarize for the jury, for

23   instance, all of the drug tests and then the office visits

24   contained in one patient's chart, is that feasible for you to

25   do sitting there?

1    A.   No, it's not possible.  It's thousands and thousands of

2    pages of documents.

3    Q.   Okay.  In this investigation, were you asked to do

4    something like I just described, which is look at the medical

5    records and identify failed drug screens and corresponding

6    office notes?

7    A.   Yes, I was.

8    Q.   Okay.  And other pertinent information?

9    A.   Yes.

10   Q.   Did you, from the medical records, then create certain

11   summary charts to identify what is in those charts in a more

12   readable format?

13   A.   Yes, I did.

14   Q.   Okay.  And did you prepare those?

15   A.   Yes.

16   Q.   And to the best of your knowledge and efforts, are those

17   accurate representations of what is in the medical records

18   themselves?

19   A.   Yes, they are.

20        MR. SMITH:  Okay.  If we can, let's bring up first

21   Government Exhibit 501A.  Okay.  And just for the witness.

22   BY MR. SMITH:

23   Q.   Ma'am, what is Government Exhibit 501A?

24   A.   They are Lisa Waynick's overview.

25   Q.   And when you say "overview," can you just describe, in

1    general terms, for the Court, what's meant by that?

2    A.   It includes a timeline of failed drug tests, failed drug

3    notes, dismissal notifications, and prescriptions from

4    Stanton.

5    Q.   Okay.  And because this case involves just Dr. Stanton at

6    this point, were you focusing on Dr. Stanton's prescriptions

7    and office visits when you prepared this summary?

8    A.   Yes, I was focusing on Stanton.

9    Q.   Okay.  So to be clear, do you have every single detail

10   from every medical record notated on these timelines?

11   A.   No.

12   Q.   Okay.  Would you be able to read it if you did that?

13   A.   No.

14           MR. SMITH:  Your Honor, if we can at this time, we

15   would move to admit Government Exhibit 501A.

16           THE COURT:  Any objection?

17           MR. STRIANSE:  No objection.

18           THE COURT:  Thank you.  I am going to admit 501A.

19       I want to give you another mid-trial instruction.  And

20   this is very much like the one I gave yesterday on the summary

21   financial exhibit.

22       You are seeing certain summary evidence in the form of

23   the overview that's in front of you.

24       Do you have that up, Madam Clerk?

25           COURTROOM DEPUTY:  Not to them.

1          THE COURT:  Okay.  Let's pull that up so they can

2     see.

3          So you have this overview in front of you.  This summary

4     was admitted in evidence in addition to the material it

5     summarizes, because it may assist you in understanding the

6     evidence that has been presented.  But the summary is not

7     itself primary or independent evidence of the material it

8     summarizes and is only as valid and reliable as such

9     underlying material.  The weight of the summary, as with the

10    underlying summarized material, is a matter solely for you to

11    decide.

12         Now, there are going to be a series of records similar to

13    this.  I want you to think about this same instruction with

14    respect to all of the summary exhibits.  And so as an example,

15    it refers to a source up in the top right-hand corner.  That

16    Exhibit 115 is in evidence.  That is evidence, Exhibit 115.

17    Earlier admitted is the GMA record for Lisa Waynick.  And so

18    the summary is based on that underlying primary evidence.

19    Keep that in mind as you evaluate the proof.

20         All right.  That's admitted.  Mr. Smith, you can

21    continue.

22         MR. SMITH:  Thank you, Your Honor.

23    BY MR. SMITH:

24    Q.  All right.  Just to orient the jury, let's begin if we

25    can just blow up -- well, just giving an overview, there's a

1    line at the bottom that has different colors.

2        Can you explain to the jury what is reflected in that

3    line at the bottom of this exhibit?

4    A.   It's the year.  So, for instance, the brown is all of

5    2017, and the pink is all of 2018.  And then within it is the

6    number of drug tests failed in that year.  So, for instance,

7    in 2017, there was seven failed -- or seven failed drug tests,

8    and in 2018, there was ten total failed drug tests.

9    Q.   Okay.  And in some instances, with this chart and

10   additional ones we're going to review, did the years then go

11   on to the next page?

12        MR. SMITH:  So can we go to the next page?

13        THE WITNESS:  Yes.  So the second page is the rest of

14   2018, and then the green is 2019.

15   BY MR. SMITH:

16   Q.   Okay.  And just carrying forward?

17   A.   And forward, the blue is 2020.

18   Q.   And is this intended to summarize the time period, where

19   available, of 2016 to 2020?

20   A.   Correct.

21        MR. SMITH:  Okay.  If we can go back to page 1.

22   BY MR. SMITH:

23   Q.   So that's the timeline at the bottom reflecting year.

24        Can you tell the jury a little bit about the information

25   that's contained above what each of those -- not individually,

1    but just generally, what each of those entries mean?

2    A.   So the -- for instance, the first one, the January 6

3    "failed UDT," that means urine drug test.  So that's when it

4    was sent off to a lab.

5         And then on August 8th, you see "failed UDS."  That's

6    urine drug screen.  That means they were -- they conducted a

7    drug screen in the -- in the office during that day.

8    Q.   Okay.

9    A.   And then there's also, on September 25th of 2018, there

10   is a failed urine drug note.  And that's when inside the

11   encounter notes or the patient records, it was noted inside

12   that -- that -- that was the date.

13   Q.   Okay.  So if we were to open up the medical records,

14   there would be various kinds of information, including urine

15   drug testing results; is that fair?

16   A.   Yes.

17   Q.   And that later on, there may be what you've called

18   encounter notes or office notes?

19   A.   Yes.

20   Q.   Okay.  Is the idea that you have taken those pieces and

21   put them into a timeline so the jury can see them here?

22   A.   Yeah, correct.

23   Q.   One final note.  When you used the term "UDT" on this

24   chart, the date that is displayed there, what is that date?

25   A.   So that is the date that the office receives the results

1   back.  So, for instance, the first one, January 6, the office

2   visit was probably three to five days earlier.  So it might

3   have been January 3rd that the actual office visit was.

4   Q.   Okay.  So if that's when the office visit was, was it

5   your understanding that's when the specimen would have been

6   collected and sent out to the lab?

7   A.   That is correct.

8   Q.   And then what you report is the date when, according to

9   the record, it was available back to the office?

10  A.   That is correct.

11  Q.   Okay.  So with that background in mind, just to orient

12  the jury --

13          MR. SMITH:  Can we blow up just 2017, Rebecca, if

14  that's possible?

15  BY MR. SMITH:

16  Q.   And if I could ask you to do this for every line in every

17  exhibit, but just to start out with, can you just walk through

18  2017 and explain to the jury what it is we're looking at, at

19  this portion of the summary?

20  A.   So on January 6, the office received the results of a

21  failed urine drug test, or the patient was positive for

22  norbuprenorphine.  So they were not -- they were not

23  prescribed norbuprenorphine, and it was in their system.  On

24  the --

25  Q.   Not to interrupt you, but next to it, you have the

1    notation, in this and other charts, that says, "First UDT."

2         Can you explain to the jury what you mean by that?

3    A.   That was the patient's first visit.

4    Q.   Okay.  So this patient, when they showed up to the office

5    at this point in time, in 2017, the first UDT that was taken

6    was positive for norbuprenorphine?  That's what you're saying

7    there?

8    A.   That is correct.

9    Q.   All right.  Please continue.

10   A.   The -- on May 15th, the office received results that --

11   another failed drug test, and they were -- the patient was

12   positive for Morphine.  Again, they were not prescribed

13   morphine, and they had it in their system.

14        On July 13th, there was another failed drug test for,

15   again, positive morphine and dextromethorphan.

16        On August 8th, there were -- there was another failed

17   drug test.  They were negative for oxycodone and oxymorphone,

18   meaning they were prescribed oxycodone and oxymorphone, and

19   they did not have it in their system.

20        On October 6, there was a failed in-house drug screen

21   where they were positive for benzodiazepines, or "benzos."

22   Q.   And, ma'am, you've used the abbreviation "benzos" there.

23        Could you explain?  Is that -- probably for space, but

24   can you explain that to the jury?

25   A.   It's a benzodiazepine.  So it could be a drug such as

1   alprazolam, which is Xanax.  Diazepam.  So it normally has a

2   "pam" at the end.

3   Q.   Okay.  Does it include drugs like Xanax and Valium and

4   Klonopin?

5   A.   Yes.

6   Q.   Okay.

7   A.   On November 11th, there was another failed drug test

8   for -- they were positive for fentanyl and morphine and

9   dextromethorphan.

10      And, again, on December 6, it was a failed maybe drug

11  screen, and they were positive for benzodiazepines.

12           MR. SMITH:  Okay.  If we could go back up.

13  BY MR. SMITH:

14  Q.   So that's in 2017.  And at the bottom, I think you've

15  already told us, but there's a notation reflecting the number

16  of urine drug screens that were inconsistent or failed that

17  year.

18      How many was that?

19  A.   In 2017, there was seven failed drug tests or screens.

20  Q.   Okay.  So that reference at the bottom counts what you

21  just discussed at the top?

22  A.   Correct.

23  Q.   Okay.  Moving forward into 2018, did this patient

24  continue to fail drug tests?

25  A.   Yes.

1    Q.   Okay.  Can you describe for the jury some of the drugs

2    that this individual tested positive for or negative for?

3    A.   On January 9th, there was a failed drug test.  They were

4    positive for fentanyl and alprazolam, as well as

5    dextromethorphan.  And they were negative for their prescribed

6    drug oxycodone.  So there's negative for noroxycodone

7    metabolite.

8    Q.   Okay.  And if we move forward into August 30th, for

9    instance.

10   A.   On August 30th, there was a failed drug test.  They were

11   positive for fentanyl, and they were negative for noroxycodone

12   metabolite.

13   Q.   Okay.  Was there a patient encounter note in September of

14   that year that referenced a patient encounter about the drug

15   screens?

16   A.   Yes.  On September 25th, there was a drug note in the

17   patient records, and it said, "Patient suspects her daughter

18   might have somehow put medication or fentanyl in her food,

19   drink."

20        MR. SMITH:  Okay.  Now, if we can zoom back out,

21   Rebecca.

22   BY MR. SMITH:

23   Q.   So in total, how many drug tests had this patient failed

24   in 2018?

25   A.   In 2018, they failed ten failed drug tests.

1      MR. SMITH:  Rebecca, can we go to the next year,

2 please.  All right.  Let's go to the end of 2018, if we can.

3      Are we able to get the full left side of the page there?

4 Thank you.

5 BY MR. SMITH:

6 Q.   Okay.  I think one item we haven't discussed yet, is

7 there's a notation that has a date, and it says the words

8 "Stanton RX."

9      Can you explain what that means?

10 A.   Yes.  In the pink boxes, those refer to the prescriptions

11 that Stanton wrote.

12 Q.   Okay.  And chronologically, can you explain to the jury

13 how you tried to arrange those prescriptions vis-à-vis the

14 drug test?

15 A.   So if they had a failed urine drug screen, which was

16 taken that day, it was the urine drug screen and then the

17 prescription, if Stanton wrote a prescription.  If it was a

18 drug test where they received the records after the visit, it

19 was -- it would be Stanton's drug -- or Stanton's RX, for

20 prescription, followed by the drug test.

21 Q.   So did you try to put these in chronological order as

22 best you could?

23 A.   Yes.

24 Q.   Okay.  But, for instance, there's two entries there for

25 November 20th, and that is why you elected to put one before

1    the other on November 20th?

2    A.   That is correct.

3    Q.   All right.  Let's talk about that particular point in

4    time.

5        Based on your review, is this the first time that

6    Dr. Stanton prescribed a controlled substance to this patient?

7    A.   Yes, on November 20th.

8    Q.   And at this point, approximately how many urine drug

9    tests had the patient failed before this prescription?

10   A.   Like eight.

11   Q.   That year?

12   A.   Yes.

13   Q.   And then how many the previous year?

14   A.   Seven, I believe it was.

15   Q.   So how many is that in total?

16   A.   Fifteen.

17        MR. SMITH:  Now, just to give the jury a sense of how

18   the summary works, Rebecca, if we can, bring up Government

19   Exhibit 115.

20       Your Honor, this has been previously admitted.  We seek

21   permission to publish it to the jury.

22        THE COURT:  Yes, you may.

23        MR. SMITH:  Okay.

24   BY MR. SMITH:

25   Q.   Ma'am, what is Government Exhibit 115 here?

1   A.   They are the patient records.

2   Q.   And do you have a rough idea of how many pages this is?

3   A.   Around 300 to 500.

4   Q.   Okay.  As described earlier, are the urine drug test

5   results and office notes kind of sprinkled throughout the

6   file?

7   A.   Yes, that's correct.

8   Q.   And just to be candid, is it sometimes difficult to find

9   the ordering of the files, based on your review?

10   A.   Yeah.  Sometimes the drug tests were first and then

11   followed by encounter notes, followed by more encounter notes,

12   followed by more drug tests.

13   Q.   So I don't want to whipsaw you too much, but if we can

14   just look at a couple of specific pages.

15         We saw in that summary chart, in November of 2018, there

16   was a reference to urine drug screen; is that right?

17   A.   Yes.

18            MR. SMITH:  Okay.  If we can, let's bring up page 398

19   of this exhibit.

20   BY MR. SMITH:

21   Q.   Okay.  Is this the underlying urine drug screen that is

22   then summarized on the chart?

23   A.   Yes.

24   Q.   Okay.  And can you, just very briefly, walk the jury

25   through your review of this document and why you put what you

1    put into the summary chart?

2    A.    So these were the in-house urine drug screens, and then

3    on this date, it circled "benzodiazepines, yes."  So they were

4    positive for benzodiazepines.

5          And then you could see in the bottom, "oxycodone."  It

6    says, "no."  So that means they were negative for oxycodone.

7    Q.    Now, to determine whether something is an expected result

8    or unexpected result, would you have to, in reviewing this,

9    reference another piece of information?

10   A.    Yes.  I would either have to look at the prescription

11   monitoring records Excel sheet or the KASPER printout that was

12   also in the -- in the patient records.

13   Q.    Okay.  And is the idea there that you want to know, in

14   your mind, what drugs should be in the patient's system, and

15   then you look at this paper to see what drugs are in the

16   patient's system?

17   A.    That is correct.

18   Q.    Okay.  So if we look at --

19                MR. SMITH:  Go to page 714, please.

20   BY MR. SMITH:

21   Q.    So first in this case, were you able to review the KASPER

22   or PDMP information --

23   A.    Yes.

24   Q.    -- in the patient chart itself?

25   A.    That is correct.

1      MR. SMITH:  All right.  If we could pull up kind of

2   the bottom half.

3   BY MR. SMITH:

4   Q.   All right.  So we're looking at a drug screen that

5   happened in November.  So November 20, 2018.

6      At that point in time, according to this record, what

7   drugs should be in the patient's system?

8   A.   What should be in their system was -- was what was

9   prescribed or filled on October 27, 2018, which was

10  oxymorphone as well as oxycodone.

11  Q.   Okay.  And if we --

12      MR. SMITH:  Just go back out to that record.

13  BY MR. SMITH:

14  Q.   At this point in time, do these records list the MME, or

15  morphine equivalent, the patient is on?

16  A.   Yes.  It's the -- it was 150.

17  Q.   Okay.  Does this page also appear to bear a handwritten

18  signature?

19  A.   Yes.

20  Q.   Okay.  Now, if we go back to -- so that -- you've told us

21  those are the drugs that should be in the system.

22      And just very briefly, what are those?

23  A.   Oxymorphone and oxycodone.

24      MR. SMITH:  Okay.  Now, let's go back to page 398, if

25  we can.

1   BY MR. SMITH:

2   Q.   Okay.  What was in the patient's system?

3   A.   Only benzodiazepines.

4   Q.   Okay.  So according to this note, was there any oxycodone

5   or oxymorphone based on that urine drug screen?

6   A.   There was not.

7   Q.   Okay.  And the drug that is positive, the benzodiazepine,

8   based on your review of the record, was there an active

9   prescription for that?

10  A.   No, there was not.

11  Q.   Okay.

12       MR. SMITH:  So if we then return to Government

13  Exhibit 501A.  Can we go back to that slide?

14  BY MR. SMITH:

15  Q.   So walk us through, then, chronologically, what happens

16  with that background in mind?

17  A.   So, again, we see the failed urine drug screen, as I

18  mentioned.  You were positive for benzodiazepines and negative

19  for oxycodone and oxymorphone.

20       And then on that same day, Stanton prescribed oxycodone,

21  15 milligrams, 80, 80 pills; and then oxymorphone, 15

22  milligrams, 60 pills; as well as gabapentin, 120 pills.

23  Q.   And what about the next month?

24  A.   On December 18th, Stanton prescribed oxycodone, 15

25  milligrams, 80 pills; oxymorphone, 15 milligrams, 60 pills; as

1   well as gabapentin 120 pills.

2   Q.   Based on your review of the records, were each of these

3   prescriptions for quantities for a full 30 days, a full month?

4   A.   Yes.

5   Q.   Okay.  And based on your review, was there any changes in

6   the quantities or dosages?

7   A.   No.

8   Q.   So there's the failed drug screen in-house there on

9   November 20th, and the next two prescriptions were for full

10  months' quantities unchanged?

11  A.   Correct.

12  Q.   Now, at that point, of November 20, 2018 -- sorry, in

13  December of 2018, did it appear that there was a urine drug

14  test collected that day?

15  A.   Yes.  Most likely on December 18th, there was a urine

16  drug test that was completed.

17  Q.   And what did that urine drug test show?

18  A.   That the -- the patient failed.  They were positive for

19  fentanyl, and they were negative for noroxycodone metabolite.

20  Q.   And when you say "noroxycodone metabolite," can you just

21  explain the significance of that or why you noted it?

22  A.   Because under the drug screen for the labs, it could say

23  "oxycodone and noroxycodone," which -- which is part of it,

24  and it would say "negative."

25       MR. SMITH:  Okay.  So briefly, if we can go back to

1    Government Exhibit 115 and go back to page 395 -- or two --

2    page 395.  Okay.  We can blow that up for the witness.  Thank

3    you.

4    BY MR. SMITH:

5    Q.   Okay.  Ma'am, is that the urine drug screen -- or urine

6    drug test that you referenced there?

7    A.   Yes.

8    Q.   Okay.  And just so the jury understands, there's a

9    collected and reported data at the top?

10   A.   Yes.

11   Q.   Is that what you were describing as far as the chronology

12   of what you listed in the report?

13   A.   Yes, that's correct.

14   Q.   And what date did you use?

15   A.   The reported date, November 21st.

16   Q.   Okay.  And then based on this report, what were the

17   inconsistent results?

18   A.   They were -- they were negative for noroxycodone and

19   positive for fentanyl.

20        MR. SMITH:  All right.  And if we can go now back to

21   Government Exhibit 501A, back to the summary.

22        Excuse me.  Well, that, but then also the first part of

23   2019, too.  That's perfect.

24   BY MR. SMITH:

25   Q.   Okay.  So we have this test that you just told us about

1    in December of 2018.

2        Is there an indication that this patient was seen again

3    in January, so the next visit after that test?

4    A.   Yes.  The next visit after that was January 17th.

5    Q.   Okay.  And does that office note contain any notations?

6    A.   Yes.  There was a note in that section that said, "Told

7    to not crush them," meaning oxycodone, "up and put them in her

8    urine."

9    Q.   Okay.  Is there any indication that that patient was

10   tested again in-house that day?

11   A.   Yes.  On January 17th, there was a failed drug screen for

12   January 17th.

13   Q.   So at this point, on January 17th, there had been the

14   preceding failed drug test in November, in December, and then

15   in-house on that day?

16   A.   Yes.

17   Q.   And that includes a positive drug test for fentanyl?

18   A.   Yes, on December 21st.

19   Q.   And positive drug test for benzodiazepines?

20   A.   Yes, on January 17th.

21   Q.   Okay.  And despite all of that, was there a prescription

22   written that day?

23   A.   Yes.  On January 17th, Stanton wrote a prescription for

24   180 oxycodone and 60 oxymorphone.

25   Q.   And just to be clear, can you look at the oxycodone and

1    say that number?

2    A.   Oxycodone, 15 milligrams, 80 pills.

3    Q.   Okay.  I think you misspoke and said 180.  I just wanted

4    to clear that up.

5    A.   Oh, sorry.

6    Q.   Okay.  So if we're looking at the prescriptions there

7    from November, December, and January, is there any change in

8    the dosage or amount?

9    A.   No.

10   Q.   Okay.  So with those failed drug tests, 30 days of

11   prescriptions were given for the same for each of those

12   months?

13   A.   Correct.

14   Q.   What about in February?

15   A.   In February, Stanton had -- or prescribed oxycodone, 80

16   pills; oxymorphone, 60 pills; gabapentin, 120 pills.

17   Q.   Now, on that February visit, who did it appear to you saw

18   the patient that day?

19   A.   Stanton.

20   Q.   Okay.  Was there a drug test that indicated whether the

21   patient had any illicit substances in their body at that

22   office visit?

23   A.   Yes.  On February 22nd, they received the results back

24   that there was a failed drug test, and they were positive for

25   heroin.

 1            MR. SMITH:  And, Rebecca, if we can move over four at

 2   a time.  You can just arrow over.  Perfect.

 3   BY MR. SMITH:

 4   Q.    Okay.  So this patient's tested positive for heroin,

 5   tested positive for fentanyl, and a variety of other drugs; is

 6   that a fair summary?

 7   A.    Yes.

 8   Q.    Okay.  In total in 2019, how many drug tests did this

 9   patient fail?

10   A.    Eight.

11   Q.    Okay.  And moving forward, did this patient continue

12   getting prescriptions from GMA?

13   A.    Yes.

14            MR. SMITH:  Can we zoom back out?

15   BY MR. SMITH:

16   Q.    Now, there's another type of note or notice that you

17   notated in some of these records I don't think we've told the

18   jury about.

19         Can you explain what is depicted there with the date

20   April 18th on it?

21   A.    These were dismissal notices that were also in the

22   encounter notes.

23   Q.    And can you just describe what it is that you saw when

24   you looked at the office note?

25   A.    So sometimes there would be a dismissal notice or just

1    texting.  For instance, on April 18th, patient is being

2    dismissed due to having illegal substances in multiple urine

3    and oral drug screens.  Patient gets one more visit.

4    Q.   Now, did you see these dismissal notices with some

5    frequency in your review of all of these medical records?

6    A.   Yes.

7    Q.   And how many medical records did you review,

8    approximately, do you think?

9    A.   In total, maybe like 50 to a hundred.

10   Q.   Okay.  Now, this dismissal notice, did you see instances

11   where that same language appeared to have carried over in to

12   subsequent office notes?

13   A.   Yes.

14   Q.   Was that a somewhat common thing that you saw, based on

15   your observations?

16   A.   Yes.

17   Q.   During those time periods where a patient is getting the

18   dismissal notices, based on your evaluation, did the patient

19   still continue getting prescriptions?

20   A.   Yes.

21   Q.   For instance, this patient, can you walk the jury through

22   the chronology of what happened at GMA after that first

23   dismissal notice?

24   A.   They were -- there was a failed drug test on April 20th.

25   They were positive for heroin and morphine.

1          On May 15th, Maccarone prescribed oxycodone and

2     oxymorphone.  Again, the patient continued to be seen.

3          On May 15th, there was a second dismissal notice.  Again,

4     it said, "Patient" is -- is -- "is being dismissed due to

5     having illegal substances in multiple urine and oral drug

6     screens.  Last visit."

7     Q.   Okay.  So that April 18th dismissal notice, do you have

8     an indication of which doctor would have been seeing the

9     patient that day?

10    A.   It was Maccarone.

11    Q.   And you say that because you noted the instances of

12    Stanton's office visits?

13    A.   Yes.

14    Q.   Okay.  So by comparison, we have earlier failed drug

15    tests, for instance, on January 7th of 2017; December 21,

16    2018; and the other ones we talked about.

17         Did you see any indications of a dismissal by Dr. Stanton

18    for any of those drug tests?

19    A.   No.

20    Q.   If we go forward in time.

21         Did Dr. Stanton see this patient again later in 2019?

22    A.   Yes, on June 17th.

23    Q.   What drug test occurred leading up to that June 17th

24    visit?

25    A.   On May 20th, there was a failed drug test.  They were

1   negative for oxymorphone and noroxycodone metabolite.

2       And on June 17th, there was a failed drug screen.  They

3   were positive for benzodiazepines.

4   Q.   Okay.  Now, did the records indicate that Dr. Stanton saw

5   the patient at that time period?

6   A.   Yes, on June 17th.

7   Q.   Okay.  What was the prescription that Dr. Stanton wrote?

8   A.   He prescribed oxycodone, 75 pills; oxymorphone, 60 pills;

9   and there was a gabapentin, 240, and there was a refill.

10  Q.   Okay.  So after all of the failed drug tests we just

11  talked about, the prescription for oxycodone is now at 75, 15

12  milligrams?

13  A.   Yes.

14  Q.   And if we flip back to -- just the page above, do you

15  remember what it was the year -- earlier in the year, or late

16  2018, when we talked about it?

17  A.   It was oxycodone, 80 pills.

18  Q.   Okay.  So there had been a grand total of reduction of

19  five oxycodone pills after all of these failed drug tests?

20  A.   Yes.

21  Q.   And to that point, if we look in 2019, the time period

22  before, do you see any indication of a Maccarone prescription

23  of May of 2019?

24  A.   Yes.

25  Q.   And what was that prescription for?

1    A.    Oxycodone, 75 pills; oxymorphone, 60 pills.

2    Q.    So if one of the doctors took 5 pills off, for whatever

3    reason, which doctor did that?

4    A.    Maccarone.

5    Q.    Let's carry forward, if we can.

6          You referenced earlier seeing -- I asked you a question

7    about seeing these dismissal notices with some frequency.

8          Is this an example of that in Ms. Waynick's file?

9    A.    Yes.

10   Q.    Okay.  Did that notice continue carrying forward for

11   several months in a row?

12   A.    Yes.

13   Q.    Did the patient continue failing drug tests through 2019?

14   A.    Yes.

15   Q.    Now, based on your review of these records, was there a

16   gap, a period of time, where the patient appears to have left

17   the practice?

18   A.    Yes, after September of 2019.

19   Q.    Okay.  When the patient came back to the practice in the

20   records, was that patient drug tested at her initial reentry?

21   A.    Yes.  For example, on September 4th, the patient

22   reestablished pain management after being dismissed for three

23   positive heroin drug tests.  And in that same visit, they were

24   positive for fentanyl.

25              MR. SMITH:  Now, if we can, just to step back,

1   Rebecca, if you can zoom back out.  Let's go to the first

2   page.

3   BY MR. SMITH:

4   Q.   In 2017, how many failed drug tests were there?

5   A.   Seven.

6   Q.   In 2018, how many failed drug tests were there?

7   A.   Ten.

8   Q.   So if we just keep counting, how many is that now?

9   A.   17.

10  Q.   Okay.  2019, how many failed drug tests were there?

11  A.   Eight.

12  Q.   So I hate to make you do math on the spot.  It's mean.

13  But can you just tell us --

14  A.   26.

15  Q.   17 plus 8?

16  A.   17 -- 25.

17  Q.   I told you it was mean.  I'm sorry.

18       Okay.  So 25 failed drug tests at this point, including

19  for drugs like heroin?

20  A.   Yes.

21  Q.   When that patient showed back up at this practice, after

22  roughly a year interval, what does this patient have in their

23  system?

24  A.   They had -- they were positive for fentanyl.

25  Q.   Did that patient receive a prescription that first visit?

1  A.   Yes, on -- they received their prescription on

2  September 8th for oxycodone, 90 pills; oxymorphone, 60 pills;

3  and gabapentin, 120 pills.

4  Q.   So that's now 26 failed drug screens, and this patient

5  got a prescription for oxycodone and oxymorphone from --

6  A.   Yes.

7  Q.   -- Dr. Stanton?

8  A.   Yes.

9  Q.   What about the next month?

10  A.   On October 6, Stanton prescribed oxycodone, 90 pills;

11  oxymorphone, 60 pills.

12  Q.   And was a send-out lab test done that day?

13  A.   Yes.

14  Q.   And what was in the patient's system on October 6?

15  A.   They were positive for heroin, fentanyl, and they were

16  negative for oxycodone and gabapentin.

17  Q.   Is that now 27 failed drug screens?

18  A.   Yes.

19  Q.   Did the patient continue -- so that's through the end --

20  into October of 2020?

21  A.   Yes.

22  Q.   27 failed drug screens?

23  A.   Yes.

24       MR. SMITH:  If we can, let's go to Government

25  Exhibit 501B.

1    Q.   Did you review the patient file of a patient named Misty
2    Brown?
3    A.   Yes.
4    Q.   Okay.  And what time period did those records begin,
5    based on your review?
6    A.   In 2019.
7    Q.   When that patient came to the office, was she doing a
8    drug screen?
9    A.   Yes.
10   Q.   And what was the result of that?  And I say "drug
11   screen."  I apologize.  I keep using that term
12   interchangeably.
13        But was she given a urine drug test?
14   A.   Yes.  She was -- she failed her first urine drug test.
15   She was positive for buprenorphine, oxymorphone, and
16   gabapentin.
17   Q.   And did she fail another drug test that year?
18   A.   Yes.  On September 9th, she failed another drug test.
19   She was positive for buprenorphine, oxycodone, oxymorphone.
20   Q.   And let me just stop you.
21        Did you prepare this summary in the same way you prepared
22   the other ones?
23   A.   Yes.
24   Q.   Okay.  And to the best of your knowledge, is it a true
25   and accurate depiction of what's in the medical records?

1    A.   Yes.

2         MR. SMITH:  Okay.  And before we go too much further,

3    Your Honor, I would move to admit Government Exhibit 501B.

4         THE COURT:  Any objection?

5         MR. STRIANSE:  No objection.

6         THE COURT:  That will also be admitted.

7    And I'll apply the same mid-trial instruction on the

8    summary consideration to 501B.  Any other 501 series that are

9    admitted, consider the same instruction, that it's summarizing

10   the underlying source material that's in evidence and is only

11   as reliable as that evidence.  That's for your consideration

12   as the jury.

13        Proceed.

14        MR. SMITH:  Okay.  If that's published to the jury,

15   so the jury can see it?  All right.

16   BY MR. SMITH:

17   Q.   Let's go into 2020, if we can.

18        Did Dr. Stanton write prescriptions for this patient?

19   A.   Yes.

20   Q.   Did this patient test positive for any drugs in March of

21   2020?

22   A.   Yes, they failed a drug test.  They were positive for

23   fentanyl and buprenorphine, and they were negative for

24   phentermine.

25   Q.   Did the patient receive any prescriptions in March of

1   2020?

2   A.   Yes.  On March 30th, Stanton wrote a prescription for

3   oxymorphone, 60 pills; oxycodone, 95 pills; gabapentin, 90

4   pills.

5   Q.   Okay.  Did this patient fail any other drug tests in that

6   time period?

7   A.   Yes.  The next month, they failed a -- or that visit,

8   they received results back on April 2nd.  They were positive

9   for methamphetamine, and they were negative for phentermine.

10  Q.   And so at this point, this patient has tested positive

11  for buprenorphine, fentanyl, and meth?

12  A.   Yes.

13  Q.   I don't want to have to ask you to read it, but did this

14  patient continue receiving prescriptions from Gateway Medical

15  Associates?

16  A.   Yes.

17  Q.   Did that include prescriptions from Dr. Stanton?

18  A.   Yes.

19  Q.   Okay.  Let's fast-forward to the next part of 2020.

20       In August of 2020, did this patient fail any drug tests?

21  A.   Yes.  They failed again for -- they were positive for

22  methamphetamine.

23  Q.   Okay.  And the next ensuing visit, did the patient

24  receive any prescriptions?

25  A.   Yes.  On September 1st, Stanton wrote a prescription for

1    oxycodone and oxymorphone and gabapentin.

2    Q.   Okay.  Was there a urine drug test collected that day?

3    A.   Yes.

4    Q.   And what was in the patient's body when she was at the

5    practice that day?

6    A.   In her system was methamphetamine and oxazepam.

7    Q.   Okay.  So both August and September, Misty Brown,

8    according to this record, was on methamphetamine when she came

9    into Gateway Medical Associates?

10   A.   Yes.

11   Q.   And she received a prescription from Dr. Stanton?

12   A.   Yes.

13   Q.   In total, in this time period, how many urine drug tests

14   did Misty Brown fail?

15   A.   Seven.

16   Q.   That's 2020?

17   A.   Yes.

18   Q.   How many did she fail in 2019?

19   A.   Two.

20   Q.   So how many total?

21   A.   Nine.

22   Q.   Did you also review the file for a gentleman named Shawn

23   Brown?

24   A.   Yes.

25            MR. SMITH:  Can we bring up Government Exhibit 501C,

1    please?

2    BY MR. SMITH:

3    Q.   Ma'am, what is 501C?

4    A.   It is Shawn Brown, the review.

5    Q.   Did you prepare this summary based on Shawn Brown's

6    medical chart recovered in the underlying investigation?

7    A.   Yes.

8    Q.   And is it a true and accurate summary of items in that

9    record, to the best of your knowledge?

10   A.   Yes.

11        MR. SMITH:  Your Honor, we move to admit Government

12   Exhibit 501C.

13        THE COURT:  Any objection?

14        MR. STRIANSE:  No objection.

15        THE COURT:  That will also be admitted, part of the

16   501 suite, under the same instruction I've given you on

17   summaries.

18        MR. SMITH:  Thank you, Your Honor.

19        THE COURT:  It can be displayed.

20        MR. SMITH:  If we could look at the first part of

21   2019 there.

22   BY MR. SMITH:

23   Q.   Was there an encounter and prescription in late January

24   of 2019?

25   A.   Yes.  On January 31st, Stanton prescribed oxycodone and

1    oxymorphone and gabapentin.

2    Q.    Okay.  And based on your review, was there a urine drug

3    test that was collected and then sent out that day?

4    A.    Yes.  It was on February 5th.  They received the records

5    back for a failed drug test.  It was -- the patient was

6    positive for hydromorphone, hydrocodone, oxazepam, alprazolam,

7    and clonazepam.

8    Q.    Now, based on your review of records, was there an active

9    prescription as of the date of collection for those drugs?

10   A.    No.

11   Q.    So if the jury heard any suggestion earlier in this trial

12   that somehow Shawn Brown's initial drug test was because of an

13   active prescription, at the time he walked into that clinic,

14   is that correct based on your review of records?

15   A.    I'm sorry.  Could you repeat the question?

16   Q.    Sure.  If it had been suggested that Shawn Brown's drug

17   test there was not a failure because it was just testing

18   positive for the drugs that he had an active prescription for

19   from a previous clinic, would that be accurate?

20   A.    Yes.  I would know because I looked at the KASPER report

21   to see if he had any active prescriptions.

22   Q.    And did he?

23   A.    No.

24   Q.    So is that a failed drug test?

25   A.    Yes.

1    Q.   Okay.  So that's February.

2         Did the patient return in March?

3    A.   Yes.

4    Q.   And was this the next encounter with the patient?

5    A.   Yes.

6    Q.   And was there a greater than 30-day interval there?

7    A.   Yes.

8    Q.   Okay.  What did the patient receive on that day?

9    A.   Oxycodone, oxymorphone, and gabapentin.

10   Q.   Did this patient fail any other drug tests in 2019?

11   A.   Yes.  On June 27th, they failed a drug screen.  They were

12   negative for oxycodone and oxymorphone.

13   Q.   On August 3rd?

14   A.   They failed a drug test.  They were positive for

15   buprenorphine.

16        And then on December 1st, they failed another drug test.

17   They were negative for noroxycodone metabolite.

18   Q.   Now, was there a note in August of 2019 about this

19   patient's either behavior or poor representations to the

20   clinic?

21   A.   Yes.  On August 29th, there was a note in the patient

22   records that said he -- or "The patient accidentally took the

23   Suboxone.  He thought he took his heartburn medication."

24   Q.   Okay.  You mentioned that in December, there's a negative

25   for the oxycodone metabolite, noroxycodone?

1   A.   Yes.

2   Q.   Was there a corresponding office note for the next time

3   the patient was in the office?

4   A.   Yes.  On December 27th, there was a note that said,

5   "Positive for crush medication.  No metabolites."

6   Q.   Okay.  So that's in December of 2019, and that's what the

7   office note said.

8        Did the patient return in January of 2020?

9   A.   Yes, on January 29th.

10  Q.   And what did the patient receive that day?

11  A.   Stanton prescribed oxycodone and oxymorphone.

12  Q.   What is the milligrams of oxymorphone at this point?

13  A.   Oxymorphone -- or oxycodone, 30 milligrams; and

14  oxymorphone, 20 milligrams.

15  Q.   Okay.  So it's oxy, 30 milligrams, by this point in time?

16  A.   Yes.

17  Q.   And if we go back to early 2019, what was the milligrams

18  for this patient?

19  A.   On January, it was oxycodone, 10 milligrams; and -- and

20  oxymorphone, 7.5 milligrams.

21  Q.   And if we go back down.  So that was 10 milligrams and

22  7.5, respectfully.

23       By this point in time, what is the patient on?

24  A.   30 milligrams and 20 milligrams.

25  Q.   Okay.  Now, as time moves forward, does this patient fail

1   any other drug tests?

2   A.   Yes.  On April 6th, they failed the drug test.  They were

3   positive for methamphetamine, hydromorphone, and tramadol.

4   Q.   And did the patient receive a prescription the next

5   month?

6   A.   Yes.

7   Q.   Or that month.  I'm sorry.  After that drug test came

8   back?

9   A.   Yes.  On April 28th, Stanton prescribed oxycodone,

10  oxymorphone, and gabapentin.

11        MR. SMITH:  If we zoom back out for that year.

12  BY MR. SMITH:

13  Q.   In total -- did the patient fail one more drug test in

14  September of that year?

15  A.   Yes.  In September 24th, they failed the drug test.  They

16  were positive for hydromorphone and morphine.

17  Q.   Okay.  If we can, let's take a look at another patient.

18        MR. SMITH:  Can we bring up Government Exhibit 501D?

19  BY MR. SMITH:

20  Q.   Ma'am, do you recognize 501D?

21  A.   Yes.  It is Donald Cozart's overview.

22  Q.   And was this prepared in the same fashion as you prepared

23  the other summary charts?

24  A.   Yes.

25        MR. SMITH:  Your Honor, move to admit Government

1  Exhibit 501D.

2          THE COURT:  Any objection?

3          MR. STRIANSE:  No objection.

4          THE COURT:  Thank you.  That'll be admitted, may be

5  displayed, and is subject to the same summary evidence

6  instruction I've given.

7  BY MR. SMITH:

8  Q.   Okay.  If you can, does this patient -- when does this

9  timeline start?  What point in time?

10 A.   2017.

11 Q.   And what was in that patient's body, according to that

12 first urine drug test?

13 A.   They were positive for oxymorphone.

14 Q.   And was that an expected positive?

15 A.   No.  They did not have a prescription for oxymorphone.

16 Q.   Okay.  We have a report here of something we that haven't

17 seen in some of the other summaries.

18      What is noted in July of 2018?

19 A.   In the patient's encounter notes for that visit, there

20 was a note that said, "Patient reported medication was

21 stolen."

22 Q.   Okay.  And in 2018, can you walk us through whether there

23 were any failed drug tests?

24 A.   Yes.  On August 21st, the patient failed.  They were

25 positive for heroin, and they were negative for noroxycodone

1    metabolite.

2         On September 17th, they failed again.  They were, again,

3    positive for heroin, morphine, and codeine, and they were

4    negative for oxymorphone.

5    Q.   Did those dismissal notices you've told us about, did

6    those start popping up in the patient file throughout this

7    time?

8    A.   Yes.

9    Q.   Did that include in October and November?

10   A.   Yes.

11   Q.   So the patient failed a drug test.

12        Patient had heroin in their body in August, September,

13   October of 2018?

14   A.   Yes.

15   Q.   Okay.  What about the next month, in November?

16   A.   In November, there was another dismissal notice.

17   Q.   And was there a drug test --

18            MR. SMITH:  If we go to the next page.

19   BY MR. SMITH:

20   Q.   Was there another drug test in November?

21   A.   Yes.  The patient failed again.  They were positive for

22   heroin, fentanyl, and morphine.

23   Q.   Okay.  So there's positive drug tests in August,

24   September, October, and November; is that correct?

25   A.   Yes.

1    Q.   And do each of those have heroin and other drugs?

2    A.   Yes.

3    Q.   Okay.  After those four months in a row of positive drug

4    tests for heroin, did the patient come in on December of

5    2000 --

6    A.   Yes, on December 6th.

7    Q.   And did the patient receive a prescription?

8    A.   Yes.  Stanton prescribed oxycodone, 80 pills, and

9    oxymorphone, 60 pills.

10   Q.   Okay.  Did the patient come back in January?

11   A.   Yes.  On January, Stanton prescribed oxycodone, 75 pills;

12   and oxymorphone, 60 pills; Gabapentin, 60 pills.

13   Q.   Based on your job, do you have a rough sense of MME?

14   A.   Yes.

15   Q.   Okay.  So do you know what oxycodone's MME is?

16   A.   I don't, not off the top of my --

17   Q.   Not off the top of your head?  Okay.  Fair enough.

18        So from December to January, it looks like there was a

19   five-pill reduction; is that fair, for the oxycodone?

20   A.   Yes.

21   Q.   And the oxymorphone stayed the same?

22   A.   Yes.

23   Q.   Did that patient have any drugs in their body in January

24   of --

25   A.   Yes.

1    Q.   -- 2019?

2    A.   Yes.  They failed a drug test.  They were positive,

3    again, for heroin, fentanyl, morphine, and codeine.

4    Q.   So according to the records, when this patient came into

5    GMA and saw Dr. Stanton on January 9th and got a prescription,

6    that they should have heroin, fentanyl, morphine, and codeine

7    in their system?

8    A.   Yes, that is correct.

9    Q.   Did the patient continue testing positive for fentanyl or

10   heroin?

11   A.   Yes.  On March 23rd, they failed another drug test.  They

12   were positive for fentanyl, morphine, and dextromethorphan.

13            MR. SMITH:  Okay.  If we can go to Government

14   Exhibit -- I'm sorry.  Sorry.  One more page.

15       If we can go back to (indiscernible).

16            THE COURT:  Still within 501D?

17            MR. SMITH:  We're still within 501D.

18            THE COURT:  Okay.

19            MR. SMITH:  Let's go, if we can, now back to January

20   through July of 2019.

21   BY MR. SMITH:

22   Q.   Okay.  We discussed this with another patient, but does

23   this patient appear to have a gap?  So they continued to be

24   seen and then had a gap in the records?

25   A.   Yes.  It looks like on -- after July 22nd, they were --

1    there was a gap.

2    Q.    And then when do they come back to the practice?

3    A.    They came back on January 16th of 2020.

4    Q.    And when that patient came back to the office in January

5    of 2020, were they drug tested?

6    A.    Yes.  They failed a drug test.  They were positive for

7    fentanyl.

8    Q.    So looking back in 2019, how many times was there some

9    notation that this patient had supposedly been dismissed from

10   this practice?

11   A.    Yes.  Before they were dismissed, they were positive

12   for -- positive for heroin seven times.

13   Q.    And how many dismissal notices did you count?

14   A.    Nine.

15   Q.    So nine dismissal notices for those drug tests.  This

16   patient comes back in January of 2020, after several months

17   away.

18         And what's in the patient's body when they show up on day

19   one in 2020?

20   A.    Fentanyl.

21   Q.    Moving forward, in 2020 -- so the next page, please --

22   did this patient continue to get prescriptions?

23   A.    Yes.  It looks like Stanton, on April, prescribed

24   oxycodone and oxymorphone; in May, oxycodone and oxymorphone;

25   and then in August, Stanton also prescribed oxycodone and

1    oxymorphone.

2    Q.  Did this patient continue testing positive for drugs like

3    fentanyl?

4    A.  Yes.

5    Q.  Was the patient negative, in some instances, for the

6    medications that they were getting from GMA?

7    A.  Yes.  On -- in May and June, they were negative for what

8    they were prescribed, oxycodone and oxymorphone.

9         MR. SMITH:  Okay.  Sorry about that, Rebecca.  If we

10   could now move and pull up Government Exhibit 501E.

11   BY MR. SMITH:

12   Q.  Ma'am, did you review the records for a patient named

13   Anita Fralix?

14   A.  Yes.

15   Q.  Did you prepare a summary consistent with how you've

16   described the other summary charts?

17   A.  Yes.

18   Q.  Okay.

19        MR. SMITH:  Your Honor, I would move to admit

20   Government Exhibit 501E.

21        MR. STRIANSE:  No objection.

22        THE COURT:  Thank you.  That'll be admitted as part

23   of the 501 series under the same summary evidence instruction.

24   It may be displayed.

25

1    BY MR. SMITH:

2    Q.   Where does this timeline start?  What point in time?

3    A.   In 2019.

4    Q.   Did the patient encounter Dr. Stanton and receive a

5    prescription in January of 2019?

6    A.   Yes.  Stanton prescribed oxycodone, oxymorphone, and

7    gabapentin.

8    Q.   What milligram of oxycodone was prescribed?

9    A.   30 milligrams.

10   Q.   And what count?

11   A.   Oxycodone, 30 milligrams, 90 pills; and oxymorphone, 10

12   milligrams, 60 pills.

13   Q.   Okay.  So on that visit, was there a test conducted to

14   see what was in the patient's body that day?

15   A.   Yes.  They had buprenorphine, morphine, oxazepam,

16   Lorazepam, alprazolam in their system, and they were negative

17   for oxycodone and oxymorphone.

18   Q.   Now, moving forward, did that patient come back in

19   February?

20   A.   Yes.  In February, they failed a urine drug screen.  They

21   were positive for opiates and benzodiazepines.

22   Q.   Did that patient receive a prescription on that day?

23   A.   Yes.  Stanton prescribed oxycodone, oxymorphone, and

24   gabapentin.

25   Q.   Okay.  Was there any change or alteration to the

1    prescriptions between January and February because of that

2    urine drug screen -- or urine drug screens?

3    A.    No.    Oxycodone and oxymorphone stayed the same.

4    Q.    Did the patient continue coming to Gateway Medical

5    Associates throughout 2019?

6    A.    Yes.

7    Q.    Did the patient test positive later in 2019 for heroin?

8    A.    Yes.    On May 19th, they were positive for heroin and

9    alprazolam, and they were negative for oxycodone and

10   gabapentin.

11   Q.    Was there a corresponding office note about the failed

12   drug test?

13   A.    Yes.    On June 13, in the patient records, it said,

14   "Suspects someone in her household is somehow putting illegal

15   substances or heroin in her food or drink."

16   Q.    Over the course of 2019, how many drug tests did this

17   patient fail?

18   A.    The patient failed 11.

19   Q.    And did the drug tests appear to happen monthly at GMA?

20   A.    Yes.

21   Q.    How many months are there in a year?

22   A.    12.

23   Q.    Okay.    How many drug tests did she fail?

24   A.    11.

25   Q.    Moving forward into 2020, and not to go back and walk

1    through all of them, but in this patient file, did you also

2    see that dismissal note, or dismissal notice, occur again?

3    A.    Yes.

4    Q.    Is this another example where it occurred time and time

5    again?

6    A.    Yes.

7    Q.    Okay.  So let's go into 2020.

8          Were there notations in 2020 that the patient had been

9    dismissed?

10   A.    Yes.

11   Q.    In these notations, does this dismissal frequently say

12   "last visit"?

13   A.    Yes.

14   Q.    Based on your review, was it the last visit?

15   A.    No.

16   Q.    Did Dr. Stanton prescribe any controlled substances to

17   this patient in 2020?

18   A.    Yes.  In March, he prescribed oxycodone, oxymorphone, and

19   gabapentin; and again in April, prescribed oxycodone,

20   oxymorphone, and gabapentin.

21   Q.    Did the patient test positive for any drugs in April of

22   2020?

23   A.    Yes.  In April, the patient failed a drug test.  They

24   were positive for fentanyl and negative for gabapentin.

25   Q.    And did that patient receive a prescription the next

1   month?

2   A.   Yes.  Stanton prescribed oxycodone, oxymorphone, and

3   gabapentin.

4   Q.   And then go through the end of 2020, if we can.

5        I don't want you to narrate all of them, but just

6   generally speaking, did this patient continue failing drug

7   tests during 2020?

8   A.   Yes.

9   Q.   And did that patient continue getting prescriptions from

10  GMA?

11  A.   Yes.

12  Q.   And does that include, for instance, a prescription in

13  June from Dr. Stanton?

14  A.   Yes.

15       MR. SMITH:  All right.  If we can, let's bring up

16  Government Exhibit 501F.

17  BY MR. SMITH:

18  Q.   What is 501F, ma'am?

19  A.   It is Cleavon Parchman's overview.

20  Q.   Same questions.  Did you review a patient file for

21  Cleavon Parchman?

22  A.   Yes.

23  Q.   Did you prepare a summary?

24  A.   Yes.

25  Q.   Okay.

1      MR. SMITH:  We move to admit Government Exhibit 501F,

2   Your Honor.

3      THE COURT:  Any objection?

4      MR. STRIANSE:  No, Your Honor.

5      THE COURT:  That'll also be admitted under the 501

6   suite rubric under the same instruction.

7      MR. SMITH:  Okay.  And if this could be published to

8   the jury.

9      THE COURT:  Yes, it may.

10  BY MR. SMITH:

11  Q.   Okay.  Ma'am, when does this timeline start?

12  A.   In April of 2020.

13  Q.   And is the time period for this patient file, is this one

14  a fairly condensed one, a fairly short period of time?

15  A.   Yes.

16  Q.   Okay.  So from April to August of 2020 -- sorry.  This is

17  another kind of math question, but roughly how many months is

18  that?

19  A.   Five.

20  Q.   In that time period, how many drug screens did this

21  patient fail?

22  A.   Four.

23  Q.   Starting in April of 2020, did this patient get any

24  prescriptions from Dr. Stanton?

25  A.   Yes.  In April, Stanton prescribed oxycodone, 15

1    milligrams, 90 pills; morphine, 15 milligrams, 30 pills;

2    gabapentin, 60 pills; and in May, oxycodone and morphine.

3    Q.   Okay.  Was this initial visit, were there notations

4    indicating whether the patient was -- my apologies.

5         Was there any notations indicating that the patient was

6    reestablishing care at this time, meaning they're coming back

7    to the facility?

8    A.   Yes.  The -- on April 25th, there was a note that the --

9    it was a patient's -- patient was reestablishing pain

10   management at the clinic.

11   Q.   Okay.  So this first time back, what did the patient have

12   in their body that first time?

13   A.   They were positive for heroin, fentanyl, oxycodone, and

14   oxymorphone.

15   Q.   And in that next month, so after the urine drug test came

16   back, the next visit, who did the patient see?

17   A.   Stanton.

18   Q.   And what did Stanton prescribe?

19   A.   Oxycodone, 90 pills; and Morphine, 30 pills.

20   Q.   Was there any change or adjustment to the prescription

21   between April and May?

22   A.   No.  Oxycodone and -- and morphine stayed the same.

23   Q.   So there's an intervening test for heroin; same

24   prescription?

25   A.   Yes.

1    Q.   Moving forward, do we see some of the same things we've

2    seen in the other notes, including a note about a patient's

3    justification for testing positive?

4    A.   Yes.  On June 18th, there was a note that the patient

5    states he was around his friends.  That might have involved

6    illicit substances.  And then again, on August 19th, there was

7    a note that said, "When asked, he or the patient says, 'He has

8    never done meth or fentanyl.'"

9    Q.   Okay.  But if we go back to the June urine drug test,

10   what was in that patient's body?

11   A.   The patient was positive for methamphetamine and

12   fentanyl.

13   Q.   Did the patient receive one of these -- well, what did

14   the patient receive?  Did the record contain an indication of

15   a dismissal?

16   A.   There was a dismissal notice, but the patient continued

17   to be seen.

18   Q.   And then in July, so the -- you talked about that June

19   urine drug test.  In July, did the patient come back to the

20   clinic?

21   A.   Yes.

22   Q.   And what did that patient receive?

23   A.   In July, Stanton prescribed oxycodone, morphine, and

24   gabapentin.

25   Q.   And is there a urine drug test indicating what was in

1    that patient's body on that day?

2    A.   Yes.  The patient was positive for methamphetamine and

3    fentanyl again.

4         MR. SMITH:  If we can, let's move to 501G.

5    BY MR. SMITH:

6    Q.   Okay.  Did you prepare a summary for -- a file for a

7    patient named Jennifer Vardaman?

8    A.   Yes.

9    Q.   And is that what's reflected in 501G?

10   A.   Yes.

11   Q.   And did you prepare that in the same manner that you

12   prepared the other summaries?

13   A.   Yes.

14        MR. SMITH:  Your Honor, I move to admit Government

15   Exhibit 501G.

16        THE COURT:  Any objection?

17        MR. STRIANSE:  No objection.

18        THE COURT:  That'll also be admitted under the same

19   process we've covered for all of the 501 summary exhibits.  It

20   may be displayed.

21        MR. SMITH:  Thank you, Your Honor.

22   BY MR. SMITH:

23   Q.   What time period is reflected in this summary?

24   A.   2019.

25   Q.   Now, in 2019, were there prescriptions written in the

1    early part of the year?

2    A.    Yes.

3    Q.    Okay.  And were those by Dr. Stanton?

4    A.    Yes.

5    Q.    Moving forward, we see a notation in July of that year

6    that I don't think we've encountered before on some of the

7    other notes.

8          So what does this say?

9    A.    It was -- there was a sheet in the patient file that's --

10   that had pill counts on it.  And then the -- it said, "In my

11   professional opinion, patient is not taking his medication as

12   prescribed."

13   Q.    So with all of the other files we've looked at today, did

14   you see any other indications of pill count results?

15   A.    There were a couple, but not many.

16   Q.    Okay.  And in all of the files here that you reviewed, I

17   think you told us it was probably in excess of 50, how often

18   did you see indications that pill counts were being done?

19   A.    Very few.  I think maybe, like, three to five patients.

20   Q.    And in this instance, was there a pill count done,

21   purportedly, in July?

22   A.    Yes.

23   Q.    And did the patient pass that pill count?

24   A.    No.

25   Q.    Did the patient get a prescription in July?

1    A.    Yes.  Stanton prescribed oxycodone, oxymorphone, and

2    gabapentin.

3    Q.    Let's fast-forward later in that year.

4          Did this patient begin testing positive for illicit

5    substances?

6    A.    Yes.

7    Q.    And what drugs were those?

8    A.    They're positive for fentanyl, and they were negative for

9    oxycodone and oxymorphone.

10   Q.    If we can fast-forward now into 2020.

11         Did this patient continue to be seen at Gateway Medical

12   Associates?

13   A.    Yes.

14   Q.    Okay.  Is there another note of what the patient was

15   representing to the office?

16   A.    Yes.  On January 2nd, there was a note in her patient

17   records that said she or the patient states, "She shares a

18   locker with a male coworker and suspects that he is tampering

19   with her medication."  We -- "We recommend patient getting a

20   safe for her" medication, "medications.  We discuss keeping

21   medications in original bottle and on her at all times if

22   outside the house."

23   Q.    So that's in January.  If we go back to late 2019,

24   there's a reference to the patient as talking about tampering

25   with her medications in a locker at work.

1      Is that what you just told us?

2  A.   Yes.

3  Q.   Okay.  What would that have to do with testing positive

4  for fentanyl?

5  A.   I don't know.

6  Q.   Now, if we go forward into 2020, did the patient take a

7  drug test that came back in February of 2020?

8  A.   In February, they failed a drug test.  They were positive

9  for buprenorphine, fentanyl, and hydrocodone.

10  Q.   Now, proceeding that February failed drug test, had the

11  patient received, according to the records, another one of

12  these dismissals?

13  A.   Yes, on January 30th.

14  Q.   And what --

15      THE COURT:  Mr. Smith, we might be at a break point.

16      MR. SMITH:  That's fine, Your Honor, yes.

17      THE COURT:  Okay.  Why don't we take a break at this

18  time.  We'll take about 20 minutes under the same instructions

19  you've been under throughout.  No discussion.  No reading,

20  exploration, research.  Do continue to keep an open mind as

21  the proof comes in.  I'll excuse the jury now with my thanks

22  for a 20-minute morning break.

23      (The jury exited the courtroom at 10:34 a.m.)

24      THE COURT:  Thank you.  The jury has exited.

25  Everybody can be seated.

1     Ms. Carter, you can step down.  Do come back after the

2     break to continue your testimony, and -- just a moment -- and

3     do avoid discussing your testimony during the break, okay?

4                THE WITNESS:  Yes, sir.

5                THE COURT:  Thank you, ma'am.  You can step outside

6     the courtroom.

7          How much longer do you anticipate, Mr. Smith?

8                MR. SMITH:  Your Honor, I will say because of

9     adjustments to trial, we plan on her going longer than was in

10    our witness list, but the delta is still significantly less

11    than our total projected time.  So I think we still have a

12    good while longer.  I would say at least another hour, but we

13    will move as fast as we can.

14               THE COURT:  All right.  Anything to take up,

15    Mr. Smith?

16               MR. SMITH:  No, Your Honor.

17               THE COURT:  Mr. Strianse.

18               MR. STRIANSE:  No, Your Honor.

19               THE COURT:  Okay.  We'll take that break and pick up

20    in 20 minutes.

21         (Recess from 10:36 a.m. until 10:53 a.m.)

22         (The jury entered the courtroom at 10:56 a.m.)

23               THE COURT:  Thank you so much.  We're back on the

24    record with all parties assembled, and the jury returned to

25    the courtroom after the morning break.  Thank you for that.

1    Ms. Carter is still on the witness stand.  You're still

2  under oath.

3    Do you understand that?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  And let's proceed onward with direct.

6         MR. SMITH:  Thank you, Your Honor.

7  BY MR. SMITH:

8  Q.  Ma'am, when we left off, I believe we were talking about

9  your review and summary of a patient file for a patient named

10  Jennifer Vardaman; is that correct?

11  A.  Yes.

12  Q.  And we had talked about, I believe, the year 2019, and

13  you had told us about a failed pill count, drug test, and now

14  we're in 2020.

15    Is that a fair bringing us current?

16  A.  Yes.

17  Q.  Okay.  In January of 2020, did this patient take a drug

18  test?

19  A.  Yes.  They failed the drug test in January.  They were

20  positive for cocaine, heroin, fentanyl, codeine, and morphine,

21  and they were negative for their prescribed oxycodone and

22  oxymorphone each.

23  Q.  Now, this came after -- this is when the drug test was

24  reported back; is that fair?

25  A.  Yes.

1  Q.   And this was all on the same date that the patient

2  reported the bit about tampering with her locker at work or

3  something to that effect?

4  A.   Correct.

5  Q.   Okay.  So on that date, that patient had the substances

6  you just talked about in her body?

7  A.   Correct.

8  Q.   And moving forward into February, did the patient fail

9  any drug test?

10 A.   Yes.  They failed in February.  They were positive for

11 buprenorphine, fentanyl, and hydrocodone.

12 Q.   And then the next time the patient came to the office was

13 when?

14 A.   On March 17th.

15 Q.   Did the patient receive a prescription on that date?

16 A.   Yes.  Stanton prescribed oxycodone, oxymorphone, and

17 gabapentin.

18 Q.   Did this patient have recurring dismissal notices in her

19 file?

20 A.   Yes.

21 Q.   Did the patient take a drug screen in March?

22 A.   Yes.  They failed.  They were negative for oxycodone and

23 gabapentin.

24 Q.   And the patient was negative for oxycodone in March.

25      In April, did the patient receive a prescription for

1   oxycodone?

2   A.   Yes.

3   Q.   From who?

4   A.   From Stanton.

5   Q.   Move forward to the urine drug test in April.

6        When was that reported back?

7   A.   On April 21st.

8   Q.   Okay.  So both March and April of that year, were there

9   negative tests for oxycodone?

10  A.   Yes.

11  Q.   Did that patient receive prescriptions in April and May

12  for oxycodone?

13  A.   Yes.

14  Q.   And who described in both of those instances?

15  A.   Both were by Stanton.

16       MR. SMITH:  Can we move one additional page down?

17  BY MR. SMITH:

18  Q.   Did this patient continue coming to GMA and receiving

19  prescriptions in 2020?

20  A.   Yes.

21  Q.   Did that include a June prescription from Dr. Stanton?

22  A.   Yes.  In June, Stanton prescribed oxycodone and

23  oxymorphone.

24  Q.   Now, in June of that year, is there a reference to a

25  "UDS"?

1    A.   Yes.  On that same day that he prescribed, there was a

2    failed urine drug screen.  They were negative for oxycodone

3    and oxymorphone.

4    Q.   And is the urine drug screen, can you remind the jury

5    which variety of testing that is?

6    A.   Those are conducted in-house.

7    Q.   And in the medical files you've reviewed, how were those

8    displayed in the record?

9    A.   It has various drugs, like benzodiazepines, opiates,

10   oxycodone, and then it has the "yes" or "no" circled.

11   Q.   Okay.  And that's in that file, a scanned-in version of

12   whatever was notated on that paper?

13   A.   Correct.

14        MR. SMITH:  If we can, let's move to Government

15   Exhibit 501H.

16   BY MR. SMITH:

17   Q.   Ma'am, do you recognize Government Exhibit 501H?

18   A.   Yes.  It is Charles Wooten's overview.

19   Q.   Did you prepare the summary based on Charles Wooten's

20   patient file?

21   A.   Yes.

22   Q.   In the same manner you've prepared the other exhibits?

23   A.   Yes.

24        MR. SMITH:  Your Honor, I move to admit Government

25   Exhibit 501H.

1          THE COURT:  Thank you.

2       Any objection?

3          MR. STRIANSE:  No objection.

4          THE COURT:  Thank you.  That will be admitted under

5    the same rubric and instruction we've been using for the 501

6    group, and it may be displayed.

7    BY MR. SMITH:

8    Q.   Ma'am, if we can, just briefly, when did this patient

9    take a first urine drug test at the practice?

10   A.   On January 22nd.

11   Q.   Okay.  And what provider did the patient see?

12   A.   Stanton.

13   Q.   And what did the patient have in their system on that

14   day?

15   A.   They were positive for oxycodone and oxymorphone.

16   Q.   And based on your review of the records, was that an

17   expected result?

18   A.   No.  Based on the KASPER, they were not prescribed

19   oxycodone or oxymorphone.

20   Q.   Okay.  And was there a prescription issued the next

21   office visit?

22   A.   Yes.  On February 18th, Stanton prescribed oxycodone,

23   oxymorphone, and gabapentin.

24   Q.   Was there any adjustment to the prescription between

25   January and February with that intervening failed drug test?

1    A.   No.

2    Q.   Later on in 2019, did this patient fail any other drug

3    test?

4    A.   Yes.  In March, they failed their positive for

5    methamphetamine and negative for noroxycodone metabolite.  And

6    again in April, they failed their positive for

7    methamphetamine, amphetamine, and they were negative for

8    oxymorphone.

9    Q.   So positive for methamphetamine and then negative for

10   prescribed controlled substances?

11   A.   Correct.

12   Q.   Does the patient have a gap in their files?

13   A.   Yes, from May of until December.

14   Q.   Okay.  And then in December, does the patient come back

15   to the clinic?

16   A.   Yes.  In December, they were -- they reestablished pain

17   management after being dismissed for methamphetamine EDTs.

18   Q.   And which doctor saw the patient on that day?

19   A.   Stanton.

20        MR. SMITH:  If we go to Government Exhibit 501I.

21   BY MR. SMITH:

22   Q.   Ma'am, did you review the patient file for a patient

23   named Susan Henderson?

24   A.   Yes.

25   Q.   Did you prepare it in the same manner -- the summary in

1    the same manner that you prepared the other summaries you've

2    told us about today?

3    A.   Yes.

4         MR. SMITH:  Your Honor, we move to admit Government

5    Exhibit 501I.

6         THE COURT:  Any objection?

7         MR. STRIANSE:  No objection.

8         THE COURT:  Okay.  That'll also be admitted under the

9    same process and instruction, and it may be displayed.

10   BY MR. SMITH:

11   Q.   Okay.  Beginning at the bottom left, what time frame do

12   we start for this summary?

13   A.   In April, she reestablished pain management after being

14   previous -- dismissed from the practice for positive cocaine

15   drug tests.

16   Q.   And in 2017, did she fail any drug tests?

17   A.   Yes.  In July, she was negative for her prescribed

18   oxycodone and oxymorphone.

19        In October, she was positive for cocaine.

20        And in December, she was positive for cocaine again.

21   Q.   So that's three failed drug tests in 2017?

22   A.   Yes.

23   Q.   In 2018, did the patient fail any drug tests?

24   A.   Yes.  In April, they were positive for Morphine.

25        In July, they were negative for her prescribed oxycodone.

1      In August, positive for methylphenidate.

2      In November, they were negative for their prescribed

3  oxycodone and oxymorphone.

4  Q.   And during this time period, do we see the same recurring

5  dismissals that you've told us about before?

6  A.   Yes.

7  Q.   Okay.  Let's move forward to the next page, to the end of

8  2018.

9      Did the patient receive prescriptions from Dr. Stanton at

10  the end of 2018?

11  A.   Yes.  In November, Stanton prescribed oxycodone, 30

12  milligrams.  And then in December, oxycodone again.

13  Q.   Okay.  Now, it's hard because these are two different

14  pages, but if we can go to the previous page, was there a

15  urine drug screen, the kind you told us about a moment ago,

16  the in-house variety, with the circle paper?  Did that occur

17  in November of 2018?

18  A.   Yes.  On November 16th, on that same visit date, the

19  patient was negative for their prescribed oxycodone and

20  oxymorphone.

21  Q.   Now, moving forward into 2019.

22      I'm sorry.  I meant to ask you:  In 2018, how many failed

23  drug tests were there in 2018, according to your review?

24  A.   Five.

25  Q.   2019, did the patient receive prescriptions from

1    Dr. Stanton in the early part of that year?

2    A.   Yes.  In January, they received oxycodone, oxymorphone,

3    and gabapentin from Stanton.  And again in February, Stanton

4    prescribed oxycodone and oxymorphone.

5    Q.   So we move through 2019.

6         In total, how many failed drug tests were there in 2019?

7    A.   Nine.

8         MR. SMITH:  Okay.  And if we go to the next page,

9    Rebecca.

10   BY MR. SMITH:

11   Q.   Into the end of 2019, does the patient have a positive

12   drug test in November?

13   A.   Yes.  In November, they were positive for cocaine.

14   Q.   And is there a patient note about that?

15   A.   Yes.  The following -- in December, it says, "She or the

16   patient does not know how cocaine got into her system."

17   Q.   Okay.  Let's go forward into 2020.

18        Does the patient continue returning to GMA in 2020?

19   A.   Yes.

20   Q.   And if we look, for instance, in April and May of 2020,

21   did the patient take a test in April of 2020?

22   A.   Yes.  In April, the patient failed a drug test.  They

23   were positive for fentanyl and negative for phentermine.

24   Q.   Okay.  After that positive fentanyl test was reported

25   back on April 5th, did the patient return the next month?

1   A.   Yes.  In May, the patient received a prescription from

2   Stanton for oxymorphone and phentermine.

3   Q.   And if we move forward into 2020, did the patient receive

4   several more prescriptions from Dr. Stanton?

5   A.   Yes, in June and August and October.

6   Q.   And how many total failed drug screens or tests,

7   combined, were there in 2020?

8   A.   Seven.

9   Q.   So if we can, let's go back to the first page of this

10   patient's.

11      How many were there in 2017?

12   A.   Three.

13   Q.   And how many were there in 2018?

14   A.   Four.

15   Q.   So that's -- three plus four is?

16   A.   Seven.

17   Q.   Okay.  We're at seven.

18      In 2019, how many were there?

19   A.   Nine.

20   Q.   So what are we at now?  Seven plus nine?

21   A.   16.

22   Q.   And then as we get into 2020?

23   A.   23 total.

24   Q.   Did you also review a patient file for a gentleman named

25   Jonathan Pooler?

1    A.   Yes.

2         MR. SMITH:  Can we bring up Government Exhibit 501J?

3    BY MR. SMITH:

4    Q.   Ma'am, what is 501J?

5    A.   It is Jonathan Pooler's overview.

6    Q.   Did you prepare the summary that is before you on the

7    screen in the same fashion as you prepared these other

8    summaries?

9    A.   Yes.

10   Q.   Okay.

11        MR. SMITH:  Your Honor, we move to admit Government

12   Exhibit 501J.

13        THE COURT:  Any objection?

14        MR. STRIANSE:  No objection.

15        THE COURT:  Thank you.  That'll be admitted under the

16   same process and instruction, and it may be published.

17        MR. SMITH:  Thank you.

18   BY MR. SMITH:

19   Q.   Okay.  If we can, can you just look and orient the jury

20   to the amount of time depicted on this timeline?

21   A.   From July to December of 2018.

22   Q.   But beginning in July, did this patient test positive for

23   any substances or negative for any substances at Gateway

24   Medical Associates?

25   A.   Yes.  In July, they were positive for heroin; THC, which

 1   is marijuana; fentanyl; morphine; codeine; ethanol; and

 2   they're negative for oxymorphone.

 3        Again, in August, positive for heroin, THC, fentanyl,

 4   morphine, codeine, and ethanol.

 5        And then in September, positive for heroin, THC,

 6   morphine, and codeine.

 7   Q.   Does recurring dismissal notes pop up for this patient?

 8   A.   Yes.

 9   Q.   And then in November of 2018, what is reflected?

10   A.   They were positive for heroin, THC, morphine, codeine,

11   ethanol, and negative for their prescribed noroxycodone

12   metabolite and oxymorphone.

13   Q.   So at that point in time, starting in July, there was how

14   many failed drug tests for heroin?

15   A.   Can you zoom out, please?  Four.

16   Q.   So four in approximately how many months?

17   A.   Approximately six.

18   Q.   Okay.  So after that November 13th drug test for heroin,

19   did Mr. Pooler come back to Gateway Medical Associates and

20   receive a prescription?

21   A.   Yes.  On December, Stanton prescribed oxycodone,

22   oxymorphone.

23        MR. SMITH:  Your Honor, if I could have a moment to

24   check with my paralegal.

25        THE COURT:  Yes, of course.

1        (Off-the-record discussion.)

2    BY MR. SMITH:

3    Q.    Okay.  If we can, I would like to move on to another area

4    of analysis.

5        You mentioned a moment ago that you -- we've talked

6    through, I think, ten patients now.

7        Did you review more than ten patient files?

8    A.    Yes.

9    Q.    Okay.  And were each of those patient files similarly

10   very long?

11   A.    Yes.

12   Q.    If I were to ask you to sit here in court and go through

13   every time you saw a failed drug screen in each of those

14   patient files, could you realistically do that with all of

15   that paper?

16   A.    No.  It's too much paperwork.

17   Q.    Okay.  Were you asked to prepare a summary of those

18   medical records and just note any inconsistent drug tests that

19   you identified in your analysis?

20   A.    Yes.

21   Q.    Okay.  And did you try to do that to the best of your

22   ability given the length and volume of medical records?

23   A.    Yes.

24   Q.    Okay.  Can you verbalize your answer into the mic?

25   A.    Yes.

1   Q.   Okay.

2   A.   Yes.

3   Q.   Thank you very much.

4        MR. SMITH:  Okay.  Let's take a look at Government

5   Exhibit 502, please.

6   Q.   Ma'am, what is Government Exhibit 502?

7   A.   They're a compilation of all of the inconsistent drug

8   tests for patients.

9   Q.   And so of the patient files you reviewed, you identified

10  any inconsistent drug tests and then put them into this

11  summary chart?

12  A.   Yes.

13  Q.   And are these based on the underlying medical records

14  that you reviewed that we obtained in this investigation?

15  A.   Yes.

16       MR. SMITH:  Your Honor, we move to admit Government

17  Exhibit 502.

18       THE COURT:  Any objection?

19       MR. STRIANSE:  No objection.

20       THE COURT:  Thank you.  To the extent it summarizes

21  information already in evidence, the same summary evidence

22  instruction would apply.  That's admitted and may be

23  displayed.

24  BY MR. SMITH:

25  Q.   Ma'am, if you could, could you just explain the layout of

1    this summary for the jury?

2    A.    So the patient name is in the first column.  The second

3    date -- or the second column has the drug test date or when

4    the specimen was collected.  The third column is the results

5    of the drug tests.

6          And then the next column after that is the next reviewing

7    provider.  So if the drug test for the first one, Keta Abner,

8    was taken in August of 2019 in the following month, Maccarone

9    saw Keta Abner.  And then the next column after that is if it

10   was a urine drug screen, then it was that -- that provider.

11   That's all.

12   Q.    Okay.  And so just so we're understanding, the top row

13   there, there is a DT date, or a drug test date?

14   A.    Yes.

15   Q.    What is that date?

16   A.    That was a date the specimen was collected.

17   Q.    Okay.  And is that a little bit different than those

18   earlier timelines we showed?  What date did you use for those?

19   A.    That was the date that the results were reported back to

20   the office.

21   Q.    When a drug test is sent out, it'll be -- I think we've

22   already explained this -- it was collected on day one, and it

23   would come back maybe day three or four; is that fair?

24   A.    Yes, that's correct.

25   Q.    Okay.  In an effort to capture that and to put it in a

1    fair chronology, did you put these two columns on the right to

2    indicate who would have been in a position to receive that

3    information?

4    A.   Yes.

5    Q.   Okay.  So that first, the next reviewing provider, were

6    you trying to notate whoever would have seen the patient after

7    that drug test?

8    A.   Yes, after the report -- the results were reported.

9    Q.   Okay.  And is it a little bit different when we're

10   talking about those in-house urine drug screens that we talked

11   about with the circles?

12   A.   Yes, because for the drug screens, the provider would

13   have seen them on the same day.

14   Q.   Okay.  And so that's why there's two columns on the

15   right?

16   A.   Yes.

17   Q.   There is also highlighting in orange in this document.

18   A.   Yes.

19   Q.   Can you explain that to the jury, please?

20   A.   Those were the visits where Dr. Stanton would have seen

21   that -- this result.

22   Q.   Now, if we can, let's look at -- just to give the jury a

23   sense, how many pages long is this exhibit in total?  Do you

24   know off the top of your head?

25   A.   No.  A lot.

1          MR. SMITH:  Okay.  If we could just arrow through.

2    Can we go to page 45?

3    BY MR. SMITH:

4    Q.   Okay.  Does that appear to be the end to you?

5    A.   Yes.

6    Q.   Okay.  I don't want to sit and read all 45 pages with

7    you, but the idea is, this progresses.

8          For each patient, from top to bottom, did you organize

9    this in any particular order?

10   A.   By patient last name, alphabetical order.

11         MR. SMITH:  And if we can go back to the first page.

12   BY MR. SMITH:

13   Q.   Within each patient -- so, for instance, this first

14   patient here -- how were those organized?

15   A.   By the drug test date.

16   Q.   Okay.  And in what order are they?

17   A.   By the drug test date.

18   Q.   Sorry.  Are they moving forward in time or backwards in

19   time?

20   A.   Oh, okay.  So the most recent is on top.

21   Q.   Okay.  So it's kind of a reverse order where for each

22   patient, the most recent is top, and the oldest is at the

23   bottom?

24   A.   Yes, that is correct.

25         MR. SMITH:  So if we can, let's go down to the bottom

1    of Keta Abner.

2    BY MR. SMITH:

3    Q.   And just so that the jury kind of understands what we're

4    all looking at, can you walk the jury through what we see for

5    Keta Abner?

6    A.   So her first drug test where that was inconsistent was on

7    February 23rd of 2018.  It was a lab visit that was sent out,

8    and she was inconsistent positive for oxazepam, alprazolam,

9    and she was inconsistent negative for the prescribed

10   gabapentin.  And then the doctor that saw that result next was

11   Maccarone.

12   Q.   Okay.  And if we can, let's look at the highlighted

13   entries, just for the sake of time.

14        What is the first highlighted entry there for Keta Abner?

15   A.   The first one in time or the --

16   Q.   Yes, or first one in time.  Thank you.

17   A.   Okay.  On December 28, 2018, it was a lab drug test.  She

18   was negative for her prescribed oxycodone, oxymorphone,

19   butalbital, and gabapentin.  The next doctor that would have

20   seen that result was Stanton.

21   Q.   Can you go to the next in time?

22   A.   On January 25, 2019, she was inconsistent positive for

23   methadone and alprazolam that were not prescribed.  The next

24   doctor that would have seen that result was Stanton.

25   Q.   And what about into May of 2019?

1    A.    In May, it was a lab drug test.  She was inconsistent

2    positive for THC again, which is marijuana; methadone;

3    alprazolam; phentermine; and she was negative for her

4    prescribed Adderall and butalbital.  The next doctor that

5    would have seen those results was Stanton.

6    Q.    Based on your review of these patient files, typically

7    whenever there's an office visit noted here, was there also an

8    indication that the patient was prescribed a controlled

9    substance on that date?

10   A.    Yes.  I either looked at the KASPER printout that was in

11   the medical patient records or in the PMP.

12   Q.    How often in your review of patient files did you see a

13   patient come in, have a drug test like this, and the notation

14   saying, "We're giving the patient ibuprofen or Tylenol today"?

15   A.    It was noted in the -- all of the prescriptions, but in

16   the -- in the summaries, no.  It was normally seeing a --

17   could you repeat that question?

18   Q.    Yeah.  It wasn't a very good question.  I apologize.

19         You had explained that typically when you would see

20   these -- as you reviewed, you would see a controlled substance

21   prescription being issued on that day based on the notations

22   in the medical record.

23         Is that what you just told us?

24   A.    Yes.

25   Q.    Okay.  How often do you see an alternate scenario where a

1  patient has failed a drug test and so instead of a controlled

2  substance, like oxycodone or oxymorphone, the practice says,

3  "This date, they get just Tylenol," or "This date, they get

4  something lower dose or lower potency"?

5  A.  No.

6  Q.  Did you ever see that?

7  A.  No.

8  Q.  Okay.  So as we move through this summary, when we walked

9  through that ten-patient summary a little bit earlier today,

10  did we see a number of failed drug tests for a drug called

11  fentanyl?

12  A.  Yes.

13  Q.  Okay.  Were those patients that tested positive for

14  fentanyl in that ten-patient summary, was that the only time

15  you saw that in these medical records?

16  A.  No.  In these other patients, there was positive for

17  fentanyl also.

18          MR. SMITH:  So if we can go to page 6, please.

19  BY MR. SMITH:

20  Q.  Did you summarize entries for a patient named Lucia

21  Davis?

22  A.  Yes.

23  Q.  Okay.  What kind of drugs did Ms. Davis test positive

24  for, according to the records?

25  A.  She was inconsistent positive for drugs such as fentanyl,

1  cocaine, heroin, morphine, hydromorphone.

2       MR. SMITH:  And if we go to the next page, page 7.

3  BY MR. SMITH:

4  Q.  Did she also have a number of other failed drug tests

5  earlier in time?

6  A.  Yes.  Additionally, inconsistent positive for

7  buprenorphine, methadone, hydrocodone.

8       MR. SMITH:  If we go between those two pages, you

9  just zoom out.

10 BY MR. SMITH:

11 Q.  So we did some counting, and I made you do math a little

12 bit earlier for certain patients, including Susan Henderson,

13 who I think you told us had in excess of 20 failed urine drug

14 tests?

15 A.  Yes.

16 Q.  Did you see other patients like that with that volume of

17 failed drug tests in your review of patient files?

18 A.  Yes.

19 Q.  Is your notations there for Ms. Davis an example of that?

20 A.  Yes.

21 Q.  Don't want you to count here, but that whole first page

22 and then the second page, is that in excess of 20 failed UDSs?

23 A.  Yes, it appears so.

24 Q.  Now, did you see indications in your summary of the

25 medical records of patients with the same last names?

1    A.   Yes.

2    Q.   Okay.  Let's look, if we can.  I think Anita Fralix is

3    one of the summary patients that we looked at a little bit

4    earlier today.

5    A.   Yes.

6    Q.   And do you remember your summary for Ms. Fralix?

7    A.   Yes.

8         MR. SMITH:  Okay.  If we can go to page 8.  If we can

9    just zoom in on Ms. Fralix briefly.

10   BY MR. SMITH:

11   Q.   Is the idea here that you've also pulled these same drug

12   tests and put it into the summary that we walked through

13   earlier this morning for Ms. Fralix?

14   A.   Yes.

15   Q.   Okay.  And this is just another way of reflecting those

16   same results; is that fair?

17   A.   Yes.

18   Q.   Okay.  So Ms. Fralix, it appears, based on your summary,

19   failed drug tests for fentanyl and other drugs; is that fair?

20   A.   Yes.

21   Q.   If we scroll down to the next page reflected on her

22   chart, what patient is noted there?

23   A.   Steven Fralix.

24   Q.   Looking at this chart, are we able to determine the dates

25   that each patient was at the office?

1    A.    Yes.

2    Q.    Okay.

3    A.    From the drug test date.

4    Q.    So as an example, if we were to look at the date of

5    April 13, 2020, is there a notation there for Mr. Fralix on

6    April 13, 2020?

7    A.    Yes.

8    Q.    Okay.  And what is the urine drug test result there?

9    A.    They were inconsistent positive for fentanyl, and they

10   were negative for their prescribed gabapentin.

11   Q.    Is there also a notation on that same date for Anita

12   Fralix?

13   A.    Yes.  On the same date, she was inconsistent positive for

14   fentanyl and negative for her prescribed gabapentin.

15         MR. SMITH:    And if we go back to page 9.

16   Q.    If we look at January 17, 2019, do you see a notation for

17   Mr. Fralix?

18   A.    Yes.  He was inconsistent positive for buprenorphine,

19   morphine, nordazepam, oxazepam, temazepam, and alprazolam.

20   Q.    And is there an entry for Anita Fralix on that same day,

21   January 17, 2019?

22   A.    Yes.  She was inconsistent positive for buprenorphine,

23   morphine, oxazepam, lorazepam, and alprazolam, and

24   inconsistent negative for her prescribed oxycodone and

25   oxymorphone.

1        MR. SMITH:  Now, if we move forward to -- let's go to

2   page 13, please.

3   BY MR. SMITH:

4   Q.   Did you see results for a patient named Shannon Hicks?

5   A.   Yes.

6   Q.   Okay.  And were there numerous failed urine drug tests

7   for this patient, Shannon Hicks?

8   A.   Yes.

9   Q.   Okay.  Can you describe what you see there?

10  A.   She was positive for -- inconsistent positive for drugs

11  like marijuana, hydromorphone, oxazepam, and negative for

12  prescribed drugs such as clonazepam -- or, I mean, phentermine

13  and alprazolam.

14  Q.   Okay.  If we just continue walking through this document

15  briefly.

16       The next page, are there additional failed drug tests for

17  Ms. Hicks?

18  A.   I'm sorry.  Repeat the question, please.

19  Q.   Just are there additional -- onto the next page, I was

20  just asking:  Are there additional failed tests?

21  A.   Yes.

22       MR. SMITH:  Let's go to page 16.

23  BY MR. SMITH:

24  Q.   Do you see notations for a patient named Patsy Jones

25  Smith?

1    A.   Yes.

2            MR. SMITH:  Okay.  And if we can, let's just scroll

3    through this, and then the next page.  And then on to page 18.

4    BY MR. SMITH:

5    Q.   Okay.  You told us earlier about Ms. Henderson, and we

6    talked about a few other patients that had in excess of 20

7    urine drug tests.

8            Were there patients in this chart that failed even more

9    than that?

10   A.   Yes.

11   Q.   And are we looking at an example here?

12   A.   Yes.

13           MR. SMITH:  Okay.  And if we could keep scrolling

14   through.

15   BY MR. SMITH:

16   Q.   On page 18, those continue on, and then there's other

17   entries for a patient named Miranda Jones.

18           MR. SMITH:  And if we can, go to the January 3, 2019

19   entry, which is on page 18, Rebecca.

20   BY MR. SMITH:

21   Q.   Did Ms. Jones fail a drug test on that date?

22   A.   On January 3, 2019, she was inconsistent positive for

23   methamphetamine, THC, buprenorphine, hydromorphone,

24   hydrocodone, and she was negative for her prescribed

25   phentermine.

1          MR. SMITH:  So then we can go to page 19, please.

2     BY MR. SMITH:

3     Q.   This entire page for the same patient?

4     A.   Yes.

5     Q.   And the next page?

6     A.   Yes.

7          MR. SMITH:  Similarly, can we move forward to

8     page 21?

9     Q.   Do you see a patient named Debra Kirby?

10    A.   Yes.

11    Q.   Did she fail a number of drug tests that are reflected on

12    that page into the next page?

13    A.   Yes.

14    Q.   Ma'am, let's take a look, if we can, at a patient named

15    Kimber Nantz.  That's on page 25.

16         Can you give us a sense, beginning in 2018, with

17    Ms. Nantz, of what happened with her during drug testing?

18    A.   She was negative for prescribed drugs, such as oxycodone

19    and alprazolam, and then she was positive for other drugs,

20    such as nordazepam and clonazepam.  Also positive for

21    marijuana and morphine.

22    Q.   And in April of that year, does she fail drug tests for

23    methamphetamine?

24    A.   April of which year?

25    Q.   2019.

1    A.    Yes.  She was positive for methamphetamine and

2    amphetamines.

3    Q.    And if we move forward, does she continue failing drug

4    tests as we move into 2020?

5    A.    Yes.

6    Q.    Okay.  Next, let's look at, briefly, a patient named

7    Penny Parrish.

8            MR. SMITH:  And can we go to page 26, please?

9    BY MR. SMITH:

10   Q.    Did you see a review of the file for a patient named

11   Penny Parrish?

12   A.    Yes.

13           MR. SMITH:  If we can go to the next page.

14   BY MR. SMITH:

15   Q.    Beginning in 2016, was Ms. Parrish seen at GMA?

16   A.    Yes.

17   Q.    Okay.  And throughout the next several years, did she

18   repeatedly fail urine drug tests?

19   A.    Yes.

20           MR. SMITH:  Okay.  And if we can go back to page 26.

21   BY MR. SMITH:

22   Q.    As we get into 2020, did Ms. Parrish fail several drug

23   tests in 2020?

24   A.    Yes.

25   Q.    What was the drug test on August 18, 2020?

1   A.   She was positive for methamphetamine and THC.

2   Q.   Did you review a patient file for somebody named Misty

3   Province?

4   A.   Yes.

5         MR. SMITH:  Can we go to page 29?

6   BY MR. SMITH:

7   Q.   Was there also an individual named Charles Provence noted

8   in your chart?

9   A.   Yes.

10  Q.   Okay.

11        MR. SMITH:  If we can go to page -- go to page 31 and

12  32.

13  BY MR. SMITH:

14  Q.   Okay.  Are there patients with the same last name,

15  Saylor, Larry and Jane?

16  A.   Yes.

17        MR. SMITH:  Let's go to page 33.

18  BY MR. SMITH:

19  Q.   Was there a patient file for an individual named Brandon

20  Smith?

21  A.   Yes.

22  Q.   Did he fail any drug tests?

23  A.   Yes.

24  Q.   What kind of failed drug tests did Brandon Smith have?

25  A.   He was inconsistent positive for hydrocodone, and

 1    negative for prescribed oxycodone and oxymorphone.  Also

 2    positive for norbuprenorphine.

 3    Q.   Did he test negative several times for prescribed

 4    medications?

 5    A.   Yes.

 6         MR. SMITH:  Okay.  Let's go to page 35, please.

 7    BY MR. SMITH:

 8    Q.   Unfortunately, I don't know that we're going to be able

 9    to pronounce this last name, but did you review files for a

10    patient Deborah S.?

11    A.   Yes.

12    Q.   Okay.  And did she test negative for prescribed

13    medications multiple times?

14    A.   Yes.

15    Q.   On page 36, did you review a patient file for an

16    individual named Clyde Teague?

17    A.   Yes.

18    Q.   What did he test positive for?

19    A.   Fentanyl.

20         MR. SMITH:  We move forward, then, into page 40.

21    Well, actually 39.

22    BY MR. SMITH:

23    Q.   Did you see a number of notations for patients with the

24    last name Wagers?

25    A.   Yes.

1    Q.   Okay.  If we move forward onto page 40, did that include

2    individuals named Elzie and Raleigh Wagers?

3    A.   Yes.

4    Q.   Did you note failed drug tests for both of those

5    individuals?

6    A.   Yes.

7    Q.   In each of those instances, was there a notation

8    indicating that those individuals had potentially failed urine

9    drug tests?

10   A.   Yes.

11        MR. SMITH:  Okay.  If we can take that down, please.

12   BY MR. SMITH:

13   Q.   In addition to this summary -- and if you can just remind

14   the jury, the summary we just looked at, what does that

15   capture?  What type of drug test?

16   A.   Inconsistent or failed drug test.

17   Q.   And so that's whether positive or negative; is that fair?

18   A.   Yes.

19        MR. SMITH:  Okay.  Briefly, and Government

20   Exhibit 503, can we bring that up for the witness?

21   BY MR. SMITH:

22   Q.   Okay.  What's Government Exhibit 503?

23   A.   It's inconsistent illegal drug tests.  So they -- if they

24   are inconsistent positive for drugs such as cocaine,

25   marijuana, heroin, methamphetamine.

1  Q.   Okay.  And is this in some way kind of a subset of the

2  information that was in the previous Exhibit 502?

3  A.   Yes.

4  Q.   Okay.

5        MR. SMITH:  Your Honor --

6  BY MR. SMITH:

7  Q.   The best you could, did you summarize accurately the

8  medical records obtained in the investigation?

9  A.   Yes.

10  Q.   And are those voluminous?

11  A.   Yes.

12  Q.   Okay.

13        MR. SMITH:  Your Honor, we move to admit Government

14  Exhibit 503.

15        THE COURT:  Any objection?

16        MR. STRIANSE:  No objection.

17        THE COURT:  503 will be admitted as another summary

18  exhibit under the same instruction you've gotten that

19  summarizes underlying evidence in the record.  It's only as

20  reliable as that underlying evidence.  That's for you to

21  assess as jurors.  That'll be admitted and may be displayed.

22  BY MR. SMITH:

23  Q.   Okay.  Ma'am, does this -- formatting wise, is this the

24  same as the previous summary we talked about?

25  A.   Yes.

1    Q.   So that's the drug test date.

2         What is the drug test date in this document?

3    A.   That was, again, the -- the date the specimen was

4    collected.

5    Q.   Okay.  And then the two columns on the right, is that the

6    same as the previous chart?

7    A.   Yes.

8    Q.   Okay.  Does this chart also contain highlighting?

9    A.   Yes.  Those are the drug tests that Stanton would have

10   seen.

11         MR. SMITH:  Your Honor, if I could have a moment to

12   confer.  I believe I'm wrapping up here.

13         THE COURT:  Yes, you may.

14      (Off-the-record discussion.)

15         MR. SMITH:  Your Honor, that's all the questions I

16   have.  Thank you.

17         THE COURT:  Thank you.

18      Mr. Strianse.

19         MR. STRIANSE:  Yes, Your Honor.

20                      CROSS-EXAMINATION

21   BY MR. STRIANSE:

22   Q.   Good morning, Ms. Carter.

23   A.   Good morning, sir.

24   Q.   You are an analyst for the Drug Enforcement

25   Administration; is that right?

1   A.   Yes, sir.

2   Q.   You are not a physician?

3   A.   No.

4   Q.   And what is your degree in?  What is your training in?

5   A.   My college degree, sir?

6   Q.   I'm sorry?

7   A.   My college degree?

8   Q.   Yeah, your degrees.

9   A.   Yes, in criminalogy -- or criminology and tele

10  (indiscernible) analysis.

11  Q.   Okay.  Now, in doing the analysis that you presented

12  today, were you able to determine the total number of

13  electronic medical records that were retained by GMA?

14  A.   I don't remember the exact number.

15  Q.   Was it well over 400?

16  A.   That sounds about right.

17  Q.   Does that sound about right?

18  A.   Yes, sir.

19  Q.   Maybe close to 500 charts?

20  A.   Yes.

21  Q.   Is that right?

22       And I think you told the jury that you selected 50 to a

23  hundred to review; is that right?

24  A.   Yes.

25  Q.   Okay.  I thought that's what you had told us.

1    Who gave you your assignment in this case?

2 A.   Diversion Investigator Sizemore.

3 Q.   And are you located here in southeastern Kentucky?  Where

4 is your office?

5 A.   I am currently in the U.S. embassy in Mexico City.

6 Q.   When you were working on this project, where were you?

7 A.   I was in northern Virginia.

8 Q.   Northern Virginia.  And I assume you communicated with

9 Diversion Investigator Sizemore by email; is that right?

10 A.   And phone calls.

11 Q.   And phone calls.  And he's the one that gave you your

12 scope of work; is that right?

13 A.   Yes.

14 Q.   And what was the assignment that he asked you to perform

15 here?

16 A.   It was to summarize the -- the patient records.

17 Q.   Okay.  Did he identify what type of patients he was

18 interested in?

19 A.   No.

20 Q.   Was he looking for -- were there any instructions that he

21 was interested in files that had a preponderance of failed

22 drug screens?  Was that a factor?

23 A.   No.  He just provided the patient records, and they were

24 reviewed.

25 Q.   And they were reviewed.  You had no -- the contours of

1    this assignment were not defined?

2    A.   No.

3    Q.   You didn't really go in with any preconceived notions

4    about the kind of patients you were looking for?

5    A.   No.

6    Q.   Okay.  You took us through the 501 series.

7         Do you remember that?

8    A.   Yes, sir.

9    Q.   Now, if you need to consult your notes, please let me

10   know, but 501A was a patient named Lisa Waynick; is that

11   right?

12   A.   Yes.

13   Q.   And do you remember statistically the total number of

14   failed tests for Lisa Waynick?

15   A.   No.

16   Q.   Okay.  Did you do an analysis of how many of those failed

17   tests were under the watch of Dr. Maccarone?

18   A.   Yes.  They were all in the charts.

19   Q.   Okay.  And I have sort of counted that up.

20        Do you have those numbers in your head, or did you write

21   them down anywhere, in terms of attributing the failed drug

22   tests that were when Dr. Stanton was seeing the patient or

23   when Dr. Maccarone was seeing the patient?

24   A.   I would have to look at the table.

25   Q.   Okay.

1    THE COURT:  I'm sure Ms. Woolums can pull anything up

2    you want displayed.

3           MR. STRIANSE:  Okay.

4    BY MR. STRIANSE:

5    Q.   Is it safe to say that Dr. Maccarone was the provider

6    that had the most failed drug test experiences with these

7    patients?

8    A.   I would have to count them up.

9    Q.   Okay.  And you've not done that?  You've not counted

10   those up?

11   A.   No.

12   Q.   Okay.  Now, you told us you're not licensed to practice

13   medicine?

14   A.   No.

15   Q.   And the overviews that you put together in this case,

16   they don't contain any information about the actual patient

17   interactions with either provider; is that right?

18   A.   Only when there was stuff in the encounter notes that

19   directly stated what the patient told to the provider.

20   Q.   Okay.  In terms of excuses for failed drug tests?

21   A.   Yes.

22   Q.   Okay.  So you're not here offering an opinion today as to

23   whether a prescription was issued in the normal course of

24   medical practice --

25   A.   No.  I'm just --

1   Q.   -- or anything like that?

2   A.   No.  I'm just summarizing the patient records.

3   Q.   Okay.  And you're not offering any opinion about the

4   patient's diagnosis that was made at GMA?

5   A.   No, I'm not.

6   Q.   And you're not offering any opinion as to whether the

7   patient needed any of these controlled substances that were

8   prescribed?

9   A.   No.

10  Q.   Okay.

11       MR. STRIANSE:  Your Honor, may I have one moment?

12       THE COURT:  Of course.

13  (Off-the-record discussion.)

14       MR. STRIANSE:  Those are my questions.

15       THE COURT:  Is that all, Mr. Strianse?

16       MR. STRIANSE:  Yes.

17       THE COURT:  Sorry.  I didn't hear you.

18  Mr. Smith.

19       MR. SMITH:  Your Honor, we have no additional

20  questions.  Thank you.

21       THE COURT:  Is she finally excused?

22       MR. SMITH:  Yes.

23       THE COURT:  Do you agree?

24       MR. STRIANSE:  Yes.

25       THE COURT:  Thank you, ma'am.  That concludes your

1    testimony.  You may step down, and you're free to go.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Can we confer for a moment?

4         (Sidebar conference.)

5              THE COURT:  Can you hear, Mr. Strianse?

6              MR. STRIANSE:  Yes.

7              THE COURT:  So I'm happy to do 15 more minutes before

8    the lunch break if you've got a short witness, or we can go

9    ahead and break now.

10             MR. SMITH:  Yeah.  Your Honor, our next witness, who

11   I think is going to take us through the remainder of the day,

12   is Investigator Sizemore.

13        And one thing I think we might want to do is just test

14   the audio.  There is going to be recordings played, and so we

15   may want to just test and then inquire of the jurors as they

16   need headphones, as needed.

17             THE COURT:  Okay.  And so you think he'll be the last

18   witness of the day for the government?

19             MR. SMITH:  I think so.  I anticipate him taking

20   several hours, but yes.

21             THE COURT:  And then will that leave only Vardaman

22   for Monday?

23             MR. SMITH:  That's correct, Your Honor.

24             THE COURT:  Okay.  All right.  So I say we break now

25   until 1:00 p.m. and come back for Sizemore at that point.

1           You okay with that, Mr. Smith?

2                MR. STRIANSE:  That's fine.

3                MR. SMITH:  That should be fine.

4                MR. STRIANSE:  Judge, I had one question.

5           Has the government decided whether they're going to play

6       the entire recording of Dr. Stanton?

7                MR. SMITH:  As represented at the pretrial, our

8       intent would be to play certain clips, which we have

9       disclosed, transcribed, and then marked individually.  I don't

10      presently intend to play every single clip, but we're trying

11      to organize them by subject matter, because it kind of skips

12      around throughout the conversation.  But that's our intent.

13               THE COURT:  Okay.

14               MR. STRIANSE:  Okay.

15               THE COURT:  All right.

16          (Sidebar conference concluded.)

17               THE COURT:  Okay.  That's going to get us to our

18      lunch break.  It's about quarter till.  Let's break until

19      1:00 p.m.  And the same admonitions.  No case discussion,

20      exploration, or evaluation.  With my thanks for your attention

21      and flexibility today, I'll excuse the jury now for lunch

22      until 1:00 p.m.  Thank you.

23          (The jury exited the courtroom at 11:48 a.m.)

24               THE COURT:  Okay.  Thank you.  The jury has exited.

25      Everybody can be seated.  So as I understand the forecast, the

1    government plans to call the case agent back and that that

2    will be the lone government witness for the balance of the

3    afternoon.

4        Roughly, how long do you think he's going to take for the

5    direct?

6        MR. SMITH:  I think our witness list revised was six

7    hours.  I think it's going to be shorter than that.  It's

8    going to be somewhat dependent on just the mechanics of

9    playing those clips and going from there.  In total, just so

10   the Court understands, I think the total length of that

11   interview is two hours.  We're going to be playing a subset of

12   that, breaking it up in discussion.  But that's just one part

13   of the testimony.

14       THE COURT:  Okay.  Is it realistic to think we can

15   get through his direct and cross this afternoon?

16       MR. SMITH:  It's possible.  I don't know the length

17   of cross.  I will try to condense and hustle, but either way,

18   I really do think we're going to hand the case over -- even if

19   he were to carry over to Monday, it wouldn't be a lot.  And I

20   could certainly, you know, streamline over the weekend.  If we

21   have that other witness.  But I don't see a way we don't hand

22   the case over Monday morning.

23       THE COURT:  All right.  And, Mr. Strianse, of course,

24   if you want to play parts of the interview that are not played

25   by the prosecution, feel free to do that.

1    And so it does sound like -- you know, you'll get a full

2    chance to cross him, of course, but it does sound like Monday,

3    fairly early, we'll go to the defense case.

4        Can you give me any estimate on what you are thinking in

5    terms of the length of the defense case?  I'm not holding you

6    to anything.  I'm just trying to forecast.

7        MR. STRIANSE:  Depending on what time we start on

8    Monday with our case, probably one day.

9        THE COURT:  All right.  That's helpful.  So let's

10   take our lunch break.  You guys, I would encourage you to

11   either now or come back in early and just work on the audio

12   and make sure everything is working.  And then we'll come back

13   at 1:00 and pick up with the proof.

14       Anything else to take up?

15       MR. SMITH:  Does Your Honor want us to do anything

16   with -- I anticipate that the transcriptions are synced and

17   they will play on the video.  Of course, I say that out loud,

18   but do you want paper copies for the jury or for the Court of

19   any of those transcripts?

20       THE COURT:  They show on the screen?

21       MR. SMITH:  They show on the screen.  So we just have

22   those as backup, but --

23       THE COURT:  That's not something I would require.

24       MR. SMITH:  Okay.

25       THE COURT:  Thank you.  Anything else for you,

1    Mr. Strianse?

2         MR. STRIANSE:  No, Your Honor.

3         THE COURT:  Okay.  We'll take our lunch break at this

4    time.  Thank you.

5         (Recess from 11:51 a.m. until 12:59 p.m.)

6         THE COURT:  Thank you.  Good afternoon to everybody.

7    We're back on the record with the jury not yet in the

8    courtroom, but all counsel present and Dr. Stanton here.

9         You have an issue, Mr. Smith?

10         MR. SMITH:  Just want to remind the Court that

11    Investigator Sizemore had testified earlier in the trial.  I

12    believe we had given the dual witness instruction --

13         THE COURT:  Right.

14         MR. SMITH:  -- but I thought it might be appropriate

15    to do it again.  I mean, we bifurcated his testimony.  He may

16    reference back at some point to that testimony he gave before.

17    We will try to make it a clear demarcation when he's

18    testifying to facts of the investigation, that that's what

19    he's doing.  But I thought it would probably be a good idea to

20    give that instruction again now just to make sure the record

21    is clean on that.

22         THE COURT:  Okay.  Any thought on that, Mr. Strianse?

23         MR. STRIANSE:  I'm sorry.  Dr. Stanton was talking to

24    me, Judge.

25         THE COURT:  Mr. Smith suggested I give the dual role

1  again.

2            MR. STRIANSE:  That's fine, Your Honor.

3            THE COURT:  Okay.  I'll be glad to do that.

4     Anything else?

5            MR. SMITH:  No, Your Honor.  That's it.  Thank you.

6            THE COURT:  Anything for you, Mr. Strianse?

7            MR. STRIANSE:  No, Your Honor.

8            THE COURT:  Okay.

9       (The jury entered the courtroom at 1:00 p.m.)

10           THE COURT:  Be seated, please.  Listening to either

11    one of us will work.  All right.  The jury has returned to the

12    courtroom after the lunch break.  It looks like it's clouding

13    up there just in time for the weekend.  I hope that's not how

14    it plays out.  We're ready to continue the government's case.

15       Mr. Smith.

16           MR. SMITH:  Thank you, Your Honor.  The United States

17    calls Diversion Investigator Kyle Sizemore.

18           THE COURT:  Kyle Sizemore.

19           KYLE SIZEMORE, GOVERNMENT'S WITNESS, SWORN

20           THE WITNESS:  I do.

21           COURTROOM DEPUTY:  Thank you.

22           THE COURT:  Good afternoon, sir.

23           THE WITNESS:  Good afternoon.

24           THE COURT:  You've been in the courtroom.  You've

25    been on the stand before in this trial and know the drill.

1    If you would state your name and spell your last name.

2         THE WITNESS:  Kyle Sizemore.  And that's

3    S-I-Z-E-M-O-R-E.

4         THE COURT:  Thank you.  And, ladies and gentlemen,

5    you did hear from this witness before.  I gave you an

6    instruction at that time.  I'm going to give it to you again

7    just because this witness sort of has two different roles as a

8    witness.  So I'm going to give you an appropriate instruction

9    again concerning that.

10        You're about to hear the testimony of Investigator

11   Sizemore, who's expected to testify regarding both facts and

12   opinions.  You should give each of these types of testimony as

13   much weight as you think it deserves considering the factors

14   I'll instruct you on at the end of the proof.  These factors

15   generally include the witness's ability or inability to

16   perceive the relevant events, his memory, his behavior while

17   testifying, and any potential motives.

18        Another relevant factor is how believable the testimony

19   is in light of all the other evidence.  You should consider

20   these factors, which I'll explain in more detail when I give

21   my final instructions at the end of the proof, in weighing the

22   credibility of this witness and considering his factual

23   testimony.

24        As to the witness's testimony regarding opinions, you do

25   not have to accept any of the witness's opinions.  In addition

1    to the general factors I just described, in deciding how much

2    weight to give an opinion, you should consider the witness's

3    qualifications and how he reached his conclusions.  You should

4    also consider this witness's dual fact and opinion roles in

5    determining what weight, if any, to give his opinion

6    testimony.

7         Remember that you alone decide how much of a witness's

8    testimony to believe and how much weight it deserves.

9         Mr. Smith.

10             MR. SMITH:  Thank you, Your Honor.

11                       DIRECT EXAMINATION

12   BY MR. SMITH:

13   Q.   Sir, you previously introduced yourself to the jury at

14   the outset of the trial.

15        If you could, just reintroduce yourself to the jury and

16   just remind them what it is you do for a living.

17   A.   My name is Kyle Sizemore.  I'm a diversion investigator

18   with the DEA.

19   Q.   And as the diversion investigator with the DEA, were you

20   assigned to an investigation of Gateway Medical Associates?

21   A.   Yes.

22   Q.   Have you been one of the principal investigators in this

23   case since its inception?

24   A.   Yes.

25   Q.   I would like to take you through a few steps and

1  categories of information from your investigation.

2      If we can, let's begin with reference to the prescription

3  drug monitoring data that we've heard about in this trial.

4      Sir, are you familiar with prescription drug monitoring

5  databases?

6  A.   Yes.

7  Q.   Is that something you work with, with some frequency?

8  A.   Yes.

9          MR. SMITH:  And if we can, Rebecca, can we bring up

10 Government Exhibit 300, please?

11 BY MR. SMITH:

12 Q.   As she's doing that, you were in the courtroom today, and

13 you saw what Government Exhibit 300 is; is that correct, sir?

14 A.   That's correct.

15 Q.   Okay.  And that was the prescription drug monitoring

16 database for Dr. Maccarone and Dr. Stanton?

17 A.   That's correct.

18 Q.   Okay.  And is that what's displayed before us on the

19 screen here?

20 A.   Yes.

21 Q.   Okay.  Now, as we've heard, these are many lines of data;

22 is that fair?

23 A.   That is fair.

24 Q.   Were you asked or did you endeavor to try to just give us

25 some approximate counts for how many controlled substance

1    prescriptions were written during the time period under

2    investigation?

3    A.   I did.

4    Q.   Okay.  Could you, to the best you can, please walk the

5    jury through how you went about doing that from this data set?

6    A.   It's a pretty large data set.  This particular data set

7    here actually includes dates from around 2014 to 2021 for both

8    Dr. Maccarone and Dr. Stanton.  So what I did was I limited

9    the date range from November of '18 to October of 2020.

10        And then in an effort to ensure that I wasn't getting any

11   patients that would have been seen at any of Dr. Stanton's

12   other clinics, I tried to go through and find common patients

13   that Dr. Maccarone and Dr. Stanton had both wrote

14   prescriptions to, because the way the -- the PMPs work is that

15   prescribers can have one DEA number per state, and they can

16   use that DEA number at multiple clinics.  So I didn't want to

17   try to cross over between the clinics or anything.

18        So I went through and found a group of patients -- I

19   think it was around 500 or so -- that they had both had in

20   common.  And so I filtered it for, again, those dates between

21   2000 -- November of '18 to October of '20, and then I limited

22   it to those patients they had in common.

23   Q.   Okay.  And just to explain that a little further, when

24   you obtained a report from either KASPER or Tennessee's

25   database, which is called CSMD, is that provided to you on a

1    provider basis?

2    A.   Yes.

3    Q.   Meaning it's all the prescriptions for a given doctor, in

4    this case?

5    A.   Yes.

6    Q.   And that is not necessarily limited to where the doctor

7    might have been working at the point in time of any particular

8    prescription?

9    A.   That's correct.

10   Q.   Okay.  And so if I understand you correctly, did you try

11   to narrow down prescriptions that you thought were most likely

12   written from Gateway as opposed to any other clinic that

13   Dr. Stanton might have been associated with and prescribing

14   from in those time frames?

15   A.   That's correct.

16   Q.   In addition to that, you mentioned a date limitation

17   beginning in November of 2018.

18        Can you explain why?

19   A.   Based on the information that we obtained during the

20   investigation, it -- it -- it -- it seems that Dr. Stanton's

21   prescribing at Gateway did become frequent in the November of

22   '18 area, so I didn't want to take anything prior to that

23   because I didn't want to, again, risk getting anything in his

24   other clinics.

25   Q.   Okay.  So based on all of that, were you able to come up

1  with an approximate total for the number of Schedule II

2  controlled prescriptions written from the clinic during that

3  time frame?

4  A.  Yes.

5  Q.  Okay.  And did you put that data together and then just

6  put it on the slide so that we can look at it more easily?

7  A.  I did.

8        MR. SMITH:  Your Honor, just for the witness, if we

9  can, and this would just be a demonstrative, Your Honor, but

10 we've marked it as Government Exhibit 506.

11 BY MR. SMITH:

12 Q.  Can you see that, sir?

13 A.  I can.

14 Q.  Okay.  Sir, is that the slide we just talked about?

15 A.  That is.

16       MR. SMITH:  Your Honor, with your permission, we

17 would ask to be able to publish it to the jury but not to

18 admit it.

19       THE COURT:  Any objection?

20       MR. STRIANSE:  No objection.

21       THE COURT:  I'll certainly allow that.  Let me give

22 you an instruction on this kind of a summary.

23    So you're going to see this summary chart marked

24 Exhibit 506.  You can go ahead and put that up.

25       This is offered to assist in the presentation and

1    understanding of the evidence.  The item is not itself

2    evidence.  It's simply an aid in your understanding of the

3    evidence and must not be considered as proof of any facts.

4         All right.  You can proceed.

5         MR. SMITH:  Thank you.

6    BY MR. SMITH:

7    Q.   Sir, if you could, just walk through with the jury what

8    your counts were from the calculation you just described.

9    A.   So for Dr. Maccarone, during that period of time, and

10   this includes -- it -- it's filtered for Kentucky and

11   Tennessee patients together, and it -- it includes that he

12   wrote 9,368 Schedule II prescriptions, and Dr. Stanton wrote

13   5,820, for a total of 15,188.

14   Q.   Now, in your view, based on what you did, do you think

15   that this is a conservative estimate?

16   A.   I do.

17   Q.   And is it possible that this could be off by, you know, a

18   few prescriptions here or there because of the other unknowns

19   you just described?

20   A.   Yeah, that's right.

21   Q.   Okay.  But is this your best effort, on the voluminous

22   data you have, to give an approximate count?

23   A.   Yes.

24   Q.   Okay.  So during the time period November of 2018 to

25   October of 2020, Dr. Stanton, according to your rough

1   calculations, prescribed approximately 5,800 different

2   Schedule II prescriptions?

3   A.   Yes.

4   Q.   And then Dr. Maccarone was the number above that, the

5   9,000 figure?

6   A.   That's correct.

7        MR. SMITH:  All right.  Rebecca, if we can take that

8   down, please.

9   BY MR. SMITH:

10  Q.   Sir, we just looked at the data for kind of getting

11  counts of these prescriptions.

12       As an investigator, if you want to obtain a copy of all

13  of the prescriptions written for a patient, what is it that

14  you have to do, typically?

15  A.   We have to go to each individual pharmacy that the

16  prescriptions were filled at.

17  Q.   Okay.  And in your experience, do patients always go to

18  the same pharmacy month after month over the course of several

19  years?

20  A.   Not always.

21  Q.   In this case, did you try to obtain prescriptions for a

22  subset of patients that were attending Gateway Medical

23  Associates?

24  A.   Yes.

25  Q.   Okay.

1          MR. SMITH:  Your Honor, if I can, can we bring up

2     Government Exhibit 400?  And this is a collection -- let me

3     give the exact letters.  Let's start with 400A.

4     BY MR. SMITH:

5     Q.   So there's 400A through M.

6          Sir, do you recognize that?

7     A.   I do.

8     Q.   What are 400A through M?

9     A.   Are they all for the same patient?  I only see A.

10    Q.   Oh, I'm sorry.  Do you see B?

11    A.   Yeah, B.

12    Q.   Okay.

13    A.   A and B are prescriptions for Misty Brown from

14    Dr. Stanton.

15    Q.   Okay.  So, sir, while we're looking at these, did you

16    collect prescriptions from various -- you and other

17    investigators, did you collect prescriptions for patient Misty

18    Brown?

19    A.   Yes.

20    Q.   Okay.  And is that what's reflected here in Government

21    Exhibit 400A through M?

22    A.   Yes.

23    Q.   Okay.  In some instances for some patients, were you able

24    to obtain every single prescription that you identified on the

25    monitoring database?

1    A.   No.

2    Q.   Is that sometimes because pharmacies may not have been

3    responsive or records may be lost?

4    A.   Yes.

5    Q.   Okay.  And to be specific, are the prescriptions listed

6    in Government Exhibit 400A through M, are those for the

7    defendant, Dr. John Stanton?  Are those his prescriptions?

8    A.   Yes.

9    Q.   Okay.

10         MR. SMITH:  Your Honor, we move to admit Government

11   Exhibit 400.

12         THE COURT:  Any objection?

13         MR. STRIANSE:  No objection.

14         THE COURT:  Okay.  The A through M series?

15         MR. SMITH:  Correct, Your Honor.

16         THE COURT:  Those will be admitted and may be

17   displayed.

18         MR. SMITH:  Okay.  And if we can just bring that up

19   to show the jury.

20   BY MR. SMITH:

21   Q.   Okay.  Sir, just to confirm, were these the prescriptions

22   that you and other investigators obtained for patient Misty

23   Brown issued by Dr. John Stanton?

24   A.   Yes.

25   Q.   Okay.  Did you also obtain prescriptions for patient

1    Shawn Brown?

2    A.   Yes.

3         MR. SMITH:  Can we bring up Government Exhibit 401?

4         And for the record, Your Honor, this is collective as

5    Government Exhibit 401A through 401R.

6         THE COURT:  All right.

7    BY MR. SMITH:

8    Q.   Sir, for the sake of time, did you obtain these

9    prescriptions in a similar fashion to patient Misty Brown's,

10   which we just talked about as Government Exhibit 400?

11   A.   That's correct.

12   Q.   Okay.  And to the best of your knowledge, are these

13   accurate copies of what were received from the pharmacies who

14   maintained them?

15   A.   They are.

16        MR. SMITH:  Your Honor, move to admit Government

17   Exhibit 401.

18        THE COURT:  Any objection?

19        MR. STRIANSE:  No objection.

20        THE COURT:  Thank you.  401 will also be admitted, A

21   through R, and may be displayed to the jury.

22     MR. SMITH:  Okay.  Can we just briefly show that to the

23   jury?  Okay.  Thank you.

24   BY MR. SMITH:

25   Q.   Sir, did you also obtain prescriptions for a list of

1    additional patients beyond this?

2    A.   Yes.

3    Q.   Okay.

4         MR. SMITH:  And if the Court and counsel is amenable,

5    as we've done earlier in the trial, what I would propose is I

6    will identify, by exhibit number and patient name, the

7    prescriptions.  I will identify for the record the letters

8    associated with it, but I would ask to move them in

9    collectively rather than one by one just for the sake of time,

10   if that's acceptable.

11        MR. STRIANSE:  That's acceptable.

12        THE COURT:  All right.

13   BY MR. SMITH:

14   Q.   Okay.  Sir, did the investigators obtain prescriptions

15   for patient Donald Cozart?

16   A.   Yes.

17   Q.   Okay.  That has been marked as Government Exhibit 402A

18   through J.

19        MR. SMITH:  Can we show that?  Just 402A.

20        THE WITNESS:  That's right.

21   BY MR. SMITH:

22   Q.   Okay.  And I'll identify, for the record, Government

23   Exhibit 403, just A through R.

24        Did investigators obtain prescriptions for Anita Fralix?

25   A.   Yes.

1   Q.    Okay.  And just I'll ask you globally.  For all of these

2   prescriptions I'm going to talk about, have you consolidated

3   and collected these in the course of your work?

4   A.    Yes.

5   Q.    Okay.  To the best of your knowledge, are they all

6   accurate copies of what was provided to investigators by the

7   pharmacies that maintained them?

8   A.    Yes.

9   Q.    Okay.  So 403A through R is patient Anita Fralix.

10        Sir, did you obtain prescriptions for patient Jeffrey

11  Ghent?

12  A.    Yes.

13  Q.    Okay.  And that, for the record, is marked as

14  Exhibit 404A through X?

15  A.    That's right.

16  Q.    Government Exhibit 405, which is 405A through G.

17        Did you obtain prescriptions for Florence Harris?

18  A.    Yes.

19  Q.    Government's Exhibit 406.  That's 406A through I.

20        Did you obtain prescriptions for patient Susan Jones?

21  A.    Yes.

22  Q.    Government Exhibit 407A through N, N as in Nancy.

23        Did you obtain prescriptions for a patient named Kimber

24  Nantz?

25  A.    Yes.

1  Q.   Government Exhibit 408, 408A through J.

2       Did you obtain prescriptions for Cleavon Parchman?

3  A.   Yes.

4  Q.   409A and B.

5       Did you obtain prescriptions for patient Jonathan Pooler?

6  A.   Yes.

7  Q.   Government Exhibit 410.  And that's A through AA.

8       Did you obtain prescriptions for Adam Rather?

9  A.   Yes.

10 Q.   And we'll advance to 412, Government Exhibit 412A through

11 X.

12      Did you obtain prescriptions for Jennifer Vardaman?

13 A.   Yes.

14 Q.   Government Exhibit 413A through AA.

15      Did you obtain prescriptions for Elzie Wagers?

16 A.   Yes.

17 Q.   414A through M.

18      Did you obtain prescriptions for Raleigh Wagers?

19 A.   Yes.

20 Q.   Okay.  And last couple.  Paragraph 415 -- or Government

21 Exhibit 415.

22      Did you obtain prescriptions for patient Lisa Waynick?

23 A.   Yes.

24 Q.   And that's 415A through MM.  So it's MM.

25      And then 416.

1    Did you obtain prescriptions for Charles Wooten?

2  A.  Yes.

3  Q.  And that's 416A through H.

4         MR. SMITH:  So at this time, Your Honor, I would move

5  to admit all of the exhibits, including the subparts I listed,

6  into evidence.

7         THE COURT:  Any objection?

8         MR. STRIANSE:  No, objection.

9         THE COURT:  Those will all be admitted, and the

10  government can display them as it chooses.

11         MR. SMITH:  Thank you, Your Honor.

12  BY MR. SMITH:

13  Q.  Sir, in the course of your investigation, did you

14  participate in various stages of investigating the case?

15  A.  I did.

16  Q.  Did that include interviewing witnesses?

17  A.  It did.

18  Q.  Executing a search warrant in October of 2020?

19  A.  Yes.

20  Q.  In 2021, was Defendant James Maccarone charged in this

21  case?

22  A.  He was.

23  Q.  And was he arrested pursuant to a federal search

24  warrant -- I mean, federal arrest warrant?

25  A.  Yes.

1    Q.   Okay.  After that point in time, did you have the

2    opportunity to speak with the defendant, John Stanton?

3    A.   I did.

4    Q.   Okay.  And do you remember exactly when that was?

5    A.   I do not.

6    Q.   Okay.  Was it before or after Dr. Maccarone was arrested?

7    A.   It was after.

8    Q.   Okay.  Can you, just in general terms, explain to the

9    jury how that discussion came about and how it occurred?

10   A.   We were heading to Clarksville to -- to -- to do some

11   more interviews with the patients, and one of the things we

12   wanted to do was see if we could sit down and talk -- talk to

13   Dr. Stanton about his role at the clinic, his responsibilities

14   and things that he may or may not have seen.  And in the

15   course of trying to get ahold of him, I think we -- I maybe

16   exchanged some phone calls with his -- his office staff, but

17   eventually we ended up getting on the phone together.

18   Q.   Okay.  Was it your intent that day to conduct an

19   interview over the telephone?

20   A.   No.

21   Q.   Okay.  Now, as an investigator, do you always record your

22   interviews?

23   A.   I do not.

24   Q.   Okay.  In some instances, do you do that?

25   A.   Yes.

1  Q.   Okay.  In this instance, did you record your interview or

2  your discussion with Dr. Stanton over the telephone?

3  A.   I did.

4  Q.   Okay.  And just to set the scene for the jury, where were

5  you the entire time this interview occurred?

6  A.   In a car.  I was a passenger in a car.

7  Q.   And I think as you already described, was this the time

8  period in your mind you were expecting to have a lengthy

9  interview with someone that you were investigating?

10  A.   No.

11  Q.   Okay.  But despite the fact that you were in a car, did

12  you move forward and speak with Dr. Stanton at that time?

13  A.   That's correct.

14  Q.   Okay.  Generally speaking, going into an interview like

15  that, what was your intention?  What was your goal?

16  A.   I was attempting to collect any information that I could

17  regarding Dr. Stanton's roles at the -- at -- at Gateway

18  Medical Associates.

19  Q.   In the course of the interview, did you have a strategy

20  of planning to confront him or jam him up on any particular

21  fact?

22  A.   No.

23  Q.   Just to be frank with everyone, were you hoping that he

24  would just continue talking to you and you could gather as

25  much information as you could?

1    A.    That's right.

2    Q.    And so as you went through the interview, is that the

3    approach you took?

4    A.    Yes.

5    Q.    Did you try to disagree with Dr. Stanton?

6    A.    No.

7    Q.    Did you agree with everything he said?

8    A.    No.

9    Q.    Let's, if we can, also just talk about the mechanics of

10   recording.

11        At what point in time did you begin recording the

12   conversation?

13   A.    I -- I think it was probably around the first few

14   minutes.  There was a point in time when I was trying to -- to

15   see if Dr. Stanton wanted to sit down and talk with us.  And

16   at some point, I realized, I think we're going to do an

17   interview over the phone.  And so I clicked the first recorder

18   I had next to me to try to get it on recording.

19   Q.    Okay.  So does the initial recording start while the

20   conversation is already underway?

21   A.    Yes.

22   Q.    Did you disclose to Dr. Stanton whether you were

23   recording the conversation?

24   A.    No.

25   Q.    Is that common?  As an investigator, do you do that?

1    A.   It is.

2    Q.   And why is that?

3    A.   It -- I thought sometimes it may -- it may -- it may

4    interfere with getting the complete truth or getting -- or

5    being able to collect all the information.  If someone knows

6    they're being recorded, they may be less willing to -- to give

7    you the truth.

8    Q.   Now, did you tell Dr. Stanton that he was under any

9    obligation to speak with you?

10   A.   No.

11   Q.   Okay.  Did you make any threats to him to make him talk

12   to you?

13   A.   No.

14   Q.   Again, you weren't physically present with him.  There

15   were no officers around him.  You guys were on the phone; is

16   that fair?

17   A.   That's correct.

18   Q.   Okay.  Now, how many total recordings are there of this

19   interaction that you had?

20   A.   There's two.

21   Q.   Okay.  And why is that?

22   A.   The first recorder I had next to me was another cell

23   phone.  And I usually keep a recorder in my backpack, but I

24   didn't -- I didn't want to keep playing -- I didn't want to

25   keep recording on my phone in case somebody called and that

1    other phone interrupted the -- the recording.  So at the

2    beginning, I was -- I was fumbling around trying to find my

3    other recorder.

4         And then I think it was -- it had no batteries in it, and

5    then I had to put batteries in it.  And so there's a little

6    bit of delay in me being able to get the second recording

7    going.

8    Q.   Okay.  So fast-forward to today.  The recordings in the

9    government's possession of this interview are split between

10   two different electronic files?

11   A.   Yes.

12   Q.   Okay.  And have you reviewed both of those?

13   A.   Yes.

14   Q.   To the best of your knowledge, do the recordings in the

15   government's possession, do they capture everything that you

16   recorded?

17   A.   Yes.

18   Q.   Okay.  To the best of your recollection, was there any

19   intent by you to somehow cut off part of the conversation or

20   leave out something that was said?

21   A.   No.

22   Q.   So to the extent things are missing in the recording,

23   it's just for the reasons you've explained about, A: Not being

24   ready for a substantive interview at that moment and then

25   having to switch devices?

1   A.   That's right.

2   Q.   Okay.  If we can, I would like to begin with what has

3   been marked as Government Exhibit 26A.

4        MR. SMITH:  And, Your Honor, just to flag this for

5   you, this is --

6   BY MR. SMITH:

7   Q.   Well, sir, do you know what 26A is?

8   A.   I do.

9   Q.   Okay.  What is that?

10  A.   That is the -- that's the first recording.

11  Q.   Okay.

12       MR. SMITH:  Your Honor, just for ease, we're going to

13  go ahead and play this one in its entirety.  It's

14  approximately 13 minutes long.  And we would ask permission to

15  do so.

16       THE COURT:  Any objection to that?

17       MR. STRIANSE:  No, sir.

18       THE COURT:  And are you seeking admission of 26A at

19  this point?

20       MR. SMITH:  Yes, Your Honor.

21       THE COURT:  Okay.  That would be granted.

22     Now, let me just confer on one issue.

23     (Sidebar conference.)

24       THE COURT:  Can you hear, Mr. Strianse?

25       MR. STRIANSE:  Yes, sir.

1    THE COURT:  So is this going to have the running

2  subtitle?

3    MR. SMITH:  Yes.

4    THE COURT:  Okay.  So I'm going to give an

5  instruction on that at this point.

6    Is this the appropriate time?

7    MR. SMITH:  Yes, Your Honor, I think so.

8    THE COURT:  Do you agree, Mr. Strianse?

9    MR. STRIANSE:  Yes, sir.

10    THE COURT:  Okay.

11  (Sidebar conference concluded.)

12    THE COURT:  All right.  I'm going to admit that

13  exhibit and allow the government to play it.

14    It's my understanding the government has arranged for

15  there to be subtitles on the screen in front of you.  That is

16  an effort to track what the audio is saying, but I want to

17  read you an instruction about it as you process this proof.

18    Before we play the recording, let me advise you that the

19  recording itself is the evidence, not the transcript, which

20  includes any subtitle.  The transcripts are merely for your

21  aid and guidance as you listen to the recording and clarifying

22  portions of the recording that may be difficult to hear or to

23  aid you to identify speakers.  The recording, however, is

24  evidence in the case.  The transcript, including any subtitle,

25  is not evidence.

1    If you perceive any variation, you will be guided solely

2    by the recording and not the transcribed words.  In other

3    words, believe your ears, not your eyes.  Of course, if you

4    don't want to use the transcript or subtitle, you're not

5    required to.  If you cannot determine from the recording that

6    particular words are spoken, you must disregard the transcript

7    insofar as those words are concerned.

8         All right.  You can proceed.

9              MR. SMITH:  Thank you, Your Honor.

10   BY MR. SMITH:

11   Q.   Now, as we're preparing to play this, Investigator

12   Sizemore, if you could just tell the jury, in general terms.

13   We've talked about kind of your approach to the interview

14   in -- and in broad contours what your mindset was going into

15   it.

16        Specific to the substance of the interview, what are some

17   of the things that you had hoped to ask Dr. Stanton questions

18   about?

19   A.   I wanted to speak to him about his roles and

20   responsibilities at the clinic, drug screens, people traveling

21   from Kentucky, and pill counts, and some of the other red

22   flags that we had noticed.

23   Q.   So at this point, was your investigation of GMA fairly

24   far along?

25   A.   Yes.

1    Q.   And so, for instance, did you feel like you had already

2    obtained and reviewed information about, among other things,

3    the drug screens we've heard a lot about throughout the course

4    of this trial?

5    A.   Yes.

6    Q.   Okay.  Just as a preview for the jury, does the

7    conversation that unfolded, does it stay to just one topic at

8    a time in an orderly procession topic by topic?

9    A.   No.  It's just like any other conversation.

10   Q.   Okay.  Does that mean it skips around from topic to

11   topic?

12   A.   It does.

13   Q.   Now, I anticipate that the jury is going to hear you or

14   Dr. Stanton returning to certain topics at different times

15   throughout the course of this conversation; is that fair?

16   A.   That is.

17   Q.   And in total, throughout the length of the interview,

18   from your perspective, why did you keep returning to certain

19   topics?

20   A.   There were certain topics that I was trying to get some

21   clarity on, because I -- I didn't -- there seemed to be a lot

22   of inconsistencies in what I was being told.  And so I was

23   just trying to get some more clarity on certain topics.

24   Q.   Okay.  Let's go ahead, if we can, listen to that first

25   recording.  And just, for the sake of ease, we're going to

1    play it all the way through.  I may ask Rebecca to stop it at

2    certain times, but with the Court's permission, I'll play it

3    now.

4              THE COURT:  Yes, you may.

5         (Audio recording played in open court.)

6    BY MR. SMITH:

7    Q.   So just briefly right there, there's a Jamie that's

8    referenced.

9         Is that true, sir?

10   A.   Yes.

11   Q.   Is Jamie that's being referenced, is that person in any

12   way associated with the DEA?

13   A.   No.

14   Q.   Okay.

15             MR. SMITH:  Let's proceed.

16        (Audio recording played in open court.)

17   BY MR. SMITH:

18   Q.   When you asked at this point as to whether he was the

19   backup director, what did you mean by that?

20   A.   I think at some point early on in the first part of the

21   conversation, before it got recorded, I think he had mentioned

22   something about him being Dr. Chavin's, backup director at --

23   at GMA.  So I was just getting back to that to ask questions.

24   Q.   So is it your understanding, based on this conversation,

25   and perhaps other information, that Dr. Stanton still

1  continued to have some association with Gateway Medical

2  Associates into 2021?

3  A.   Yes.

4  Q.   And according to this, that included being a backup

5  medical director?

6  A.   Yes.

7        MR. SMITH:  Okay.  Rebecca.

8     (Audio recording played in open court.)

9  BY MR. SMITH:

10 Q.   So this statement that we just heard -- and, again, the

11 jury's hearing should control, but that Dr. Stanton said that

12 he did not -- he wasn't required to, nor did he, review any of

13 his medical records.

14     Had you, at any point in the conversation, to your

15 recollection to that point, asked him about the medical

16 records?

17 A.   No.

18 Q.   And do you have any idea why, in context, he was talking

19 about whether he was required to review medical records?

20 A.   No.

21 Q.   Is that something that reoccurred throughout your

22 conversation?

23 A.   It had, yeah.

24 Q.   And what was his general position about whether he

25 reviewed medical records at GMA?

1  A.   He said he didn't have to and that he didn't.

2  Q.   Thank you.

3       (Audio recording played in open court.)

4  BY MR. SMITH:

5  Q.   So, sir, you just asked him an intervening question about

6  whether he saw new patients.

7       And can you explain, at least from your perspective, what

8  it is you had been told on either end of that question?

9  A.   At this point -- what he had told me?

10 Q.   Yeah.

11 A.   It -- it seemed like at first, that -- that he had --

12 that he did see some new patients at Gateway Medical

13 Associates.

14 Q.   And then did you ask a question to try to confirm that?

15 A.   Yes.

16 Q.   And then what was his response?

17 A.   He said, no, that would be -- that would be different at

18 a clinic that had nurse practitioners.

19       MR. SMITH:  Okay.  Can you press play?  Thank you.

20       (Audio recording played in open court.)

21 BY MR. SMITH:

22 Q.   So at this point, is it fair to say that Dr. Stanton has

23 been speaking kind of a long time unbroken?  You haven't had

24 any questions or intervening comments?

25 A.   Yes, that's correct.

1  Q.   Okay.  At this point, did you ask him questions about

2  whether he had reviewed any medical records?

3  A.   No.

4  Q.   Did you ask him anything about dismissals?

5  A.   No.

6        MR. SMITH:  Rebecca, can you press play, please?

7        (Audio recording played in open court.)

8  BY MR. SMITH:

9  Q.   So these two topics, dismissals and lowering medications,

10 were these topics that reoccurred throughout the interview

11 with Dr. Stanton?

12 A.   Yes.

13 Q.   Okay.  And you mentioned that you came back to certain

14 topics repeatedly because you were not clear on what the

15 response was.

16       Were these two of those areas?

17 A.   Yes.

18       MR. SMITH:  Okay.  Let's continue listening, and

19 we'll address that down the road.

20       (Audio recording played in open court.)

21 BY MR. SMITH:

22 Q.   So, sir, we just heard you ask a question; is that fair?

23 A.   That is.

24 Q.   Okay.  And that question is about the requirements to

25 review records vis-à-vis if a practice has something like a

1    nurse practitioner?

2    A.   Yes.

3    Q.   Okay.  To be clear for the jury, when you said that, is

4    that because that's your view on the requirements?

5    A.   No.

6    Q.   Okay.  Why do you say that in this interview?

7    A.   I'm just confirming what he said, and I was trying to sum

8    that conversation up and just get back into the medical

9    records conversation.

10   Q.   Now, as we listen forward in this interview, is that

11   something that you did repeatedly in the course of this

12   interview?

13   A.   Yeah.  I mean, in any interview I do, whether recorded or

14   not, I often will repeat what people say to make sure that I

15   understood it correctly.

16   Q.   Okay.  And so throughout this interview, are you trying

17   to summarize or repeat back to Dr. Stanton what you think he's

18   telling you so that you have it on the recording for the

19   purposes of a report or anything else you might do with it?

20   A.   That's right.

21        MR. SMITH:  All right.  Rebecca, please press play.

22        (Audio file played in open court.)

23   BY MR. SMITH:

24   Q.   At the beginning of that exchange, you made a statement

25   about him doing dismissals.

1      Do you remember that?

2    A.    Yes.

3    Q.    Okay.  And, again, why did you make that question to him?

4    Why did you make that statement to him?

5    A.    Trying to confirm what his thoughts were on that.

6    Q.    Was that prompted by his earlier statement we talked

7    about a moment ago?

8    A.    Yes.

9    Q.    Okay.  And so at this point in the interview, what did

10   you understand him to be telling you about whether he did

11   dismissals or was responsible for dismissals?

12   A.    It sounds like that he talked to Dr. Maccarone about

13   dismissals.

14   Q.    And who, according to him, was responsible for the

15   dismissals?  Who did the dismissals at the practice?

16   A.    Dr. Maccarone.

17   Q.    Okay.  Is that an area that seemed to change over the

18   course of the interview?

19   A.    Yes.

20         MR. SMITH:  Okay.  Let's continue listening.

21      (Audio recording played in open court.)

22   BY MR. SMITH:

23   Q.    All right.  Based on this conversation, did he indicate

24   to you an awareness that the clinic had, in his words, been

25   raided?  Did you understand that to be a reference to

1    something?

2    A.    Yes.

3    Q.    What was that reference to?

4    A.    The search warrant that we executed in October.

5    Q.    Okay.  And based on your conversation with him, the

6    statements he made to you, did he express that he was unaware

7    of whatever prompted that raid, whatever concerns or practices

8    might have been going on?

9    A.    Yes.

10   Q.    Okay.  Now, did you have an idea at that point how long

11   Dr. Stanton had been affiliated with --

12   A.    Yes.

13   Q.    How long?

14   A.    From July 2016 until maybe the day after the search

15   warrant, somewhere in that area.

16          MR. SMITH:  Okay.  Let's continue on.  Thank you,

17   Rebecca.

18       (Audio recording played in open court.)

19   BY MR. SMITH:

20   Q.    Okay.  So there's a long discussion that just occurred

21   about medications raising and lowering.

22       Are you generally with me?

23   A.    Yes.

24   Q.    Okay.  And we've looked at some examples in this case.

25       Did you have a sense of that from your investigation?

1    A.    Yes.

2    Q.    Okay.  Were you able to discern, based on your review of

3    the data and otherwise, a discernible practice of raising and

4    lowering across every patient?

5    A.    It's pretty inconsistent, so it's actually pretty tough

6    to do.

7    Q.    So, for instance, if we were to bring up Government

8    Exhibit 501C, just as an example.

9          Can you just walk the jury through, for patient Shawn

10   Brown -- it's a patient we're familiar with -- can you please

11   just walk through what prescriptions you saw in the first

12   couple of months there?

13   A.    January 31st, there is oxycodone, 10 milligram, 90 count;

14   oxymorphone, 7.5, 30 count; gabapentin, 800 milligram, 120.

15         On March 4th, there is oxycodone, 10 milligram, 90 count;

16   oxymorphone, 7.5, 30 count; and then gabapentin, 800

17   milligram, 120.

18         And then on August 1st, it's now oxycodone, 30 milligram,

19   70 count.

20   Q.    And what had it been before, milligram wise?

21   A.    Ten.

22   Q.    Okay.

23   A.    And then oxymorphone, 15, 60 count.  And it's previously

24   7.5, and then gabapentin, 800 milligram, 240.

25   Q.    Okay.  And to be accurate, there's a gap there between

1    March of 2019 and August of 2019?

2    A.    Yes.

3    Q.    And do you infer from that that Dr. Maccarone would have

4    been seeing this patient?

5    A.    Yes.

6    Q.    And so the patient started out at 10 milligrams, and by

7    the time we're in August, they're on 30 milligrams?

8    A.    Yes.

9    Q.    Just three times as much?

10   A.    Yes.

11   Q.    Is that fair?

12   A.    That is.

13   Q.    Okay.  Three times as much as far as the milligrams go.

14         Is this kind of a familiar pattern to you, when I asked

15   you the question of, was there consistent raising or lowering?

16   A.    Yeah.  There's -- there's times when Dr. Stanton rolled

17   over.  There's times when Dr. Maccarone rolled over.  There's

18   times when Dr. Maccarone raised it up, and then the next

19   prescription Dr. Stanton writes is the same raise that

20   Dr. Maccarone wrote.  And then --

21   Q.    Yeah.  Now, as an investigator, when you're reviewing

22   this information and looking at it, was it significant to you

23   when, in that instance -- for instance, let's say somebody is

24   getting 70 oxy 30s.

25         If they take 5 pills off, was that a significant

1    difference to you given the total MME of that patient at the

2    time?

3    A.    No.

4    Q.    Okay.  And for most of the patients you looked at, that

5    we've looked at in this trial, what were the MME levels like

6    based on your review of the data?

7    A.    A lot of them were in the hundred to 200 area.

8    Q.    Were there some patients even higher than that?

9    A.    Yeah.

10   Q.    So differences going from 210 to 200, to 220, to 190, are

11   those still in an area that, as an investigator, you

12   understand to be significantly high?

13   A.    Yeah, they're still very high.

14        MR. SMITH:  Okay.  Now, if we can continue on with --

15   can you press play?  Oh, that was the end.  Okay.

16   BY MR. SMITH:

17   Q.    So that is the end of the first recording.

18        And just to orient the jury, is that recording longer or

19   shorter than the second recording?

20   A.    Much shorter.

21   Q.    Okay.  So the second recording is much longer.  And if

22   possible, what I would like to do with you now, we've heard

23   kind of various topics mentioned throughout the interview.

24        If possible, if it's okay with you, Investigator

25   Sizemore, I would like to kind of proceed through and look at

1    clips of this interview by certain topics.

2         Is that okay?

3    A.   That is.

4    Q.   Okay.  And, again, just so the jury understands, as we

5    walk through these clips, are these going to be sequential all

6    the time?

7    A.   No.

8    Q.   And is that because topics are talked about at different

9    points in the interview?

10   A.   That's right.

11   Q.   Okay.  So, for instance, we heard a couple comments in

12   that first recording about drug tests, and we heard a

13   reference about cocaine and whether patients would be

14   discharged.

15        Was that a topic that came up again in the course of your

16   discussions?

17   A.   Yes.

18   Q.   Okay.  If we can, let's first play Government Exhibit --

19             THE COURT:  Well, hang on.

20             MR. SMITH:  Oh, I'm sorry.  I'm sorry.  I'm sorry,

21   Your Honor.  Yeah.

22             THE COURT:  So 26B, I haven't admitted that yet.

23        You're moving for admission?

24             MR. SMITH:  Yes.  And I jumped the gun, Your Honor.

25   I'm sorry.

1          THE COURT:  That's okay.  So you're seeking admission

2     of all of B?  But you're only going to use parts of it, but

3     you're seeking admission of all of it?

4          MR. SMITH:  I was only going to admit the clips, but

5     I'm amenable to if the defense prefers otherwise.

6          MR. STRIANSE:  I think for the record, you admit it

7     all.

8          THE COURT:  And you've seen all of 26B?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Okay.  Why don't I admit all of it.  You

11     play the parts you want to play.  Then you can play any

12     additional parts you want to play.  I'll admit all of 26B.

13          And it's going to have the same type of subtitle method

14     the government has used for 26A, correct?

15          MR. SMITH:  That's correct, Your Honor.

16          THE COURT:  Okay.  Same instruction on that.  Listen

17     with your ears.  Believe your ears if there's a conflict.

18     Follow that same instruction in using the subtitles.

19          You can proceed.

20          MR. SMITH:  Okay.  Thank you, Your Honor.

21          I may, for the record, just ask -- I will reference clip

22     numbers that we have marked as exhibits.  And we've actually

23     broken those out into different electronic files, I believe.

24     So just for the record, I will reference those and briefly ask

25     to admit them, if that's okay, Your Honor.

1    Okay.  So first is 26B2.  We would ask to admit that.

2         THE COURT:  All of the subparts are admitted.

3         MR. SMITH:  Okay.  I'll just reference them, and

4    we'll just assume they're admitted.

5         THE COURT:  Yeah.

6         MR. SMITH:  Thank you, Your Honor.

7    So first, can we please bring up 26B2?

8    (Audio recording played in open court.)

9    BY MR. SMITH:

10   Q.   Okay.  So in this clip, the topic of discharges for drug

11   screens is raised again; is that fair?

12   A.   That is.

13   Q.   And what did he say about people who tested positive for

14   heroin and cocaine?

15   A.   He said, "Unless it was something like heroin or cocaine,

16   in which case they wouldn't even come see me for an injection,

17   they were being discharged."

18   Q.   So the patients who were testing positive for heroin or

19   cocaine were being discharged?

20   A.   Yes.

21   Q.   Was there still some lingering confusion in your mind

22   about who was doing the dismissing?

23   A.   Yes.

24   Q.   Okay.  Based on your review of the records, did you

25   believe it was accurate that patients were actually being

1   discharged for, let's say, heroin?

2   A.   No.

3           MR. SMITH:   Now, can we bring up Government

4   Exhibit 26B5?

5   Q.   So did you ask Dr. Stanton, again, about whether patients

6   were failing drug tests?

7   A.   Yes.

8   Q.   Is that based on some of the familiarity you already had

9   with the medical records and their contents?

10  A.   That's correct.

11          MR. SMITH:   Okay.   Please press play.

12       (Audio recording played in open court.)

13  BY MR. SMITH:

14  Q.   All right.   So in listening to that, as an investigator,

15  did that explanation make a lot of sense to you?

16  A.   No.

17  Q.   Can you explain why not?

18  A.   Well, somebody who's going to be -- have negative tests

19  for four months in a row, and it seems like the whole month

20  delay thing, I -- I would feel like once you got the abnormal

21  test the first time --

22  Q.   And, sir, I don't want you to opine on a practice of

23  medicine, but what I wanted to get at was:   You had reviewed

24  records.   You had seen information.

25       Did that response line up with what you were expecting?

1    A.   Not based on the records that I reviewed, no.

2    Q.   Okay.  Now, did you talk about this -- this discussion,

3    the types of urine drug tests he's talking about, is it fair

4    to say that it appears he's talking about a negative drug test

5    when a patient doesn't have something in their system?

6    A.   Yes.

7    Q.   Okay.  Did you talk about pill counts with Dr. Stanton?

8    A.   Yes.

9         MR. SMITH:  Okay.  Let's bring up Government

10   Exhibit 26B15.

11   Q.   And just so the jury understands, why did you ask

12   Dr. Stanton about pill counts?

13   A.   Because based on the information that we had gotten about

14   the clinic and the way they treated pill counts.

15        (Audio recording played in open court.)

16   BY MR. SMITH:

17   Q.   Okay.  So when you asked him, "Did you ever see that

18   happening?" why did you ask him that question?

19   A.   Because it happened so often, and everybody in the clinic

20   seemed to know about it.

21   Q.   Did Dr. Stanton express whether he had any way to know

22   about it?

23   A.   He said he didn't.

24        MR. SMITH:  Now, just as example, can we bring up

25   Government Exhibit 501G?

1    BY MR. SMITH:

2    Q.   Sir, in Government Exhibit 501G, does it summarize

3    Jennifer Vardaman's patient file, as an example?

4    A.   Yes.

5    Q.   Now, have you looked at patient records in this case?

6    A.   I have.

7    Q.   How frequently have you encountered when there were notes

8    about pill counts?

9    A.   Not very often.

10   Q.   Okay.  How hard did you have to look in a given file to

11   see whether there were notations about pill counts?

12   A.   You had to look.

13   Q.   And how long did you have to look to determine that there

14   weren't many notes about pill counts?

15   A.   Not very long.

16   Q.   Okay.  Now, in this example, was there an instance in

17   Ms. Vardaman's file in which a pill count was conducted on

18   July 9th?

19   A.   Yes.

20   Q.   And was that reflected in an office note?

21   A.   Yes.

22   Q.   And that's summarized here?

23   A.   Yes.

24   Q.   And who was the doctor that saw Ms. Vardaman after that?

25   A.   Dr. Stanton.

1        MR. SMITH:  Now, returning to the topic of

2   discharges, can we go to Government Exhibit 26B8, please?

3   Okay.  Let's press play here.

4        (Audio recording was played in open court.)

5   BY MR. SMITH:

6   Q.  So at this point in the interview, what was your

7   understanding about discharges and the supposed policy of

8   discharges at Gateway?

9   A.  Dr. Stanton would make a recommendation to Dr. Maccarone,

10  and he took care of it.

11  Q.  Okay.  So that's what he was telling you?

12  A.  Yes.

13  Q.  Okay.  And what about the medication levels and lowering

14  them because of an aberrant drug screen?

15  A.  Same.  It was a recommendation that was made.

16        MR. SMITH:  Okay.  Let's go to 26B9.

17       (Audio recording played in open court.)

18  BY MR. SMITH:

19  Q.  So at this point in the interview, what was your

20  understanding about what he was telling you about raising or

21  lowering medications?

22  A.  That if there was an abnormal test, that he lowered them

23  at the visit by 10 percent.

24  Q.  Did that indicate to you, as an investigator, that he had

25  some awareness that people were failing drug tests?

1    A.   Yes.

2    Q.   Now, with respect to --

3         MR. SMITH:  Okay.  Let's look at one more.  Can we

4    look at 26B28?

5    Q.   At times, did Dr. Stanton draw a distinction between

6    certain types of drugs?

7    A.   Yes.

8    Q.   So, for instance, we heard about, I think, cocaine and

9    heroin in some of the earlier clips?

10   A.   Yes.

11   Q.   In your understanding, and we'll play this in a second,

12   was there a distinction being drawn between, you know, failed

13   drug tests that might result in lowering pills and then

14   certain type of drug tests that were kind of deal-breakers?

15   A.   Yeah, there were certain illicit drugs.

16        MR. SMITH:  Okay.  So can we press play on this clip?

17        (Audio recording played in open court.)

18   BY MR. SMITH:

19   Q.   So did it identify certain types of drug tests, including

20   cocaine and heroin?

21   A.   Yes.

22   Q.   And how did he refer to those kind of drugs?

23   A.   As heinous.

24        MR. SMITH:  Press play, please.

25        (Audio recording played in open court.)

1    MR. SMITH:  I'm sorry.  Can we pause it there?  Is it

2    possible to rewind it?  I think I -- we skipped just a bit.

3    I'm sorry, Rebecca.

4        (Audio recording played in open court.)

5    MR. SMITH:  Let's talk about that point.

6    BY MR. SMITH:

7    Q.   So based on this discussion, was there a distinction

8    between something heinous, like heroin, that was an automatic

9    discharge, and then the other drugs that got the percentage

10   decrease?

11   A.   Yes.

12   Q.   Okay.  Now, in your review of the files and everything

13   else you've seen, did you ever see any indication that there

14   was a percentage decrease applied?

15   A.   No.  It usually seemed to be just five or ten pills.

16   Q.   Okay.  And that was not a mathematical percentage of any

17   actual prescription, as far as you could discern?

18   A.   No.

19   MR. SMITH:  Okay.  Thank you, Rebecca.

20       (Audio recording played in open court.)

21   BY MR. SMITH:

22   Q.   So based on this interaction, was your understanding of

23   what he was telling you that for the non-heinous group of

24   drugs, if there was some bad result, that he would have been

25   aware of it and understood that's why a medication was

1    lowered?

2    A.   Yes.

3    Q.   Okay.  So based on this, did that indicate to you, was he

4    telling you that he was aware of the drug screen results?

5    A.   That is correct.

6    Q.   Did he suggest to you anywhere in here that something had

7    been removed or hidden from him in a file?

8    A.   No.

9    Q.   Okay.  I realize they're kind of related, but did you

10   also talk about prescribing the medications themselves with

11   Dr. Stanton?

12   A.   Yes.

13        MR. SMITH:  Okay.  If we can, let's bring up 26B7.

14   BY MR. SMITH:

15   Q.   While she's doing that, for instance, Investigator

16   Sizemore, did you discuss with Dr. Stanton how the

17   prescriptions themselves were generated at the practice?

18   A.   I did.

19        MR. SMITH:  Okay.  Can we press play again?

20        (Audio recording played in open court.)

21   BY MR. SMITH:

22   Q.   So in addition to the mechanics of prescribing, did you

23   also discuss with Dr. Stanton the dosage amounts or the what

24   we referred to as the MME levels?

25   A.   Yes.

1      MR. SMITH:  Okay.  Can we look at Government

2  Exhibit 26B20, please?

3      (Audio recording played in open court.)

4  BY MR. SMITH:

5  Q.  So the numbers there, what did you understand those to be

6  references to?

7  A.  The MEDD numbers.

8  Q.  Okay.  And based on your understanding, and we've heard

9  in this trial, there's different thresholds of MEDD levels?

10  A.  That's correct.

11  Q.  Okay.  And you had told us earlier about your review of

12  the data and what you saw, 100, 200 and that.

13      What did Dr. Stanton say about his understanding of the

14  patients and what levels of medication they were on?

15  A.  Yeah.  He said they were -- they were at -- a lot.  Were

16  at 220 or 250.

17  Q.  Now, just before we do that, the other point of

18  clarification.

19      In this clip, Dr. Stanton references "our clinic" and

20  what he does at "our clinic?"

21      Did you have an understanding of what that meant?

22  A.  Yes.

23  Q.  Okay.  Can you explain that, please?

24  A.  There were a few times throughout the interview where we

25  would -- he would talk about, I guess, in comparison to his

1   other clinic.

2   Q.   Okay.  So it was your understanding that Dr. Stanton

3   either owned or worked at another clinic; is that right?

4   A.   Yes.

5   Q.   And was he comparing how that clinic practices to the way

6   Gateway practiced?

7   A.   Yes.

8        (Audio recording played in open court.)

9   BY MR. SMITH:

10  Q.   Okay.  Did you also talk to Dr. Stanton about the

11  distance patients were traveling, how long they were waiting

12  if Dr. Maccarone was there?

13  A.   Yes.

14            MR. SMITH:  If we can, let's look at Government

15  Exhibit 26B17.

16       (Audio recording played in open court.)

17  BY MR. SMITH:

18  Q.   So, again, this reference to "MEDD," is that the term

19  "MME" we've been using throughout the trial?

20  A.   Yes.

21  Q.   And what was your understanding of what he was saying

22  between the difference in Tennessee and Kentucky?

23  A.   That Kentucky's recommendation is 90, and Tennessee's is

24  120.

25  Q.   And so this is him recounting to you what patients had

1    purportedly told him about why they were coming from Kentucky?

2    A.   Yes.

3    Q.   And that related to the amounts of medications they could

4    get?

5    A.   Yes.

6    Q.   Now, in addition to the distances, let's look at, well,

7    one related one.

8         MR. SMITH:  26B23, please.

9    Q.   Did you ask him again about this concept, the travel from

10   Kentucky, at another point in the interview?

11   A.   Yes.

12        MR. SMITH:  Rebecca, can we please play that?

13        (Audio recording played in open court.)

14   BY MR. SMITH:

15   Q.   Okay.  So according to Dr. Stanton, did patients tell him

16   that, "The doctors in Kentucky give us too low of a dosage and

17   stuff?

18   A.   That's correct.

19   Q.   Now, related to the travel in this case, let's talk a

20   little bit about the wait time.

21        Did you talk to Dr. Stanton about the amount of time

22   patients are waiting at the clinic?

23   A.   I did.

24        MR. SMITH:  Okay.  Let's look at 26B18, please.

25        (Audio recording played in open court.)

1   BY MR. SMITH:

2   Q.   So that last question you asked him, about whether there

3   was complaints about it being hard on their pain, why did you

4   ask that question?

5   A.   Well, because driving three or four hours for even a

6   normal person is -- is kind of tough to do.

7   Q.   And who is this population of patients supposed to be at

8   GMA?

9   A.   People with extreme low back pain.

10  Q.   And so when you asked him that, you asked him, "Did you

11  hear complaints about, you know, the pain from the wait?"

12       And what was his response?

13  A.   "No."

14  Q.   What did they complain about?

15  A.   Having to come back in the morning or get a motel, or not

16  being able to -- they wanted to get out of there earlier.

17  Q.   Let's look, if we can -- did you ask him if he had or did

18  you discuss with him whether he had any discussions with

19  Dr. Maccarone about the travel or the wait times?

20  A.   Yes.

21       MR. SMITH:  Okay.  Let's look at 26B22.

22       (Audio recording played in open court.)

23  BY MR. SMITH:

24  Q.   That last exchange, he said, "Patients would come to my

25  office, we would lower their medications, and then they would

1   leave and go back to Dr. Maccarone's office."

2        What was the significance of that to you?

3   A.   He was indicating that they were going back to

4   Dr. Maccarone's office because they were getting higher

5   dosages.

6   Q.   And he indicated to you that he was aware of that?

7   A.   Yes.

8            MR. SMITH:  Can you press play, Rebecca?

9        (Audio recording played in open court.)

10  BY MR. SMITH:

11  Q.   So according to Dr. Stanton, did Dr. Maccarone say to

12  him, at some point, you know, "You can take my patients, but

13  they're going to come back to me because you don't give them

14  what they want"?

15  A.   That's correct.

16  Q.   And what is the "what they want"?  What did you

17  understand that to mean in context?

18  A.   The pills.

19  Q.   And Dr. Stanton said he was aware of this, that

20  Dr. Maccarone told him this?

21  A.   Yes.

22           MR. SMITH:  Let's go to Government Exhibit 26B.

23           THE COURT:  We're going to take a break in just a

24  moment.

25           MR. SMITH:  Yes.

1          THE COURT:  If now is a good time, we'll take it now.

2          MR. SMITH:  Yeah.  Thanks, Your Honor.

3          THE COURT:  Okay.  Continue to abide by the same

4   rules during this break.  No discussion, reading, exploration.

5   Continue to keep an open mind as the proof comes in.  It's

6   2:26 by my watch.  We'll take a 20-minute break at this time.

7          Thank you to the jury.  You're excused.

8          (The jury exited the courtroom at 2:26 p.m.)

9          THE COURT:  Thank you.  The jury has exited.

10  Everybody can be seated.  You can step down, Investigator

11  Sizemore.

12         Would you tap that mic on the podium?  I'm not picking

13  you up very well.  Okay.  I think you're kind of speaking past

14  it instead of toward it.

15         MR. SMITH:  I am.

16         THE COURT:  It would be helpful to have the

17  amplification.  I'm fine if you want to tilt it around a

18  little bit.  I'm fine with that, too.

19         MR. SMITH:  I apologize to you and the court

20  reporter.

21         THE COURT:  No, no.  It's fine.  Everything is going

22  fine.  It would help, I think, to pick that up.

23         Anything else to take up?

24         MR. SMITH:  No, Your Honor.

25         THE COURT:  Mr. Strianse.

1    MR. STRIANSE:  No, Your Honor.

2    THE COURT:  Okay.  We'll take that break, then.

3    Thank you.

4    (Recess from 2:27 p.m. until 2:48 p.m.)

5    THE COURT:  All right.  Thank you.  We're back on the

6    record with all parties present, counsel.  And Dr. Stanton is

7    here.  The jury is all present and accounted for after the

8    afternoon break.  The witness remains on the stand under oath.

9    And, Mr. Smith, you can continue.

10    MR. SMITH:  Thank you, Your Honor.

11    BY MR. SMITH:

12    Q.    Okay.  I think when we left off, I was asking you about

13    one topic of your interview of Dr. Stanton that related to

14    travel and wait time for patients at Gateway Medical

15    Associates; is that fair?  Are we on the same page?

16    A.    Yes.

17    Q.    Okay.  Now, did Dr. Stanton indicate whether he had

18    communicated with Dr. Maccarone about that subject?

19    A.    Which clinic are we talking about here?

20    Q.    Just step back.  I'm not asking you about any particular

21    clinic.

22    Before we broke, did we hear a conversation about

23    interactions between Dr. Stanton and Dr. Maccarone about

24    patients that -- between the two clinics?  So between his

25    clinics and GMA and whether patients would get what they want?

1    A.   Yes.

2    Q.   Okay.  Did Dr. Stanton make any references to losing

3    patients in the context of big wait times?

4    A.   Yes.

5           MR. SMITH:  Okay.  Can we bring up Government

6    Exhibit 26B24, please?

7        (Audio recording played in open court.)

8    BY MR. SMITH:

9    Q.   So with respect to these patients that were coming and

10   staying for long time periods, did he indicate an awareness to

11   you that patients were staying as late as 1:00 a.m.?

12   A.   Yes.

13   Q.   Okay.  And at the end of this exchange, did he say that

14   he wasn't their doctor?

15   A.   Yes.

16   Q.   Have you seen throughout the medical records where

17   Dr. Stanton prescribed to these people many times?

18   A.   Yes.

19   Q.   Did we just introduce and look at a number of

20   prescriptions that Dr. Stanton wrote to these patients?

21   A.   That's correct.

22   Q.   Now, you told us earlier in your testimony, when you were

23   giving us some background opinion on your training, you talked

24   about the concept of group travel, okay?  Now, I want to move

25   forward to just factual testimony here about your conversation

1    with Dr. Stanton.

2         Did you talk about or did any issues of group travel

3    arise in your interview with him?

4    A.   Yes.

5              MR. SMITH:  Okay.  Let's look at Government

6    Exhibit 26B26.

7         (Audio recording played in open court.)

8    BY MR. SMITH:

9    Q.   Now, sir, did you recognize the name Wagers?

10   A.   I did.

11   Q.   How did you recognize that name?

12   A.   Because Jeffrey Ghent had sponsored Elzie and Raleigh.

13   Q.   Sir, don't introduce anything he might have told you.

14        Just were you familiar with that name from the

15   investigation?

16   A.   Oh.  Yes.

17   Q.   Those other names, for instance, the Hibbards.

18        Did you see indications that those were patients at

19   Gateway Medical Associates?

20   A.   Yes.

21             MR. SMITH:  And if we pull up -- just briefly,

22   Rebecca, can we bring up Government Exhibit 502?  Can we go to

23   page 12, please?

24   BY MR. SMITH:

25   Q.   Were these some of the names that we identified earlier

1    as having the same last name and failing drug tests at GMA?

2    A.   Yes.

3         MR. SMITH:  Okay.  You can bring that down, Rebecca.

4    BY MR. SMITH:

5    Q.   Now, we've heard in this case about injections.

6         Did you talk at all to Dr. Stanton about injections?

7    A.   Yes.

8         MR. SMITH:  Okay.  Can we please bring up Government

9    Exhibit 26B12?

10        (Audio recording played in open court.)

11   BY MR. SMITH:

12   Q.   And I think the last part is a little bit quick, but were

13   you able to discern what was said at the last piece?

14   A.   Yes.

15   Q.   And what did he indicate to you about patients who didn't

16   take injections?

17   A.   He said they didn't want the injections.  They just

18   wanted the medications.

19   Q.   Now, did you also talk about the money that Gateway was

20   bringing in during the time period in question?

21   A.   I did.

22        MR. SMITH:  Let's bring up Government Exhibit 26B13.

23        (Audio recording played in open court.)

24   BY MR. SMITH:

25   Q.   So I realize we're talking about money, but in the

1   context of that statement, what did he say about urine drug

2   screens?

3   A.   He said that -- that they get that done about every time,

4   so he can look at it to see if there isn't a variance when

5   they come in.

6   Q.   So in his statement to you, he was aware they were being

7   drug tested every month, and he could look at it to see if

8   there was something wrong with it?

9   A.   Yes.

10       (Audio recording played in open court.)

11  BY MR. SMITH:

12  Q.   Okay.  So what was the purpose of asking him these

13  questions about the money?  What were you trying to figure

14  out?

15  A.   I was trying to figure out his awareness of -- of the

16  money and then, again, just in general, red flags that were

17  shown at the clinic, just trying to see if he was aware of

18  those red flags as -- as well.

19  Q.   Did he indicate to you -- well...

20       Now, we talked about injections earlier.

21       Did you talk to Dr. Stanton about how he was paid?

22  A.   Yes.

23            MR. SMITH:  Okay.  Let's look at 26B27.

24       (Audio recording played in open court.)

25  BY MR. SMITH:

1    Q.   Couple of things there.  There's a reference to a

2    "no-show fee."

3         What was your understanding of that based on what he told

4    you?

5    A.   There was an -- an injection no-show fee as well.

6    Q.   So if somebody was supposed to get an injection and they

7    didn't show, he would get paid some of the no-show fee?

8    A.   Yeah.

9    Q.   Now, that last part, when he says something to the effect

10   of, "The patient didn't give the money directly to me.  They

11   paid at the window," do you know why he said that?

12   A.   No.

13   Q.   Did you make any suggestion that the money came right to

14   him?

15   A.   No.

16        MR. SMITH:  Now, could we press play?

17        (Audio recording played in open court.)

18   BY MR. SMITH:

19   Q.   So we looked at, in this trial, some financial records,

20   and we saw over the course of time, I think it's fair to say,

21   that Dr. Stanton's amount of money he received from GMA went

22   up over the course of time.

23        Based on his statements to you, did he say that the

24   injections were part of why he was making more money?

25   A.   Yes.

1    Q.   Now, did you talk to him about the time period after the

2    search warrant and kind of the status -- I don't want to say

3    the status of the investigation, but post search warrant time

4    period?  Did you talk to him about that?

5    A.   Yes.

6    Q.   For instance, did you ask him about leaving the practice?

7    A.   Yes.

8         MR. SMITH:  Okay.  Now, let's look at 26B11.

9         (Audio recording played in open court.)

10   BY MR. SMITH:

11   Q.   So earlier we heard conversations that he related about

12   Maccarone purportedly disagreeing with him, for instance,

13   about the hours or maybe different medication levels and this

14   idea that patients are going to come back to GMA because

15   Stanton doesn't give them what they want.

16        But in this clip, does he say that they were always in

17   agreement?

18   A.   Yeah.  He says that he would suggest something, and they

19   would be in agreement.

20   Q.   Now, did he discuss with you any steps he took when he

21   was leaving Gateway Medical Associates?

22   A.   Yes.

23   Q.   I used the term "leaving Gateway Medical Associates," but

24   as I think we covered earlier, did he indicate to you that he

25   actually stayed on as a backup medical director in some

1  capacity?

2  A.   Yes.

3         MR. SMITH:  So let's look at Government Exhibit 26B4,

4  please.

5      (Audio recording played in open court.)

6  BY MR. SMITH:

7  Q.   Just so that the jury understands, in this part of the

8  discussion, did Dr. Stanton tell you about some letters he

9  gave to Dr. Maccarone?

10 A.   Yes.

11 Q.   And in this portion of the conversation, is he talking to

12 you about the contents of those letters?

13 A.   Yes.

14 Q.   And what did he say about the content of the letter that

15 he gave to Dr. Maccarone with respect to urine tests that had

16 cocaine or heroin?

17 A.   He said they would not knowingly give medication to

18 anyone who repeatedly failed a urine drug test or who had

19 cocaine or heroin, and it was their policy to consistently try

20 to lower the medications.

21 Q.   Did he give you any idea or did he tell you why that

22 topic in particular was put into a letter that he drafted?

23 A.   No.

24         MR. SMITH:  Can you press play, Rebecca?

25      (Audio recording played in open court.)

1  BY MR. SMITH:

2  Q.  Was it your understanding that Dr. Stanton drafted and

3  gave letters from Dr. Maccarone to sign?

4  A.  Yes.

5  Q.  And then according to Dr. Stanton, what was

6  Maccarone's -- did Maccarone agree to sign those?

7  A.  No.  He -- according to what he said, he said he -- they

8  refused to sign them.

9  Q.  Now, did you ask Dr. Stanton for copies of those letters?

10  A.  I did.

11  Q.  And have you seen copies of the letters through other

12  sources as well?

13  A.  Yes.

14  Q.  Okay.  So let's look at the copy that Dr. Stanton sent to

15  you.

16        MR. SMITH:  Let's look at Government Exhibit 27, I

17  believe.  And, first, let's look at Government Exhibit A.

18  BY MR. SMITH:

19  Q.  How did Dr. Stanton transmit the letters to you?

20  A.  Email.

21  Q.  And, sir, do you see what has been marked as 27A?

22  A.  Yes.

23  Q.  Okay.  What is that?

24  A.  That's the email.

25        MR. SMITH:  Your Honor, we move to admit Government

1    Exhibit 27A.

2           THE COURT:  Is A, is that just the email?

3           MR. SMITH:  It's just the email, and then we have B

4    and C, which will be the letters.

5           THE COURT:  Okay.  Any objection on that?

6           MR. STRIANSE:  No objection.

7           THE COURT:  Thank you.  27A will be admitted and may

8    be displayed.

9    BY MR. SMITH:

10   Q.   Okay.  Sir, what did he tell you in that email?

11   A.   He said, he wrote, "The Word documents that I printed and

12   gave" to Dr. -- "to Maccarone three days after the raid.  Last

13   October, they were printed, 20 October, and given to him soon

14   after.  Let me know if you have trouble opening them."

15          MR. SMITH:  And let's go to 26B, please, Rebecca.

16   Yeah, I'm sorry.  27B.

17   BY MR. SMITH:

18   Q.   Okay.  Sir, do you recognize 27B?

19   A.   Yes.

20   Q.   Was this one of the attachments to the email that we just

21   looked at?

22   A.   It was.

23          MR. SMITH:  Your Honor, we move to admit 27B.

24          THE COURT:  Any objection?

25          MR. STRIANSE:  No, Your Honor.

1    THE COURT:  That'll be admitted and may be displayed.

2    BY MR. SMITH:

3    Q.   If you would, please, can you just read this letter

4    aloud?

5    A.   Yeah.  "Dr. Stanton has been medical director at Gateway

6    Medical Associates for the past two years."

7    Q.   Okay.  Just pause for a second.

8         So this starts out talking about Dr. Stanton in the third

9    person here.

10        Based on your understanding of what Dr. Stanton told you,

11   who wrote this letter?

12   A.   He did, Dr. Stanton.

13   Q.   Okay.  So Dr. Stanton is writing about Dr. Stanton here

14   in this letter?

15   A.   Yes.

16   Q.   Okay.  So please continue.

17   A.   "During that time, his duties were to evaluate patients

18   with an MEDD over 120 to determine the necessity of continuing

19   these levels of narcotics."

20   Q.   Okay.  And going to that first -- those two paragraphs

21   where he talks about during this time, how long did he say,

22   authoring this letter, that he had been the medical director

23   at Gateway Medical Associates?

24   A.   Past two years.

25   Q.   And this was written in what time frame?

1    A.    October 2020.

2    Q.    Based on your investigation, is the claim that he had

3    been the medical director for only two years, is that

4    accurate?

5    A.    No.

6    Q.    Based on your review of financial records, for instance,

7    had he been getting paid from Gateway Medical Associates for

8    twice that long?

9    A.    Yes.

10   Q.    Please continue to read.

11   A.    "Additionally, he was responsible for giving patients

12   injections as needed in the back, trigger points and joints.

13   Dr. Stanton questioned every patient he saw to make sure they

14   had tried alternative treatments, such as bracing therapy,

15   pain creams, anti-inflammatory medications, and injections.

16         "If Dr. Maccarone was sick or recovering from surgery,

17   Dr. Stanton would see every patient to make sure that there

18   was no lapse in their treatment and medications as needed.  He

19   would perform a physical exam on new patients, MEDD patients,

20   and those receiving injections.  Dr. Stanton was compensated

21   by a set fee as medical director, as well as by his split fee

22   for injections given.  He was never compensated by the

23   patients directly."

24   Q.    Okay.  Let's stop there.

25         Did that seem familiar to you, this idea that he was

1    never compensated directly?

2    A.    Yes.

3    Q.    How so?

4    A.    He brought it up to me in the conversation.

5    Q.    Can you continue reading?

6    A.    "If a patient that he saw had an illicit medication in

7    the urine or no metabolites in the urine, he made sure the

8    MEDD was lowered by 5 to 10 percent.  At no time did

9    Dr. Stanton sign prescriptions if he had been made aware that

10    the patient was a repeat offender of our drug screen policy."

11    Q.    Okay.  Let's stop there.

12          So in this letter that Dr. Stanton is writing about

13    Dr. Stanton, this is shortly after the time period that the

14    DEA has executed a search warrant at Gateway Medical

15    Associates.

16          Am I understanding that correctly?

17    A.    Yes.

18    Q.    And he brought this letter to Dr. Maccarone and wanted

19    Dr. Maccarone to sign it; is that correct?

20    A.    Yes.

21    Q.    And he says in this letter he wants Dr. Maccarone to sign

22    a letter saying that he, Dr. Stanton, at no time did he sign a

23    prescription if he had been made aware that a patient was a

24    repeat offender of our drug screen policy?

25    A.    That's correct.

1    Q.   Can you read the last paragraph?

2    A.   "Because Dr. Maccarone is a physician, there was no

3    requirement Dr. Stanton review Dr. Maccarone's charts.  That

4    being said, Dr. Stanton did, on multiple occasions, confirm

5    with Dr. Maccarone that our drug screen policies were being

6    followed."  And then the signature line for Dr. Maccarone.

7    Q.   That first sentence, "Because Dr. Maccarone is a

8    physician, there was no requirement that Dr. Stanton review

9    Dr. Maccarone's charts," again, who is saying that in this

10   letter?

11   A.   Dr. Stanton.

12   Q.   Did that statement sound familiar to you?

13   A.   Yes.

14   Q.   How so?

15   A.   He brought it up in the interview.

16        MR. SMITH:  Can we look at Government Exhibit 27C?

17   BY MR. SMITH:

18   Q.   Was there also a second letter attached to the email we

19   talked about?

20   A.   Yes.

21   Q.   Does this appear to be a true and accurate copy of that?

22   A.   It does.

23        MR. SMITH:  Your Honor, we move to admit Government

24   Exhibit 27C.

25        THE COURT:  Any objection?

1          MR. STRIANSE:  No objection.

2          THE COURT:  That'll be admitted as well and may be

3     displayed.

4     BY MR. SMITH:

5     Q.   So if we can, Investigator Sizemore, same series of

6     questions.

7          Your understanding, based on your interview with

8     Dr. Stanton and how this was transmitted to you, who was it

9     that authored this letter?

10    A.   Dr. Stanton did.

11    Q.   Okay.  And in this instance, it uses the term, or the

12    pronoun, "I."

13         Do you see that?

14    A.   I do.

15    Q.   Okay.  So in one letter, he's talking about himself in

16    the third person as Dr. Stanton, purportedly from

17    Dr. Maccarone's perspective, and then who is this letter

18    supposed to be written from?

19    A.   Himself.

20    Q.   Okay.  Can you read at the top?

21    A.   "On Thursday, 15 October, I was informed that the offices

22    of Gateway Medical Associates had been served a warrant and

23    raided by the eastern Kentucky DEA for the purposes of

24    obtaining information with regards to several patients who had

25    been found to have been diverting and selling their

1   prescription narcotics at various locations in eastern

2   Kentucky, such as Hazard, Manchester, London, as well as

3   others.  It appears that these patients continued to receive

4   their prescriptions in spite of having no metabolites in their

5   urine, which is an indication of diversion, on multiple

6   occasions.

7        "Additionally, there were patients who continued to

8   receive prescriptions for narcotics in spite of testing

9   positive or meth on more than one occasion.  I was unaware of

10  this ongoing situation which was occurring often enough and

11  with enough patients to prompt a federal investigation."

12  Q.   Okay.  Let's hold there.

13       In fairness, in that last paragraph, it says, "In spite

14  of testing positive or meth."

15       Is it fair to say that may be a typo?  In context,

16  "positive for meth"?

17  A.   Yeah.

18  Q.   Okay.  What is your understanding of what "meth" means in

19  that context?

20  A.   Methamphetamine.

21  Q.   Okay.  Please continue.

22  A.   "I have decided that I can no longer be the medical

23  director now that I am aware of the problem since to do so

24  would give the impression" that I -- "that I condone or I am

25  not concerned with what has transpired.  I am hereby giving

1  notice of my resignation as medical director.  I will,

2  however, continue for two more weeks seeing only patients with

3  an MEDD over 120 or those that need injections with the

4  understanding that I will not be signing any more

5  prescriptions.  John Stanton, M.D."

6  Q.   Okay.  In his discussion with you, did he indicate to you

7  how he knew about all of these bad things that he lays out in

8  this letter?

9  A.   No.

10  Q.   But in this letter, what he says is, now that I'm aware

11  of it, I can't be involved?

12  A.   That's right.

13  Q.   Did he ever explain to you how being involved with

14  Gateway Medical Associates for four years, he wasn't aware of

15  any of those things?

16  A.   No.

17  Q.   Last couple of questions about the interview.  Let's just

18  look at a few more things.

19      Now, after the search warrant was executed, you told us

20  that Dr. Maccarone was arrested at some point, and was it your

21  understanding that the clinic ceased operating?

22  A.   That's right.

23  Q.   Okay.  Did you discuss that with Dr. Stanton?

24  A.   I did.

25           MR. SMITH:  Let's look at 26B31.

1      (Audio recording played in open court.)

2    BY MR. SMITH:

3    Q.   So at this point in time, we're several months past the

4    search warrant, and he had told you about, and you've seen, a

5    letter in which he wrote about all of the bad things that were

6    happening at GMA, and he couldn't be associated with that

7    because it would give the impression he condoned it; is that

8    fair?

9    A.   That's fair.

10   Q.   And then when the office closed, did he indicate to you

11   that there was an overflow of people coming to his office?

12   A.   Yes.

13   Q.   He said that there's a line in front of his building?

14   A.   Yes.

15   Q.   And what did he say about that?

16   A.   He said, "I was just about ready to start an advertising

17   campaign, so I may not need to bother with that."

18   Q.   And was he laughing when he was talking about this?

19   A.   Yes.

20   Q.   Based on your understanding, were these the same people

21   that were at the clinic where all of those bad things were

22   transpiring, according to his letter?

23   A.   Yes.

24          MR. SMITH:   Okay.

25      (Audio recording played in open court.)

1    BY MR. SMITH:

2    Q.    Now, did he tell you that his policy in context there --

3    and I don't think this is in the clip, but did he tell you his

4    office had a policy of kind of a radius that he would allow

5    patients to come from?

6    A.    Yes.

7    Q.    How far?

8    A.    I think it was a hundred miles.

9    Q.    So his policy was a hundred miles.

10         At Gateway, did he tell you that he had talked to people

11   coming from, let's say, London, Kentucky?

12   A.    Yeah.

13   Q.    Toward the end of the interview, did you talk to him

14   again about this concept of people in pain with hurt backs and

15   other injuries traveling down to his pain clinic?

16   A.    I did.

17   Q.    And was this something that you personally were repeating

18   for any particular reason?

19   A.    Yeah.

20   Q.    Can you just explain that to the jury?

21   A.    Well, I've had a back injury, so I know that when I made

22   that drive, it was pretty hard on me to do.  And I consider

23   myself pretty active, so I can't imagine somebody who's in

24   that kind of pain who needs that kind of medication doing that

25   drive.

1    Q.   So did you relay that to Dr. Stanton?

2    A.   I did.

3    Q.   Okay.  Let's listen to that part.

4         MR. SMITH:  Can we go to 26B32?

5         (Audio recording played in open court.)

6    BY MR. SMITH:

7    Q.   So in that context, when they say, "Yeah, when they sit

8    in the car there, it makes it kind of suspicious."

9         Who did you understand the "they" to be?

10   A.   The patients.

11   Q.   Where?

12   A.   In the parking lot in the car.

13   Q.   Okay.  We've heard a couple of times in the course of

14   your interview that Dr. Stanton was contrasting between what

15   he thought was an acceptable practice at his clinic and then

16   what was happening at Gateway Medical Associates, and I think

17   one of the areas is the medications; is that fair?

18   A.   Yes.

19   Q.   Did you talk about oxycodone and oxymorphone with

20   Dr. Stanton?

21   A.   Yes.

22   Q.   Okay.  And is there a reason that those two medications

23   were ones that you were asking about?

24   A.   Yeah.  That seems to be more of the sought-out

25   combinations that we typically see more of looking at the red

1    flags.  And when we're seeing people that are diverting the

2    medications, the oxycodone and oxymorphone is a -- it's --

3    it's a more difficult combination to get.  So we always take a

4    look at that.

5    Q.   And then just factually, so separating that from the red

6    flags analysis, factually, in your investigation, what were

7    the two drugs that you saw most patients at Gateway Medical

8    Associates getting?

9    A.   It was oxycodone and oxymorphone.

10   Q.   Okay.  In your mind, that's why you're asking him this

11   question?

12   A.   Yes.

13        MR. SMITH:  Okay.  Let's bring up 26B21.

14        (Audio recording played in open court.)

15   BY MR. SMITH:

16   Q.   So you asked him at his other clinic whether he

17   prescribes oxycodone and oxymorphone, and what was his

18   response?

19   A.   "No.  It's too addictive."

20   Q.   All right.  I'd like to move on to another topic.  We'll

21   move away from the interview now.  Thank you.

22        We looked -- well, I would like to do two things with

23   you.  First, we talked about the medical records in this case.

24   And I understand you're not a physician, and I'm not asking

25   you to be one sitting on the stand today.

1      But as an investigator, did you look at some of the

2  medical records yourself?

3  A.   Yes.

4  Q.   Okay.  And in doing so, did you see indications or see

5  things that happened with patients that contrasted to what you

6  heard in that interview?

7  A.   Yes.

8  Q.   So, for instance, the idea about when Dr. Stanton was

9  talking about how involved he was with either setting

10  patients' medication levels and whose job that was, what was

11  he generally telling you, in your recollection?  Whose job was

12  that, according to him?

13  A.   Oh, that was Dr. Maccarone's.

14  Q.   Now, did you review a patient file for a patient named

15  Lisa Waynick?

16  A.   I have.

17  Q.   And I don't mean to say that you have committed to memory

18  all of the pages in that file or that you understand all the

19  medicine in it, but I would like to talk to you about a couple

20  of things of significance in your investigation.

21          MR. SMITH:  If we can, can we bring up Government

22  Exhibit 115, Rebecca?

23          And, Your Honor, this has been previously admitted,

24  and we ask to publish it.

25          THE COURT:  Yes, you may.

1    BY MR. SMITH:

2    Q.    Okay.  If we can, let's go to page 375.

3          And what's the date of this record?

4    A.    January 11, 2017.

5    Q.    And what is the reason for the visit?

6    A.    Establishing pain management.

7    Q.    Okay.  So in context, what did you understand this to be

8    for this patient?

9    A.    Their first visit.

10   Q.    To GMA?

11   A.    Yes.

12   Q.    Okay.  Now, in this medical record, was there an

13   indication that this patient had been to a previous clinic?

14   A.    Yes.

15   Q.    From your investigation, are you familiar with a clinic

16   called Clarksville pain institute?

17   A.    Yes.

18   Q.    Did you understand that Dr. Stanton had some association

19   with that?

20   A.    Yes, as the medical director.

21   Q.    If we go to page 899, for instance, what is this, sir?

22   A.    It looks to be a clinical note from the Clarksville pain

23   institute.

24   Q.    Okay.  And under the facility there, whose name is under

25   the facility?

1    A.   Dr. John Stanton.

2    Q.   Is there an indication in the medical record as to what

3    happened to Ms. Waynick, this other clinic with which

4    Dr. Stanton was affiliated, CPI?

5    A.   Yes.

6         MR. SMITH:  Okay.  Let's go to page 896.

7    BY MR. SMITH:

8    Q.   What happened to Ms. Waynick?

9    A.   She was discharged.

10   Q.   For what?

11   A.   Failure to comply with the treatment plan.  And "missed a

12   pill count" written next to it.

13   Q.   And what date was it that she was dismissed?

14   A.   It says January 10, 2017.

15        MR. SMITH:  Okay.  Let's go back to 375.

16   BY MR. SMITH:

17   Q.   So that was January 10th.

18        When does she show up at Gateway Medical Associates?

19   A.   The next day, January 11th.

20   Q.   At this point in time in your investigation, was

21   Dr. Stanton associated with Gateway Medical Associates?

22   A.   Yes.

23   Q.   Now, we've looked at Ms. Waynick's records and a variety

24   of other summary exhibits.

25        Is it fair to say that over the course of time,

1    Ms. Waynick failed a number of drug tests?

2    A.    That's right.

3    Q.    And that includes drug tests for fentanyl and other

4    drugs?

5    A.    Yes.

6    Q.    And then she received prescriptions throughout 2017 and

7    2018?

8    A.    Yes.

9    Q.    Now, at some point, based on your review, was she

10   dismissed from Gateway Medical Associates?

11   A.    I believe so.

12   Q.    Okay.  And, for instance, if we look at page 588.

13         According to this, when was she originally given a

14   dismissal letter?

15   A.    April 18, 2019.

16   Q.    And what's the date on this?

17   A.    September 9, 2019.

18   Q.    Okay.  She had been dismissed but seen a number of times,

19   and as of September, she's still associated with the clinic.

20         After that point, did she then appear to travel to

21   another clinic?

22   A.    Yes.

23              MR. SMITH:  Can we go to page 560?

24   BY MR. SMITH:

25   Q.    As we're doing that, based on your investigation, are you

1    aware of a facility called The Joint & Spine Pain Center?

2    A.   Yes.

3    Q.   Okay.  Based on your investigation, who was associated

4    with that clinic?

5    A.   Dr. Stanton.

6    Q.   What are we looking at here at page 560?

7    A.   It's a clinical note from Joint and Spine Center.

8    Q.   So Ms. Waynick had been at Clarksville pain institute,

9    where Dr. Stanton was the medical director?

10   A.   Yes.

11   Q.   She got kicked out of there for a pill count?

12   A.   Yes.

13   Q.   She goes to GMA, where Dr. Stanton was the medical

14   director?

15   A.   That's correct.

16   Q.   She fails drug tests for fentanyl and other drugs and is

17   dismissed, albeit, over the course of many months?

18   A.   That's right.

19   Q.   Where does she go next?

20   A.   The Joint & Spine Pain Center.

21   Q.   What's your understanding of who owns that?

22   A.   Dr. Stanton does.

23   Q.   In fact, when payments were made from Gateway Medical

24   Associates' bank account to Dr. Stanton, to what entity were

25   those checks typically made out?

1  A.  Sometimes to Joint and Spine Center.

2  Q.  And that's where Ms. Waynick goes next?

3  A.  Yes.

4  Q.  And approximately what time does she -- is this in 2019

5  and 2020?

6  A.  Yes.

7  Q.  Okay.  Later in 2020, did Ms. Waynick leave the Joint and

8  Spine Center?

9  A.  I believe so.

10      MR. SMITH:  Let's go to page 553.

11  BY MR. SMITH:

12  Q.  Why was she dismissed from The Joint & Spine Pain Center?

13  A.  Failed pill count, and it has a couple of dates, and then

14  failed or inconsistent urine drug screen, unprescribed

15  alprazolam, unprescribed morphine, heroin in urine.

16  Q.  So she's being dismissed from The Joint & Spine Pain

17  Center for failing drug tests for heroin, morphine, and pill

18  counts?

19  A.  Yeah, that's right.

20  Q.  Okay.  Where does she go next?

21  A.  I believe GMA, Gateway Medical Associates.

22  Q.  Okay.  So what's the date of her dismissal there?

23  A.  August 24, 2020.

24  Q.  August of 2020, she's dismissed for heroin, other drugs.

25      Let's look at Government Exhibit 143 -- I'm sorry.  Not

1    Exhibit 143.  Page 143 in that exhibit.

2         What is this, sir?

3    A.   It's a -- a clinical note from Gateway Medical

4    Associates.

5    Q.   And what doctor does she see when she shows back up to

6    GMA?

7    A.   Dr. Stanton.

8    Q.   She went from Clarksville Pain Institute, where

9    Dr. Stanton was the medical director?

10   A.   Yep.

11   Q.   Goes to GMA, where Dr. Stanton is the medical director?

12   A.   That's right.

13   Q.   She goes to the Joint and Spine Center, that Dr. Stanton

14   owns?

15   A.   Yes.

16   Q.   And then she shows back up at GMA, and who's the first

17   doctor she sees?

18   A.   Dr. Stanton.

19   Q.   Is there any discussion anywhere in the history of

20   present illness about any of what we just discussed?

21   A.   I don't believe so.

22   Q.   On this date, did Dr. Stanton -- I'm sorry, did the

23   patient take a drug test?

24   A.   I believe so.

25            MR. SMITH:  Okay.  Let's go to page 57.

1  BY MR. SMITH:

2  Q.   What was the result of this drug test?

3  A.   It was inconsistent for oxycodone, oxymorphone, and

4  fentanyl, not prescribed.

5  Q.   So she had already gone through those three clinics, one

6  of which is already GMA.  Positive tests for fentanyl and

7  heroin.  She shows up and sees Dr. Stanton.

8       What's in her system?

9  A.   Oxycodone, oxymorphone, and fentanyl.

10 Q.   Fentanyl is in her system again?

11 A.   Yep.

12 Q.   So what day does that drug test come back?

13 A.   September 4, 2020.

14 Q.   So the visit was on September 2nd.  The drug test comes

15 back September 4th.

16      MR. SMITH:  Let's look at page 130.

17 BY MR. SMITH:

18 Q.   Who did she see in the next visit at GMA after all of

19 that?

20 A.   Dr. Stanton.

21      MR. SMITH:  If we scroll down to page 137, at the

22 bottom.

23 BY MR. SMITH:

24 Q.   The fifth line down, "Review with patient urine drug

25 screen"?

1   A.   Yep.

2   Q.   Does this indicate that the patient failed a drug test?

3   A.   Yes.

4   Q.   So it was recognized that the patient failed a drug test?

5   A.   Yes.

6   Q.   And at that point in time, on that day, was there a drug

7   test indicating what was in the patient's body when she was at

8   this office visit?

9   A.   I believe so.

10          MR. SMITH:  Let's go to page 53.

11  BY MR. SMITH:

12  Q.   What was still in that patient's body?

13  A.   Fentanyl and norfentanyl.

14  Q.   Last couple of questions, or group of questions, if I

15  can.

16       Sir, do you remember earlier in this trial, we identified

17  Government Exhibit 17, a series of patient lists?

18  A.   Yes.

19          MR. SMITH:  And just to pull those up, Rebecca.

20  BY MR. SMITH:

21  Q.   So just to orient you, were they patient lists like that?

22  A.   That's right.

23  Q.   Were those found by investigators in the course of a

24  search warrant?

25  A.   That's correct.

1  Q.   There was a question earlier by counsel to Officer

2  Janutolo about whether agents investigated whether

3  prescriptions were filled after these notations were made.

4  A.   Yes.

5  Q.   Okay.  Did that happen?

6  A.   Yes.

7  Q.   If we can, to do so, did you identify certain patients

8  that were identified in these lists?

9  A.   I did.

10  Q.   Okay.  And did you and investigators look to obtain

11  copies of prescriptions for those patients on or after that

12  date?

13  A.   That's correct.

14  Q.   Were you able to identify and obtain prescriptions issued

15  by Dr. Stanton to these patients on or after the dates of

16  these lists?

17  A.   Yes.

18       MR. SMITH:  Okay.  Let's go to Government Exhibit

19  417.  If we can begin with 417A.

20  BY MR. SMITH:

21  Q.   What is this?

22  A.   That is a prescription for oxycodone, 30 milligram, to

23  Jason Martin, written by Dr. Stanton on February 11, 2019.

24       MR. SMITH:  And, Rebecca, can you just scroll

25  through?  Go down, just all the way through, just to show that

1    there's multiple pages.

2    BY MR. SMITH:

3    Q.   Okay.  Sir, do you see that this exhibit contains

4    multiple pages?

5    A.   Yes.

6    Q.   Okay.  What are those collectively?

7    A.   Prescriptions for Dr. Martin (sic) by John Stanton.

8    Q.   Okay.  And were these collected by the DEA from

9    pharmacies?

10   A.   Yes.

11   Q.   And to the best of your knowledge, are these in the same

12   format electronically as they were kept by the pharmacy?

13   A.   They are.

14        MR. SMITH:  Your Honor, we move to admit Government

15   Exhibit 417A.

16        THE COURT:  Any objection?

17        MR. STRIANSE:  No objection.

18        THE COURT:  417, that will be admitted and may be

19   displayed.

20   BY MR. SMITH:

21   Q.   Okay.  Now, in addition to prescriptions for Mr. Martin,

22   did investigators obtain prescriptions for a number of other

23   patients?

24   A.   Yes.

25   Q.   Does that include Steven Fralix?

1    A.   Yes.

2    Q.   Ethel Williamson?

3    A.   Yes.

4    Q.   Ginny Parker?

5    A.   Yep.

6    Q.   Michelle Perkins?

7    A.   That's right.

8    Q.   And a number of other patients?

9    A.   Yep.

10   Q.   Okay.

11        MR. SMITH:  Your Honor, we have designated

12   prescriptions for each of those patients as Government

13   Exhibit 417B through L.  For the sake of time and efficiency,

14   I would ask to admit those collectively now, unless there's an

15   objection.

16        THE COURT:  Any objection?

17        MR. STRIANSE:  No objection.

18        THE COURT:  All right.  417B through L, each of those

19   sets will be admitted and may be displayed as the government

20   chooses.

21   BY MR. SMITH:

22   Q.   Okay.  Sir, I want to look at those in just a moment, but

23   did you then take those prescriptions that you were able to

24   collect for these various patients and compare them to those

25   appointments?

1   A.   That's right.

2   Q.   All right.  And to aid the jury in being able to do this

3   review, when you were doing it, or when someone does it, you

4   essentially have one next to each other?

5   A.   No.

6   Q.   Meaning it's helpful to see them next to each other?

7   A.   Oh, yeah, yeah.

8   Q.   So has the United States compiled a series of composite

9   exhibits showing the page from Government Exhibit 17 and then

10  the prescription from Government Exhibit 417?

11  A.   Yes.

12  Q.   Okay.  So as an example, let's look at Government

13  Exhibit 601.  601A.

14       MR. SMITH:  Your Honor, I'll represent to the Court

15  that each of the exhibits in this composite exhibit has

16  already been admitted by either the 17 series or the 417

17  series that I've talked about.  I would like to move all of

18  these into evidence so the jury has them, but I might do that

19  in kind of a truncated fashion, if that's okay.

20       THE COURT:  So each component is already in evidence,

21  so these are just pulled from things that are already

22  admitted?

23       MR. SMITH:  We just married up, yeah, two exhibits

24  and put them in the same place, but under a new number as a

25  composite exhibit, that's right.

1       THE COURT:  Any objection to that, Mr. Strianse?

2       MR. STRIANSE:  No, sir.

3       THE COURT:  All right.  And so what's the field of

4  what you're wanting to be admitted or wanting to be --

5       MR. SMITH:  Sure, Your Honor.  It's Government

6  Exhibit 600 through 611.

7       THE COURT:  Okay.  Any objection on all of those

8  going in?

9       MR. STRIANSE:  No, sir.

10       THE COURT:  Okay.  Thank you.  Those will all be

11  admitted and may be displayed at the party's election.

12       MR. SMITH:  And just so the record is clear, and for

13  the deputy, each of those components has a 600 -- for

14  instance, 600 has an A and B.  Some of them have an A, B, and

15  C.

16       THE COURT:  Looks like each of them has at least an A

17  and B, and 608 and 610 have a C as well?

18       MR. SMITH:  That's correct, Your Honor.

19       THE COURT:  Okay.  Those will all be admitted.

20       MR. SMITH:  Thank you, Your Honor.

21  BY MR. SMITH:

22  Q.  All right.  Sir, if we can, just to give the jury a sense

23  of how this works.

24       MR. SMITH:  Can we bring up Government Exhibit 601A,

25  please.  And with Your Honor's permission, we'll publish that

1   to the jury.

2           THE COURT:  Yes, you may.  They're all in.

3           MR. SMITH:  Okay.  Great.

4   BY MR. SMITH:

5   Q.   Do you see a notation on this for a patient named Francis

6   Broussard?

7   A.   I do.

8   Q.   Okay.  And what did it say for Francis Broussard?

9   A.   Says, "Oral.  Send out.  Oral.  Meth, fentanyl, morphine,

10  oxy C, oxy M, COC, Suboxone."

11  Q.   Okay.  Was it your understanding, based on your

12  investigation, that this noted an aberrant drug test result,

13  or drug screen result, that occurred at Gateway Medical

14  Associates?

15  A.   Yes.

16  Q.   Okay.  Did you then look in the prescriptions to see

17  whether the same patient received prescriptions?

18  A.   Yes.

19          MR. SMITH:  Okay.  So if we go to Government

20  Exhibit 601B, and if we can go to page 15.

21  BY MR. SMITH:

22  Q.   Sir, were you able to determine whether on the date of

23  that appointment, whether there were prescriptions written?

24  A.   Yes.

25  Q.   And were there?

1  A.  Yes.

2  Q.  By whom?

3  A.  Dr. Stanton.

4           MR. SMITH:  Okay.  Can we go to the next page?

5  BY MR. SMITH:

6  Q.  What are the drugs that were written on that date?

7  A.  Oxymorphone and oxycodone.

8  Q.  Okay.  What was the date of these prescriptions?

9  A.  March 26, 2020.

10          MR. SMITH:  Okay.  Rebecca, if we can go up.  Just

11  page up.

12  BY MR. SMITH:

13  Q.  Okay.  Did this patient continue getting prescriptions?

14  A.  That's correct.

15  Q.  From who?

16  A.  Dr. Stanton.

17          MR. SMITH:  Let's look at Government Exhibit 602A.

18  BY MR. SMITH:

19  Q.  Do you see a notation for a patient named James Campbell?

20  A.  I do.

21  Q.  What does it say?

22  A.  "240, negative 10, fent" and "/MOR."

23          MR. SMITH:  Let's look at Government Exhibit 602B.

24  And go to page 24.

25  BY MR. SMITH:

1  Q.   Were you able to determine whether this patient received

2  prescriptions on the date of the patient list we just saw?

3  A.   Yes.

4  Q.   Okay.  And who wrote those prescriptions?

5  A.   Dr. Stanton.

6  Q.   And what drugs were they for?

7  A.   Oxymorphone is that one.

8         MR. SMITH:  If we go to the next page, please, 25.

9         THE WITNESS:  And oxycodone.

10  BY MR. SMITH:

11  Q.   Okay.  Now, sir, in your investigation, and in court,

12  have we heard the name Fralix?

13  A.   Yes.

14  Q.   And we looked at a summary chart of Anita Fralix; is that

15  fair?

16  A.   That's fair.

17         MR. SMITH:  Okay.  Let's go to Government

18  Exhibit 603A.

19  BY MR. SMITH:

20  Q.   Okay.  Is there a notation for a Steven Fralix?

21  A.   There is.

22  Q.   What does it say?

23  A.   "232.5 in fentanyl, negative 10, oxy C."

24  Q.   And what about for Anita Fralix?

25  A.   "In 187.5, fent, minus 5 oxy C."

1          MR. SMITH:  And if we look at 603B, at page 16.

2     BY MR. SMITH:

3     Q.   Did Steven Fralix receive prescriptions from Dr. Stanton?

4     A.   Yes.

5          MR. SMITH:  Okay.  And if we go down to page 17.

6     BY MR. SMITH:

7     Q.   Does that include oxymorphone?

8     A.   Yes.

9     Q.   And the next page, oxycodone?

10    A.   Yes.

11    Q.   Now, did we also collect and you -- and we referenced

12    earlier testimony, prescription obtained from Anita Fralix?

13    A.   That's right.

14         MR. SMITH:  If we go to Government Exhibit 403M.

15    BY MR. SMITH:

16    Q.   Did Anita Fralix also get prescriptions from Dr. Stanton

17    on this date?

18    A.   Yes.

19    Q.   Now, there's a reference on that piece of paper saying

20    "in," which potentially suggests in-house, or do you know?

21    A.   No idea.

22         MR. SMITH:  But just to be safe, let's look at

23    Government Exhibit 103 at page 35.

24    BY MR. SMITH:

25    Q.   Sir, does the record contain an earlier notation of a

1    failed drug screen by Anita Fralix?

2    A.   It does.

3    Q.   And that was the month before?

4    A.   Yep.

5    Q.   And this drug screen, presumably, was available by what

6    date?

7    A.   April 16, 2020.

8    Q.   And what was the patient positive for at this point?

9    A.   Fentanyl.

10   Q.   So I don't want to go through each of these composite

11   exhibits, but do each of them -- just for the jury's benefit,

12   are they each laid out in similar fashion with the A being the

13   patient list and then the other exhibits being the

14   prescriptions?

15   A.   That's right.

16        MR. SMITH:   Okay.   Let's look at the last one for --

17   let's look at page 610.

18   BY MR. SMITH:

19   Q.   Did you identify a patient named Marlene Thornton on

20   these lists?

21   A.   Yes.

22   Q.   And if we look at 610A, is there a reference to Marlene

23   Thornton?

24   A.   There is.

25   Q.   And can you point that out?   What does it say?

1   A.   It says, "Oral m-o-r-p, fent, heroin.  Dismissed."

2   Q.   Okay.  So this says that the patient has been dismissed?

3   A.   That's right.

4         MR. SMITH:  Let's look at Government Exhibit 610B.

5   BY MR. SMITH:

6   Q.   Can you see Marlene Thornton's name on --

7   A.   Yes.

8   Q.   And according to this list, is that patient's name still

9   appearing?

10   A.   It is.

11   Q.   And this is a month after that dismissal notation?

12   A.   Yes.

13         MR. SMITH:  Now, let's go to 610C.  And let's go to

14   page 2, if we can.

15   BY MR. SMITH:

16   Q.   Now, that first appointment list we looked at, was that

17   dated March 30th?

18   A.   I believe so.

19   Q.   Okay.  Where it said "dismissed"?

20   A.   Yes.

21   Q.   On that date, did Dr. Stanton write that patient, or a

22   patient by that name?

23   A.   Yes.

24   Q.   And for what drug?

25   A.   Oxymorphone.

1          MR. SMITH:  Go down to the next page.

2     Q.   What else?

3     A.   Oxycodone.

4          MR. SMITH:  Go to page 10.

5     BY MR. SMITH:

6     Q.   Did that patient continue getting prescriptions?

7     A.   Yes.

8     Q.   For instance, in May?

9     A.   That's right.

10         MR. SMITH:  And I think we skipped one.  Can we go to

11    page 6?

12    BY MR. SMITH:

13    Q.   Did a patient get a prescription for oxycodone in April?

14    A.   Yep.

15    Q.   So that notation of being dismissed in March, under the

16    list for Dr. Stanton's patients that day, this patient

17    continued receiving prescriptions for months after?

18    A.   That's right.

19    Q.   Okay.  Based on your review of the information in the 600

20    series of exhibits, were there multiple instances of patients

21    receiving prescriptions after a notation for a drug test or a

22    dismissal notice?

23    A.   Yes.

24         MR. SMITH:  Your Honor, if I could have a moment to

25    check my notes.  I think I may be wrapping up.

1          THE COURT:  Yes.

2          MR. SMITH:  Thank you.

3      (Off-the-record discussion.)

4  BY MR. SMITH:

5  Q.   Last question.  Sir, are you familiar with the judicial

6  district the Eastern District of Kentucky?

7  A.   Yes.

8  Q.   Okay.  Where are you today?

9  A.   I'm in the Eastern District of Kentucky.

10  Q.   Okay.  Is London in the Eastern District of Kentucky?

11  A.   It is.

12          MR. SMITH:  That's all the questions I have, Your

13  Honor.  Thank you.

14          THE COURT:  Thank you.  Mr. Strianse, I propose we

15  take a little break now and then start your cross-examination.

16      Are you okay with that?

17          MR. STRIANSE:  That's fine, Your Honor.

18          THE COURT:  Okay.  Why don't we take 20 minutes now.

19  Continue to abide by the admonitions you've been under.  Take

20  20 minutes.  We'll come back and begin cross-examination.

21  Thank you all.

22      (The jury exited the courtroom at 3:52 p.m.)

23          THE COURT:  Thank you.  The jury has exited.

24  Everybody can be seated.

25      So we'll take that break.  And, Mr. Strianse, certainly

1    no time pressure on your cross-examination.

2       Do you have any feel for the probable length?

3          MR. STRIANSE: I think it's going to be short.

4          THE COURT: Okay. Well, then my hope is, we'll come

5    back after the break, and you can complete your cross and any

6    redirect. And I had hoped to get the jury out by no later

7    than 5:00 on Friday. And if we need to go a little past that,

8    I'm okay with it, but it sounds like that's doable, you think?

9          MR. STRIANSE: Yes, sir.

10         THE COURT: All right. Anything else to take up?

11         MR. SMITH: Your Honor, I was going to tender -- just

12    for the record, we're going to make the transcripts a court

13    exhibit, just for the record, in case that's necessary down

14    the road. So we've marked those as just court exhibits for

15    that purpose.

16         THE COURT: Those track the excerpts that have been

17    played?

18         MR. SMITH: Yes. So what we have is, Court Exhibit A

19    would be the full transcript of the first recording, which we

20    played in its entirety.

21       26B is a transcript of the entire recording, which was

22    admitted.

23       And then -- and C, Court Exhibit C, would be a transcript

24    of all of the clips.

25         THE COURT: Okay.

 1          MR. SMITH:  Just in case it's needed for the record,

 2    but not go back to the jury.

 3          THE COURT:  Thank you.  I'm glad to take those as a

 4    court exhibit.

 5       Any objection to that, Mr. Strianse?

 6          MR. STRIANSE:  No, Your Honor.

 7          THE COURT:  Okay.  Those will be a non evidentiary

 8    court exhibit.

 9       Anything else, Mr. Strianse?

10          MR. STRIANSE:  No, sir.

11          THE COURT:  Okay.  We'll take that break.  Thank you.

12       (Recess from 3:54 p.m. until 4:07 p.m.)

13       (The jury entered the courtroom at 4:08 p.m.)

14          THE COURT:  All right.  Thank you.  We're reassembled

15    with all parties and counsel present, the jury in the

16    courtroom after the last break of the day, and the witness

17    still on the stand.

18       Mr. Strianse.

19          MR. STRIANSE:  Thank you, Your Honor.

20                          CROSS-EXAMINATION

21    BY MR. STRIANSE:

22    Q.   Good afternoon, Agent Sizemore.

23    A.   Good afternoon.

24    Q.   There's just a few things that I want to cover this

25    afternoon.

1       Early in your testimony, you talked about the PDMP data,
2   the prescription data; is that right?
3   A.   That's right.
4   Q.   And I think you told the jury that you selected a time
5   interval from November of 2018 to November of 2020; is that
6   right?
7   A.   That's right.
8   Q.   That November 2018 date coincides with when Dr. Stanton
9   filled in for Dr. Maccarone at GMA; is that right?
10  A.   I think it was around that time, yeah.
11  Q.   And is that sort of what informed your decision to start
12  at November 2018?
13  A.   That was part of it, and part -- again, I wanted to try
14  to be as fair as possible and not try to include any other
15  patients from the other clinics.  And there was -- there was
16  a -- that did appear to be the time frame in the PMP data when
17  it was more consistent prescribing with those common patients.
18  Q.   Right.  A whole lot more prescribing on the part of
19  Dr. Stanton; is that right?
20  A.   Well, I briefly looked at the 2016 to 2017 range.  Again,
21  not too much because I'm not sure if I'm -- what patients I'm
22  seeing.  It's -- it's hard to tell the difference.  And I
23  would say probably, on average -- I mean, there were
24  Schedule II scripts.  And there was an uptick.  I don't know
25  if I would characterize it as a lot more, but there was maybe,

1    on average, a hundred a month during that time frame.

2    Q.   So you did take a look at the 2016/2017?

3    A.   Briefly.

4    Q.   Is that right?

5    A.   Yes, briefly.

6    Q.   Because the indictment charges the time frame of July

7    2016 through March of 2021; is that right?

8    A.   Yes.   That July date is when he became the medical

9    director.

10   Q.   And without trying to get into the details of the

11   numbers, I think you would concede that before he became sort

12   of the replacement for Dr. Maccarone, the PDMP would have

13   shown much less prescribing by him in 2016 and 2017?

14   A.   There was less in that time frame, yes.

15   Q.   Okay.   Now, these recordings that we heard this

16   afternoon, the series of clips that was played, I'm trying to

17   orient myself to the time.

18        Was that in March of 2021?

19   A.   I'm not entirely sure, to be honest with you.   There's a

20   report, if you have that and the date on it, it would be a lot

21   easier for me.

22   Q.   I think the original indictment that charged

23   Dr. Maccarone and Mr. Ghent and Mr. Prince was, I think,

24   March 25th of 2021.

25        Does that sound right?

1    A.   I'm not sure, but I'm -- I'm positive that it was after

2    the indictment.

3    Q.   Okay.

4    A.   Because we had that discussion on the -- on the phone

5    call about Dr. Maccarone being arrested.

6    Q.   Okay.  So it was after the return of that original

7    indictment, and you just sort of called Dr. Stanton out of the

8    blue --

9    A.   I did.

10   Q.   -- right?

11   A.   That's right.

12   Q.   You were driving from London down to the Clarksville

13   area; is that right?

14   A.   Yes, sir.

15   Q.   And this is after the indictment of Dr. Maccarone.

16        And I assume you probably got Dr. Maccarone's number out

17   of Ms. Jackman's text messages?

18   A.   It's either that or --

19        MR. SMITH:  Your Honor, just to clarify, are we

20   talking about Dr. Maccarone's number or Dr. Stanton's number?

21        MR. STRIANSE:  I'm sorry.  Dr. Stanton's number.

22   Forgive me.

23        THE WITNESS:  I don't remember the chronology, but I

24   did call his office and ask for his number.  And I don't

25   remember if there -- there's a chance that I did get it from

1   that, but I did also talk to somebody in his office and asked

2   for his phone number to make sure maybe -- to make sure I -- I

3   had the correct number.  I did have a number for him.

4   BY MR. STRIANSE:

5   Q.   Okay.  And you called him, I believe, on his cell number;

6   is that right?

7   A.   Yes.

8   Q.   And he picked up; is that right?

9   A.   That sounds right.

10  Q.   And he spoke to you for a couple of hours; is that right?

11  A.   Yes.

12  Q.   And answered every question that you put to him?

13  A.   Yes.

14  Q.   He didn't say, "Well, I need to go hire a lawyer, and I'm

15  not going to talk to you"; is that right?

16  A.   That's right.

17  Q.   And you sort of remained in some contact with him between

18  that date -- and we think it's probably March.  It's after

19  that first indictment -- and the time that he got charged; is

20  that right?

21  A.   I believe the contact was the letters.  Might have been

22  the only other contact.  I think I sent a text or an email.  I

23  can't remember.

24  Q.   Because I think you made a request of him in July of '21;

25  is that right?

1   A.   That's right.

2   Q.   Where you were requesting copies of these letters that he

3   had prepared?

4   A.   That's right.

5   Q.   Again, without the assistance of a lawyer, as far as you

6   know?

7   A.   As far as I know.

8   Q.   He had prepared one letter for Dr. Maccarone to sign?

9   A.   Yes.

10  Q.   And then he had prepared a resignation letter?

11  A.   That's right.

12  Q.   And as far as we understand, he's doing all of these

13  things on his own; is that right?

14  A.   That's right.

15  Q.   Okay.  And I think he sent you these letters on July the

16  18th of '21.

17       Does that sound right?

18  A.   That sounds right.

19  Q.   And then I think four days later, he ended up getting

20  charged in that superseding indictment; is that correct?

21  A.   If that's the date.  I don't recall the date.

22  Q.   All right.  So up until he got charged in that

23  superseding indictment, he had this dialogue going with you;

24  is that right?

25  A.   We had a conversation and an email, yeah.

1  Q.   And I assume he thought he was being cooperative with you

2  during these times; is that right?

3  A.   He was cooperative as far as communicating with me, yes.

4       MR. STRIANSE:  May I have one moment, Your Honor?

5       THE COURT:  Of course.

6  (Off-the-record discussion.)

7       MR. STRIANSE:  Those are my questions.

8       THE COURT:  All right.  Thank you.

9    Mr. Smith, any redirect?

10      MR. SMITH:  No, Your Honor.  Thank you.

11      THE COURT:  All right.  Thank you, sir.  That

12 concludes your testimony.  You can step down.

13      THE WITNESS:  Thank you, sir.

14      THE COURT:  Let's confer for just a moment.

15 (Sidebar conference.)

16      THE COURT:  Mr. Strianse, can you hear me?

17      MR. STRIANSE:  Yes, sir.

18      THE COURT:  Mr. Smith, does that still conclude your

19 proof for the day?

20      MR. SMITH:  It does, Your Honor.

21      THE COURT:  And you still plan to call Ms. Vardaman

22 Monday morning?

23      MR. SMITH:  Just to update the Court, she touched

24 base with our agent this morning and is still at least telling

25 us she has a fever.  Candidly, I think our agent is a little

bit dubious by this point. So we're going to --

THE COURT: She's got the "I don't want to be there court fever," sounds like, potentially?

MR. SMITH: Exactly. So we're going to work on it over the weekend, and what I'll try to do is send a -- if it's okay, I'll send an email to chambers and to counsel just saying where our status is on that.

THE COURT: And do the possibilities include she's not going to be here and we're just not going to call her? Is that potentially on the table?

MR. SMITH: Potentially. I don't think at this point, we would seek, you know, like a several-day continuance. But we'll think about it over the weekend and see what our options are and see what her status is.

THE COURT: Okay. And are you confident it's going to be her or nothing on Monday morning?

MR. SMITH: I think so. Yes, Your Honor, I think.

THE COURT: Okay. So what I would like to do is go ahead and let the jury go home today. We'll bring them back Monday normal time. The government can conclude its case. Then we'll have a break for a motion and then turn to the defense case.

And so I think I'll just tell the jury the government should finish early Monday. Then the defense will have an opportunity to present its case. And, otherwise, just not

1    tell them anything else about the schedule until we know more

2    on Monday.

3        Does that sound okay, Mr. Smith?

4            MR. SMITH:  That's fine, Your Honor.

5            THE COURT:  Mr. Strianse.

6            MR. STRIANSE:  That's fine.

7            THE COURT:  Okay.

8        (Sidebar conference concluded.)

9            THE COURT:  All right.  Raise your hand if you would

10   complain about going home now on Friday afternoon?  I don't

11   expect any complaints.  Listen, you've been a great group all

12   week.  I really appreciate your attention and timeliness.  And

13   I see all kinds of jurors, and you've all been locked in on

14   the proof.  I'm really grateful for that.

15       So just to give you a little forecast, we're going to end

16   for the day.  Come back Monday same time.  Check in at 8:15.

17   We'll start at 8:30.  My expectation is the government is

18   going to conclude its proof pretty early on Monday morning.

19   Then we'll have a little break for some legal issues, but

20   promptly after the government closes, then the defense will

21   have a chance to put on its case.

22       Now, I'll remind you, the defense has no proof burden.

23   Dr. Stanton is protected by the right to remain silent.  So

24   the defense has the opportunity, but not the obligation, to

25   put on proof in the case.  That chance will arise, and we'll

1   listen to the government's case -- I'm sorry, to the defense

2   case, if the defense elects to put on proof.  If not, then

3   we'll take the next steps in the case.

4       So that's where we are, and I'll give you more

5   information on Monday as things become clearer.

6       Over the course of the weekend, I do want to reiterate

7   the rules you're under.  You can't talk to anybody about the

8   case.  You can't read anything, listen to anything.  If a news

9   story comes on, very unlikely if a news story comes on, turn

10  the T.V. off.  Turn the radio off.  Walk out of the room.  If

11  you see a news article, close the paper.  Don't read it.

12  Don't take anything like that in.  Don't do any effort to

13  educate yourself or learn about issues pertinent to the case.

14      Do continue to keep an open mind, but the proof has come

15  in to this point.  You've seen it, but don't begin evaluating

16  it, ordering it in your brain, forming any opinions about it.

17      Now, I always use the metaphor of how we're going to

18  treat the courtroom.  After we leave tonight, we'll lock the

19  courtroom up, close the doors to the courtroom.  Nobody is

20  going to be in here all weekend.

21      I want you to treat this case in your mind the same way.

22  When I excuse you, I want you to close the doors in your brain

23  relative to this case.  Don't think about it.  Don't ponder

24  it.  Don't ruminate on it over the weekend.  Close it up.

25  Come back in Monday morning, we'll open the courtroom, you'll

open your brains back up on this matter, and we'll continue with the case.

But until then, just kind of shut it down and be ready to continue on Monday morning.

Really, again, thank you for a strong week of work. Appreciate it very much. With that said, leave your notebooks, and I'll excuse the jury now. Have a very pleasant weekend.

(The jury exited the courtroom at 4:19 p.m.)

THE COURT: All right. The jury has exited. Everybody can be seated.

So if we're on that timeline, Mr. Strianse, are you pretty confident you can get your case concluded by Monday, or what's your thinking on that?

MR. STRIANSE: Your Honor, I think that we probably can, yes, sir.

THE COURT: All right. Well, once that happens, then, of course, the government potentially would have a rebuttal opportunity. Once all of the proof is closed, of course, we'll have our charge conference. I'm working on instructions. Hoped to have them to you before today, but I'll try to finish them tomorrow and give them to you over the weekend.

Now, all I've got from the defense is a good-faith instruction and an objection to a deliberate ignorance

1    instruction.  So I'll put a set together.  Again, it'll

2    probably be overinclusive.  I'll have some issues in there

3    that won't apply, and we'll go through and drop the things

4    that don't apply and talk about the contested matters and

5    reach a final decision.

6        But it'll give you a working beginning point.  And then

7    once we send you a draft, everything after that, we'll redline

8    so you can track any charges.

9        When we get to closings, how long are you thinking for

10   the government, all tolled?

11           MR. SMITH:  I think if we could allocate an hour and

12   split it that way.  I would have to collect my thoughts a

13   little bit, but I think that that would be reasonable.

14           THE COURT:  Okay.  Mr. Strianse.

15           MR. STRIANSE:  Probably no more than 45 minutes,

16   maybe less.

17           THE COURT:  Okay.  I'll give you both an hour.

18   That's a total for the government.  So main argument and

19   rebuttal, and then the defense can have an hour.  You don't

20   have to take it all, but give you equal time.

21       Of course, Mr. Smith, nobody ever does this, but -- or I

22   haven't seen it much.  The government can't say, "Okay.  I've

23   got an hour.  I'll take ten minutes for my first argument, 50

24   for a rebuttal."  I think I had a prosecutor one time who

25   tried to defer his entire closing.  I won't name who that is.

1    Tried to defer his entire closing.  I said, "No.  You can't do

2    that."  But an hour each is what we'll plan for when it comes

3    to that.

4        So let's say our proof closes on Monday.  We'll see what

5    time of day it is.  I would expect, you know, we probably send

6    the jury home, really grind hard to get through the charge

7    conference, get everything completed, and then have the jury

8    come back on the next day for closings and instructions.

9        You know, my experience -- you're both very experienced

10   as well -- if you're each taking an hour for closing, the

11   instructions, you know, usually take a minute per page, that's

12   a 45-minute proposition.  So you're really talking about a

13   half day to get it presented.  And so I'm really always

14   reluctant to start that very late in the day because I don't

15   like a jury getting the case late in the day.

16       I'm not crazy about that dynamic.  I have done it, but in

17   my experience, it has worked better to have kind of a block of

18   time with the jury not here where we can work, get the work

19   finished, not be rushed to complete the instructions, get the

20   copies out.  That's when, you know, mistakes tend to happen.

21   Give us time.  Give you an overnight to be -- give you time to

22   be ready, and then have the jury fresh for those arguments.

23       That's typically how I do it.  We'll react to what the

24   schedule presents, but that's kind of my thinking going into

25   Monday.

1  Any comment on that or anything else you need to bring

2  up, Mr. Smith?

3  MR. SMITH:  No, Your Honor.  That all sounds

4  agreeable to me.  Thank you.

5  THE COURT:  Mr. Strianse.

6  MR. STRIANSE:  No, Your Honor.

7  THE COURT:  All right.  Well, we will send the

8  instructions out.  Michelle will give you a witness and

9  exhibit list.  Just be sure the exhibits are squared away, you

10  know, that they all get tendered to the clerk, and everybody

11  ought to be confident that everything matches up on the

12  record.  And I don't think there's anything else we need to

13  take up.

14  Michelle, anything else for you?

15  COURTROOM DEPUTY:  No, Your Honor.

16  THE COURT:  Paul?

17  Okay.  Appreciate the good work this week, efficient and

18  cooperative work by both sides.  And I'll be here early Monday

19  to take up any issues we need to take up, and we'll press on

20  at that point.

21  Have a great weekend.  Thank you.

22  (Proceedings adjourned at 4:25 p.m.)

23  - - -

24  C E R T I F I C A T E

25  I, KIMBERLEY ANN KEENE, RMR, certify that the
foregoing is a correct transcript from the record of

1    proceedings in the above-entitled case.

2

3    /s/ Kimberley Ann Keene, RMR       December 8, 2022
       KIMBERLEY ANN KEENE, RMR          Date of Certification

4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

**GOVERNMENT'S WITNESSES**

KETA ABNER
Direct Examination............................... Page 20
Cross-Examination................................ Page 30
Redirect Examination............................. Page 34
Recross-Examination.............................. Page 35

MONICA CARTER
Direct Examination............................... Page 40
Cross-Examination................................ Page 130

KYLE SIZEMORE
Direct Examination............................... Page 143
Cross-Examination................................ Page 236

**DEFENSE WITNESSES**

- - -

**GOVERNMENT'S EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 300 | Prescription monitoring records | 42 | 43 |
| 501A | Summary. L. Waynick | 46 | 47 |
| 501B | Summary. M. Brown | 72 | 73 |
| 501C | Summary. S. Brown | 76 | 76 |
| 501D | Summary. D. Cozart | 80 | 81 |
| 501E | Summary. A. Fralix | 86 | 86 |
| 501F | Summary. C. Parchman | 90 | 91 |
| 501G | Summary. J. Vardaman | 94 | 94 |
| 501H | Summary. C. Wooten | 102 | 103 |
| 501I | Summary. S. Henderson | 104 | 105 |
| 501J | Summary. J. Pooler | 109 | 109 |

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 502 | Compilation.  Inconsistent drug tests | 112 | 112 |
| 503 | Compilation.  Inconsistent drug tests. (Subset of GX 502) | 128 | 129 |
| 400A-M | Stanton scripts.  M. Brown | 150 | 151 |
| 401A-R | Stanton scripts.  S. Brown | 152 | 152 |
| 402A-J | Stanton scripts.  D. Cozart | 153 | 156 |
| 403A-R | Stanton scripts.  A. Fralix | 153 | 156 |
| 404A-X | Stanton scripts.  J. Ghent | 154 | 156 |
| 405A-G | Stanton scripts.  F. Harris | 154 | 156 |
| 406A-I | Stanton scripts.  S. Jones | 154 | 156 |
| 407A-N | Stanton scripts.  K. Nantz | 154 | 156 |
| 408A-J | Stanton scripts.  C. Parchman | 155 | 156 |
| 409A-B | Stanton scripts.  J. Pooler | 155 | 156 |
| 410A-AA | Stanton scripts.  A. Rather | 155 | 156 |
| 412A-X | Stanton scripts.  J. Vardaman | 155 | 156 |
| 413A-AA | Stanton scripts.  E. Wagers | 155 | 156 |
| 414A-M | Stanton scripts.  R. Wagers | 155 | 156 |
| 415A-MM | Stanton scripts.  L. Waynick | 155 | 156 |
| 416A-H | Stanton scripts.  C. Wooten | 156 | 156 |
| 26A | Stanton recording.  Part 1 | 162 | 162 |
| 26B | Stanton recording.  Part 2 | 176 | 177 |
| 27A | Email.  Stanton to Sizemore | 200 | 201 |
| 27B | Email attachment to 27A | 201 | 202 |
| 27C | Email attachment to 27A | 205 | 206 |

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 417A | Stanton scripts. J. Mason | 223 | 223 |
| 417B | Stanton scripts. S. Fralix | 224 | 224 |
| 417C | Stanton script. E. Williamson | 224 | 224 |
| 417D | Stanton scripts. G. Parker | 224 | 224 |
| 417E | Stanton scripts. M. Perkins | 224 | 224 |
| 417F | Stanton scripts. J. Campbell | 224 | 224 |
| 417G | Stanton scripts. L. Frazier | 224 | 224 |
| 417H | Stanton scripts. T. Myers | 224 | 224 |
| 417I | Stanton scripts. M. Thornton | 224 | 224 |
| 417J | Stanton scripts. C. Jones | 224 | 224 |
| 417K | Stanton scripts. M. Baker | 224 | 224 |
| 417L | Stanton scripts. F. Broussard | 224 | 224 |
| 600A-B | Composite. M. Baker | 225 | 226 |
| 601A-B | Composite. F. Broussard | 225 | 226 |
| 602A-B | Composite. J. Campbell | 225 | 226 |
| 603A-B | Composite. S. Fralix | 225 | 226 |
| 604A-B | Composite. L. Frazier | 225 | 226 |
| 605A-B | Composite. C. Jones | 225 | 226 |
| 606A-B | Composite J. Martin | 225 | 226 |
| 607A-B | Composite. T. Myers | 225 | 226 |
| 608A-C | Composite. G. Parker | 225 | 226 |
| 609A-B | Composite. M. Perkins | 225 | 226 |
| 610A-C | Composite. M. Thornton | 225 | 226 |
| 611A-B | Composite. E. Williamson | 225 | 226 |