1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF KENTUCKY
2           SOUTHERN DIVISION at LONDON
                      - - -
3
   UNITED STATES OF AMERICA,    : Docket No. 21-CR-019
4                                :
                     Plaintiff,  : London, Kentucky
5                                : Monday, August 29, 2022
                                 :
6   versus                       : 8:15 A.M.
                                 :
7   JOHN L. STANTON,             : Jury Trial Day 5 of 7
                                 :
8                     Defendant. :

9                      - - -
           TRANSCRIPT OF JURY TRIAL
10         BEFORE ROBERT E. WIER
       UNITED STATES DISTRICT COURT JUDGE
11                     - - -

12  APPEARANCES:

13  For the United States:    ANDREW E. SMITH, AUSA
                             U.S. Attorney's Office
14                           260 West Vine Street
                             Suite 300
15                           Lexington, Kentucky 40507

16  For the Defendant:        PETER J. STRIANSE, ESQ
                             Tune, Entrekin & White
17                           5000 11th Avenue N.
                             Suite 600
18                           Nashville, Tennessee 37203

19

20  Court Reporter:           KIMBERLEY KEENE, RMR (a.m.)
                             KATHLEEN MALONEY, RMR, FCRR (p.m.)
21                           Official Court Reporter
                             310 South Main Street
22                           London, Kentucky 47041

23

24
        Proceedings recorded by mechanical stenography,
25  transcript produced by computer.

1    (Proceedings commenced at 8:22 a.m.)

2         THE COURT:  All right.  Thank you very much.

3    Good morning to everyone.  We are assembled again, U.S.

4    versus Stanton, with all counsel present and Dr. Stanton

5    present as well.  Hope everybody had a pleasant, restful

6    weekend.

7    The jury is not yet in the courtroom.  All 14 here?

8         COURT SECURITY OFFICER:  All the jurors.

9         THE COURT:  I'm sorry?

10        COURT SECURITY OFFICER:  They're ready.

11        THE COURT:  All right.  So, Mr. Smith, appreciate you

12   communicating about the witness.

13   And so you anticipate resting as soon as we call the

14   case?

15        MR. SMITH:  Yes, Your Honor.

16        THE COURT:  Okay.  And all of the exhibits, are they

17   all squared away, Madam Clerk?

18        COURTROOM DEPUTY:  Yes, Your Honor.

19        THE COURT:  Okay.  Then, Mr. Strianse, I hadn't

20   circled back on the forfeiture issue.  I just need to know, if

21   we get to that point, whether the forfeiture issue and the

22   licensure is going to be submitted to the jury or decided by

23   the Court.

24        MR. STRIANSE:  Your Honor, if the Court has concluded

25   that the license is a proper subject of the criminal

1   forfeiture count, then I would ask that it be submitted to the

2   jury.

3          THE COURT:  Well, the government tendered a brief on

4   it and cited some cases that do recognize it as a property

5   interest.

6       Do you have any argument contrary to that?

7          MR. STRIANSE:  No, Your Honor.  I agree it is a

8   property interest, and by virtue of that, I think he is

9   entitled to have the jury pass on it.

10         THE COURT:  Okay.  Then I will include it in the jury

11  instructions, just a generic heads-up to the jury that they

12  may have a short additional proceeding to follow.

13      Okay.  We'll get those instructions worked up as well.

14      Did send a draft out of the instructions and appreciate

15  the government tendering an additional post rule onset to

16  consult.  That's helpful.

17      So going into today, again, give me your best estimate on

18  the length of the defense case.

19         MR. STRIANSE:  Your Honor, I think Dr. Stanton's

20  testimony will take at least 90 minutes to two hours on

21  direct.  I have two witnesses I want to highlight for the

22  Court.

23      Is this a good time while we're waiting?

24         THE COURT:  Sure, yep.

25         MR. STRIANSE:  Your Honor, I'm mindful of the Court's

opinion in the *Akers* case, the district court opinion that you authored. In addition to Dr. Stanton, I would like to advance as witnesses Ti-Nea, and that's, for the court reporter, T-I dash N-E-A, Humphrey, who is a licensed practical nurse who worked with Dr. Stanton for over 22 years, worked with him in his orthopedic surgery practice and then helped him open up his own pain clinic.

If I understand the Court's ruling in *Akers*, what I would try to elicit from Ms. Humphrey is Dr. Stanton's prescribing conduct, his general reputation as a doctor. I would be offering this opinion testimony through her. I feel consistent with *Akers*, that it would be probative of Dr. Stanton's overall course of care of patients and his prescribing intent.

And then I have a patient by the name of Jennifer Bopp, who was a former Dr. Maccarone patient, and then after Gateway Medical Associates closed, she was treated by Dr. Stanton at his clinic. And I would, again, be eliciting from her Dr. Stanton's prescribing practices, her opinion of him as a physician.

So those general areas.

THE COURT: Okay. Do you plan any others besides those three?

MR. STRIANSE: No. We have three witnesses.

THE COURT: Okay. And sounds like you should no have

1    trouble completing your case today?

2         MR. STRIANSE:  No, sir.

3         THE COURT:  All right.  And we'll take up any issues

4    on those witnesses before they're called.

5         All right.  What else do we need to take up this morning,

6    Mr. Smith?

7         MR. SMITH:  Your Honor, I assume, schedule wise, that

8    the defense is going to have a motion to make.  So is the plan

9    to bring them in, rest our case, and then argue that motion

10   to -- send them back out?  Do you want to do it on the

11   headphones?  What's the --

12        THE COURT:  Yeah, I certainly would not have picked

13   to bring them in and immediately send them out on a break, but

14   I understand you're having to make decisions on that witness,

15   and I okayed it.  So that's what we'll do.

16        We'll bring them in, call the case, I'll say, "You can

17   continue with your proof," you rest, and I'll send them out

18   for a few minutes for a break.  We'll take up the motion then,

19   and then get into the defense case.

20        MR. SMITH:  Thank you, Your Honor.

21        THE COURT:  All right.  Anything else, Mr. Strianse?

22        MR. STRIANSE:  No, Your Honor.

23        THE COURT:  Okay.  Let's bring them in.

24      (The jury entered the courtroom at 8:28 a.m.)

25        THE COURT:  Good morning, everyone.  If the clerk

would call the case.

COURTROOM DEPUTY: Yes, Your Honor.

London Criminal Number 21-CR-19S, United States of America versus John L. Stanton.

THE COURT: Thank you very much. Counsel, if you would state your appearances, please.

MR. SMITH: Good morning, Your Honor. Andrew Smith on behalf of the United States.

THE COURT: Good morning.

MR. STRIANSE: Good morning, Your Honor. Peter Strianse on behalf of Dr. Stanton.

THE COURT: Good morning. And good morning to you, Dr. Stanton.

Ladies and gentlemen of the jury, good morning to all of you. Appreciate you being here ready to go this morning on time, as usual. Hope everybody had a pleasant weekend. And we're here to begin day five of the trial.

Has everybody adhered to the rules you've been under all the way through? Anyone no? Okay. I appreciate that very much.

We are still in the government's case as of the end of Friday, and so now I'll turn to Mr. Smith.

Mr. Smith.

MR. SMITH: Thank you, Your Honor. At this time, the United States rests its case. Thank you.

1          THE COURT:  All right.  Thank you.

2      Okay.  That's going to close the proof for the

3  government.  It does necessitate that we take up a legal issue

4  at this point.  And so I'm sorry to have you show up and

5  immediately give you a break, but that's where we are on the

6  mechanics of the trial.

7      I'm going to keep this break short.  I think it'll be no

8  more than 20 or 30 minutes, but it'll give you a chance to go

9  get another cup of coffee and get settled in.  Then we'll come

10  back and continue with the proof.

11      Now, after the government's case, the defense has a

12  chance to put on proof.  As I've told you repeatedly, no

13  obligation to put on proof, no burden in the case, but the

14  chance to put on proof.  And so the defense will have that

15  opportunity after we come back from the break.

16      So with my appreciation, I'll see you in about a half an

17  hour.  Thank you.

18          (The jury exited the courtroom at 8:30 a.m.)

19          THE COURT:  Okay.  Thank you.  The jury has exited.

20  Everybody can be seated.

21      Mr. Strianse.

22          MR. STRIANSE:  Thank you, Your Honor.

23      Your Honor, it comes down to defendant John Stanton,

24  pursuant to Rule 29 of the Federal Rules of Criminal

25  Procedure, and moves for a judgment of acquittal as to the one

1   count in which he is named.  He's named in the conspiracy

2   count.  I notice that there is no aiding and abetting that is

3   alleged in the conspiracy count.  And, of course, he's not

4   charged in either of the substantive counts.

5       I understand the standard that the Court will employ at

6   this stage of the proceedings, which you're going to be

7   viewing the evidence in the light most favorable to the

8   government.

9       I think this is an unusual case, and I would like to

10  argue to the Court and suggest to the Court that based on the

11  proof that we've heard over the last four days, that the

12  government has not proven that there was a criminal agreement

13  involving John Stanton to distribute controlled substances.

14      Factually, I don't think the jury has heard any proof

15  that there was any mutual understanding before -- between

16  Dr. Stanton and anyone else that was involved in this case.

17  There has been no showing that there was any cooperation

18  between Dr. Stanton and any other witness that we've heard

19  over the last four days.

20      Just to highlight briefly.  I know the Court is familiar

21  with the government's proof.  Terry Prince testified.  He told

22  the jury that he did not know Dr. Stanton.  Had never met

23  Dr. Stanton.  Never spoke to Dr. Stanton.  Did not have

24  contact information for Dr. Stanton.  Some of these witnesses

25  that testified, these patient witnesses, had contact

information for Dr. Maccarone, which was really unusual.

Jeffrey Ghent testified. Dr. Stanton, according to the testimony that Ghent provided, only interacted with Mr. Ghent in his role as a patient. Dr. Stanton saw and treated Mr. Ghent and treated him as a real patient.

The Court may remember his testimony on cross-examination. He had a number of significant health issues. He presented to GMA with imaging studies which confirmed his chief complaints that he made to the clinic. He had a rotator cuff tear. He had degenerative arthritis in his thumb. The imaging studies all confirmed that. And he had some significant problems with his neck, also confirmed by imaging studies.

And Dr. Stanton, again, treated him as a real patient, sent him to surgery, and ordered him a back brace. I thought it was significant that in his dealings, Dr. Stanton's dealings with Mr. Ghent, there were no abnormal urine drug screens. There was one drug screen that related to Mr. Ghent where there was no metabolite in his urine.

But based on the testimony and the records, that prescription -- the last prescription before he had that test with nothing in his urine was on November 26, 2018, and then 38 days later, where he had since run out of his prescription on January the 3rd, 2019. That's when he had no metabolites in his urine, so -- and he has an explanation for that.

1       As far as Dr. Maccarone is concerned and his testimony,

2    there was really no testimony from Dr. Maccarone that he had

3    ever reached any sort of an agreement, an illegal agreement,

4    to violate the law with Dr. Stanton.  In fact, the testimony

5    was that they really didn't communicate much at all,

6    particularly when Dr. Maccarone was out of the office.

7       I asked Ms. Keene over the weekend to prepare an excerpt

8    of Dr. Maccarone's cross-examination, and I thought it was

9    significant that on cross-examination, I had this following

10   exchange with Dr. Maccarone.  I have a copy for the government

11   and for the Court.

12      You have it?

13      Your Honor, can I hand one up to the Court?

14          THE COURT:  Yes.  Thank you.

15          MR. STRIANSE:  And, for the record, I'm handing the

16   Court a transcript excerpt that was prepared by the official

17   court reporter, Kimberley Keene, of the testimony of

18   Dr. Maccarone.

19      And if the Court would turn to page 6.  And starting at

20   line 13, this is the question and answer in a colloquy that I

21   had with Dr. Maccarone.

22      At line 13:  And in the quiet time at the Grayson County

23   jail and the reflection that you've engaged in, have you sort

24   of convinced yourself that, yes, I was a member of a

25   conspiracy?

1    Line 16.  Answer:  Yes.

2    Question:  Now, that's upon reflection, but I really want

3    to ask you about the time frame in the indictment.  Let's go

4    back in time when people like Ghent and Prince and Mr. Pooler,

5    and others that we may see, were coming to your clinic and

6    getting prescriptions.  Then and there, in that moment of

7    time, which is the moment that the jury is going to be

8    concerned about, did you reach an agreement with them where

9    you knew they were getting schedule II pills and that they

10   were going to drive back to the streets of southeast Kentucky

11   and sell those pills?

12   His answer at line 2 on page 7:  No.

13   Question.  Line 3:  You never reached an agreement at

14   that point in time, did you?

15   Answer:  No, sir.

16   So I know that Dr. Maccarone had this retrospective view

17   of what had happened at GMA.  And looking back on it, while

18   he's been incarcerated over the last six months, he was

19   engaging in some self-criticism and self-awareness where he

20   was here telling the jury that looking back on it, he thought

21   he was in a conspiracy.

22   But when he looked at it through the appropriate prism,

23   what was going on back at the time frame alleged in the

24   indictment, I think he pretty clearly said that he was not

25   engaged in any conspiracy.

1    Your Honor, in dealing with some of the issues that have

2    been raised over the last four days, we've had an unusual

3    situation where the government has lost their expert witness.

4    And I'm familiar with what the Sixth Circuit says in

5    cases like *Bartee*, B-A-R-T-E -- T-E-E, *Larson*, *Rogers*, that in

6    some cases, and the Court noted this the other day, that if

7    it's just so obvious, the government does not have to advance

8    a witness, an expert witness, to comment on whether the

9    conduct of a charged physician is outside the bounds of

10   legitimate medical practice.

11   I'm sure the Court is aware of a district court opinion

12   that was authored by Judge Barrett, out of the Southern

13   District of Ohio, and that's *United States versus Temeck*,

14   T-E-M-E-C-K.  It was decided July 27, 2018.  And I have that

15   cite if the Court needs it, but I'm sure the Court is aware of

16   this.

17   In the *Temeck* case, it was before the court on a

18   post-trial motion.  And in that case, Judge Barrett, in

19   analyzing the cases in the Sixth Circuit about the government,

20   in some instances, not having the burden of having to advance

21   an expert, analyzed *United States versus Word*, 806 F.2d 658.

22   And Judge Barrett talked about the Sixth Circuit

23   addressing this specific issue, about whether the government

24   needs an expert in these types of cases.  And he analyzed

25   *Word*, and the Sixth Circuit has said in *Word* that "cases

indicate that while expert testimony as to 'legitimate medical purpose' and 'in the usual course of professional practice' may be helpful to a jury, there are cases in which lay testimony is so clear that no expert...is required."

And then he analyzed that in the context of Mr. Temeck's case. And in looking at what the plainly improper prescribing practices were in *Word*, he distinguished what was going on in Temeck's case.

And some of the lay testimony in *Word* that made the Sixth Circuit comfortable in feeling as if an expert was not needed included testimony that the defendant sold great quantities of Dilaudid for large sums of money, per the defendant admitted that he wrote prescriptions for various individuals without a physical exam based merely on their request for a specific drug. One witness in that case testified that he had told the doctor he intended to sell the pills. This is, Judge, distinguishing Temeck's case from Word's case.

There was evidence that the defendant in *Word* wrote prescriptions in return for sums of money ranging between $200 and $1,000 for each prescription, and they often wrote prescriptions at service stations, in vans, or in restrooms. So with that extreme conduct, it's pretty obvious that there was no need for an expert.

In the situation in Dr. Stanton's case, there has been no proof as to a violation of the standard of care. There has

1   been no expert proof as to whether these specific

2   prescriptions were outside the bounds of legitimate medical

3   practice.

4           THE COURT:  I mean, the pharmacist is something,

5   right?  Lee is something.  It's not nothing.

6           MR. STRIANSE:  She is, but I don't remember her

7   really descending to the particulars of each of the patients.

8           THE COURT:  She didn't go patient by patient, but she

9   talked about practices and standards.

10          MR. STRIANSE:  Yes, sir.

11          THE COURT:  Okay.  Go ahead.

12          MR. STRIANSE:  But I don't think she would have been

13  a substitute for Dr. Smyth or another expert who would have

14  looked at each one of the patient charts and --

15          THE COURT:  I'm not saying she's a substitute.  I'm

16  just saying that she's in that area.

17          MR. STRIANSE:  Yes, sir.

18          THE COURT:  Okay.

19          MR. STRIANSE:  And just to make sure that the record

20  is covered, the Court is aware that the Sixth Circuit has, in

21  *United States versus Wheat* talked about the buyer-seller

22  relationship not being a conspiracy.

23          And that's a relatively recent Sixth Circuit case decided

24  in '21.  And the reason that I bring it up is that there is an

25  older Second Circuit case, and I just want to make sure that

1    I'm preserving the record on this.  *United States versus*

2    *Wexler*, W-E-X-L-E-R, 522 F.3d 194, a Second Circuit case from

3    2008.

4         In *Wexler*, the defendant doctor wrote prescriptions for

5    schedule II pills.  According to the case, Dr. Wexler knew

6    that the patient was distributing the drugs to others and that

7    the prescriptions were not medically necessary.  The

8    prescriptions were not in amounts that would have led the

9    doctor to believe the patient was distributing the pills.

10        The doctor in that case, Wexler, was found guilty, and

11   the Second Circuit reversed that conviction based on what they

12   characterized as the buyer-seller relationship that existed

13   between the doctor and the patient and found that that

14   conspiracy charge could not stand.

15        So the reason I bring that up is because of *Wheat* and the

16   Sixth Circuit recent pronouncement on that.

17             THE COURT:  All right.

18             MR. STRIANSE:  Thank you.

19             THE COURT:  Thank you, Mr. Strianse.

20        Mr. Smith.

21             MR. SMITH:  Thank you, Your Honor.

22        Your Honor, as you know, at this stage, when you're

23   weighing a Rule 29 motion, you have to view the light -- the

24   evidence in the light most favorable to the prosecution and --

25             THE COURT:  Yeah, I've got the standard.

1          MR. SMITH:  You know the standard.

2          THE COURT:  Get to the argument.

3          MR. SMITH:  Well, the second part about the standard,

4    not to skip over, but it's how a conspiracy can be found,

5    including by all inferences, by circumstantial evidence.  And

6    so with that background in mind, I want to touch on a couple

7    of points.

8          The first is, the Court is aware, and the Sixth Circuit

9    has found in several cases, including *United States v.*

10   *Elliott*, and, more recently, *United States v. Noel*, which are

11   both -- I believe both originated out of this district.  I

12   believe the Court probably has those cites, but I can provide

13   them if needed.

14         Those talk about not only (inaudible) if you'll hear, but

15   what is sufficient to find violations of the Controlled

16   Substances Act in these cases, including the fairly well

17   recognized principle that expert proof isn't strictly

18   necessary.  I'll talk about that in a moment.

19         But, generally speaking, you know, all that's required

20   for the jury to convict is for Dr. Stanton to have conspired

21   with at least one other person.  And so the conspiracy can be

22   broader.  It's alleged that it was broader.  But most of

23   counsel's argument was really focused on things other than the

24   evidence of his agreement to join, essentially, a pill mill,

25   as Dr. Maccarone testified to, and his agreement with

Dr. Maccarone to do so.  And so whether he had direct contact with Mr. Prince or he had direct contact with Mr. Pasternak doesn't really affect that analysis one bit.

With respect to Dr. Maccarone, counsel argued that there was no testimony that he had contact or any illegal agreement, but as Dr. Maccarone discussed in his testimony, he had conversations with the defendant about things like not wanting to prescribe because of the "exposure" initially.  He talked about staying late and how it looks bad.  He talked about how many prescriptions raised red flags for the state.  To be clear, those kinds of over communications, those kinds of -- or discussions would not be legally necessary to find the existence of the conspiracy.

As Your Honor knows, it can be spoken or unspoken and inferred through a course of conduct.  Here we have four years almost unbroken in which the defendant participated in this clinic.  And through just the sheer evidence of the similarity and parallels and conduct, the same kinds of prescriptions or the same kind of drugs -- and we'll talk about some of the other red flags in a moment -- all of that is more than sufficient to infer a common purpose, an interdependence between Dr. Maccarone and Dr. Stanton for the purpose of keeping this clinic open to make money through unlawful prescribing.  So there was ample evidence from that alone.

With respect to Dr. Maccarone's testimony on

cross-examination, I do think we should be careful about what
Dr. Maccarone actually said in the full context of his
testimony.  Obviously, he testified at length on direct
examination about his participation in the conspiracy, his
admission that he was part of that conspiracy.

He did acknowledge up front that conceptually, the
concept of a conspiracy, as it is for most people, is not an
easy thing.  And he referenced, as you'll recall, this belief
that initially, there had to be some kind of dark room
clandestine, you know, meeting of the minds where they shook
hands and say, "Let's conspire," which, of course, is not
required at all.  And then he explained kind of what was more
important, which is the actual factual conduct, which was more
than enough to show the existence of a conspiracy.

Now, on cross-examination, the questions that counsel
just read from the transcript, counsel asked questions about
Maccarone at the time in his -- whether he "reached an
agreement with the patients themselves."

And understandably in context, I think it's fair to say
that Dr. Maccarone was saying, you know, at the time, I did
not sit and say with Jeff Ghent, for instance, "Let's form a
conspiracy to distribute drugs."

Number one, the question is not asked as to whether he
formed a conspiracy with Dr. Stanton; and, number two, in
context with everything else that Dr. Maccarone said, it's

entirely believable that a jury could rationally conclude
that, yes, he never sat down and said, "I am hereby conspiring
with you," with any of the patients.

But he did acknowledge, and it's important to read on in
that transcript, what Dr. Maccarone said next, which was, "But
there was -- there were red flags in my practice. There were
so many red flags in my practice, and I just pressed on," and
importantly said, "And I didn't do it alone."

And that's kind of the gist of the case. He testified at
length throughout the entire course of his direct, and even on
redirect, about the litany of things that he knew at the time
were in violation of the Chronic Pain Guidelines of Tennessee,
that he knew were not proper medical practice, and they both
kept doing it anyway. All of that would be strong evidence to
infer the existence of a conspiracy.

There's a host of other evidence that counsel does not
mention. That's the testimony of all of the employees, the
testimony of the patients, and Maccarone himself, that paint a
picture of how this clinic operated. And this goes into the
next point about the necessity of expert testimony.

As counsel I think ably just summarized, there are
certain factors the courts have long recognized as being red
flags or indicators of unlawful prescribing. And courts in
other instances, including the case I talked about at the
outset, have recognized that in certain cases where the

conduct is egregious enough or just common sense bad enough, an expert isn't required.

And I think this is exactly that case. You've heard evidence of what this clinic was like. Patients traveling long distances. Staying many hours into late at night. Paying high amounts of cash, albeit on debit cards, but out of pocket, you know, in excess of $400, sometimes as much as $800. Patients repeatedly getting the same types of addictive combinations of drugs.

And then one thing that, of course, counsel did not mention, I don't believe at all in his argument, were the drug tests, which, in fact, are the very problem in this case. An expert is not required for a jury to look at all of these failed urine drug screens and, particularly, the types of drugs they failed that they tested positive for or when they tested negative, and concluded that those are significant indicators of illegal prescribing.

Again, the cupboard is bare with respect to expert proof, Your Honor.

You mentioned Jill Lee, who is a pharmacist. You know, the Tennessee Chronic Pain Guidelines are in evidence. The jury has heard them. They'll have an opportunity to review them. And Ms. Lee testified about her kind of expertise and understanding about proper prescribing, which is consistent with those guidelines. We walked through a number of those.

1    There are points in there. Not to go through all of

2    them, but, among others, this concept of doing a urine drug

3    test before you issue that first script, the difference in

4    immediate release and extended release medications, risk

5    assessment, including urine drug screens, high MMEs. All of

6    those things are laid out in plain language in those

7    guidelines. Ms. Lee talked about them. And there has been a

8    lot of proof that those guidelines were not followed.

9    So for all of those reasons, I think there's sufficient

10   proof to go to the jury, number one, about the conspiracy and

11   then the underlying kind of imbedded question about acting

12   outside the usual course of professional practice.

13   Happy to answer any questions about that.

14   There is the comment about the buyer-seller relationship.

15   I would just note that that is not applicable here. This case

16   isn't about just a doctor and a patient and whether that's

17   just a transaction between those two parties. In the case

18   counsel cited, I don't believe that -- unless I misunderstood

19   the facts, I don't believe there was another doctor.

20   So here, there's another individual with whom there's a

21   conspiracy. And obviously, you know, the Court has heard

22   testimony and the jury has heard testimony from three other

23   individuals who have admitted to participating in the

24   conspiracy who were not just patients themselves. So I don't

25   think that case law is applicable here.

1    Thank you, Your Honor.

2         THE COURT:  Thank you.  Anything else briefly?

3         MR. STRIANSE:  Just one other thing.  There was no

4    expert proof that these prescriptions were not authorized or

5    issued by Dr. Stanton in an illegitimate way that made it an

6    unauthorized distribution, which I think is now required by

7    *Ruan*.  And I think the record is really silent on that issue,

8    that he knowingly and intentionally, contrary to his

9    authorization, distributed these by signing these

10   prescriptions.

11        THE COURT:  Okay.  Thank you.

12   Well, we all know the Rule 29 rubric.  And, Dr. Stanton,

13   I'm just deciding whether the case should be submitted to the

14   jury.  In doing that, I draw all reasonable inferences in the

15   government's favor, and the question is whether any rational

16   juror could find the elements of the case proven beyond a

17   reasonable doubt.

18        So that's the framework.  The jury is the fact finder in

19   this case, and so I'm just deciding whether there's a

20   sufficient factual question elementally to justify the jury

21   performing its role.

22        I mean, you know, reading over the weekend and kind of

23   preparing for the argument, I just kind of wrote down a series

24   of things that stick out in my mind.  And, you know,

25   ultimately, cases of this type always come down to a

1   competition between the legitimacy and the aura of legitimacy

2   at a clinic versus the things that would depict the punitive

3   legitimacy as sort of window dressing for what's really going

4   on.

5       And that's a broad overview of kind of how these cases

6   tend to come in.  Every case has its particularities, and this

7   one is no different.

8       I do think the jury has got to decide this case, and

9   here's why I say it.

10      Were there prescriptions written unauthorized?  Was the

11  clinic operating in a way that centered on unauthorized

12  prescriptions?  And the total numbers over the period,

13  Maccarone wrote, I think, two-thirds, and Stanton one-third,

14  or something like that, in terms of the total numbers on a

15  patient population of 500 common patients.  So it's a big

16  block of the practice.

17      So the measure on the practice legitimacy, you know,

18  we've got the Tennessee guidelines.  We've got GMA's own

19  written policies.  And on paper, they look compliant.  I mean,

20  they were submitted to assure licensure.

21      I do wonder, looking at the proof on the drug screen

22  management and the pill count issues and the lack of effective

23  dismissals, you know, it's sort of, I think, could be

24  described as kind of a Russian constitution.  Looks great on

25  paper, but if you say Ukraine's a war, you go off to prison

1    for ten years.

2         And so the practice versus what the paper says, that's an

3    important point for the jury, potentially, to wrestle with.

4    And so I think it's legitimate to look at GMA's written

5    policies as sort of defining this is what it ought to be.  And

6    if the doctors are ignoring those policies, that, to me, can

7    reasonably say something about adherence to authorized

8    prescription writing.

9         The pharmacist, Lee, talked about it.  Maccarone talked

10   about it.  Stanton himself, in the interview, talked about

11   kind of what's in and out of bounds and what combination is

12   too addictive to write.  And so I do think there are practice

13   descriptions that matter.

14        The clinic operations, the things that stuck out in my

15   notes included the cost, the financial mode of operation at

16   the clinic.  The patient population geography, I think

17   Maccarone said 70 percent Kentucky patients, most of them from

18   Eastern Kentucky.  You know, that has an explanation the jury

19   might buy.  That also has a suspicious undertone that the jury

20   might seize on.

21        The hours of the clinic, the way the doctors operated, so

22   there's commonality in the prescription writing, although

23   there is evidence that Dr. Stanton tended to write at a lower

24   level or, in some cases, reduced or signed off on reductions.

25   Some evidence of that, but also plenty of evidence that the

doctors essentially wrote the same way. But they went about it at one clinic in ways that managed the time differently. Both ways, I think, could support an inference that's unfavorable and incriminating.

So Maccarone, of course, kept these absurd hours. People at the clinic all hours of the night. Parking lot all hours of the night. Scripts being written until 4:00 in the morning. Just absurdly unusual in terms of how a clinic would operate. Dr. Stanton knew this. He knew this was going on. He knew how unusual that was.

Now, Stanton didn't do that. He came in during the day and saw patients during the normal business hours. But if you look at what the -- we had, you know, two or three employees who talked about it, or more.

So Stanton would see a block of 20, 25 patients in an hour and a half. And the patients said five minutes, five to ten minutes, less than five minutes. Why don't we do the math? If you're there for 90 minutes and you see 25 patients, you're not spending four minutes per patient. That dovetails very well with the view that he got a packet, script on top, sees the patient briefly, signs the script, and out the door.

Now, you know, the jury is hearing this. And they're seeing what the paper says is supposed to happen, and they're seeing this practice. And so I think the jury can make some inferences from that on how the doctors were working together

1    to serve the same population in, arguably, a consistent

2    manner, doctor to doctor, and I do think that through one

3    inference -- one inference, one view, is incriminating.

4         Other things.  The rarity of dismissals, the rarity of

5    pill counts.  You know, I think it's questionable, this miss a

6    pill count, pay a fee idea when the purpose of the pill count,

7    explained at trial, is to sniff out diversion.  And so if the

8    diverting patient can avoid any consequence by writing a

9    check, that not only undercuts the rigor of the medicine and

10   the oversight, but it also contributes to a view that this is

11   about money, generating money, and not about medical

12   treatment.

13        Inconsistency on the screens and tests and the result

14   from that, the absence of dismissal, even on what Dr. Stanton

15   said, you know, the heinous drugs, just not seeing the

16   dismissals that have any teeth to them.  I mean, dismissal but

17   readmission; dismissal, readmission.  Very concerning.

18        The dosages, the combinations, again, these are red flag,

19   confirmatory, on the consistency of prescription drug

20   combinations, the numbers on the prescriptions.  And, you

21   know, we saw a sampling.  I didn't go back and record every

22   one, but enough proof that the jury certainly is going to have

23   a feeling that of the patients they saw, they were getting a

24   typical combination of the same groupings of drugs.

25        And, you know, Maccarone's version is, "Well, we were

checking boxes and papering the file, but the reality is, we were giving the patients what they wanted, the scripts. That's what they wanted.  That's what they were there for."

The practices at the clinic, who reduced the medication, the idea that the scribe is making some off the cuff kind of SOP five or ten-pill reduction, you know, the jury might see that as okay, but might see it as, you know, really a dereliction in who was making the medical judgments at the clinic.

The parking lot.  You know, the circumstances at the parking lot is certainly something the jury could focus on.

Now, part of all of this matters, and when I'm talking about Maccarone's practices, is that Stanton was the medical director.  And the Tennessee regulator, he told this jury, "Look, it's Stanton's clinic.  It can only exist because Stanton is the medical director."  Once the law changed in '16, that clinic could not have operated without Stanton stepping into the role as medical director.  And that role included significant oversight responsibility for the entire shop.

And I know the defense has a theory that tries to sort of compartmentalize what Stanton had to do or should have done. The jury certainly heard that the buck stops with him.  And so if he's the linchpin for how the clinic can operate and he's fully aware of how Maccarone does operate, indeed he is

1    carrying through Maccarone's patients for two extended

2    periods.  When Maccarone is out, he's alone at the switch.

3        So he's got knowledge of what's happening through

4    Maccarone.  He's got his own practice at the clinic that,

5    overall, is arguably consistent with what Maccarone did.  And

6    he's the medical director and responsible for compliance with

7    all of the propriety of prescribing and recordkeeping,

8    et cetera.

9        Then, you know, in my mind, I think the jury could see

10   that.  It's really all landing on Stanton's plate in terms of

11   culpability.  What do we see?  We saw and heard that Stanton

12   never did policy training.  He never had meetings about

13   policy.  He never advised staff about policy.  He never took

14   steps to shore up the adherence of the practice to all of the

15   various rules that applied.  We heard this over and over again

16   from patients.

17       So, again, that's something that the jury, hearing,

18   taking into account, could very well view as incriminating and

19   probative of knowledge, intent, joinder, indeed facilitation,

20   for how the clinic operated and that the operation was outside

21   of legitimate medical practice and usual course of medical

22   practice.

23       The UDT failures, I mean, one witness said five to six a

24   day were failing and still getting scripts.  The time

25   manipulation on Dr. Stanton's attendance at the clinic as

medical director, witnesses saying that he was never there at the time required. That's just one nugget, one nugget that the jury could attribute significance to. That could provide context for the overall operation.

He said he did not access medical records. He expressly told the diversion investigator that they had never looked at Maccarone's medical records. You know, as medical director, that strikes me as problematic given the rules and Exhibit 22 and what he undertook as medical director. But that's what he said.

And in that interview, he acknowledged, seems to me, knowing Maccarone's prescription writing and level, tried to distance himself, you know, I think arguably, in a self-serving way contrary to what the record shows, saying things like, "How would I know? How would I know what's going on in this or that area?" Well, you would know if you're the medical director charged with operation of the clinic and you have access to the full record. That's how you would know.

Describing himself not as the patient's doctor, I don't know. Maybe the jury buys that, but it seems difficult. With the 500 commonly treated patients, seems difficult to me.

Now, look, these are conspiracy cases. We know conspiracy can be proven inferentially. Does not have to be a hammered out, four corners agreement. Of course, there's an agreement here. He's the medical director at the clinic. Did

that operation, did that formal structure include a component
that was a wink wink, nod nod, we're going to run this as a
pill mill.

Well, I think Maccarone's testimony clearly supports that
the answer is yes. And the jury may or may not buy that, but
I think there's plenty of evidence to support that there was a
mutual, interdependent, cooperative relationship between the
doctors to serve this patient group, which, you know,
Maccarone said, "We're going to give them what they want.
And, you know, if we don't, they'll leave, essentially."

When they talked about patients switching clinics, they
may leave, but they're going to come back, because they're
giving them what they want. That's how the clinic operated.
Repeatedly, patients said, "We go there to get scripts.
That's why we go there. That's why we drive. That's why it's
worth it, because I can spend an entire day waiting, but I get
that script, and it's worth a lot of money."

All of these red flags paint a picture of diversion. And
so the jury might hear that and, I think, could reasonably
infer from it, particularly based on the patient proof.
Diversion means something. It means something is going on
that's highly problematic.

And maybe it's a specific patient using too much. Maybe
it's pills going to the street. And the point of these
screening tools and oversight tools is to ferret out, where

are there problems in this patient population?  And if the
tools are in there and are kind of doing their job but are
being ignored, I think the jury can look at that and can draw
some inferences from it, including knowledge, participation,
and joinder in an illegal prescription writing agreement by
Dr. Stanton.

Now, the proof on, you know, the destination for those
pills, you know, that requires the jury to believe what these
patients are saying, that they presented themselves in a way
and that the overall pattern supports, attributing that
knowledge to Dr. Stanton.  It's not a slam dunk, but I think a
reasonable juror could find it based on the overwhelming
record of the way patients were treated despite problems,
despite what looked like glaring problems.

Waynick, Brown, Cozart, Fralix, Vardaman, Wooten,
Henderson, not going through all of them in detail, but each
of those is an instance -- tacking on the sponsor testimony,
each of them is an instance of a really problematic
prescription writing pattern that can certainly accumulate to
tell this jury something about what was really going on at
this clinic.

And what was really going on, Maccarone said it was a
pill mill.  Pooler said it was a pill mill.  That's why he was
there, because it was a pill mill.  And the medical director
of that operation for four years, the person who let it

1  happen, who was central to, indeed required, for it to

2  operate, was Dr. Stanton.

3      Now, the jury might hear the proof and reject all of that

4  and say, "We're not convinced there was an agreement.  We're

5  not convinced Dr. Stanton joined an agreement."  That's a

6  possible outcome, certainly, but I think the other side is

7  also a possible reasonable outcome for a juror who's rational

8  to reach based on the inferences I've noted.

9      So for all of those reasons, I am going to submit the

10  case to the jury.  I think on the expert issue, listen, an

11  expert would be helpful to the government here.  There's no

12  question about it.  Always an expert is helpful.

13      But the clarity of the operational problems is such to me

14  that a juror could, despite not having a specific expert go

15  patient by patient, that a juror still could find, a lay juror

16  could find, that all of these noncompliances and failures to

17  adhere to policy and ignorance of what the record really is

18  showing supports a conclusion about the legitimacy of the

19  prescription writing.

20      Add that to the Tennessee guidelines, the GMA policies,

21  the pharmacist Lee, Maccarone's view, and Stanton's own

22  comments in the interview I think gets the government over the

23  line on that particular issue.

24      I haven't read the *Wexler* case.  I certainly am familiar

25  with *Wheat*.  I'm denying the motion, but I will go read that

1    case.  And then at the conclusion of all of the proof, I'll be

2    more prepared to look more at that.

3        You know, *Wheat* is a true buyer-seller, you know,

4    one-to-one scenario, very, very different from the long-term,

5    four-year clinic operation we're talking about here with

6    repeated patient prescriptions over a broad patient

7    population.  So I'm not buying the theory, but I will go read

8    *Wexler* before we finish everything, after all of the proof.

9    But at this point, the motion is denied.

10       Okay.  Anything else to take up, Mr. Smith?

11            MR. SMITH:  Just, Your Honor, as we discussed last

12   week, we did and when -- we'll seek to have Dr. King

13   potentially testify in rebuttal if that's appropriate.  I

14   understand Your Honor has reserved on whether that's proper,

15   the scope of that.

16            THE COURT:  Right.

17            MR. SMITH:  But in the interim, we would request to

18   have Dr. King here and observing the testimony in the event he

19   is allowed to testify.  So I just wanted to notify -- I think

20   Your Honor said it's okay, but he is here, and I just

21   wanted --

22            THE COURT:  I appreciate that.  He can be here during

23   the defense proof.

24            MR. SMITH:  Thank you.

25            THE COURT:  Mr. Strianse, anything else for you?

1        MR. STRIANSE:  No, Your Honor.

2        THE COURT:  Okay.  Let's see.  So it's 9:15.  It

3   might be helpful for us to take, like, five minutes so we all

4   get a little mini break, because then we'll bring the jury in

5   and we'll go for about an hour and a half.

6        So instead of all of us having to sit for another hour

7   and a half, why don't we take five minutes and then try to

8   come back in and begin with the defense case then.  Thank you.

9        (Recess from 9:14 a.m. until 9:20 a.m.)

10        THE COURT:  All right.  Thank you.  We're reassembled

11   with all counsel and Dr. Stanton present.  The jury is not yet

12   in here.

13        Anything to take up, Mr. Smith?

14        MR. SMITH:  No, Your Honor.

15        THE COURT:  Mr. Strianse.

16        MR. STRIANSE:  No, Your Honor.

17        THE COURT:  Okay.  Let's bring them in.

18        (The jury entered the courtroom at 9:21 a.m.)

19        THE COURT:  All right.  Thank you.  The jury has

20   returned to the courtroom.  Sorry.  That took a little bit

21   longer than I had hoped.  I appreciate your patience.  The

22   best laid plans sometimes go astray.

23        My wife had me trimming, you know that little ground

24   cover they call Vinca?  As that little ground cover grows up,

25   and you trim it.  And so I was trimming it this weekend with

my electric hedge trimmer and yanked the cord behind me and

sliced right through it.  And so that quickly ended that task

and sent me to splicing for a significant period.  So things

don't always work out exactly as I plan.  That's one other

example.

The government has concluded its proof, and now I'm going

to turn to the defense and allow the defense its opportunity

to put on proof as well.

Mr. Strianse.

MR. STRIANSE:  Call John Stanton.

THE COURT:  John Stanton.

JOHN STANTON, DEFENSE WITNESS, SWORN

THE DEFENDANT:  I do.

COURTROOM DEPUTY:  Thank you.

THE COURT:  Sir, good morning to you.

THE DEFENDANT:  Good morning.

THE COURT:  Do try to speak toward that mic in a

clear voice so we can hear and understand your testimony.

If you first would state your name and spell your last

name.

THE DEFENDANT:  John L. Stanton.

THE COURT:  And spell your last name, please.

THE DEFENDANT:  S-T-A-N-T-O-N.

THE COURT:  Thank you.

Mr. Strianse.

1          MR. STRIANSE:  Thank you, Judge.

2                    DIRECT EXAMINATION

3   BY MR.  STRIANSE

4   Q.   Good morning, Dr. Stanton.

5   A.   Good morning.

6   Q.   How old are you, sir?

7   A.   66.

8   Q.   And where do you live?

9   A.   Clarksville, Tennessee.

10  Q.   And how long have you lived in Clarksville?

11  A.   Since 1996.

12  Q.   Are you married, sir?

13  A.   Yes.

14  Q.   Do you have children?

15  A.   Yes.

16  Q.   And do you have grandchildren?

17  A.   Yes.

18  Q.   You are a physician, correct?

19  A.   Yes.

20  Q.   How many years have you been a physician?

21  A.   Since December of 1980.

22  Q.   Tell the jury a little bit about where you were raised.

23  A.   Well, I was born in California, and we moved to Texas

24  and -- when I was probably 4 or 5 years old.  Eventually, we

25  moved from Houston up to Bryan-College Station, and I went to

1   Texas A&M.  My father was a professor there.  I went to Texas
2   A&M undergraduate.
3         And then I went to Baylor College of Medicine in Houston,
4   Texas, and received my medical degree in November of 1980.
5   Subsequently, I --
6   Q.   Pardon me.
7   A.   Go ahead.
8   Q.   After you received your medical degree, what were the
9   kinds of things that you did?
10  A.   Well, after I earned a medical degree, I worked for a
11  community health clinic in northern Houston for about six
12  months.  And then I went to Dallas, Texas, to do an internship
13  at that time in general surgery.
14  Q.   And did you do an orthopedic residency at any point?
15  A.   Yes.  During that -- that internship, I realized I would
16  rather do orthopedic surgery than general surgery.  So I went
17  to -- ultimately went to Brooke, B-R-O-O-K-E, Brooke Army
18  Hospital, in San Antonio, and did a residency in orthopedics.
19  Q.   And are you board-certified in orthopedics?
20  A.   I am.
21  Q.   After that residency in San Antonio, what was your next
22  assignment?
23  A.   Well, I was -- I did a couple assignments in the
24  military, and then I went into private practice in east Texas
25  starting in 1992.

1    Q.   And what was that type of practice?

2    A.   It was an orthopedic practice.

3    Q.   And what brought you to Clarksville, Tennessee?

4    A.   So I was in this practice in east Texas for four years,

5    and I was a -- basically, a junior partner.  And I -- I -- I

6    was -- I was very busy, but I didn't really have any control

7    over the practice.  So I decided to move and have my own

8    practice.

9         And initially, I was recruited to Hopkinsville, Kentucky,

10   and while I was there, I found out that there was an

11   opportunity in Clarksville, Tennessee, and so I opened a

12   practice there in 1996.

13   Q.   And what was the nature of that practice?

14   A.   It was an orthopedic practice.  I had another -- a

15   partner who was recently graduated from an orthopedic

16   residency, and we established a practice there.  And we

17   were -- we were partners in orthopedics up until my retirement

18   from orthopedics in July of 2018.

19   Q.   Tell the jury a little bit about your orthopedic

20   practice.

21   A.   So as a general orthopedic practice, I didn't really want

22   to specialize in anything.  I liked the idea I could do a

23   variety of different types of procedures.  And, of course, in

24   orthopedics, you're dealing primarily with things -- just with

25   fractures.  I mean, fractures of the foot, broken hands,

1    broken wrists, broken femurs, any kind of fracture.

2          But then there was a lot of other orthopedic or

3    musculoskeletal things we took care of.  We took care of back

4    pain and neck pain.  I didn't do surgery on backs or necks,

5    but I treated them conservatively.

6          So if a patient came in with back pain, for example, we

7    would evaluate them, get x-rays, talk to them about their back

8    or their neck, and then recommend physical therapy,

9    anti-inflammatory medications and bracing.  Get them a home

10   exercise program for their back.  And if they didn't do well,

11   the problem continued, we would send them to a spine surgeon,

12   who would evaluate them for, potentially, surgery.

13         The other orthopedic practice was -- the orthopedic

14   practice which was surgical could be anything from a bunion to

15   a trigger finger, to a carpal tunnel problem, rotator cuff

16   tears in the shoulder.  We did hip and knee replacements, knee

17   arthroscopies, just any kind of orthopedics.

18         And it was -- it was kind of a -- it was a lot of fun

19   because patients would come in with a lot of different

20   problems, and you would take care of them, they would get

21   well, and then they would leave.  And then you had kind of

22   taken care of that issue, and they could move on and go from

23   there.

24         It wasn't something that just continued on and on, but

25   ultimately, by the time I retired from orthopedics in 2018, I

1   had taken care of musculoskeletal problems for approximately

2   30 years at that point.

3   Q.   And were you a chief of surgery in Clarksville?

4   A.   There was a period of time, for about two and a half

5   years, when I was a chief of surgery representing the surgery

6   department and was -- you know, I would attend medical

7   executive meetings, and we would have to deal with unruly

8   surgeons occasionally.  That really wasn't a big problem.  It

9   was a lot had to do with administrative protocols, to some

10   extent.  It was more like operating room issues that had to be

11   discussed and go over.

12   Q.   Tell the jury a little bit about how demanding the life

13   of an orthopedic surgeon is.

14   A.   Well, the surgery is fun, and every day I'd go in the

15   operating room, and I'd be all optimistic.  I had these four

16   or five cases I'm going to do.  And by the end of the day, I

17   was beat, you know.  I mean, you're doing a hip replacement.

18   Then you got a couple of knee replacements.  And -- and then

19   there's the issue about being on call.

20       There were, I think, six orthopedic surgeons, and

21   Clarksville is about a hundred, maybe 150,000 people, so a lot

22   of people are falling down and breaking things or damaging

23   their knees or tearing their ligaments or something.  And we

24   were required to be on call in case something happened.

25       So a patient would come into the emergency room, or to

1    one of our patients who had a problem, or if there was

2    patients who were -- there were patients who were in the

3    hospital who had been operated on by one of the other

4    surgeons, we would have to check on them on the weekends and

5    make sure they were doing well.

6         And I was on call every fourth weekend, which meant that

7    from Friday morning until Monday morning, I was the doctor

8    they would call for any kind of problem.  And it could be, you

9    know, somebody came in and broke their ankle, and we got to

10   operate on it, you know, middle of the night, or whatever.

11   And then one night a week, I was on call.

12        When I turned 55, I could have stopped being on call,

13   because I had been there for quite some time at that point.

14   But I really kind of felt obligation to the other doctors

15   because at that time, there were only four of us who could

16   take call.  So if I came off of call, that meant the other

17   three guys would be on every third weekend, every third night,

18   which would have been kind of hard for them.

19        And so I didn't mind -- you know, I didn't mind to see

20   patients.  Once you get into a schedule, it's not that bad.

21   So I went ahead and stayed on call for an additional seven

22   years, until at the age of 62, I retired from orthopedic

23   surgery.

24   Q.  What were your prescribing practices like when you were

25   functioning as an orthopedic surgeon?

1    A.   So the medications I prescribed would be predominantly

2    anti-inflammatories and maybe occasionally, very rarely, a

3    muscle relaxant.  But as far as -- as after surgery, people

4    got pain medications after surgery.

5         And one of the things that I always thought about when

6    I'm writing a prescription for somebody after they've had

7    surgery, in particular -- that's what I was doing at the

8    time -- was, how do you know what to prescribe?  Because if

9    I'm doing surgery, I'm thinking, okay, this is a carpal

10   tunnel.  That's not going to hurt too bad.  Putting a rod down

11   someone's femur, they might be a lot sorer afterwards.  So I

12   have to think about what I'm going to give them.

13        You also have to think about the patient.  If I had a

14   40-year-old Mennonite farmer come in, they usually don't

15   complain about pain.  If I had a 13 or 14-year-old female,

16   she's going to be crying a lot after her surgery.  So you kind

17   of adjust what you're going to give.  But the -- the -- the

18   real issue is, is it -- you don't know how much pain a patient

19   has or is going to have, and you're giving them medication

20   that you've never taken yourself, so you don't know what it's

21   like.

22        So it would be kind of like if you went into a restaurant

23   and you said, "I'm really hungry," and the waiter has to

24   figure out how much food to bring you and what -- what's going

25   to be the right -- and -- and he's never tasted the food

1    himself, okay?  So it's -- it can be difficult to know what to

2    give a patient.

3         And in my situation, as an orthopedic surgeon, you're

4    just giving patients medications after their surgery.  So I

5    would have them come back two or three days later and -- and

6    see how they were doing and see if we need to adjust the

7    medications.  But, in general, I never gave anybody

8    medications for more than two or three weeks because, really,

9    there's really no reason to after surgery.

10        The inflammation, you give them an anti-inflammatory and

11   the pain medications, and the pain usually comes down

12   relatively quickly.  They don't need to continue on with

13   medication for a long period of time.  But then, then you have

14   issues where you have a patient -- and luckily -- luckily, I

15   was -- I was very lucky.

16        I didn't have patients who had had, say, for example,

17   a -- a hip replacement became infected or a knee replacement

18   that came loose and had to have multiple surgeries and -- and

19   had chronic pain.  I didn't have those patients.  But if I

20   had, I would have referred them to a -- to a pain clinic,

21   because that's just something I didn't have the time to deal

22   with.

23   Q.   Did there come a point in time in your career where you

24   made a transition to pain management?

25   A.   Yes.  In 2015, I was doing orthopedics, and a former PA

1    of mine was working at a pain clinic.  It's called Clarksville

2    Pain Institute, CPI.  And they -- they needed a -- kind of a

3    backup medical director.  They had a medical director, but he

4    wasn't -- he was only coming in intermittently.

5          So they needed someone who could come and sign charts.

6    And at that time, in 2015, all you had to do was be a doctor

7    and review the records of the nurse practitioners, or the PAs,

8    make sure that what they did appeared to be appropriate, and

9    sign off on those charts.  But things changed in 2016.

10   Q.    What was that change?

11   A.    Well, in 2016, the state of Tennessee decided that you

12   had to have some type of certification in pain management.

13   And there were several options on how you could become

14   certified in pain management.

15         The typical way was that you would -- if you're an

16   anesthesiologist and you had done a fellowship in pain

17   management, which is typically a one-year fellowship in pain

18   management, that would count.  If you were a physician who

19   was, like, either a neurosurgeon or -- or a physiatrist, or

20   whatever, you could become a member of the American board --

21   I'm sorry, the American Board of Pain Management, ABPM.

22         And interestingly enough, ABPM was open to physiatrists,

23   who kind of are rehabilitation doctors; it was open to

24   neurosurgeons and neurologists; and it was open to

25   psychiatrists and anesthesiologists, but it was not open to

1    orthopedic surgeons.  I thought that was kind of strange

2    because we do nothing but deal with musculoskeletal pain every

3    day.  Psychiatrists, I guess unless he's going to go into

4    addiction treatment, I'm not sure why he would be more

5    qualified than I was.

6         There was a different -- different way of becoming

7    certified.  It was the American Board of Interventional Pain

8    Physicians, ABIPP.  And they had a program of -- of classes,

9    and -- and which were, you go into meetings, and they teach

10   you about pain management, as well as teach you different

11   kinds of injections.  They had cadaver labs, where you would

12   go and learn how to put spinal cord stimulators in or how to

13   do nerve blocks in and around the spine or in and around the

14   neck, and so on.

15        So at that time, I -- I took the -- the first part.

16   There was an exam.  It was a two-part exam.  The first exam

17   was based on, you know, what are the laws with regards to pain

18   management?  Teaching about the medications and so on.  And I

19   took that -- that exam and passed that in 2016.  That was part

20   one.  And it was at that time that Dr. Maccarone first

21   approached me.

22   Q.   And what was the nature of his inquiry in 2016?

23   A.   So Dr. Maccarone was just a medical doctor.  He wasn't

24   board-certified.  He had been board-certified at one time, but

25   he let that lapse, and he didn't attempt to continue.  So he

1    was not a part of the hospital staff, but he had offices right

2    next door -- right next door to my office.  It was -- we were

3    separated by a small field, but I could look out my office

4    manager's window and see the back of his office.

5         So he -- we knew each other.  He had been a hospitalist.

6    And that meant that if a patient was admitted for orthopedic

7    problems but they also had heart or lung problems, then a

8    hospitalist would take care of them while they're in the

9    hospital so that the -- the medical doctor wouldn't have to

10   come in to take care of them.

11        So we knew each other from that.  We weren't really

12   particularly friends.  I mean, we never -- throughout the

13   entire course of our -- our experience, we never had lunch

14   together, dinner.  Well, I went to a lunch with him and his

15   staff one time.  We never had dinner together.  He never came

16   to my house.  I never went to his house.  You know, we never

17   texted each other really, so...

18        But I knew him, and he had found out that I had passed

19   the -- part one of ABIPP.  And I think what happened was, he

20   had a -- I call him a financial guy.  He had a financial guy,

21   Trey Judd, who was kind of also his practice -- I don't want

22   to say practice manager, but he managed all the finances,

23   because apparently at one point, Maccarone had lost his -- his

24   ability to bill Medicare.  And Trey Judd came to him and said,

25   "Well, why don't you just do a" --

1            THE COURT:  Hang on.  Hang on just a second.  Let's
2     confer for a second.
3         (Sidebar conference.)
4            THE COURT:  Can you hear, Mr. Strianse?
5            MR. STRIANSE:  Yes, sir.
6            MR. SMITH:  Objection.  Hearsay.
7            THE COURT:  Yeah, he can't import hearsay.  So I'm
8     going to tell him --
9            MR. STRIANSE:  Yes, sir.
10            THE COURT:  -- to stick to what he knows, not what
11     somebody else said.  I will say he's running off on long
12     narratives.
13            MR. STRIANSE:  Yes, sir.
14            THE COURT:  And so I want you to reel him in a little
15     bit.  I don't want to have to say it in front of the jury, but
16     I do want you to reel him in to questions, because he's --
17     you're spinning him, and he's just sort of taking off.
18            MR. STRIANSE:  Yes.
19            THE COURT:  So let's tighten that up.  Okay.
20         (Sidebar conference concluded.)
21            THE COURT:  And, Doctor, stick to what you know, not
22     what somebody said to you during your testimony.
23            THE DEFENDANT:  Yes, Your Honor.
24            THE COURT:  And wait for the next question.
25         Mr. Strianse.

1    BY MR. STRIANSE:

2    Q.   Dr. Stanton, let me interrupt you from time to time with

3    a question or two.

4         You talked about your background in orthopedics.

5         How did that inform your approach to pain management?

6    A.   One of the tenets of pain management is in the -- in

7    the -- the -- the guidelines, is you always want to start with

8    conservative care.  You want to start with alternative

9    treatments.  And then, if need be, you move to pain

10   medications.

11        Basically, orthopedics was the whole first two-thirds of

12   that.  If I -- if a -- if a patient came in and had knee pain,

13   for example, I wouldn't just put them on narcotics.  We would

14   get x-rays, evaluate the patient, talk to them, examine the

15   knee, and maybe give them an anti-inflammatory.

16        If they come back the next visit and they're not any

17   better and they have swelling of their knee, we might try a

18   cortisone shot and maybe get an MRI.  If they come back the

19   next visit and they still have catching or popping or locking

20   in the knee and the -- the injection hasn't really helped,

21   they still have swelling, then we'll suggest doing surgery,

22   a -- a knee scope.  And if that doesn't work, then we move up

23   to a knee replacement.

24        But as I mentioned before, if it progresses beyond that,

25   where you've done all of those things, say, for the knee, or

1    in the back, we take these patients and we have them do

2    therapy, get a brace for their back, and try injections in

3    their back.  If those things don't work, then you move on to

4    the -- to the narcotics.

5    Q.   Dr. Stanton, did there come a point in time that you

6    opened up your own pain management clinic?

7    A.   Yes.  So as I mentioned, I was medical director for

8    Clarksville Pain Institute, CPI.  And I would be there, you

9    know, one day a week.  I would be filling out paperwork and

10   signing charts and -- and stuff.  And I kind of observed how

11   they ran their clinic, and they had -- they had a -- a -- an

12   intake room, where patients would come in and they would talk

13   to one of the medical assistants.

14         And they did the same thing in Maccarone's office, but I

15   wasn't aware -- there when they were doing it.  I would hear

16   them say, "Well, how's your condition?  Anything change?

17   How's the medications doing for you?  Is everything stable?"

18         And -- and I was reviewing the medication the patients

19   were getting.  They seemed appropriate.  And I thought, you

20   know, for that, I kind of had a low opinion of -- of pain

21   management, because all you ever hear about with pain

22   management is people getting in trouble with the law.  And

23   like, why would I want to be part of that?

24         But I realized, when I was there with them, that -- that

25   you could run a pain clinic in a -- in a legal way, in a

1   nice -- a nice way, and -- and take care of people that really

2   had those needs.

3       And I realized that there are patients who had had

4   multiple surgeries on their back or they had failed back

5   problems where they had -- they had fusions, and now they had

6   arthritis above those levels and they couldn't have more

7   surgery.  Or they had an infected knee, and they ended up

8   having to -- they -- they could never have another surgery on

9   their knee.  And I thought, you know, this could kind of tie

10  in with what I'm doing in orthopedics, because I could kind of

11  take that next step in the care of my patients.

12      And so I opened a clinic of my own.  And what was

13  interesting, I found -- I kind of realized that some of my

14  orthopedic patients, especially the ones that had some hip

15  and -- hip and low back pain, would do better with injections

16  in the lower spine that I had learned about when I was getting

17  my training.  And I even started doing some of those

18  injections on my orthopedic patients.

19  Q.   Let's talk about your connection to Gateway Medical

20  Associates.

21      To give us sort of a timeline, when did you begin

22  functioning as the medical director there?

23  A.    Okay.  So Trey Judd contacted me, and I believe that he

24  had looked -- and he -- again, he was the advisor for

25  Maccarone.  I believe he looked through the -- the -- the --

1    the state of Tennessee has a list of all doctors who are

2    considered pain specialists, and he found my name.  And lo and

3    behold, I was right next door.

4         So he calls me up, and I come over and meet with him and

5    Maccarone.  And he says, "Maccarone needs a medical director

6    for his pain clinic, and -- and the responsibilities are going

7    to be to go through all of the protocols" --

8    Q.   Dr. Stanton, I hate to interrupt you.

9    A.   Yes.

10   Q.   Don't be saying what other people have told you.  Don't

11   be repeating what other people have told you.  It would be

12   hearsay.

13   A.   Okay.

14   Q.   As a result of that meeting that you had with Mr. Judd

15   and Dr. Maccarone, did you make a decision to get involved at

16   GMA?

17   A.   Yes.  It sounded reasonable at the time.

18   Q.   And what position did you accept?

19   A.   I was medical director.

20   Q.   And tell the jury, briefly, what were your duties as

21   medical director at GMA.

22   A.   Okay.  So there are, I guess you would say,

23   administrative duties as medical director, such as making sure

24   that the -- that the way patients are paying is correct.  I

25   mean, they're not handing out wads of cash.  It has to be done

1    with a debit card or a check -- it can't be a check -- a debit

2    card or a credit card or insurance.

3        But Maccarone didn't really take much insurance.  He had

4    converted mostly to a self-pay practice for a number of

5    reasons, but -- so I had to make sure that the -- that the

6    money was being collected.  He did have some patients that

7    took insurance, because I know that they have a -- a biller

8    who sent claims out to insurance companies, but, in general,

9    they -- you had to make sure that the money was being

10   collected correctly, it was being logged in correctly, that --

11   that there were protocols in the -- in the practice.

12   Q.   And let's talk about that.

13       What were the protocols and the policies at GMA?

14   A.   Okay.  Protocols, in general, are created in-house.

15   There are -- there are some guidelines provided by the -- by

16   the state regulations, but, in general, you have to follow

17   those guidelines, and then the protocols are created in-house

18   by -- in his case, by himself, before I got there.  In other

19   cases, it may be a -- a collaboration between the nurse

20   practitioners, PAs, and the doctor to create those -- those

21   policies.

22       There are three main policies.  There's a policy that has

23   to do with random pill counts, and he had a random pill-count

24   policy.  Initially, it was coming in twice a year.  Randomly

25   be called to come in to have a pill count.  Eventually, it

1   became three times a year.

2        And there are a couple of reasons to do random pill

3   counts.  One, if a patient comes into the clinic and doesn't

4   have any of the medications in their urine, they may have --

5   they may have a good excuse, they may not, but if they do that

6   a couple of times, you become suspicious that they might be

7   selling the medications or they might just be running out

8   early and not taking them as directed.

9        You can call a patient and say, "Come in, bring your

10  pills, and we're going to count them," a week or two after

11  they get their prescription, when they theoretically should

12  still have, you know, three-fourths or -- or the -- or -- or

13  half their medications, and confirm that they're taking

14  correctly and that they still have their medicine.

15       The second reason would be if you get an anonymous call

16  that says, "Hey, Fred Jones, one of your patients, is selling

17  medications to my sister, and I don't like it.  You need to --

18  you need to check on that."  So you get an anonymous call, so

19  the next time the patient comes in, you give them their

20  medications, and then a week or two later, you have them come

21  in to check that.

22       The third reason to do a random pill count would just be

23  to basically cast a net out there and see if you catch

24  anything.  So you may say, "We're going to do a random pill

25  count in April, August, and November, and everybody has to

1    come in at some point during that month to get their random

2    pill count."

3    Q.   During your time at GMA, did you think that that

4    pill-count policy was being followed and implemented

5    appropriately?

6    A.   Yes.  I -- I looked at the pill-count policy with Emilie,

7    the office manager, and I asked her, "Are patients coming

8    in -- being called to come in for random pill counts?"  And

9    she said, yes, they were.  And I talked to Maccarone, and I

10   said, "Tell me about your pill-count policy," because the

11   pill-count policy, if you look at it, what it actually says --

12   and you might see an example a little bit later here -- it

13   says, "If you" -- "You are required to come in for three pill

14   counts, and failure to do so may result in your termination."

15       So his policy did not say, "If you don't come in for

16   three pill counts, you're going to be discharged."  It just

17   said that you're required to come in for the pill counts, and

18   if you don't do that, that may result in your -- in discharge.

19       I asked Maccarone.  I said, "What's your -- what's your

20   understanding of your pill-count policy?"  And he says --

21            THE COURT:  Hang on.  Hang on.  Disregard anything he

22   says about somebody else unless I tell you otherwise.  Let's

23   confer for a moment.

24       (Sidebar conference.)

25            THE COURT:  You know, if we keep telling him not to

1  do it and he keeps doing it, I'm going to get more and more

2  direct with the jury and with him.

3       And so I'm going to let you tell him again to avoid

4  relaying what somebody else has said.  Now, if you've got a

5  hearsay exception or a theory or a nonhearsay use, I'm glad to

6  hear about it, but he's obviously determined to get up there

7  and say what people have said to him, and I'm going to depend

8  on you to try to police it.

9            MR. STRIANSE:  Yes, sir.

10           THE COURT:  And if he keeps going across bounds, I'm

11 going to keep telling the jury, more and more directly, that

12 he's crossing bounds talking about things he shouldn't talk

13 about, okay?

14           MR. STRIANSE:  Yes, sir.

15           THE COURT:  All right.

16      (Sidebar conference concluded.)

17 BY MR. STRIANSE:

18 Q.   Dr. Stanton, before my next question, please avoid

19 relaying to the jury things that other people have told you,

20 okay?

21 A.   Okay.  I was just trying to confirm how I knew what they

22 were doing.

23           THE COURT:  Do you understand he said to avoid that?

24           THE WITNESS:  Yes.  Yes, Your Honor.

25           THE COURT:  Okay.  I'm telling you that, too.  Thank

1    you.

2    BY MR. STRIANSE:

3    Q.   We were talking about policies and procedures at GMA.

4    You told us about the pill count.

5         What were some of the other policies and procedures?

6    A.   Okay.  So they also had a policy of doing urine tests.

7    So when a patient would come in, you would collect a urine

8    test.  And there's -- there's a couple of ways you can do

9    that.  But the state of Tennessee requires that a urine test

10   be done on every patient at least twice a year to evaluate and

11   see if they have the appropriate medications, they have

12   metabolites in the urine, and make sure that -- that they

13   don't have what they shouldn't have.  The only requirement is

14   twice a year.

15        They also recommend that the patients have a -- a urine

16   test four or five times a year if they're kind of a moderate

17   risk and more than four or five times a year if they're a

18   higher risk.  And based on my observations of the records, he

19   was following that.

20        The third policy had to do with discharging patients,

21   and -- or dismissing patients.  And it wasn't -- there was --

22   he had -- he had a protocol in place that said, "If a patient

23   has cocaine or heroin in their urine, they're discharged."

24        He -- he had his own policy that was expressed to me

25   and -- and -- that -- what he wanted to do -- first of all, he

1  wanted to be in charge of discharging every patient.  If -- if

2  we were both in the clinic at the same time, he was adamant

3  that he wanted to be the one to actually discharge the patient

4  and -- and wanted me to present the patient to him, and then

5  he would take care of the discharge.

6      But the other -- his other part of his policy was if a

7  patient was discharged, they were given a reduced dose of

8  their medications.  It wasn't a tapering dose, but it was a

9  reduced dose of the medications, and were given a discharge

10  letter to go out and find another clinic to go to, and then

11  they could come back in a month to make sure they had found

12  another clinic, make sure everything was set, and that they

13  were taken care of.  If not, they would give them one more --

14  one more dose of the medications so they wouldn't -- wouldn't

15  go through withdrawal, and then they would be gone.

16      So my understanding of this policy was that he was

17  concerned the patient might have to go find another clinic.

18  And compassionate reason, because if a patient is discharged

19  for heroin, they may or may not be able to find another clinic

20  to go to.  Another clinic may say, "I don't want to have

21  anything to do with someone who's discharged with heroin."

22      Some clinics would say, mine included, that if you had --

23  discharged for a drug offense, that we're willing to consider

24  seeing you, but we're going to keep a close watch on you for

25  the first three months and make sure there's no aberrancies,

1    because if so, you're going to be discharged.

2    Q.   What sort of discretion does a physician have over their

3    policies and procedures?

4    A.   Basically, complete with the exception of what the state

5    regulations are.

6         So the other reason that there was an issue is because

7    this is during COVID.  This is -- when I -- when I was really

8    involved in -- when I was involved in seeing patients to the

9    extent that they would be -- I had the opportunity to

10   discharge them myself.  This is between a period of time when

11   it was hard to get into new clinics.  This is 2019 and 2020.

12   So there was that concern as well.

13   Q.   Give the jury some idea of how busy you were as a

14   physician at the time you were working at GMA.

15   A.   Okay.  So I was -- I was medical director for two clinics

16   for Clarksville Pain Institute.  One was in -- in Springfield,

17   Tennessee, and the other was in Clarksville, Tennessee.  And

18   they're about an hour's drive from each other.  And then I had

19   my own clinic in Clarksville.

20        And so Monday, Tuesdays, and Wednesdays, I was going to

21   those three clinics, and I would get there at 8:00 in the

22   morning, sometimes 7:30, and be there until 3:00 or 4:00 in

23   the afternoon.  And then on Thursdays, I was doing procedures

24   at a local surgery center.  We were doing procedures to kind

25   of give a long-term pain relief.  They're called RFAs,

1    radiofrequency ablations.

2        This is a procedure where you can actually -- if you

3    determine a nerve is relaying pain back to the brain, you can

4    cauterize that nerve and give patients six or eight months of

5    relief.  And I was doing that until -- until noon on

6    Thursdays, and I was off on Fridays.

7    Q.   Dr. Stanton, I want to direct your attention to November

8    of 2018.

9        Were you working at GMA at that point in time?

10   A.   Yes.  I -- I had worked for GMA in 2016 up until -- I

11   think about the summer or fall of 2017.  And at that time, I

12   was, of course, medical director trying to make sure that the

13   policies were being followed, but I was also seeing patients

14   for an MME visit.

15       And then the MME visit is if a patient has an MME, which

16   is a level of narcotics over a level of 120, in Tennessee,

17   they have to be -- they have to see the -- the -- the medical

18   director for a consult once a year, minimum once a year.  And

19   that's what I -- that's what I was basically doing in 2016 up

20   until 2017.  And if I convinced a patient they needed a shot,

21   they would come back for another visit to get a shot, and I

22   also gave them braces and therapy prescriptions.

23       In 2017, I stepped away for about six to nine months, and

24   they had another medical director, who was an

25   anesthesiologist.  And he -- he came in and was the medical

1    director.

2         Then in the beginning of -- like in the summer of 2018, I

3    was available again to be medical director.  The director they

4    had took another job.  So they contacted me again and said,

5    "Hey, do you want to come back just to do what you had been

6    doing before, basically supervise the -- make sure the

7    policies are being followed, and -- and just do the MME visits

8    and injections?"  And I was not writing any prescriptions at

9    any of the clinics.

10   Q.   Let me stop you right there.

11        When you were functioning as the medical director, were

12   you writing prescriptions at GMA?

13   A.   No, I was -- was not writing medical -- I was not writing

14   prescriptions at any clinic.

15   Q.   So not at Clarksville Pain Institute and not at your

16   clinic?

17   A.   The last time I wrote a prescription for a pain -- pain

18   medicine was the end of July 2018, when I retired from

19   orthopedics.

20   Q.   Now, in November of 2018, did Dr. Maccarone experience a

21   pretty significant health crisis?

22   A.   Yes.

23   Q.   Tell the jury about that.

24   A.   Maccarone is a diabetic, and he didn't take real good

25   care of himself.  He had a room full of snacks, which he

1    always offered to me, which is very nice, and he partook of

2    them himself.  And his blood sugar went up to 500, he went

3    into diabetic shock, and was admitted to the hospital with

4    gangrene on part of his foot.

5         And I got a -- a frantic call from his office manager

6    that Dr. Maccarone is being transferred down to Nashville to

7    have his foot operated on, and he's going to have part of his

8    foot amputated, and -- she thought, and that he could be out

9    for four to six weeks, and could I come in and cover.

10        And I said, "What do you mean 'come in and cover?'"  And

11   she says, "Well, we have -- we have 20 to 30 patients coming

12   in this afternoon to get their medications, and they --

13   they -- they need their medicines.  And we need to have you

14   come in and write the prescriptions."

15   Q.   What did you decide to do when you received that call?

16   A.   You mean, how did I decide whether I was going to do that

17   or not?

18   Q.   Yes, sir.

19   A.   Okay.  So this was something I had not planned on having

20   to do.  It was not something I signed up for.  It was not

21   something -- writing narcotic prescriptions was not something

22   I really ever wanted to do.  And I thought about it.  I had

23   several options.

24        You know, I didn't know these patients real well.  I had

25   only met about 50 of them at that point, maybe 75, because I

1    was just doing MME visits.

2    Q.    And just so it's clear for the record -- I think we know

3    by this point in time, "MME" -- what is an MME visit?

4    A.    So the MME visit, which we talked about briefly, patient

5    comes in for a consult, and you sit down and you try to find

6    out what's going on with the patient, why are they on a high

7    level of medications, and you go over their history, you talk

8    to them about what their medical condition is, you examine

9    them if -- if -- if need be.

10        And one of the things I always did for those visits was

11   to make sure, "Well, have you tried alternative treatments?

12   Do you have a brace?"  And it was -- it was interesting to me.

13   There are a lot of patients that would say, "Well, no one has

14   ever asked me about a brace."  I would say, "Well, let's try a

15   brace for your back."

16        "Well, how does it work?"  And I talked to them about how

17   it stabilizes the spine.  It kind of helps transfer the weight

18   of your upper body into your pelvis so it doesn't -- all of

19   the weight doesn't have to go through your spine.  We talked

20   about that.  Give them a prescription for a brace.

21        I would talk to them about therapy.  A lot of these

22   patients had had therapy in the distant past, but, you know,

23   they come -- had pain for 16 years, had therapy, and after a

24   while -- you know, they weren't getting therapy every -- every

25   year.

1    And I asked them, I -- I said, "Well, you know, what

2    about a home exercise program?"  And they didn't know what

3    that was a lot of times.  I said, "You know, you can go to

4    therapy, and they can do heat and ultrasound to you.  They

5    can -- they can do massage, and they can show you -- actually,

6    they can do, essentially, stretching and strengthening

7    exercises and so on.

8        "But if you can learn how to do those exercises on your

9    own at home, then you can do that every day.  You can stretch.

10   You can strengthen yourself.  And going to the therapy clinic

11   for six weeks isn't going to cure your problem, but there are

12   these things you can do on your own."

13   Q.   Why were you conducting the MME visits?

14   A.   Because it was required by the state as the medical

15   director.

16       So -- so I -- I would talk about that, and we would talk

17   about injections and the purpose of injections, and get them

18   set up for injections if they wanted to, and give the braces

19   and therapy prescriptions.

20       And we talked about their medications.  And if I thought

21   their medications were kind of abnormally high, I would make

22   note of that, and then I would confer with Dr. Maccarone as to

23   why they needed that much medicine.  They already had --

24   Q.   Let's go back to my question about:  Did you agree to see

25   Dr. Maccarone 's patients when he was out?

1    A.   Right.  So I -- I -- as I said, I -- I met some of the

2    patients, but I didn't know all of them.  So I had no idea

3    that -- that, apparently, a lot of them were just, you know,

4    coming from Eastern Kentucky just to get medications to sell,

5    apparently, because people I had met had real problems.  They

6    had real pain, and they needed the medications.

7         So one option, I suppose, would have been to say, "I'm

8    just going to see the ones that aren't from Eastern Kentucky,

9    and -- and I'll just see the ones that are from nearby, a

10   hundred-mile radius.  That would not probably have been fair

11   to those patients from Eastern Kentucky, because I'm sure

12   there are a lot of Eastern Kentucky patients that need pain

13   medicine.  And, in fact, listening to the testimony of the

14   ones up here who were drug dealers, they all actually needed

15   pain medicine for themselves.

16        The other option would have been to say, "Well, I'll just

17   see some of the patients.  I don't have time to do all of

18   that," or just to say, "I'm not going to do it at all.  I'm --

19   I'm not going to take that responsibility."

20   Q.   How many patients would you see in an afternoon on a

21   regular basis at GMA?

22   A.   They had about 500 patients, 125 a week.  I was there

23   four afternoons a week.  I would see anywhere from 17 to 35

24   patients in an afternoon.

25   Q.   And just so it's clear, this is when Maccarone is out?

1   A.   Yes.

2   Q.   And you were functioning as more than the medical

3   director?

4   A.   Yes.

5   Q.   Actually seeing his patients?

6   A.   Yes.

7   Q.   And give the jury some idea of how many patients you

8   would see in an afternoon.

9   A.   So I could see -- we -- we had it set up to try to make

10  it run smoothly.  We had it set up where I would receive a

11  packet, and that's already been discussed.

12       And in that packet was a copy of the previous notes;

13  the -- I'm sorry, the previous office visit; and -- in case I

14  needed to look at that to see what the history was on that

15  patient and what medications they were on; and, yeah, the

16  CSMD, that showed where they're getting other prescriptions,

17  make sure they weren't getting prescriptions from anybody

18  else, basically, and lab results, urine lab results.

19       Sometimes be medication results.  Sometimes -- I mean, on

20  occasion, it would be health results.  Like I would go through

21  that and have to see, you know, what their hematocrit was or

22  they had low iron, or whatever.

23  Q.   Are these the packets that we've heard about during the

24  trial?

25  A.   Yes.

1    Q.   How was it that those packets came into existence?

2    A.   Well, I discussed with Emilie, the office manager.   I

3    said, "We're going to have to make this so I can go through

4    these patients relatively rapidly."  And she said --

5    Q.   Well, without telling us what she said, as a result of

6    that conversation, did you receive a packet?

7    A.   Yes, I received a packet.  It had everything in it,

8    the -- the prior note, urine results, other lab results, the

9    CSMD, and the medications that were already printed up.

10   Q.   And was there some urgency in the situation that dictated

11   that you needed a packet like this?

12   A.   Yes, because those were the essential items, other than

13   talking to the patient, that I would need to determine if we

14   could continue them on their medications.

15   Q.   How many afternoons a week were you seeing Maccarone

16   patients?

17   A.   Four.

18   Q.   And how many patients, typically, would you see?

19   A.   Between 17 and 36.

20   Q.   And give the jury some idea of how much time you were

21   spending physically at Maccarone's office to try to see these

22   patients?

23   A.   Minimum -- minimum of six minutes per patient.

24   Q.   Now --

25   A.   Sometime --

1    Q.   Now, at first blush, six minutes seems like a short

2    visit, but explain to the jury what you were able to

3    accomplish in six minutes.

4    A.   Okay.  So just you can kind of see it on the timeline, a

5    patient would come in.  Emilie, or some other medical

6    assistant, would hand me the -- the chart and say, "This is

7    Mr. Jones.  He's here."  And sometimes they would say, "We've

8    reduced his medications."  Always tried to reduce medications,

9    if I could.  But -- if they were high.

10        "Here's his -- here's his chart."  And the patient would

11   sit down.  I would say, "Hello.  How are you doing?"  And --

12   and I would say, "The reason I'm here is because Dr. Maccarone

13   is out sick."  "I heard about that."  And so I would say, "I'm

14   filling in.  I'm not, of course, the regular doctor, but I'm

15   going to try to get you your medications.  Now, how are you

16   doing?  What do you do for a living?  And -- and, you know,

17   Are you having any problems?  Are you -- any change from last

18   visit?"

19        Occasionally, they would say, "Well, you know, I -- I

20   really think I need more medication."  And I would always tell

21   them, "I'm not going to raise your medications."

22   Q.   What were you trying to accomplish each afternoon when

23   you were filling in for Dr. Maccarone?

24   A.   I was trying to make sure the patients were stable, that

25   they didn't have any acute changes that needed to be

1    evaluated, and make sure they were getting their medications

2    so they wouldn't go through withdrawal, and -- and make sure

3    that everything appeared appropriate before I could give them

4    those medications.

5    Q.   And what was your prescribing practice when you were

6    filling in for Dr. Maccarone?

7    A.   Well, as I said, I wasn't in the habit of prescribing

8    medications for -- at that point -- at that point, it had only

9    been three months, but I certainly was not used to writing for

10   long-term medications.

11       So my practice was, "We're going to keep you on whatever

12   Dr. Maccarone had you on to make it simple.  You've -- you've

13   been on these -- how long have you been on these?"  And he

14   said, "Well, I've been on these for two years," or for six

15   months.  There were very, very few patients that had just

16   started on medications when he went out sick.

17       So these were medications they had been on for a long

18   period of time.  And I thought the prudent thing was to

19   continue on those medications with the -- with the belief he's

20   going to come back in four weeks.

21   Q.   And let me ask you about that.

22       What was your belief as to when he might actually return?

23   A.   Well, having amputated part of people's feet myself, I

24   knew that typically you're out for four to six weeks.  And at

25   that point, the wound is healed up enough they can put a

1  bandage on it, they can keep the weight off of it, and they

2  can sit in their chair with their foot elevated and see

3  patients.

4  Q.   And how long was Maccarone out?

5  A.   Four months.

6  Q.   Now, after four months of being out, he did return; is

7  that right?

8  A.   Yes.

9  Q.   And did you remain at GMA?

10  A.   Yes.

11  Q.   Did you return to your role as a medical director?

12  A.   Yes.

13  Q.   Okay.  Now, when Maccarone returned, was he back

14  full-time?

15  A.   Well, no.  As we heard testimony earlier, he was --

16  typically call in one day a week.  So he was really only

17  there, for the most part, about three days out of the week.

18  Q.   Let's talk about the patients that you were seeing when

19  you were filling in for Dr. Maccarone.

20      Tell the jury a little bit about the type of patient as

21  far as their history of taking pain pill prescriptions.

22  A.   So most of them had been on them for a long period of

23  time.  Most of them -- most of them had low back pain.  They

24  had had surgeries.  They had documented x-ray -- x-ray

25  documentation that they have arthritis or they had neck

1  problems.

2      They're also a group of people who had a significant

3  amount of arthritis of their knees, shoulder problems, rotator

4  cuff problems.  I would say probably three-fourths were back

5  and neck pain.

6  Q.   Were these patients coming from other clinics?

7  A.   They had all the -- they pretty much all come from other

8  clinics except for ones that were self-referred.

9  Q.   GMA and at your clinic, would you receive referrals from

10  other providers?

11  A.   Yes.

12  Q.   What type of providers?

13  A.   Well, typically it would be -- it would either be an --

14  an orthopedic surgeon from somewhere or a neurosurgeon from

15  somewhere, who would -- said, "There's nothing more I can do

16  surgically on this patient."  And then there would be

17  referrals from other clinics.  If a patient had been

18  discharged for some reason or if they had moved and they were

19  coming from another clinic.

20           MR. STRIANSE:  Your Honor, may I move to the --

21           THE COURT:  Yes.

22           MR. STRIANSE: -- overhead projector?  I've got just a

23  few exhibits that I would like to show.

24           THE COURT:  Of course, yes.

25           MR. STRIANSE:  Your Honor, may I approach

1    Dr. Stanton?

2         THE COURT:  Yes, you may.

3    BY MR. STRIANSE:

4    Q.   Dr. Stanton, let me show you what has been marked for

5    identification as Defendant Exhibit -- it's a collective

6    exhibit -- 1A through K, and ask if you can identify this.

7    A.   These are -- these are pictures of the clinic that I took

8    from discovery.

9    Q.   And do they fairly and accurately depict Gateway Medical

10   Associates?

11   A.   Yes.

12        MR. STRIANSE:  Your Honor, we would offer this as

13   evidence and ask to publish it to the jury.

14        THE COURT:  Any objection?

15        MR. SMITH:  Your Honor, could we go on the headphones

16   briefly?

17      (Sidebar conference.)

18        THE COURT:  Can you hear, Mr. Strianse?

19        MR. STRIANSE:  Yes, sir.

20        THE COURT:  Okay.  Yes.

21        MR. SMITH:  Your Honor, I have no objection to the

22   pictures.  If you turn to Defense Exhibit 1J.

23        THE COURT:  Okay.

24        MR. SMITH:  Among the pictures is, I think, a

25   summary.  I'm not entirely sure of the origins of this.  Just

1  from reading it, it looks like something Dr. Stanton may have

2  written, if that's going to be a demonstrative or something,

3  but --

4          THE COURT:  How about that?

5          MR. STRIANSE:  Judge, that will be a demonstrative,

6  if that's permissible.

7          THE COURT:  So that's not part of photos taken from

8  GMA?

9          MR. STRIANSE:  No, sir.

10         THE COURT:  Okay.  Can you take J out?

11         MR. STRIANSE:  Yes.

12         THE COURT:  And I haven't heard you be at a point

13 where there's a foundation for this yet.  So you can circle

14 back to J if you want to use it.

15         MR. STRIANSE:  Yes.

16         THE COURT:  We'll talk about that separately, but

17 I'll admit 1A through K, but omitting J at this point.

18         MR. STRIANSE:  Yes, sir.

19         THE COURT:  And no objection on that?

20         MR. SMITH:  Correct.

21         THE COURT:  Okay.  Thank you.

22     (Sidebar conference concluded.)

23         THE COURT:  All right.  I've admitted that group, 1A

24 through K, but not including J.

25         MR. STRIANSE:  Yes, sir.

1      THE COURT:  So A through K is admitted and may be

2   displayed as you -- as you choose.

3      MR. STRIANSE:  May I proceed, Judge?

4      THE COURT:  Yes, you may.

5   BY MR. STRIANSE:

6   Q.   Dr. Stanton, let me show you what has been received as

7   evidence as Defendant's 1A.

8      What is depicted in Defendant's 1A?

9   A.   This is the fire escape route, which is a hand-drawn

10  layout of Dr. Maccarone's clinic.

11  Q.   And if you could, walk through 1A with the jury --

12  A.   Okay.

13  Q.   -- and identify where your --

14  A.   Okay.  So the front of the office, which you've seen

15  before, was down here.  That's -- you've seen a picture of the

16  front of the office, and that's where the patients would enter

17  to come into the clinic.  There was a front desk right here,

18  right here, where they -- the receptionist was.

19      I would come in this back door here, into the clinic, and

20  I could either go straight ahead down to Dr. Maccarone's

21  office there or come down this hallway here and down here to

22  my office, which is this room down here, this little room

23  here.  And we'll see a picture of that in a minute.

24      There's also an exam room here, where I did injections,

25  and an exam room here, where I could examine patients.  These

1   exam rooms across the back, some of those would be filled with

2   patients waiting to be seen by me.  They would bring in

3   several patients at a time.  They would sit back there, and

4   then they would bring them in one by one to see me.

5   Q.   And is this the time that you're substituting for

6   Dr. Maccarone?

7   A.   This was whenever I was there, because if I was doing an

8   MME visit, I was usually in that same office.  And if I -- if

9   I was there just to do injections, I would come in, put my

10  stuff in the office, and then do the injections in the room

11  next door.  And the work station right across here is where

12  the materials and supplies were located to do injections.

13  Q.   Let me show you what has been received as evidence as

14  Defendant's 1B.

15       And this is a photograph; is it not?

16          THE COURT:  Hang on just a second.  Can you clear

17  that, Michelle?  Just the markings.  There you go.  Thanks.

18          THE WITNESS:  So this is a hallway that, if I came in

19  the back door, I would turn left and go down -- I could go

20  down that hallway.

21  BY MR. STRIANSE:

22  Q.   And what is --

23  A.   And the far end of that, I would make a right turn to

24  where I was --

25  Q.   I -- I spoke over you.  If you could tell us that again.

1    A.   Okay.  So if I came in the back door, turned left, walked

2    down that hallway, make a right turn at the very end, that

3    would take me down to my office.

4    Q.   Let me show you what has been received as evidence as

5    Defendant's 1C.

6         And what is depicted in this photograph?

7    A.   Yes.  If I went in that back door and went straight ahead

8    and turned left, that was Dr. Maccarone's office.  And he sat

9    in the chair on the far right.

10        The scribe, Shanna, who you met the other day, would sit

11   in the chair to -- just to the left of that, and there would

12   be a computer sitting on that little table there.  And then

13   the patient would sit in the chair to the far left.

14   Q.   Let me show you what has been received as Defendant's 1D,

15   another schematic of the office.

16   A.   Right.  This is -- this is just a -- just to show, again,

17   I came in the door in the back and went down that circuitous

18   route to get to my office, which is in the bottom right-hand

19   corner.

20        THE COURT:  And the labeling of it, those are defense

21   generated, correct?

22        MR. STRIANSE:  Yes.

23        THE COURT:  Okay.  So the original exhibits, the

24   underlying photo, the notations in the blocks are applied by

25   the defense case.  Just be aware of that.  Okay.

1    BY MR. STRIANSE:

2    Q.   Dr. Stanton, let me show you what has been received as

3    1E, a photograph.

4         What is depicted in this photograph?

5    A.   So this is a work station.  The -- the cabinets that have

6    the multicolored piece of paper on it is where they would keep

7    the supplies for injections.  I would bring over anesthetics,

8    and they supplied the cortisone.  There's two different kinds

9    of cortisone we used and the different needles that we would

10   potentially use, and different syringes.  They would -- they

11   would use all of that, along with alcohol swabs would be in

12   that cabinet.

13        And my office was behind that gentleman's head on the

14   left.  That's where I would sit.

15   Q.   Let me ask you a question about the injections that you

16   gave.

17        Would you draw the medicines into the syringe yourself?

18   A.   Yes.  The -- there are a multitude of different

19   injections that we would give -- the body parts we could give

20   injections to.  So, for example, if a patient comes in and

21   says they have shoulder pain, where are you going to give them

22   an injection?

23        You have to examine them.  Could be -- it could be the --

24   the biceps tendon in the front of the humerus here in the

25   front, and that would require -- in that case, I would use

1    dexamethasone.  It's less likely to cause tendon problems.

2        If it was the acromioclavicular joint, which is a joint

3    at the end of the collarbone, I would use dexamethasone or

4    cortisone, but only a small amount because it's a small joint.

5    I had to use a small needle to get that in there.

6        If it was bursitis of the shoulder or rotator cuff

7    problems, it would be up underneath the bone, underneath the

8    shoulder here.  And in that case, I would use a 22 gauge, a

9    slightly larger needle, so I could determine what I'm putting

10   the medicine in, whether it is resistance, meaning the

11   medicine is going into the -- to the tendon, or if it flows in

12   freely, which means it's going into the -- into the bursa.

13       And I would use Kenalog, a different kind of -- which is

14   a different cortisone, and a long-acting anesthetic.  A lot of

15   people said they had shoulder pain.  What they were actually

16   talking about was a trigger point up here on the top of the

17   scapula, in which case I would use the same medications, but I

18   use a different needle.  So there's no way to know ahead of

19   time what -- what type of needle or syringe or medication I'm

20   going to need until I've evaluated the patient.

21   Q.   How many years' experience did you have in giving this

22   type of injection?

23   A.   Thirty.

24   Q.   Dr. Stanton, let me show you what has been received as

25   Defendant's 1F, another photograph.

1        What's depicted in that photograph?

2    A.   That's another -- another picture of the -- of a work

3    station, and just looking at it from the other side of the

4    work station.  This is where the medical assistants would sit

5    and -- and enter information into the computer with regards

6    to -- to the -- what the patient status was.  There were forms

7    that had to be filled out when the patient came in with

8    regards to how they -- their functional level, based on

9    medications, compile all of the urine results.

10        That -- that door that has the wreath on it, if you go

11   through that, that's the laboratory.  And Quest Diagnostics

12   provided a -- a person there who would collect urine and blood

13   samples.  And Quest Diagnostics rented from the other end of

14   Dr. Maccarone's building.

15        So there was a -- it was -- the -- all of the reports

16   would come back directly onto the computer from

17   Dr. Maccarone's office, from Quest back to Dr. Maccarone's

18   office.

19        My office is the kind of -- you see the little vertical

20   window at the far end there in the right.  That's where --

21   there's where I would sit.  And the patients would come in --

22   they would come in through a door just to -- just to the right

23   there and be taken back down that hallway there to wait to

24   come and see me.

25   Q.   Dr. Stanton, I wanted to ask you a couple of questions

1    about urine drug screens and urine drug tests.

2         If you would, tell the jury the difference between the

3    urine drug screen and the urine drug test.

4    A.   So the urine drug screen is a cup.  You use the cup, and

5    it's called an immunoassay.  If you're allergic to something,

6    you have -- you have immunoglobulins in your blood stream that

7    will attach to a certain allergen, and then they connect.

8         In these urine cups, they have these little artificial

9    immunoglobulins that are in different parts of that, a little

10   strip inside that cup, that will connect to, say, codeine or

11   any other kind of medicine that's in there.  And they react.

12   So if it reacts, you can see right then that the parent drug,

13   whether it's -- whether it's oxycodone or if it's, you know,

14   THC, will connect, and it can see that.

15        It also has a little temperature measurement in there to

16   validate this human body temperature.  Not something that was

17   brought in, hopefully.  And sometimes there's a pH measure to

18   see if the urine has been diluted.

19        So what you're seeing with a point-of-care cup is you're

20   getting a result that day.  It's a basic test that shows, are

21   the medications in there that are supposed to be in there?

22   Within limits, it shows that.  And are there things that

23   shouldn't be in there?  That's -- that's point-of-care cup.

24   It's known as a UDS.

25   Q.   And why is there a need for a subsequent confirmatory

1    test?

2    A.   Well -- and hopefully we'll get into this later -- there

3    can be false positives and false negatives on a drug screen.

4    A couple of examples of why you could have a false negative

5    would be if someone had -- well, if -- a false negative --

6    a -- a negative result on a point-of-care cup means that they

7    didn't detect any medications in there.

8         Why not?  Well, it could be that the -- that the level of

9    medication in the urine is not sufficient to give a positive

10   result on the drug screen, either because they -- they have

11   run out of their medications or the last pill they had was two

12   days ago, or because they diluted their urine by drinking a

13   lot of water.

14        Or they could have a false positive, and it might show

15   something in there, such as meth, whereas there's not really

16   meth in their urine.  And the point-of-care cups are not real

17   accurate when it comes to things like that.  So you want to

18   confirm that result.

19        And at Dr. Maccarone's office, they did not necessarily

20   do a confirmation on every cup.  They -- as you heard

21   testimony, they would alternate.  One month they would do the

22   cup; one month they would do the -- the -- the drug -- the

23   UDT, which is a confirmation.  Next, they go back to the cup.

24        So you can have a bad result on a cup, and if you confirm

25   it, it may actually show that there are -- that the medicine

1    is in there, but they didn't do a confirmation.

2          The confirmation is done with a machine called an LCMS.

3    It's a liquid chromatography-mass spectrometer.  It's a large

4    machine about the size of the -- about the size of a

5    refrigerator.  It lies on its side.

6          And it uses liquid chromatography where you -- where you

7    evaluate -- a small sample of the urine is purified so no

8    impurities are in it, and it's run through the machine.  And

9    it's much more accurate.  And not only does it tell you about

10   the parent drug -- when I say "parent drug," I mean the drug

11   that they took.  It can also show metabolites.

12         So if a patient takes -- if the patient hasn't been

13   taking their pill, they can have a little oxycodone pill in

14   their pocket and kind of rub their fingers on it and kind

15   of -- a little bit, get the medicine on their fingertip, and

16   then put that down in the pee, and it'll show that there's

17   oxycodone in the urine, on the cup.

18         But when you run it through the confirmation test, it'll

19   show, yeah, there's oxycodone, a lot more than you would

20   think, but there's none of the metabolites.  It hasn't been

21   metabolized through the body.  And now you know that it was a

22   fake positive.  It wasn't -- it was a fake normal test.

23         So --

24   Q.   Dr. Stanton, let me show you another photograph from GMA.

25         Take a look at this.  For the record, we're looking at

1    Defendant's 1G that's been received as evidence.

2         What does that depict?

3    A.   That's the office where I saw patients.

4    Q.   And is this the office that you used to see patients when

5    you were filling in for Dr. Maccarone?

6    A.   It's the office I used all the time.

7    Q.   And then let me show you 1H.

8         Is this another photograph of the office?

9    A.   Yes.  And just to the right of that desk, you can't see

10   it, but there's just barely room -- this office was about

11   eight by ten feet.  Just to the right of that desk, where the

12   telephone is, there's a chair, and that's where the patients

13   would come in and sit.  There was room -- barely room there

14   for one patient to sit while I interviewed them.

15        And behind that door that you see on the left is where a

16   little shelf where I could reach back and grab my

17   prescriptions for braces and therapy and -- or paperwork that

18   needed to be filled out for patients.  That was kept on that

19   shelf behind that door.

20   Q.   On those afternoons that you were trying to see 25 or so

21   of Dr. Maccarone's patients, where would the staff stage those

22   patients?

23   A.   Well, they -- those patients would come in earlier that

24   morning and have all of their -- their lab work done and their

25   paperwork assembled, and then they would wait wherever they

1    waited, if they did wait.  Some would go somewhere, and then

2    they would come back.  When they -- when I was there to see

3    them, they would come into the waiting room, and then two or

4    three of them would be taken back to some -- some rooms back

5    in the back, some of the other empty exam rooms along that

6    back hall.

7    Q.   Let me show you what has been received as evidence as

8    Defendant's 1I.  It's a photograph.

9         What's depicted in that photograph?

10   A.   This is the room where I would do the injections.  And I

11   have already drawn up the injections at the work station and

12   brought them in there, set them on that little -- that little

13   sink you barely see on the right-hand side, get out my alcohol

14   swab and the Band-Aid and -- and then examine the patient to

15   confirm where we're going to do the injection.

16        Some patients, before we would even draw up the

17   injection, we would have to talk to and examine, because

18   sometimes they would come in and say, "You know, I -- I told

19   them I want an injection in my back, but my neck is killing

20   me.  Can you do my neck today instead?"

21        And it didn't make a difference.  They had already paid

22   for the injection.  It didn't make any difference where we --

23   where we put it.  It wasn't an insurance issue.  And sometimes

24   they would say, as I said, "It's my shoulder."  "Okay.  Well,

25   I have to examine the shoulder to see where exactly to put it.

1    That had to be done before I drew up the injection.  But this

2    is where I actually gave the injections.

3    Q.   Dr. Stanton, did you prepare a demonstrative exhibit that

4    listed the type of injections that you gave when you were

5    either working in your clinic or working at GMA?

6    A.   Yes.

7    Q.   And would that assist you and the jury in giving a

8    rundown of what those injections are and what they are

9    designed to do?

10   A.   It would -- it would be a -- a nice visual for the -- for

11   the jury, but I would be glad to just go through it verbally,

12   if -- if necessary.

13        MR. STRIANSE:  Your Honor, may I show him this

14   demonstrative exhibit?

15        THE COURT:  You may.

16   BY MR. STRIANSE:

17   Q.   Dr. Stanton, take a look at 1J, which is a demonstrative

18   exhibit that we're not going to be offering as evidence.

19        What is it?

20   A.   This is just a -- this is just a -- a sheet.  And what it

21   shows is the type of injections I could do at Maccarone's.

22   Q.   And let me stop you just real quickly.  Forgive me.

23        Did you prepare this?

24   A.   Yes.

25   Q.   Go ahead.

1    A.    Okay.   There has been some discussion.   I -- I believe we

2    may have discussed it.   The injections that were given at

3    Maccarone's were just temporary and didn't really do that much

4    good.   And in some cases, they -- they -- they were just

5    temporary.   So, for example, if a patient had trigger point

6    pain in their -- in their upper shoulder blade, that may only

7    help for, you know, a few days to give a shot there.

8          Bursitis in the shoulder, I -- I can give a personal

9    example.   My right shoulder was killing me for almost four or

10   five weeks, and I gave myself a shot two weeks ago in my right

11   shoulder, in my shoulder bursa.   It feels great.   I'm not

12   having any pain at all.   Knee injections can last up to three

13   months.   Some injections, like injections of the lower back,

14   are not only therapeutic, but they're also diagnostic.

15         So, for example, if you -- if you feel in your lower back

16   on each side, there's what's called the sacroiliac joint, the

17   joint between the sacrum and the iliac bone.   And there are

18   ligaments there.   Those ligaments are about an inch away from

19   the facet joints, which are the joints between the vertebrae.

20   And they're also about an inch away from the -- the deep joint

21   in the sacrum between the sacrum and the iliac, which is an

22   actual articulation, not just ligaments.

23         So if we gave an injection to the ligaments in the SI

24   joint and the patient got good relief, even for a couple of

25   days, we would know that's where the pain is coming from.   If

1   they get an injection there and it -- and it doesn't -- it

2   doesn't help at all, it could be coming from one of those

3   other locations.  So you kind of use injections sometimes to

4   help diagnose where the problem is.

5         If you give an injection in the -- in the rotator cuff

6   area for what you presume is bursitis and they get relief for

7   a couple of weeks, yeah, that's good.  If they get no relief,

8   they may actually have a tear of the rotator cuff.  That needs

9   to be evaluated with an MRI.  So some injections that I could

10  do at Maccarone's office could be -- could be real helpful.

11  Others were also diagnostic.

12        Carpal tunnel injections, I could do carpal tunnel

13  injections and wrist tendon injections.  Those sometimes could

14  actually take care of the problem.  Trigger point -- I mean,

15  trigger finger injections, carpal tunnel injections can

16  sometimes give relief for -- for months at a time.  So there

17  were injections we could do there.

18        At my office, I had a fluoroscopy machine, and I could do

19  injections under fluoroscopy, which were given in a much more

20  directed manner.  So in the lower back, for example, if I

21  wanted to test the facet joints, I could give an injection

22  right where the nerve is that goes to the facet joint to see

23  what kind of relief they get.  I couldn't do that at

24  Maccarone's.  If I wanted to put an injection in the

25  sacroiliac joint, the actual joint itself, that had to be done

1  with fluoroscopy.

2  Q.   And what is fluoroscopy?

3  A.   So fluoroscopy is, it's a machine that has a big -- a

4  thing that looks like a C that projects out.  It's -- it -- it

5  has one in -- one part of -- of the C, the top or the bottom,

6  either one, is producing the x-rays, and the other part has a

7  T.V. that captures those and shows what you're doing.  So in

8  live time, you can see right where you're putting that needle.

9  And I could do hip joint injections at my office, people who

10  have hip arthritis or hip inflammation, and put an injection

11  in the hip joint.

12      Then, again, because in pain management, it's kind of a

13  progression of treatment, as it was in orthopedics.  I could

14  go to a surgery center, and if I determined that numbing up

15  the nerve that goes to a facet joint gives good -- good

16  temporary relief, I could do a different procedure there with

17  a different kind of needle that actually would heat up.  It's

18  called RFA, radiofrequency ablation.  Heat up and cauterize

19  that nerve.

20      And these are things I offered to all patients, including

21  Maccarone's patients.  I would tell them, "Hey, come over to

22  my office.  We can try this, the -- the facet injections.

23  Here's my card.  We'll set you up for that.  You can come back

24  to Maccarone when you're done."  But if you get a good result,

25  then you would have insurance and it's not -- did have

1    insurance, we could proceed on and give them sometimes six or

2    eight months' relief of their pain with the RFAs.

3         And a lot of medical directors, if they're, like, a

4    psychiatrist or they just have a training in neurology, they

5    may not be willing or able or -- or interested to do those

6    type of advanced injections.  But I thought it was a good

7    thing to be able to provide to my patients.

8    Q.   Dr. Stanton, was there any tension between you and

9    Dr. Maccarone about your desire to do an alternative therapy

10   like injections?

11   A.   The issue was -- and there were a couple of times, maybe,

12   when I demanded the patient get an injection or they wouldn't

13   get their medication.  My feeling was that a patient should

14   try an injection at least once.  If a patient came and saw me

15   for an MME visit, for example, and they had no alternative

16   treatments, and they were against getting an injection, I

17   would say, "Okay.  Let's try the brace.  Let's try the

18   therapy.  Let's see what that does."

19        And then they would come back and see me again at some

20   point.  And I would say, "Well, did you get the brace?"

21   "Yes."  "Did you get the therapy?"  "Yes."  "Did it help?"

22   "Not that much."  I said, "Well, stand up and turn around.

23   Let me poke you where it hurts."

24        And then -- and if -- if they gave a good response, I

25   would say, "Why don't you try the injection there and see if

1    it does any good."  "No, no.  I just do not want an

2    injection."  I would say, "Well, you know, you're at a high

3    level of narcotics, and if you're unwilling to participate in

4    what could make you better, I'm going to lower your

5    medications, okay?"  And some of them would agree to do it.

6         Now, if they got the injection and it didn't help, I'm

7    not going to do it again.  There are some patients who really

8    were not candidates for injection.  If they had had a fusion

9    from their upper thoracic spine all the way down to their

10   pelvis, there's really no reason to do an injection on those

11   people.

12        So my -- my concept was, if there's something we can do

13   that's simple, easy, and quick that can help us either

14   diagnose a problem, give you temporary or -- or long-term

15   relief, I believe you should try that.  And if they refuse to

16   try it, then my feeling was, we're going to lower the

17   medications, because you're just not participating in trying

18   to get yourself better.

19   Q.   Were you able to force any injections on people?

20   A.   No, they didn't have to get the injection, but they might

21   get their medications lowered.  I never refused to give

22   someone their medications, give them -- I would never refuse

23   to give some medications if they didn't take the injection.

24   Q.   Dr. Stanton --

25             MR. STRIANSE:  Judge, may I approach Dr. Stanton?

1          THE COURT:  Yes, you may.

2    BY MR. STRIANSE:

3    Q.  Dr. Stanton, let me show you what we have marked as

4    Defendant's collective Exhibit 2.  It's a demonstrative

5    exhibit.

6          We're not going to offer it as evidence, but can you

7    identify that?

8    A.   Yes.  This is -- it's a -- a -- this is a grouping of --

9    of charts and information taken from the Tennessee pain

10   guidelines.  It's already been offered as evidence in the --

11   in the past.  This is from that same pain guidelines.  And it

12   discusses the pitfalls and the difficulties in adequately

13   evaluating urine drug results.

14   Q.  With the Court's permission, I'm going to show you these

15   slides.

16   A.   Okay.

17          THE COURT:  Yes, you may.

18   BY MR. STRIANSE:

19   Q.  Dr. Stanton, just to get us started, the first sheet has

20   a title, "Lab Interpretation."

21          And when you prepared this exhibit, what did you mean by

22   "Lab Interpretation"?

23   A.   Well, that was this -- that's a section of the -- of the

24   pain guidelines that it was under, interpreting lab results.

25   And they're talking urine results in this case.

1    Q.   And when we're talking about guidelines, we're talking

2    about the Tennessee Chronic Pain Management Guidelines; is

3    that right?

4    A.   Yes.

5    Q.   Which the jury has already seen.

6         And demonstrative Exhibit 2B, is that the cover of

7    that --

8    A.   Yes.

9    Q.   -- publication?

10   A.   Yes.

11   Q.   2C is an appendix; is that right?

12   A.   Yes.

13   Q.   And it deals with urine drug testing, correct?

14   A.   Yes.  Yes.

15   Q.   2D, we have highlighted certain portions of this

16   appendix.

17        And what is it that you thought was significant from this

18   portion of the chronic pain guidelines?

19   A.   We've already discussed some of this.  The first upper

20   paragraph talks about the immunoassay, which is the cup, and

21   how it works, and then the LCMS and how that works, which is

22   the -- the more definitive test.

23        And underneath, there's -- there's some studies that were

24   done that shows false positive tests, which were -- which

25   you -- you do a cup and, for example, it could show

1    amphetamines, it could show marijuana, it would show

2    methadone -- excuse me, show oxycodone, and even meth.  And

3    the very -- they vary from 85 percent inaccurate to 13

4    percent -- I'm sorry, 18 percent inaccurate.

5    Q.   And what is the significance of false positives when

6    clinics use these point of care?

7    A.   If you just use this cup and you just use a cup every

8    time a patient came in, you would be using that as criteria to

9    discharge a patient who showed meth in the urine, and there's

10   between an 80 and a 99 percent chance that that result was

11   incorrect.

12   Q.   Take a look at demonstrative exhibit 2E.

13        What is the significance of this?

14   A.   This -- this particular chart shows some medications.  It

15   has a whole list of medications that can -- or other things

16   that you might consume that would show up as a false positive

17   on that; so, for example, on your point-of-care cup.  So, for

18   example, I think you will know if you eat a lot of poppy

19   seeds, for example.  It can show up as -- as an opioid.  Even

20   quinine, tonic water.

21        There are other medications that'll give a false

22   positive.  So, for example, if someone is taking morphine, it

23   may show up as buprenorphine.  If they're taking other

24   medications, it could show up as fentanyl.  And other

25   medications that -- like a phenothiazine compound, for

1    example.  Or verapamil, which is for the heart, can show up as

2    methadone in the urine.

3    Q.   What could be the consequences of a false positive to a

4    patient?

5    A.   Well, you have a patient who has a heart condition taking

6    verapamil come into your clinic and you discharge them for

7    meth, and they really aren't taking the meth.  That's known as

8    an unjustified discharge.

9    Q.   Take a look at 2F, which is on the screen now.

10   A.   Okay.  This is a partial list of drugs which can cause a

11   false positive test, and it's basically the same one you just

12   showed a minute ago.

13   Q.   Take a look at 2G.

14   A.   So this is a list of why you might not find any

15   medications in the urine, why it shows up that the urine is --

16   is -- doesn't have the medications you -- you're looking for.

17   And the top one says that the -- it may not reliably detect

18   synthetic or semisynthetic opioids, such as hydrocodone,

19   oxycodone, or oxymorphone.  These -- some -- some of these

20   cups may not actually show those when they're in the urine.

21        Also, the -- the -- the cups may not show medications

22   that are in the urine.  For example, some cups don't show

23   heroin, and they don't -- some of them don't show Tramadol,

24   which is a -- a different kind of pain medication.  And they

25   don't show -- they may not show methadone.  So -- or

1    carisoprodol, which is a muscle relaxant.  The -- the test

2    only tests about, like, seven or eight items.  It doesn't test

3    every single drug.  So they could have something in the urine

4    you don't know about.

5    Q.   But what is the use of a urine drug screen?  Why do

6    clinics use a presumptive test like that?

7    A.   Well, it's quick and easy, and you can look at it right

8    then and try to make a decision on the patient that day.  But,

9    again, it's not always accurate.  And if the urine -- for

10   example, if it's a diluted specimen, the patient drinks a

11   bunch of water, there may not be enough of the medicine or --

12   that they took an illicit.  Maybe they took -- or even

13   something they were supposed to have in their urine to -- to

14   pop the test.

15        A lot of times patients come in and they just can't -- "I

16   just can't pee."  And so drink some water.  Drink some more

17   water.  Go on and drink some water.  And finally, okay, and

18   then it turns out the specimen is diluted.  Doesn't show the

19   medications.  And they say, "Well, we're going to have to

20   discharge you because you don't have the medicine in your

21   system," or you become suspicious of them.  As a minimum,

22   you're -- you are temporarily or long-term suspicious.  If you

23   get the -- the urine drug test, the -- the -- the other test,

24   then that can allay your suspicions.

25   Q.   Take a look at 2H.

1      That talks about the need for confirmatory testing?

2  A.   Yes.

3  Q.   Explain to the jury why that presumptive test is just not

4  sufficient.

5  A.   Due to a high rate of false positives and false negative

6  results, consideration should be given to performing a

7  confirmatory test.  And then it discusses a couple of

8  different types of confirmatory tests.  One is the urine

9  confirmatory test, the UDT, which is often sent out.

10      But the other is an oral swab.  If you have a patient who

11  just can't pee or they have kidney problems, kidney failure,

12  or, for some reason, they can't produce a urine specimen, you

13  can put a swab in their mouth.  They -- they put this thing.

14  They suck on it for about a minute.  Then you hand it back.

15  They send it off to the lab.

16      What's -- there's an interesting difference in that, and

17  we -- in Maccarone's patients, we saw a few patients who had

18  oral swabs.  The oral swab is -- is good at detecting the

19  parent medication, but may not show metabolites.  So, again,

20  you could have a patient who -- who, say, took a pill an hour

21  before they came in, and the oral swab is going to show that

22  pill in there, but it may not show that they haven't actually

23  been taking it on a regular basis.  It doesn't show the

24  metabolites.

25      On -- on the other hand, if they have been taking that

1    medication for a long period of time and they have the

2    metabolites in it, but they haven't taken the pill recently,

3    it won't show the parent drug, and it won't show the

4    metabolites.

5         So this is a -- a patient who's really taking the

6    medicine but just didn't take it that day or, perhaps, they

7    took it that morning and had to wait until late that evening

8    to see Maccarone.  And when they see him, they do the oral

9    swab, and the metabolites are in the urine, but the -- the --

10   the pill has processed through, and -- and it's no longer in

11   the -- in the oral swab.

12   Q.   Well, what did the Tennessee guidelines suggest or

13   recommend for the total number of confirmatory urine drug

14   tests that a patient is supposed to receive on an annual

15   basis?

16   A.   Minimum of two.

17   Q.   These patients that were coming to Gateway Medical

18   Associates, were they being given this presumptive UDS

19   point-of-care cup test every visit?

20   A.   No.  And the -- and the issue is, is that we've heard

21   testimony that they would get the cup one time, and the next

22   month, they would get the -- the urine drug test, the -- the

23   confirmation.  So one thing you need to keep in mind is that

24   the urine drug test shows what the patient was taking the

25   month before.

1    And that test result comes back two or three days later

2    after the visit, so you won't get those results -- you won't

3    see those results necessarily until the next visit a month

4    later.  So you're looking at the results if a patient -- if

5    the patient comes in -- in the 15th of December and they have

6    a -- they have a -- a point-of-care cup, you're seeing with

7    possible false positives and negatives, seeing what they're

8    taking right there that day.

9        If they get the UDT that day, on December 15th, and you

10   see them January 15th, what you know from that test now is

11   what they were taking prior to that December 15th visit.  So

12   there's always a time delay.

13   Q.  Dr. Stanton, are there some patient charts that we would

14   like to go through this afternoon with you?

15   A.  Yes, yes.  There's some charts I would like to go through

16   because at the end of Friday last week, it was shown that

17   there were a number of urine results that were considered

18   failures or urine -- urine results that were -- that were --

19   that were not acceptable and that the patients got their

20   medications anyway.  And --

21   Q.  Dr. Stanton, let me approach you, if the Court will let

22   me.

23           THE COURT:  You may.

24   BY MR. STRIANSE:

25   Q.  Let me show you what has been marked for identification

1  as Defendant's Exhibit 3.

2      Do you recognize that?

3  A.   Yes.  This is, again, from the discovery.  These are

4  chart notes on Jeffrey Ghent.

5  Q.   And when you say "from the discovery," you mean we

6  received these from the United States?

7  A.   Yes.

8      MR. STRIANSE:  Your Honor, we would offer this as the

9  next numbered exhibit.

10     THE COURT:  Any objection?

11     MR. SMITH:  Your Honor, I think we might need to

12  discuss this and the next several, if you have a moment.

13     THE COURT:  All right.  We're probably at a good

14  break point for the morning.  So we'll take that up during the

15  break.

16     I'm going to give you a 20-minute break at this point.

17  Ladies and gentlemen, continue under the same rules.  No

18  discussion, no exploration or research.  Don't begin

19  evaluation or forming conclusions or opinions.  Just take the

20  proof in until you've been instructed and released to

21  deliberate.

22     Let's take a 20-minute break at this time.  Thank you,

23  ladies and gentlemen.

24     (The jury exited the courtroom at 10:44 a.m.)

25     THE COURT:  All right.  The jury has exited.

1    Everybody can be seated.  You can step down, Dr. Stanton.

2        All right.  Mr. Smith.

3            MR. SMITH:  Your Honor, there are a series of

4    excerpts from the patient charts the defense has identified as

5    their various exhibits.

6            THE COURT:  Uh-huh.

7            MR. SMITH:  Each of these, the underlying full chart,

8    is in evidence.

9            THE COURT:  Okay.

10           MR. SMITH:  So it's important to understand.  But I

11   think we would object to admitting these as separate exhibits

12   because they contain highlighting.  They contain annotations.

13   Sometimes they would contain those red boxes, and some of

14   those red boxes contain, you know, factual assertions.

15       I think it's fine to use them as demonstratives just as

16   if we were playing them electronically and highlight things.

17   We can do that.  I have no objection to that.  But putting it

18   as a separate exhibit is a little bit both incomplete and

19   potentially kind of -- there's this additional set of

20   assertions in there.

21           THE COURT:  All right.

22           MR. STRIANSE:  That's fine.  I intended to offer it

23   as a demonstrative and not as an exhibit.  I had just

24   forgotten that we had annotated to this extent.

25           THE COURT:  All right.  So as to 3, I would let you

1    use 3.  And 3 does duplicate, in terms of the underlying

2    record, what's in evidence.

3        Do you agree, Mr. Smith?

4            MR. SMITH:  I do.

5            THE COURT:  Okay.  So I think we should tell the jury

6    the records themselves are in.

7        And what's the exhibit number for Ghent?

8            MR. SMITH:  Give me one moment, Your Honor.

9            THE COURT:  Well, anyway, you can give me the number

10   after the break.  I don't have to have it right now, or

11   Ms. Woolums can find it.  We'll say the records are in.  I'm

12   going to let you use Exhibit 3 as a demonstrative aid.  I'll

13   give them a quick instruction on that.

14       And then you can use anything on 3 and display it as you

15   see fit.  Just remember, Mr. Strianse, for the jury to see it,

16   you've got to communicate that you want the jury to see it.

17   And so if you don't say that, then I don't know, and Michelle

18   doesn't know to put it up there.  And so just remember that.

19   Use it as you see fit, but be aware of that, okay?

20       Same issue with other exhibits or should we take them one

21   at a time?

22           MR. SMITH:  I think it would be the same issue, for

23   the most part.  There are a couple of schedules that maybe we

24   just take up at the time --

25           THE COURT:  Okay.

1          MR. SMITH:  But just so -- but I think may contain

2     annotations.  If it's helpful, I can run through the

3     corresponding exhibit numbers right now.

4          THE COURT:  All right.

5          MR. SMITH:  So Ghent, which is designated as Number

6     3 --

7          THE COURT:  Yep.

8          MR. SMITH: -- for the defense.  That is Government

9     Exhibit 104.

10          THE COURT:  All right.

11          MR. SMITH:  The next one, which is Defense Exhibit 4,

12     I believe, and counsel can correct me, I think larger excerpts

13     from the patient chart for Pooler.  And that's Exhibit 109.

14          THE COURT:  All right.

15          MR. SMITH:  The next one is government -- Defense

16     Exhibit 5, identified as Waynick.  That's Government Exhibit

17     115.

18          THE COURT:  All right.  Same protocol on those.

19        Mr. Strianse, do you agree with all of that?

20          MR. STRIANSE:  Yes.

21          THE COURT:  Okay.

22          MR. SMITH:  And then skipping to Number 8, there's a

23     reference to Misty Brown.

24        That is a chart, so I think that's a little bit different

25     analysis.  You know, they may use that as a demonstrative or

1   some kind of summary.

2            THE COURT:  Okay.  That's not an actual patient

3   record?

4            MR. SMITH:  It's not an actual patient record.

5            THE COURT:  Okay.  Does that cover them or one more?

6            MR. SMITH:  And then 9 is -- it's identified as being

7   for patient Anita Fralix.

8            THE COURT:  Uh-huh.

9            MR. SMITH:  Which would be Government Exhibit 103.

10           THE COURT:  All right.

11           MR. SMITH:  But I have to believe it also, then,

12  contains behind that records also for Cozart, which is 102.

13  And I'll have to look.  Perhaps counsel can identify the other

14  ones, but there's, I think, a couple of patients in this one

15  exhibit.

16           THE COURT:  All right.  Well, for any of those, we'll

17  follow the same protocol.  Identify the -- the underlying

18  record is in evidence, and try to point the jury where that

19  is, that these can be displayed, but only as a demonstrative

20  aid.  It will not go in because there are highlights,

21  notations, disputed points that the defense has made, you

22  know, an entry or characterization about.  So that won't be in

23  evidence.  That'll apply to all of those records.

24       Okay.  Anything else we need to take up, Mr. Smith?

25           MR. SMITH:  No, Your Honor.

1          THE COURT:  Mr. Strianse, how much longer do you

2    think you have on direct?  That's about an hour and a half.

3    I'm not holding you to a clock.  I'm just getting an idea.

4          MR. STRIANSE:  Probably at least another hour.

5          THE COURT:  All right.  Well, we need to get the

6    proof in today per your representation earlier.

7          MR. STRIANSE:  Yes.

8          THE COURT:  So let's just try to stay on track for

9    that.

10       Okay.  Anything else for you?

11         MR. STRIANSE:  No, sir.

12         THE COURT:  Okay.  We'll take our break at this

13   point.  Thank you.

14       (Recess from 10:50 a.m. until 11:03 A.M.)

15       (The jury entered the courtroom at 11:03 a.m.)

16         THE COURT:  All right.  Thank you.  We've reassembled

17   after the morning break with everyone present.  The jury has

18   returned from the break.  Thank you-all for your punctuality,

19   as usual.  Dr. Stanton is still on the stand.

20       I think we're going to see a series of exhibits,

21   beginning with Exhibit 3, which are going to be demonstrative,

22   meaning they're not going to be admitted, but they're going to

23   be displayed to you as an aid in understanding the testimony

24   in the case.

25       Each of the exhibits is going to be parts of the

1    underlying medical record.  So, for example, Exhibit 3

2    pertains to records from Jeffrey Ghent.  The underlying record

3    is in evidence for Mr. Ghent.  As an example, his records are

4    at Exhibit 104.

5         The exhibits you're going to see as demonstrative are

6    parts of the underlying medical record that has some

7    highlights or commentary that will be illuminated during

8    Dr. Stanton's testimony.  We'll identify each of those as we

9    go along.

10        But Exhibit 3 I will allow to be used demonstratively, as

11   indicated.  It may be displayed to the jury as Mr. Strianse

12   requests.

13        And you can continue your direct examination.

14            MR. STRIANSE:  Yes, Your Honor.  I would request that

15   the jury be shown this.

16            THE COURT:  All right.  It may be displayed.

17   BY MR. STRIANSE:

18   Q.   And, for the record, Dr. Stanton, we're looking at

19   Defendant Exhibit -- Demonstrative Exhibit 3; is that right?

20   A.   Yes.

21   Q.   And this is the patient chart for Jeffrey Ghent, correct?

22   A.   Yes.

23   Q.   That was received as Government Exhibit 104, and it's

24   already in the record; is that right?

25   A.   Yes.

1    Q.   I would like to go through this with you pretty

2    efficiently.

3         What is depicted on this first page of Mr. Ghent's?

4    A.   This is an example of what would be on each chart note,

5    and it shows the medical conditions the patient has.  So, for

6    example, there is -- there's cervical disc disease.  He had

7    spondylolisthesis and spondylolysis, which is a condition in

8    the lower spine where you have a -- a fracture through part of

9    the bone, and you have arthritis of the joints in the lower

10   spine.

11        And he had chronic pain syndrome.  He had pain in his

12   right foot.  These are all the conditions that were in his

13   chart that were used to show that this patient was qualified

14   as a chronic pain patient.

15   Q.   And what is chronic pain syndrome?

16   A.   The chronic pain syndrome is any pain that continues

17   beyond three to six months, and it's an ongoing process.

18   Q.   What's depicted on this next page of Mr. Ghent's chart

19   that we've highlighted?

20   A.   The -- the decision to give pain medications to a patient

21   is not just purely based on a patient coming in and saying,

22   I'm -- "My back is killing me," or, "I went to another pain

23   clinic for -- for a year, and they gave me pain medicines.

24   Why can't you give me pain medicine."  You have to have some

25   kind of confirmation.

1     In this case, you want -- you want diagnostic studies.

2    And so we have here is an example of an MRI of the shoulder,

3    which shows that he had a chronic rotator cuff abnormality.

4    You see that right up here, chronic rotator cuff

5    abnormalities, which would be a rotator cuff tear.  It wasn't

6    actually an x-ray, but it shows that there's a potential for

7    this rotator cuff tear.

8    Q.   Take a look at the next slide.

9    A.   Okay.  Another x-ray.  This shows arthritis of the base

10   of his thumb.

11   Q.   What about this next page from his chart that's

12   highlighted?

13   A.   This shows mild multilevel degenerative changes and an

14   anterolisthesis of C7 and T1.  This is -- this means that the

15   disc between the C7, which is the lowest cervical vertebrae,

16   and T1, which is the upper thoracic vertebrae, that that disc

17   has worn out, flattened out, kind of like a -- a grade terrain

18   to a -- or -- or a tire that's low on air.  And as a result,

19   it's allowed the vertebrae to slip forward one vertebrae on

20   the other and instability at that level.

21   Q.   When you see an imaging study like this, what does that

22   indicate to you as a physician?

23   A.   That this patient has a condition that is a pain

24   generator.

25   Q.   Take a look at this next one.

1   A.   This is confirmation of the diagnosis we looked at

2   earlier, spondylolysis and grade 1 spondylolisthesis of L5 on

3   S1.  L5 is the fifth lowest lumbar vertebrae.  S1 is the upper

4   portion of the sacrum.  The sacrum is comprised of five

5   vertebrae that kind of fuse together as a child -- as an

6   infant.  And -- and there was a -- a slip between those two.

7        Again, it was a -- the disc is -- is protruding.  You see

8   there's -- there it says "central disc" -- "central disc

9   protrusion," and then "modern arthropathy," I -- I covered

10  that partially, and "pars defects on both sides."

11       The -- in the -- in the spine, you have the body of

12  the -- the body of the vertebrae.  It kind of looks like a --

13  like a little sweetened condensed milk can.  It's a little

14  cylinder.  It's about as high as it is wide.  That's the body

15  of the vertebrae.

16       On the back of the -- behind the spinal cord are the

17  joints that connect each vertebrae together, and they're

18  connected by a -- by a -- the joints.  The upper joint and the

19  lower joint are connected by a part that goes in between those

20  two joints.  It's known as the pars intra-articularis, meaning

21  the part between the joints.

22       If there is a defect there, if that's broken, then it

23  allows the vertebrae to slip forward.  It's kind of like

24  you're hanging on by your fingers, and all of a sudden your --

25  your knuckle breaks and you can slip.  And that's why it's

1   called a spondylolisthesis.  That's a slippage of one

2   vertebrae on the other.

3   Q.   And this is confirmed by MRI; is that right?

4   A.   Yes.

5   Q.   By Dr. Charles Kerma?

6   A.   Yes.

7   Q.   Take a look at the next slide.

8        What is this?

9   A.   Well, in addition to having arthritis of the base of his

10  thumb, he has arthritis of his big toe, the first metatarsal

11  phalangeal joint.  That would be -- if you had a bunion,

12  that's where that would be located.  It's the joint between

13  the -- the -- the part of the toe that moves and the part

14  that's inside the foot.

15  Q.   And this is a radiologic study?

16  A.   Yes.

17  Q.   Performed by Rajesh Gogia, G-O-G-I-A, doctor?

18  A.   Gogia, yes.

19  Q.   What is this next panel?

20  A.   This is an x-ray of his shoulder.  And it shows that

21  there's loss of the subacromial joint space consistent with a

22  rotator cuff pathology.  So in your shoulder, you have the

23  ball on the top of the shoulder.  You can feel it up here.

24  And then you have, underneath that, your arm bone.  And in

25  between the two is the tendon that brings your arm up from

1  your side.

2      And that space underneath the acromion, which is this

3  bone here, is the subacromial space.  And in his case, the arm

4  bone had shifted upwards so that it's striking or rubbing

5  against the bottom of the acromion because the rotator cuff is

6  torn and retracted.  That tendon in between the two is now

7  gone, and that's why he was hurting in that area.

8  Q.   This is an x-ray that was taken at Manchester Memorial

9  Hospital in Manchester, Kentucky; is that right?

10  A.   Yes.

11  Q.   What is this next series of images in his chart?

12  A.   So every time a patient would come in, we would do what's

13  called a functional evaluation.  And this is to see if they're

14  getting improvement from their medications and how -- how the

15  pain is affecting their daily activities and how much relief

16  the treatment they're getting is helping.  And at the top up

17  here, you can see he was getting 70 percent relief of pain

18  from the medications and 70 percent improvement of his

19  function.

20  Q.   And this is, obviously, a self-report by the patient; is

21  that right?

22  A.   Yes.

23  Q.   What is this next panel?

24  A.   Okay.  This is the SOAPP-R, which is a -- a risk

25  assessment test to see the risk of a patient diverting or

1    abusing his medications.  It's based on things like -- you

2    know, there are some -- there are some things that can have a

3    higher risk of the patient becoming addicted or diverted, such

4    as child abuse, if they've been -- if they've gone to jail

5    before, these kind of things.  And he was felt to be of a

6    moderately -- moderate risk.

7         But, again, this is based on what he tells you.  He

8    doesn't have to -- he -- if he doesn't want you to know he --

9    he went to jail, just say, "No, I didn't go to jail."

10   Q.   So you're relying on the patient to be an accurate

11   reporter?

12   A.   Yes.

13   Q.   Is this another page of this risk assessment?

14   A.   Yes.

15   Q.   What is this next panel?

16   A.   Okay.  So first time I saw Jeffrey Ghent, or Ghent, was

17   in November of 2017.  This was towards the end of my first

18   stint as medical director, starting in the summer of 2016.

19        And he came in for a consult with the medical director

20   because his MME was above 120.  And all this shows is that

21   that's why he was there and that he had neck pain, foot pain,

22   shoulder pain, low back pain.

23   Q.   And what is the plan of care on this next panel?

24   A.   Well, he had problems with his shoulder, and I evaluated

25   his left shoulder extensively and his right knee.  And he

1    wanted to see -- he was waiting to see an orthopedic surgeon

2    for -- to consider surgery.  So I said, "I want you to go to

3    therapy for a few visits for your back."

4         I also referred him to see an orthopedic for evaluation

5    of his shoulder to see what needs to be done, because we were

6    recommending -- and we recommended a brace for his back.  So I

7    was trying to be as complete as I could with his care, getting

8    him a brace, getting him some therapy, and I wanted him to go

9    see the -- the surgeon about his -- surgeon about his

10   shoulder, if anything could be done, because he's

11   relatively -- he's 57 years old, but, you know, you want to

12   have a -- a nice shoulder, if you can.

13   Q.   On your recommendation, did he get that surgery?

14   A.   No.

15   Q.   Are these your notes that we see in this panel?

16   A.   Yes.  And what -- these are my handwritten notes.  At the

17   very bottom -- it's kind of cut off a little bit, but at the

18   bottom, I made a note.  I wanted him to try a real brace.  He

19   had something he got at Walmart, or someplace like that.  I

20   said, "Try a real brace and see an orthopedic surgeon.  Bring

21   a letter or a note, status of the shoulder and the knee, and

22   what the orthopedic surgeon's plan was.  And that was in 2017,

23   November of 2017.

24   Q.   What is this that we're seeing, November 1 of '18 in his

25   chart?

1   A.   Okay.  So this -- this period of time is -- I had come

2   back to work for Maccarone again and -- and had not seen the

3   patient in the interim to know whether he had -- what -- what

4   the -- the -- the surgeon had said.  But, ultimately, I found

5   out that he did not have surgery.

6        So what we have here is a urine test.  And what you're --

7   this is a -- the urine confirmatory test.  It shows gabapentin

8   had been prescribed.  It was expected.  And he had --

9   oxycodone had been prescribed.  And he had -- oxymorphone had

10  been prescribed, and he had it.  Importantly, noroxycodone,

11  which is a metabolite of oxycodone, was present, indicating

12  that he had actually taken and consumed the pill and that the

13  metabolites were present.

14  Q.   Is this an example of a good drug screen result for a

15  patient?

16  A.   As far as I was concerned, it was.  He had some

17  dextromethorphan, which could be a cough syrup, that had not

18  been prescribed to him, such as Nyquil or Robitussin, but that

19  would not preclude me from giving him his prescriptions.

20  Q.   Those would be over-the-counter preparations; is that

21  right?

22  A.   Correct.

23  Q.   What is this that we're seeing?

24  A.   So this is an example of the CSMD.  You've heard of the

25  CSMD.  What it shows is -- once it stops moving around.

1   Q.   Yeah.   Sorry.

2   A.   That -- this shows that Dr. Maccarone had given him those

3   prescriptions for oxymorphone and the gabapentin, and it says

4   right here, Maccarone's the prescriber.  And that, again, is

5   checked to make sure.  If it said -- if it said Dr. Bill

6   Smith, be like, how -- who's -- why is he getting medicine

7   from somebody else we don't know about?  And we -- we would

8   want to know that.

9   Q.   What is this that we're seeing, "In-House USD"?

10  A.   So this is the cup test, and these are the medications

11  they test for.  So, for example, I don't see heroin on there.

12  If he was taking heroin, this cup test would not show that.

13  But what it did show is oxycodone, which he had been

14  prescribed.

15  Q.   Would that be a consistent UDS, or urine drug screen?

16  A.   Yes.

17  Q.   Consistent why?

18  A.   Because it showed the medications that had been

19  prescribed and nothing else.

20  Q.   What is this next chart note?

21  A.   So this shows that on November 26, I guess it would be

22  about the day after Thanksgiving, or right around

23  Thanksgiving, he was there to see me, because up in the

24  right-hand corner, the red, it shows that Maccarone was out.

25  Maccarone was -- was not there to see patients, so I was

1    tasked with seeing him and writing his prescriptions.

2            THE COURT:  And the red portion is your addition,

3    Mr. Strianse; is that correct?

4            MR. STRIANSE:  Yes, sir.

5            THE COURT:  Okay.  Just take note of that, ladies and

6    gentlemen.

7    BY MR. STRIANSE:

8    Q.   That was what you had to show that Dr. Maccarone was out?

9    A.   As a reminder to me and as information that this was the

10   period of time when I was having to see all of his patients.

11   Q.   And this is November 26, 2018.

12        Do you remember what date he had that medical emergency

13   and went out?

14   A.   About two -- a week or two before that.

15   Q.   And what is this next panel?

16   A.   Okay.  So couple of interesting things on here.  He

17   got -- this is -- shows the oxymorphone and the oxycodone that

18   had been highlighted.  And those are the narcotics that we're

19   most concerned about.

20        Maccarone had a -- had a habit of giving people vitamin

21   D.  There is some evidence that vitamin D can help with

22   vitamin D deficiency, can cause pain.  Some of these people

23   may have been off a product.  That wasn't related to his case,

24   necessarily.

25        Neurontin, at the bottom there, is gabapentin.  That's

1  this one right over here.  That's gabapentin.

2      And then at the bottom, I have this MME as 180.  And you

3  can keep track of that number, because in his case, his number

4  didn't really change.  But you'll see a notation here that

5  said due to his number being 180, we were tapering his

6  medication.  This is something that was added by Emilie or

7  Shanna, who -- who would -- would compile the -- the paperwork

8  at the end of the visit.

9  Q.   Did you include that language?

10 A.   No, I did not.

11 Q.   So you did not include "Due to his ACME number" on the --

12 "on the CSMD being 180, we are tapering"?

13 A.   No, I did not.

14 Q.   Having an opportunity to review these charts that we

15 received in discovery, was that a recurring line in these

16 charts?

17 A.   Yes.  And as we heard earlier testimony, this was based

18 on a template that Maccarone had.  He had basically two

19 templates with regards to their -- to the level of the ACME,

20 which is the same as the MME.  One template said that his

21 level is below 120, so we're raising it.

22     The other one said his level is above 120, so we're --

23 like this one, it was a high level, so we're -- we're tapering

24 it.  He -- apparently they did not have a template that said,

25 "He's right at 120, so we're going to leave him here," but

1   these are the two templates that they used.

2   Q.   When did you become aware that they were using templates?

3   A.   When I was reviewing these charts over and over again and

4   going through them in detail and had a chance to review a lot

5   of the -- the charts with Maccarone's that I had not been

6   reviewing when he was in the office.  And then looking at my

7   own charts and seeing this had been added on there.  And I

8   asked -- I asked the scribe how that got in there, and she

9   told me it was a -- it --

10          MR. SMITH:  Objection.

11          THE DEFENDANT:  Sorry.  Sorry.

12          THE COURT:  Don't say what somebody else told you,

13  Dr. Stanton.

14      Disregard that comment, ladies and gentlemen of the jury.

15      Please continue.

16  BY MR. STRIANSE:

17  Q.   And you added that MME calculation of 180; is that right?

18  A.   Yes.

19  Q.   And when you were doing this deep dive on the charts and

20  reviewing them, was this after you were charged?

21  A.   All of the -- repeat that, please.

22  Q.   I said:  When you were doing this deep dive into the

23  charts, when was that?

24  A.   Yes.  This is all based on discovery that I received.

25  Q.   Okay.

1    A.    After I had been charged.

2    Q.    What is this next page that we're seeing?

3    A.    Again, this is CSMD that came -- that we would get before

4    we would see the patient.

5    Q.    And then this next panel for Mr. Ghent?

6    A.    So this is a -- the next visit, which was January 3,

7    2019, the previous visit having been December 26th, about five

8    weeks prior.  And he was back for another medication refill.

9    Q.    And you are making a note that Dr. Maccarone is still

10   out; is that right?

11   A.    Yes.

12   Q.    What are we seeing here?

13   A.    This is a list that was given to me when I walked in the

14   clinic that day.  And there are, ultimately, oh -- you know,

15   that there were 37 patients that I was going to have to see

16   that afternoon.

17   Q.    Okay.  And it continues onto the next page?

18   A.    Well, this is -- this just shows -- this just highlights

19   the upper half of that.  So you can see that Ghent's name is

20   on there, and -- and that there are 37 patients.  There's also

21   notations I've made on there.  Let me just -- I don't know if

22   this is the best one to show you on, but there are notations

23   on there that I was asking every patient about injections and

24   bracing and therapy when they came in.

25        And I would give them a brace prescription or a therapy

1   prescription as needed.  Even though I was seeing 37 patients,

2   I would ask all of them about knee injections and other

3   injections.  And these are examples of two patients, different

4   patients, who had agreed to get an injection at some point in

5   the future.

6       You'll also notice that these charts did not show any --

7   there are no notations other than my notations on them.

8   Q.   Here is another chart, and you've added the MME 180; is

9   that right?

10  A.   Yes.  If you -- if you'll zoom out, you can -- you can

11  see that this is -- this is the second -- this is the -- the

12  end of the note from January 3rd.  The MME is still 180, and

13  the urine drug screen had been -- that had been performed on

14  November 26th was referred to and was consistent.  Even though

15  that was done five weeks prior, it was made -- that's the only

16  urine test that had been done on this patient in the recent

17  past.  So that was noted and that he got his medications.

18  Q.   And is that tapering language recycled in this page, in

19  the chart as well?

20  A.   Yes.

21  Q.   Were you seeing that tapering language back at the time

22  that you were working at GMA?

23  A.   I actually wasn't really noticing it.  And if I did see

24  it, I assumed that it was true.

25  Q.   What is this next panel?

1    A.   So this is in January.  And every year, in January and

2    February, every patient has to re-sign their -- their patient

3    agreements.  There is one that is an agreement that they

4    will -- they will comply with the rules and protocols of

5    Maccarone's clinic, and the other one has to do with their

6    diagnosis as listed and that they are agreeing that they

7    understand the risks of taking narcotics, that they could

8    become addicted or they could have, you know, depression of

9    their -- of their respiratory system or something.

10        So this is done in the beginning of every year, not just

11   on the anniversary when that patient came.  So in addition to

12   having to see those 37 patients that day, I was having to fill

13   out this paperwork on every patient as well.

14   Q.   So this is during that four-month interval when

15   Dr. Maccarone was first away from the office?

16   A.   Yes.

17   Q.   And is this the second page?

18   A.   Yes.  This shows my signature on that.  That has to do

19   with the diagnosis and the risks and benefits, and the next

20   one I think you're going to see after this shows that the --

21   that they're going to follow the rules.

22   Q.   And just in a nutshell, what rules are they representing

23   that they're willing to follow?

24   A.   That they're going to go to one pharmacy, not multiple

25   pharmacies, unless they call back on this particular issue

1   with getting their medications at that pharmacy, that the

2   medications are only going to come from the physician who's

3   either -- in this case, be myself or Maccarone at that clinic,

4   and if they're going to go to a -- have a surgery or

5   something, they would have to let us know that they're getting

6   medications from someone else.

7   Q.   What's the significance of having one dedicated pharmacy?

8   A.   Well, it's a lot easier to keep track of the CSMD, and

9   you know the patients aren't shopping around for different

10  pharmacies to get their medications.

11  Q.   And Mr. Ghent signed that?

12  A.   Yes.

13  Q.   This looks like another urine drug test; is that right?

14  A.   Correct.  And if you zoom in on the upper portion up

15  there, you'll see that this is what -- what was described

16  previously as a failed drug test, a failed -- failed urine

17  test.

18       And what you see is on the -- above this yellow line up

19  here, you can see that it was drawn at the visit January 3rd.

20  The result came back two days after that visit, on the 5th of

21  January.  And it's inconsistent.  It doesn't show any of the

22  medications in the urine.  So I was concerned about that.

23  Q.   And how did you address that?

24  A.   You can go to the next page.

25       This is a summary, just so we don't have to go scrolling

1   back through.  But if you move that a little bit to the right,

2   you can see the dates of his visits.  Keep going, please.

3       And what you see there is that, if you remember, he saw

4   us November 26th and got medications.  His urine test -- his

5   urine test appeared normal, but he was not seen again until

6   January 3rd.  That's five weeks.  That's 38 days, I believe.

7   This, to me, was an explanation as why he had nothing in his

8   urine.  He had run out of his medications several days

9   earlier.  Probably a week earlier.

10      So that -- although that was -- would have been

11  considered a failed urine drug test, it was not reason to

12  give -- not give -- to hold back his medications.  He had run

13  out at this point, and he needed his medications.  So he went

14  ahead and got his medications.

15      Go to the next sheet, and you'll see that he --

16  Q.   Is that typically a 30-day supply?

17  A.   Yes.

18          THE COURT:  Mr. Strianse, that page was not in the

19  medical records.

20      That's a chart prepared by the witness; is that correct?

21          MR. STRIANSE:  Absolutely, yes, sir.

22          THE COURT:  Okay.  Just be aware of that, ladies and

23  gentlemen.

24  BY MR. STRIANSE:

25  Q.   And what is this?

1    A.   Now, this is a CSMD for the next visit.  So this is the

2    end of the month, now into January, that same month, and there

3    are -- this is a typical visit.  And this particular note is

4    included because it's going to show all of the pages that I

5    would have reviewed.  Every time a patient came in, I was

6    given the previous note.  And this just kind of shows, again,

7    there were 17 patients that day, and you can see the patients

8    who agreed to get injections.

9    Q.   So this is an example of the packet that you would see?

10   A.   Yes.  All of these -- this just shows how many pages I

11   was reviewing when a patient would come in.

12   Q.   Typically seven to nine pages?

13   A.   Seven to nine pages, yes.

14   Q.   What is this one?  Is this still included in the packet

15   for Charles Wooten?

16   A.   Yes.  And at the bottom, it shows the medications he was

17   prescribed, which was similar to what he had gotten before.

18   His MME was still 180.

19   Q.   And you highlighted the medications and added the MME

20   calculation?

21   A.   Yes.  And then this is a comment that was added saying

22   that it was inconsistent from January 3rd with prescribed

23   medications as negative for all of his medications.  And I had

24   talked to him about it, and he explained that it had been over

25   a month.  And I reviewed and looked at it, and then, yeah, it

1    turns out it had been over a month since he got his

2    medications.  So I went ahead and gave him his pills.

3    Q.   And you're seeing that tapering language again --

4    A.   Yes.

5    Q.   -- is that right?

6    A.   Yes.

7    Q.   And here's the --

8    A.   Another -- another visit.  Got another visit.  There's

9    the CSMD that I would review.  And, again, now -- now -- now

10   we're back to everything appearing normal again on his urine

11   testing.

12   Q.   It's normal because he's been prescribed oxycodone and

13   it's showing up?

14   A.   Yes.

15   Q.   In his urine?

16   A.   It -- it was an -- an expected result.

17        And this is February 26th, again, for medication refill.

18   Q.   And, again, Dr. Maccarone was out?

19   A.   Yes.

20   Q.   And is this his first four-month stint?

21   A.   Yes.

22   Q.   Being out?

23   A.   Yes.  This is -- he came back -- I think within a month

24   or so after that, he came back.

25   Q.   And here's the CSMD?

1    A.   So if you look at the date on that, in the upper left,

2    the -- that previous note was from February.  And now

3    Maccarone has come back and has seen the patient.  And if you

4    remember, the MME -- ACME was 180 on the patient.  So this --

5    now, this -- this is a visit coming up on -- I see him

6    again -- I haven't seen him for about four months now.  I'm

7    seeing him in June.  And now we see his MME is up to 202.

8    Q.   And did you raise him up to 202?

9    A.   I did not.

10   Q.   Here's another in-house urine drug screen.

11   A.   Yes.

12   Q.   And, again, that looks like a good result?

13   A.   Yes.

14   Q.   This one is dated June 26 --

15   A.   Yes.  That was --

16   Q.   -- of 2019?

17   A.   I believe that was the same -- that was the same visit, I

18   believe, June of 2019.

19   Q.   And Dr. Maccarone is out again?

20   A.   Well, he wasn't feeling good.  He wasn't out for a

21   four-month period, but he just didn't feel good.  And they had

22   me come in to see patients for him that day.

23   Q.   So they would -- if he decided not to show up on a given

24   day after he had returned, presumably, they would just call

25   you and you would come in?

1    A.   If I could, yes, I would, because I didn't want the

2    patients -- there -- there were situations where he had maybe

3    only six or nine patients and wasn't -- the money wasn't

4    there.  So he wasn't going to come in.  Or the end of the day,

5    he's not feeling well, he's not going to come in, and so I was

6    asked if I was available so the patients wouldn't have to get

7    a motel and have to come back the next day.

8         And I felt -- you know, I felt bad for these people.  So

9    I would go ahead and swing by, as -- as they said, and see --

10   give them their medicine.

11        Now you see he's up to an MME of 233.

12   Q.   And did you raise him up to 233?

13   A.   No.  That was in the interim there between February and

14   June.  And what you'll notice is, if you -- if you -- you

15   don't have to go back, but if you go back to the -- to the

16   MME -- to the CSMD, if you remember, it's at 202.

17   Q.   Yes.

18   A.   Which shows that the CSMD is not always accurate, okay?

19   Sometimes they don't -- they don't count all of the

20   medications or they -- for some reason, it's not always

21   accurate.  He actually had an MME of 233 at that -- at that

22   visit.

23   Q.   And what is this?

24   A.   These are just -- at that same visit, when I saw him, I

25   went ahead -- he had a -- he wanted a back brace.  I had given

1   him a prescription for a back brace in 2017, if you recall,

2   but he had lost it or something had happened.  So I gave him

3   another prescription for a back brace, and it -- it says up

4   there the diagnosis is "LBP," low back pain, "DDD," which is

5   degenerative disc disease, and "ABD." and that word is

6   supposed to be "hernia."  He has an abdominal hernia, and I

7   wanted to make sure that the brace shot took that into

8   consideration when they gave him his back brace.

9   Q.   Do you know if patient Ghent ever filled this

10  prescription?

11  A.   I don't remember.  I didn't see him -- I don't think I

12  saw him again for a few more months.

13  Q.   On this same visit, there is this other panel?

14  A.   Correct.  In addition to the left shoulder, which had a

15  rotator cuff tear, he also has instability of the right

16  shoulder.  And so I -- these two forms that you just saw were

17  prescription forms for bracing and therapy.  They were

18  generic.  The patients came from a lot of different places.  I

19  did have prescriptions for -- for therapy that were for local

20  therapy clinics, and I used those if they were from out of

21  town.  But if they came from somewhere else, I had these forms

22  already printed out.

23       The top line there has to do with if it's neck pain, to

24  get a -- a -- have the therapy show them some home exercise

25  program for the neck.

1      Next one down is try some cervical traction and -- and

2   give them a home unit, if needed.

3      The next line below that would be for the common -- for

4   the low back pain.  "Evaluate and recommend a lumbar home

5   exercise program with one or two weekly follow-up visits."  In

6   his case, he needed strengthening of the rotator cuff, the

7   subscapularis, work on his range of motion.  This is BIW,

8   which is twice a week for four to six weeks, and a home

9   exercise program, HEP.

10  Q.   And this is the CSMD?

11  A.   That's from the different -- that's from January of 2020,

12  now six months later.

13  Q.   And it seems as if his MME is coming down?

14  A.   It appears to be down to 150 there.

15  Q.   How was that accomplished?

16  A.   It would have been, in this case, probably by Maccarone,

17  because he was seeing him in the interim.

18  Q.   Here's another chart note?

19  A.   January 24, 2020.  Yes, I saw him that -- that time.

20  Q.   And here, on January 24, 2020, his MME is back up to 240?

21  A.   Well, it wasn't really back up.  The -- the MME of 150

22  and the CSMD had only taken one of his two medications into

23  consideration, not both of them.  And, again, it shows the

24  inaccuracies of the -- that you can give with the CSMD, which

25  is why you can't just look at the CSMD and say, "Well, good.

1    He's back down to 150."  If you calculate the MMEs on the

2    oxycodone and oxymorphone that he was getting, he was actually

3    up to a level of -- of 240.

4    Q.   And what is this?

5    A.   Well, it's January again, and -- and I'm back having to

6    fill out all of their paperwork for them.

7    Q.   So this is his contract, if you will?

8    A.   Yes.  And his risk and benefits of -- of narcotics.  And

9    at that visit, the reason I was seeing him in January wasn't

10   because Maccarone was sick.  He was there for another MME

11   visit, okay?  And this -- this -- we can go through it very

12   quickly.

13        This just shows the history that I obtained at the top.

14   It shows the physical exam there in the middle.  And it shows

15   my -- a summary of my notes of what I wanted him to have done

16   at the bottom.

17   Q.   And you are seeing him as a medical director on this

18   visit?

19   A.   This is my medical director visit.

20   Q.   And then there's the note?

21   A.   That just finishes up the summary of what I -- my -- my

22   handwritten notes, which are right there, on the patient.

23   Q.   And there's another CSMD for March of 2020?

24   A.   Yes.  This is -- this is back -- the second time that he

25   was out sick.  Maccarone was out sick.  He was out over the

1    winter of 2018/'19 and then back again in the middle of the

2    summer of 2020.

3    　　　And this, again, shows -- this is a little bit different

4    than some of the other ones you've looked at.  This is the

5    beginning in March of 2020.  This is the patients.  So I had

6    36 patients, in addition to him, to see.  Wait, wait, wait.

7    　　　And, again, you see the patients I have recommended

8    injections on.  You see that there are no other notes other

9    than my own.  And in red, on the right, are the ten patients

10   they had lined up for me to do injections on that day, in

11   addition to those other patients.

12   Q.   This shows an MME of 240; is that right?

13   A.   Right.  That was the -- that -- he was -- he was still at

14   that MME of 240, and these are the medications he was getting.

15   This is just showing that he's -- came in to see me for an

16   injection of his left shoulder in May of 2020.

17   　　　And I think the next one shows that he came back.  And

18   this is the paperwork I had to fill out every time they would

19   come in for an injection.

20   　　　The -- they came in for shoulder pain.  This part -- this

21   part right here was prefilled out.  The two lines above that

22   was what I termed where they actually needed the injection in

23   their shoulder.  That was the informed consent.  The patient

24   would sign that.

25   Q.   And how many injections would he have received?  Would

1  those be three separate site injections?

2  A.   This is -- this was one injection in the left shoulder

3  where the bursa is on that day, May 20th.  And the next

4  picture, I think he came back in, and then that just shows he

5  also -- I think he also got a knee injection on May 20th, of

6  his knee.

7       And then he came back in October 6th of 2020, the last

8  time I ever saw him, and he's getting an injection in his left

9  shoulder.  I believe that was his right shoulder.  Now we're

10 doing the left shoulder.

11 Q.   That was your last encounter with Mr. Ghent before the

12 clinic was closed; is that right?

13 A.   Correct.

14      MR. STRIANSE:  Your Honor, may I approach

15 Dr. Stanton?

16      THE COURT:  You may.

17 BY MR. STRIANSE:

18 Q.   Let me show you what has been marked for identification

19 as Defendant's Demonstrative Exhibit No. 5 and ask if you

20 recognize that.

21 A.   Yes.  These are the notes on Lisa Waynick.

22 Q.   And is that a chart that was in the discovery that was

23 produced by the government in this case?

24 A.   Yes.

25 Q.   Is that right?

1    A.   Yes, that's true.

2    Q.   And did you review this and make certain highlights and

3    notations on it?

4    A.   Yes.

5         MR. STRIANSE:  Your Honor, with the Court's

6    permission, we would like to use it as a demonstrative exhibit

7    and publish it to the jury.

8         THE COURT:  All right.  Same process we used before

9    on the Ghent chart.  I believe the underlying Waynick chart is

10   in the record as Exhibit 115.  So that is in the record.  You

11   can consult on 115.

12        This demonstrative exhibit, I will allow the defense to

13   display that and let you see it.  Keep in mind the comments,

14   notations, highlights are created by the defense as

15   illustrative or intended to be helpful to the jury.  Those are

16   not admitted into evidence.

17        Is there also a summary chart he's created in this one?

18             THE DEFENDANT:  No, I don't believe so.

19             MR. STRIANSE:  I don't believe so, Your Honor.

20             THE COURT:  Okay.  So with those instructions, I'll

21   let that be displayed to the jury.

22             MR. STRIANSE:  Thank you, Judge.

23             THE COURT:  You're welcome.

24   BY MR. STRIANSE:

25   Q.   Dr. Stanton, is this the Waynick chart?

1  A.   Yes, yes.  And we can just kind of go through this

2  quickly.  The -- it -- the first page shows the diagnoses.

3  These are the x-ray findings.  As for the diagnoses the

4  patient had that was -- let me see.  There's -- it's kind of

5  hard for me to read, but there's chronic pain syndrome, low

6  back pain, neck pain, a lot of the stuff here about her neck

7  that -- degenerative disc disease, and so on.  And then also,

8  some slippage or arthritic changes of the joints in the neck,

9  which is a -- a spondylosis, okay?

10      So this is just -- these are just some examples.  Again,

11  briefly, we can go through these.  This just shows the

12  multilevel changes in her lumbar spine.  Degenerative changes,

13  that means the discs are wearing out.

14  Q.   And this is some diagnostic imaging that was done --

15  A.   Yes.

16  Q.   -- is that right?

17  A.   Yes.  Again, the lower -- lower back findings.  This

18  says, "Multilevel degenerative changes in the lower back."

19  Q.   So these are all confirmatory imaging tests about her

20  condition; is that right?

21  A.   Yes.  And it shows degenerative changes in the cervical

22  spine as well, and muscle spasm.  And you can see that I

23  saw -- I highlighted that and signed it when I saw the

24  patient.  And, again, these are some more studies with regards

25  to the back.

1    Q.   And then this is --

2    A.   And then this --

3    Q.   -- this is her functional tests?

4    A.   Yes, her functional testing.

5    Q.   And what is she generally reporting in terms of her pain

6    level?

7    A.   Well, one of the things you can see is she has little Xs

8    there where she -- where her pain is.  It's in both legs, her

9    lower back, and her neck.  And the next page show what -- that

10   she was getting 70 percent improvement with her treatment.

11   And then again, this is a -- the risk testing that we did, the

12   SOAPP-R.  And then this is a copy of what a pill-count policy

13   looked like.

14   Q.   And what was the pill-count policy in 2017 at

15   Dr. Maccarone's?

16   A.   It was three -- three pill counts per calendar year.  And

17   if you are in breach of the contract, you are at risk of being

18   dismissed.

19   Q.   And this shows a discharge of her from another pain

20   clinic; is that right?

21   A.   Right.  This -- this case was discussed extensively

22   the -- the other day, which is why I wanted to go through it.

23   She had been a -- a patient at Clarksville Pain Institute.

24   And if you remember, I was medical director there.  At this

25   particular clinic, they probably had about seven or 800

1    patients.

2         And in addition to my -- to doing MME visits, at that

3    clinic, I also did new patient visits for the new patients

4    that came in.  And I also had reviewed every one of the charts

5    there.  I didn't -- because these were nurse practitioners and

6    PAs, so I was required to review their medical records.  I had

7    to sign off.

8         This patient was discharged in January of 2017 for her

9    failure to comply with the pill-count policy.  At that point,

10   the only thing I would have -- I had not met the patient, but

11   I -- if I had reviewed the chart, I might have seen that there

12   was a notation that she had -- that she had missed her pill

13   counts.

14        In fact, what actually happened was, I -- I did include

15   it in here.  They called her up and said, "You need to come

16   for your pill count."  And then they said, "You missed your

17   pill count."  And she said, "I'm not coming back."  And she

18   ended up coming -- going to Maccarone's clinic and was

19   admitted to Maccarone's clinic the month after, in, I think,

20   February of 2017.

21             THE COURT:  Let's confer for a moment.

22        (Sidebar conference.)

23             THE COURT:  He's, again, doing exactly what I told

24   him not to do.  That whole story is hearsay and is improper to

25   put before the jury, Mr. Strianse.  So, I mean, I'm inclined

1  to tell the jury to disregard his evidence regarding how that

2  pill count discharge came to be and, again, admonish him not

3  to relay hearsay to the jury.

4          MR. STRIANSE:  Yes, sir.

5          THE COURT:  Is that what the government requests?

6          MR. SMITH:  Yes, Your Honor.  I mean, it puts us in a

7  little bit of a bind where if we object, it makes us look like

8  we're trying to hide something, but it's -- yeah.

9          THE COURT:  Okay.  I'm going to do that at this

10 point.

11      (Sidebar conference concluded.)

12          THE COURT:  Dr. Stanton purported to tell you what

13 had happened behind that pill count discharge.  That's all

14 hearsay.  And so I'm going to strike it from the record.  I'm

15 going to direct the jury to disregard what Dr. Stanton said

16 about that.

17      And, Dr. Stanton, again, I'm going to tell you to, as

18 part of your testimony, stop telling the jury what other

19 people told you, what other people said.  Your testimony is to

20 be based on your personal knowledge, not what someone has said

21 or told you.

22      And so you can continue your examination, Mr. Strianse.

23          MR. STRIANSE:  Thank you.

24 BY MR. STRIANSE:

25 Q.  Dr. Stanton, what are we seeing here?

1    A.   This is the first time I saw the patient.  This is

2    October 27th of 2018, which is, at that point, about 20 months

3    after she had been admitted to Maccarone's clinic.  So she had

4    left CPI in January of 2017, and the first time I actually see

5    her as a patient is October of -- of 2018.

6    Q.   And what is this urine drug test telling us?

7    A.   Well, it -- in some parts, it looks pretty good.

8    She's -- has the oxycodone, the oxymorphone, the noroxycodone,

9    but there's a -- this was considered a failed drug test

10   because at the top, it shows Klonopin, which is clonazepam,

11   which is for anxiety and depression.  And that was something

12   that had not been prescribed by Maccarone.

13       I believe -- I think it was my understanding that she had

14   been prescribed that by another physician, but the question

15   was:  Why was she taking that?  And whether that was

16   acceptable or not.

17   Q.   In your role as a physician, if a patient has a

18   documented history of depression or anxiety, how do you view a

19   test that looks like a failed test if it has some

20   benzodiazepine in it?

21   A.   If a patient has a diagnosis of major depressive order

22   (sic) or a history -- psychiatric history of anxiety, it would

23   not surprise me that occasionally this patient might be taking

24   a Xanax or alprazolam or clonazepam, something like that.

25       That -- you know, you are allowed to take benzodiazepines

1   when you're taking narcotics, but there is a risk of

2   depression of the respiratory system.  So you have to really

3   discuss that with the patient and make sure that they

4   understand the risks and that -- the -- that they're

5   encountering when they do that.

6       This is the urine drug screen from that same day, I

7   believe, and it shows that there is a benzo in her system.

8   Q.  And, again, that would not necessarily be a disqualifier?

9   A.  It would not be a disqualifier, but you would need to

10  discuss that with the patient.

11  Q.  And what are we seeing on this next panel?

12  A.  Well, this is her -- one of -- this is -- one of her

13  listed diagnoses is, she has major depressive disorder.

14  Q.  So if the presumptive test or the urine drug test shows

15  the presence of a benzodiazepine, what kind of a discussion do

16  you have with that patient?

17  A.  How often she's taking it, does she really need it, and

18  who she's getting it from.  And, again, I -- I -- she was

19  not -- we were not giving her that medication, but I believe

20  another -- another physician had been giving it to her.

21  Q.  And take a look at the report here.

22  A.  Under "Psychiatry," she self-reported that she had

23  anxiety, depression, and sleep problems.  And for me, that was

24  justification for her -- for her taking a benzo.

25  Q.  And what are we seeing here on this panel?  I think it's

1    November the 20th of 2018.

2    A.    Right.  So she was in to get -- this is the period of

3    time when Maccarone was out sick.  She comes in to get her

4    medications, and that's why she's there.

5    Q.    Also on November 20, 2018?

6    A.    Correct.

7    Q.    What are you seeing here?

8    A.    So it says she's given a strong counseling.  Have all her

9    prescribed medications.  If you go back to the UDT -- now,

10   this is November 20th.  If you go back to the UDT that we

11   looked at a minute ago that showed the alprazolam -- I -- I

12   think it was that one.  It was -- I don't know if you can go

13   back or not to those.  It was the --

14          THE COURT:  He wants to go back a sheet, I believe.

15   BY MR. STRIANSE:

16   Q.    Are you talking about the clonazepam?

17   A.    The previous UDT test.

18   Q.    Sure.

19   A.    I believe.  Okay.  That one was good -- oh, I'm sorry.

20   Go to the -- to the point of care -- the point-of-care cup

21   from October 25th.  The point-of-care cup was done, I believe,

22   the same -- at the previous visit.  Okay.  Yeah.

23   Q.    You want the October one?

24   A.    Yes, if you could.

25   Q.    One moment.  We'll come back to that --

1   A.   Okay.  That's fine.

2   Q.   -- Dr. Stanton.

3   A.   That's fine.  Anyway --

4   Q.   What is your recollection on the UDS?

5   A.   On that -- on that UDS, the -- the UDS that was done in

6   October, the previous visit, it didn't show -- it did not show

7   any of her prescribed medications in the urine.  And so then

8   you're thinking, well, why didn't she have that in there?  And

9   we know there's several reasons it might not have shown up in

10  that cup.  She might not have been taking the medicines.  She

11  could have sold it.  There are nefarious reasons.  Or it could

12  just be that it didn't show up.

13       At this point now, that was from a month ago, and now

14  it's a month later.  It's November.  And she needs her

15  medications.  So my concern at that point was, am I going to

16  withhold her medications based on a failed urine drug -- urine

17  drug screen when we don't know -- it was never confirmed?

18  There was never a confirmation done on that test.  So I went

19  ahead and gave her her medications and gave her a warning to

20  make sure she was taking her -- her -- her pills correctly.

21  Q.   Take a look at December 18th of 2018.  What are we seeing

22  here?

23  A.   Again, Maccarone is out.  She's back to get her

24  medications.  We have had no intervening urine drug test, so I

25  believe we went head and just gave her medications for that

1  visit.

2  Q.   And this was during his first illness; is that right?

3  A.   Yes.

4  Q.   And what was she being prescribed?

5  A.   Oxymorphone, oxycodone.  Every one of his patients were

6  on those two medications.  There was a period of time that we

7  tried some other medications, like a Belbuca patch.  That

8  didn't really work out.  We -- there were other medications we

9  talked about using.  A long-acting -- long-acting medications

10 and short-acting medications, let me just briefly discuss

11 that.

12      In -- after surgery, you give somebody short-acting

13 medication.  You don't want to give them some of this long

14 acting until they've been on the short acting for a period of

15 time and looks like they're going to need something to kind

16 of -- they have enough pain that they're having a lot of

17 breakthrough pain.

18      So you give them a long-acting medication that they take,

19 and it kind of has a -- a real -- it keeps them at a

20 relatively good level of -- of medicine.  But if they have

21 breakthrough, you would have something like oxycodone, or

22 something else, to take when they have low periods where they

23 have pain.

24      And there's several options for long acting.  Oxymorphone

25 is just one of them.  There's MS Contin, which is an extended

1    release morphine, and there are fentanyl patches.  It's a -- a

2    patch you apply to the skin.  It lasts for three days, and it

3    slowly loses fentanyl into the bloodstream.  These are

4    long-acting medications.

5         Oxymorphone is just one of those, and it's not

6    particularly better or worse than any of the others.

7         MS Contin is -- has addictive capabilities as well.

8    There's Dilaudid, which is hydromorphone, which is even

9    stronger than oxymorphone.  In our clinic, we have maybe just

10   two or three patients that are on Dilaudid because they have

11   so much pain.  But that's not something commonly used.

12        These are just -- these are common medications, and this

13   is what Maccarone used on pretty much every single one of his

14   patients.

15   Q.   Dr. Stanton, this is December 18th of 2018?

16   A.   Yes.

17   Q.   This is during that first four-month period when

18   Dr. Maccarone was out; is that correct?

19   A.   Yes.

20   Q.   And what was the prescribing plan that you had to deal

21   with Maccarone's patients when he was out sick?

22   A.   Well, for a number of reasons, I kept them on the same

23   medications they were on.  First of all, I believe he was

24   going to be coming back within a month or so.

25        Second of all, I didn't want to be switching up the

1    medications in midstream.  I was, you know, interested in

2    maybe lowering the medications, but I wasn't going to switch

3    them over to something different that they had been on for

4    several years.  Most of these patients -- like this case, for

5    example, she had been a patient since, in this case, almost

6    two years on those medications.

7        So the -- what seemed prudent was to continue them on the

8    same medications.  And I know there has been a lot of comment

9    that I just prescribed the same thing as Maccarone.  Well, the

10   only times I saw these patients was when he was out sick and I

11   was trying to see 30 or 35 patients every time I came in.  Or

12   I'm seeing them intermittently for an MME visit or because

13   he's not feeling well.

14       And, again, it would not be prudent for me, on one visit,

15   just to change their medications up just to try something else

16   if they appear to be doing well with those medicines.  That's

17   why it looks like I'm always prescribing the same thing as

18   Maccarone, because I was just -- the easiest thing that --

19   that the most prudent thing was to continue on the medications

20   they were used to and not try to switch it up and then have to

21   deal with them having too much or too low of medication when

22   they came back.

23   Q.   Dr. Stanton, on this next panel, what was the purpose of

24   the comment that you put in red on this sheet?

25   A.   So here it says that the UDS performed in November 20th

1    was inconsistent, and that's what we discussed a minute ago.

2    But this was a UDS that was from way back, November 20th.

3    This was not a UDS that was done on that visit.  There had

4    been no intervening urine drug tests.  So they're just making

5    reference to the drug test from the time before.

6    Q.    And here is another urine drug test; is that right?

7    A.    Correct.

8    Q.    From December 21, 2018?

9    A.    Correct.

10   Q.    And what does this show?

11   A.    Okay.  So this shows -- now, if you look at the date at

12   the top, it was collected December 18th, which is -- which is

13   at the time of that previous visit, okay?  This is not

14   something I would have known about at that previous visit.  It

15   was reported on December 21st.

16       And what this shows is, the reason this is considered

17   a -- a failed -- there's a couple of reasons it's considered a

18   failed urine drug test.  If you look underneath where it says

19   "oxycodone and oxymorphone," these are high levels of the

20   medicine.  And then you look at the noroxycodone.  She did not

21   have -- she did not have any noroxycodone in her system.

22       This is probably an indication that she had rubbed the

23   pill on her finger or something.  Had nothing in her system.

24   Put that into the urine.  And it shows that there -- that --

25   that she had a parent drug, but not the metabolite.  It also

1    shows that she had some fentanyl in her urine.  Not a lot, but

2    a little bit of fentanyl.

3        There's a couple of reasons that could have happened.

4    One, she took her medications excessively and ran out of them

5    and -- and procured some pills that had fentanyl in them to

6    cover her pain.

7        The other option is, is that she -- she disposed of her

8    pills, sold them, diverted them, and then was taking fentanyl

9    to cover her pain.  But this is what was going on in this --

10   what this shows was what she had been doing up until December

11   18th and was reported December 21st.

12       So when I see her -- go to the next page -- now it is

13   January 17th.  So that -- that drug test at that time was from

14   a month prior.  And now I'm looking at -- at a drug screen

15   that was done the same day, and the drug screen is good.

16       So I'm having to wonder, okay, I -- I'm not sure what she

17   was doing in -- in -- from the middle of November to the

18   middle of December, but now she's back to get her medications,

19   and her urine test is -- looks good.  So am I going to punish

20   her by discharging her for something that was happening over a

21   month prior?  And so I talked to her about it.  She said, you

22   know -- she said, no, she wasn't selling the pills.  She just

23   ran out, and she was scared about it.

24            MR. SMITH:  Your Honor.

25            THE DEFENDANT:  I'm sorry.  I'm sorry.  I'm sorry.

1    But we did discuss it.

2            THE COURT:  Hang on.  Just disregard his reference to

3    what the patient said.

4            THE DEFENDANT:  Okay.  Gave her counseling, and --

5    and on January 17th, we gave her more medication.

6    BY MR. STRIANSE:

7    Q.   And what is this note?

8    A.   That's the note from the visit on January 17th, when she

9    came in.

10   Q.   Maccarone's still out on that initial --

11   A.   Yes.

12   Q.   -- illness?

13   A.   And then this was the -- again, this shows the 35

14   patients I had to see that day, that afternoon/evening.

15   Q.   Here you calculate the MME; is that right?

16   A.   150, yes.  It hasn't changed.

17   Q.   What's the significance of this panel, which you

18   highlighted?

19   A.   Well, this is the -- the discussion was inconsistent.  It

20   says, "Given counseling all her prescribed medications and to

21   not crush them up and put them in her urine."  And that's what

22   we just talked about.

23          Then she comes back in February of '19, and they had not

24   done an intervening prescription, so -- but Maccarone was out

25   sick, and I believe she got her medications.  You can kind of

1    go there.  I had, like, 29 patients, I think, that day to see,

2    in addition to her.

3    Q.   And you are seeing these patients in the afternoon; is

4    that right?

5    A.   Yes, starting around 4:00 in the afternoon, maybe 4:30.

6    Q.   And tell the jury how you would have spent your morning

7    of these days that you were coming into Maccarone's clinic.

8    A.   I -- if I was at -- at any of the -- at my clinic or the

9    other two clinics, what I was doing at that time was I was

10   seeing MME patients, new patients, and doing procedures.  So I

11   would be doing joint injections.  I would be doing facet joint

12   injections with fluoroscopy.  I would be doing that all day

13   long, probably seeing maybe 20 patients during that day doing

14   procedures on half of those, and then drive over to see this.

15   Q.   Let me show you this panel, March 24, 2019.

16        And this is a urine drug test; is that right?

17   A.   Yes.

18   Q.   For Ms. Waynick?

19   A.   Yes.

20   Q.   And what are we seeing here?

21   A.   That she had heroin in her urine, and -- and meth.  So

22   she saw me -- saw Maccarone that day.  I'm sorry.  Saw

23   Maccarone that day.  And he had -- he had access to that

24   result.

25   Q.   And then the next panel jumps to April the 18th of 2019;

1    is that right?

2    A.    Yeah.  I mean, yes.  That -- this is April of 2019.  He's

3    back seeing patients now.

4    Q.    And he's seeing Ms. Waynick on this day; is that right?

5    A.    Correct.

6    Q.    April 18th of 2019?

7          On that same day, April 18, 2019, when Maccarone is

8    seeing Ms. Waynick, what's the event that he thought was

9    significant on this panel?

10   A.    Well, the heroin and the meth.  And so he discharged her

11   on that date, April 18th of 2019.

12   Q.    And you made, in the footer here, a little note in red?

13   A.    Yes.  I was never told of the discharge.  And so there

14   would -- I was not aware of that urine test.  And I did come

15   in -- I did see her on -- a few days later, just to give her a

16   shot in her shoulder, but that was the only reason I was there

17   to see her that day.

18   Q.    That's April 23rd of 2019?

19   A.    Yes.

20   Q.    Cortisone shot?

21   A.    Yes.

22   Q.    Is that something that had been scheduled in advance?

23   A.    When I saw her as a patient previously, she would have

24   scheduled on that list of what patients who -- was agreed to

25   get an injection once she came back from being -- from

1   Maccarone being out sick.

2   Q.   This next urine drug test is May 20th of 2019.

3        Which doctor was seeing her on this day?

4   A.   Well, this was the one that was collected.  It was

5   collected on May 15th.  I'm not sure who saw her the day, but

6   it was available on May 20th.

7   Q.   And how does this test look?

8   A.   Well, it shows the gabapentin.  It shows the oxycodone.

9   It doesn't show the noroxycodone.  And there are a lot of

10  negatives on there.  There was -- I believe it was a -- the

11  quantity was not sufficient to test everything.  So it was

12  considered a failed urine test, but the sample is a very small

13  sample and was -- and a number of the tests had to be -- had

14  to be canceled.

15  Q.   And --

16  A.   But -- but that being said, I was not happy with the fact

17  that it looked like she was possibly crushing her pills again

18  on that May 20th.  And so when I saw her, if you go to the

19  next note --

20  Q.   Before we leave this note, what does "oral fluid" mean?

21  A.   Okay.  So, again, this -- that does provide some -- some

22  question to the results, because as we discussed, the -- the

23  oral fluid test would be likely to show the oxycodone, but it

24  would be unlikely to show the noroxycodone, which is a

25  metabolite.  The oral test is better for testing for the

1  parent drug.

2  THE COURT:  We're pretty much at our lunch break,

3  Mr. Strianse.

4  MR. STRIANSE:  That's fine.

5  THE COURT:  All right.  It's 12:05 on my watch.

6  Let's take an hour and ten minutes.  Try to be back at 1:15 to

7  pick up with the proof.  Continue to abide by the same

8  restrictions you've been under.  No discussion, no research or

9  reading about the case.  Don't begin to form opinions or make

10 judgments until released to do so.  Appreciate your

11 flexibility and attention this morning.  I'll excuse the jury

12 now for the lunch break.

13  (The jury exited the courtroom at 12:05 p.m.)

14  THE COURT:  Okay.  The jury has exited.  Everybody

15 can be seated.  You can step down, Dr. Stanton.

16  All right.  Mr. Strianse, what kind of forecast can you

17 give me about the remaining duration of direct?

18  MR. STRIANSE:  Judge, I have four more exhibits that

19 are much shorter than the other ones we've been looking at.

20  THE COURT:  That tells me exhibit number.  It doesn't

21 tell me when I can expect you to --

22  MR. STRIANSE:  Well, probably 45 minutes maybe.

23  THE COURT:  Then how long do you anticipate your

24 other witnesses being?

25  MR. STRIANSE:  Very short.

1    THE COURT:  All right.  Can we get the case concluded

2    today, Mr. Smith?

3    MR. SMITH:  I think so.  Obviously, I'll sit down and

4    go through my notes and try to keep cross as tight as

5    possible.  It's just going to depend what's said in the next

6    section.  But I hadn't intended cross to take more than, you

7    know, 45 minutes to an hour.

8    Again, try to keep it tight for the others, if they're

9    short.  And then we would take up the issue of rebuttal, but

10   that would necessarily have to be constrained and shorter.  So

11   I still think we have a chance.  I guess we'll just -- you

12   know, but certainly it sounds like it's going to go into late

13   afternoon.

14   THE COURT:  Yeah.  I really want us to make a

15   stronger effort to get it concluded today.  Essentially, the

16   morning has been -- the direct has been elongated because

17   Dr. Stanton has repeatedly sort of delivered a narrative or a

18   soliloquy on various topics.

19   I'm letting him put his case on, but that's why it's

20   taken as long as it's taken.  And so that needs to be

21   tightened for the remaining 45 minutes of the direct

22   testimony.

23   And, Dr. Stanton, I'm not going to have you repeatedly

24   spouting hearsay to this jury.  And I've told you not to do

25   it.  I've admonished you not to do it.  I'm only going to get

1    more and more direct with the jury if you continue to go

2    outside what I'm telling you.

3        So on that witness stand, do not report what other people

4    have told you or what other people have said.  That's

5    typically hearsay.  If your lawyer has got a theory on it,

6    he's going to let me know.  But I'm telling you not to do it

7    in response to questioning.

8        Do you understand that?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  All right.  What else do we need to take

11   up at this point, Mr. Smith?

12           MR. SMITH:  Nothing, Your Honor.  Thank you.

13           THE COURT:  Mr. Strianse.

14           MR. STRIANSE:  Nothing, Your Honor.

15           THE COURT:  Now, that other thing on these packets.

16   So I understood them to be excepts from the medical records.

17       Are those schedule pages from the medical record?  Are

18   they from some other source in the discovery?  What would you

19   say about that?

20           MR. STRIANSE:  Judge, let me make sure I'm on the

21   same page with you.  What number are you referring to?

22           THE COURT:  Well, I don't have an example, but when,

23   for example, Dr. Stanton will say, "Well, there's a page that

24   shows I had 37 patients that afternoon," or, "There's a page

25   that shows I had" -- okay.  Here is an example.  In Exhibit 3,

1   this kind of page.  I just want to know where it comes from.

2   Is that part of the medical record?

3           MR. SMITH:  It comes from the discovery.

4           THE COURT:  Okay.  But it's not in the underlying

5   medical record.  It's a different source.

6           MR. STRIANSE:  Let me double-check that.

7           THE COURT:  Okay.

8       (Off-the-record discussion.)

9           MR. STRIANSE:  It's not in the four corners of the

10  medical record.  We had it in there to show how many patients

11  he was seeing that day.

12          THE COURT:  Okay.  And I assume it's not in the

13  packet of -- what would the -- I forget what the staff called

14  them.  The schedule sheets or something?

15          MR. SMITH:  Yeah, the appointment list.

16          THE COURT:  Appointment list?

17          MR. SMITH:  Such as, if it helps, my perspective is,

18  there are a couple of dependent exhibits they have.  Like at

19  Exhibit 6, for instance, if you look at that.

20          THE COURT:  Yeah.

21          MR. SMITH:  Just I think this -- a similar document,

22  the same document.  Those are from discovery.  You can see the

23  Bates numbers down at the lower right.

24          THE COURT:  Right.

25          MR. SMITH:  The other ones are kind of truncated or

just excerpts.  I can't always see a Bates number.  I confess
I have not one-to-one compared, but I assume they're coming
from the discovery, just -- but not within the record.  Those
are -- there are documents we collected, physically hard copy.
These are from the search warrant.  That's what you're holding
there.  And the medical records obviously came from Quest, the
EMR system.

        THE COURT:  Right.

        MR. SMITH:  I think what they did is took it from the
discovery.

        THE COURT:  Yep.

        MR. SMITH:  And put that -- spliced it in there.

        THE COURT:  Okay.

        MR. SMITH:  Counsel can confirm that.

        THE COURT:  So I haven't admitted any of that.  I
mean, I'm okay as long as the government -- these are just
demonstrative, but I have told the jury everything is already
in the record and you're just -- you're using things from the
record.  If they're not in the record, A, I want to be able to
say that; and, B, the government may have a problem with you
using and displaying it if it's not in evidence.

    So I would just give some thought to that.  I didn't
realize it until we were midstream that that category existed
or that there's summary charts within the exhibits that
Dr. Stanton has created.  That's a different category, of

1    course.

2            MR. STRIANSE:  He did not create this.

3            THE COURT:  I know not that one, but there was one he

4    did create --

5            MR. STRIANSE:  Yes.

6            THE COURT:  -- on the comparative drug test.  So

7    let's just be careful and rigorous on that process.

8        All right.  Anything else, Mr. Smith?

9            MR. SMITH:  No, Your Honor.

10           THE COURT:  Mr. Strianse.

11           MR. STRIANSE:  No, Your Honor.

12           THE COURT:  Okay.  We'll be in a break until 1:15.

13       (Luncheon recess at 12:11 p.m.)

14                              - - -

15                   C E R T I F I C A T E

16           I, KIMBERLEY ANN KEENE, RMR, certify that the
     foregoing is a correct transcript from the record of
17   proceedings in the above-entitled case?

18

19   /s/ Kimberley Ann Keene, RMR          December 8, 2022
     KIMBERLEY ANN KEENE, RMR              Date of Certification
20   Official Court Reporter

21       (Proceedings continued at 1:15 P.M.)

22           THE COURT:  All right.  Thank you.  We're reconvened

23   with all parties present outside the jury's -- or outside the

24   presence of the jury.

25       Anything to take up, Mr. Smith?

1    MR. SMITH:  No, Your Honor.

2    THE COURT:  Mr. Strianse?

3    MR. STRIANSE:  No, Your Honor.

4    THE COURT:  Okay.  Let's bring them in.

5        (Jury present.)

6    THE COURT:  Good afternoon, ladies and gentlemen.  I

7    appreciate your timely return from lunch.  I hope you had a

8    good lunch break.  We're going to continue with the defense

9    case.

10       Dr. Stanton, you can return to the witness stand.

11       Sir, you understand you are still under oath?

12       THE WITNESS:  Yes.

13   BY MR. STRIANSE:

14   Q.  Good afternoon, Dr. Stanton.

15   A.  Good afternoon.

16   Q.  When we -- is the jury still seeing this?  Could we --

17   when we left, broke for lunch, this was a urine drug test that

18   you had just identified; is that right?

19   A.  Yes.  This is an oral sample, and we're looking at the

20   results of that.  And there was a concern that oxymorphone was

21   not present and that oxycodone was not present.  And we talked

22   that sometimes metabolites should not be present but the

23   oxymorphone should be present.

24   Q.  The next visit, June 17th of 2019, there was an in-house

25   UDS.  Is that what's reflected on this panel?

1    A.   Yes.

2    Q.   And what are those results?

3    A.   Well, those results appear to be good.  It shows the

4    benzos and the oxycodone.  Again, we have to question whether

5    the metabolites are there.  And we don't know that based on

6    that test.

7    Q.   Anything out of the ordinary, given her history for a

8    benzodiazepine to be in that presumptive test?

9    A.   No.

10   Q.   This next panel, June 17, 2019, you have made a notation

11   that Maccarone was out; is that right?

12   A.   Yes.

13   Q.   And she is back to Gateway to -- for what purpose?

14   A.   To get her medications.

15   Q.   And meets with you?

16   A.   Yes.

17   Q.   What's significant about this next panel?

18   A.   Well, a couple of things.  We have lowered her MME a

19   little bit.  She's still getting the same medications.  And I

20   believe, if you go to the next page, it will show that we went

21   ahead and discharged her.

22   Q.   And what was the reason for discharging her on June 17,

23   2019?

24   A.   Because this is the second time that she had an aberrant

25   urine test, and it was -- it was becoming uncomfortable to

1   continue giving her medications with -- with those findings at

2   that time.

3   Q.   And she was discharged from GMA.  Do you know where she

4   went to next for treatment?

5   A.   If you go to the next page, please, I think.  So there's

6   a note that says that she was dismissed on June 17th.  And

7   then the next page, she ended up going back because, as was

8   his policy, if they are discharged, they go back for a second

9   visit, make sure they found a place to go.  Saw Dr. Maccarone,

10  and he eventually discharged her, and she ended up coming

11  to -- okay.  You can stop -- you can stop there for a second.

12  That's 2019.

13       So, again, he discharged the patient due to the

14  inconsistencies, and here is her last visit.

15  Q.   And you've got a little footer there "discharged after

16  four months"?

17  A.   Yes.  I discharged her back in June, I guess it was.

18  Maybe it was May, May or June.  And he continued to see her

19  for three more months even after -- even though I discharged

20  her and talked to him about the fact that she needed to be

21  discharged.

22       Now --

23  Q.   What is this?

24  A.   This is -- this is a CSMD for a year later.  This is

25  September 1st of 2020.

1    Q.   And is she back at GMA?  Where is she now?

2    A.   Now she is back at GMA.

3    Q.   Where had she been in between her two GMA stays?

4    A.   So what happened was she ended up coming to my clinic,

5    which is almost next door, and was admitted and was seen there

6    for approximately 12 months, maybe 11 months.  Twice

7    appointments were made for her to see me as a new patient for

8    an MME visit, and she canceled one and no-showed for the

9    other, but she was a good patient.  All her urine tests were

10   good.  There were no problems until the very last -- the last

11   visit.  I believe it was August of 2020.  She had heroin in

12   her urine and was discharged.

13   Q.   And who was the provider that was seeing her at Joint and

14   Spine Clinic?

15   A.   It was a nurse practitioner named Leslea Streetman.

16   Q.   Did the nurse practitioner discharge her?

17   A.   Yes.

18   Q.   Back on these panels, September the 8th of 2020, what is

19   this that we're seeing?

20   A.   Well, she's back for a new patient visit, and she's back

21   to see me.  And the last time I had seen her was in the summer

22   of 2019.  So she's being readmitted, and I happened to be the

23   person to see her when she came back to be seen.

24   Q.   So this is over a year later that you are seeing her?

25   A.   Yes.  And that's her physical exam and discussion of her

1   medical problems, and her medications.  At that point --

2   Q.   What is her --

3   A.   At that point we -- when we readmitted her, we had her on

4   a lower MME.  We had her on the lower MME at my office.  And

5   when she came back to see us, based on that, we had her at an

6   MME of 105.

7   Q.   And relatively speaking, is that a low MME?

8   A.   It's below the 120 cutoff, and it was considered to be

9   appropriate.

10  Q.   And what are we seeing on this panel?

11  A.   These are the medications we gave her -- that I gave her

12  that first return visit.

13  Q.   And what is reflected on this panel, September 4th of

14  2020?

15  A.   Okay.  This is actually -- this is the end of that note

16  from that first return visit.  She had had a urine test done

17  on September 4th, and we've already gone past that.  But that

18  urine test showed a couple of abnormalities, and that was

19  not -- that urine test result was not made available to me

20  three or four days later when the patient came in to be seen

21  for that first return visit.  So I didn't have a chance to

22  look at that note -- sorry -- at that urine test.

23       And this is the note at the end of that visit, and there

24  was -- if you look at the fourth line down from the top, it

25  said, "Performed urine drug screen in office today," and

1  that's the drug screen I believe you saw, but I did not have

2  access to UDT.  That was not made available.  And actually I

3  didn't see that result until the following visit.

4  Q.   When you were at Gateway Medical Associates, did you have

5  concerns that you were not seeing every confirmatory urine

6  drug test?

7  A.   I did.  I actually brought it to the -- there was a

8  situation where Emilie -- this is -- this was in about the

9  summer of 2020, I believe, or earlier in 2020.  I can't

10  remember exactly when she brought me a urine drug test result

11  from a previous patient that was abnormal, and I became upset

12  about it because I hadn't seen that urine drug test result.

13      And I spoke to her and to Maccarone about it, and I said

14  I felt like these are being hidden from me and that wasn't

15  good.  I needed to see every UDT in there, and I expected that

16  when I got the chart that they would all be in there.  But I

17  was presented -- I was presented a UDT several months after a

18  patient had been there.  I'm not sure why she showed it to me.

19      I think there was a patient being discharged and she was

20  confirming that with Maccarone to discharge the patient, and I

21  hadn't seen the UDT.

22  Q.   Did those concerns linger even after that date?

23  A.   Yes.

24  Q.   What are these notes?

25  A.   These are the notes from the physical exam when I saw the

1    patient the first visit on September 8th.

2    Q.   And what is this?

3    A.   I gave her a prescription.  We talked about her back was

4    hurting; so I gave her a prescription for a brace.

5    Q.   Again, you don't know if she actually filled that

6    prescription?

7    A.   No.  But then -- these are the papers I have to fill out

8    when they come in as a new patient or the once-yearly visit

9    for their understanding of their responsibilities and the

10   risks and benefits of narcotics.

11   Q.   So those are those initial forms that a new patient or

12   returning patient --

13   A.   Yes.

14   Q.   -- would complete at GMA?

15   A.   Yes.  Yes.

16   Q.   And this CSMD, what is this telling us?

17   A.   This is from the last visit I had with her, and if you

18   look closely at that time, at the bottom, the first three

19   medications listed there were the ones that I gave her when

20   she came to see me that has my DEA number under prescriber.

21        The two bottom ones are the ones she received prior to

22   coming to see me, my nurse practitioner.

23   Q.   Here is something from October 6, 2020.  What is this in

24   her chart?

25   A.   This is my last visit with the patient.

1    Q.   And what was her MME at that last visit?

2    A.   I kept it at the same.  It was 105.

3    Q.   What is this panel?

4    A.   You haven't seen very many of these.  We didn't include

5    most of them.  But this is just an example of one of the lab

6    tests that we would have done when they came in, checking her

7    blood sugar.  She was diabetic, and we were checking her blood

8    sugar.

9         We were not treating her blood sugar, but we wanted to

10   know what it was.

11        The reason she came in October 6th, after I had just seen

12   her, is because she was there to get an injection in her left

13   sacroiliac joint, in the ligaments we spoke of earlier.

14        Otherwise, I would not have seen her that visit.  But

15   because I was seeing her, they went ahead and had me give her

16   her medications also.

17   Q.   And did you give her an injection that day?

18   A.   I did, in the ligaments, the tendons and the -- I believe

19   the left side of her sacroiliac joint.

20   Q.   That's what's reflected here?

21   A.   Yes.

22   Q.   And then this is the informed consent for the injection;

23   is that right?

24   A.   Yes.  That's the last I saw of her.

25   Q.   When you say that was the last that you saw of her, was

1   she ultimately discharged?

2   A.   I don't know because shortly after that I resigned as

3   medical director.

4          MR. STRIANSE:  May I approach Dr. Stanton?

5          THE COURT:  You may.

6   BY MR. STRIANSE:

7   Q.   Dr. Stanton, let me show you a demonstrative exhibit that

8   we have marked as Exhibit A.

9   A.   Yes.

10  Q.   And what is that?

11  A.   This is a summary of the events that occurred with

12  regards to Misty Brown.  Without going through the lengthy

13  records, this is a summary.

14  Q.   Is this a summary that you prepared?

15  A.   I did.

16  Q.   And will this summary assist you and the jury in

17  navigating through Misty Brown's chart?

18  A.   Yes.

19         MR. STRIANSE:  Your Honor, may I use this as a

20  demonstrative exhibit?

21         THE COURT:  Any objection?

22         MR. SMITH:  Yes, Your Honor.

23     (Sidebar conference.)

24         THE COURT:  Can you hear me, Mr. Strianse?

25         MR. STRIANSE:  Yes.

1          MR. SMITH:  Your Honor, I don't mind him using it as

2     a guide for his testimony, having it in front of him.

3          If you turn to page 2 of the exhibit, down at the bottom,

4     there's a representation, which I presume is the defendant's

5     that says, you know, I discussed abnormal urines with

6     Maccarone, he said he would discharge her the next visit.

7          That's his factual representation and also a reference to

8     what Maccarone supposedly said.  That's not a demonstrative.

9          THE COURT:  I tend to agree.  I will let him have it

10    in front of him but not display it to the jury.

11         MR. STRIANSE:  Yes.

12    (Sidebar conference concluded.)

13         THE COURT:  I'm going to let the witness use it

14    during his testimony, but I'm not going to have it displayed

15    to the jury.

16         MR. STRIANSE:  May I have one moment, Your Honor?

17         THE COURT:  Yes, you may.

18         MR. STRIANSE:  May I return this to Dr. Stanton?

19         THE COURT:  Yes, you may.

20    BY MR. STRIANSE:

21    Q.   Dr. Stanton, how did you prepare that summary chart?

22    A.   By using the information from -- directly from the

23    medical records.

24    Q.   What sort of events were you trying to capture on that

25    summary?

1   A.   Misty Brown was presented earlier last week as a patient

2   who had a number of failed urine tests and received

3   medications anyway, and I was wanting to present this to show

4   what my thinking and my logic and my reasons were to give her

5   medications in spite of those, quote, failed urine tests.

6   Q.   Why don't you take us through each event and the results

7   of those tests.

8   A.   I will.

9        So Misty Brown was seen -- I'm sorry.  Misty Brown was

10  seen in December of 2019, and she had a urine drug test, a

11  confirmatory test done.  And that showed oxycodone,

12  oxymorphone, and GABA, which is all good, but it was negative

13  for phentermine.  Phentermine is similar to Fen-Phen.  It's a

14  weight-loss medication.  It's an amphetamine, and it's not

15  something that I was particularly happy that she would be

16  taking because it does have side effects, but she was on

17  phentermine.

18       So in this particular lab test -- it came to us on

19  December the 6th -- it did not have any of the phentermine in

20  there, in her urine.

21       I was fine with that.  I would prefer she wasn't taking

22  the phentermine.

23       She had a urine drug screen on January 2, 2020, and at

24  that time it showed oxycodone.  So that was a good urine drug

25  screen.  And she saw me on January 2nd for the purpose of an

1  MME visit as well as to get her medications.

2       So I went through the whole process with the MME visit,

3  talked to her, talked to her about her weight loss medicine,

4  and went ahead and gave her her medications because that

5  failed drug test was really not a concern to me.

6       Then she came back January 30th and saw Maccarone.  He

7  gave her medications.

8       February 28th she saw Maccarone.  He gave her

9  medications.

10      March -- the results of the urine drug tests from

11  February 28th came back positive for oxycodone, oxymorphone,

12  GABA, and fentanyl, which she should not have had in her

13  urine.

14      Now, fentanyl, again, in this case, she had all of the

15  medicines she was supposed to have, but additionally she had

16  fentanyl.

17      So the question would be was she taking that because she

18  was getting insufficient pain relief?  I don't know.  But I

19  saw her on the 30th of -- of March, and that result was from

20  the previous month.  So when she came in to see me on the 30th

21  of March, she was there for a shot and to get her medications,

22  and at that time I went ahead and gave her a shot in her

23  shoulder, and I reduced her medications because of the failed

24  urine test and gave her counseling.

25      She came back April 28th to get her medications, and

1   the -- she had a urine drug test that time that showed the

2   possibilities of meth.  And the reasons I say "possibilities"

3   is because phentermine is an amphetamine and methamphetamine

4   is also an amphetamine, and I felt it was possible that this

5   time she had taken her phentermine but it showed up as meth

6   instead of phentermine.

7        So we talked about that and gave her her medications and

8   discussed that she better not be taking meth.  She came back

9   May 29th of 2020 to see me to get her meds, and now we had a

10  similar result we had before.  She had the Oxy, she had the

11  GABA, she had the oxymorphone, but she didn't have the

12  phentermine, and she didn't have the meth either.  So that to

13  me kind of confirmed that the meth may have been representing

14  the phentermine she was taking.  And, again, I wasn't

15  concerned about the phentermine not being taken.

16       She came back again in -- let's see.  So that was May

17  29th.  She came back again on July 2nd and saw Maccarone, and

18  when Maccarone saw her, again, she did not have the

19  phentermine in her system, and he gave her medications.

20       Then on July 23rd, there are hospital records that show

21  she had been admitted to the hospital for an overdose.  And

22  then Maccarone saw her again August 7th.  So he saw her before

23  and after the overdose.

24       Now, I don't know -- no one told me about the overdose.

25  That wasn't mentioned to me.  There was a time gap I wasn't

1    seeing the patient.  And, honestly, I don't know if he knew

2    there was an overdose.  There's no -- I'm not sure there is a

3    requirement the hospital has to call the medical clinic where

4    the patient is getting the medications and say, "Hey, did you

5    know that the patient had an overdose?"  But regardless that

6    was an event that I know I didn't know about.  It was during a

7    time when Maccarone was seeing her.

8         She came back to see me September 1st of 2020 to get a

9    shot and medications, and I gave her an injection in her neck.

10   But the urine had been done just prior to that, so the Oxy,

11   the oxymorphone and GABA and now it showed the meth again.

12        So this was really a problem with me, and I wanted to

13   discharge her.

14        Maccarone happened to be in the office.  I discussed it

15   with him, and he assured me that --

16             MR. STRIANSE:  Let's not get into what Maccarone

17   said.

18             THE WITNESS:  Anyway, we had a discussion, and it was

19   decided he was going to discharge the patient.  So she came

20   back October 2nd, her next visit.  We tested her that visit

21   when I saw her.  She came back -- that urine test again came

22   back with meth, and then on October 2nd, Dr. Maccarone

23   discharged the patient.

24        And the reason I wanted to go through this is this

25   patient had basically six or seven urine -- failed drug tests,

1    but she got her medications in every case.  And I wanted to

2    explain the reasoning why she got her medications.

3              MR. STRIANSE:  Your Honor, may I approach

4    Dr. Stanton?

5              THE COURT:  You may.

6    BY MR. STRIANSE:

7    Q.   Dr. Stanton, let me show you what's been marked for

8    identification as Defendant's Exhibit 4.  It's another

9    demonstrative exhibit.  I want to ask if you recognize that.

10   A.   Yes.

11   Q.   And what is it generally?

12   A.   It is the -- a list of one patient, Jonathan Pooler.  The

13   final note on each visit shows what the MME was doing on this

14   patient over a series of several months.

15   Q.   And where did we get the records to make this

16   demonstrative exhibit?

17   A.   They were in the discovery.

18             MR. STRIANSE:  Your Honor, with the Court's

19   permission, I would like to show it to Dr. Stanton and publish

20   it to the jury.

21             THE COURT:  Yes.  Similar to the other patient

22   compilations, I will let you use Exhibit 4 as a demonstrative

23   exhibit.

24        It will not be admitted into evidence, but I will let the

25   jury see it.

1    The source merely is the underlying medical records for

2    Pooler.  Mr. Pooler's, I believe, are at Exhibit 109, which is

3    admitted into evidence.  You can certainly consult that as

4    needed.

5         The markings, highlights, any commentary within Exhibit 4

6    are defendant's commentaries; so be aware of that.

7         Proceed.

8              MR. STRIANSE:  Thank you.

9    BY MR. STRIANSE:

10   Q.   Dr. Stanton, can you see that?

11   A.   Yes.

12   Q.   And you have highlighted a portion at the bottom of this,

13   and it has that language about gradually tapering; is that

14   right?

15   A.   Yes.  So this is in March of 2018.  I don't believe I was

16   associated with the practice at that time.  This is before I

17   returned back to the practice in the summer of 2018.  And what

18   the note says is that, due to the fact his MME is 59, we are

19   not gradually tapering his medications.

20   Q.   And that first one was March 2nd.  He's back seeing

21   Dr. Maccarone on March the 30th; is that right?

22   A.   Right.  So he returns on March 30th, 2018, and now the

23   MME is 135.

24        So the note says that we're gradually tapering the

25   medications.  But, in fact, in the interim Maccarone has

1   raised the medications.

2   Q.   Raised from the CSMD report that reflected 59 to -- on

3   March 2nd, 2018, to 135 just weeks later; is that right?

4   A.   Yes.

5   Q.   What are we seeing on this next screen?

6   A.   So this is April 26th.  Again I was not there at the

7   time.  But the number was raised up to 150.  But it says that

8   they are gradually tapering his medications.

9   Q.   Does it look to you as if they are gradually tapering the

10  medications?

11  A.   It does not.

12  Q.   Were you aware of this as it was happening back in the

13  spring of 2018?

14  A.   No.  I'm not even sure I was associated with the clinic

15  at that point.

16  Q.   Take a look at the next panel dated May 24, 2018.  What's

17  going on with this patient at that visit?

18  A.   Well, he's at MME of 150, and again it's being tapered.

19  Q.   At least that's what the chart says?

20  A.   Yes.

21  Q.   And then on June 21, 2018, what's the activity?

22  A.   Same thing.  MME is staying at 150, but it says it's

23  being tapered.

24  Q.   July 19th of 2018, what's going on with Mr. Pooler?

25  A.   By this time I was back at the clinic, or close to being

1    back to the clinic, and now the patient is up to 180, and the

2    MME is gradually being tapered, but it really isn't.

3    Q.   And, again, were you aware of this activity?

4    A.   No.

5    Q.   Take a look at this next one, August 17, 2018.  What's

6    going on here?

7    A.   Well, now the MME is up to 225, but it still says we're

8    gradually tapering the medications.

9    Q.   And who is the provider for all of these?

10   A.   Maccarone.

11   Q.   Were you aware that he had gone to 225?

12   A.   No.

13   Q.   Take a look at September 14th of 2018.  What's going on

14   with Mr. Pooler on that visit?

15   A.   Now it's at 195.

16   Q.   So it's been reduced slightly?

17   A.   Yes.

18   Q.   October 12th of 2018, is it staying steady at 195?

19   A.   Yes, but it says it's being tapered.

20   Q.   And the last page is November the 8th, 2018.  What's

21   going on with Pooler on that date?

22   A.   It was still at 195, although it says it's being tapered.

23   Q.   Were you aware they were using that language and

24   recycling it, "tapering medications"?

25   A.   The only way that I would have been able to determine

1    that would have been if I had gone into every patient record

2    and looked at a series of -- of office visits and calculated

3    out what the MME was over a period of time on every patient

4    that he had to determine if that was being done.

5    Q.   Would that be beyond the scope of what a medical director

6    would be expected to do?

7    A.   Yes.

8    Q.   Give the jury some idea of how labor intensive it would

9    be to go into every chart and calculate the MME.

10   A.   Well, you have 500 patients, and if I just did a random

11   selection, I might not find anything, and if I did, now I'm

12   obligated to go through every chart to see what's going on,

13   and it's very onerous.  You have to go into each note.  You

14   can't just rely on the CSMD, as we've already seen.  So I

15   would have to go into each note and calculate it out based on

16   oxymorphone.  The patient is on -- taking 90 milligrams of

17   oxymorphone.  You divide that by 30 because sometimes you

18   could be on oxycodone, be 95 pills, they'd get 100 pills or

19   105 pills.  You got to divide by 30.  You get a number.  And

20   you multiply that by the milligram dosage the patient is

21   getting.  Say it's 15.  And then you have got to multiply that

22   times 1.5, and that gives you the MME for oxymorphone.

23       I'm sorry.  You have to multiple it by three for

24   oxymorphone.

25       For oxycodone you have to do the same thing.  If the

 1    patient had -- say you had 55 oxycodone for the month.  You'd

 2    divide that by 30.  Multiply it times the dose.  It's 10.

 3    Multiply that by 1.5.  That gives you the MME for oxycodone.

 4         You have to add the two to figure out what the MME is.

 5         So it would take a couple minutes to do each one.  And

 6    then -- then you have got to go to the next chart back, the

 7    next chart back, the next chart back and see what the -- what

 8    the status of the MME is.

 9         At that point, if you are going to do that, you might as

10    well be writing a log out what every MME is on every single

11    patient over a timeline and then compare that to what's being

12    said, and you would realize that what was being put in there

13    was very confusing.

14         If I'm going back and looking at a note on a patient

15    because it's the first time I'm seeing a patient and I'm

16    giving a refill because Maccarone is out of town or sick or

17    whatever reason, I look at the note, and it says, MME is 180;

18    it's being gradually reduced.  I'm thinking, okay, it's being

19    reduced.

20         But in actuality, I would have had to have gone through a

21    series of those and calculate out what the MME is to see if it

22    was actually being done.

23         And I -- it was very confusing to me, and I kind of

24    theorized it as being done to look good for the state when the

25    state did their inspections.

1    Q.   Dr. Stanton, let me show you a government exhibit that's

2    been received in evidence -- it's Exhibit 504 -- and ask if

3    you recognize this exhibit.  It's titled, "Summary Opioid

4    Increase Or Decrease."  The bottom of the page reflects it's

5    Government's Exhibit 504.

6         Do you remember this exhibit?

7    A.   No.

8    Q.   Do you remember it being offered?

9    A.   Yes.

10   Q.   Let's just go through it.  It reflects information

11   regarding your prescribing practices in relation to several

12   patients at GMA.

13        MR. SMITH:  Your Honor, can we confer on this?

14        (Sidebar conference.)

15        THE COURT:  Can you hear me, Mr. Strianse?

16        MR. STRIANSE:  Yes.

17        MR. SMITH:  Your Honor, this exhibit was never

18   admitted into evidence.  It was just referenced as if it was.

19        THE COURT:  Is that right?  I don't have it in front

20   of me.  Okay.  It's not admitted.  It was -- it wasn't

21   displayed?

22        MR. SMITH:  It wasn't displayed.  Our folks prepared

23   it, but he's not the witness to talk through that summary.

24        THE COURT:  Okay.

25        MR. STRIANSE:  Forgive me.  I didn't hear what he had

1   said a moment ago.

2       It was not admitted?  Not offered?

3           THE COURT:  That's right.

4           MR. STRIANSE:  Okay.

5       (Sidebar conference concluded.)

6   BY MR. STRIANSE:

7   Q.   Dr. Stanton, there's one last exhibit that I would like

8   to show you.  You were here in the courtroom last week, were

9   you not?

10  A.   Yes.

11  Q.   And you remember that the government played a recorded

12  interview of you, I think, roughly March of 2021.  Does that

13  sound familiar?

14  A.   Yes.  It was about six months after I had resigned and

15  was shortly after I believe he was -- his clinic was shut

16  down.

17  Q.   And just to reorient the jury, this was a recording that

18  was made by Diversion Investigator Sizemore; is that right?

19  A.   Yes.

20  Q.   And were you expecting a call from DI Sizemore on that

21  day?

22  A.   No.

23  Q.   Just sort of a call out of the blue?

24  A.   Yes.

25  Q.   And do you remember talking to Mr. Sizemore that day?

1   A.   With difficulty.  I had very bad laryngitis.

2   Q.   It was a pretty long conversation; is that right?

3   A.   It certainly was.

4   Q.   What was your attitude as you were talking to

5   Mr. Sizemore?

6   A.   I was trying to give him an honest answer on everything

7   that he asked.  I didn't feel I had anything to worry about.

8   Q.   Did you try to answer truthfully all of his questions?

9   A.   Yes.

10  Q.   Now, we heard segments of the recording last week; is

11  that right?

12  A.   Yes.

13  Q.   And we were also provided with transcripts of that long

14  recording; is that correct?

15  A.   Yes.

16  Q.   Did you identify a few panels of the transcript that we

17  would like to just quickly go through with the jury?  Is that

18  right?

19  A.   Yes.

20  Q.   And what I'm going to ask you to do is not to read this

21  into the record but take a moment.  And this is --

22         MR. STRIANSE:  Your Honor, can I approach

23  Dr. Stanton?

24         THE COURT:  Yes.

25  BY MR. STRIANSE:

1   Q.   Let me show you this exhibit.  It's been marked for

2   identification as Defendant's Exhibit 10.

3   A.   Yes.

4   Q.   What is this?

5   A.   This was a transcript that was provided to us of my

6   conversation with Sizemore, and this is not a summary.  This

7   is the actual transcript of what I said word for word.

8   Q.   And have you altered the government's transcript in

9   anyway?

10  A.   No.

11       MR. STRIANSE:  Your Honor, we would offer Defendant's

12  10.

13       MR. SMITH:  Your Honor, the audio recording is in

14  evidence.  I don't think we -- we need to go on the headphones

15  for this probably.

16       THE COURT:  Yes, we do.

17  (Sidebar conference.)

18       THE COURT:  So is this based on the subtitles?

19       MR. STRIANSE:  Yes.

20       THE COURT:  Is it kind of from the same source?

21       MR. STRIANSE:  I don't have to offer it.  I could

22  show it to him, and we could get at it that way.

23       THE COURT:  Yeah.  I did not admit the subtitles.  I

24  specifically told the jury the evidence is the tapes, not the

25  transcripts.  So those are not in.

1      I think if you want to let him have this in front of him

2    and -- I'm okay with him having it in front of him.  And you

3    can ask him about the conversation, and he can clarify.  But

4    putting the transcripts in, I have not done that and would not

5    intend to do that.

6          What's your view, Mr. Smith?

7          MR. SMITH:  It's the same.  I think the instructions

8    are pretty clear that the transcripts are -- you know, they

9    are our best effort to summarize, but we have been very clear

10   with the jury that the hearing of it contemporaneous needs to

11   control.  So you can't separate and admit is it as an exhibit.

12         THE COURT:  I think you can place it in the

13   conversation with him and let him explain what you want him to

14   explain, but I'm not going to admit them as exhibits -- I'm

15   not going to admit them into evidence.

16         I do think, Mr. Smith, if he wants to display it so the

17   jury can see what they are talking about, I'll just tell them

18   it's another version of the subtitles.  I think it's okay for

19   them to see it.  Do you agree with that?

20         MR. SMITH:  I guess the difficulty is they are not at

21   the same time listening to it.  And they have been told it's

22   their listening that needs to be controlling.

23         THE COURT:  Are these parts that they heard the other

24   day?

25         MR. STRIANSE:  Some were but not all.

1      THE COURT:  Okay.  Well, that's probably a fair

2  point.

3      What do you say to that?

4      MR. STRIANSE:  I mean, I understand what they are

5  saying about not having the contemporaneous playing of the

6  recording.  I'm just trying to think of a noncumbersome way to

7  do this.

8      Let me just ask him some direct questions about it and

9  see how that works.

10      THE COURT:  Okay.

11      (Sidebar conference concluded.)

12  BY MR. STRIANSE:

13  Q.  Dr. Stanton, let me ask you some questions about the

14  recording excerpts that some of these were not played and see

15  if -- what your recollection is of the conversation and what

16  your intent was in describing certain things to Special Agent

17  Sizemore.

18      Did he ask you about what your practice was when you

19  would review a patient's file?

20  A.  Yes.

21  Q.  And do you remember what you told him?

22  A.  I don't have the paperwork that -- in front of me to look

23  at.  But as I recall, I told him that I had the file to look

24  at, which included the CSMD, the medication prescriptions, the

25  urine test results that had been placed in there.

1    Q.   Would it help refresh your recollection to take a look at

2    the transcript?

3    A.   Yes.

4         MR. STRIANSE:  May he use it to refresh his

5    recollection?

6         THE COURT:  Yes.  Yes.

7    BY MR. STRIANSE:

8    Q.   Dr. Stanton, the easiest way for me to do this is to give

9    it to you a page at a time, if that's all right.

10   A.   All right.

11   Q.   Take a look at that.  Read that to yourself.  And let me

12   know if that helps refresh your recollection.

13   A.   Yes.

14   Q.   What do you remember telling Agent Sizemore about your

15   interaction with patients?

16   A.   That I would look at the CSMD, the KASPER, the urine

17   results and then prescriptions.  I told him that the

18   prescriptions were all -- there was no electronic prescribing

19   at Maccarone's office.  Other clinics use electronic

20   prescribing, but it was not required or mandated at that

21   point.  So all the prescriptions were typed up and ready to

22   go.  And I would go through those and make sure that they

23   were -- that they were correct, with the understanding that

24   these were the same medications that they had been on before

25   perhaps at a lower level.

1    Q.   Do you remember in this interview that Investigator

2    Sizemore conducted with you that he asked you about whether

3    there was a requirement that patients had to have an

4    injection?

5    A.   Not on this particular page.

6    Q.   No.  I know that.

7    A.   Okay.  Yes, he did ask me if there was a requirement that

8    they had to have an injection.

9    Q.   Would it help refresh your recollection to take a look at

10   the next page?

11   A.   Sure.

12   Q.   If you would read that to yourself and see if that

13   refreshes your recollection of what you told him on that

14   topic.

15   A.   Basically this was a reiteration of what I said before,

16   which was I think the patient should try an injection at least

17   once if they hadn't tried it before.

18        I also discussed the patient who had come back, had an

19   injection on the -- both sides of the neck, but it made him

20   feel dizzy and lightheaded.  So we discussed the next time

21   we'd just do it on the one side; we didn't have to do it on

22   both sides at the same time.  And I discussed -- I felt it was

23   reasonable that -- hence the state mandates, that we have

24   alternative treatments that we try an injection at least once.

25   Q.   Do you remember having a conversation with Investigator

1    Sizemore about rescheduling visits for injections?

2    A.    Yes.

3    Q.    Would it help refresh your recollection --

4    A.    In that case I don't need to.

5    Q.    Okay.

6    A.    What I had said was that it was upsetting to me that I

7    would -- for example, that day that I was talking to him that

8    they had scheduled 12 patients for me to do injections and

9    only four had shown up.  So there was eight patient slots that

10   were no longer available for other patients.  This was during

11   a period of time when I wasn't there all day long.  I was just

12   coming in to do those injections and see MME patients and

13   write prescriptions for the patients because, after -- after

14   the first time of him being out, they kind of had me writing

15   prescriptions for everybody if I saw them so they wouldn't

16   have to wait -- wait around to see Maccarone.

17        And so there was a paucity or there was a -- two-thirds

18   of the patients hadn't shown up, and I suggested that I felt

19   that, not only should those patients pay a no-show fee for

20   missing an appointment, but if they are not going to comply

21   with an injection that they had agreed to get, after

22   discussion they had agreed to get that, the MME should be

23   lowered somewhat.

24   Q.    Do you remember Investigator Sizemore asking you

25   questions about patients traveling from the state of Kentucky

1   to Tennessee?

2   A.   I said yes, I knew there were patients coming from

3   Kentucky.  He asked me how many.  And I said I thought maybe

4   about a quarter of the practice, and he was surprised by that

5   answer.  And I said, as far as I know.  I don't know exactly

6   how many people are coming from Kentucky.  There is no way --

7   there's no reason I would be keeping track of that, what

8   percentage of patients are coming from different areas.  But I

9   thought maybe about a quarter of the patients were coming from

10  Kentucky and that some of them were traveling 100 miles or

11  maybe two or three hours of travel time.

12  Q.   Do you remember him asking you about pill counts?

13  A.   Yes.

14  Q.   Do you remember the response that you gave?

15  A.   Maybe if you have me look at that again real quick.

16        MR. STRIANSE:  May I approach Dr. Stanton?

17        THE COURT:  You may.

18  BY MR. STRIANSE:

19  Q.   Take a look at these three pages and read them to

20  yourself.

21  A.   So first thing you asked -- to finish up, he asked if

22  people are coming from Kentucky, and he asked about pill

23  counts, and we discussed -- he discussed if I had anything to

24  do with the policy.  I said, no, I did not have anything to do

25  with the pill-count policy other than confirming there was a

1    policy.  Maccarone had come up with that policy on his own,

2    and the pill-count policy, as we discussed already, says you

3    have to have three random pill counts a year or you may be

4    dismissed.

5        And I had expressed to Maccarone that, you know, how --

6    how are you going to do a pill count if somebody lives far

7    away?  He said, well, they can still go to a pharmacy, and the

8    pharmacist will take their pills and count them and then call

9    us and let us know what the pill counts are.  So they can do

10   it even though they live several hours away.  They don't have

11   to go to his office.  They can go to a pharmacy to do it.

12       And he asked -- and the other thing I expressed was that

13   there are ways around pill counts.  If you have -- if -- let's

14   say you are selling your drugs to someone and then, all of a

15   sudden, they have a pill count and you've just disposed of 50

16   pills, what do you do?  Well, you can go back to that person

17   and pay -- rent those pills back for a few hours to go have

18   your pill count done and then bring the pills back to that

19   person.  So there are ways around pill counts.

20       And -- and then he asked me if I had -- if I had ever

21   seen anybody discharged for a failed pill count, and I told

22   him that pill counts are done on a random basis.  A lot of

23   times they are done on days I'm not there and that I would not

24   necessarily know if someone had been discharged for a pill

25   count because I wouldn't see that patient or that chart again

1    and it was not something that was made known to me.  They

2    would not tell me, Dr. Stanton, here's a list of patients from

3    last week who had pill-count failures and they have all been

4    discharged.

5         So --

6              THE COURT:  Okay.  Wait for the next question.  Go

7    ahead.

8    BY MR. STRIANSE:

9    Q.  I just have one more area I would like to cover with you,

10   Dr. Stanton.

11   A.  Okay.

12   Q.  You've been provided a copy of the indictment in this

13   case; is that right?

14   A.  Yes.

15   Q.  And you know what you are charged with?

16   A.  Yes.

17   Q.  You are charged with engaging in a conspiracy or an

18   agreement to violate the law.

19        Do you understand that that's what you are charged with?

20   A.  Yes.

21   Q.  And you are charged with being a member of a conspiracy

22   that was prescribing Schedule II drugs outside the course of

23   legitimate medical practice?

24   A.  Correct.

25   Q.  I'm going to ask you here and now in front of the jury

1    did you do that; did you conspire with anyone to violate the

2    law?

3    A.   No.  And there was no incentive for me to do that.  I

4    received -- my pay was the same regardless of what I did,

5    other than the injections.  There was no incentive for me to

6    ever -- to violate the law or put my medical license at risk.

7    I had nothing to gain.  I was gaining nothing from writing

8    these patients prescriptions other than trying to take care of

9    the patients.

10   Q.   Did you reach an agreement with James Maccarone to

11   violate the law?

12   A.   No.

13   Q.   Did you reach an agreement with any patient that appeared

14   here in court and testified to violate the law?

15   A.   No.

16   Q.   Did you reach an agreement with anyone to violate the

17   conspiracy law?

18   A.   I did not.

19   Q.   Here in the Eastern District of Kentucky or anywhere

20   else?

21   A.   No, sir.

22   Q.   Now, you were registered with the Drug Enforcement

23   Administration as a prescriber, were you not?

24   A.   Yes.

25   Q.   And were you authorized to prescribe medications as a

1    result of that DEA licensure?

2    A.   Yes.

3    Q.   Were you given a DEA registration number?

4    A.   Yes.

5    Q.   And was that DEA registration number in effect at the

6    time you were prescribing medication in this case?

7    A.   It was.

8              MR. STRIANSE:  Your Honor, I had my premarked

9    exhibits, and I just misplaced them.  But that would be my

10   last numbered exhibit.  So I would need to take a moment to

11   find that.

12             THE COURT:  All right.  You can do so.

13        Have you seen that exhibit, Mr. Smith?

14             MR. SMITH:  I don't think so, but I don't think we're

15   going to have an objection.

16             MR. STRIANSE:  Your Honor, if I could mark this one,

17   and find the other, as a substitution.

18             THE COURT:  That's fine.  What number is that?

19        What number is that, sir?

20             MR. STRIANSE:  Our last numbered exhibit was?

21             COURTROOM DEPUTY:  I think it was No. 10.  Let me

22   check.

23        (Defendant's Exhibit No. 11 was marked for

24   identification.)

25             MR. STRIANSE:  May I approach the witness?

1    BY MR. STRIANSE:

2    Q.   Dr. Stanton, let me show you what's been marked for

3    identification as Defendant's Exhibit No. 11 and see if you

4    recognize that.

5    A.   Yes, this is my DEA license that was the -- that expired

6    February 28th of this year, '22.

7    Q.   And that was --

8            MR. STRIANSE:  Your Honor, we would offer that as

9    Defendant's 11.

10           THE COURT:  Any objection?

11           MR. SMITH:  No objection.

12           THE COURT:  Okay.  That will be admitted.

13       (Defense Exhibit No. 11 was received in evidence.)

14   BY MR. STRIANSE:

15   Q.   And that authorized you to prescribe Schedule II through

16   V controlled substances?

17   A.   It does or did.

18           MR. STRIANSE:  Your Honor, those are my questions.

19           THE COURT:  Okay.  Thank you.  Can we retrieve that

20   exhibit?  Do you mind?  Take that to the clerk.

21       Just No.11, Dr. Stanton.

22           THE WITNESS:  Yes.

23           THE COURT:  Thank you.

24       Mr. Smith.

25           MR. SMITH:  Thank you, Your Honor.

1                          CROSS-EXAMINATION

2    BY MR. SMITH:

3    Q.   Good afternoon, sir.

4    A.   Good afternoon.

5    Q.   If we can, let's begin by talking about one of the

6    patients that you talked about with your counsel a moment ago,

7    Lisa Waynick.  Okay?

8    A.   Yes.

9    Q.   Now, as I understand it, in your testimony, you -- I

10   think we are on the same page -- that Lisa Waynick had been at

11   this clinic, CPI, where you were the medical director; is that

12   fair?

13   A.   Correct.

14   Q.   And she was dismissed from that clinic because she didn't

15   come in for a pill count, she didn't want to go back, and so

16   she comes to Gateway Medical Associates; is that fair?

17   A.   Correct.

18   Q.   Now, at that point she's admitted, and she's seen mostly

19   by Dr. Maccarone, correct?

20   A.   For about 20 months until I saw her.

21   Q.   And you first saw her in November of 2018, correct?

22   A.   Probably, yes.

23   Q.   Okay.  Now, we didn't go over this in your direct

24   testimony, but at that point how many drug tests had

25   Ms. Waynick failed?

1    A.   Prior to my first seeing her?

2    Q.   Yes.

3    A.   I have no idea.

4    Q.   You had the chance to see the medical records in this

5    case?

6    A.   I have.

7    Q.   You had the chance to summarize them?

8    A.   I did not.  I reviewed her failed drug tests when she was

9    seeing Dr. Maccarone.

10   Q.   If I told you she had failed approximately 15 drug tests

11   at that point in time, any reason to dispute that?

12   A.   No.

13   Q.   Okay.  And that would include five tests where she failed

14   for fentanyl?

15   A.   It could be.

16   Q.   So that's all kind of what happened before she saw you in

17   11 -- in November of 2020.

18        Now, you talked about, if you recall, how there was an

19   October urine drug test proceeding that.  Do you remember

20   that?  With Mr. Strianse?

21   A.   I believe so.

22   Q.   And you talked about, in your testimony, how in that

23   October drug test, there was aberrancy, is what I think you

24   called it, an inconsistent result?  Do you remember what that

25   was?

1   A.   Was that the lack of phentermine?

2   Q.   I think you are confusing patients.  I think that's Misty

3   Brown.

4   A.   Okay.  Go ahead.

5   Q.   Ms. Waynick -- and we'll look at some records in a second

6   to be fair.

7        But I believe Ms. Waynick, your testimony was, that she

8   had an aberrancy because she was positive for a

9   benzodiazepine.  Do you remember that?

10  A.   Yes.

11  Q.   And I think you said this wasn't a big deal because

12  another physician prescribed that.

13  A.   I said I wasn't sure.  I thought another -- I believe

14  another prescriber was giving her the benzo.

15  Q.   I think you actually said two times that another

16  physician was giving her the benzodiazepines.

17  A.   That was my understanding, but I can't say that for sure.

18       MR. SMITH:  Let's -- if we can bring up Government's

19  Exhibit 115.  Let's go to page 714.

20  BY MR. SMITH:

21  Q.   Sir, in advance of your testimony, as we just discussed,

22  you had an opportunity to review these medical records?

23  A.   Yes.

24  Q.   And these were all produced to you in discovery; is that

25  correct?

1    A.   Yes.

2    Q.   First of all, whose signature is on that -- on this page?

3    A.   Mine.

4    Q.   Do you understand what it is you are looking at here?

5    A.   Yes.

6    Q.   It's the CSMD report for this time frame?

7    A.   Yes.

8    Q.   In October of 2018, did Ms. Waynick have any prescription

9    from any provider for a benzodiazepine?

10   A.   Not from Dr. Maccarone.

11   Q.   Is the KASPER or the CSMD somehow limited to just

12   Dr. Maccarone?

13   A.   No.  No.  So you're -- no, so there was no other

14   prescriber listed.

15   Q.   So if you stated earlier in your direct testimony twice

16   that this patient was on a benzodiazepine prescribed by

17   another provider, that would not be correct?

18   A.   Apparently -- apparently not.

19   Q.   Okay.  Now, you understand, as a board-certified pain

20   management physician, the dangers of benzodiazepines combined

21   with opioids?

22   A.   Yes.

23   Q.   They increase the risks of overdose, don't they?

24   A.   Respiratory problems.

25   Q.   They both slow down the patient's breathing and combined

1    they can have synergistic effect and kill the patient, true?

2    A.   Correct.

3    Q.   So it is a big deal when a patient comes in who's getting

4    high-dose opioids at this point, 150 MME, and has a benzo in

5    their system; isn't it?

6    A.   We discussed how often she was taking the benzos.

7    Q.   I'm sorry.  Did you respond to my question?

8         It's a big deal; isn't it?

9    A.   A big deal based on how often she's doing it, yes.

10   Q.   Okay.  It's especially a big deal if that patient is not

11   being prescribed that benzodiazepine by a mental health

12   professional who you are supposed to consult with and to

13   coordinate care; isn't that true?

14   A.   Correct.

15   Q.   But according to this record and what we are looking at

16   here, this patient was self-medicating with the

17   benzodiazepine, correct?

18   A.   Yes.

19   Q.   That same patient -- and as we move forward, I think

20   we've talked about this.  On that day, she takes a test in

21   November of 2020, and do you remember what the result of that

22   drug screen was?

23   A.   No.

24        MR. SMITH:  Okay.  Can we go ahead and bring up -- we

25   are still on 115.  Can we please bring up 398, please,

1    page 398.

2    BY MR. SMITH:

3    Q.   Sir, do you remember talking about this a moment ago on

4    direct exam?

5    A.   Yes.

6    Q.   And I don't mean for you to memorize every page.  So if

7    you need a chance to look at it, let me know, but I believe

8    you also looked at this drug test with your counsel; is that

9    fair?

10   A.   Yes.

11   Q.   This drug test also shows a positive for benzodiazepine?

12   A.   Yes.

13   Q.   You would disagree with me that the last report we just

14   looked at, the same CSMD, confirmed that patient didn't have a

15   prescription for that benzo?

16   A.   Correct.

17   Q.   You mentioned a moment ago depending on the frequency

18   she's taking it.  It appears she's taking it at least two

19   months in a row; is that fair?

20   A.   Yes.

21   Q.   Now, moving forward, that patient also took a drug

22   test -- so you saw this patient in November, December,

23   January, and February; is that fair?

24   A.   Yes.

25   Q.   So you did see this patient four months in a row?

1  A.  Yes.

2  Q.  And, moving forward, we can pull up the results, but I

3  believe you acknowledged earlier that the patient then failed

4  a drug test for fentanyl.  Do you remember that?

5  A.  Yes.

6  Q.  Okay.  And do you remember approximately when that was?

7  A.  No.

8  Q.  Okay.  Was it on the urine drug test collecting in

9  December?

10  A.  December of --

11  Q.  Of --

12  A.  Of 2018?

13  Q.  2018.  Does that sound right to you?

14  A.  It could have been.

15  Q.  Let's go ahead and pull it up just so we can orient you.

16      MR. SMITH:  Can we go to page 395?

17  BY MR. SMITH:

18  Q.  Do you remember seeing this and talking about it with

19  your attorney, I believe?

20  A.  Yes.

21  Q.  Okay.  And so I think you remarked on direct this is an

22  inconsistent drug screen for two purposes:  One, the absence

23  of the oxycodone metabolite, correct?

24  A.  Yes.

25  Q.  And, two, that she has fentanyl in her system, right?

1   A.   Yes.

2   Q.   I think you even kind of offered that what you infer may

3   have happened is that, because of the levels of the parent

4   drug, that oxycodone, that there may have been some kind of

5   crushing and sprinkling.  Do you remember telling the jury

6   something about that?

7   A.   Yes.

8   Q.   And that she's also taking fentanyl, correct?

9   A.   Yes.

10  Q.   So you knew and you understood, as a physician, the

11  significance of this, that this person could be diverting her

12  prescribed medication and, as I think you said, using fentanyl

13  to, quote, cover her pain?  Do you remember saying that?

14  A.   Yes.

15  Q.   Well, the other explanation for this, sir, is she's

16  addicted to drugs; isn't it?

17  A.   Well, the other explanation was that she diverted.

18  Q.   And took fentanyl, correct, sir?

19  A.   And I think I believe I said that she could have been

20  taking fentanyl to cover her pain and had sold her

21  medications.

22  Q.   Correct.

23  A.   There are a number of -- a number of possible answers of

24  what was going on.

25  Q.   But one of those explanations, when somebody is taking

1    and abusing fentanyl, is that they're a drug addict; is that

2    fair?

3    A.   It could be.

4    Q.   Now, you then said, moving forward, you prescribed again,

5    and you prescribed in January after seeing that drug test

6    result, correct?

7    A.   The result from the month before, yes.

8    Q.   Yes.  So you knew she had taken benzodiazapines that she

9    wasn't supposed to have, which is dangerous to combine with

10   the fentanyl that she was potentially diverting to obtain, and

11   you wrote that prescription anyway, didn't you?

12   A.   Yes.

13   Q.   And then you told the jury about a January drug --

14   in-house drug screen, and that was on January 17th, 2019.  Do

15   you remember that?

16   A.   You have to show it to me.

17        MR. SMITH:  Okay.  Can we bring up page 394, please?

18   BY MR. SMITH:

19   Q.   Do you recall that, sir?

20   A.   Yes.

21   Q.   Did you tell the jury that this UDT is, quote, good?

22   A.   No.  I -- well, I don't remember exactly what I said.

23   What I believe I said was it was good as far as the oxycodone

24   but, again, it showed the benzo.

25   Q.   So that's, in fact, not good, correct?

1    A.   It's not because if she's taking the benzo.

2    Q.   But you prescribed again on that day, didn't you?

3    A.   Right.  She had a diagnosis of anxiety and -- and

4    depressive disorder.

5    Q.   So if a patient is self-medicating who has anxiety and

6    depressive disorder, doesn't it make it even more dangerous to

7    give them drugs if they are also taking fentanyl and

8    benzodiazepines?

9    A.   It could be.

10   Q.   Now, you then saw the patient again in February, but in

11   that January note -- let me pull it up again -- there's also a

12   reference in which the patient was told not to crush meds

13   and -- do you recall that?

14   A.   Yes.

15   Q.   And in that January of 2019 note --

16        MR. SMITH:  We can go ahead and pull it up.  Can we

17   go to page 212?  Actually go to 218.

18   BY MR. SMITH:

19   Q.   Are you able to see that?

20   A.   Yes.

21   Q.   Okay.  At the beginning of that paragraph, it says

22   "Reviewed with patient."  Do you see that, sir?

23   A.   Yes.

24   Q.   It says, "Reviewed with patient urine drug screen

25   performed on 12-18-2018, which is inconsistent with her

1   prescribed medications.  Patient was given strong counseling

2   to have all of her prescribed medications in her UDS and to

3   not crush them up," and I believe it's meant to be "put them

4   in her urine."  Is that fair?

5   A.   Yes.

6   Q.   Okay.  There's no mention in that note about the fentanyl

7   test, is there?

8   A.   No.

9   Q.   But there is a recognition clearly in this medical record

10  that this patient was crushing up her medication to beat her

11  drug screen at the medical clinic where you are the medical

12  director?

13  A.   I would have to look back and see when was the fentanyl

14  test.  When did that come through?

15  Q.   We just looked at it.  It was December of 2018.

16  A.   Okay.

17  Q.   Now, moving forward --

18        THE COURT:  He asked for clarification on your

19  question.

20  BY MR. SMITH:

21  Q.   I need to ask you a question.

22        Sir, are we clear, on the same page, with the December,

23  January drug tests?

24  A.   Yes.

25  Q.   Okay.

1    MR. SMITH:  Your Honor, is that sufficient, or do you

2  want me to cover it again?  Okay.

3  BY MR. SMITH:

4  Q.   And then you saw this patient again in February of 2019,

5  correct?

6  A.   Yes.

7  Q.   And, again, at this point, you now have the results from

8  the October, the November, the December, and the January drug

9  tests all at your disposal, correct?

10 A.   Yes.

11 Q.   And you prescribed to the patient again, didn't you?

12 A.   Yes.

13 Q.   Now, when you talked to Investigator Sizemore, he asked

14 you the question:  Did you see anybody consistently fail urine

15 drug screens?  Did you see that while you were there?

16    He asked you that question, correct?

17 A.   Yes.

18 Q.   And your response to him during the investigation was

19 "no"?

20 A.   About the point-of-care cup or the UDT results?

21 Q.   Investigator Sizemore said to you, "I know you mentioned

22 that people -- I said -- do people consistently fail urine

23 drug screens?  Did you see that while you were there?"  Your

24 response, "no."

25    You said that, correct?

1    A.   Correct.

2    Q.   Now, moving forward -- and, again, I don't believe this

3    was covered.

4         Did you have an opportunity to review Ms. Waynick's file

5    immediately after this point, so in February, March, April?

6    A.   If I hadn't seen her, then I would not have.

7    Q.   No, in preparing for your testimony today.

8    A.   I concentrated on the tests that I saw and how I

9    responded to them.

10   Q.   Okay.

11   A.   Occasionally I looked at what Dr. Maccarone had done if

12   there was a timeline in between, but I don't remember exactly

13   what Dr. Maccarone did if he were the one who had seen the

14   patient.

15   Q.   So on this date, the February date where you prescribed

16   her again, do you know what the result -- what was in her body

17   that day?

18   A.   No.

19   Q.   It was heroin, sir.  Did you see that?

20   A.   No.  That was after I saw the patient, I believe.

21   Q.   Well, to be fair, the heroin was in her body the day you

22   saw the patient?

23   A.   Right, but the result came back several days later.

24   Q.   And then the next office visit she took a test and was

25   positive for heroin again.  Do you dispute that?

1    A.   Is that when I saw her?

2    Q.   I'm not asking who saw her.  Do you dispute that that's

3    what the testing shows?

4    A.   I don't know what the testing showed after I wasn't

5    seeing her anymore.

6         MR. SMITH:  Again, let's look at page 389, please,

7    Rebecca.

8    BY MR. SMITH:

9    Q.   Sir, do you agree with me that this patient tested

10   positive for heroin in March of 2019?

11   A.   Yes.

12   Q.   Would you like to pull up the February one as well?

13   A.   We can if you wish.

14   Q.   Can you --

15   A.   I believe this one here.

16   Q.   Go to page 391.

17   A.   Yes.

18   Q.   Okay.  So in both February and March of 2019, this

19   patient tests positive for heroin?

20   A.   Correct.

21   Q.   So she tested positive for fentanyl five times before

22   your first visit with her; she tested positive for fentanyl

23   while you were seeing her during that four-month span and

24   benzos; and then the last day you saw her in that little

25   stretch, she tested positive for heroin, although, as you were

1    saying, you didn't see that result.  Have I summarized that

2    fairly?

3    A.   Okay.  Let me just --

4    Q.   Answer my question, sir.

5    A.   Let me restate it so I make sure I have it correct.  Five

6    times she had fentanyl before I saw her; one time she had

7    fentanyl when I did see her; and then she had heroin twice

8    after I saw her.

9    Q.   Correct.

10   A.   Yes.

11   Q.   Okay.  So we were on the same page there?

12   A.   Yes.

13   Q.   Now, fast-forward, you mentioned in direct examination

14   that you saw this patient in June again; is that true?

15   A.   Okay.  Yes.

16   Q.   And leading up to that June test, June visit, there was a

17   May of 2019 office visit.  Do you remember that?

18   A.   You can --

19        MR. SMITH:  And can we go to page 385, please?

20        THE WITNESS:  Is that it?  Is that the one I'm --

21   okay.

22   BY MR. SMITH:

23   Q.   Do you see that, sir?

24   A.   Yes.

25   Q.   Okay.  Is that dated May of 2019?

1   A.   Yes.  I believe this is the one that, based on the

2   result, I discharged her, I believe.  I can't remember.

3   Q.   Okay.  We're going to get to that in a second.

4        So you agree that, leading up to that June office visit,

5   this is what you had available?

6   A.   Yes.

7   Q.   I think you told us on the direct examination that you

8   were not happy about the patient crushing pills again?

9   A.   I said that that -- that's what it appeared to be because

10  there was no oxy -- well, this is, I believe, an oral sample,

11  and I discussed the oral samples are interpreted differently

12  than urine results.

13  Q.   Just to be fair, I asked you on direct examination this

14  is the drug test you said you were not happy about.

15  A.   Correct.

16  Q.   Okay.  Now, moving forward to --

17       MR. SMITH:  If we can, let's go to Government's

18  Exhibit 612, if we can.  Not Exhibit 612.  I'm sorry.

19  Page 612 of this exhibit.  Okay.  And can you go down one more

20  page, Rebecca?

21  BY MR. SMITH:

22  Q.   Okay.  Do you see the date of this?

23  A.   June 17th.

24  Q.   Okay.  So that is the office visit that you were talking

25  about, the June office visit; is that fair?

1    A.    Correct.

2          MR. SMITH:  If we go down one more.

3    BY MR. SMITH:

4    Q.    The month before Dr. Maccarone saw the patient, correct?

5    A.    Correct.

6          MR. SMITH:  And if we can go down all the way to the

7    last page of that.  Keep going all the way down.  Okay.

8    BY MR. SMITH:

9    Q.    Now, on your direct and during your testimony during

10   direct examination, you said that June was when, quote, we or

11   I discharged the patient?

12   A.    Yes.

13   Q.    Do you recall that?

14         But this is the month before, correct?

15   A.    No, this is the month before.

16   Q.    May --

17   A.    The July visit --

18   Q.    May comes before June, right, so that's the visit before

19   yours, correct?

20   A.    Correct.

21   Q.    What does it say there at the bottom?

22   A.    That she's being dismissed.  That was her first -- based

23   on his protocol, his first dismissal.

24   Q.    So just to be clear, you did not dismiss this patient?

25   A.    He had discharged her, and based on our -- the in-house

1    protocol, patient would come back for one last visit and then

2    be dismissed for good, allowed to come back to make sure they

3    found another clinic to go to, and she had when I saw her.

4    Q.   Now, you told us -- and I think you just went over it in

5    this discussion about your audio recording -- that one of the

6    pieces of information that was made available to you in these

7    packets was the previous month's note, correct?

8    A.   Correct.

9    Q.   This was the previous month's note, correct?

10   A.   Right.

11   Q.   In that previous month's note, it says, "Patient is being

12   dismissed due to having illegal substances, multiple urine and

13   oral drug screen, last visit," period, correct?

14   A.   Right.  They all say that.

15   Q.   Right.  And you were the one who saw this the next visit

16   and prescribed anyway?

17   A.   Because she was -- they always -- the protocol was --

18   again, I'll reiterate -- was the patient would be seen;

19   discharged, if there was an aberrancy; and given a reduced

20   dose medication -- was the protocol -- and then come back one

21   more -- one last month the next month for one last visit and

22   medications if they hadn't found a clinic and then that would

23   be the last time we would see them.  That was the protocol.

24   So they would receive medications at both visits.

25   Q.   So this is your protocol?

1    A.    This is Maccarone's protocol.

2    Q.    Who was the medical director at this clinic?

3    A.    I was.

4    Q.    So was it your protocol?

5    A.    It was both of our protocol.

6    Q.    So it was your protocol to see patients again after they

7    have been dismissed for failing heroin and fentanyl tests?

8    A.    Well, as I said earlier, the patients were having trouble

9    getting into new clinics because of their -- the reason for

10   the discharge and because of COVID.  So we would see them back

11   one more time, and then that would be it.

12   Q.    And the reason patients are having a tough time getting

13   into another pain clinic is because they had tested positive

14   for heroin at their previous pain clinic; is that fair?

15   A.    Sometimes that was the reason.  Not always but sometimes.

16   Q.    That's pretty self-serving, isn't it, to say that I'm

17   kicking them out for something that everyone knows is going to

18   prevent you from getting into a pain clinic, as it should,

19   because you are taking heroin, and to then use that as a

20   reason to keep prescribing to them?

21   A.    Not all clinics will not accept patients who have had

22   heroin.  As I said before, patients -- she eventually found --

23   eventually she came to our clinic, and our clinic said, well,

24   you know you had heroin but we'll go ahead and see how you do

25   with it.

1   Q.   That's right.  Your clinic did do that, didn't you?

2   A.   Yeah, and she did fine for the first 11 months.

3   Q.   And then she came back to Gateway Medical Associates and

4   tested positive for fentanyl again, didn't she?

5   A.   Yes.

6   Q.   That's not doing fine, is it?

7   A.   No.  She did fine at our clinic until the very last month

8   when again she had heroin and was discharged.  She had no

9   urine problems the 11 months she came to our clinic.

10  Q.   So just to be clear, your and Maccarone's policy with

11  respect to discharges was that, if somebody tested positive

12  for heroin or fentanyl, they would get a prescription that day

13  and then they could come back the next month and get another

14  prescription, and that would be it?

15  A.   That was my understanding.  And Maccarone and I spoke

16  about it.  And that was the way he had done it for years, and

17  that's the way we kept on doing it.  It wasn't the way I did

18  it at my clinic.

19  Q.   Why was that?

20  A.   We had different protocols at my clinic.

21  Q.   Why?

22  A.   Because we had different criteria.  This is protocols

23  that he had set up and been using for years.

24  Q.   But you went along with them, didn't you?

25  A.   Well, we discussed it and talked about it.  I can't say

1    what exactly we said.  I'm not allowed to say what exactly we

2    said and what I felt about it.  But I wasn't real sure about

3    it, but the reason we did it was because we knew, if the

4    patient did have trouble getting into another clinic, we

5    didn't want them to go through withdrawal.

6    Q.   Well, you can say -- you just said you didn't feel --

7    what did you just say?  You didn't feel real good about it,

8    you didn't feel clear about it?  Is that what you just said?

9    A.   I didn't feel real clear up about it, but I -- but his

10   feeling was these patients might go through withdrawal and we

11   were going to give them two chances to find another clinic,

12   and she did find another clinic.  She ended up going to my

13   clinic.  I didn't send her to my clinic.  That's where she

14   ended up going.

15   Q.   Is it your testimony, sir, that it is consistent with a

16   doctor's obligations, it's consistent with the course of

17   professional practice to prescribe to heroin addicts to keep

18   them from going through withdrawal?

19   A.   When -- when -- in this patient we knew that she was

20   taking -- we knew that she was taking her medications.  Not

21   consistently --

22   Q.   I'm sorry, sir.  This is the same patient who you just

23   told us on direct examination twice was crushing up her pill

24   and putting it in the drug screen to beat the drug screen.

25   That is the patient that you knew was taking her medications

1  as prescribed?

2  A.   There were visits when everything was good, the urine

3  tests were good, and she was taking her medications.

4  Q.   There were visits where they were not good and she was

5  not taking her medications, right?

6  A.   Right.  So we don't -- we didn't know -- there's no way

7  we could know exactly how often she was taking her pills.  She

8  could have been taking them every other day, taking them every

9  day, or not taking them at all.  We didn't know.  But we -- we

10 discharged her, and to give her the benefit of the doubt, we

11 gave her her medications -- a reduced level of her medications

12 and discharged her.

13 Q.   Sir, at that point she failed something like 20 drug

14 tests.  At what point do you no longer give somebody the

15 benefit of the doubt?

16 A.   Well, under my watch, she had only failed a couple drug

17 tests.

18 Q.   For fentanyl, for benzodiazepines, and then for heroin?

19 A.   I didn't consider the benzodiazepine necessarily a

20 failure.  I knew -- her records show that she had mental

21 issues, and she and I discussed it.

22 Q.   So taking a controlled substance that is not prescribed

23 to you that is deadly, as you just told us, when combined with

24 the other drugs you knew she was taking, that's not a concern?

25 A.   I can't tell you what she told you.  I'm not allowed to

1    tell you what she told me about the benzos, but she had benzos

2    left over from a previous -- a previous doctor that had been

3    prescribing it to her, and she took them as needed.  And so I

4    wasn't concerned about that.

5    Q.   She was not taking them under the care of a physician at

6    that time, correct?

7    A.   Not at that time, no -- later she wasn't.

8    Q.   Now, you repeatedly said, as we understand it now, that

9    your and Maccarone's policy was you fail a drug test, you get

10   a prescription that month, you get a prescription the next

11   month?

12   A.   Reduced each time.

13   Q.   Now, if we look at this patient -- let's look at

14   page 650.  When was this patient actually dismissed?

15   A.   I believe she wasn't actually -- I believe she was kept

16   on for several months by Maccarone and didn't leave until

17   November or -- I'm sorry -- September.

18   Q.   According to this record, she was initially dismissed in

19   April, correct?

20   A.   Yes.

21   Q.   Now, on direct examination, you said I and we dismissed

22   her in June, but she had actually been dismissed two months

23   prior, correct?

24   A.   I never saw the note from back two months prior.

25   Q.   That raises another point, and I think it's something you

1   said over and over and over again in your testimony about what

2   you didn't see and what you didn't know.

3       Sir, you were the medical director at this facility,

4   correct?

5   A.   Yes.

6   Q.   And you heard the testimony that one of your obligations

7   as a medical director was to ensure that there was a proper

8   medical recordkeeping system that the medical records were

9   accurate, correct?

10  A.   We had a proper medical record system, and the records --

11  as far as the accuracy of the records, I reviewed any -- every

12  record that I saw I reviewed, but I wasn't in the -- I wasn't

13  in the habit of going through and randomly reviewing or

14  sequentially or systematically reviewing records of

15  Dr. Maccarone.

16  Q.   So, for instance, when you talked about this language

17  about tapering, repeating over and over again, do you remember

18  you talked about that?

19  A.   No, I said we would give a reduced dose for the

20  medication.

21  Q.   Just so we're understanding each other, when you talked

22  about, with your counsel, there was a recurring kind of clone

23  note that said, because the ACME is X amount --

24  A.   Yes.   Yes.

25  Q.   Tapering and reducing?

1    A.   Right.

2    Q.   But -- and I think, in fairness, you were somewhat

3    critical of that saying that this is something that didn't

4    really make sense because it wasn't always actually being

5    tapered, correct?

6    A.   Correct.

7    Q.   You also agree with me that it's pretty illogical to say,

8    for instance, you know, because the patient's MME is 50, we

9    are going to increase it just because of that?

10   A.   Correct.

11   Q.   So none of that really makes sense, and I think we are on

12   the same page?

13   A.   Right.

14   Q.   Okay.  But I think your testimony was that you couldn't

15   have and didn't know that that was something that was

16   occurring in these notes?  Is that what your testimony is?

17   A.   Yes.

18   Q.   So you, as the medical director at this clinic for four

19   years, couldn't have and didn't know that that thing that

20   recourse in every single one of these notes was there?

21   A.   Well, it occurred in every single one of some patient's

22   notes for a period of time.  It wasn't happening in every

23   single note.

24   Q.   Which patient note did you see that that language wasn't

25   there?

1    A.   I can't, offhand.

2    Q.   Now --

3    A.   The note -- the notes that I reviewed for this case were

4    a handpicked group of 16 patients and of those, eight had no

5    problems in their urine testing and eight had -- did have

6    issues in their urine testing, and one of those eight I never

7    saw.

8    Q.   Now, sir, to be fair, in discovery the government

9    produced something like 70 medical records to you, didn't

10   they?

11   A.   There was almost a hundred, but there was a lot of

12   records in there, yes.

13   Q.   So within those charts, one big question that's still

14   kind of lingering is:  Did you actually go into the electronic

15   medical recordkeeping system and review notes in the EMR?

16   A.   At Maccarone's office.

17   Q.   Yes?

18   A.   No, I did not go in and review.  I reviewed the last

19   note -- note I have from the month before.

20   Q.   You were the medical director at a clinic for four years

21   where your job was to ensure the accuracy of the medical

22   records, and you didn't once go into the electronic medical

23   recordkeeping system?

24   A.   I went into the medical recordkeeping system but not to

25   systematically review his records.

1   Q.   So which is it?  Did you go into the EMR or not?

2   A.   Yes, I would go in there.  I would sign my notes or look

3   up -- look up stuff, but --

4   Q.   So you did sign your notes?

5   A.   I did sign some of my notes.  Not all of them.

6   Q.   Sorry.  You signed some of them, or you signed all of

7   them?

8   A.   I signed all the notes that I did MMEs on and new-patient

9   visits.  During the periods of time when Maccarone was gone

10  and I was seeing 20 to 30 patients a day and there were --

11  these patients were coming back for just a routine refill of

12  their medications, then I would not necessarily sign those

13  notes.  But I would go and sign the ones that had MME visits

14  or new-patient visits.

15  Q.   So you would sign some of your notes but not all of the

16  notes?

17  A.   That's correct.

18  Q.   So who signed the other notes?

19  A.   The -- the Emilie who our -- Emilie who is -- who is the

20  office manager would sign those for me, sign off on them, and

21  then present those to me the next visit when I saw the

22  patient, and I could look over them at that time.

23  Q.   So every note that bears your signature that we have

24  available in evidence here that says, "Signed by John Stanton,

25  M.D.," are those accurate, to the best of your knowledge?

1    A.   Some of them.  And the other ones I would sign when I

2    would see the note.  So what would happen would be I would see

3    the patient -- let's say I would see the patient --

4    Q.   If we can just stick with my question.  Again --

5              THE COURT:  Let him explain that.

6         Go ahead.

7              THE WITNESS:  See a patient in January and, of

8    course, I'm seeing, I will say -- December I was seeing a

9    large number of patients.  And so if I didn't -- if I wasn't

10   doing an MME visit or a new patient visit, then Emilie would

11   have that -- would put in the note it had been signed by me,

12   and the next month I would have that note available to review,

13   and I would sign the note physically, sign the note, give it

14   to her.  But then they would not take that hand-signed note --

15   turns out they never put those into the chart.

16        If you -- if you remember her testimony --

17   BY MR. SMITH:

18   Q.   Sir, I think we are getting a little far afield here.

19        My question to you is:  The electronic notes we have

20   where it says, "Signed by Dr. John Stanton," are those

21   accurate or are they not accurate?

22   A.   They are accurate with an MME or a new-patient visit.

23        The other ones were reviewed and hand signed by me at the

24   next visit.

25   Q.   And so does that mean that the version that exists -- the

1    version that existed in the MR is, in fact, accurate?

2    A.   Yes.

3    Q.   So the things that are noted in there are things that you

4    saw and you did?

5    A.   In the note, yes.

6    Q.   Yeah.  All right.

7        Now, in each of your review of those notes, you used the

8    language about tapering, increasing, and decreasing, didn't

9    you?

10   A.   That was put in there, but I didn't put that in there.

11   Q.   Sir, I just asked you if the contents of those notes were

12   accurate, and you said yes.  And now you are saying, no,

13   because I didn't put it in there?

14   A.   The -- the tapering -- I brought that to the attention of

15   the -- of the Court because this is something that was put in

16   there after I had -- after I had seen the patient, but it

17   wasn't something that I had put in there.

18       So if I saw the patient the next visit, I could make a

19   comment about that and then sign the note.  But,

20   unfortunately, those signed notes never got into the -- into

21   the electronic medical record.

22       Once the -- every note that I signed, every visit that I

23   saw, whenever I saw a patient, I would review the note, and if

24   it was appropriate, I would sign it.  If not, I would make a

25   notation on it, and I would sign it, but none of those ever

1    were put into the records.  They were all shredded.

2    Q.   And you went there for four years, and you never noticed

3    that?

4    A.   Well, the next time I come in to see the patient, it may

5    not be but six or seven months later.

6    Q.   So whose job is it?  You're the medical director.  It's

7    your job to make sure things are accurate.  And you are saying

8    that things were getting shredded.  I think you said things

9    were being hidden from you.

10   A.   There's not a single urine drug test that I saw and

11   signed scanned into the computer.  So I can't say for sure

12   that I saw all those urine drug tests.

13   Q.   And you heard testimony from the employees as to exactly

14   why that is, right, that they didn't take the signed versions

15   because they are already in the EMR, correct?

16   A.   That was the reasoning.  They said that every other month

17   they would do -- have a UDT.  So I would expect maybe 10 or 15

18   UDTs each month.  But if I got 11 or 12, I would know if a

19   couple had been not necessarily hidden but it had not been

20   given to me.

21        Every urine drug test that I signed was given back to

22   Emilie, and subsequently, upon reviewing all these records

23   when the discovery was given to me, I realized that none of

24   those UDTs that I had signed were in the note.  And when I

25   reviewed the note the next month, the UDT results were in a

1   separate portion and separate part of the chart.  So I was

2   reviewing what had been written the time before and assumed

3   that it was correct.

4   Q.   So let me see if I'm understanding this correctly.  You

5   do agree that you were giving the UDT results in this packet

6   of information, correct?

7   A.   I was getting UDT results in about 50 -- 30 to 50 percent

8   of the charts that I got because they weren't doing it every

9   month.

10  Q.   So there was 50 percent of the patients that you were

11  seeing where you never had access to the UDT result from the

12  previous month?

13  A.   No.  That's not what I'm saying.  I'm saying there could

14  have been -- there could have been 12 UDT results that were

15  completely normal and one that had heroin in it and wasn't

16  given to me.  So I didn't know -- I didn't -- I didn't know

17  that.

18       And so if I had -- if there was a UDT result that had

19  heroin in it that I had signed it and had been scanned into

20  the computer, I would be able, say, yeah, I guess I saw that.

21  But there is not a single UDT result -- I came across three

22  UDT results of my patients that Maccarone had signed.  I am

23  not sure how or why.  It had his handwritten signature.  They

24  had printed it out, given it to him, and then they scanned it

25  into the chart.

1    But they didn't print -- they didn't scan any of mine in

2    the chart so I can't say that I saw every UDT result.

3    Q.   Let me ask it this way:  Are you saying that there would

4    have been times where you would go into see a patient,

5    somebody took the UDT result away from you, you didn't have it

6    in front of you, based on what you just said, because it was a

7    bad result, so you didn't have the result in front of you, but

8    then you wrote the prescription anyway?

9    A.   Well, if you -- yes, because if I didn't know that there

10   was a problem with the UDT --

11   Q.   Wouldn't that have been unusual that they didn't have a

12   UDT result?

13   A.   No, not at all.  We looked here a few minutes ago.  We

14   saw a patient who I saw -- I gave examples of seeing a patient

15   one month with urine results.  The next month, there's no

16   urine result, and the note in the chart refers back --

17   Q.   Which example are you talking about?

18   A.   Well --

19   Q.   Are you talking about Mr. Ghent?

20   A.   No.  No.  I can't remember.  I think it was probably --

21   probably Lisa Waynick.  There was a couple times where I saw

22   Lisa Waynick.  One month there was a UDT.  The next month

23   there was no UDT.

24   Q.   There was either a drug screen or a drug test at this

25   practice every month for all these patients.  That's what the

1   testimony has been.  That's what the records show.  Isn't that

2   true?

3   A.   Well, that's what the testimony is.

4   Q.   Let me ask you this question:  You would agree with me

5   that, as a doctor, the standard is not I get to keep

6   prescribing until somebody ties me down, pries my eyes open

7   and tells me there's a problem with the drug tests?

8        Instead, the standard is you have to inquire, ensure it's

9   safe to give that patient the drug before you write that

10  prescription; isn't that true?

11  A.   Correct, and that's why --

12  Q.   So if you don't have the information available to you for

13  whatever reason, it's your duty as the doctor and medical

14  director to go get that information, isn't it?

15  A.   I would not -- I was not expecting a UDT result on every

16  patient every time.  About 50 percent -- maybe 30 percent had

17  UDT results.

18  Q.   So are you saying, in the medical records you reviewed,

19  only 30 to 50 percent of patient files had a monthly UDT

20  result?  Is that your testimony for the jury today?

21  A.   Yes, and if you go through, you can see that there's --

22  Q.   Sir, I think you have answered my question.

23       Let's go on to patient Jeff Ghent.  Do you remember

24  talking about him earlier today?

25  A.   Yes.  Yes.

1    Q.   Now, I think you picked up with Jeff Ghent in --

2              THE COURT:  Mr. Smith, I'm sorry to interrupt.  We

3    are probably at a breaking point if you are going to move to a

4    new area.

5              MR. SMITH:  That's fine, Your Honor.

6              THE COURT:  Why don't we take 20 minutes at this

7    time.  Continue to abide by the same admonitions you have been

8    under.  No discussion.  No exploration or reading.  No

9    formation of opinions or judgments.  And I excuse the jury now

10   with my thanks for 20 minutes.

11        (Jury not present.)

12             THE COURT:  The jury has exited.  Everybody can be

13   seated.  You can step down, Dr. Stanton.

14        What's your estimate on remaining length of cross?

15             MR. SMITH:  I would say about half an hour, Your

16   Honor.

17             THE COURT:  All right.  Well, we'll come back a

18   little after 3:00 and get through Dr. Stanton and then hear

19   the balance of the defense case, and I guess we'll see where

20   we are schedule-wise.

21        Anything to take up, Mr. Smith?

22             MR. SMITH:  No, Your Honor.  Thank you.

23             THE COURT:  Mr. Strianse?

24             MR. STRIANSE:  No, Your Honor.

25        (Recess from 2:45 P.M. until 3:02 P.M.; jury present.)

1    THE COURT:  Thank you.  We're back from the break

2    with all counsel present, Dr. Stanton on the stand, the jury

3    all here and accounted for.

4        Mr. Smith, you may continue.

5        MR. SMITH:  Thank you, Your Honor.

6    BY MR. SMITH:

7    Q.  Sir, just to wrap up one point on this discussion about

8    the policy for urine drug tests and urine drug screens, you

9    told me before the break about it was Maccarone's policy or it

10   was your and Maccarone's policy about heroin, and I presume

11   other drugs like it, where the patient would get a

12   prescription that day and they would get one more visit the

13   next month and then another prescription to ensure they could

14   get care or something, right?  That's what you told us?

15   A.  Basically.

16   Q.  But that's not the policy that you and Dr. Maccarone told

17   the state you were following, was it?

18   A.  I don't believe we discussed it with the state.  I'm not

19   sure what you mean.

20   Q.  Well, you heard testimony that part of what a pain clinic

21   who's licensed to you as a medical director -- you hold the

22   license -- they have to submit certain information to the

23   state to show that they are complying, correct?

24   A.  Correct.  You are talking about the State of Tennessee?

25   Q.  Correct.

1    A.   Okay.

2    Q.   And that the state, in the regulations that we heard

3    about, requires various policies and procedures to be in

4    place.  Is that fair?

5    A.   Yes.

6    Q.   As we looked at it in this case and it's already in

7    evidence, one of the things that was sent to the state was

8    GMA's urine drug test policy; is that fair?

9    A.   Yes.

10   Q.   Okay.  Let's look at Government's Exhibit 22B, please.

11   And in the policy that was submitted to the state, the policy,

12   as it was described to the state, was that, if someone tested

13   positive for methamphetamine, cocaine, or heroin, it was,

14   quote, an immediate discharge.  Isn't that what that says?

15   A.   Yes.

16   Q.   Now, you also spoke with your counsel about a patient

17   named Jeff Ghent.  Do you remember that?  Jeffrey Ghent?

18   A.   Yes.  Yes.

19   Q.   Sir, as we are going through this, if you need to pull up

20   the medical record or have the other records in front of you,

21   please say so.

22        Now, as I -- if we can just kind of get up to speed

23   collectively here, you recall that Mr. Ghent was admitted

24   sometime in 2016 by Dr. Maccarone; is that fair?

25   A.   I believe so.

1    Q.    And just generally from reviewing his history, was he

2    prescribed oxycodone, oxymorphone, Xanax and some other drugs?

3    Does that sound right?

4    A.    Yes.

5    Q.    And I think you said you first saw him in November of

6    2017 for one of these medical director's visits?

7    A.    Yes.

8    Q.    Now, in the course of these medical director visits --

9    well, I guess, stepping back, would you agree with me that the

10   criteria used to select these medical director visits was that

11   a patient was above a certain level of MME; is that right?

12   A.    Correct.

13   Q.    And that level is 120?

14   A.    Yes.

15   Q.    Now, the reason for that, it's a state mandate.  I think

16   you already told everybody that you are aware of that, right?

17   A.    Yes.

18   Q.    That's because, when you are above a certain threshold,

19   those patients are at a little more risk -- they are in a

20   little bit more danger because they are on more high-level

21   medications; is that fair?

22   A.    Yes.

23   Q.    So they need somebody who has more expertise, they need

24   somebody who's a pain management specialist like yourself to

25   take a look, look at their care, review, and make sure

1    everything is appropriate; is that fair?

2    A.   Yes.

3    Q.   And I think you said you did that with Mr. Ghent,

4    correct?

5    A.   Correct.

6    Q.   And when you did that, I think what you said was you were

7    trying to be as complete as you could with his care, correct?

8    A.   Yes.

9    Q.   Now, do you remember at that point in time in November of

10   2017 which medications contributed to his MME being above 120?

11   A.   No.

12   Q.   If I told you, based on the medical records, that the

13   medications he was being prescribed at that time were

14   oxycodone and then a drug called methadone, does that sound

15   right?

16   A.   It could be.

17   Q.   Okay.  Sir, did you happen to review this file as you

18   were preparing for this testimony?

19   A.   Yes.

20   Q.   It sounds like you did, and you picked out certain pages,

21   along with your counsel, and that's what you talked through

22   today, correct?

23   A.   In general, I would review my -- my participation and the

24   patient, and I would review the documentation -- the documents

25   that justified admission to the pain clinic.

1   Q.   All right.  And so, when you were trying -- I think you

2   said trying to be as complete as you could with his care, when

3   you were doing that specialized visit because he is on all

4   these MEDDs, did you happen to notice that Mr. Ghent had

5   failed approximately 15 drug tests and basically never took

6   his methadone?

7   A.   No.  I only reviewed the notes when I saw him.

8   Q.   Now fast-forward.  You did see him again, you said, in

9   this period of November and then a January visit.  Do you

10  remember that?

11  A.   Yes.

12  Q.   Okay.  And I think to be fair, that was in 2018 to 2019.

13  So --

14  A.   Correct.

15  Q.   And you went at some length to discuss about how the UDT

16  was actually a consistent UDT because that patient had missed

17  about a month between the visits.  I think you said like

18  38 days.

19       Are you with me?

20  A.   No.  It was November 26th, and then he was seen again on

21  January 3rd.  So there was long enough of a period of time

22  that would explain why he had run out of medication.

23  Q.   So more than that 30-day window for that prescription,

24  fair?

25  A.   Yes.

1    Q.   And I think what -- in fairness what you are saying is,

2    if he took it as prescribed, it would have been expected that

3    he would run out of the medication before that next visit, and

4    so perhaps it shouldn't be surprising that that UDT pops up as

5    all negative.  Is that fair?

6    A.   That was the way I interpreted it at that time, yes.

7    Q.   But in fairness, there's something else significant about

8    that that you didn't talk about, isn't there?

9    A.   I don't remember.

10   Q.   Well, if a patient who's on, at that point -- I think you

11   talked about the patient was well over 150 MME, let's say.  Is

12   that approximately --

13   A.   It was about 150, yes.

14   Q.   150 MME.  So a patient who's on 150 MME because they are

15   in chronic debilitating pain, that patient walked into your

16   office and had no drugs in their system -- is that what we

17   understand Mr. Ghent's condition to be?

18   A.   Appeared that way.

19   Q.   Did you see any notes in your medical record where you

20   said Mr. Ghent was going through severe withdrawal?

21   A.   No.

22   Q.   Did you see any notes in your medical record where it's

23   discussed, hey, Mr. Ghent, how did you get by all this time?

24   How are you feeling?

25        Is that noted anywhere in there?

1    A.   No.

2    Q.   In fact, the note says it's an inconsistent UDT, and the

3    patient is told to have their medications in their system,

4    right?

5    A.   Correct.

6    Q.   That's a pretty clear indication of diversion, if

7    somebody is walking in, they are not withdrawing, they don't

8    seem to be in any distress, and yet they just walked out with

9    another 30 days' worth of prescriptions, didn't they?

10   A.   I'm not going to agree to the fact the patient is not

11   having medical issues means that he's diverting.

12   Q.   I mean, he comes in, he's not in withdrawal, and there's

13   no notation in the note that any of that is even discussed;

14   isn't that fair?

15   A.   A lot of times what patients do is they'll kind of take

16   their medications, kind of taper -- not taper.  They'll try to

17   kind of spread them out.  And they end up running out maybe a

18   day or two before their visit rather than eight days before.

19   If they realize they have to stretch their pills out over a

20   38-day period, at some point he would have realized, I don't

21   have enough pills left to my next visit because of the

22   holidays.  It was Thanksgiving one time.  It was New Year's

23   the next time.

24   Q.   So you would have, as a doctor, if all those discussions

25   happened, it would have been your duty to document that

1   thought process, that medical decisionmaking in your record.

2   That was your duty, wasn't it?

3   A.   Yes.

4   Q.   That does not appear in that medical record, does it?

5   A.   No.

6   Q.   Next you talked about a patient named Misty Brown.  Do

7   you remember that?

8   A.   Yes.

9   Q.   And she was the one where you have the chart, correct?  I

10  just wanted to talk about one point that you raised with Misty

11  Brown's care.

12         MR. SMITH:  If we can, can we bring up Government's

13  Exhibit 100 at page 44?

14  BY MR. SMITH:

15  Q.   While we are doing that, sir, do you remember talking

16  with your attorney about Misty Brown being prescribed a drug

17  called phentermine?

18  A.   Yes.

19  Q.   Okay.  And phentermine is a Schedule IV controlled

20  substance?

21  A.   Yes.

22  Q.   And I think you described it's -- I think it's sometimes

23  called Adipex, the same drug.

24  A.   Weight-loss medication.

25  Q.   But it's also a stimulant, correct?

1    A.   It's an amphetamine, yes.

2    Q.   And it ends with the m-i-n-e; it's an upper?

3    A.   It's an upper.

4    Q.   That's a controlled substance because it has abuse and

5    addiction potential and other potential side effects, correct?

6    A.   Right.

7    Q.   Now, I think you noted in the chart that you put together

8    and otherwise that -- well, let me ask you this:  Did you

9    discontinue her phentermine?

10   A.   No.

11   Q.   So you did continue prescribing phentermine even though

12   she was testing negative for it, correct?

13   A.   I have to look at the record to see if I prescribed it or

14   not.

15   Q.   You just told me you didn't discontinue it.  So which is

16   it?

17   A.   I'm just saying I would have to look at the records to

18   see if there was -- if I wrote a script for phentermine.  I

19   can't remember if I wrote a script for phentermine.

20        She may have gotten it just once every month.  It may

21   have been that she got it every other month.  I don't

22   remember.

23   Q.   Okay.  Well, if we looked at your medical records and it

24   showed phentermine in the ongoing prescriptions, you wouldn't

25   dispute that you prescribed it to her?

1   A.   No.  No.

2   Q.   Similarly, if we looked in the KASPER and the CSMD and it

3   showed up as being filled, you wouldn't dispute --

4   A.   Correct.

5   Q.   -- that you, in fact, prescribed that?

6   A.   Right.

7   Q.   So going forward, you discussed how this patient tested

8   positive for methamphetamine on this date in -- that was

9   collected in March of 2020 and reported in April of 2020,

10  correct?

11  A.   Yes.

12  Q.   Okay.  Now, to this point the patient had repeatedly

13  failed as negative for phentermine in her preceding drug

14  tests; is that fair, or do you want to look at those?

15  A.   I think there was twice she failed and was positive for

16  meth, and then I think later on she had two more failed

17  phentermines.

18  Q.   So she had two more failed --

19  A.   Yeah, phentermines.

20  Q.   She had consistently failed for phentermine then.  We can

21  agree on that, right?

22  A.   Once or twice I think she had it, but in general, no.

23  Q.   Well, let's just -- so we're on the same page here -- she

24  had failed an April 2nd UDT for phentermine.  Do you agree

25  with that?

1    A.    Okay.

2    Q.    She failed a March 9th UDT for phentermine?

3    A.    Correct.

4    Q.    She failed the May 3rd UDT for phentermine?

5    A.    Yes.

6    Q.    So in that time period, she was failing for phentermine?

7    A.    Correct.

8    Q.    We agree with that?

9          When you are discussing this result with your attorney,

10   you said you kind of discounted this result because you

11   thought that it was possible that the methamphetamine result

12   was triggered by the phentermine and not by meth?

13   A.    What I said was one possibility was that maybe she

14   actually was taking her phentermine that month and it showed

15   up as methamphetamine because of an error in the urine

16   testing.  That's what I said.

17   Q.    I want to be very clear about this and with the jury on

18   this point and just with all of your testimony.

19         Are you saying that now that you are looking back on it

20   and thinking about it and having a chance to review the

21   records and think of an explanation for this, or is that what

22   you thought about then?

23   A.    Well, as I said, when she came in, she didn't have the

24   phentermine, I wasn't overly concerned about it.  I talked to

25   her about it, and we discussed it.  And then she had the meth

1    in there, and she said -- I'm not going to say what she said,

2    but I was assured that she wasn't taking that but she had been

3    taking her phentermine, and so that was my consideration.

4    Q.   And so if we were to go to your medical record for the

5    visit with Ms. Brown on April 28, 2020, would we see all that

6    discussion documented?

7    A.   No.  I was -- part of the problem was I was trying to see

8    30 or 40 patients that day.  It made it difficult.

9    Q.   Now, sir, I was hoping to go through a few things with

10   you generally about the clinic.  You would agree with me that

11   you knew when the clinic was operating a couple of things.

12   You knew, number one, that patients were, in fact, traveling

13   there from long distances including from Kentucky; is that

14   fair?

15   A.   I knew that they were traveling maybe 2 or 300 miles --

16   that's what I knew -- and that they were coming from Kentucky,

17   yes.

18   Q.   Okay.  So it's 2, 300 miles.  That is a fairly long

19   distance?

20   A.   I'm sorry.  I'm sorry.  Two to three hours, and they were

21   coming from Kentucky.  Not 2 or 300 miles.

22   Q.   Two to three hours would probably be 100 to 200 miles; is

23   that fair?

24   A.   Correct.

25   Q.   Okay.  You knew that Dr. Maccarone was keeping very odd

1    hours for a practitioner, true?

2    A.   He always did even when he was on a hospitalist.

3    Q.   But -- but you would agree with me, when -- the clinic --

4    A.   Yes.

5    Q.   -- when you were medical director, he was seeing patients

6    until 3:00, 4:00, 5:00 in the morning?

7    A.   I didn't know that.  I knew he was there until 11:00 or

8    12:00 at night, but I didn't know he was there until those

9    hours in the morning.

10   Q.   Well, I think in your interview with Investigator

11   Sizemore, you said you knew he was there until 1:00 A.M.; is

12   that fair?

13   A.   Okay.

14   Q.   And you would agree with me that a doctor seeing pain

15   patients at 1:00 A.M. is odd?

16   A.   It is -- it is true.  When he was -- when he was -- had

17   his own practice, he would make rounds in the hospital at 1:00

18   or 2:00 in the morning.

19   Q.   This wasn't a hospital --

20   A.   I'm just saying that was the hours he kept.

21   Q.   -- we both agree?

22   A.   Right.

23   Q.   You knew he was keeping these weird hours?

24   A.   Correct.

25   Q.   And, in fact, you told Investigator Sizemore that you had

1    a discussion with Dr. Maccarone about that, and your reaction

2    was, "Hey, you are going to lose patients if you keep doing

3    this."  And his response to you was, "You know, they may go to

4    you, they may go to somebody else, but they'll come back

5    because I keep giving them what they want."  He told you that?

6    A.   Yes.

7    Q.   Now, throughout your testimony, you frequently referred

8    to this as Maccarone's clinic or Maccarone doing the

9    prescribing.  And, for instance, when we talked about the

10   prescriptions, you said it looks like I'm writing the same

11   meds as him because he would start them out or he would put

12   them on a certain type of medication, and then you would keep

13   prescribing the same thing.  Do you remember that?

14   A.   There were a few patients that I would see as an initial

15   patient, but I would say 95 percent of them were patients that

16   he had already had them on those medications.

17   Q.   But your point was it looks like you're writing the same

18   meds when you really weren't?

19   A.   No.

20   Q.   Did you say that?

21   A.   No.  The point is that I was writing the same meds as

22   him.  My point was I'm not going to try to change their

23   medications in midstream.  I'm not going to see the patient

24   one visit to do an MME visit and change his medications.  And

25   when he was out sick, my anticipation was he was coming back

1    the next month.

2    Q.   So we're in agreement, then, it's not just that it looks

3    like you were writing the same medications; you were, in fact,

4    writing all those prescriptions?

5    A.   I just kept them on what they were on to make things

6    simple for the patient.

7    Q.   And you would agree with me that, as a doctor, a DEA

8    registration is issued to you personally, correct?

9    A.   Yes.

10   Q.   Your counsel held up and showed that DEA registration,

11   correct?

12   A.   Correct.

13   Q.   And you would agree with me, as a practitioner, as

14   somebody who's authorized to prescribe controlled substances,

15   every time you write your name on that line, you are

16   responsible for that, correct?

17   A.   Yes.

18   Q.   You also talked about the urine drug screen, the

19   alternating between UDS and UDT and UDS.  Do you know what I'm

20   talking about?

21   A.   In general, that's the way they did it.

22        There were times when the patient wouldn't have any urine

23   testing at all.

24   Q.   I understand you are saying that now, but on your direct

25   testimony, you said it was urine drug screen, urine drug test,

1  urine drug screen.

2      Are we on the same page about that point, that the

3  alternating?

4  A.   You can look at the records and see --

5  Q.   We are not talking about how often, just the practice

6  of -- what I'm trying to get at -- this is not a trick.  I'm

7  just trying to get at you, I think, were raising the concern

8  about, if you ran a urine drug screen but then didn't confirm

9  that drug screen.  Do you remember talking about that?

10 A.   Yes.

11 Q.   Okay.  And I think your discussion with counsel was that

12 we would run a urine drug screen one month, and the next month

13 they would come in for a send-out, right?

14 A.   Okay.  Yes.

15 Q.   Is that what you were describing?

16 A.   Well, what I was describing would be that there would

17 be -- there would be some situations -- let's say, for

18 example, the patient had a urine drug test on December 15th.

19 Then the next month, they'd come back, and it's January 15th,

20 and they do a drug screen.  So now at that visit we have two

21 tests to look at.

22      The next month, when they come back, in -- February 15th,

23 a urine drug test might be done again, but we don't have that

24 result until the next month.  So there would be no urine drug

25 test to look at at all that second month.

1    Q.   Right.  So I think we are describing the same thing

2    here --

3    A.   Okay.

4    Q.   -- which is you would have a screen in-house but that

5    would not be sent out externally, but then the next month,

6    somebody would come in, they would have a test which would

7    just go out externally, and that prior screen -- I think what

8    you were saying was that it didn't get confirmed, who knows

9    what happened to that, and that wasn't available.  Is that

10   fair?

11   A.   No.  What I said was the urine drug screen can be

12   confirmed by doing a urine drug test that same visit.

13   Q.   You can send that sample out for confirmation?

14   A.   Right, but, in general, that is not how it was being

15   done.

16   Q.   Right.  So that point, what you just said, that is what

17   I'm trying to ask you about.

18        Are we on the same page?

19   A.   Right.

20   Q.   That practice of whether it was confirmed or not, that

21   continued on throughout the time you were there?  That was

22   typically the case, that they would not send that UDS out for

23   confirmation?

24   A.   Correct.

25   Q.   And you said in your testimony -- you refer to it as

1   Maccarone was doing that.  Do you remember that?

2   A.   That was the way his policy was.  He had set that up with

3   the urine -- with the people who collected the urine right

4   there in his office.  That was all set up before I got there.

5   Q.   And you, sir, were the medical director there for four

6   years.  You prescribed to patients thousands of times.  And

7   you did that with that being the urine drug testing that you

8   had available to you, correct?

9   A.   Yes.  I mean, he was only required to do it twice a year,

10  but he was doing it a lot more than that.

11  Q.   Now, you also mentioned during your testimony about --

12  something about COVID.  Do you remember saying that?

13  A.   Yes.

14  Q.   I think, if I understood you correctly, you said most of

15  this happened during COVID.

16       Do you remember saying that?

17  A.   I said that, by the middle of 2019, into -- into and

18  through 2020.  I may not have said that, but that's what I

19  meant.

20  Q.   Just to clear it up, you would agree with me that 2016,

21  2017, 2018, and really most of 2019 COVID wasn't a thing in

22  our society, it wasn't --

23  A.   No.  The first time he was out sick, COVID was just

24  starting by the time he came back, which is around March, I

25  believe.

1   Q.   Of 2020?

2   A.   '19.  I believe -- I don't remember exactly, but I

3   thought the COVID started being an issue sometime in 2019.  I

4   can't remember exactly.

5   Q.   We'll let everybody's recollection control on that.

6        I think you already mentioned this -- a couple other

7   points -- you did, in fact, do more than just continue

8   people's medications, correct?

9   A.   I gave them braces and therapy and injections, too, yes.

10  Q.   But you also admitted patients, didn't you?

11  A.   Occasionally, yes.

12  Q.   Well, you admitted Anita Fralix?

13  A.   Yes.

14  Q.   You admitted Shawn Brown?

15  A.   Okay.

16  Q.   You admitted Charles Wooten?

17  A.   Okay.

18  Q.   You admitted Susan Jones?

19  A.   If you say so.  I don't remember --

20  Q.   Jennifer Vardaman?

21  A.   Yeah, I suppose so.

22  Q.   Cleavon Parchman, you admitted him, too?

23  A.   Who?

24  Q.   Cleavon Parchman?

25  A.   Okay.

1    Q.   The point is, in each of those instances, I believe you

2    prescribed them oxycodone and oxymorphone, correct?

3    A.   Correct.

4    Q.   All right.  Sir, just a couple last questions for you, if

5    we can.

6         MR. SMITH:  And, Your Honor, if I can have a moment

7    to check my notes here.

8         THE COURT:  Yes.

9    BY MR. SMITH:

10   Q.   Couple last things.  I don't know if we talked about

11   this, but you talked with your attorney about the concept of

12   pill counts, right?

13   A.   Yes.

14   Q.   You gave your attorney a pretty thorough explanation of

15   the purpose of a pill count and what you are looking for when

16   you do a pill count, right?

17   A.   Yes.

18   Q.   And you agree with me that's a method of fighting against

19   drug diversion?

20   A.   Correct.

21   Q.   It's not perfect, but it's one of the tools you could use

22   to fight against diversion, right?

23   A.   Yes.

24   Q.   Now, when you were talking about your interview with

25   Investigator Sizemore, you noted that, in your discussion with

1  him, you kind of said, well, the problem with pill counts is,

2  somebody -- if they sold all those meds, they could go get

3  some back and beat the pill count.  Do you remember talking

4  about that?

5  A.   Yes.

6  Q.   And you would agree with me that just because someone

7  might be able to beat the pill count isn't a reason not to do

8  it at all, correct?

9  A.   Correct.

10 Q.   Now, again, the representation to the state about the

11 pill count policy at GMA was that they were doing three a year

12 and you may be discharged if you don't comply, correct?

13 A.   Correct.

14 Q.   Based on your review of the records, was GMA complying

15 with that pill-count policy?

16 A.   That's not something I found in the records.

17 Q.   I think that's exactly the point, sir.  You didn't see

18 any notations reflecting that people did pill counts?

19 A.   Well, I showed a patient today that had a pill count.

20 Q.   One, correct?

21 A.   And that is one of the three I was showed, yes.  But I

22 didn't look through all of those records to see who was doing

23 pills counts.

24     I was only there two days a week and afternoons.  So if a

25 pill count had been done during that day or on another day,

1    that's not something that they would necessarily tell me

2    about.

3    Q.   Well, there are occasionally notations in the records

4    that I think you have reviewed in advance of this trial --

5    occasionally there are notations -- a notation saying a

6    patient came in for a pill count and here was the result,

7    right?

8    A.   Correct.

9    Q.   In fact, there was one with Patient Jennifer Vardaman.

10   We talked about her in the summary.  And she failed a pill

11   count the visit before she saw you.  Do you remember hearing

12   about that?

13   A.   She actually, as I recall, had two pill counts.  The one

14   prior to that was good, and there was a note from Maccarone

15   that said the pill count is adequate.  The second one, which

16   you are speaking of, said the pill count was not felt to be

17   consistent.

18   Q.   Well, let's look at that real quick.

19        MR. SMITH:  Okay.  Let's bring up Government's

20   Exhibit 112, page 207.

21        THE COURT:  It's her record?  Is that correct?

22        MR. SMITH:  Yes, Your Honor.  This has previously

23   been admitted.

24   BY MR. SMITH:

25   Q.   Sir, I'll represent this is Vardaman's patient file.

1  It's obviously been redacted.

2      This is what you are talking about?

3  A.    Okay.  I vaguely -- as I said, I vaguely remember she had

4  one beforehand.

5  Q.    Okay.  And so, if we scroll down, that lists the results

6  of the pill count, correct, at the bottom?

7  A.    "Patient is taking her medications as prescribed."  Yes.

8  Q.    It says that.

9      Now, to be fair, I don't think that the entries in here

10  are correct, meaning, that -- notations about how many of each

11  drug the patient is being prescribed.  But even if we did

12  that, this is seven days after the patient filled their

13  prescription.  Do you see that?

14      MR. SMITH:  So if we go out to the note at the top,

15  Rebecca.  Just any --

16  BY MR. SMITH:

17  Q.    It's on the 11th, right?  Do you see that, sir?

18  A.    Okay.  March 11th.  Go ahead.

19  Q.    March 11th.

20      MR. SMITH:  If we go down to the bottom.

21  BY MR. SMITH:

22  Q.    Okay.  When does it say the fill date was?

23  A.    Fill date was March 4th.

24  Q.    Okay.  So it's been seven days, right?

25  A.    Okay.

1    Q.   And how many of each pill should the patient have been

2    taking?

3    A.   So she was taking them q eight hours.  Okay.  So how

4    many -- she got 60, I think.

5    Q.   I think if --

6    A.   If she's taking one pill three times a day and the time

7    difference was -- she had -- the 4th, and this is the -- what

8    is this?  Is this the 11th?  So this is -- this is on the

9    11th.  So that would have been seven days later.  So seven

10   times three is 21.  So 21 from 60 would be -- would be 39.

11   Q.   39.  Correct.

12   A.   Okay.  That's correct.

13   Q.   If the patient was, in fact, getting 60 oxycodone and 90

14   oxymorphone but putting that aside, how many oxymorphone

15   should they have?

16   A.   Let's see, 90.  So if she had -- she wasn't -- apparently

17   wasn't taking all of her oxymorphone because she should

18   have had it again -- well, okay.  She's taking it twice a day;

19   so it would be 14.  So she would have been -- she would have

20   had 76.  She had 71.

21   Q.   So it's a little bit off, but we'll just -- assuming that

22   that's correct and/or potentially entry error by someone that

23   wasn't you.  Fair enough?

24   A.   Okay.

25   Q.   Then there was another pill count a little bit later?

1    A.   That one --

2         MR. SMITH:  And that's on page 179, please.

3    BY MR. SMITH:

4    Q.   And you remember seeing this one, correct, sir?

5    A.   Yes.  When I scanned through the charts, I came across

6    that.

7    Q.   Okay.  And the conclusion there was the patient had

8    failed that pill count, correct?

9    A.   Correct.

10   Q.   You saw the patient the next month?

11   A.   I saw her I think -- I think it was for an office visit

12   sometime that next month.

13   Q.   Okay.  In fact, you saw her I think about nine days

14   later?

15   A.   Okay.

16   Q.   And you prescribed her her full monthly set of --

17   A.   Right.  This note would -- the note that was given me had

18   to -- would have been the previous office note.  They weren't

19   giving me pill count notes.  That's one of the reasons I

20   didn't -- didn't know when pill counts were being done.  They

21   were giving me the previous office note, not random pill count

22   notes.

23   Q.   My point with all of this then, sir:  You see what it

24   looks like when they did, in fact, do pill counts?  There is a

25   notation in the record like this?  It kind of looks like an

1   office visit, but it's just they put the math in the bottom;

2   is that fair?

3   A.    Correct.

4   Q.    You would agree with me that, in all the records you

5   reviewed, this does not pop up very frequently?  Agreed?

6   A.    Correct --

7   Q.    This does not pop up three times a year for every patient

8   like the policy says?

9   A.    Correct.

10  Q.    And I understand your testimony to be:  I didn't know

11  that; I couldn't have known that; is that right?

12  A.    When I was there at the office, yeah, there was no way --

13  no one was reporting to me about pill count -- what the pill

14  count results were or whether patients were being discharged

15  for pill counts.

16  Q.    But this is the same thing like what we talked about the

17  drug test results, which is you had access to the EMR, you had

18  access to the medical records, you could have logged on to

19  check patient files to see if they were doing that, and you

20  didn't do that, did you, sir?

21  A.    If you -- if you look at the picture of my office, there

22  was not a computer in my office.

23  Q.    So did you check the EMR, or did you not check the EMR?

24  A.    I would have to go back and check the EMR at a later

25  point.  But check the EMR for what?

1    Q.   To see if there were notations of pill counts?

2    A.   No.  No.

3    Q.   So you did not do that?

4    A.   Not for pill counts, no.

5    Q.   As the medical director for that facility, for four

6    years, you did not actually look to see if people were

7    following the pill count policy in the records; is that fair?

8    A.   Do you mean did I sit down and go through 500 charts on a

9    month basis to see if they happened to have a pill count done?

10   I did not.

11   Q.   Did you go -- did you go through two charts on a monthly

12   basis to see if they had a pill count?

13   A.   Yeah, but that's not a representative sample of anything.

14   Q.   So you did go through two patient charts a month?

15   A.   I would go through charts intermittently.  Now, when

16   Maccarone was out --

17   Q.   On that point, if I can, when you talked to Agent

18   Sizemore, you repeatedly told him you weren't reviewing the

19   medical records.  You told him what you had available to you

20   was the previous month's note, the CSMD, that packet of

21   information.  But you repeatedly in that interview said, "I

22   wasn't reviewing the medical records."

23        In fact, you said, "I would be a whole lot more worried

24   about this whole thing, but I wasn't reviewing the medical

25   records."

1     Now, did you say that?

2  A.   I was speaking about Maccarone's records.

3  Q.   Okay.  And these records, are they -- are they your

4  records? are they Maccarone's records? whose records are they?

5  A.   If they are patients that I saw, then I would be going

6  back through them at some point to review them.

7  Q.   Okay.  And in your records, did you note pill counts?

8  A.   No.

9  Q.   Lastly, sir, you would agree with me that opioids are

10 dangerous, correct?

11 A.   They can be, yes.

12 Q.   And you would agree with me that this part of the country

13 has been suffering from an opioid epidemic for several years

14 now, the better part of six, seven, eight years now, correct?

15 A.   Yes.

16 Q.   And Kentucky and Tennessee have been particularly hard

17 hit by that?

18 A.   Correct.

19 Q.   And you would agree with me that, as a pain management

20 physician, that's something that you are aware of and that you

21 need to be cognizant of when you are taking care of patients;

22 is that fair?

23 A.   Correct.

24 Q.   You would agree with me that the biggest driver of the

25 opioid epidemic, the thing that is harming most people out

1   there, is fentanyl and heroin?

2   A.   Yes.

3   Q.   And you, sir, based on everything we've looked at in this

4   case, you repeatedly prescribed to people who had heroin and

5   fentanyl in their systems, didn't you?

6   A.   On occasion, after reviewing the chart and talking to the

7   patient, sometimes I did, yes.

8   Q.   And the drugs that you gave these people who are on

9   fentanyl and heroin were oxycodone and oxymorphone more often

10  than not, correct?

11  A.   Yes.

12  Q.   Those are drugs that you told Investigator Sizemore are

13  too addictive to give at your own clinic, correct?

14  A.   Well, I was not speaking -- I was mistaken when I said

15  that.

16  Q.   Did you say that?

17  A.   He asked about Dilaudid, and I didn't know what he meant

18  when he said Dilaudid.

19  Q.   Sir, if the record were to show that he asked about

20  oxycodone and oxymorphone, did you prescribe those, and you

21  said, no, they are too addictive, do you deny that?

22  A.   I don't deny I said that, but we do prescribe it in our

23  office.

24       MR. SMITH:  Your Honor, that's all the questions I

25  have.

1          THE COURT:  Thank you.

2      Redirect?

3                      REDIRECT EXAMINATION

4  BY MR. STRIANSE:

5  Q.  Just a couple of questions, Dr. Stanton.

6      You were asked about a patient Jeffrey Ghent.  When you

7  were seeing him, it was when Dr. Maccarone was out the first

8  time; is that right?

9  A.  Yes.

10  Q.  And, generally speaking, his urine drug screens and urine

11  drug tests were good with the -- during that interval with the

12  exception of one time; is that right?

13  A.  Yes.

14  Q.  Do you remember a -- a test that was taken in January of

15  2019?

16  A.  The one that was done on January 3rd, I believe.

17  Q.  Right.

18      Do you remember in advance of that test, I think it was,

19  a prescription had been issued to him on November 26, 2018; is

20  that right?

21  A.  Yes.

22  Q.  And then fast-forward 38 days or so to January the 3rd of

23  2019, and that was the one test that we saw earlier that had

24  no metabolites in the urine; is that right?

25  A.  Correct.  That's the only time.

1   Q.   Now, based on your experience with that patient and your

2   training, were you concerned about that result?

3   A.   No, because it had been 38 days.

4   Q.   And did there seem to be a rational, reasonable

5   explanation for why there would be no metabolite --

6   A.   Yes.

7   Q.   -- in January?

8   A.   Yes.

9   Q.   Was there anything about your interaction with Ghent when

10  you were seeing him when Dr. Maccarone was out that really had

11  your antenna up that he was some drug-seeking patient that was

12  lying to you?

13  A.   No.

14  Q.   What was your experience with Ghent?

15  A.   He was a typical patient who had orthopedic problems

16  that -- a number of orthopedic problems that would require

17  pain medications, a chronically torn rotator cuff by the time

18  I saw him, and he was taking his medications appropriately, as

19  far as I could tell.

20  Q.   All of the imaging studies, all the medical records, did

21  he appear to be a legitimate pain patient to you?

22  A.   Correct.

23  Q.   Was he reporting to you that he was in pain?

24  A.   Yes.

25  Q.   Let me ask you a few questions about Lisa Waynick.  She's

1   another patient that you saw during that little slice of time

2   in four months beginning November of 2018; is that right?

3   A.   Yes.

4   Q.   Did you see her the 20 months that preceded your

5   replacement of Maccarone?

6   A.   No.

7   Q.   Did you see her in the months after the four months that

8   you were seeing her?

9   A.   No.

10  Q.   And then one other thing:  On these --

11          MR. SMITH:  Your Honor, can we go on the earphones

12  real quick on that point?

13          (Sidebar conference.)

14          THE COURT:  Can you hear me, Mr. Strianse?

15          MR. STRIANSE:  Yes.

16          MR. SMITH:  Your Honor, I think the representation

17  was just made that, after the four months in -- was it 2017?

18          MR. STRIANSE:  No.

19          MR. SMITH:  Which time period?

20          MR. STRIANSE:  '18.

21          MR. SMITH:  For Ms. Waynick?

22          MR. STRIANSE:  Waynick.

23          MR. SMITH:  That she was seen in 2020.  When he

24  readmitted her, he saw her twice.

25          MR. STRIANSE:  All right.

1      MR. SMITH:  I just want the record to be clear on

2    that point.

3           THE COURT:  Do you want to clarify?

4           MR. STRIANSE:  Yes.

5           THE COURT:  Okay.

6      (Sidebar conference concluded.)

7    BY MR. STRIANSE:

8    Q.   Did you see her later in 2020?

9    A.   Yes.

10   Q.   And how was it that you were seeing her again in 2020?

11   A.   She had been discharged from the clinic, gone for a year,

12   came to my clinic.  I never actually saw her at my clinic, but

13   she was discharged and then came to Maccarone's clinic.

14   Q.   Okay.  That was the interval that she was seen by a nurse

15   practitioner at Joint and Spine; is that right?

16   A.   Yes.

17   Q.   Just one other thing that I wanted to ask you.  We've

18   talked a lot today about these urine drug screens and urine

19   drug tests.  When you would be seeing a patient, did you have

20   an expectation that you would be seeing a urine drug test

21   every time that you were conducting that visit?

22   A.   No.  The most I would expect would be 50 percent of the

23   time.

24   Q.   Why was that?

25   A.   Well, because they were doing them approximately

1  50 percent of the time.  They were -- on some patient charts I

2  reviewed -- I can't name which ones they were -- sometimes

3  there would be two or three months that would go by and they

4  wouldn't have a urine drug test.  They weren't required to do

5  them every other month, but on the average, it was every two

6  to three months they would have a urine drug test.

7  Q.   And based on your training and experience, was there

8  anything unusual about that?

9  A.   No.

10        MR. STRIANSE:  Those are my questions.

11        THE COURT:  Thank you.

12     Anything else, Mr. Smith?

13        MR. SMITH:  No, Your Honor.  Thank you.

14        THE COURT:  Thank you, sir.  You may step down.

15     (Witness excused.)

16        THE COURT:  Did you leave the papers up there?  I'm

17  sorry.  Thank you.

18     All right, Mr. Strianse.

19        MR. STRIANSE:  I call Tonia Humphrey.

20     **TONIA HUMPHREY, DEFENDANT'S WITNESS, DULY SWORN**

21        THE COURT:  Good afternoon, ma'am.

22        THE WITNESS:  Good afternoon.

23        THE COURT:  Try to speak in a clear, loud voice.

24     Would you first state your name and spell your last name?

25        THE WITNESS:  Tonia Humphrey, H-u-m-p-h-r-e-y.

1          THE COURT:  Please spell that first name, too.

2          THE WITNESS:  T-o-n-i-a.

3          THE COURT:  Mr. Strianse.

4                          DIRECT EXAMINATION

5    BY MR. STRIANSE:

6    Q.   Good afternoon, Ms. Humphrey.

7    A.   Good afternoon.

8    Q.   Be sure to keep your voice up so we can hear you this

9    afternoon.

10   A.   Yes, sir.

11   Q.   Where do you live?

12   A.   I live in Cumberland City in Stewart County.

13   Q.   And that's in Tennessee; is that right?

14   A.   Yes, sir.

15   Q.   And have you lived in Stewart County your entire life?

16   A.   Yes, sir.

17   Q.   And how are you currently employed?

18   A.   At the Joint and Spine Pain Center.

19   Q.   In Clarksville?

20   A.   Yes, sir.

21   Q.   And what is your position there at the Joint and Spine

22   Clinic?

23   A.   I'm a nurse.

24   Q.   And do you know John Stanton?

25   A.   Yes, sir.

1   Q.   And tell the jury how you know Dr. Stanton.

2   A.   I have been with Dr. Stanton since 1999.  I went straight

3   out of nursing school with him in orthopedics.

4   Q.   And how many years is that that you've been working with

5   Dr. Stanton?

6   A.   Like, 22.

7   Q.   So when you first began working with him, you were

8   working with him in his orthopedic practice; is that right?

9   A.   Yes, sir.

10  Q.   And did there come a point in time that he opened up his

11  own pain clinic?

12  A.   Yes, sir.

13  Q.   Do you remember when that was?

14  A.   That was in 2015.

15  Q.   Okay.  Did your duties change when the transition was

16  made from the orthopedic practice to the pain management

17  practice?

18  A.   Some, yes, sir.  But I was still the nurse, yes, sir.

19  Q.   Focusing on the time that you've worked with him in the

20  pain management practice, how would you describe his

21  prescribing conduct?

22          MR. SMITH:  Objection.

23       (Sidebar conference.)

24          THE COURT:  What's the objection?

25          MR. SMITH:  Your Honor, this is 404 evidence.  She's

1  offering evidence of other conduct to prove conduct in

2  conformity with the -- his prescribing habits at Joint and

3  Spine Center, not at issue in this case.

4      She wasn't at GMA.  I think what he's trying to do --

5  he's a good, careful doctor there -- to raise the inference

6  that he must have done so at the other practice and --

7            THE COURT:  Can you repeat the last sentence?

8            MR. SMITH:  Just making clear that this is

9  inadmissible propensity evidence under Rule 404.

10           THE COURT:  Mr. Strianse?

11           MR. STRIANSE:  Judge, I was trying to ask these

12 questions in obedience to the *Akers* opinion that you have

13 offered, unless I misread it.  I thought that prescribing

14 conduct for his general reputation as a doctor would be

15 appropriate areas for a witness like this.

16           THE COURT:  Well, I think that would depend partly on

17 the temporal period, and that case would have involved

18 prescribing practices within a particular patient population.

19 It doesn't sound like this is the same patient population.

20     So your question was describe his prescribing practices?

21           MR. STRIANSE:  Yes.

22           THE COURT:  What are you anticipating she's going to

23 say?

24           MR. STRIANSE:  I think she's going to say that he was

25 the type of doctor that would lower medications and not give

1     high doses of pain pills.

2              THE COURT:  Mr. Smith?

3              MR. SMITH:  We moved in limine.  This is classic good

4     evidence of I was doing good stuff at a different place,

5     different time, and, ergo, it means I'm not guilty here.

6              THE COURT:  It doesn't seem like -- it's not

7     pertinent character evidence.  It seems that you are trying to

8     take the mechanics of a practice in one clinic and have her

9     comment on it and use that to create an inference about

10    mechanics in a different practice, which does seem -- that

11    does seem different.

12             MR. STRIANSE:  I thought that it was also a close

13    patient population.  For example, Lisa Waynick was with GMA

14    and came to Stanton's clinic, and there are other GMA patients

15    that went from GMA to Stanton's clinic.  So I thought it was

16    basically a similar patient population, similar patient class.

17             THE COURT:  Mr. Smith?

18             MR. SMITH:  We have heard evidence of hundreds of

19    patients, 500 in a given month, but that's not always the same

20    500, or episodically having one or two in the same town is not

21    the same thing.  But, again, it still would not -- still other

22    acts -- evidence trying to prove action and conformity with

23    that behavior, and that's not admissible.

24             THE COURT:  All right.  Mr. Strianse?

25             MR. STRIANSE:  Your Honor, that was my purpose in

1    offering it.  I thought it was a similar patient class and

2    that the prescribing practice would be probative of his

3    overall course of patient -- care of patients.

4           THE COURT:  Well, you have cited to *Akers*.  That

5    case, you know, from years ago.  I don't have a photographic

6    memory of what happened in that case.  That case involved

7    specific questions about the way a doctor prescribed.  For

8    example, did he make home visits, did he write prescriptions

9    outside the office, you know, house calls, medicine off-site,

10   that sort of thing.  So I do remember grappling with his other

11   prescribing for this same patient population in the same

12   period and allowing some proof in on how he typically treated

13   patients, but I don't -- I don't recall in the character vein

14   allowing in proof -- general proof of this type.

15       So proffer to me what our proof is going to be.

16           MR. STRIANSE:  You know, the testimony would have

17   been, as I have stated, careful prescribing habits.  I was

18   also going to try to elicit opinion testimony from her as to

19   his general reputation as a doctor.

20           THE COURT:  Well, I think if you wanted to say, in

21   your view, is he a careful practitioner, I'm okay with letting

22   her answer that.

23       His general reputation as a physician, what's your view

24   on that, Mr. Smith?

25           MR. SMITH:  So moving past that issue, did you want

1   me to comment on the question you proposed?

2          THE COURT:  Um-hum.

3          MR. SMITH:  The question you proposed about is

4   general -- you know, whether he's a careful doctor, that still

5   sounds kind of like a character.  It's 404(b) or 405(b).

6   Either way, it's specific instance of conduct he proved some

7   other way, which is not permitted.

8       As to the good doctor character, I'm not sure that's a

9   character trait, but even if it, it's not a pertinent

10  character trait.

11      We moved in limine that has to be at issue for the

12  enhancements of this offense and just somebody opining, yeah,

13  I think you are a good doctor, I see the allure of that from a

14  defense side.  Certainly that's not --

15         THE COURT:  The scope, the scope of proper practice?

16  That is part of the element.

17         MR. SMITH:  But completely it is something that's

18  disputed, but the question is:  How are they proving it?  And

19  the mode of proving it here is by eliciting an opinion by

20  somebody being a careful doctor.  You can't proffer that he

21  is, in fact, a careful doctor here by saying with specific

22  instances of conduct under 405(b).  That's -- that's kind of

23  what they are getting at, he's a good, careful doctor; he

24  acted this way when I was with him, ergo he must be acting

25  that way then.

1          THE COURT:  But that's a specific instance.  I'm not

2    letting him do that.

3          MR. SMITH:  Right.

4          THE COURT:  I'm talking about a 404(a)(2)A, the

5    defendant may offer evidence of the defendant's pertinent

6    trait, and if the evidence is admitted, prosecution may offer

7    evidence to rebut it.

8          MR. SMITH:  We have talked about those are not

9    pertinent traits for a Title 21 offense.  It's not a question,

10   for instance, of an instance when you have a fraud offense

11   where the offense depends on this trait.  That's not -- his

12   general care as a physician does not dictate one way or

13   another whether he's within the scope of professional

14   practice, and her opinion on that -- I mean, you could ask a

15   lot of opinion questions about a lot of good traits about a

16   doctor or any other defendant, but that doesn't make it

17   pertinent.

18      Rule 405 is limited this way for a reason.

19         THE COURT:  Again, I'm under Rule 404, not under

20   Rule 405.

21         MR. SMITH:  I thought we were now talking about the

22   opinion as a good doctor.

23         THE COURT:  All right.  Let me send the jury out.

24      (End of sidebar conference.)

25         THE COURT:  I'm going to excuse you for a few minutes

1    while we hash out another legal issue.  So let's take about a

2    ten-minute break at this time under the same admonitions.

3    Thank you.

4        (Jury not present.)

5        THE COURT:  I want to hear proffer on what the

6    question and answer is going to be so I can evaluate in that

7    context.

8        Mr. Strianse, briefly go ahead.

9        MR. STRIANSE:  Your Honor, there was two areas I was

10   going to try to cover with this witness.

11       THE COURT:  Go ahead.

12       MR. STRIANSE:  One was her observation of the

13   prescribing conduct of Dr. Stanton.  And I think her answer

14   would be that --

15       THE COURT:  Go ahead and ask her.  I want to hear

16   what she says.

17       MR. STRIANSE:  Okay.

18                        OFFER OF PROOF

19   BY MR. STRIANSE:

20   Q.   Ms. Humphrey, you have worked with Dr. Stanton for

21   22 years now; is that right?

22   A.   Yes, sir.

23   Q.   And what -- what has your observation been in terms of

24   his prescribing of schedule II pain pills?

25   A.   He's always been very limited with his prescriptions.

1    Therefore, the patient has more of an incentive to want to get

2    better, where they are not medicated to where they don't want

3    to get better, they just want to rely on medicine.

4    Q.   And what has been your experience with him in terms of

5    prescribing alternative remedies and therapies?

6    A.   That it's -- that's just part of his practice.  We do --

7    he does medications.  He does physical therapy, bracing,

8    injections.  There's more alternatives than medication at the

9    clinic.

10   Q.   And do you have an opinion as to his general reputation

11   as a doctor?

12   A.   I do.  He's an upscale man.

13            THE COURT:  What did you say?

14            THE WITNESS:  He's very prominent.

15            THE COURT:  He's a what scale?

16            THE WITNESS:  Upscale.

17            THE COURT:  Upscale man?  Is that what you said?

18            THE WITNESS:  Upscale.  He's very prominent in our

19   community.  He's well-known.

20   BY MR. STRIANSE:

21   Q.   But how about your opinion as to how he functions as a

22   doctor?

23   A.   I have no complaints on that.

24   Q.   Okay.

25   A.   I've -- I mean, he's by the book.

1        MR. STRIANSE:  Your Honor, those would be the areas

2    that --

3        THE COURT:  Okay.  Would you step out for a few

4    minutes, step out of the courtroom?

5        Thank you.

6        (Witness not present.)

7        THE COURT:  Can we close that door back there?

8    Okay.  So the question about her experience with his

9    prescribing, that seems doctor specific to me.  She's at a

10   different clinic.  I don't believe that's appropriate proof

11   under Rule 404 as to his conduct at this clinic.

12       And he's repeatedly distinguished his clinic from the

13   Maccarone clinic.  And then I think turning around and using

14   an operation at his clinic in a way that bolsters the view of

15   how he operates at the other clinic is particularly outside

16   the bounds because of the distinctions that have been drawn

17   and the principles of Rule 404.

18       Same for the use of alternatives.  I mean, the record

19   here shows the prescriptions.  It shows the treatment of the

20   course 500 patients.  So if they're -- I don't think it's

21   proper to result -- or to resort to that proof.

22       Obviously, I'm not going to let you ask about his general

23   reputation in the community, that he's a good, upscale man, I

24   think she called him.  That would not be proper.

25       I am going to let you ask if she has an opinion about his

general reputation as a practitioner, and her answer, as I

understood it today -- a moment ago, was no complaints on

that; he's by the book.  I'm going to let you ask her that and

let her give that answer, but that's going to be the extent of

what is permitted.

I do think the care he shows, his degree of rectitude as

a practitioner -- I do think that's pertinent as a character

trait as it relates to the elements of the conspiracy charge.

So within that limited vein, I'm going to let the proof

come in.

The government can cross-examine as it sees fit.

That's the extent I'm going to allow of her testimony in

this regard.

Anything else on that, Mr. Strianse?

MR. STRIANSE:  No, sir.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  So we'll call -- get her in, and then

your last witness is going to be who?

MR. STRIANSE:  Jennifer Bopp.

THE COURT:  Bopp.  All right.  Okay.  Let's bring the

witness back in first.

(Witness present.)

THE COURT:  Don't bring the jury back in yet.  You

can be seated.

1      I have decided what I'm going to allow you to be asked

2   and not allow you to be asked.

3      So Mr. Strianse is not going to ask about your

4   observations of prescribing history or alternate or

5   alternative treatment.

6      It means he's not going to ask you about your view of the

7   general reputation of Dr. -- Dr. Stanton.  So I don't want you

8   to give that answer about he's an upscale man.

9      I am going to let him ask you your view of his general

10  reputation as a general practitioner.  Your answer a moment

11  ago was you have no complaints and he does things by the book.

12  That's fine, but that's the farthest I'm going to let your

13  testimony go in terms of the area we've talked about.

14     Do you understand that, ma'am?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  All right.  Let's bring the jury

17  in.

18     (Jury present.)

19          THE COURT:  Thank you, ladies and gentlemen of the

20  jury.  You've been so flexible and patient throughout this

21  trial.  I'm grateful for it.

22     We took a short break to take up a legal issue, and now

23  we're ready to continue with the direct examination of

24  Ms. Humphrey.

25     Mr. Strianse.

1    BY MR. STRIANSE:

2    Q.   Ms. Humphrey, you told us that you live in Stewart

3    County; is that right?

4    A.   Yes, sir.

5    Q.   That is adjacent to Montgomery County or Clarksville; is

6    that right?

7    A.   Yes, sir.

8    Q.   And you have worked in the Clarksville area for over

9    20 years; is that right?

10   A.   Yes, sir.

11   Q.   And what is Dr. Stanton's general reputation in that

12   community as a medical practitioner?

13   A.   He's well-known.

14   Q.   And what about his reputation?

15   A.   He has a very good reputation in Clarksville.  He's

16   well-known for multiple things.

17   Q.   Good reputation as to what?

18   A.   Absolutely.

19   Q.   Let me finish that question.  He enjoys a good reputation

20   for what?

21   A.   For his care for his patients.

22             MR. STRIANSE:  Thank you.

23             THE COURT:  Mr. Smith.

24                          CROSS-EXAMINATION

25   BY MR. SMITH:

1    Q.   Good afternoon, ma'am.

2         You worked with Dr. Stanton at the Joint and Spine Pain

3    Center.  Do I have that right?

4    A.   Correct.

5    Q.   You did not work with him at Gateway Medical Associates,

6    correct?

7    A.   No, sir.

8              MR. SMITH:  Thank you, Your Honor.

9              THE COURT:  Anything else?

10             MR. STRIANSE:  No, Your Honor.

11             THE COURT:  Thank you, ma'am.  That concludes your

12   testimony.  You can step down.

13        (Witness excused.)

14             THE COURT:  Mr. Strianse.

15             MR. STRIANSE:  Call Jennifer Bopp.

16        **JENNIFER BOPP, DEFENDANT'S WITNESS, DULY SWORN**

17             THE COURT:  Good afternoon, ma'am.  Try to speak

18   toward that mic in a clear voice, if you would, so we can

19   understand your testimony.

20        That chair is fixed, but the mic will move, if you need

21   to move it towards you.

22        Will you start by telling me your name and spelling your

23   last name?

24             THE WITNESS:  Jennifer Bopp, B-o-p-p.

25             THE COURT:  Thank you.

1      Mr. Strianse.

2           MR. STRIANSE:  Thank you, Your Honor.

3                      DIRECT EXAMINATION

4   BY MR. STRIANSE:

5   Q.   Ms. Bopp, where do you live?

6   A.   White Bluff, Tennessee.

7   Q.   Is that in Dickson County, Tennessee?

8   A.   Yes, sir.

9   Q.   How are you employed?

10  A.   I currently own a hemp farm.

11  Q.   Where is that?

12  A.   I'm sorry?

13  Q.   Where is that located?

14  A.   Highway 47 North in White Bluff, Tennessee.

15  Q.   What sort of products does that farm produce?

16  A.   We do CBD for several companies in the Nashville and

17  Dickson area.

18  Q.   Do you also grow vegetables and things like that?

19  A.   Yes, sir.

20  Q.   And do you know Dr. Stanton?

21  A.   Yes, sir.

22  Q.   How did you come to know Dr. Stanton?

23  A.   I was referred by my primary care to Dr. Maccarone's

24  practice.  Once I was referred, though, he was absent for

25  several appointments; so I was seen also by Dr. Stanton.

1    Q.   What was the nature of the referral from your primary

2    care physician to Dr. Maccarone's office?

3    A.   I was in a car wreck in December of 2019, and I had some

4    pretty extensive damage to my arm and back.  And my primary

5    care felt that injections would be in my best interest, as

6    well as further medical care that he couldn't provide.  So he

7    referred me to that clinic.

8    Q.   Were you seen by Dr. Stanton at Gateway Medical

9    Associates?

10   A.   Yes, I was.

11   Q.   And did there come a point in time that you transitioned

12   from Gateway Medical Associates to Dr. Stanton's clinic?

13   A.   Yes, there was.  I chose to make that decision or had

14   prompted that decision, just the uncertainties.  Sometimes

15   when you would go for your appointment, Dr. Mac would not be

16   present.  Some of the care that the primary care said I needed

17   I couldn't get from Dr. Maccarone.  And so one of the staff

18   there had recommended that I maybe see Dr. Stanton instead of

19   Dr. Mac.

20   Q.   And were you getting injection therapy from Dr. Stanton?

21   A.   Yes, I was.

22   Q.   Any other alternative treatments?

23   A.   Therapy, as well, and I was also given braces and sent

24   for other physical therapy that was needed.

25   Q.   And you've been -- you've known Dr. Stanton now for how

1    long?

2    A.   Roughly over two years.

3    Q.   And do you know his general reputation as a medical

4    practitioner?

5    A.   Yes.

6    Q.   And what is that reputation?

7    A.   It's one of very good standing.  I didn't have near the

8    problems like when I was at Dr. Mac's clinic.  To begin

9    with --

10            THE COURT:  He's just asking about the reputation.

11            THE WITNESS:  Oh, yes.

12            THE COURT:  That's --

13            THE WITNESS:  Sorry.

14            THE COURT:  Next question.

15   BY MR. STRIANSE:

16   Q.   Reputation is what other people will say about a person.

17   Have you heard positive things about Dr. Stanton?

18   A.   I base it off what I experienced from his care.

19            MR. STRIANSE:  Thank you.

20            THE COURT:  Mr. Smith.

21            MR. SMITH:  Thank you, Your Honor.

22                         CROSS-EXAMINATION

23   BY MR. SMITH:

24   Q.   Good afternoon, ma'am.  How are you?

25   A.   Good.  And you?

1    Q.   Good.

2         Just a couple quick questions.  Do you remember, by any

3    chance, when the last month was that you went to GMA?

4    A.   February of 2021.

5    Q.   Do you have a general understanding of when the clinic

6    closed?

7    A.   No.  There had been times when patients were rescheduled,

8    I guess, prior to the last time when I went to the building,

9    and there was just a notice on the door.

10   Q.   Do you recall a time period before that in February of

11   2021 when Dr. Stanton stopped coming as regularly to GMA?

12   A.   Yes.

13   Q.   Was that in about October of 2020?

14   A.   I can't be for certain because, like I said, there was

15   another doctor also that was at Gateway.  I seen Dr. Stanton

16   more than I seen Mac in my time there.  I can tell you that.

17   Q.   Whenever Dr. Stanton left -- I don't mean it to be a

18   memory test.  But from that point forward, you did stay for

19   several additional months at GMA before moving on; is that

20   fair?

21   A.   I would say a couple months, trying to get records,

22   before I could transition, yes.

23   Q.   Okay.  What were Dr. Maccarone's hours like, just out of

24   curiosity?

25   A.   Well, he would usually have patients scheduled for the

1    morning, but he never got there to see anybody before

2    6:00 P.M.

3        The latest I was ever there myself, though, was about

4    9:30, 10:00 at night, and I just demanded to be rescheduled

5    because, I mean, I was -- I had work the next morning at

6    7:00 A.M., and I just didn't see what the -- I had already

7    wasted a whole day there waiting to be seen.

8            MR. SMITH:  All right.  Thank you, Your Honor.

9        Thank you, ma'am.

10           THE COURT:  Mr. Strianse.

11           MR. STRIANSE:  I have nothing further.

12           THE COURT:  Is she finally excused?

13           MR. STRIANSE:  Yes.

14           THE COURT:  Thank you, ma'am.  That concludes your

15   testimony.

16       (Witness excused.)

17           THE COURT:  All right.  Mr. Strianse.

18           MR. STRIANSE:  Your Honor, Dr. Stanton would rest at

19   this time.

20           THE COURT:  All right.  Thank you.  Let's confer for

21   just a moment.

22       (Sidebar conference.)

23           THE COURT:  All right.  That closes defense case.

24       Does the United States plan to offer rebuttal proof?

25           MR. SMITH:  It would seek to offer proof in the form

1   of Dr. King's testimony.

2           THE COURT:  Is that the only rebuttal witness?

3           MR. SMITH:  That's correct.

4           THE COURT:  Tell me the topics you intend to cover by

5   way of rebuttal.

6           MR. SMITH:  Let me grab my other binder real quick.

7       Your Honor, can you hear me?

8           THE COURT:  Yeah.

9           MR. SMITH:  Okay.  Your Honor, the questions would be

10  specific to rebut certain contentions.  I guess, just stepping

11  back, in his testimony today Dr. Stanton obviously raised a

12  number of issues about the practice of medicine, for instance,

13  the interpretation of the UDT results, what certain medical

14  records showed, how to interpret certain results, when it was

15  proper to dismiss those kind of things.  So we would have a

16  targeted set of questions.

17      I don't have any one written out verbatim, but among

18  others, here are some -- what I would intend to ask him.  Is

19  that helpful?

20          THE COURT:  Um-hum.

21          MR. SMITH:  Okay.  Question 1 would be:  If a

22  practice's or office's urine drug testing program is

23  insufficient, what is the proper recourse for a practitioner?

24  What is within the usual course of professional practice with

25  respect to making sure you have UDTs available to you, that

1  kind of thing?

2      I think that was directly related to his testimony.

3          THE COURT:  All right.

4          MR. SMITH:  Second would be time:  If you, as a

5  practitioner, do not have enough time in your schedule for

6  whatever purpose to see a certain population of patients, what

7  is the appropriate way to treat it?  Conversely, is rushing

8  through patients because of time constraints -- is that in the

9  course of professional practice?

10      Third would be the review of medical records.  Is it

11  sufficient to review one previous note and not examine or

12  review prior medical records before making a prescribing

13  decision at a given point in time?

14          THE COURT:  And sticking to the review testimony that

15  Dr. Stanton gave today?

16          MR. SMITH:  Yes.  I don't want -- I think it fairly

17  put -- he said he generally had available that previous note

18  to him and a few other pieces of information.  He did not

19  typically go back and review.  For instance, in Mr. Ghent's

20  case, he did not go back and review all those other UDTs.  I

21  think the question would be focused on:  Is that an acceptable

22  approach, not looking back at -- if you are seeing this

23  patient for the first time, regardless of whatever, should you

24  review?  I think that's what we would ask.

25          THE COURT:  All right.

1        MR. SMITH:  I think there are certain things in the

2    imaging of Mr. Ghent and Ms. Waynick we would ask him just

3    to -- they were held out, as the defense, as being

4    justifications for prescribing.  For instance, arthritis.  We

5    would ask him specifically to opine:  Is that a basis for

6    prescribing opioids?

7        THE COURT:  Okay.

8        MR. SMITH:  Length of time of a patient, he said

9    minimum of six minutes per patient for follow-up visits.  I

10   would ask him to opine on:  Is that acceptable practice?

11       I may ask him hypotheticals specific to the proof such

12   as:  If a doctor had to see 25 to 30 patients in an hour and a

13   half to two hours, which I think is consistent with the proof,

14   what is your opinion on that?

15       And then, if I can just consult my notes for -- given

16   that we just finished up cross, just give me two minutes to

17   think about it, but it wouldn't be much more than that.  Three

18   or four more questions.

19       THE COURT:  Okay.  Take a quick look, and then I want

20   to hear from Mr. Strianse.

21       MR. SMITH:  Your Honor, I think the last several

22   categories would be asking him to explain to the jury this

23   concept of whose patient it is.  And so I think that's been

24   kind of an issue raised in the defense:  They were Maccarone's

25   patients; I was seeing them.

1    Dr. King would testify about his understanding, when you

2   are a practitioner, whether it's the first time or you are

3   filling in four months, in medicine whose patient for that --

4   who's responsible for that, that kind of thing.

5    Next would be a fairly pointed question, but I think --

6   which came up repeatedly, which is, if they -- if a patient

7   tests positive for certain types of drugs, especially heroin,

8   fentanyl, and methamphetamine -- obviously that's been a

9   central issue here today -- what is his opinion of what the

10  acceptable approach is, how do you react to that as a

11  practitioner, should you continue prescribing that kind of

12  thing?  But focused on that issue.

13   And the last would be some pointed questions based on his

14  observation about the testimony about Misty Brown and Lisa

15  Waynick to include, you know, reactions to drug screens,

16  explanations for drug screens.

17   He's had a chance to sit and listen to that.  I haven't

18  had a chance to prepare him on that, but I would just ask him

19  a couple of questions about that.

20       THE COURT:  Okay.  Mr. Strianse?

21       MR. STRIANSE:  Your Honor, we would object to this

22  testimony.  The Court excluded Dr. King as an expert because

23  he thought it was fundamentally unfair to the defense, the

24  United States to find an expert after the trial had begun.

25   I still don't have a report from Dr. King.  As far as I

1  know and subject to being corrected, I don't have a CV for

2  Dr. King.

3      THE COURT:  I think you were sent the CV.  That's

4  what was represented to me.

5      MR. STRIANSE:  Okay.

6      THE COURT:  I agree with that.  I excluded him, but

7  this is rebuttal.  So why should I not allow him to rebut the

8  testimony of Dr. Stanton given today?

9      MR. STRIANSE:  Well, for all the reasons that you

10  excluded him in the first place.  I think it's unfair to have

11  some expert get shoehorned into an existing trial and expect

12  us to be, as you had noted, able to fully confront and

13  cross-examine this expert, whether it's in a rebuttal setting

14  or whether it's in their case in chief.

15      So all of those considerations I think still apply, and I

16  would ask the Court not to permit the government to advance

17  him as a rebuttal witness.

18      THE COURT:  Okay.  Well, I think the context is

19  different, and guarding very carefully against what this is

20  and what this is not, this is not: the door is open for King

21  to come in and say anything he wants on this record.

22      I am going to let him in as rebuttal for Stanton's

23  in-court testimony today, and I'm reading from the *Hofstetter*

24  case which characterizes this distinction.  It says the proper

25  function of the rebuttal evidence is to contradict, impeach,

1  or diffuse the impact of the evidence offered by an adverse

2  party.  That's from the Sixth Circuit this year.

3       And then there's another case that the -- the *Bland* case

4  from 2007 that also characterizes the relationship between

5  rebuttal and expert proof.

6       I think Rule 16 clearly notes a distinction between the

7  disclosures obligations as to one but not as to rebuttal

8  proof.  So on the limited categories that Mr. Smith went

9  through, the -- the time issue, the practitioner opinions that

10 were given, proper practice opinions, the medical record

11 review specific to what Dr. Stanton said today, the Ghent and

12 Waynick imaging, and the Brown- and Waynick-specific opinions

13 that were given about drug screens, I'm going to let him

14 testify on those; the time per patient; responsibility of the

15 practitioner with respect to the patient when he's writing,

16 again, to the extent Dr. Stanton talked about it -- that's

17 what I'm allowing -- and the immediacy of discharge relative

18 to street-drug positive and what the proper scope and usual

19 course is with respect to that standard.  I am going to allow

20 rebuttal on those areas but not on anymore.  And so we'll

21 proceed with the rebuttal case.

22       (Sidebar conference concluded.)

23            THE COURT:  Sorry.

24       Mr. Strianse.

25       (Sidebar conference.)

1          MR. STRIANSE:  Your Honor, sorry.  So I'm clear, the

2     nine topics that I raised with him, in addition -- keeping

3     them constrained?

4          THE COURT:  Yep.

5          MR. SMITH:  Those are all --

6          THE COURT:  Yep, all within the scope of what

7     Dr. Stanton testified to today.  So it's not unfettered on

8     each topic.  It's tied to the testimony today.

9          MR. SMITH:  The last point I did want to make clear,

10    I intend to raise on direct what his compensation is.  We have

11    not paid Dr. King any money yet because he has been recently

12    retained.  So I do intend to elicit all that, but I wanted

13    counsel to know before he gets on the stand he has a contract

14    for $27,500.  He's paid for travel, paid time away from his

15    office.

16       I will do my best to ask all that, but I was not -- if he

17    wants any additional information or to take time to think

18    about that.

19       But I think I'll try to cover that, in fairness, in my

20    direct.

21          THE COURT:  All right.

22       (End of sidebar conference.)

23          THE COURT:  The defense has rested.  The government

24    has an opportunity for a short rebuttal case.

25       Mr. Smith.

1    MR. SMITH:  Yes, Your Honor.  Very briefly, the

2  United States calls Dr. Timothy King.

3    THE COURT:  Timothy King.

4    **TIMOTHY KING, GOVERNMENT'S WITNESS, DULY SWORN**

5    MR. SMITH:  Sir, I think he has some notes with him.

6  I would like to be able to give those to defense counsel to

7  review before.

8    THE COURT:  All right.

9    MR. SMITH:  Just so the record is clear, I have asked

10  the witness to discard the papers and not have them in front

11  of him.

12    THE COURT:  They are not in his hands.

13    Good afternoon, sir.

14    THE WITNESS:  Good afternoon.  I apologize for my

15  voice.

16    THE COURT:  If there's not water up there -- it looks

17  like there is.  You are welcome to that.

18    Sir, do speak toward the mic in a clear voice so we can

19  hear your testimony.

20    First if you would state your name and spell your last

21  name.

22    THE WITNESS:  My name is Timothy King, K-i-n-g.

23    THE COURT:  Thank you.

24    Mr. Smith.

25    MR. SMITH:  Thank you.

1                    DIRECT EXAMINATION (Rebuttal)

2    BY MR. SMITH:

3    Q.   Sir, could you please just give the jury a very brief

4    overview of your professional experience and training?

5    A.   Again, my apologies for my voice.

6         I'm a physician, an M.D., and I have been in practice for

7    about 47 years.  I practice mostly in Indiana.  Currently I

8    live in Michigan.  I'm a pain management physician.  My

9    foundation is anesthesiology.  I'm board-certified in

10   anesthesiology.  I'm also board-certified in pain management

11   as well as addiction medicine.

12        For the last several decades, I have practiced

13   exclusively pain medicine.

14   Q.   Okay.  Thank you, sir.

15        Has the United States retained you to be here today for

16   the purpose of your testimony?

17   A.   Yes, it has.

18   Q.   And when were you initially contacted to potentially

19   testify in this case?

20   A.   I was initially contacted approximately one week ago by

21   yourself.

22   Q.   Okay.  Do you typically charge for your services?

23   A.   I do.

24   Q.   Okay.  In this case, given that timeline, have you

25   submitted an invoice to the United States yet?

1   A.   No, sir.

2   Q.   Has the United States allocated a contract to you of

3   approximately $27,000 to include expenses?

4   A.   Yes.

5   Q.   Okay.  And you would bill against that depending on the

6   amount of work you have done?

7   A.   Correct.

8   Q.   Okay.  Typically, can you just give the jury a sense of,

9   for instance, how much you bill for in-court testimony, how

10  much you charge for that?

11  A.   For a day in court, I typically charge $6,000.

12  Q.   And if you're traveling, are your travel expenses covered

13  as well?

14  A.   Travel expenses are covered, and room and board is

15  generally covered, yes.

16  Q.   And are you also paid -- if you are missing time from

17  other work, you are compensated for that time as well?

18  A.   If I'm missing time from the clinic and I cannot take

19  care of patients or do other administrative duties, recompense

20  at $1300 per day.

21  Q.   Are you also paid in any kind of preparation or review

22  work you do, do you bill by the hour for that?

23  A.   Yes.  My hourly fee is $400 per hour.

24  Q.   Okay.  Now, I would like to ask you a couple of questions

25  about -- well, let me ask you this:  Have you been here

1    present today in the courtroom?

2    A.   I have, yes.

3    Q.   You have had the opportunity to observe the testimony?

4    A.   Yes.

5    Q.   Okay.  I would like to ask you a couple of questions

6    about just the testimony, just what you've seen here in court

7    today.  Okay?

8    A.   Yes.

9    Q.   Okay.  First do you remember there being discussions

10   about urine drug testing?

11   A.   Yes.

12   Q.   Okay.  Generally speaking, as a practitioner and with

13   your training and experience, if, for some reason, a doctor

14   doesn't have adequate access to urine drug testing, either the

15   type of it, having results available to you, having the

16   accuracy of the testing, any of that, what -- what should a

17   doctor do?

18   A.   Well, a doctor needs to be aware of the results of the

19   urine drug testing.  The urine drug testing is an inherent

20   part of the risk management of the patient when opioids or

21   controlled substances are prescribed.  So there needs to be an

22   effort to address that need.  It's part of what we refer to as

23   universal precautions.  It has to be defined, and oversight

24   has to be maintained.  Urine drug screen results, per standard

25   of care, have to be known for the ongoing prescribing or for

1   the initial prescribing, for that matter, of controlled

2   substances.

3   Q.   So if -- related question:  Let's say you, as a

4   practitioner, are going into the office, and, for whatever

5   reason, the amount of time you have available to you that day

6   would make seeing patients in a certain amount very difficult.

7   So, for instance, if the jury has heard testimony about seeing

8   25 to 30 patients in an hour and a half to two hours, what is

9   your reaction to that, sir, and what would you do consistent

10  with the course of professional practice?

11  A.   There are two parts to that question.

12       The first is:  Does it make sense to schedule that many

13  patients in that time frame particularly if they are chronic

14  pain patients who typically require more time for detailed

15  history taking?  So that time frame is unreasonable.

16       Typically, a follow-up patient who might be stable on

17  opioids might require between 15 to 20 minutes, minimum, and a

18  new patient, significantly longer.

19       If it turns out that a schedule of that sort is not

20  possible, because the provider or the physician has other

21  obligations and is trying to pack patients into a tight time

22  frame, that's not reasonable.  That's outside the standard of

23  care to do something like that.

24       The care of a chronic pain patient does require adequate

25  time for both physical examination as well as history taking.

1   So the scenario you put forth is one that would not be

2   reasonable.  It would fall outside the usual course of medical

3   practice to anticipate it could be done well and the standard

4   of care could be maintained.

5   Q.   On that point, in your opinion, is seeing patients for

6   six minutes sufficient?

7   A.   No.  It's insufficient.

8   Q.   Okay.  Now, when a doctor sees a patient -- let me set it

9   this way:  Let's say you, as a doctor, are covering for

10  another doctor, and so you are going to see patients because,

11  for whatever reason, that doctor is out.  Whose patient is it

12  when you see them as a doctor?

13  A.   The patient may be primarily under the care of another

14  provider.  Let's say, it might be a partner of mine.

15        But if I happen to be on call over a weekend and take a

16  call from that patient asking about additional medication or

17  whatever, I am the individual who at that point is in charge

18  of that patient.  It would still be upon -- upon me to decide

19  the right therapy and to address the right answer to the

20  question that the patient is asking.

21        If drugs were involved, if opiates or other controlled

22  substances needed to be prescribed -- let's say, it was on a

23  weekend and I might be on call -- the DEA registration that I

24  have is still under my name, and I bear the responsibility for

25  prescribing those medications in an appropriate manner.

1    We do tend to avoid -- try to avoid labeling patients as,

2    quote, belonging to someone.  There generally is a primary

3    caregiver.  We understand that.  And there generally, from

4    time to time, may be another doctor covering, but we would

5    handle that scenario in a manner that would be reflected by --

6    let's say, if I covered for a patient for a weekend, might

7    refill that patient's medications, if appropriate, for that

8    weekend, but then have the patient come in Monday to see their

9    primary care provider -- their primary provider.

10    Does that answer the question adequately?

11   Q.   Let me ask you this:  So if you -- you talked about

12   writing a prescription maybe to get someone through a weekend.

13    If you were going to write a full 30-day prescription for

14   a patient that you had not seen before, would you, as a

15   practitioner, review that patient's entire medical file

16   including their urine drug screen history?

17   A.   Yes.  What you present is a different scenario.  That

18   would be one that would require an independent evaluation

19   prior to issuing 30 days worth of medication.

20   Q.   Would that be the case even if another doctor had been

21   prescribing opioids to that patient?

22   A.   Yes, and the key phrase there is an independent medical

23   evaluation must be performed.

24   Q.   Okay.  You have heard testimony today and you heard the

25   discussion about urine drug testing related to testing that

1   picked up positives for either heroin, fentanyl, or

2   methamphetamine, so those three drugs.  Do you remember that?

3   A.   Yes.

4   Q.   In your opinion, if a patient tests positive for one of

5   those drugs on a confirmation urine drug test, how many more

6   opioids should be given to that patient?

7   A.   The standard of care indicates that, if we have

8   confirmation testing for the presence of one of those drugs,

9   that becomes what we might refer to as a full stop.

10       If heroin or methamphetamine or cocaine show up, that's

11  an indication that we're dealing with a patient who is

12  addicted to very dangerous controlled -- illegal substances,

13  and combining those medications with any other controlled

14  substances that might be prescribed to that patient creates a

15  significant hazard, a significant risk of overdose and death.

16       So only one confirmatory test is all that's necessary.

17  We refer to that as a critical event.  It becomes a full stop,

18  and it has to be addressed with objectivity at that point.

19  Q.   And related to that point, is it within the course of

20  professional practice in pain medicine to continue prescribing

21  to avoid withdrawal from heroin or something else?

22  A.   No.  Specifically, to continue prescribing to, quote,

23  avoid withdrawal would be outside the usual course of medical

24  practice.  It would not be using opioids for a legitimate

25  medical purpose.

1   Q.   Sir, last two areas.  Were you present when a patient

2   named Misty Brown was discussed?

3   A.   Yes.

4   Q.   And did you hear testimony about Misty Brown's

5   phentermine prescriptions?

6   A.   I did, yes.

7   Q.   Is phentermine a drug that is commonly abused?

8   A.   Yes.  Phentermine has been put forth as an amphetamine.

9   Yes, it can be abused.

10  Q.   And if a patient is not taking that as confirmed by

11  multiple urine drug testing, is it within the course of

12  professional practice to continue prescribing it?

13  A.   No, it is not.

14  Q.   Did you hear the testimony regarding whether the

15  phentermine results could have caused a methamphetamine

16  positive?

17  A.   I did hear that said, yes.

18  Q.   What was your reaction to that?

19  A.   It's not true.  And the -- would you like me to explain

20  to the jury why it's not true?

21  Q.   If you could do so just very briefly.

22  A.   Just briefly, it's a confirmatory test.  It's an

23  electrochromatography mass spectrometry test, and those tests

24  test for specific compounds, and those tests do differentiate

25  between the different amphetamines.

1   Q.   Lastly, did you see the testimony for a patient named

2   Lisa Waynick?

3   A.   Yes.

4   Q.   Okay.  And I believe some imaging and other background

5   information was provided about Ms. Waynick?

6   A.   Yes.

7   Q.   Based on your review, was there anything that was

8   discussed here in open court that would have justified giving

9   Ms. Waynick opioids to begin with?

10  A.   No.  My opinion is, at least based on the imaging -- and

11  the imaging, to be specific, were X-rays.  There were

12  indications of arthritic changes, changes that were

13  appropriate with age and normal wear and tear, but there were

14  no indications I saw on those X-rays that supported a

15  diagnosis that would be in favor of using long-term opiates.

16  Q.   Okay.

17  A.   I did not see any confirmation on imaging that suggested

18  confirmation of a chronic pain problem that would support the

19  use of opiates.

20  Q.   And putting that aside, did you hear the testimony today

21  about her types of failed drug tests, the crushing the pills,

22  and other things of that nature?

23  A.   Yes.

24  Q.   Okay.  For instance, if there was testimony that, as

25  early as 2018, this patient had failed tests for fentanyl and

1    then was taking benzodiazepines -- did you hear that?

2    A.   Yes, I did.

3    Q.   What is your opinion on that?

4    A.   That's very concerning.  Particularly in today's

5    environment where we know the majority of fentanyl is coming

6    in from other than medical sources.  It's coming over the

7    border.  And the fentanyl that's being taken, generally

8    speaking, and showing up in our patients' urine being

9    nonmedical grade, is an unknown purity and unknown dose.  That

10   in and of itself is dangerous enough and worrisome enough, but

11   we add to that the fact that, in this particular case, there

12   were benzodiazepines added to that.

         The combination of a benzodiazepine and an opioid is

14   extremely dangerous.  The strongest possible warning was put

15   forth in 2016 by the FDA, the Food and Drug Administration,

16   saying do not combine these medications unless it is

17   absolutely medically necessary because of the overwhelming

18   concern with respiratory depression and death.

19       Those are very concerning when I see that illegal drug

20   fentanyl, or at least nonprescribed drug fentanyl, in

21   combination with nonprescribed benzodiazepines.

22   Q.   Does the fact that that patient may have had a diagnosis

23   of either depression or anxiety from a prior provider -- does

24   that change that analysis?

25   A.   No.  It does not change the analysis.  They would require

1    a coordination of care with that prior, let's say, psychiatric

2    provider, but it certainly does not indicate that the use of

3    the benzodiazepine is appropriate.  It's still not for a

4    legitimate medical purpose in this case.

5    Q.   Based on your review of the testimony, what was the

6    proper recourse -- what was the recourse within the usual

7    course of professional practice once a practitioner believes

8    that a patient is crushing up pills and putting it in the

9    urine to defeat the drug test?

10   A.   In a situation like that, by definition, you have a

11   question of diversion.  The patient is using medications for

12   something that was not prescribed, and we have a situation

13   where the patient is, in all likelihood, addicted, as well.

14        We understand in pain medicine that, when you are dealing

15   with illegal activities like diversion, when you are dealing

16   with a medical diagnosis like addiction, pain management is

17   not going to be effective, and the options that we may use to

18   try to treat a patient's chronic pain is going to be

19   ineffective until the addiction is addressed and until the

20   diversion is defined.

21        So in a case as you put forth, it would be standard of

22   care to exercise what we call an opiate exit strategy.

23        Opiates would be ceased.  The patient would be referred

24   for addiction.  This is common sense.  The addiction would be

25   addressed and hopefully brought under control.  The diversion

1    issue would be addressed.  The patient would need to go

2    through those steps before we could reasonably assume from a

3    medical standpoint that we could provide appropriate pain

4    treatment.

5    Q.   Okay.  And related to that issue about if a patient is

6    negative for medications and then they are presenting to the

7    practice, did you hear that about, for instance, Mr. Ghent and

8    Ms. Waynick we were just talking about?

9    A.   Yes.

10   Q.   In your view, if the patient comes in and does not have

11   the drugs in their system, what should a provider do?  Is it

12   appropriate and within the usual course of professional

13   practice to write a full month after that?

14   A.   It is not.  The standard of care requires at that point

15   that, if the patient does not have the prescribed medications

16   in their urine, they essentially are what we call opioid naive

17   at that point, and to simply continue writing the

18   prescriptions is dangerous and is not appropriate.

19        The patient being opiate naive at that point is likely to

20   overdose if they take their usual prescription as prescribed.

21   The dose would be too high.  But aside from that very

22   dangerous issue, we also have the situation where the patient

23   is, obviously, abusing the medications or probably diverting.

24   If they are absent and they were prescribed, we assume they

25   were diverted.

1        So we have a double situation here.  It's unsafe to keep

2    prescribing them, and it's inappropriate from a medical

3    standpoint to prescribe them because the patient has been

4    abusing them.

5        So those are indications of noncompliance where the

6    appropriate step would be to cease prescribing the

7    medications.

8        By the way, they would not require weaning at that point

9    because they have already been shown, based on the urine drug

10   screen, that there's no drug in their system.  So they don't

11   need to be weaned.  They don't need to be brought down.  They

12   need to be stopped entirely at that point and sent for

13   addiction treatment.

14   Q.   I meant to ask you, with respect to your opinion about a

15   positive for heroin or fentanyl or methamphetamine -- I

16   asked -- I asked the question about how many opiates should be

17   prescribed after that point.  But one other question is:   In

18   your opinion and within the usual course of professional

19   practice, is stopping opioids synonymous with dismissal?  Does

20   that have to mean the same thing?

21   A.   No.  I see what you are saying.  I'll clarify that,

22   slightly different wording, with the jury.

23       The question, the way I'm interpreting what you are

24   asking, is, if we have a patient who has an inconsistent urine

25   drug screen and that patient -- the question then becomes what

1    do we do with that; do we discharge the patient?  And that's

2    not the correct answer.  In today's world, this happens rather

3    frequently.

4        The correct standard of care is, if the patient is not a

5    candidate to have opiates going forth, you don't discharge the

6    patient as a provider.

7        I may take opiates off the table and say, "It's unsafe

8    for me to continue prescribing opiates to you" or "I'm not

9    going to continue them because there's evidence of diversion

10   or abuse."

11       But we don't fire the patient.  The patient still has

12   legitimate needs, still has a pain issue.  It may be

13   psychological.  It may be real.  We don't know.  But it

14   deserves to be addressed.

15       So we don't fire patients from the practice.  We take

16   opiates off the table.  We refer them for appropriate

17   treatment, whether it be addiction or psychological, stress

18   management, and we would use nonopiate treatment options

19   including physical medicine, psychologic services, nonopioid

20   medications.

21   Q.   Last set of questions.  You saw the testimony with

22   respect to Jeffrey Ghent.

23   A.   Yes.

24   Q.   Okay.  And at the outset of the testimony, did you see a

25   list of conditions that defense counsel and the defendant

1   discussed as Mr. Ghent's kind of basis for receiving opioids?

2   Did you see those?

3   A.   Yes.

4   Q.   And I think that included a shoulder injury; is that

5   fair?

6   A.   Yes.

7   Q.   Back problem and -- well -- my words.  An issue related

8   to the back and then also a toe issue.  Do you recall that?

9   A.   Yes.

10  Q.   In your opinion, did you see anything in any of those

11  imaging summaries that you thought was a legitimate basis to

12  initiate opioid prescribing?

13  A.   I did not.

14          MR. STRIANSE:  Object to his opinion.  He's not been

15  qualified as an expert.

16      (Sidebar conference.)

17          THE COURT:  Can you hear me, Mr. Smith?

18          MR. SMITH:  Okay.  I hear you.

19          THE COURT:  The horse is pretty far out of the barn

20  on that.  What do you say on that, Mr. Smith?

21          MR. SMITH:  Well, I did kind of lay foundation.  He

22  has 42 years of practicing pain management.  I think that

23  probably suffices, but I can lay a further foundation.

24          THE COURT:  I think he said he's board-certified,

25  trained as an anesthesiologist, and has decades in pain

1    management.  We don't use the term expert anymore, just

2    opinion witness.

3         So I'm going to overrule the objection.  If you want to

4    add to the foundation, that's up to you.  You can certainly

5    cross him on the basis for the opinions.

6    BY MR. SMITH:

7    Q.   Sir, just before you go on with your question, you told

8    us how long you have been practicing as a physician?

9    A.   Yes, I did.  Approximately 47 years.

10   Q.   Okay.  And I think you took -- in the last year, have you

11   been -- well, strike that.

12        Based on your training and experience as a physician, did

13   you have a practical experience interpreting imaging results,

14   for instance?

15   A.   Yes.  That was the core part of the practice, yes.

16   Q.   Did you do that on a daily basis as a practicing

17   physician?

18   A.   Yes.

19   Q.   Does that include reviewing and kind of deducing what

20   imaging results would show, for instance, on spinal MRIs?

21   A.   Yes.

22   Q.   And X-rays?

23   A.   Yes.

24   Q.   Same thing for shoulders?

25   A.   Yes.

1    Q.   And feet?

2    A.   Yes.

3    Q.   Are you trained and do you have experience applying what

4    you see in those to the practice of medicine and developing a

5    treatment plan for it?

6    A.   Yes.

7    Q.   Okay.  With that background in mind, if you could just

8    tell us what your view was of the imaging that was displayed

9    for Mr. Ghent and whether, within the usual course of

10   professional practice, those conditions warranted the

11   initiation of prescribing opioids?

12   A.   Yes, and they require a little detail, but let me give a

13   general overview.

14        The X-rays showed various arthritic changes throughout,

15   whether it was the thumb or the foot or the back or the neck.

16   The patient was between 50 and 60 years old, had had a

17   relatively hard life.  I believe he was a tree trimmer, based

18   on what I saw in the exhibits or heard in the exhibits today.

19   So he's had a little bit of a hard life.

20        The last time we were all normal from an X-ray standpoint

21   was 18 years old.  From that standpoint on, we have all

22   degenerated.  Our disks have gotten not quite as high and

23   maybe a little misaligned.  Our joints have become arthritic,

24   not only our low back but our neck and our hands and our feet

25   as well.

1      When I reviewed the results of those X-rays, it indicated

2  what we might otherwise say normal for age-arthritic changes.

3      What I saw was -- okay.  So let me go back one step.  We

4  can't read pain on an X-ray.  We can't read pain on an MRI.

5  What we can see are indications of physical disruption like

6  arthritis or instability.  And then as physicians, we take

7  that as a cue and we actually examine a patient and check

8  their reflexes and range of motion and various other stress

9  tests to see if those things that we saw on X-ray might

10  conceivably be mechanically causing the pain that the patient

11  is complaining of.

12      But per se, the images did not impress me as being other

13  than normal for age.  So as such, they did not form a

14  foundation -- an objective foundation for the ongoing use of

15  particularly high-dose chronic opioid therapy.

16  Q.   Putting the age aside, there was an issue with the

17  rotator cuff?

18  A.   Correct.

19  Q.   And shoulder.  That's an injury.  That sounds to me like

20  something more than just age.

21  A.   Well, if we consider -- to put it simply, if we consider

22  rotator cuff wear and tear, okay, it may have started as a

23  result of an injury.  I would grant that you are correct, but

24  it's still age related, age proportionate.

25      It was a -- it was a torn rotator cuff, but rotator cuffs

1   are chronic, rotator cuff injury.  But those things don't

2   require -- don't matter -- are not generally accepted as

3   candidates for long-term opiate treatment.

4   Q.   The foot, the toe arthritis, does oxycodone or

5   oxymorphone treat toe arthritis, if that's what the imaging

6   showed?

7   A.   No, they do not treat it.  It may serve as a Band-Aid,

8   but the primary treatment option, the treatment choice, for

9   musculoskeletal problems, whether it be a torn rotator cuff or

10  toe arthritis are rehab exercises, anti-inflammatory

11  medications, weight loss, smoking cessation, change in

12  life-style.  But opiates are not thought of as treatment

13  indications for those problems.

14          MR. SMITH:  Okay.  Your Honor, that's all the

15  questions I have.  Thank you.

16          THE COURT:  Mr. Strianse.

17                    CROSS-EXAMINATION

18  BY MR. STRIANSE:

19  Q.   Good afternoon, Dr. King.

20  A.   Good afternoon, sir.

21  Q.   You indicated that you were contacted about a week ago?

22  A.   I don't remember the exact day, but plus or minus, it was

23  about a week ago, correct.

24  Q.   This trial began on Tuesday, August 23rd.  When were you

25  contacted?

1   A.   Again, I don't remember whether it was Monday or Tuesday

2   or Wednesday, but it was some time in that time frame.

3   Q.   Well, did the government tell you that the trial was

4   underway when they contacted you?

5   A.   The government indicated the trial was starting the next

6   day.

7   Q.   The next day.  So you were contacted on Monday then; is

8   that your best recollection?

9   A.   That would sound logical, yes.

10  Q.   Okay.  Now, you have not prepared any report; is that

11  correct?

12  A.   Correct.  No report.

13  Q.   Were you aware that this case has been pending against

14  Dr. Stanton since July of 2021?

15  A.   No, sir.

16  Q.   You were in here for today; is that right?

17  A.   Correct.

18  Q.   I assume you arrived yesterday?

19  A.   Correct.

20  Q.   Did you realize that the government has presented

21  hundreds -- literally hundreds of exhibits in this case?

22  A.   I'm not aware of what went on before.

23  Q.   You have not had an opportunity, in fairness to you, to

24  review 5 or 600 exhibits, have you?

25  A.   I have not, correct.

1    Q.   The -- and you're familiar with these kinds of cases

2    because you have appeared as an opinion witness in many other

3    cases, correct?

4    A.   That's correct.

5    Q.   How many cases over the years have you appeared in?

6    A.   Fair question.  I don't know if I have an exact number,

7    but I have opined as a pain management expert in, oh, 50 to

8    100 cases, perhaps.

9    Q.   50 to 100 cases, always appearing for the United States;

10    is that right?

11    A.   My background has been that I have opined occasionally

12    for medical boards and very -- and occasionally for a civil

13    case.  On those formal court cases, I've always represented --

14    when employed by the government, I have represented the

15    government, yes.

16    Q.   And in fairness to you, you have also not had the

17    opportunity to review the discovery in this case?

18    A.   That's correct.

19    Q.   And with your experience of appearing as a government

20    witness between 50 and 100 times in cases just like this

21    against physicians, you know better than anybody the volume of

22    information that's produced by the government as discovery?

23    A.   I'm aware of that, but I would point out that I am not up

24    here expressing an opinion based on my review because, as you

25    correctly said, I have done no formal review.

1     I'm just basically addressing the standards at this

2  point.

3  Q.   Right.  So you have not reviewed any of the discovery?

4  A.   The only thing I have reviewed has been what has been

5  presented today.

6  Q.   Just by sitting here in the courtroom?

7  A.   Correct.

8  Q.   Okay.  And you are here offering an opinion about Jeffrey

9  Ghent, Patient Jeffrey Ghent?

10 A.   I'm not offering an opinion on Mr. Ghent.  I'm offering

11 an opinion on the standard of care as was represented in some

12 of the material that was presented on your exhibit.

13 Q.   But, I mean, you are just sort of coming in as a gadfly

14 and hearing some testimony and telling the jury that you

15 thought that Jeffrey Ghent was some illegitimate patient; is

16 that right?

17 A.   Well, I'm not a gadfly, and I'm not presenting opinions

18 specifically on Mr. Ghent.  I'm addressing the standard of

19 care for the use of opiates in chronic pain management.

20 Q.   And you have been in pain management how many years?

21 A.   Well, giving the fact that I started out as an

22 anesthesiologist, arguably I have been in pain management my

23 entire life.

24 Q.   And do you currently have a clinic?

25 A.   Yes.  This last year I was on sabbatical from our clinic

1    while I did some traveling, but the clinic I have been

2    involved with over the years and will start seeing patients

3    again this -- in September is a clinic in Northwest Indiana

4    just outside Chicago.

5    Q.   But it's been quite some time since you regularly saw

6    patients; is that right?

7    A.   I have been on sabbatical the last year.

8    Q.   The last year.

9         Go back before your sabbatical.  Did you have a clinic

10   where you were actively seeing patients?

11   A.   It was that clinic.

12   Q.   Okay.  Now, you heard the testimony and may have seen, if

13   you were able to, some of the imaging studies that Mr. Ghent

14   presented when he appeared as a patient at Gateway Medical

15   Associates?

16   A.   Correct.

17   Q.   And you're saying that his problems were nothing but age

18   related; is that right?

19   A.   I don't know that I would phrase it that superficially.

20   He obviously was an individual who had a great deal of

21   physical stress in his life, but the changes that are

22   represented on those X-ray results are -- I have no reason to

23   disbelieve them.

24        My statement simply is they do not in and of themselves

25   define a chronic pain source deserved of long-term opiate

1   therapy.

2   Q.   So in your practice, you never dealt with a patient that

3   had a complete rotator cuff tear?

4   A.   We deal with rotator cuff tears on a fairly regular

5   basis.  Rotator cuff tears is not generally, medically, or

6   scientifically accepted as a diagnosis for the use of

7   particularly high-dose opiates.

8   Q.   And then have you dealt with patients that have

9   spondylosis, Grade I spondylosis with L5-S1 disc protrusion?

10  A.   Yes.  I have that, and a lot of our patients have that.

11  But, again, those are what we call musculoskeletal diagnoses

12  that are best treated with different types of physical

13  medicine, again, weight loss; smoking cessation; life-style

14  changes; anti-inflammatories; nonopioid medications.

15       The evidence-based treatment of that type of degenerative

16  disc disease and low-back pain -- the evidence-based treatment

17  for that is scant at best.  It is not there.  And the results

18  have not been shown to increase a patients' functional ability

19  or to decrease their overall pain scores.

20  Q.   Were you aware -- I don't know if you gathered it from

21  the testimony today while you were in the courtroom -- that in

22  November of 2018 Dr. Stanton had to step in for Dr. Maccarone

23  who had fallen ill to diabetic shock?

24  A.   Yes, I heard that.

25  Q.   And he was out of the office for four months?

1    A.   I heard that, yes.

2    Q.   And he had a very healthy practice of hundreds of pain-

3    management patients?  Were you aware of that?

4    A.   I don't know how many he had, but I was aware of the

5    general circumstances as it was represented today.

6    Q.   And I'm sure it's the same way in Indiana, but you would

7    agree that a doctor has an affirmative duty not to abandon

8    patients; is that right?

9    A.   Correct.

10   Q.   And these patients were particularly vulnerable, were

11   they not, as pain-management patients?

12   A.   I don't know what you mean by "vulnerable."

13        Certainly, the doctor has the duty to do good and the

14   duty to do no harm.  Those are the two ethical principles.

15        So as you infer, the patients need to be taken care of,

16   but they also need to be taken care of in a manner that

17   ethically does not put them at further risk or cause harm.

18   Q.   By "vulnerable," so we're communicating, I'm talking

19   about a class of patients that are on -- some of them on very

20   high MME prescriptions.

21   A.   I don't know if I would use the word "vulnerable," but I

22   think you and I would both agree they were on relatively high

23   morphine-equivalent doses.

24   Q.   And if Dr. Stanton had said, when he received that call

25   about coming in to substitute for a sick Dr. Maccarone, that

1    he was not going to see these patients, those patients would

2    be in danger of having significant withdrawal symptoms, all

3    manner of problems; is that not true?

4    A.    It would be a challenge to deal with them, and we deal

5    with that really on a daily basis.  There are a number of

6    patients who might come to our clinic because their previous

7    doctor closed his practice or whatever, or they came to us

8    looking for care because they were discharged because of

9    inconsistent urine drug screens from another practice.

10        That occurs fairly regularly, and it is a difficult

11   situation.

12        The bottom line is, as a physician, I still have to treat

13   them appropriately.  I still have to do no harm.  And so it's

14   incumbent on me by standard of care to do a complete and

15   thorough examination, formulation of a treatment plan, and to

16   go forth with what I think is the best for the patient.

17   Q.    In your role as a pain-management doctor, you are

18   familiar that the Food and Drug Administration comes out

19   periodically with drug safety communications; is that right?

20   A.    Yes.

21   Q.    Are you familiar with one of their communications that

22   identifies the harm reported from sudden discontinuation of

23   opioid pain medicines?

24   A.    I'm not aware of their specific statement on that.

25        I am aware of the fact that none of us, not our practice

1   or any prudent practice, are in favor of sudden

2   discontinuations, which is what I referenced a little bit

3   earlier.

4       We may take -- we may, what we call, exercise an opiate

5   exit strategy, if appropriate, if we think the opioids need to

6   be brought down or ceased.  But I don't think any of us would

7   simply stop them unless, as we talked about, the urine drug

8   screen showed their complete absence, in which case you could

9   completely stop it.

10  Q.   Don't you agree that, in an emergency situation like

11  this, with hundreds of patients that are potentially left

12  without a provider that the greater good was served by

13  Dr. Stanton stepping in and taking care of those patients?

14  A.   I believe the greater good is always served when a

15  physician steps in.  But when you say, "taking care of," that

16  assumes that the standards of care were addressed and not just

17  that the opioids were continued to be prescribed despite these

18  flagrant inconsistencies in urine drug testing that showed the

19  presence of illegal substances.  To continue prescribing in

20  that manner with evidence of noncompliance is not in the best

21  interest of the patient.

22  Q.   In fairness, you have not had the opportunity to review

23  the complete history of these patients in terms of their drug

24  screen results; is that right?

25  A.   I'm aware of what was presented here today and no

1  further, correct.

2  Q.  So you heard two or three hours of testimony this

3  morning?

4  A.  Yes.

5  Q.  Is that right?

6  A.  Correct.

7  Q.  But have not read any of the charts, correct?

8  A.  I have not done any complete chart reviews, correct.

9  Q.  And have prepared no report?

10  A.  Correct.

11  Q.  And I think you -- you were expressing some discomfort at

12  the length of the visits that these patients at

13  Dr. Maccarone's clinic were receiving when they were seeing

14  Dr. Stanton.

15  A.  I'm not expressing a discomfort.  I'm just telling you

16  how it is in real life, after many, many decades of taking

17  care of chronic pain.  Their needs are great, and the

18  variability with regard to the stressors and concerns with

19  function are such that it's almost impossible to do an

20  appropriate job in any less than 15 to 20 minutes assuming

21  that the patient is stable.

22       If the patient is not stable or has a history of

23  noncompliance or inconsistent urine drug screens or admission

24  for an overdose, those are things that will lengthen up the

25  visit.

1     I can't conceive of six minutes being an appropriate

2  visit across the board, given the complexity and the concerns

3  related to the use of high-dose opiates.

4          MR. STRIANSE:  Those are my questions.

5          THE COURT:  Mr. Smith?

6          MR. SMITH:  Your Honor, can I confer on the

7  headphones?

8       (Sidebar conference.)

9          THE COURT:  Mr. Smith?

10         MR. SMITH:  I would want to make the record clear on

11 one point with respect to what he's reviewed.

12     As you recall, we disclosed a letter.  We had sent him

13 some patient files.  I think the witness is in a little bit of

14 a box when he doesn't talk about whether you see -- he doesn't

15 represent he's speaking from something else.  But I want

16 Mr. Strianse to know that, if he wants to cross-examine.

17         THE COURT:  He said he's done no complete file

18 review.

19         MR. SMITH:  I think that's fair.

20         THE COURT:  Do you have any concerns about that?

21         MR. STRIANSE:  No.

22     (Sidebar conference concluded.)

23         THE COURT:  Any redirect?

24         MR. SMITH:  No, Your Honor.

25         THE COURT:  Thank you, sir.  That concludes your

1    testimony.  You can step down.

2        (Witness excused.)

3            THE COURT:  Mr. Smith, any additional proof?

4            MR. SMITH:  No, Your Honor.  Thank you.

5            THE COURT:  Thank you.  Just stand and stretch for a

6    moment while I confer one last time.

7        (Sidebar conference.)

8            THE COURT:  So can you hear me, Mr. Strianse?

9            MR. STRIANSE:  Yes, I can.

10            THE COURT:  Okay.  So my suggestion would be we send

11    them home, have them come back -- I think I'll give them a

12    little later report time tomorrow.  Let's say 8:45.  We'll

13    plan to start at 9:00 with closing arguments, an hour each,

14    following which I'll instruct.

15        We've got to get it to the jury some time around the noon

16    hour, plus or minus, and they can deliberate to their hearts'

17    content until they get to the verdict, however long it takes.

18    Meaning, they'll only go as late as they want tomorrow.  If

19    they want to go late, they can.  If they want to wrap around

20    the next day, no pressure on the schedule.

21        That's my plan going forward.  Does that sound

22    acceptable, Mr. Smith?

23            MR. SMITH:  Yes, Your Honor.

24            THE COURT:  Mr. Strianse?

25            MR. STRIANSE:  Yes, Your Honor.

1          Judge, did you want me to renew my --

2          THE COURT:  We'll do it.  I'm going to send them

3     home, and we'll talk about the logistics.  Okay.

4          (Sidebar conference concluded.)

5          THE COURT:  I appreciate the good -- hard work and

6     day of attention today.  That is going to conclude the jury's

7     work for today.

8          Now, you've heard all of the proof.  I want you to

9     continue to follow the rules you have been under.  No case

10    discussion, no research or exploration regarding the case.

11    Don't begin forming your decision.  You have not been

12    instructed.  You haven't heard the arguments.  That will

13    happen tomorrow.

14         Here's the schedule for tomorrow:  I'm going to have you

15    come in a little bit later than today.  It's been a long and

16    kind of a jumbled day of being in and out.  So I'm going to

17    have you come in tomorrow by 8:45.  So we'll start at 9:00.

18    So not 8:15 but 8:45 report.  We'll start at 9:00.

19         This is what's going to happen:  Both sides will have an

20    argument period.  Each is going to have an hour.  Now, they

21    don't have to take an hour, but each has an hour.

22         The government goes first and can take that hour and can

23    chop off some of it to use for rebuttal.  So the government

24    will argue first.  Then the defense will have an argument.

25    And then the government will have the remainder of that hour,

1    as much as it seeks, for a brief rebuttal.

2        That argument period -- I'll make sure you get a break in

3    there -- will be followed by the Court's instructions.  I will

4    read the instructions to you.  You'll also get a copy of them.

5    My law clerk will display them on the overhead or on the ELMO

6    and will turn the pages as we go so you can read along.  I'll

7    read them to you, and then you'll get a copy to go with you.

8        All of that is going to take essentially the full

9    morning.  So by the end of the morning -- we ought to be right

10   at the noon hour -- I will release you to deliberate.  We'll

11   have your lunch ordered in.  So it will be waiting for you.

12       So that ought to dovetail such that, at the end of the

13   morning, you'll break to deliberate; your lunch will be here;

14   you can eat and then get to work.

15       Once you begin your deliberation, as I have told you, the

16   schedule is going to largely be up to you.  I don't want you

17   to feel any time pressure on the schedule.  There is no time

18   pressure.  You can work and deliberate all day long until

19   you -- until you are satisfied and you reach a decision.

20       If you get to the end of the day and you want to work

21   late tomorrow, we'll order food for you, feed you.  You can

22   work into the evening.

23       You get to the end of the day and you think, that's all

24   for today, we want to come back the next day, that's fine,

25   too.  So don't feel any pressure about that.

Let the deliberations run their course appropriately in the jury room, and so I'll largely defer to you on that once we get to that point.

But the point is tonight I'm going to release you. Go home, have a restful evening, come back tomorrow on the schedule I have indicated. We'll get the case to you midday and let you get to work on deliberations at that point.

Any questions by any of you?

All right. Thanks so much for your attention. Leave your notebooks and have a pleasant evening. I'll see you at 8:45 in the morning for check-in. 9:00 we'll start, no later than that. Thank you-all.

(Jury not present.)

THE COURT: Everybody can be seated. The jury has exited for today.

We are going to take a few minutes, a little break ourselves, before we jump into our remaining topics.

On your exhibits, Mr. Strianse, most of them, I think, were -- were demonstrative. I do want them to be in the record, but a lot of them contain patient identifiers.

I'm inclined to put them in the record under seal for now. We may go back and have you redact them later so there can be an unredacted version and a redacted version. But I don't want all those patient names, identifiers, birth dates, things like that, full addresses in the open record. So for

1  now, at least, I think I'll put those in the record, public

2  record, under seal.

3      We'll sort that out posttrial once I see the final

4  exhibit list.  But I don't want those -- I want the

5  demonstrative exhibits available in the record, but I don't

6  want them publicly available at this point.

7      Does that make sense to you?

8          MR. STRIANSE:  That's fine.

9          THE COURT:  Okay.  I'll put that in the minutes, and

10 we'll circle back as needed.

11     So I know you want to renew your motion.  If you are

12 prepared to briefly address that, you can now, or we can wait

13 until after the short break.

14         MR. STRIANSE:  Your Honor, I just want to renew it

15 for the record and incorporate all the arguments that I made

16 when the government rested.

17         THE COURT:  All right.  Anything you want to say in

18 response?

19         MR. SMITH:  No.  Just I incorporate my responses to

20 his incorporated argument.

21         THE COURT:  Okay.  Well, we talked about it at length

22 today, and the defense case, you know, certainly created some

23 additional areas for the jury to wrestle with, and I think

24 Dr. Stanton had a full chance to depict his version of the

25 record and the events.

1    I think that -- for all the same reasons I said this

2  morning, I just think the jury has got to pass on this and has

3  to make the determinations factually about what happened, and

4  then we'll have to apply those factual determinations under my

5  instructions.

6    And I do -- I continue to believe that a rational jury

7  could find the elements of the government's charge established

8  beyond a reasonable doubt.

9    Whether a jury will, that's what will remain -- we'll

10  wait to see from the course of deliberations, but I do think

11  it's a submissible case, and I will, as a result, deny the

12  renewed motion.

13    All right.  Why don't we take -- take about a ten-minute

14  break, come back in, have the charge conference.

15    I did send the instructions out I think, what, Sunday.

16  Saturday, Saturday evening.  Yep.  Saturday evening sent those

17  out.  I hope both sides got a chance to see those.

18    And so why don't we take ten minutes, and we'll come back

19  in and march through the instructions at that point.

20    Thank you.

21    (Recess taken from 5:05 P.M. to 5:20 P.M.)

22    THE COURT:  All right.  We are back on the record.

23  The jury has gone home for the day, and now I will turn to the

24  issue of jury instructions.

25    And so I got a set from the government.  I think all I

1    got from the defendant -- I got an objection to deliberate

2    ignorance and then I believe from -- from the defense also got

3    a good faith instruction filing, which I'm not seeing for some

4    reason.

5        Is that right, Mr. Strianse?

6           MR. STRIANSE:  The good faith is Docket Entry 218.

7           THE COURT:  Can you print that, Michelle?  I know I

8    got it.  I can't put my hands on it.

9           COURTROOM DEPUTY:  Which?

10         THE COURT:  Docket Entry 218.  I have got it.  Never

11    mind.

12         COURTROOM DEPUTY:  Okay.

13         THE COURT:  So I worked on that draft on -- have been

14    working on it, and we -- and put, you know, the final touches

15    for me on it on Saturday and sent it out.

16        So what I want to do is just go instruction by

17    instruction.  Tell me if you have got an objection or anything

18    to add to it.

19        Some of these are bi- -- kind of binary on-off

20    instructions.  So let's just go page by page.

21        No. 1, anything on that, Mr. Smith?

22           MR. SMITH:  No objection, Your Honor.

23           THE COURT:  Mr. Strianse?

24           MR. STRIANSE:  No objection.

25           THE COURT:  No. 2, Mr. Smith?

1           MR. SMITH:  No objection.

2           THE COURT:  Mr. Strianse?

3           MR. STRIANSE:  No objection.

4           THE COURT:  No. 3?

5           MR. SMITH:  No objection.

6           THE COURT:  Mr. Strianse?

7           MR. STRIANSE:  No objection.

8           THE COURT:  No. 4, Mr. Smith?

9           MR. SMITH:  No objection.

10          THE COURT:  Mr. Strianse?

11          MR. STRIANSE:  No objection.

12          THE COURT:  No. 5, Mr. Smith?

13          MR. SMITH:  No objection.

14          THE COURT:  Mr. Strianse?

15          MR. STRIANSE:  No objection.

16          THE COURT:  No. 6, Mr. Smith?

17          MR. SMITH:  No objection.

18          THE COURT:  Mr. Strianse?

19          MR. STRIANSE:  No objection.

20          THE COURT:  No. 7, Mr. Smith?

21          MR. SMITH:  No objection.

22          THE COURT:  Mr. Strianse?

23          MR. STRIANSE:  No objection.

24          THE COURT:  No. 8, Mr. Smith?

25          MR. SMITH:  No objection.

1    THE COURT:  Mr. Strianse?

2    MR. STRIANSE:  No objection.

3    THE COURT:  No. 9, Mr. Smith?

4    MR. SMITH:  No objection.

5    THE COURT:  Mr. Strianse?

6    MR. STRIANSE:  No objection.

7    THE COURT:  No. 10, Mr. Smith?

8    MR. SMITH:  No objection, Your Honor.

9    THE COURT:  Mr. Strianse?

10   MR. STRIANSE:  No, Your Honor.

11   THE COURT:  No. 11, Mr. Smith?

12   MR. SMITH:  No objection.

13   THE COURT:  Mr. Strianse?

14   MR. STRIANSE:  No objection.

15   THE COURT:  All right.  No. 12, substantive

16   instruction.  Tell me your reaction to that, Mr. Smith.

17   MR. SMITH:  Your Honor, I think it's largely

18   consistent with what the government proposed, and I'm not able

19   to discern any differences that I would object to.  So no

20   objection to it.  I do think it accurately captures what the

21   law makes clear.  I think we are going to posture -- that's a

22   little confusing to me in the Supreme Court case whether

23   there's some kind of instruction to the jury that is necessary

24   as to the kind of swinging presumption.  You know, we

25   obviously are not contesting that he was registered, and kind

1    of a confusing issue because you have a statute that says we

2    don't have to negative the thing that we are all talking about

3    here.

4           THE COURT:  Right.

5           MR. SMITH:  I don't think it's necessary.  I think

6    phrasing it just as -- although it's not -- it's a quasi

7    element under that case.  I think phrasing it here in the

8    elements of the offense is fully appropriate.  I think it

9    protects the defendant's rights under *Ruan*.  So I think this

10    is sufficient.

11           THE COURT:  I appreciate that.  I think there's going

12    to be some maybe thorny issues on a given case on that.

13        You know, I looked back at the indictment.  The

14    government does allege that he had a DEA authorization.  So I

15    sort of feel like, well, that obviously is not contested:  Was

16    he a licensed practitioner?  Did he have a DEA registration?

17        That could be an issue in a given case, but the way the

18    proof came in, I'm convinced that's really not in play as an

19    elemental matter, and I -- I wrestle with where to put --

20    where to put the knowledge to make it, you know, clear but fit

21    within the conspiracy elements, and, you know, the cases that

22    we've seen, the tendered cases, those are all substantive act,

23    not conspiracy charges, I think.  So -- all right.  So you're

24    okay on Instruction No. 12.

25        How about you, Mr. Strianse?

1    MR. STRIANSE:  Your Honor, I would request a

2 sentence.  I'm on page 13.  This is Instruction 12.

3    THE COURT:  Um-hum.

4    MR. STRIANSE:  At the end of the second element

5 after, "purpose," period, I would ask the Court add this

6 sentence:  The government must prove beyond a reasonable doubt

7 that the defendant knew that he was acting in an unauthorized

8 manner or intended to do so.

9    THE COURT:  Well, I certainly tried to capture

10 that -- that concept.

11  Yeah.  Over at the end of the prescriptions definition

12 specifically said, The United States must prove that the

13 conspiracy included an agreement that the defendant or

14 co-conspirator would distribute controlled substances through

15 prescriptions that the defendant knew were not issued or

16 intended -- or intended -- the defendant knew -- or intended

17 not to be issued for legitimate medical purpose in usual

18 course of professional practice.

19  I certainly tried to capture that idea there.  Is that

20 adequate or not?

21    MR. STRIANSE:  Your honor, I would really like,

22 consistent with *Ruan*, to see the -- they have to prove beyond

23 a reasonable doubt that he was acting in an unauthorized

24 manner.

25    THE COURT:  Well, "authorized" -- "authorized" means

1    not in compliance with the reg, right?  That's what *Ruan* says.

2         MR. STRIANSE:  I'm trying to find "authorized."  Do

3    you have "authorized" in the instruction?

4         THE COURT:  Well, it's -- it's meant --

5    "authorization" is meant to be -- as I read *Ruan*, "authorized"

6    means in compliance with the reg.  The reg is within the usual

7    course for legitimate medical purpose.  So maybe we can craft

8    something to make that clear.

9         What do you think, Mr. Smith?

10        MR. SMITH:  A couple things.  One, yes, I think in

11   *Ruan* and otherwise -- I think there the Court's use of the

12   term "authorized" is clearly meant to just be a shorthand

13   for -- anybody who has worked in these cases, they know what a

14   pain it is to write those words over and over again.

15        THE COURT:  Yeah.

16        MR. SMITH:  I'm fairly -- fairly certain it was just

17   a drafting choice.  But in this case "authorized" does mean,

18   you know, for legitimate purpose by a practitioner acting in

19   the usual course of professional practice.  It's shorthand for

20   that, but I think it's proper to spell it out as the Court

21   has.

22        You do explain at the bottom of page 15, "Licensed

23   physicians are authorized to distribute controlled substances

24   through valid prescriptions," and then you explained what a

25   valid prescription is.  So we use the word "authorized" there.

1    I think that's clearly what's meant by "authorized" in *Ruan*.

2        There would be, you know, substantive benefit for putting

3    the word "authorized" there.

4        But I'll also state, just stepping back, too, this is a

5    conspiracy count, and we do not have to prove that the

6    defendant himself -- certainly what factually we've alleged,

7    not backing away from that, but as a legal matter, we don't

8    have to prove it was the defendant himself who was actually

9    outside the usual course of professional practice.  It's a

10   conspiracy to distribute controlled substances that were

11   issued in that format.

12        THE COURT:  Right.

13        MR. SMITH:  And so that's, for instance, why I think

14   the -- you just referenced in page 16 it's an agreement that

15   the defendant or a co-conspirator would distribute controlled

16   substances.  So I think that language might also confuse on

17   that issue.  In other words, it's -- it's -- somebody has to

18   be doing it that way.  It doesn't necessarily have to be the

19   defendant, and we could charge in theory a conspiracy with a

20   nonmedical professional and a doctor.  You wouldn't have to

21   prove that each of those persons wrote the prescriptions that

22   way.

23        THE COURT:  Yeah.  I think it -- I think it captures

24   it, Mr. Strianse.  I'm trying to see if there's a place to put

25   that in that doesn't make it confusing.

1          And you just want a tag at the end of Element 2?

2               MR. STRIANSE:  Yes, sir.  That -- that element deals

3     with him individually.  It seems like the appropriate spot.

4               THE COURT:  All right.  I'm going to think about

5     that.

6          What else do you have on 12?

7               MR. STRIANSE:  I don't have anything else on 12.

8               THE COURT:  Okay.

9          All right.  13, Mr. Smith?

10               MR. SMITH:  No objection.

11               MR. STRIANSE:  No objection.

12               THE COURT:  Okay.  Let's see.  Yeah, I'm not -- so,

13    you know, one option would be to list people who may have been

14    involved in the events that are not on trial.

15         I'm fine just leaving it "some of the people are not on

16    trial."

17         Are you okay with that, Mr. Smith?

18               MR. SMITH:  Yeah, I would prefer to leave it --

19               THE COURT:  Mr. Strianse?

20               MR. STRIANSE:  That's fine.

21               THE COURT:  Did include a venue instruction.  I'm not

22    sure -- I don't -- was that in your set, Mr. Smith?

23               MR. SMITH:  I confess I don't remember.  I don't know

24    the defense has asked for one.  I don't mind keeping it in.

25    Yeah.  I don't remember, Your Honor.  I apologize.

THE COURT:  Yeah.  Obviously, Mr. Strianse, it helps to get the full tender from the defense so I can kind of know what -- what people are wanting or not wanting.

Feels to me -- seems to me that it's probably -- it's probably something that ought to be included if -- if you want it.

MR. STRIANSE:  I would keep it.

THE COURT:  Okay.  All right.  15, Mr. Smith?

MR. SMITH:  Sorry, Your Honor.  No objection.

THE COURT:  Mr. Strianse?

MR. STRIANSE:  No objection to 16 [sic].

THE COURT:  16, Mr. Smith?

MR. SMITH:  No objection.

THE COURT:  Mr. Strianse?

MR. STRIANSE:  No objection, Your Honor.

THE COURT:  17, Mr. Smith?

MR. SMITH:  No objection.

THE COURT:  Mr. Strianse?

MR. STRIANSE:  No objection.

THE COURT:  Now, that last -- that last -- that one, two, three -- that fourth paragraph, acts that the defendant did -- "knowingly did or did not do," that -- "or did not do," that's bracketed in the pattern, sometimes included, sometimes not, depending on the proof.

I do think there is enough here -- enough allegations of

omitted behavior by Dr. Stanton that I think it's proper to include that. That's why -- that's why I included it, just by way of commentary.

All right. 18, Mr. Smith?

MR. SMITH: No objection.

THE COURT: Mr. Strianse, I know you have got an objection to that. Just go ahead and state it for me.

MR. STRIANSE: Your Honor, at Docket Entry 217, I submitted a written objection to that; so I'm going to rely on that.

Basically, the argument that I made is that the good faith instruction in general has the effect, in my view, of lessening and perhaps even shifting the burden of proof. And then in light of *Ruan*, I was making an argument that I thought that it denied Dr. Stanton due process and it is inconsistent with *Ruan*.

I didn't think that it could really logically and legally coexist with *Ruan*, and I focused on the knowing or intentional mens rea as applied by the statutes "except as authorized" clause.

So based on my written arguments, I do object to the deliberate ignorance.

THE COURT: All right. Mr. Smith?

MR. SMITH: Your Honor, I touched on this briefly earlier in the trial. We do believe it's appropriate. I

think it's consistent with both of the -- the recent
instructions that we have tendered to the Court both in the
Southern District of Ohio and the Middle District of
Tennessee.

Just, globally, deliberate ignorance and willful
blindness is a way under the law to prove a defendant's
knowledge.

All *Ruan* said was that the mens rea of knowledge now
clearly applies to the authorization language.  I don't think
there's anything about *Ruan* that is inconsistent with the
deliberate ignorance instruction.  I think, again, just like
any other case in which knowledge is required, if the facts
warrant it, it's appropriate to give an instruction of this
nature.  I think the facts do warrant it in this case, and I
can expand on that if Your Honor wishes.  But I think there's
a basis on the record to give it here, and I think it is
consistent with *Ruan*.

THE COURT:  Well, I -- so I've looked at it carefully
and studied it carefully.  I do think, you know, that
instruction is not -- not an automatic.  I do think it's a
pathway for the jury to find knowledge where knowledge is an
element of a particular crime.  There's got to be sufficient
evidence of action that would support that kind of description
of the defendant's conduct, and I -- I do think here with the
proof that there's been about accessing the record, what

1    records were reviewed, the patient packets, kind of the -- the

2    incomplete picture of the patient's entire history, you know,

3    Dr. Stanton saying he did not look at Maccarone's records and,

4    you know, didn't -- didn't go back or couldn't go back or

5    wouldn't go back.  But -- but I think there's enough there --

6    enough sort of stepping away from what the records would show

7    to fully evaluate and be brought to bear, that factually I

8    think it's supported.

9        Does -- does *Ruan* change things?  I told you my struggle

10   is making sure that I'm respecting what the Supreme Court says

11   on, you know, that mens rea being there.  And I read the case

12   carefully, and I don't see anything that says that *Ruan* should

13   be treated as a different variety or quality of knowledge.

14   It's knowledge or intent.  So I don't see any reason to think

15   that the -- that the -- the discussions in the Supreme Court

16   case from this circuit, the *Global-Tech* case from 2011 that

17   endorsed the instruction, the *Mitchell* case cited in the

18   commentary, and then I had a prior case kind of involving a,

19   you know, roughly comparable theory by the government, the

20   *Goulter* case.  I did give the instruction there.  The Sixth

21   Circuit affirmed it as appropriate in a case of this type.

22   Clearly not allowing it to be used as a pathway to finding,

23   you know, joinder in an agreement, or anything like that,

24   proving an agreement, but knowledge on the element of the

25   alleged unauthorized nature of the prescriptions I do think --

1  I do think is appropriate.  So I am going to give the

2  instruction.

3      It clearly -- relative to the objection that was filed, I

4  don't agree that deliberate ignorance allows a defendant to be

5  convicted on a "should have known" standard.  That's not what

6  it says at all.  In fact, the instruction expressly says that

7  carelessness or negligence or foolishness is not the same and

8  the defendant has to have deliberately, you know, taken a --

9  cast a blind eye to what was obvious.

10     So I understand the objection.  I appreciate what's

11  motivating it.  But I do think deliberate ignorance is

12  properly included as a pathway to finding knowledge.  So I

13  will -- I will include it as phrased.

14     All right.  The defense theory, I left that -- I left it

15  blank because I wanted to articulate it the way you would

16  want, Mr. Strianse.

17     Tell me your -- your thinking on No. 19.

18         MR. STRIANSE:  Your Honor, I was really more

19  interested in a good faith instruction than a defense theory

20  instruction.

21         THE COURT:  Okay.  We're certainly going to get to

22  that as well.  You can argue now if you want to.

23         MR. STRIANSE:  I, frankly, was not going to be

24  submitting a theory instruction.  I was hoping the Court was

25  going to consider a good faith instruction.

1      THE COURT:  Okay.  Go ahead and tell me your argument

2  on that.

3      MR. STRIANSE:  Your Honor, the instruction that I put

4  together at Docket Entry 218 I think is supported by the cases

5  that I know the Court is aware of, *Volkman*, *Godofsky*, and then

6  also with some language that I added, *Ruan*, and there was

7  another case from the Western District of Kentucky, *Johnson v.*

8  *United States*.

9      I think that it's appropriate in this type of a case to

10  instruct the jury as to the good faith of the physician where

11  the jury is at least invited to recognize that, if there are

12  flawed attempts to comply with professional medical practice

13  or even mistaken beliefs that the prescriptions were for

14  legitimate medical purpose as to a patient's medical needs,

15  that good faith and the context of good faith in these cases,

16  good intentions, honest exercise of professional judgment is

17  an appropriate instruction for the jury to receive in a case

18  like this.

19      THE COURT:  Mr. Smith, what do you say?

20      MR. SMITH:  Your Honor, I do not believe a good faith

21  instruction is appropriate in this case or necessary going

22  forward.  I think, again, as I mentioned earlier in the trial,

23  *Ruan* was kind of a confusing procedural posture where the

24  government kind of advocated for something like an objective

25  good faith standard.

1    The Supreme Court was uniformly not impressed with that

2    idea, and understandably so, not to speak against my own

3    client, but the idea is there's nothing in the statute or

4    anywhere else that talks about good faith.

5    There is language for more and some other jurisprudence

6    where this was kind of plucked from, but ultimately I think

7    what the Supreme Court said is all those concerns and this

8    concerns about what a doctor knew or are they close to the

9    line, the way to address that is we make very clear that the

10   knowledgeable element applies to the authorization.  We have

11   done that in these instructions, and there's no reason to kind

12   of talk about judicially created standard otherwise.  It's not

13   in the law.  It's not in the statute.  And there's no reason

14   to instruct on it.

15   Admittedly, there was some confusing precedent in the

16   Sixth Circuit on this point.  *Volkman*, as you know, approved

17   of the district court's instructions and then referred to

18   those as a model or model of clarity, something to that

19   effect.

20            THE COURT:  Yes.

21            MR. SMITH:  Puts district judges in the position of

22   "I should probably follow that."

23   And then *Godofsky* comes along and basically talks about,

24   well, to the extent we called that a model, maybe not so much

25   because it -- and, again, understandably so because of the way

1   it actually works out in practice.

2       But kind of the take away was that a good faith

3   instruction, even under that old regime, is not required; it

4   wasn't necessary and, indeed, you know, I don't think was

5   given in every case.

6       But either way, I think now that we're in kind of

7   post-*Ruan,* the knowledge is very clearly in the elements of

8   the offense, that's the motive, that's -- there's no reason

9   otherwise to give a good faith instruction.

10      It's not really a legal instruction.  Everything that the

11  defense just articulated there I think is certainly a fair

12  closing argument.  You can argue against a finding of

13  knowledge because I was mistaken about this or I in good faith

14  believed that.  Those are factual assertions.

15      But I don't think we need to -- if that was enough to

16  give a good faith instruction, then I imagine you could give a

17  good faith instruction in every case that has a knowing mens

18  rea, and I just don't think that's appropriate.

19          THE COURT:  All right.  Well, I mean, it is

20  interesting because we, you know -- we have all lived under

21  *Volkman*, I think *Godofsky*.  I think that was Judge Caldwell's

22  case, was it not, from this district?

23          MR. SMITH:  I believe it was.

24          THE COURT:  I think *Godofsky* is one of the cases in

25  front of her.

1    You know, we all thought the Supreme Court was going to

2    decide on just the propriety of that instruction.  I think

3    that's really what the case went up on, and I think the

4    result -- the decision was surprising -- maybe the ultimate

5    holding wasn't surprising as a matter of logic, but them

6    deciding that issue is a little bit surprising to me.  I think

7    it was surprising to the dissent as well.

8        I think my reaction is, you know, if you read the

9    majority and the majority in *Ruan* said none of those words

10   appear in the statute.  Good faith is not in there.  And the

11   Court said, look, we're going to protect -- we're going to

12   protect the idiosyncratic practitioner by saying, to be

13   criminally liable, he has to have intended to write outside

14   the scope or he has to have known that his scripts were

15   outside the scope.

16       So that tells me, you know, if he's idiosyncratic but --

17   and as a result does not understand that he's outside the

18   scope, then he's not going to be liable.  That's -- that's

19   what *Ruan* says to me.

20       I think using good faith now doesn't square with the

21   majority.  It also doesn't square with the dissenting opinion

22   because neither one of them uses the framework or verbiage

23   that the good faith instruction would, as typically formulated

24   would import.

25       Even the tendered instruction, Mr. Strianse, by you says,

"It means that the defendant acted in accordance with what he reasonably believed to be proper medical practice."

Well, that clearly is not *Ruan*.  I mean, *Ruan* clearly says it doesn't -- it doesn't have to be a reasonable standard.  It's subjective knowledge.

So I definitely tried to capture that in 12, and I understand the request for the good faith instruction, but I don't think under the *Ruan* framework and regime that it any longer is appropriate.

I think the government has got to prove knowing or intentional prescription writing outside authorization.  Authorization means for legitimate medical purpose in usual course of professional practice.  I think that's it.  That's the whole -- that's the whole thing on standard.  So I'm not going to give the separate good faith instruction.

I know the other courts dealing with it have not been giving that instruction.  I think that's right.

I also think it's completely fair and proper for Mr. Strianse to say, look, if Dr. Stanton believed he was writing good prescriptions, if he believed that the clinic was writing good prescriptions, he's protected and that's -- that's lawful.

And, I mean, the Court said the farther a writer -- prescription writer is from recognized norms, the more likely it is he knows that his prescriptions are bad.  But that's for

1    the jury to decide on.

2         So I think the concept is built in, but I'm not going to

3    give a separate instruction on it is the bottom line.  So

4    that's where I am on that.

5         So you don't want a separate defense theory?

6              MR. STRIANSE:  No, Your Honor.

7              THE COURT:  Okay.  All right.  No. 20, Mr. Smith?

8              MR. SMITH:  No objection.

9              THE COURT:  Mr. Strianse?

10             MR. STRIANSE:  No objection.

11             THE COURT:  All right.  21 he did testify, and so

12   that will apply.

13        Anything on that language, Mr. Smith?

14             MR. SMITH:  No, Your Honor.

15             THE COURT:  Mr. Strianse?

16             MR. STRIANSE:  No, Your Honor.

17             THE COURT:  22 we'll drop.  It's inapplicable.

18        23, impeachment by prior inconsistent statement.  I

19   normally do list witnesses there.  I'm not sure we really had

20   much on that.  Maybe Emilie Jackman.

21        Who else would you think, Mr. Smith?

22        Do you have a final witness list?

23             MR. SMITH:  Your Honor, I confess -- I was looking at

24   this before.  I was not able to articulate one that I thought

25   was really impeachment of an inconsistent statement that

certainly was of consequence that the jury would remember.

I know that there were occasional uses -- as we discussed so many sets of urine objections, uses of those reports to kind of refresh and then have people testify to them, but I don't remember a true kind of inconsistency that was like a 180 about-face in this trial, as far as I can remember. And I apologize if I'm just misremembering.

THE COURT: You don't think it applies, period. What do you think, Mr. Strianse?

MR. STRIANSE: Yeah, perhaps Ms. Armijo. She was a little bit all over the map as to whether things at GMA were hidden to Dr. Stanton.

When I had her on cross-examination, I think she pretty clearly admitted that things were hidden from Stanton, and then on redirect, she -- she's been I think in the interviews flipping back and forth, and then she flipped back and forth in her testimony before the jury.

THE COURT: So she's the one that you had a phone conversation with and -- is that the one?

MR. STRIANSE: Yes. Ms. Marsh was meeting with her in person, and I was joining them by telephone.

THE COURT: What do you think of that, Mr. Smith? I mean, it wasn't proven up. The language of the instruction is she may have made a statement that may be different. So it's pretty spongy anyway.

1          MR. SMITH:  Yeah.  That one I actually do feel pretty

2   strongly about.  That was a witness who testified to objective

3   facts, things she saw, things she did.

4          This happened in pretrial preparation, as well, just as

5   in context.  And when we met her, it was, you know, I never

6   saw anything like that; I gave him the results, I handed him

7   these sheets; I got yelled at if I didn't have everything in

8   there.  But, you know, meeting with defense counsel, I felt

9   like I was asked about this a lot, and I said, you know, I

10  don't know -- knowing what kind of person Emilie is like.  She

11  never had any information that that ever happened.

12         Her, I guess, statement on cross was that she had said,

13  like, it could have happened.  I don't have the exact

14  language.  But then I elicited, as you'll recall, Your Honor,

15  the chronology of the events there was that both counsel and

16  Dr. Stanton himself, by the way, contrary to the conditions of

17  his bond, had contact with this witness, and she said that was

18  really like the first time, you know, the suggestion of this

19  idea was in her head.

20         So I don't think any of that -- I think it's pretty

21  fraught to consider that an inconsistent statement because

22  it's somewhat manufactured to begin with.

23         I don't think that she was at all inconsistent throughout

24  about what she actually saw or heard or did.  It was just this

25  more kind of, as she expressed very clearly, how did you feel

1   when he was asking those questions; she just said confused.

2      So I'm a little bit concerned, of all the witnesses, you

3   know, of pulling that one out and highlighting her. That's

4   going to signal pretty hard to the jury, oh, there must be

5   something wrong with this witness, and I don't think there was

6   based on her testimony.

7      THE COURT: Okay. Is Armijo the only one you want,

8   Mr. Strianse?

9      MR. STRIANSE: That was the only one that came to

10   mind.

11      THE COURT: All right. I'll give some thought to

12   that.

13     Okay. No. 24, opinion testimony. So I would be inclined

14   to list Jill Lee and Dr. King.

15     Who else is proper for that, Mr. Smith?

16      MR. SMITH: Your Honor, I believe it's just those

17   two.

18      THE COURT: Do you agree, Mr. Strianse?

19      MR. STRIANSE: Yes, Your Honor.

20      THE COURT: King's first name is Timothy?

21      MR. SMITH: Correct, Your Honor.

22     Lee is Jill, J-i-l-l.

23      THE COURT: Jill, yeah. All right.

24     And everything okay on the language of that for both

25   sides, Mr. Smith?

1    MR. SMITH:  Yes, Your Honor.

2    THE COURT:  Mr. Strianse?

3    MR. STRIANSE:  Yes, sir.

4    THE COURT:  All right.  The dual role, I think that

5    was only Sizemore, I believe, is the only time I gave it.

6    MR. SMITH:  That's correct, Your Honor.

7    THE COURT:  Do you agree, Mr. Strianse?

8    MR. STRIANSE:  Yes, sir.

9    THE COURT:  Are you okay with the language,

10   Mr. Smith?

11   MR. SMITH:  Yes, Your Honor.

12   THE COURT:  Mr. Strianse?

13   MR. STRIANSE:  Yes.

14   THE COURT:  All right.  So No. 26 is, you know,

15   generally meant to capture, you know, witnesses with some hope

16   or expectation of a break.

17   MR. SMITH:  Your Honor, I apologize for interrupting.

18   I'm thinking about this going back to 25.  Did we give that

19   instruction for Jill Lee?  Do you remember?  I don't think we

20   did.

21   THE COURT:  I don't think we did.

22   Did we?

23   MR. SMITH:  Okay.  I just want to be consistent.

24   THE COURT:  You think it should be given here?

25   MR. SMITH:  The reason I pause is that she talked

about red flags, principles, and all that. And then she talked about her review in this case.

As I think about it, the reason I'm pausing, when she did it initially for Dr. Maccarone, it was in the context of the investigation. So it was -- it's just kind of a weird part of her job where she really is just an expert, but she works -- she wasn't retained and sent a bunch of files like we normally would. But it's the same type of work you do as an expert witness and all that.

So I still think it's fair to consider that all opinion testimony, and especially with Stanton's case it was a little bit more typical, sent data, asked to opine. I don't think she's testifying for facts, but I just wanted to bring that to the Court.

THE COURT: I feel okay about that. Do you feel okay about that, Mr. Strianse?

MR. STRIANSE: Yes, sir.

THE COURT: Okay.

26, I do often list people on this one, and so I have got listed Maccarone, Ghent, Prince, and Pasternak.

A, any problem with that list or request to enlarge it, Mr. Smith?

MR. SMITH: No. That's the list.

THE COURT: Mr. Strianse?

MR. STRIANSE: No problem with the list.

1          THE COURT:  The language look okay, Mr. Smith?

2          MR. SMITH:  Yes, Your Honor.

3          THE COURT:  Mr. Strianse?

4          MR. STRIANSE:  Yes.

5          THE COURT:  All right.  Accomplice testimony, there,

6   also, I think Prince, Maccarone, and Ghent potentially could

7   be listed.  What's your view on that, Mr. Smith?

8          MR. SMITH:  I'm fine with that also.  Just to be

9   safe, if we want to list Pasternak as well.  He wasn't charged

10  in this case obviously, but you heard his testimony about

11  conduct.

12         THE COURT:  What do you think, Mr. Strianse?

13         MR. STRIANSE:  Probably the same list.

14         THE COURT:  Okay.  Any suggestions on the language,

15  Mr. Smith?

16         MR. SMITH:  No, Your Honor.  I'm fine with it.

17         THE COURT:  Mr. Strianse?

18         MR. STRIANSE:  No, Your Honor.

19         THE COURT:  All right.  Statements by the defendant,

20  probably applies given the phone call.

21      Anything on that, Mr. Smith?

22         MR. SMITH:  Looking -- yeah, this looks good, Your

23  Honor.  Thank you.

24         THE COURT:  Mr. Strianse?

25         MR. STRIANSE:  No objection.

1    THE COURT:  Okay.  29 is -- we had a lot of different

2    kinds of summaries and nonevidentiary pieces.  It probably

3    would be more confusing to list all of them.  We can try to do

4    it if you guys want, or we can leave it, "You have seen

5    summaries," etcetera, not make a specific reference.  I don't

6    feel strongly about it.

7         What do you think, Mr. Smith?

8         MR. SMITH:  No, Your Honor.  I think that's the

9    benefit of giving the mid-trial instruction.  It's

10   contemporaneous, and I think it's fine not to list it.

11        THE COURT:  Do you agree with that?

12        MR. STRIANSE:  Fine not to list.

13        THE COURT:  Same for the secondary-evidence

14   summaries?  You gave one or two ways, identify them or just

15   kind of refer back in the jurors' minds to the trial

16   instruction.

17        Mr. Smith?

18        MR. SMITH:  I would prefer just to refer back.

19        THE COURT:  Mr. Strianse?

20        MR. STRIANSE:  That's fine.

21        THE COURT:  All right.  So I tried to capture kind of

22   the role of the Tennessee law here.  It was displayed.  It was

23   talked about.  I just wanted to put it in its proper place

24   here.  That's what I was endeavoring to do.

25        What's your view on that one, Mr. Smith?

1        MR. SMITH: I think it's -- yeah. I'm generally in

2   favor of the approach. I'm a little concerned about the last

3   sentence in paragraph 1. I think it's correct, and I

4   understand why it's in there.

5        Obviously, you know, just being outside of an acceptable

6   practice regulation, statute, guidelines is not enough. We

7   have to prove knowledge.

8        My first read on it was that it gave me pause because I

9   fear a juror might read that and say, "I definitely think the

10   prescriptions were outside these regulations, but it's got to

11   be something above that somehow."

12        And I understand what Your Honor is saying. I think it

13   is more these help define the course of professional practice.

14   Still got to find what you say in the next paragraph, which is

15   about knowingly, but I just don't want it to be inferred that

16   the standard is something above those regulations, guidelines,

17   etcetera, because I think those do fairly help Your Honor

18   capture and articulate what the standard is.

19        THE COURT: How about if we added to the end of that

20   first paragraph something like Instruction 12, defines the

21   elements of the charge, or something like that?

22        MR. SMITH: That's fine.

23        THE COURT: All right. Any other requests from you

24   on 31?

25        MR. SMITH: No, Your Honor.

1          THE COURT:  Mr. Strianse, what do you think?

2          MR. STRIANSE:  Would you consider adding some

3     language to the second paragraph, the "however" paragraph,

4     last sentence, that sort of harmonizes it with *Ruan*?

5          THE COURT:  What do you suggest?  Because that's what

6     I was trying to do, inartfully, perhaps.

7          MR. SMITH:  Your Honor, would you be opposed to

8     saying that the statutes and regulations may be used in

9     determining or outlining what the usual course of -- you know,

10    defining the course of professional practice, and then next

11    sentence, you know, the government still maintains the burden

12    to prove the defendant acted outside -- acted in an

13    unauthorized fashion?

14       That would make the point for the defense clearer and

15    perhaps the point I was making.

16         THE COURT:  Tell me where you would want what.

17         MR. SMITH:  So just in that second -- that second

18    paragraph, two sentences.  The first would be the statutes and

19    regulations may be relevant in determining, you know, or

20    defining the course of professional practice, period.

21       And then the next would be, you know, the government

22    still has the burden to prove that the defendant acted with

23    the knowledge and intent, and the rest of it from there.

24         THE COURT:  What do you think, Mr. Strianse?

25         MR. STRIANSE:  I think after, "professional

1   practice," I would lift the period and add, "and was acting in

2   an unauthorized manner or intended to do so."

3          THE COURT:  Okay.  I'll do some work on that and send

4   you guys a red line on it.

5          MR. SMITH:  Was the proposal to add it after the word

6   "professional practice"?  Is that what I just heard?

7          MR. STRIANSE:  Yes.

8          MR. SMITH:  I think that would be a little bit

9   confusing if you are suggesting "unauthorized" is something in

10  addition to or separate from the others.

11         THE COURT:  Right.  I'm very dialed in on the

12  equation there.

13         MR. SMITH:  Fair enough.

14         THE COURT:  And I understand -- I understand the

15  value in using the word because, you know, that is the word in

16  the statute.  So I'm just trying to, you know, balance, you

17  know, that accuracy in defining what the jury has got to find

18  without, you know, surplusages or, you know, unnecessary

19  additions.

20      Okay.  I'll do some work on that.

21      Anything else on 31, Mr. Smith?

22         MR. SMITH:  No, Your Honor.

23         THE COURT:  Mr. Strianse?

24         MR. STRIANSE:  No, Your Honor.

25         THE COURT:  32 I think you requested, Mr. Smith?

1      MR. SMITH:  Yes, Your Honor.

2      THE COURT:  Anything on that?

3      MR. SMITH:  I agree with its inclusion.  It's based

4   on principally the three things the jury has heard about.

5   First the letters that were authored immediately following the

6   search warrant; the second, the very statements given to

7   Investigator Sizemore, and, third, the testimony from

8   Ms. Quinlin, the newspaper reporter in which statements were

9   made there as well.

10      THE COURT:  All right.  Mr. Strianse?

11      MR. STRIANSE:  The instruction makes me uncomfortable

12   because it appears as if the Court has made a determination

13   that he, in fact, made false exculpatory statements the way

14   that introductory sentence reads, "you have heard testimony

15   that after the crime was supposed to have been committed, the

16   defendant made false exculpatory statements."

17      THE COURT:  How about allegedly made?

18      MR. STRIANSE:  That helps.

19      THE COURT:  Yeah.  I'm certainly not intending to

20   convey that I've made any findings.  So I think that's the

21   language in the pattern.

22      MR. SMITH:  It should be, Your Honor.  I pulled it

23   out of the pattern instruction.  I don't believe I --

24      THE COURT:  Yeah.  It's the -- You have heard after

25   the crime was supposed to have been committed, the defendant

1    blank, and the blank is fill in whatever the allegation is.

2         So I do think it's better to say "allegedly made false

3    exculpatory statements."  So I'll certainly include that.

4         Anything else on that language, Mr. Strianse?

5              MR. STRIANSE:  No, Your Honor.

6              THE COURT:  33, anything on that, Mr. Smith?

7              MR. SMITH:  No objection.

8              THE COURT:  Mr. Strianse?

9              MR. STRIANSE:  No objection.

10             THE COURT:  34, I don't think we had a stipulation,

11   right?  No stipulation.

12             MR. STRIANSE:  I don't think so.

13             MR. SMITH:  I don't think so.

14             THE COURT:  I'll drop 34.

15        No judicial notice.  I'll drop 35.

16        And then the balance of these are meant to be pretty

17   standard.

18        Anything on 36, Mr. Smith?

19             MR. SMITH:  No objection.

20             THE COURT:  Mr. Strianse?

21             MR. STRIANSE:  No objection.

22             THE COURT:  37, Mr. Smith?

23             MR. SMITH:  No objection.

24             THE COURT:  Mr. Strianse?

25             MR. STRIANSE:  No objection.

1         THE COURT:  38, Mr. Smith?

2         MR. SMITH:  No objection.

3         THE COURT:  Mr. Strianse?

4         MR. STRIANSE:  No objection.

5         THE COURT:  39, Mr. Smith?

6         MR. SMITH:  No objection.

7         MR. STRIANSE:  No objection.

8         THE COURT:  40, Mr. Smith?

9         MR. SMITH:  No objection.

10        THE COURT:  Mr. Strianse?

11        MR. STRIANSE:  No objection.

12        THE COURT:  41, Mr. Smith?

13        MR. SMITH:  No objection.

14        THE COURT:  Mr. Strianse?

15        MR. STRIANSE:  No objection.

16        THE COURT:  42, Mr. Smith?

17        MR. SMITH:  No objection.

18        THE COURT:  Mr. Strianse?

19        MR. STRIANSE:  No objection.

20        THE COURT:  43, Mr. Smith?

21        MR. SMITH:  No objection.

22        THE COURT:  Mr. Strianse?

23        MR. STRIANSE:  No objection.

24        THE COURT:  44, that's relating to the forfeiture,

25   just to give the jury notice, you know, that something else

1    might be coming.

2         Any objection on that, Mr. Smith?

3              MR. SMITH:  No, Your Honor.

4              THE COURT:  Mr. Strianse?

5              MR. STRIANSE:  No, Your Honor.

6              THE COURT:  45, Mr. Smith?

7              MR. SMITH:  No objection.

8              THE COURT:  Mr. Strianse?

9              MR. STRIANSE:  No, Your Honor.

10             THE COURT:  All right.  Any other requests or

11   instructions, Mr. Smith?

12             MR. SMITH:  None, Your Honor.

13             THE COURT:  Mr. Strianse?

14             MR. STRIANSE:  Judge, I would like to go back --

15   since the Court is not going to give a good faith instruction,

16   I had one other point on page 13.

17             THE COURT:  Okay.

18             MR. STRIANSE:  Instruction 12.  Would you consider my

19   request Element 2 adding the language that I had mentioned

20   earlier that I think really is the essence of the holding in

21   *Ruan* and the conclusion in *Ruan*, the language right after

22   "purpose," period?  Government must prove beyond a reasonable

23   doubt that the defendant knew that he was acting in an

24   unauthorized manner, comma, or intended to do so.

25             THE COURT:  What does "unauthorized" mean to you

under *Ruan*?

MR. STRIANSE:  It -- it -- to me it's a higher consciousness of guilt, that the provider is making a conscious decision to act outside of his authorization under the CFR and basically making a conscious decision to abandon his duty as a physician and prescribe unauthorized Schedule II prescriptions.

THE COURT:  Well, you can't define -- you can't define authorized or unauthorized by the use of the word authorized.

MR. STRIANSE:  Right.  I didn't mean that.  What I meant was --

THE COURT:  Is it any more than or less than violating the reg boundary?  Isn't the reg boundary what -- what defines authorization in this context?

MR. STRIANSE:  It does, but, I mean, the Supreme Court said what they said, and if I'm -- the language that I read in *Ruan* was that this is a direct quote, "The government must prove beyond a reasonable doubt," that same language.

So that's why, to make sure that I'm protecting the record.

THE COURT:  Sure.  No, and I appreciate that.  I am going to look -- I am going to look at that and consider making -- making a change to No. 12.

All right.  Okay.  I got a few things to go back and tend

1    to and resolve.

2        What I'll do is I'll send you a red line as soon as we

3    finish, and then I would like you to look at that tonight and

4    just email my chambers on whether you have any further

5    objection.  You don't have to restate your prior objections

6    once you see what I do.

7        Any further objection or changes that you want or, you

8    know, you are just -- you are standing pat on your prior

9    position but you don't have anything new, that's fine.

10       I just -- it will help us to know tonight so that we

11   can -- if we need to confer again early in the morning, I'll

12   be here by 8:00.  I would ask everybody to be here by 8:00.

13   That way we can get together on it.

14       If there's nothing else to take up, then we won't get

15   together until right before -- right before the jury comes in.

16       But if there is anything else we need to hammer out in

17   the morning, you know, I want to know early to be able to

18   hammer that out at 8:00 to give us time to get those

19   instructions put together.

20       So long and short, I'll email you the red line by, you

21   know, 7:30 or so.  It would help me to hear from you tonight,

22   you know, sometime before midnight so that we can tend to it

23   in the morning and take the steps we need to.

24       So I know you'll all be working anyway doing something.

25   So if you just look at the red line, see if you got anything

1   new on that, that would be helpful to me.

2       All right.  And then I haven't looked at the forfeiture

3   instructions yet because I wasn't sure, you know, whether that

4   would need to be evaluated.  So I'll be -- I'll try to look at

5   those as well.

6       Probably what we'll do is, as soon as we finish tomorrow,

7   get the jury off deliberating, we'll need to spend some time

8   just going through those.

9       So it would -- it would help, Mr. Strianse, for you to

10  look at the government's tender.  Ours will be similar to

11  that.  And we'll spend some time nailing that down if it comes

12  to pass that the jury has to take up that additional subject

13  matter.

14      All right.  Madam Clerk, do you have all the exhibits?

15          COURTROOM DEPUTY:  Yes, Your Honor.

16          THE COURT:  And have the parties signed off on the

17  computer and taken a look at that?

18          COURTROOM DEPUTY:  Not yet.

19          THE COURT:  Be sure you have done that before it's

20  time to hand it over to the jury to make sure everything is

21  working properly.

22      What else do we need to take up, Mr. Smith?

23          MR. SMITH:  Nothing, Your Honor.  Thank you.

24          THE COURT:  Mr. Strianse?

25          MR. STRIANSE:  Nothing further.

1          THE COURT:  Thank you very much.

2     We'll send this out and hope to hear from you tonight on

3  that.

4     I will be here at 8:00 in the morning to take up anything

5  last minute on the instructions.

6     Thank you very much.

7          COURTROOM SECURITY OFFICER:  All rise.  Court is in

8  recess.

9          THE COURT:  Can we go back on for just a second?

10     I should have asked about the verdict form.  Anything on

11  the verdict form, Mr. Smith?

12          MR. SMITH:  I did get it.  No objection.

13          THE COURT:  Mr. Strianse?

14          MR. STRIANSE:  No objection.

15          THE COURT:  Thank you.

16     (Proceedings continued to August 30, 2022, at 9:00 A.M.)

17                      REPORTER'S CERTIFICATE

18          I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
19

20                                   Date:  12/8/2022
   /s/ Kathleen Maloney, RMR, FCRR
21        United States Court Reporter

22

23

24

25

1

<u>INDEX</u>

2

<u>DEFENSE WITNESSES</u>                                      <u>PAGE</u>
JOHN STANTON
3  Direct Examination.............................. 36
   Cross-Examination............................... 190
4  Redirect Examination............................ 253

5  TONIA HUMPHREY
   Direct Examination.............................. 258
6  Offer of Proof.................................. 265
   Cross-Examination............................... 270

7

   JENNIFER BOPP
8  Direct Examination.............................. 272
   Cross-Examination............................... 274

9

10 TIMOTHY KING (Rebuttal)
   Direct Examination.............................. 285
11 Cross-Examination............................... 303

12

                            - - -

13

14 <u>DEFENSE EXHIBITS</u>

15

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
16
| 1A | Photograph. Gateway Medical Associates | 71 | 72 |
17
18
| 1B | Photograph. Gateway Medical Associates | 71 | 72 |
19
| 1C | Photograph. Gateway Medical Associates | 71 | 72 |
20
21
| 1D | Photograph. Gateway Medical Associates | 71 | 72 |
22
| 1E | Photograph. Gateway Medical Associates | 71 | 72 |
23
24
| 1F | Photograph. Gateway Medical Associates | 71 | 72 |
25
| 1G | Photograph. Gateway Medical | 71 | 72 |

1          Associates

2      **Exhibit**   **Description**                        **Identified** **Admitted**
       1H          Photograph.  Gateway Medical            71          72
3                  Associates

4      1I          Photograph.  Gateway Medical            71          72
                   Associates
5
       1K          Photograph.  Gateway Medical            71          72
6                  Associates

7      1J          Demonstrative.   Injections             84
                   Stanton could perform at GMA
8
       2           Demonstrative.   Charts/Info            90
9                  Tennessee pain guidelines

10     3           Demonstrative.  Chart notes.            98
                   J. Ghent
11
       4           Demonstrative.   Chart notes.           101
12                 J. Pooler

13     5           Demonstrative.  Chart notes.            101
                   L. Waynick
14
       8           Chart.  M. Brown                        101
15
       9           Chart notes.  A. Fralix                 102
16
       11          Dr. Stanton's DEA license               188         189
17

18
                              - - -
19

20

21

22

23

24

25